IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - X

JON D. KATZENMEIER and JULIE KATZENMEIER, Husband and Wife,

Plaintiffs,

vs.

BLACKPOWDER PRODUCTS, INC., a Corporation, d/b/a CONNECTICUT VALLEY ARMS; and DIKAR S. COOP, LTDA,

Defendants.

- - - - - - - - - - - - - - - X

Case No. 4:06-cv-00169

MOTIONS TRANSCRIPT

Magistrate Courtroom, Fourth Floor
U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa
Friday, November 14, 2008
9:00 a.m.

BEFORE: The Honorable ROSS A. WALTERS, Magistrate Judge.

APPEARANCES:

For the Plaintiffs:

GARY A. EATON, ESQ.
WILLIAM E. SPARKS, ESQ.
Eaton & Sparks
1717 East 15th Street
Tulsa, Oklahoma 74104

THOMAS J. DUFF, ESQ.
Duff Law Firm, PLC
319 Seventh Street
Suite 600
Des Moines, Iowa 50309

For the Defendants:

JAMES E. SINGER, ESQ.
Bovis, Kyle & Burch, L.L.C.
200 Ashford Center North
Suite 500
Atlanta, Georgia 30338-2668

RICHARD J. KIRSCHMAN, ESQ.
Whitfield & Eddy, P.L.C.
317 Sixth Avenue
Suite 1200
Des Moines, Iowa 50309-4195

P R O C E E D I N G S

THE COURT: We'll go on the record.

MR. SINGER: Thank you. May it please the Court. I won't rehash what's in the briefing, because I think it's fairly straightforward, and I'll just take this opportunity if I might to respond--to highlight and to respond to the plaintiff's position with respect to our motion as set forth in their response brief.

First, I think it's critical, as you've just heard in the pretrial discussions, this case is first and foremost a manufacturing defect case, and then there's questions as to design and, to a certain extent, testing and so forth.

We set forth that Mr. Wakeman was unqualified to give any opinions on manufacturing or design, those type of issues.

We showed that under Daubert and its progeny he didn't meet any of the criteria, and his opinions were unreliable and untrustworthy and just mere speculation. He didn't have any testing, he didn't have any analysis, he didn't do any experiments, et cetera, et cetera.

In the face of that, they remain silent on those issues with respect to any qualifications in their brief. And in addition to that, they conceded that he's not going to testify on certain of those issues. So I think that I'm not going to really address those.

I just put those to bed and highlight it that with

respect to the main issues of design and manufacture, our position is that it's been conceded that he certainly is unqualified, unreliable and can't testify.

From their brief they say that he is able to testify on--and I'll quote--industry, custom and practice of proof testing and proofmarking; and, B--that was A--and why the official proofmark--the, quote, official proofmark, close quote, engraved on, quote, unproofed barrels, close quote, is deliberately misleading.

And so addressing their contention that he might still somehow be able to come as a witness in this trial and testify to those things, very briefly, I think not only their response but certainly what we've set forth is pretty straightforward.

He is unqualified on those. It's not-- Even if he were qualified, it's not something that would be appropriate for the jury in the facts of this case. And then, third, it's unreliable. He doesn't have a nexus between what he might possibly be qualified to and/or have done and the opinions in this case.

And real quickly I'll run through those.

They say with respect to the nature of his unqualifications that he's shot guns before and he's used guns for years, that he consulted with other people on gun issues, that he's studied literature, and that, look at his resume, he's familiar.

In response to that, I respectfully submit that nothing addresses his qualifications on the issue of proof testing, quote-unquote, proofmarking, quote-unquote, and the issue that he wants to testify to, which is the custom and industry and the fact that--or lack thereof--that these were, quote-unquote, proofmarks.

He has never designed a muzzleloader. He's never manufactured a muzzleloader. He's never been to a proofhouse. He's never, quote-unquote, proof-fired a gun from a manufacturer. He's never proofmarked a gun because he says it's supposed to be done by the proofhouse.

The mere fact that he says in his resume, which is the only qualification they point to is that he's, quote-unquote, familiar, that doesn't carry the day under the line of cases.

The fact that he's familiar without a foundation of what he's familiar with and how, and without any specifics to show it, does not meet their burden of showing any type of qualification, and, in fact, it highlights the fact that his experience is that he's not properly qualified.

And then particularly that's true here when his testimony is, as we pointed out, that part of his alleged qualifications come from his looking on the Internet at what is in French about Spain, and then looking on the Internet at what other people say about that in translation.

He's not a Spanish lawyer. He's not a Spanish

manufacturer. And he readily concedes each and every bit of that, and he's not a member of the C.I.P. So it goes to the very essence of his qualifications.

Now, second, under the line of cases his opinion must be useful and helpful to the jury under Daubert and its progeny.

I think what they say in their reply brief is because this goes to custom, you don't have to meet this requirement.

We respectfully submit that that's wrong for a couple of different reasons.

First, they cite some state law cases dealing with custom, and we're under federal law here, under the Federal Rules of Evidence, not state court. And Kumho Tire makes it very clear that when you're talking about expert testimony, it applies whether you're talking about scientific knowledge or any other kind of experience or knowledge or expert testimony.

So you can't just say, well, he doesn't have to be qualified because there's an Iowa state court case that says somebody can testify on custom without being qualified.

That's not the federal law, and it's directly contrary to Kumho and those kinds of cases.

Here, though, it's also particularly inapplicable and irrelevant and therefore not helpful to the jury even if you assume some qualifications because of the following.

It is undisputed that there is no custom or industry standard for proof-firing U.S. muzzleloaders. There's no proof-

testing requirement for a U.S. muzzleloader. There's no proof-testing procedure for a U.S. muzzleloader. There's no proofmark requirement for U.S. muzzleloaders. There's no proofmark procedure for U.S. muzzleloaders, and there's no government proofhouse.

If you look at the industry, there's likewise no industry standard to do it and there's no industry procedure.

If a person sat down and said, I want to proof-fire and proofmark a gun today in the U.S., a muzzleloader, where do I look? What do I do? There's nothing out there that describes that.

And that's all uncontroverted. So when you look at what he wants to say is he wants to go back to what Spain does or the C.I.P. nations do for Spanish guns that are radically different from the U.S. guns.

That's not relevant to the jury's question in this case, for example, that everybody concedes it was manufactured in Spain, sure, but it was designed solely for the U.S. market. It was sold exclusively to the U.S. market, the whole market. It was never sold in a C.I.P. nation.

THE COURT: As I understand the proof testing, where it's done normally consists of firing a firearm with an overload charge; is that correct?

MR. SINGER: Yes, Your Honor. And I think that that's--that gets to the facts that I think that also if you

were assuming he's qualified, if you look at this alleged question of whether or not he can testify that there's an industry custom and practice of proof-testing and proofmarking, the reason it's not relative to the jury for this case goes to that very point.

I concede because it's in our depositions and in our procedures manual for purposes of this motion that for guns made in C.I.P. nations, muzzleloaders and particularly those made to stay in the country of Spain, what the Spanish proof house requires under that evidence is the following: A, quote, overpressure load of 20,000 psi.

And the reason for that is the way they use them over there. They don't use pellets like we use over here. They don't using magnum loaders like we do over here.

So a load in a C.I.P. nation, an anticipated load is less than 20,000 psi, and so a proof load is 20,000 psi. It's over pressured.

All right. And they require that guns made over there and sold over there be proofed at that level, and every gun made and sold there for use there has to be fired at that level, and a certificate goes along with it in the gun, and it accompanies it.

THE COURT: And that's what the proofmark symbolizes, that it's been tested?

MR. SINGER: Well, that's the question. A proofmark

would symbolize that if the Spanish proofhouse puts it on, and they do.

Okay. Now, this is what's different. In the U.S. when there is no certificate requirement and no proofing requirement, and when the gun can generate up to 25,000 psi, okay, not less than.

THE COURT: Let me ask you a question. Is the gun supposed to be-- Is there some standard that it's supposed to be able to be fired at 25,000 psi?

MR. SINGER: No. What everybody tends to concede in this case is that if you--and their expert put 10 or 20 rounds through an exemplar gun and measured them with a strain gauge, that you're going to get somewhere in the neighborhood of 14 to 18 thousand pounds overload, because black powder, by its very nature, is not exactly the same all the time.

You put three pellets, which is a magnum maximum load authorized in its use, and the bullet that he says he used, that is going to get you somewhere between 14,000 on the low and 24 to 25 thousand pounds on the high.

So therefore our people have testified and agreed it is theoretically possible that you could use the approved load in this gun and generate 25,000 psi, and that's accepted and that's not disputed.

And so given that point, okay, what the facts are--and this goes back--this goes to Wakeman and not so much to

proofing.

But what Wakeman says is--or I think wants to be able to say is, proof in Spain, they required proof-testing of their guns. They require a certificate. They may or may not require the proofhouse to put their own stamp on it.

For guns in the U.S. there is no such requirement. Everybody acknowledges the pressure is higher than what the government requires over there, and yet I want to take what the government requires for those guns and use it as a linchpin and launching pad for my opinions that you didn't--that you were wrong on what you did for the U.S., even though they're apples and oranges.

And so that's another reason why he's not qualified and why his opinions aren't relevant.

What is applicable to a Spanish-made gun that's designed and manufactured and used according to the Spanish government at well less than 20,000 psi, when they have a law that says you've got to proof that, is different than the guns in the U.S. where there's no proofing requirement and they use a higher pressure.

Now, specifically, to answer your question, I think, and to avoid any confusion, because I think there seems to be some confusion about what plaintiffs say in their brief and this goes to the second point of Wakeman's opinion.

And that is, and I quote, he wants to be able to say,

quote, why the, quote, official proofmark, close quote, engraved on, quote, unproofed barrels, close quote, is deliberately misleading.

The linchpin of his opinions is if the mark on the gun is a proofmark. That's the linchpin. That's the starting point. That's an assumption. That's a speculation of his.

What the sworn testimony is of Dikar is that that is the logo type of the House of Eibar. It is not a representation that the gun is proof fired. We don't proof fire it.

THE COURT: Does the House-- These are really odd names, these proofing --

MR. SINGER: Eibar.

THE COURT: Do they actually stamp it on the barrel?

MR. SINGER: No. No. The law that Wakeman wants to rely upon and the articles say that a proofmarked gun is marked as such with a stamp at the proofhouse, the official house.

It's undisputed this is put on at the Dikar factory. And the testimony is there's two different marks at the House of Eibar.

THE COURT: Is this that three balls?

MR. SINGER: The three balls is just an insignia that it's a muzzleloader. That's all that's an insignia of.

The question that they're doing is a little shield with a knight's head on top of it. There are two different ones for the House of Eibar. They're similar and one's a little

bigger than the other.

One of them is put on there by the House of Eibar and is their proof stamp.

The other one is just a logo type of the House of Eibar, and that's put on at Dikar. And the testimony is, by Dikar, "We put it on because we are told we can't make a gun and export it out of this country without the government saying it's okay and giving approval and allowing us to export."

And they have told us you have to do this, you have to take five guns, and we're going to overpressure them to 42,000 psi, okay, because they're going to the U.S., and we'll take five guns, and we're going to subject them to the substantial overpressure testing.

THE COURT: So it's five a month, I think?

MR. SINGER: Five a month, every month.

THE COURT: Those are proof-tested to 42,000 psi?

MR. SINGER: Right at 42,000 psi. And so they take five a month, and they test them to 42,000 psi. They look for cracks. They look at them metallurgically. They send them off to a lab even if they passed. There's never been one that failed, but if they pass, they send it off. They do further examination of it to make sure there's no crack you can't see with the naked eye from the inspection of the proofhouse.

That's what the proofhouse says that Dikar must do for guns that it sells to the U.S., in the face of no U.S. proof

requirement, and no U.S. certificate requirement and no proof--U.S. proof procedures. The Spanish government says "This is what you have to do."

That's the proof-testing, if you will; not proof-firing of every individual gun, because we're talking different things.

Then the mark is the question.

The mark is the logo type of the House of Eibar. It is put on there, and the testimony by two different people from Dikar have said we put it on because we're required to. We can't send it outside the country without it. They tell us we have to do it.

So they put it on there because they're instructed by the government to do so.

And so what Wakeman wants to do is Wakeman wants to come in there--and this gets to another part of the argument that I'll address in a moment. But he wants to come in and say, "I understand that's the testimony. You're lying, I disregard it. That mark really is the mark that should have been put on by the proofhouse. And I know it wasn't, but I'm saying it should have been, and therefore when you put it on, you're making a misrepresentation and you're lying to the world."

And that gets to whether or not his opinions are reliable or not.

And we've got a little bit off, but I wanted to

highlight that, because when you're looking at whether or not what Wakeman can say to the jury in this case is relevant and whether his opinion would be admissible, you've got to first look at his qualifications.

A guy that's got no qualification in proof-testing, proof-firing never worked at a proofhouse, and can only get what he got from magazine articles and looking at the Internet, is not qualified.

Second, his opinions have to be useful. And in the face of a lack of U.S. requirement, and in fact no U.S. requirement, you can't take what was done for another country's guns that are different and somehow use that as a boot strap to get you over and make it applicable to U.S. guns.

So that's another reason why his opinions aren't useful.

And then, finally, to go to that last part, his opinions must be reliable.

And when we look at that and look at this reliability test, there's three distinct reasons why they're not.

First and foremost, he says there's proofmarks. We've just gone through it.

The testimony is these are not proofmarks indicating firing. Proofmarks, as he defines it, is a mark applied by a proofhouse that are put on in our factory. Proofmarks, as he defined it, indicates that gun has been fired.

We've never fired that gun, and we've told you we don't fire that gun, and we don't represent that we do.

The best analogy I can come up with, Judge, and I've tried to think of it, but as I was coming over here, most people in the country would say, as Wakeman wants to say, that a flashing red light on a radio tower means that it's only there for the airport--for airplanes to see it.

Well, in Des Moines, Iowa that's different.  There is a tower here that flashes red when the temperature is getting warmer.  That's there for the people, it's not there for the airplanes.

And that's the fallacy because the people in Spain have said this is factually what we do and this is factually why we do it.

Wakeman has said, "I'm disregarding that.  You're wrong.  I want to opine that it is really something else.  And if you accept my opinion and if you accept--if you ignore what you said and accept my speculation over here, what you're really doing is you're lying to people, so my opinion is you misrepresent."

He is stacking inference upon inference.  He's stacking-- He's basing an opinion on something that's contrary to sworn fact, so that again addresses the very reliability of his opinion even if he were to qualify and even if it was relevant for the jury.

And then I think that the other issue is, it's under the line of cases we've cited, he went out and searched the C.I.P. Websites after his second deposition.

The question is when you're looking at reliability, and you're trying to test the method and the scientific method--by the way, which he doesn't have one for this--but it is, you know, how did you arrive at it? Is it just for this litigation or is it something that's accepted and standard.

And what he's done is he's gone out and tried to pull out what he's learned about the C.I.P. from Internet sources during the course of this litigation.

And I guess the final point would be--on unreliability--is that it's just not reliable to take what he opines from what they do on a Spanish gun for Spain when it's a different use and a different pressure and a different requirement than the U.S., and use it as a foundation for his opinions with respect to the U.S.

And so overall, in summary, he's not properly qualified on these issues. The way he does it, and what he's trying to say under the facts of this case would not be appropriately helpful for the jury under Daubert and the Kumho Tire and the line of cases and its progeny.

And it's definitely unreliable and untrustworthy. And that begins with the linchpin of his incorrect assumption and also the fact independently that it's an assumption based upon

an assumption and something contrary to sworn fact.

THE COURT: Thank you.

Mr. Eaton.

MR. EATON: Thank you, Judge.

I thought we were going to kind of confine this to Mr. Wakeman, but it spilled over into proofmarks and I feel compelled to respond to that.

THE COURT: I wish you would, and I do have this question for you on proofmarks. Testing is one thing. Let's put that aside, whether you call it proof testing or whatever testing was done.

MR. EATON: Yes, Sir.

THE COURT: But the proofmark, apparently Mr. Wakeman is going to opine that this is misleading to put that on there.

And my question for you is, is there evidence that the presence of the proofmark on the gun affected either the father, who bought the gun, or his son who used it? Is there a causal connection?

MR. EATON: Yes, Sir. When I say "Mr. Katzenmeier," I'm talking Jon D. Katzenmeier, the plaintiff. His testimony will be that he noticed the proofmark on the gun. He's an experienced hunter and shooter of various kinds of firearms and knows the significance of a proofmark.

He noticed that it had a proofmark. That has meaning to him, as it does to most experienced shooters. You know, is

that the absolute linchpin, would he say, for instance if the question is, would you have not fired this gun if it had not had a proofmark on it?

You know, I think he'd be a little uncertain about that. He'd say, "Well, it's one of the things I considered in the gun. I looked the gun over and seen that everything fits where it's supposed to."

He's familiar with muzzleloaders so he knows what the mechanical configuration and the components typically are like, and so he's going to say that proofmark or that mark is not the only thing I relied on to make me believe this is a safe gun to use, but it's one of the things I relied on to assure me that this is a safe gun to use. I recognized this symbol as a proofmark.

And I think in our papers we cited the article clear back from 1960 under the *American Rifleman* which talks about proof testing and proofmarks and what that means to shooters in the United States.

Now, the proofmark-- So to answer your question directly, yes, there's a nexus. Mr. Katzenmeier is going to testify that he saw that it had a proofmark and that was just one of the things that assured him that it was a quality product and safe to use. It had meaning to him, as it did to the shooters that are talked about in the national--or the *American Rifleman,* the NRA publication going clear back to 1960. We put

that in our briefs to show that this is a well-established, long-standing industry custom and practice.

It's not a law. It's not a regulation like they have in Spain, it's not a formal government regulation, but it's a well-recognized and long-standing industry custom.

In fact the defendants--one of the defendants' experts, Mr. Hutton--we don't have his transcript of his deposition back but I took his deposition in Albany a few weeks ago or 2 weeks ago, and I asked him about proofmarks and he said--he told me what proofmarks were, that they were an assurance that the product--the unit, not a sample of the unit but this unit--had been fired at an overpressure, and then Remington, who I worked for for many years, proof fired every one of its guns, proofmarked with its unique company mark every unit.

And that then he goes on and says that he believes that the understanding that most American shooters who knew anything about guns was that if a gun had a proofmark, that gun had been fired and passed the proof test, that that would be the common understanding of anybody in the United States who knew anything about firearms.

That came right out of the defendants' own expert.

So Mr. Wakeman is not farafield or out on a limb with his opinion about the industry, custom and practice, the significance of a proofmark.

Now, you know, it really is a strange thing that this company admits that for guns we sell in Europe the law requires us to proof fire and proofmark those guns as an assurance of safety.

But for the guns we're going to sell in the United States, we're not going to proof fire them or proof test them but we are going to put the official government proofhouse mark on them, but it doesn't mean they've been proof tested, it's just a logo. And why is it on there? Why is it on there if not to send some kind of a message to somebody?

We submit that the jury should be allowed to draw the inference that it was put on there deliberately and intentionally, and it's the same mark that the government of Spain requires go on guns that stay in Spain. That's consistent with the American custom and practice of companies putting proofmarks on guns.

So why would they put a proofmark on a gun that's never been proofed if not to mislead and assure someone of a product's safety?

Now, you know, the counterfeit 20 dollar bill is still a counterfeit 20 dollar bill. It's not a 20 dollar bill; it's a counterfeit 20 dollar bill.

And this is really a counterfeit proofmark. There's no other reason to put it on there.

Mr. Singer says his people are going to say, "Well,

the proofhouse told us to do that."

I submit, Your Honor, that makes no sense whatsoever that they require a proof test and a proofmark on a gun they sell in Spain. There are no regulations in the United States but they put a proofmark on it anyway. That makes no sense.

He says "The people at the government proofhouse told us to do this." I interrogated their witnesses very carefully and very meticulously on this, and no one could tell me who told you that. "Well that's the way we've always done it." The proofhouse tells us that.

No documents. Asked for documents about that. No documents.

No firsthand knowledge. I mean, talk of unreliable. The assertion that the proofhouse requires us to put a counterfeit proofmark on a gun is the most unreliable evidence in this case.

So I'm kind of done with that subject now. I didn't intend to get into it.

But Mr. Wakeman, we're not putting him up here as a metallurgist or a design engineer or a mechanical engineer. We're putting him up here to establish custom and practice.

And that kind of expertise is allowed under Daubert and Kumho Tire. It's simply nonscientific evidence. It's nontechnical specialized information, and what you need to show there is proper familiarity with whatever that specialized area

of expertise is.

I submit to the Court that Mr. Wakeman has that specialized knowledge. It's not something that he got totally off the Internet, and in fact the Internet has some very good information. It's not all thin. There's good information.

Mr. Wakeman went to the good reliable sites and well before this case. He's written articles on proofmarking before this case ever came up that have appeared in his online publications.

So he has knowledge of this from several sources which establishes his reliability.

No. 1, he's been active in the industry for 50 years, ever since he was a young man, teenager, as a shooter. He's become familiar with industry customs and practices as a result of that practical hands-on, in-the-field experience.

In addition to that experience, he has done reading and research. We've of course cited a few of those pieces of literature, technical literature or industrial literature upon which he's relied to corroborate his experience in the field.

He's worked with designers of muzzleloaders and centerfire rifles and other kinds of firearms on development of loads for those different kinds of guns. In other words, the type of charge, the type of propellant, he has practical experience with that.

He does, what do you call it, product evaluations for

virtually all of the companies that manufacture and market muzzleloaders. They solicit him. They send him their products. They send him loads, charges, projectiles, firearms, and ask for him to evaluate them and write them up. They want him to publish about their guns. So he's had years of experience.

He's corroborated that with the industrial literature, and some of that is going into the European literature, the C.I.P. regulations and so forth, the EU directives that are cited in our directives, and he has worked for these companies in a capacity of evaluating their product. That's commonplace in the industry.

The defense may make an issue of the fact that he hasn't been a paid researcher or scientist with regard to their products; but they have all, including Mr. Singer's client, provided him with product, projectiles, powders, to test in the field and then write them up, evaluate them. They want his opinion out in the field.

Now, they don't much want Randy Wakeman's opinion anymore because he does not have a high opinion of CVA BPI, but at one time they sought him out and they, along with others, relied on him to evaluate their product and disseminate information.

So I submit, Your Honor, that he has the qualifications to opine on the specific areas of proof testing, proofmarking, the industry customs and practices, and what are

departures from the industry customs and practices; and it's up for the jury to decide whether he's more credible or the BPI people or Dikar people who come to court and say the proofhouse tells us to do this nonsensical thing and so we do it, but we don't know who told us to do that, and we don't have a document which tells us to do that.

So I believe in the battle of credibility or weight of the evidence Mr. Wakeman is not only qualified but is qualified to carry the day and persuade the jury.

Additionally, Mr. Wakeman has--and I don't know that we would offer--we would offer him on this subject but I think he's qualified to do it, and depending on how the trial would go, we might well want to elicit from him an opinion as to the deficiencies in the quality control practices of Dikar, in particular the way they utilize the go/no-go gauges for testing the breach areas of the barrel or inspecting the breach areas of the barrel.

Mr. Wakeman had 25-plus years of experience working in the metal forming, metal machining industry, and he basically is a guy who started at the bottom in that industry, worked his way up. He's worked with the milling machines. He's worked with the drilling machines. He's worked with the presses and the cutting measures. He's worked with go/no-go gauges. He has a practical hands-on experience with that, and he knows about the methodology of quality control.

He's not an engineer. He doesn't have a BS, an MS or a PhD, but he does have the knowledge from the School of Hard Knocks and years of experience on the factory floor, and then out in the field selling, actually bidding jobs, designing jobs, and selling those jobs from his metal forming employers to various industrial customers.

So we think he's qualified to opine in the area of metal--quality control procedures for metal forming and machining operations, and that this company's practices are deficient in that regard.

The defendants' objections to Mr. Wakeman go to the weight of his evidence, not the admissibility of his evidence, not his qualifications to present that evidence.

Thank you, Judge.

THE COURT: Thank you.

Mr. Singer, I'll let you have the last.

MR. SINGER: Very briefly, Your Honor, I think that they just hit the nail on the head. Their position is that Mr. Wakeman's credibility is to be determined by the jury on what he says compared to what the Dikar folks says, and that's the problem under the law.

The Dikar people have sworn to fact. This is not a proofmark of the proofhouse representing the gun was proof fired. This is the logo type, quote-unquote, of the House of Eibar, put on there because the colonel--and Jon Muniategui

testified to it--in the 1990s he said the colonel, who's the head of the proofhouse, which is a government entity, told him he had to do it.

All right. So how--and that's why we filed the motion. How can an expert come in and opine to an opinion or speculation on what something means when somebody else has sworn that's not it. It is factually not that way.

And I think that that's--that's the linchpin. They say why is it that it's on there, that the jury should be allowed to draw the inference that it was put on there to mislead, and everybody said that's not it? It's put on there because we can't export it without it and they tell us to. I mean they got the mark from those people. I mean they're told to do it.

So the facts here, if they had some facts to dispute it, it would be a different story. If they had some witness to come in and testify that they're lying or they're really misleading or some kind of memo or something anywhere, any time.

We've given them all kinds of documents from the proofhouse where the proofhouse is confirming the testing procedure, talking about what you mark, what you don't mark.

They did not specifically talk about the house of Eibar logo because that's been done back into the 1990s, so I think that that would be the be-all/end-all of it right there.

You can't have the jury drawing a question as to

whether something is misleading when you have uncontroverted facts, and the only way they can attempt to controvert the facts--and this is very important, I think from a Wakeman's qualifications standpoint under Daubert and its progeny--is you have to have some kind of scientific methodology to have an opinion, and you have to have some ability to have tested it, invented it and, most importantly, you have to rule out other possible scenarios.

What Wakeman's done is in the face of sworn testimony, this is not a proofmark to represent that, not only has he not considered that as a possibility, he's ignored it, and has, for the launching pad of all the rest of his opinions, an assumption that, "Oh, yes, it is, and you're lying to everybody," and that does not meet the legal requirements.

I would just very quickly hit, he's a salesman for a ball bearing company. He's not a manufacturer, designer, quality control officer, quality assurance officer, never been an engineer, never done that. He did have some work when he was much younger but he was a salesman for a ball bearing company in addition to the fact that he's a magician, but that's neither here nor there.

And then, finally, on the nexus point, I'll just leave Wakeman for a moment because the proofmark came up. This man got this gun as a gift. He didn't go buy it. He didn't make a decision to purchase it. The father purchased it and he didn't

rely upon these things.

And the critical thing here is this, according--it's not testified to in his deposition, it's not set forth in an answer to interrogatory, when we said, tell me everything that you say, everything you relied upon, every way in which you contend you were damaged.

No mention by the plaintiff that he saw a mark. No mention as to what he felt the mark might mean. No mention as far as anything.

They're coming up now after the fact that we filed these motions and they're saying "We've got it in some of these other briefs, the interrogatory answer and the question that was asked."

They don't have any of this information about the plaintiff. The father, who's the purchaser of it, didn't rely upon it, and then--and it's very clear, and then he wants to, if you give him the benefit of the doubt and he's really going to come in and say now, after the fact, three or four years later, what Mr. Eaton says he's going to say, that when he looked at it, he noticed that mark and he recognized that as a, quote-unquote, proofmark.

That's the same two things: One, the fact that he recognized it as such certainly doesn't qualify Wakeman to talk about those and/or the significance; and most importantly, there are--in their own literature that they use in support of these

motions there are definitive proofmarks, there are provisional proofmarks, there's marks, and there's marks of manufacturers.

Even in their own literature, their own articles, they don't list these two symbols from the Spanish proofhouse, the two different ones I'm talking about, the two knights heads and definitive proofmarks or provisional proofmarks.

So even if you give him the benefit of the doubt and he says, "Okay, I saw that mark, and I don't know what a knight and shield head mean, but I am going to assume it's a proofmark," it's an incorrect assumption in the facts that you have here.

There is-- You just can't have an inference to mislead a jury trying to do that when the facts are contrary.

THE COURT: Putting aside Wakeman's qualifications for a moment, could a properly qualified expert, knowledgeable about the firearms industry in this country, testify that, if it's the case, to an American user who was familiar with proofmarks, the marking on this barrel would appear to be a proofmark, indicating that it had been tested?

Could a properly qualified expert testify that far, in other words, that in this country that marking would be confusing because it appears to be a proofmark?

MR. SINGER: I think they would have to be qualified to be able to say that.

THE COURT: I'm assuming the qualification.

MR. SINGER: But the problem that I have with that is, that qualification would have to come from a knowledge of what the Spanish government does and requires, and it is very clear-- We would stipulate that the government proofhouses around the world do put government proofmarks on guns, and that certain manufacturers, as he mentioned Remington, does put a Remington mark.

And the witness testified you may not know what it means but to us I know what it means, that you could possibly--if you had that knowledge, you could say that a proofmark placed on there by the proofhouse is a signification that gun has been fired.

But what I'm saying is that can't--that qualification doesn't exist here because that's not a the Spanish government proofmark put on by the Spanish government, and it's not the Spanish government proofmark.

There's two different marks from the House of Eibar, and what Dikar puts on is the logo type of the House of Eibar, not the proofmark of the House of Eibar.

THE COURT: Thank you. I will take it under advisement. And of course I'll be getting rulings out probably through next week, and maybe the end, on these various motions in limine so that you know where you stand going in.

Anything else before we adjourn today?

MR. EATON: Nothing from the plaintiff, Judge.

MR. SINGER: No, thank you.

THE COURT: Thank you all very much, and I'll look forward to seeing you on the 1st, then.

(Proceedings concluded at 10:40 a.m.)

C E R T I F I C A T E

I, the undersigned, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that I acted as the official court reporter at the hearing in the above-entitled matter at the time and place indicated;

That I took in shorthand all of the proceedings had at the said time and place and that said shorthand notes were reduced to typewriting under my direction and supervision, and that the foregoing typewritten pages are a full and complete transcript of the shorthand notes so taken.

Dated at Des Moines, Iowa, this 19th day of February, 2009.

______________________________

CERTIFIED SHORTHAND REPORTER