IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - - X
JON D. KATZENMEIER and :
JULIE KATZENMEIER, :
Husband and Wife, :
:
Plaintiffs, :
:
vs. : Case No. 4:06-cv-00169
:
BLACKPOWDER PRODUCTS, INC., : TRIAL TRANSCRIPT
a Corporation, d/b/a :
CONNECTICUT VALLEY ARMS; :
and DIKAR S. COOP, : Volume II
:
Defendants. :
- - - - - - - - - - - - - - - - X

Courtroom, Second Floor
U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa
Thursday, December 4, 2008
9:00 a.m.

BEFORE: THE HONORABLE ROSS A. WALTERS, Magistrate Judge, and a Jury.

APPEARANCES:

For the Plaintiffs:

GARY A. EATON, ESQ.
WILLIAM E. SPARKS, ESQ.
Eaton & Sparks
1717 East 15th Street
Tulsa, Oklahoma 74104

THOMAS J. DUFF, ESQ.
Duff Law Firm, P.L.C.
319 Seventh Street
Suite 600
Des Moines, Iowa 50309-3826

For the Defendants:

JAMES E. SINGER, ESQ.
Bovis, Kyle & Burch, L.L.C.
200 Ashford Center North
Suite 500
Atlanta, Georgia 30338-2668

KEVIN M. REYNOLDS, ESQ.
NICHOLAS S.J. OLIVENCIA, ESQ.
Whitfield & Eddy, P.L.C.
317 Sixth Avenue
Suite 1200
Des Moines, Iowa 50309-4195

# I N D E X


| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Ronald Dean Katzenmeier | 40 (Sparks) | | | |
| Blake William Phipps | 70 (Sparks) | 103 (Reynolds) | 114 (Sparks) | |
| Jon Muniategui (Via videotaped deposition) | 119 | | | |
| Lester Wayne Roane | 122 (Eaton) | 172 (Singer) | 200 (Eaton) | 206 (Singer) |
| Dr. Nancy Bauman (Via videotaped deposition) | 208 | | | |


# E X H I B I T S


| PLAINTIFFS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 17 - Cerrosafe casting and materials specification sheets | 166 | 166 |
| 23 - Curriculum vitae, Lester Roane | 124 | 124 |
| 29 - Audio tape of 911 call | 94 | 94 |
| 90 - House of Eibar proofmark illustration | 140 | 140 |

P R O C E E D I N G S

(In open court, in the presence of the jury.)

THE COURT: Please be seated, everybody, and good morning to you all.

I believe this morning we're ready to start with opening statements.

And Mr. Eaton, are you going to open for the plaintiffs?

MR. EATON: Yes, Your Honor.

THE COURT: You may proceed. Thank you.

MR. EATON: Thank you, Judge.

Ladies and gentlemen, this whole saga began on October the 2nd, 2005. J.D. Katzenmeier and a young friend of his, Blake Phipps, went out to sight in their muzzleloader firearms for the upcoming hunting season.

J.D. Katzenmeier's firearm, the one with which we're going to be concerned in this case, was a BPI CVA, Connecticut Valley Arms, .50-caliber Kodiak Pro muzzleloader rifle. It used a bullet.

Now, the bullets may be different from what you've been used to seeing on TV. It's a metal bullet with a little plastic sabot on it. It doesn't have any propellant. It doesn't have any powder in it.

Propellant for a muzzleloader comes in this form, pellets. These are 50-grain Hogdon Pyrodex pellets. They're

sometimes referred to as black powder, but they're actually not black powder, they're a black powder substitute. That propellant is specifically recommended, that bullet is sold by BPI Dikar.

Now, that morning, when they went out, Mr. Katzenmeier's .50-caliber muzzleloader had never been fired. It was a pristine gun. He received it as a Christmas gift from his father, Ron Katzenmeier, the previous Christmas. That would be the Christmas of 2004.

So in 2004, when he got it for Christmas, he looked it over, made sure that all the pieces and places were there, reviewed the manual that came with it, the user's manual, and he put it away for the season--or for the spring and summer, never took it out again until he went out with Blake Phipps to test-fire this thing and sight it in for hunting season with Mr. Phipps at Mr. Phipps' place in the country.

The first witness you're going to hear is Ron Katzenmeier, J.D. Katzenmeier's father, who bought this muzzleloader and gave it to his son. The second witness you're going to hear from, Blake Phipps, was an eyewitness to this explosion of this muzzleloader firearm.

The testimony you're going to hear is that Mr. Phipps was familiar with the firearms but not really muzzleloaders. Mr. Katzenmeier, J.D. Katzenmeier, was very familiar with muzzleloaders, as well as other firearms. J.D. was really sort

of a mentor for Mr. Phipps that day. He was going to show Mr. Phipps the proper way of handling, loading, and firing muzzleloaders.

So Mr. Phipps will take you through in detail what Mr. Katzenmeier was showing him as he loaded his .50-caliber CVA muzzleloader for the very first time. He's going to describe for you in detail, because Mr. Katzenmeier was explaining to him every step of the way what he was doing, why he put in three .50-caliber pellets, why he put in the one PowerBelt bullet, how he used the rod to firmly seat the bullet on top of the powder--on top of the pellet, not jam in it. There is some testimony about the difference.

So Mr. Katzenmeier was deliberately, meticulously, carefully going through the process as he was preparing first to sight his muzzleloader in and also to instruct his friend, Mr. Phipps.

Mr. Phipps is going to tell you that as J.D. looked down the line-- And they'd set up a target, a big piece of--I think it was some sort of fiberboard. May have been two-by-four plywood or two-inch plywood, but it was downrange 100 yards or so.

Mr. Katzenmeier loaded his weapon as he instructed Blake. He got down in his crouch, and he had a sort of prepare-to-fire bench. It was an old tank. You'll see photographs of it. They used that for a bench rest for his guns

to sight it in so he can steady it on the target.

Mr. Phipps was looking downrange as Mr. Katzenmeier pulled the trigger, and Mr. Phipps will tell you that the sound he heard was really loud. It was louder than what he anticipated. And he wasn't looking directly at Mr. Katzenmeier, he was looking down at the target.

He heard the loud sound, and he turned and saw Mr. Katzenmeier rolling backwards, hands clasped to his face, and he observed what Mr. Reynolds told you yesterday was somewhat of a gory scene, and that was Mr. Katzenmeier's face blown up, powder burns, blood, flesh, and obviously alarmed Mr. Phipps.

One of the pieces of evidence you'll hear in this case is an audio tape. Mr. Phipps immediately ran to the phone--or used a cell phone, I guess was more correct, and called the 911. You'll hear his 911 call where he excitedly tells the 911 operator that his friend--a gun has blown up, a muzzleloader has blown up on his friend, and please send the ambulance or emergency medical personnel.

That's an excited and somewhat garbled call, but you will hear certain words clearly that describe this sudden, exciting, tragic event.

Mr. Phipps will tell you that he rendered what first aid he could. Mr. Phipps is in the National Guard. He had some EMT training. He rendered what first aid he could while they

awaited the ambulance.

This was out in the country. I think it's in Boone County, but it may be in a different county, but he was at least taken from the scene by an ambulance to the Boone County Hospital.

First emergency medical treatment was rendered there. It was too bad a case for the folks at Boone County to deal with. They put Mr. Katzenmeier on a helicopter and life-flighted him in to the hospital here in Des Moines, Methodist Hospital.

He received some additional treatment here at Methodist Hospital, but they weren't really equipped to deal with the complex and major facial fractures that Mr. Katzenmeier had. He had a fractured skull. He had all these small thin bones around the orbits of his eye, he had his septum fractured in multiple places and deviated, plus all the flesh wounds. So they load Mr. Katzenmeier up and send him by ground to the University of Iowa Medical Center and Clinics in Iowa City.

Next evidence you'll hear is that Mr. Katzenmeier was in the hospital there at Iowa City for about four or five days for emergency treatment and then some elective treatments. You're going to hear and see medical testimony from an otolaryngologist, Dr. Nancy Bauman, who reconstructed his face, put all the bones back together, put some metal grafts in and metal implants in his face to hold the bones together.

Certain bones couldn't be reconstructed. Certain bones couldn't be put back together. They were simply removed. These small thin bones of the sinuses were simply removed and replaced with fat graft from Mr. Katzenmeier's belly. And that's what's there today; not bone, it's fat from his belly.

You'll also hear testimony from the orthopedic surgeon who repaired his hand. The recoil from the explosion of this gun ripped his hand open, his right hand open, kind of in this webbed portion of his hand, and broke some bones. That's Dr. Brian Adams. You'll hear that testimony.

He had some eye injuries, some burn injuries to his eyes. 100 percent of the epithelium on his right eye was burned away. Dr. Kenneth Goins will tell you about the ophthalmology treatment for his eye.

And then there will be an expert medical witness, Dr. Richard Hastings, who will sort of pull all this together and sort of give you a whole-man version of the long-term and permanent effects of these injuries that Mr. Katzenmeier sustained.

Now, I want to go back to the liability side of this case a little bit. What really caused the fractures of Mr. Katzenmeier's skull and these bones in his face was not just the blast or the concussion from this firearm, but it was from the breech plug that blew out the back of this firearm and hit Mr. Katzenmeier in the face.

You'll see some photographs that actually, I think, show the threads of his breech plug where it impacted the skin on his face. You can see faint imprints of those threads from the breech plug.

Now, to just give you a general idea about this gun, we're going to be talking about a muzzleloader.

Don't be alarmed. This is disarmed.

This is not Davy Crockett or Daniel Boone with a sidelock and the pan that we've seen in all of those movies and TV series. This is what's called a modern in-line muzzleloader rifle. Some of you may be familiar with it, most of you probably not.

When Mr. Katzenmeier-- I'm left-handed. I won't turn it right. He's a right-handed man. When Mr. Katzenmeier cocked the hammer to fire it, the muzzle-- The breech plug fits here in the back. It screws in. And that's what first the propellant seats on and then the bullet seats on. And then a primer is applied right back here, and that's what ignites propellant.

The primers, I think we have some of those here. They're just little caps that fit onto a nipple at the back of the muzzleloader that performs the initial ignition, which ignites the three pellets, which then expand--the gas expands, which propels the pellets of the bullet out the end.

In this particular case, all this really is is a

contained pressure vessel. It's a pressure vessel that's uncontained at one end. What happened when Mr. Katzenmeier fired this is the pressure, which is equal in all directions, blew this breech plug out, and it hit Mr. Katzenmeier in the face, and then all of those gases and particles and propellant that came along with it also hit him in the face.

So he suffered blunt trauma from the breech plug. He suffered blast and concussion injuries, particulate injuries from the hot gases and the particles of the Pyrodex propellant that was used.

Now, the crux of liability in this case is that the breech plug did not--was not properly engaged in the barrel, and that's why it blew out. And the reason it was not properly engaged was that the barrel was defective in the area where the breech plug screws in.

The barrel had a condition from the manufacturing process called bell-mouthing. The simplest example I can think of is like a clear glass representing the barrel that had been bell-mouthed a bit in the manufacturing process so when the breech plug was screwed in, it failed to engage all the threads.

Now, this is not to scale, but it kind of gives you an example. The barrel was bell-mouthed or tapered. The breech plug is a cylinder. It engaged a little, very little.

Now, one of the experts in this case, Dr. Tipton, a mechanical engineer from the University of Tulsa, who is--

Well, he'll give you his qualifications. Dr. Tipton concluded that no more than 3 or 4 of the 13 threads on the breech plug were actually engaged with the threads of the barrel.

Now, the defendants' own witnesses will tell you that they had experienced bell-mouthing, which is a bad condition to have in one of these guns. They had found, on 25 to 50 previous occasions, bell-mouthing of barrels coming out of their factory. That's Dikar, the manufacturer of this gun, the Spanish company. Mr. Belategi's testimony will establish that.

So this is a condition that had been found in these guns on 25 to 50 previous occasions. That's the ones that had been found. Mr. Katzenmeier's gun, obviously, it was not detected until it failed in the field.

Now, there's going to be a lot of testimony about the manufacturing process, including the quality control or lack thereof. Mr. Lester Roane, an engineer from a place called P.H. White Testing Lab in Street, Maryland, he's the first person who found this. He's the first person who looked at this gun critically after the failure.

When Mr. Roane was examining this gun-- He's examined thousands of firearms, that's what H.P. White Labs does, and much of it is work for the U.S. Government. It's near the Aberdeen Testing Grounds in Maryland. Mr. Roane was measuring not only the diameter, inside diameter, of Mr. Katzenmeier's gun, but also a couple of exemplars that he'd been provided, and

he discovered that there was a small degree of bell-mouthing in the exemplars and a large degree of bell-mouthing in Mr. Katzenmeier's gun. He'll tell you that that was indicative to him of loose quality control procedures in the manufacturing process.

Mr. Roane noticed a couple of other things. He'll tell you that he noticed that this gun had a proofmark, and he'll tell you what that means, that a proofmark on a gun means that it has been proof-fired or proof-tested before it's put in the stream of commerce, before it's sold to customers.

So Mr. Roane was surprised later, when he reviewed some Dikar documents, to find that the Katzenmeier gun, which bore a proofmark, had not actually been proof-fired or proof-tested.

In fact, he later discovered from deposition testimony from Dikar people that none of the guns that had hit markets themselves in the United States are actually proof-fired or proof-tested, but they bear proofmarks, proofmarks that were not applied at the government proofhouse but were government proofmarks applied by Dikar to guns that had never been proofed. This was very surprising to Mr. Roane.

Mr. Roane, then, will testify today. He's going to appear today. He's going to tell you that he recommended to me that we have additional inspection and testing of this gun, and that was specifically to be examined by a metallurgist. He

thought it would be beneficial to determine cause of failure, reason for failure, to have a metallurgist look at the microstructure of this gun.

And he also recommended that the gun be sectioned in the area where it failed so that one could get a good look, a direct observation, not trying to look down the end, but look right onto the thread form of the gun. And so he recommended that the gun be sectioned for these additional tests.

Now, that's a pretty big deal. You can't go do destructive testing of evidence in a civil case without permission of the Court. So after both sides had had chances to look at the gun and have it inspected by experts, photographed and so forth, the Court entered an order that allowed destructive testing to occur.

And you'll hear evidence that when that happened, the Katzenmeier gun was sectioned in the breech area--I'll just show you that briefly--sectioned in the breech area of the barrel of the Katzenmeier gun, and that's this area here.

It was taken to Sherry Testing Labs in Tulsa, Oklahoma. Defense counsel was present, one of the defense experts were present, along with Plaintiffs' experts, and everybody was present when this gun was sectioned and the breech--threaded breech area was exposed so that it can be photographed microscopically and the grain structure of the underlying material analyzed.

That proved to be very critical evidence because that's when it was directly observed how these threads had not really been stripped out so much as, back toward the breech end, were nonexistent. The threads had not even actually been formed or fully formed so they didn't engage with the threads of the breech plug, unlike I showed you with the Pepsi can and the clear glass.

The first two, three, four threads were partially engaged, and they were stripped away. You'll see microphotographs which will show no threads hardly being formed on the back--toward the back part. What little bit of thread was in the front part was swept away from the pressure of the explosion when the propellant was ignited.

So the defect in this gun is primarily a manufacturing defect. You'll hear testimony from Mr. Belategi of what causes this bell-mouthing or tapering condition. It can be a worn machine tool, it's gone through too many units, it's been used to fashion too many units, or it can be a misaligned machine tool that's coming in at an angle instead of being a perfectly straight shot to form these threads.

You'll see a number of microphotographs, and the defects will be explained to you by Dr. Bruchey, Ph.D., a metallurgist who spent most of his career working for the U.S. Government at the Aberdeen Testing Grounds.

You'll hear testimony from Dr. Tipton, who is a

mechanical engineer, who really may be as much metallurgist as mechanical engineer. He's a fellow in the American Society of Materials, very high position or honor not all members of the ASM achieve. You have to be invited and you have to be recommended and you have to be approved by other fellows.

So Dr. Tipton is going to tell you about mechanical engineering issues and why the mechanical connection was flawed, but he's also going to tell you, from a metallurgical standpoint, why he was confident of that. And you'll see lots of microphotographs of this little area I'm talking about here blown up where you can see the thread form, where the threads were not formed, where they were incompletely formed, where they were sheared off. That's the defect.

Now, that defect would probably never have caused any adverse consequences had it been discovered in the manufacturing facility or at the proofhouse through proof-firing. It would have failed in the factory. It would have failed at the proofhouse, not in the field. So the failure to proof-test is as much a defect in this case as the actual physical defect in the product itself.

Ladies and gentlemen, when you hear all the evidence in this case, all the little pieces of evidence come together, it will make a whole fabric for you. And what it will prove to you is that the Dikar factory was not the most modern, did not adhere to the, I'll say, reasonable quality control procedures,

and it produced, from time to time, defective units. And because of lax quality control procedures, occasionally, perhaps more than occasionally, defective units got out the door and they got on a ship and they came to the United States.

These guns were not sold in Europe. They were made in Europe. They were not sold in Europe. Right here's the only place they were sold. You're going to hear testimony from Dikar employees, officers, engineers, as to why that was, why they sold their product only in the United States and nowhere else.

Now, the other defendant in this case, Blackpowder Products, Inc., sometimes referred to as CVA, it's an American corporation. It's incorporated in the state of Georgia, but it's owned 100 percent by Dikar, a Spanish business organization. So, actually, these two entities operate as one; one is a manufacturing entity in Europe that owns a marketing entity in the United States.

You'll hear testimony, it will be by video this morning, or perhaps this afternoon, from Jon Muniategui. He's the general director of Dikar, which is comparable to president of American corporation, and he will tell you about this business relationship, how it works together and how they deal exclusively with each other.

Ladies and gentlemen, we're going to prove to you that Dikar and its wholly-owned subsidiary, Blackpowder Products, Inc., worked together to put defective--this defective product

into the stream of commerce in the United States and basically gave instructions that led to this explosion, failure, injury.

One of the things you'll hear from Mr. Muniategui, I believe, maybe Mr. Belategi, is that the content of the marketing materials, instructional materials, was conceived by BPI, the American company. In other words, the package insert, the instruction, working manual, the PowerBelt bullet information, was all provided to the parent company of BP--or Dikar to put in with the packaging.

So both parties were involved in putting the gun, its packaging, its instructions, its warnings, admonitions together in one box that came on a ship to the United States and found its way to Salina, Kansas, where Ron Katzenmeier bought it as a Christmas gift and delivered it to his son, J.D. Katzenmeier, and that's how it all came around to October 2, 19--pardon me--2005, when Mr. Katzenmeier fired this gun the very first time and it blew up in his face.

That breech plug crushed his face, burned his face, and left him with plates in his head, left him with fat grafts and obliterated sinuses. He has trouble breathing. He breathes very little through his nose.

He also suffered an injury called a fracture of the cribriform bone, and the cribriform bone sits right up here about your forehead and back behind. It's what the front of your brain sits on. That bone was fractured multiple places.

Dr. Bauman will tell you about that.

And it severed a bunch of nerves that were olfactory nerves that affect your ability to smell or taste. This man can't smell or taste anything except the strongest of odors. He can sort of smell gasoline and kerosene, but he can't taste an ice cream cone. He can't taste a Pepsi-Cola. He can't taste a beefsteak. He can't smell any of those things. That's all because of nerve injuries to the cribriform bone, which sits right below his brain. You'll hear evidence that he actually had an injury to his brain and leaked cerebrospinal fluid.

The injuries in this case are severe, they're permanent, and at the end of the day, when you hear the evidence as to liability, you hear the evidence as to damages, we're going to ask you to return a substantial verdict for Mr. Katzenmeier because he's been through a grueling and excruciating ordeal.

He's still got concerns about future medical issues that may pop up, and you'll hear medical evidence on that. He's incurred medical expenses in the range of 75 to 80 thousand dollars. He missed three or four months' work. He has a right hand that's weak that's his dominant hand. He has problems with it at work.

He's going to tell you his story, and I submit to you that it will justify a substantial verdict in favor of the plaintiff at the end of the day.

Thank you very much.

THE COURT: Opening statement on behalf of the defendants, Mr. Singer.

MR. SINGER: Thank you, Your Honor. May it please the Court.

Ladies and gentlemen of the jury.

Mr. Katzenmeier and counsel.

If I ask you what this is and you say a hand, that's not correct. It's part of a hand. There's another side to it.

As the Judge told you yesterday, what the lawyers say is not evidence. What Mr. Eaton says is not evidence, what I say is not evidence. But I can assure you, ladies and gentlemen, that if it was exactly the way he said it was, you wouldn't have people coming all the way from Spain to testify, you wouldn't have people coming from Georgia, because we wouldn't be taking up the Court's time and your time.

Now, I'm Jimmy Singer, and, along with Kevin Reynolds, I'm very honored and privileged to represent the men and women that make up Dikar and the men and women that make up BPI.

The Judge told you that the plaintiff has the burden of proof. And there will be many things in this trial that are not in dispute. There is no question that Mr. Katzenmeier's gun failed that day. It's not in dispute. There is no question that Mr. Katzenmeier was injured that day. It's not in dispute. He has incurred medical bills. We don't dispute that. It's not

in dispute.

What happened is not in dispute. I will submit to you, ladies and gentlemen, that how it happened and why it happened is substantially in dispute. And even though we do not bear burden of proof to disprove anything, we will prove to you that this gun was safely designed and properly designed. We will prove to you that this gun was properly and extensively tested. We will prove to you that the gun was safely and properly manufactured.

And, ladies and gentlemen, even though either the counsel or the experts for the plaintiff altered the evidence and changed the evidence so that what our experts got a chance to look at was not the way it was after the incident, even though it was changed, we will nonetheless prove to you that what happened is that a substantial pressure was generated in that barrel that day, much higher than could possibly be generated by a proper load.

And not only did it strip these threads and plow out the back, it was so high it broke the metal action behind the gun, it broke the stock into pieces, it fractured the bones in the sinus of Mr. Katzenmeier, and pushed that 295-grain bullet way downrange and through a piece of Masonite siding. That's how much pressure there was. It was a substantial load of pressure.

I won't go into all the witnesses and what their names

are, and so forth. He mentioned Dr. Tipton. He's a professor. One of the witnesses we will have is Dr. Schmidt. Dr. Schmidt was actually on the review committee to approve Dr. Tipton for his fellowship.

Dr. Schmidt is a Ph.D. metallurgist who has worked for Remington for years. He has blown up guns and he's tested guns. He will explain to you why it is that the plaintiffs' experts have made faulty assumptions and where they are in error in their conclusions and what happened and why.

Now, who are the men and women whose conduct and product you'll be asked to judge? First let's talk about Dikar S. Coop. It's a cooperative in the country of Spain. That's different from U.S. companies. It means that the employees are the owners. There's about 70 of them, and they rely one upon the other. If the company does well, they do well; if the company doesn't, they don't.

They are responsible to each other to put out a good product. You will hear about that business. They are in a town called Bergara, Spain. It is up in the Basque region, about 300 or so miles north of Madrid, about 20 miles from the French border, in a valley in an area where guns have been made for centuries upon centuries, well known as a gun region.

But it is a very modern manufacturing facility, and you will hear the details about how these guns are designed with outside design companies and on computer-aided systems that can

check and evaluate pressures, and based upon the history and how they're tested and how they're evaluated and how they're tested at the national proofhouse in Spain, you will hear all of that, you will hear about the quality.

It is absolutely true that when you have a manufacturing process tools can wear out, things can get out of adjustment. You can have products that have--that don't pass specifications. That's why you do quality checks. That's why you have quality control. And that's why we have caught any kind of a problem when the--when the bell-mouthing exists.

You will hear that on this machine that makes the relevant area here, which screws a hole into--drills a hole in the back of the barrel and then cold-forms a tap by pushing a tap in and working that metal up to make it harder to make these threads, you will hear that the hole is checked.

First of all, it's manufactured on a computerized CNC lathe machine, and you will see that and hear about that. It is checked every 25 pieces with a go and a no-go gauge that's sized.

Once the threads are formed, a threaded go/no-go gauge is used every 25 pieces in the threads, and if anything is out of tolerance, they go back to all 24 before that to make sure that anything that is not in tolerance gets put into scrap, and they have a red bin for scrap.

And then you will hear that 100 percent, every single

gun, before--barrel, before it leaves that station in the factory and goes to the next one for the outside of the barrel to be done, every single, 100 percent, is checked with a sized go/no-go gauge. You will hear about the quality.

The testing that's done, a magnum load, a maximum magnum load, is authorized to be shot in this gun. It's three pellets, as Mr. Katzenmeier claims that he shot, and one of those bullets, and that can generate average of about 20,000 psi, according to their own expert's testimony. You can get as high as maybe 24,000 psi.

Five guns a month at Dikar are tested, five barrels with breech plugs, at over 41,000 psi every single month, month in and month out. There's never been a failure. You will hear about the detail of that as we go through.

Black powder also, you'll hear from both sides, I think, that it is different from smokeless. It's different from the kind of powder you use in a shotgun or a rifle or a pistol bullet because black powder is--it is like Davy Crockett. It's the kind of powder, and authorized substitutes, that have what they call a slow-burning curve. It's instantaneous for us, but in the scheme of things, by comparison, as it starts to burn and ignite, the pressure goes up, peaks, and goes down in kind of a curve like this.

In a rifle or a pistol or a shotgun, smokeless powder, not only is the pressure substantially higher, but it goes up so

fast, it peaks instantly and drops off sharply. And it can actually cause a bullet in a muzzleloading gun to be an obstruction like mud or a stick or something like that and cause a failure. So smokeless powder in a muzzleloader is an absolute no-no, and everybody will agree with that.

A short start can cause an overpressure situation, because as this powder starts to burn slowly and starts to rise, it starts to push that bullet down through the twist of the rifle and out. And if it's not seated properly and there's something in there with an air gap, it starts to burn and it doesn't slowly push that bullet and get it started from zero in velocity, and the bullet itself can result in an error.

There are a lot of things that can cause a failure in a muzzleloaded rifle, and that's why it's so critical that the instructions and the manual be followed and properly followed, and you'll hear about that.

Now, BPI, Blackpowder Products, Inc., it's a Norcross, Georgia, company. I don't know if you've ever heard of Norcross, Georgia. They-- Not when I was there--I went to high school there; we had an okay basketball team--but sometimes they're nationally ranked, the basketball team. They make-- They don't make anything, they don't design anything, but they import, sell, and market muzzleloaders, muzzleloader accessories, hunting accessories.

They have the CVA brand that you've heard about in

some of the questioning yesterday and today. They have Winchester muzzleloading brand. They have Quake slings. That blue thing over here, this is actually a gun sling. It's made by Quake, and it won't slip. That's one of the brands they have. And PowerBelt bullets. They have that brand too.

They have factory rep--excuse me--distribution reps around the country they use, and they have about 30 employees there in Norcross. They shoot these guns all the time. They shoot them as sports writers--give them to sports writers. They shoot them with television personalities on television and give them to people. You may have even seen them on ESPN, Outdoors Channel, and some of those things.

These guns have been shot by everybody at Dikar and everybody at BPI. They've been shot by sports writers, by TV personalities, by customers such as Bass Pro Shop and Cabela's, Wal-Mart, Gander Mountain, all of these, many, many others, Dick's Sporting Goods, lots of sporting goods stores that they sell to. Youth groups and hunter safety courses take these guns out of the box and let these kids shoot them. These guns are safe, ladies and gentlemen. You'll hear about BPI and what it does, how it does it.

Now, I have three things to ask of you. You may think I talk funny from Georgia, but the guys from Spain don't speak English as a native tongue. All the witnesses that will come from Spain have learned English, and they don't speak it

perfectly, but I think they speak it very well, and they generally can understand English very well.

And so both sides have agreed that, because of that, we will not try to delay this trial and drag it out by having an interpreter interpret every single thing said for my Spanish clients. What we will do is we have Nick Olivencia back here, who is a Spanish-speaking person, and if something needs to be translated by any of the Spanish witnesses, either a question one of us asks or an answer, because sometimes technical terms are difficult to translate or understand, we'll try to have it translated.

So the first thing I ask of you, ladies and gentlemen, is that you be patient if we have to go into some translation so that we can make sure that you're hearing the proper evidence.

Second, keep an open mind. Judge told you yesterday wait until you hear all the evidence. Don't make your decision up based upon just the plaintiffs' questions. Wait until you hear our cross-examination. Don't make your decision based upon just their case; wait until you hear our case.

And not even then, ladies and gentlemen. Do something that's virtually impossible psychologically to do, and that is keep an open mind until the very end, when the Judge gives you the law. Because what you'll do is you'll take the facts that you hear from the witness stand and the evidence, and you'll apply the law that the Judge gives you and your God-given

common, walking-around sense and your life experiences back in that jury room, and you'll come back with a verdict. So please keep an open mind.

Third thing I ask for you is this: Judge told you to--that your verdict should be a true verdict. The word verdict, I think, comes from the Latin veredi, it means to speak the truth. As Juan and Dudley sit here, on behalf of Dikar and BPI, and Kevin and I, and all of us, the only thing we ask you, ladies and gentlemen, is that you go into the jury room, and when you come out and you have that verdict, that it speak the truth, that it be a true verdict based upon the facts and on the law. And if you do that, we know that justice will be done and you'll have a verdict in favor of the defendant.

Thank you.

THE COURT: The plaintiffs may call their first witness.

MR. SPARKS: Your Honor, we would like to call Mr. Ron Katzenmeier.

THE DEPUTY CLERK: Please step forward to be sworn.

RONALD DEAN KATZENMEIER, PLAINTIFFS' WITNESS, SWORN

THE COURT: Mr. Sparks.

MR. SPARKS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. SPARKS:

Q. Good morning again, Mr. Katzenmeier.

A. Good morning.
Q. Would you tell the ladies and gentlemen your full name for the record, sir.
A. Ronald Dean Katzenmeier.
Q. And how old are you today, sir?
A. I'm 66.
Q. And where do you currently reside?
A. Ellsworth, Kansas.
Q. Are you currently employed?
A. No, sir. I'm retired.
Q. And where did you retire from, sir?
A. From Northern Natural Gas Company.
Q. And for how long were you employed with them, sir?
A. Twenty-nine years.
Q. Are you a married man?
A. Yes, sir.
Q. And how long have you been married?
A. Forty-four years.
Q. And your wife's name?
A. Wife's name?
Q. Yes, sir.
Trick question.
A. Sheryl.
Q. Sheryl?
A. Sheryl with an S.

Q. All right. How many children did you and Sheryl have?
A. We had two boys.
Q. And what were their names, sir?
A. Travis and Jon David, J.D. for short.
Q. As they were growing up, Mr. Katzenmeier, did you and your sons engage in any outdoor activities and hobbies?
A. Yes, sir.
Q. And what were those, sir?
A. We did a lot of hunting and fishing and the standard sports activities; football, basketball, and all that kind of stuff.
Q. Did you bring them up as hunters?
A. Yes, sir.
Q. All right, sir. Did you engage them into hunter safety courses?
A. Yes, sir.
Q. And did they complete those courses?
A. Yes, they did.
Q. And where were those courses completed?
A. Pardon?
Q. Where did--
A. Where? They were in Liberal, Kansas.
Q. All right, sir. In other words, in their hometown and resident state of Kansas?
A. Right.
Q. All right, sir. And as you grew up with your children, did

you instruct them upon the proper use of firearms and the techniques involved with them?
A. Yes, I did.
Q. Now, sir, you as an individual, do you own any muzzleloaders?
A. Yes, I do.
Q. And what muzzleloaders do you own?
A. I have a Thompson/Center Black Diamond and a Thompson/Center Encore.
Q. And have you owned any others than those two, sir?
A. Yes. Way back years ago I purchased a CVA--what was it called--just a sidelock, an older gun.
Q. We use the term sidelock. Is that what we talked about earlier, like Daniel Boone-type weapon with a ball and black powder down the horn and put it in the barrel and use it that way, sir?
A. Yes. It was a Hawken gun is what it was, CVA Hawken.
Q. All right.
A. And sidelock was the hammer on the side of the barrel or the--yeah, hammer on the side.
Q. It's very different from the weapon we're going to talk about today, isn't it, sir?
A. Yes, it is.
Q. All right, sir. Did you and your son, J.D., have an occasion to target shoot, go hunting with black powder weapons

at any point in time in your relationship?
A. No. Not during those days, we didn't, no. We were strictly just, like, target shooting or whatever.
Q. Have you ever used or gone hunting with J.D. involving a black powder weapon of any kind?
A. No.
Q. So it was all target shooting; is that correct?
A. Yes.
Q. And in the process of that target shooting and using that weapon, can you explain to the ladies and gentlemen of the jury which weapons you used with J.D. in terms of target shooting?
A. It would have been the Thompson/Center Black Diamond and then the Thompson/Center Encore.
Q. What type of propellant did those weapons use, sir?
A. They used the Pyrodex pellets.
Q. Those are the pellets that were the same type that were used for the weapon you bought your son; is that correct?
A. Exactly, yes.
Q. All right, sir. Now, when you were talking about Pyrodex pellets, you were talking about these types of pellets; is that correct, sir?
A. Yes, sir.
Q. And the Pyrodex pellets are the substitute for what you and I talked about earlier being the old type of Daniel Boone powder that you pour down the barrel; is that correct?

A. Yes. The loose powder, uh-huh.
Q. Did you and your son ever involve yourselves with the use of loose powder in any type of weapon that you taught him with, sir?
A. Yes. We used the loose powder prior to the pellets being developed.
Q. So early on in the process there was only one type of powder to use, and that was loose powder, with these weapons; is that correct?
A. Yes.
Q. And then as technology evolved, along came these pellets; is that correct, sir?
A. Yes, sir.
Q. Now, at some point in time did you give a weapon to J.D. that was one of yours, sir?
A. Yes. I gave him the old sidelock that I had, the old Hawken, but he never did shoot it. It was just turned into a mantle piece.
Q. So it's sitting on the mantle at his home?
A. Yes.
Q. And did you ever loan him or give him another weapon other than that one, sir?
A. The only one I've loaned him was the Black Diamond Thompson/Center.
Q. And when did you do that, sir?

A. Probably four or five years ago.
Q. Are you aware that whether or not he had any other weapons other than that particular weapon at that time, that being the Black Diamond Thompson/Center Fire that was a muzzleloader?
A. I think he did have a CVA Apollo, I think, muzzleloader.
Q. Let me draw your attention to the fall of 2004, the Christmastime of 2004. Did you make certain decisions about presents for your children at that time?
A. Yes, I did.
Q. And what was the decision concerning a present for J.D.?
A. I decided he liked muzzleloading so well that I went and purchased him an in-line muzzleloader for his Christmas present.
Q. You say he liked it so well. Had you and he had conversations through the years about his enthusiasm for that part of the sport?
A. Yeah, for that part of the sport, but not in particular gun.
Q. Just the sport itself?
A. Yes.
Q. Okay. And in those conversations and discussions, did he talk about using that weapon, that being a black powder weapon, to be hunting with?
A. Yes, he did.
Q. And so you made a decision in December of 2004 to purchase him one for Christmas; is that correct?
A. Yes.

Q. Can you tell me approximately, sir, when you went Christmas shopping for him for that weapon?
A. It was about the 4th or early part of December.
Q. And where did you go, sir?
A. Went to the Ace Hardware Store in Salina, Kansas.
Q. Is that where you were living, sir?
A. No. I live in Ellsworth, Kansas.
Q. And how close is that store to you in Ellsworth?
A. About 35 miles.
Q. Is that where you'd done a lot of your shopping in the past, sir?
A. Yes.
Q. The Ace Hardware Store there is more than just a hardware store, is it not, sir?
A. Yes. It's a hardware store, and it has a real nice sporting goods division in that store.
Q. And have you traded there before, sir?
A. Yes.
Q. Would you tell me, sir, on about the 4th or 5th, when you went to the Ace Hardware Store to look for this muzzleloader, did you go with a particular type of brand or model of weapon in mind?
A. Yes, I did.
Q. And what type of brand or model of weapon in mind did you have at that time, sir?

A. It was the CVA Kodiak Magnum.
Q. And why was that, sir?
A. Because I--I watched The Outdoor Channel an awful lot, and the advertising of that gun looked like a really good muzzleloader-type gun, and it at that time was advertised to have won several awards for being one of the top muzzleloaders.
Q. So you went and searched that particular type of weapon at the Ace Hardware Store, correct?
A. Yes.
Q. And when you arrived at the Ace Hardware Store in Salina, Kansas, did you have an opportunity to view and examine part of the muzzleloaders that were on display there?
A. Yes.
Q. And did you find that particular weapon that you were looking for?
A. Yes, I did.
Q. Is that the only weapon you looked at while you were there?
A. Yes. That was the only one I really had in mind.
Q. Okay. Did you pick up or try any of the others, examine them?
A. I looked at one of the Optimas, CVA Optima, which is a break-open one, and looked at it. Didn't particularly like the feel of it.
Q. So you put that one aside?
A. Put that one aside.

Q. When you picked up the other one and looked at it, it was the Kodiak that you were looking for; is that correct, sir?
A. Yes, it was.
Q. And assuming, having seen these ads and done your own thought processes about it, did you examine the weapon there in the store?
A. Yes.
Q. Did you check it out as any normal, I guess, hunter or shooter would?
A. Yeah. Picked it up, looked at it, put it up to my shoulder, kind of looked down the barrel and for the feel, the balance, and stuff like that.
Q. How long do you think you spent looking at that weapon in the store that day, sir?
A. Oh, 15 or 20 minutes, probably.
Q. And after you concluded your examination of the weapon, did you buy that one that you picked up on the display stand?
A. No, sir. I don't like to buy counter guns. I asked the clerk if they had another one in a box that I could look at and buy, and he did.
Q. And that particular box, we have marked.
MR. SPARKS: It has been introduced into evidence in this trial as an exemplar box as Exhibit No. 7, Your Honor.
BY MR. SPARKS:
Q. Is this the type of box that you saw, sir?

A. Yes. That's what the gun was in when they brought it out of the back.
Q. And when the gun was in, sir, what was the-- The gun that was in this box, what did you do when the clerk brought it to you, sir?
A. We opened up the box and I took the gun out and looked at it and looked at the box to make sure that they had the right gun in the right box, and it was the one that I wanted.
Q. Did you look to see if there were any other accessories or information with the gun?
A. Yeah. It did have a manual in there, and whatever actually supposed to come with the gun was in the box.
Q. At the time that you examined the gun and as it was in the box at that time when you looked at it, you found the manual, there were--as you said, there were other items, certain tools that were in it; is that correct?
A. Uh-huh.
Q. Is that yes?
A. Yes.
Q. Okay.
A. Sorry.
Q. The weapon in here, was it--it was set up in a packaged form?
A. Yes.
Q. Did you take the weapon out and examine it, as you said?

A. Yes, I did.
Q. And at that time did you give the same examination of the weapon as you'd given the display model?
A. I did.
Q. And did you do that in the presence of the clerk?
A. Yes.
Q. And upon examining that weapon, did you place it back in the box or did the clerk place it in there?
A. The clerk placed it back in the box.
Q. And did you then proceed about taking this weapon as a purchased item from the store?
A. Yes.
Q. Mr. Katzenmeier, beside you is a black notebook, the very large one, that has multiple tabs in it. I would ask you to turn to Tab No. 1 for us. Would you take a moment to look at that particular document.
Are you familiar with that document, sir?
A. Yes, I am.
Q. And could you describe that document for us?
A. That is the sales slip from the Ace Hardware for that Kodiak Magnum rifle.
MR. SPARKS: Your Honor, may I publish that document to the jury at this time?
THE COURT: You may.
MR. SPARKS: We're waiting for the technology to come

in.

Was it up here on this screen?

THE COURT: Counsel, you also might move that screen back there, angle it toward the jury.

MR. SPARKS: It's a marvelous thing when it works, Your Honor.

BY MR. SPARKS:

Q. Mr. Katzenmeier, is that a true and correct copy of the sales receipt that you supplied us relative to the purchase of the weapon you identified in the exemplar box?

A. Yes, it is.

Q. Did you pay cash for that or charge it? I can't tell or remember, sir, to be honest with you.

A. I paid cash for it.

Q. After you had purchased that weapon-- Let me strike that and ask you this question:

You and your wife live in Ellsworth, Kansas; is that correct?

A. Yes, sir.

Q. Does anyone else reside with you in the home?

A. No.

Q. Okay. Has anybody resided with you in the home from the end of 2004 up until, let's say-- Well, from, let's say, the time you purchased this weapon until the time you gave it away at Christmas, did anybody else reside and visit or stay in your

home overnight?
A. No.
Q. You took this weapon after you purchased it with the receipt and you went home with it; is that correct, sir?
A. Yes, sir.
Q. And tell me, sir, what did you do next with that weapon in the box as you got back to your home in Ellsworth, Kansas?
A. I took it in the house then wrapped it up for Christmas. I wrapped it myself, and then because, you know, first of December, and I was taking it to Iowa about the 20th of December, so I wrapped it and got it ready to transport up here.
Q. So once you got the weapon home, did you take it out and examine it again?
A. Yes, I did. I took it out and looked at it a little bit.
Q. Okay. Did you at any point in time remove the breech plug in that weapon?
A. No, sir.
Q. Did you at any point in time take any of the tools that are within the box and apply it to any parts of the gun?
A. No, sir.
Q. Did you do anything with the weapon in terms of dry-firing it, dropping it, or abusing it in any form or fashion?
A. No, sir.
Q. Did you make any adjustments to the weapon of any kind?
A. No.

Q. Approximately how long did you handle the weapon at the time you took it out of the box until the time you put it back in the box and began to wrap it?
A. Probably five minutes or ten minutes.
Q. And after you examined it and you were satisfied with it, you put it back in the box?
A. Yes, sir.
Q. You wrapped it for Christmas the very same day you purchased it?
A. No. Probably was a day or two later.
Q. Where did you store the weapon for that day or two?
A. I stored it in I guess what you call my den room in the basement.
Q. And as you sit here today, you're comfortable that nobody else examined or in any way altered or touched that weapon; is that correct?
A. That is correct.
Q. And after you then took that weapon from the den and wrapped it for Christmas, where did you store it?
A. I just stored it in my room.
Q. And I assume that no one else unwrapped it during that period of time; is that correct?
A. No, sir.
Q. When was the next time that you physically saw that weapon, not the package, but the weapon itself, sir?

A. It was Christmas Eve when I gave it to J.D. and he opened it for his present.
Q. So you drove it from Ellsworth to where he lives in Ogden, Iowa?
A. Right.
Q. It wasn't dropped putting it into the car, it wasn't dropped taking out of the car, was it, sir?
A. No, sir.
Q. And I'm assuming that the packaging was still in place?
A. Yes, sir.
Q. And I hope you wrap better than I do. So when you gave it to J.D., that was the next time you saw it, when he unwrapped it; is that correct?
A. That's correct.
Q. All right, sir. At the time that J.D. unwrapped the weapon and took it out, did you have a discussion with him about the gun at that time?
A. Nothing in detail. We just looked at it, felt it, and, like you normally do, you put it up to your shoulder and look down the barrel and look at it for comfort, stuff like this.
Q. As my mom would say, you do what guys do with guns?
A. Yeah.
Q. When you looked at this weapon, now, you saw Mr. Eaton handle a weapon of--well, you weren't here, but the jury saw him handle a similar weapon a while ago, this exemplar weapon. Is

that correct that this is what it looked like, in terms of not the black part of it, but in terms of the weapon itself and its size?
A. Yeah. The one I bought was a blue barrel with a camouflage stock.
Q. That's what I was getting ready to ask you. The weapon you purchased for Christmas had a camouflage stock to it; is that correct?
A. Yes.
Q. And that particular camouflage stock, the barrel was blue, or we call blue barrels--
A. Yes.
Q. --it's really kind of a dark color, correct?
What did you and your son do with that weapon after you took it out of the box and examined it? Did anything else happen with the weapon at that time Christmas Eve?
A. No. As I recall, we put it back in the box and put it in his storeroom and everything.
Q. And where is his storeroom located?
A. It's in his basement, kind of off the side of his furnace room.
Q. The next morning, on Christmas day, did you and J.D. again have an occasion to take the weapon out and look at it?
A. Yes, we did.
Q. And can you tell me, sir, at the time you took the weapon

out, where were you in the home?
A. We were in the basement.
Q. Is that where Mr. Katzenmeier, J.D.-- Excuse me, Mr. Katzenmeier. Is that where J.D., your son, keeps his weapons and his materials?
A. Yes.
Q. So you have kind of a storage area down there for his guns and gun cabinet, things of that nature?
A. Yeah. He keeps all of his guns in a locked gun cabinet, and he keeps, like, the components and other accessories in the store-type room in kind of a closet.
Q. When you and he went back down there that next morning, on Christmas morning, to look at the weapon, where was the weapon at that time?
A. It was in the box.
Q. And was it in the gun cabinet or outside the gun cabinet?
A. I recall it was just in the storeroom in the box in there.
Q. When you and he looked at it, sir, can you tell us what transpired that morning when you examined the weapon?
A. Again, we just looked at it and, as guys do, we sighted it and looked down the barrel and, you know, was excited about going out and trying it at a later date and everything. But then we did go ahead and run a swab down the barrel, a clean patch down the barrel, just to see if there was any oils or residue or anything in the barrel, and--

Q. Now, who ran that swab or clean patch through the barrel?
A. I think J.D. did.
Q. And, as a muzzleloader user, is there some specific purpose for doing that or reason to do that, sir?
A. Yeah. And I had recommended he do that, just the fact that just in case there's any oil or residue or anything from the packaging in the barrel, that it cleans it out.
Q. Did you recommend it to him that day, that morning?
A. Yes.
Q. Is that what he did next?
A. That's what he did.
Q. And when he ran that clean patch through the barrel, you observed him to do so; is that correct, sir?
A. Yes.
Q. And once he completed that task, did you examine the patch or--the clean patch to look at it?
A. Yeah. Looked at the patch, and it was pretty clean.
Q. All right, sir. Did you at any point in time or did you personally or did your son, while you were standing there with him in your presence, in any way alter or remove the breech plug in that weapon?
A. No, sir.
Q. Did you apply any of the tools to tighten it or loosen it?
A. No, sir.
Q. Did you affect any of the components on the weapon, other

than running the dry patch through it that day?
A. Only the dry patch.
Q. Once you'd done the dry patch and looked at it, what do you recall next having been done with the weapon?
A. Put it back in the box and put it back in the storage.
Q. Did you ever see it again before the accident on October 2nd, 2005?
A. No, sir.
Q. You had traveled to his home on more than one occasion after Christmas, had you not?
A. Yeah.
Q. Okay. And did you ever have an occasion to see him take the weapon out in any of those occasions you were there?
A. No, he did not.
Q. Did you ever have any occasion to ever see him fire that weapon--
A. No.
Q. --at any time?
A. No.
Q. And so once you left on Christmas day, or approximately thereafter, to go back to Kansas, you never saw that weapon again up until the date of the incident; is that correct?
A. That's correct.
Q. Now, let me focus your attention to October 2nd of 2005, which I don't believe there's any question about what happened

that day, that an explosion occurred. When was the first time, sir, that you received any information associated with this incident?
A. It was when J.D.'s wife, Julie, called our house and told us that--
MR. REYNOLDS: Excuse me, Your Honor. We would object based on hearsay.
THE COURT: Sustained.
BY MR. SPARKS:
Q. Mr. Katzenmeier, we talked about this. You cannot tell me what someone else said, so let's try to work the question a different way. How did you receive information of this incident?
A. Okay. J.D.'s wife called us at our home.
Q. Okay. And you received a phone call concerning this event?
A. Yes.
Q. What was the next step you took after you completed that phone call?
A. We started packing our stuff and suitcases and started driving to Iowa.
Q. You used the term "we." You're talking about you and who else, sir?
A. My wife and I. Actually, we didn't pack our suitcases until I picked her up off the floor. She received the call and just about fainted dead away when Julie told her what happened.

Q. Once you got things under control, your began your trip to Iowa; is that correct?
A. Yes.
Q. Where did you first arrive when you entered the state? Did you go to-- What location did you go to first?
A. We went to J.D.'s house.
Q. And what was the purpose behind that?
A. To check on him.
Q. And when you went there, was he--
A. Wasn't there.
Q. And--
A. Checked in on the grandkids.
Q. What did you find out when you arrived? Not what someone told you, what did you personally find out when you arrived there at the home in Ogden, in Boone County?
A. Okay. When we arrived there, the--we--I had found out that he had been transported to Boone County first, hospital, and then transferred to Des Moines hospital, and then immediately transferred from there to the University of Iowa Hospitals.
Q. And when was the occasion by which you and your wife were able to go see your son first?
A. It was the following day.
Q. Did you stay there in Ogden with the children, his children, your grandchildren?
A. Yes. Stayed overnight.

Q. And after you did that, sir, you said you went to go see your son; is that correct?
A. Yes.
Q. And that was in Iowa City at the University of Iowa Hospital?
A. Yes.
Q. When you got there, sir, what was the first thing you saw concerning your son?
A. Seen him in a pretty dramatic shape. He was bandaged up and everything with his head and his hand and everything.
Q. When you say his head was bandaged, can you describe what you saw to the ladies and gentlemen of the jury, sir?
A. Well, I just seen his whole top of his head and over his eyes and nose and everything was bandaged and everything. He had received some medical attention in Des Moines, some stitches to sew him up well enough to get him down there, stop it bleeding and everything, and then it was bandaged and transferred down. And his hand was bandaged because it had been broken and bleeding pretty bad.
Q. How long were you at the University of Iowa Hospital with your son, sir?
A. About a week.
Q. And during the course of his admission there, do you recall how many different surgeries your son had?
A. He had--had one on his hand first, and then I believe it was

the next day he had the one for his forehead, eyes and nose and stuff. I think that was the following day.
Q. Okay. And did you stay with him until he was discharged, sir?
A. Yes.
Q. Did you return with him home to Ogden?
A. Yes, we did.
Q. And how long did you stay with him in Ogden?
A. Approximately one or two days.
Q. Now, during the course of time you obviously had several conversations with your son concerning the incident; is that correct?
A. Yes.
Q. Did he describe to you, sir, what occurred on that day?
A. Yes.
Q. And what did he describe to you, sir, that occurred on that day?
MR. REYNOLDS: Objection, Your Honor; hearsay.
THE COURT: Sustained.
BY MR. SPARKS:
Q. Did you have a conversation with your son about the events that occurred on that day, sir?
A. Yes.
Q. And did he relay to you the information concerning the events of that day?

A. Yes.
Q. And what did you come to learn or understand had occurred on that afternoon of October the 2nd, 2005?
MR. REYNOLDS: Objection, Your Honor; hearsay.
THE COURT: I believe it would be, Mr. Sparks.
MR. SPARKS: Well, Your Honor, I'll do it a different way, then.
BY MR. SPARKS:
Q. Did you undertake any investigation of this accident yourself, sir?
A. Like-- No, probably not.
Q. Did you go look or seek out the weapon at any time to examine it?
A. I did, yes. After I got back from the University of Iowa Hospital, I did go over to the Boone County Sheriff's Department to see if I could see the weapon.
Q. Was that the next time you saw the weapon, sir?
A. Yes, it was.
Q. Can you describe for me, then, sir, what did you see?
A. I seen a weapon that had the back end of the gun, the breech plug, the hammer, and the casing, totally blown out of it. The stock was broke in, like, three different pieces.
Q. Mr. Katzenmeier, I'm going to show you what's been marked into evidence as Exhibit No. 2 and ask you, are these some of the pieces of the weapon that you saw at the Boone County

Sheriff's Department?
A. Yes, they do look like it.
Q. Do you recall, sir, approximately how many pieces this weapon was in when you first observed it at Boone County?
A. Including the barrel and everything, it would have been the three pieces; the two pieces of stock and then the barrel of the gun.
Q. Now, the stock is made out of plastic; is that correct?
A. Yeah. I think it's some kind of a composite fiberglass.
Q. Okay. Fair enough. And when you saw this weapon in those pieces at Boone County, sir, can you tell me, did it--was it in an evidence locker? Was it tagged? Was it laid out for you? How did you come to look at the pieces of this weapon at Boone County Sheriff's Department?
A. The officer in charge had brought it out and was holding it behind the counter. I never did actually get to touch it or anything. I just-- He held it and showed it to me, and I just looked at it.
Q. So you didn't physically pick up the weapon at that time or its pieces?
A. No.
Q. And it remained in control and custody of the Boone County Sheriff's Department while you were examining it; is that correct?
A. Yes.

Q. When you purchased the weapon, sir, did it come with a stock--I mean, excuse me--did it come with a scope?
A. No.
Q. And had you ever seen the weapon with a scope on it?
A. No.
Q. Okay. So when you bought the weapon, this scope was not on it when you purchased it in Salina, Kansas; is that correct?
A. That's correct.
Q. All right. Was this scope part of the material or part of the pieces that you saw at the sheriff's department?
A. Yes. I think it was still attached to the barrel.
Q. Okay. After you looked at the weapon, spent some time with your son, did you ever have an opportunity or an occasion, sir, to examine or inspect the pieces of this weapon again?
A. No.
Q. So you never physically handled it at any time?
A. No.
Q. You didn't alter it or do anything to it?
A. No, sir.
Q. You didn't destroy any evidence on it?
A. No, sir.
Q. Okay. Since October of 2005--we are now in December of 2008, there's been a three-year period of time--you have obviously had some time to interact with your son. Could you tell us approximately how much time, in a best guesstimate

format, that you've had to interact with your son since the accident and the incident?
A. You mean as just getting together?
Q. Getting together, family holidays, vacations, whatever it might be, sir.
A. Oh, probably three or four times a year.
Q. And over that course of time, sir, have you had an opportunity to observe your son as he's begun to heal and the problems that he has had as a result of this accident and incident?
A. Yes.
Q. And what are those problems that you have observed with your son as you have seen them?
A. Well, one thing being his sense of taste and smell. The accident destroyed all the nerves in his nose area when it was disintegrated, and he can no longer smell or taste food. And he comments about that, it's sure no fun eating anymore, the fact that food has no taste to it or whatever, can't smell it.
Q. Have you observed him in any form or fashion at dinners or at restaurants when you two have had dinner together about that situation, what he's said or what he's done?
A. Yeah. He normally spices up his food a lot more with pepper or something so he can taste it, or whatever, get a little taste out of it. And he has made comments to me that he eats and drinks certain things together because that's what he used to do

and that's how he remembers how he likes food, you know, not as how he tastes it today.

Q. Besides his inability to taste and his inability to smell, have you noticed any other things about him?

A. I noticed his right hand that had the thumb smashed and everything else, his--his grip, or whatever, at that hand is not quite as strong as it used to be.

Q. What about him in terms of his face, have you noticed any changes there, sir?

A. Well, yeah. I've noticed he still has--when you look at him close, you can see a lot of, like, the powder and the fiberglass still embedded in his skin, I'm told will probably never come out, and then bruising on the side of his nose that hasn't quite gone away and everything.

Q. Have you noticed anything about him from a personality standpoint that's changed any?

A. Yes. After the accident, I know he was upset about it, you know, because it was a life-changing event to him, you know. It made him do--where he couldn't do things at that particular time that he loved to do and everything else. And he was kind of emotionally upset about that because it just altered his whole course. But in the last, then, after he was healing and things started getting better, then he started getting back into activities that he liked to do again.

MR. SPARKS: All right, sir. Just one moment, if you

don't mind, sir.

THE COURT: Yes.

MR. SPARKS: I have no additional questions of this witness, Your Honor.

THE COURT: Thank you.

MR. REYNOLDS: We have no questions.

Mr. Katzenmeier, thank you, sir.

THE WITNESS: Thank you.

THE COURT: You may step down, sir. Thank you.

(Witness excused.)

THE COURT: You may call your next witness.

And, Mr. Sparks, we'll be taking our midmorning recess at about 10:30.

MR. SPARKS: That's what I was getting ready to ask you, Your Honor, about how far you were going to let me get started with Mr. Phipps before we got to that. Did you say 10:30?

THE COURT: Yes.

MR. SPARKS: We call, Your Honor, Blake Phipps as the next witness for the plaintiff.

THE DEPUTY CLERK: Please step forward and raise your right hand.

BLAKE WILLIAM PHIPPS, PLAINTIFFS' WITNESS, SWORN

THE COURT: Mr. Sparks.

MR. SPARKS: Thank you, Your Honor.

Sir, Your Honor, if you wouldn't mind just to give me the high sign when it gets time. I probably won't be flipping back and forth looking behind me, sir.

THE COURT: I will let you know.

MR. SPARKS: Thank you, Your Honor. I appreciate that.

DIRECT EXAMINATION

BY MR. SPARKS:

Q. Sir, would you state your full name for the ladies and gentlemen of the jury and the record, please.
A. Full name is Blake William Phipps.
Q. Mr. Phipps, how old a man are you today?
A. I'm 23 years old.
Q. And where do you currently reside?
A. Boone, Iowa.
Q. How long have you lived in Boone, Iowa?
A. My whole life, sir.
Q. So you've lived all 23 years there; is that correct?
A. That is correct.
Q. All right. Are you currently employed, sir?
A. Yes. With the Union Pacific Railroad.
Q. And do you have any other associations or affiliations which take up your time other than the railroad at the present time?
A. Yes. I'm in the Army National Guard.
Q. And how long have you been in the Army National Guard?

A. Just over five years.
Q. So since the time you got out of high school, then?
A. Yes.
Q. And what do you do in the Army National Guard?
A. I'm an all-wheel mechanic.
Q. Has all your time been spent here in Iowa in that process, sir?
A. No. I spent 16 months in Iraq.
Q. Back home and working for Union Pacific, prior to that, where were you employed?
A. I had worked for Northern Natural Gas, Ogden.
Q. And what were your job duties or functions there?
A. Oh, whatever they told me to do, anything from working on the pipeline to helping rebuild compressors to cleaning up anything, just anything they told me to do.
Q. Who was your boss at Northern Natural?
A. J.D.
Q. Is that J.D. Katzenmeier behind me?
A. Yes.
Q. And how long have you known Mr. Katzenmeier?
A. Oh, approximately about, I'd say, six, seven years.
Q. And when was your first interaction or involvement with Mr. Katzenmeier?
A. First time I met J.D. was when my dad had some taxidermy work done. J.D. did it for him.

Q. So J.D. was a taxidermist on the side?
A. Yes.
Q. And you would have been about how old at that time?
A. Oh, 15.
Q. And where did you meet him at that time, sir?
A. The first time I met J.D. was my dad hanging--had a deer hanging in one of his buddy's garages, and J.D. came and caped it for my dad, and that was the first time I met J.D.
Q. And when was it that you went to work at Northern Natural Gas again?
A. It was right after I graduated from high school.
Q. And when you went to work there, you said you worked under Mr. Katzenmeier for that period of time. Was he your direct and immediate supervisor?
A. Yes, for the most part, when I was working in the plant, and then I had another supervisor when I was working out in the field on a pipeline.
Q. Describe for us the relationship that you and J.D. Katzenmeier developed outside of work during that time, sir.
A. Oh, just friends, you know. When we seen each other, we'd say hi, maybe every once in a while I might stop by and see him. Nothing too great involved, but just mutual friends.
Q. There's about how big a difference in age difference between the two of you?
A. Oh, I'm not sure of J.D.'s exact age, but probably a good 10

to 15 years.
Q. Okay. And in that relationship that you and J.D. developed, did you engage in any activities together outside of work?
A. Not a lot, but yes. I mean, you know, just mainly hang out together. Every once in a while, you know, I might stop and see him, or he had been down to my place prior to that with my dad, but that was--that was about it.
Q. Do you recall what he was doing at your residence with your father?
A. Yes. He had--was down at my house shooting another gun with my dad.
Q. Do you recall what type of weapon that was?
A. I believe it was another muzzleloader. I'm not sure of the exact--exact brand.
Q. And do you know approximately when that was, sir?
A. Oh, approximately a year, maybe a year and a half, before this incident.
Q. So he was familiar with the area and the location of your home and area where this incident occurred?
A. Yes. He'd been--he'd only been down there once before, but he was familiar with it, yes.
Q. Okay. Where you guys target--or were your dad and J.D. target shooting on that occasion you saw them there that day?
A. J.D. was down there target shooting, yes.
Q. Was your dad engaged--was your dad with him or were you with

J.D. that time he was starting shooting that first time at your residence?
A. My dad was with him.
Q. So he was not unfamiliar with the location or the residence or the setup that was there; is that correct?
A. That--that is correct.
Q. What led up to October the 2nd, 2005? On the day of that event, what brought about you and J.D. to get together on that particular day, sir?
A. Well, I--like I said, I worked with J.D. at Northern Natural Gas, and I had purchased a muzzleloader and had shot muzzleloaders before, wasn't real familiar, but I wanted to learn some more, and J.D. said he had just got his new muzzleloader and he needed to do some sighting in on it, and so he came down that day and he was going to show me some things and sight in his new muzzleloader.
Q. So prior to the 5th--the 2nd, excuse me, that day, you had made some decision or discussion about coming out to your location to sight the weapons in; is that correct?
A. That is correct.
Q. You picked a date and time, I assume, then, that being the 2nd?
A. Yes.
Q. And about what time was it in the afternoon or was it in the morning when he appeared on October 2nd at your residence?

A. I believe it was late morning, 10:30, 11:00.

Q. I am obviously not a native of Iowa, nor am I a resident of Boone County, so in relationship to the city of Boone, having been there, tell us, how far in or out of town is your residence that you lived with your father at that time?

A. From--from Boone to my house?

Q. Yes, sir.

A. Approximately 10 to 15 miles from Boone.

Q. Which direction, sir?

A. It would be northwest.

Q. Is there a city or a town or some type of burg in between there that you could give reference to?

A. Well, the town I live next to is Fraser. It's just a really small town and now it's one of the small towns that are part of Boone, so...

Q. Okay. So you live quite a ways from the center part of Boone, then, itself?

A. Yes.

Q. Okay. When he arrived there that afternoon--or early--late that morning, what was the first thing that you and Mr. Katzenmeier did, sir?

A. Well, he parked his truck down at the end of my lane, and I had a table set up there, approximately 100, 125 yards from the target that we were gonna shoot at, and we set everything up there and was kind of getting prepared to do some target

shooting.
Q. When you say you set up a table, what--a table something similar to what's here in front, or something like this where--a card table, or what type of table, sir?
A. It was like a picnic table.
Q. And what types of materials or items did you place on that table?
A. We had our--our powder--you know, Pyrodex pellets and bullets and our muzzleloaders themselves, couple cleaning kit boxes, and we had assorted items in those as well.
Q. What type of weapon did you have with you there that day, sir?
A. I didn't have mine. I had a CVA Optima Pro, and I had found some problems with it, and I didn't want to fire it because I was going to return it.
Q. Okay. And where did you return the gun to?
A. I returned it to Scheels.
Q. Is that where you purchased it, sir?
A. Yes.
Q. So you did not have a weapon to fire that day; is that correct?
A. No.
Q. During the setup period of time, what items were placed on this table, as you recall, sir?
A. Like I said, I--

Q. I want to make sure I'm clear.
A. J.D. had his--his gun case with his muzzleloader in it, his Pyrodex pellets that we used and his PowerBelt slugs, and then, like I said, just a cleaning kit with your cleaning rod and then he had his push rod as well for his muzzleloader.
Q. Did he have anything else on the table, other than those items?
A. Not that I recall.
Q. Okay. In terms of that, you used the word "powder" a while ago, but was there actual powder there or was there Pyrodex pellets?
A. Just the Pyrodex pellets, yes.
Q. Earlier the jury has seen what appears to be a box of Pyrodex pellets. Is that the type of box that you saw that day, sir?
A. Yes.
Q. And when you talk about the bullet, I can hand you, sir, what has been marked--
MR. SPARKS: If I may approach, Your Honor.
THE COURT: You may.
BY MR. SPARKS:
Q. --previously as Exhibit No. 4 and ask you if you recall seeing that, sir.
A. Yes, I recall seeing that.
Q. And would you turn it over and inspect the back side of it

for me, sir.
A. Yeah, I recall seeing that.
Q. Okay. And what's in there, sir?
A. It's a .50-caliber PowerBelt slug.
Q. Do you recall how many slugs were there on the table that day, sir?
A. I don't recall.
Q. How do you remember that particular package and that particular slug?
A. That's--that's the one he's had there today, and--that day when he fired.
Q. And you recognize it?
A. Yes.
Q. And he had a box of Pyrodex pellets?
A. Yes.
Q. Did he have the manual with him with the gun?
A. I don't recall.
Q. All right, sir.
MR. SPARKS: Your Honor, I'm getting ready to get into a long and involved discussion about what transpired at that table and that location.
THE COURT: Why don't we take our recess at this time.
MR. SPARKS: Thank you, sir. I appreciate that.
THE COURT: Members of the jury, we'll be in recess for approximately 15 minutes. During the recess period please

bear in mind the admonition given previously. We'll see you in 15 minutes.

And leave your note pads right on your chairs, if you would, please.

(In open court, out of the presence of the jury.)

THE COURT: Please be seated.

Counsel, one quick thing before I let you go.

The name, Mr. Singer, of your interpreter is?

MR. REYNOLDS: Nicholas Olivencia.

THE COURT: Olivencia? And do we have his spelling in the record?

MR. REYNOLDS: O-l-i-v-e-n-c-i-a.

THE COURT: And you all know who Mr. Olivencia is; is that correct?

MR. EATON: We do not, but--

MR. REYNOLDS: He's an associate in Whitfield & Eddy.

THE COURT: Here are the two questions I have. So he's not going to be probably--or probably will not be providing simultaneous translation, but I would want to know if there's any question concerning his qualifications, if we need to make a record, A, and, B, if there's any desire, under the circumstances, that the interpreter's oath be administered to him.

MR. EATON: Mr. Singer and Mr. Reynolds have assured us, now advise us he's a member of the firm, so that's good

enough for us.

MR. SPARKS: Officer of the Court, as far as I'm concerned, Judge.

THE COURT: We'll take it that way, then. Thank you both. I'll see you in 15 minutes.

MR. EATON: Thank you, Your Honor.

(Short recess.)

(In open court, in the presence of the jury.)

THE COURT: Please be seated.

Mr. Sparks.

MR. SPARKS: Thank you, Your Honor.

BY MR. SPARKS:

Q. Mr. Phipps, we had been talking about the table and the items that were on the table before we took a break. Do you recall that, sir?

A. Yes.

Q. Tell me a little bit about the weather that day. What was the weather?

A. It was pretty nice fall day. Sun was out. Not too breezy, if I recall. Pretty nice day.

Q. So no snow on the ground?

A. No. Not like now.

Q. Okay. Silly kind of question. Had you guys been imbibing in any type of alcoholic beverages?

A. Oh, no, sir.

Q.  Had you had any medications or anything that morning that would alter your state?
A.  No.
Q.  Did you see Mr. Katzenmeier do anything of such nature?
A.  No.
Q.  When you set up the items around this table, the purpose and the process which occurred, where were you standing relative to Mr. Katzenmeier or J.D.?  Were you standing beside him, were you sitting on the ground?  What was your relationship to him and this table?
A.  We were both, if I recall, standing in front of the table, and I was standing next to J.D.
Q.  Okay.  And the items that you described were laid out on the table?
A.  Yes.
Q.  And what was the first thing that you recall seeing Mr. Katzenmeier do or say to you at that time?  Don't tell me what he said, but what do you recall him doing at that time?
A.  I recall him, he took out his muzzleloader, out of the case, and showing it to me and we were looking it over.  And--
Q.  Let me stop you there.  Was he explaining any type of features on the weapon?
A.  Not that I recall.  We were just--he was just showing it to me, and--
Q.  Did he at any time, while showing it to you, take any type

of tools or any type of apparatus and adjust anything on the weapon?
A.  No.
Q.  You know what a breech plug is, do you not?
A.  Yes, I do.
Q.  Did you see him at any time on October the 2nd, 2005, adjust, remove, or mess with in any way the breech plug?
A.  No, I did not.
Q.  All right, sir.  At that time that you two are examining the weapon, what was the next thing that you saw Mr. Katzenmeier do?
A.  The next thing I saw J.D. do is he was showing me the Pyrodex pellets and the PowerBelt bullets, showing them to me, and he showed me the Pyrodex pellets and the proper way that you need to load them.  There's a dark side on those.
MR. SPARKS:  Your Honor, may I approach for a moment?
THE COURT:  You may.
MR. SPARKS:  Thank you, Your Honor.
BY MR. SPARKS:
Q.  These Pyrodex pellets, you said there was a dark side.  I managed a while ago to put the one in here I shouldn't have, so I'll see if I can get the one out.
There you go.  Would you take a moment to take a look at that for me.  Is that the type of pellet you were looking at that day?
A.  Yes, that's the type of pellet.

Q. Would you take a moment to look at. When you say there's a dark side and a light side, can you explain what you see there, sir?
A. There's a dark-- This bottom of this is dark, and the dark side goes down when you put it in--
Q. Okay.
A. --when you load it.
Q. Did you observe Mr. Katzenmeier do that, sir?
A. First he ran a dry patch through.
Q. Okay. Well, let's back up, then. So he ran a dry patch through again on the weapon; is that correct?
A. Yeah. He just put a patch on his cleaning rod, ran a patch through, and then he dropped in--
Q. When you say ran it through, did he run it through the barrel?
A. Yes.
Q. There's some of us that have never fired a muzzleloader, Mr. Phipps, okay?
A. All right.
Q. All right. So he runs the dry patch through the barrel again. When the dry patch comes out, did you observe the patch?
A. Yeah. Yes, I saw the patch.
Q. Can you describe for us what you saw?
A. It was a white patch, white--typical cleaning patch.
Q. But was it dirty? Did it have grime or anything on it, sir?

A. I believe it was clean.
Q. Okay. So he runs a clean patch through the weapon; is that correct?
A. Yes.
Q. And then you observed him to do what next?
A. Next he loaded in these Pyrodex pellets, three of them.
Q. Okay. In what manner did he load them?
A. The proper way, with the dark side down.
Q. Okay. How did he do it? Did he do them all at one time, did he do them one at a time, or how did he load that, sir?
A. He loaded in one at a time, three total pellets.
Q. Okay. As he loaded each one and placed it where?
A. In the end of the barrel, dropping them down into the barrel.
Q. Okay. And after he did that on three successive occasions, what occurred next?
A. He then got one of his PowerBelt--PowerBelt bullets, sorry, and placed it in the end of the barrel. And then he had a starter rod, which is just a short rod with a ball on the end of it to start your bullet down into your barrel, and he-- It goes down just a few inches to start that, and then you have your full push rod.

And he pushed his--the Power--the bullet down into the barrel, and he had a mark on his push rod, and he showed that to me, to make sure that you have the bullet seated correctly.

Q. During this course of discussion he was having with you, would it be a fair characterization to say he was instructing you on how to load this weapon?
A. Yes, he was.
Q. And why was that, sir?
A. I knew some about muzzleloaders, but J.D. had a lot more knowledge on them than I did, and I just wanted to learn some more. And that's one of the reasons he came down there that day, to show me those things.
Q. So as he walked you through each step of the way, did you ask any questions, sir?
A. He pretty much gave everything to me in detail about how to do it, and I really didn't have any questions.
Q. As you sit here today, and I realize it was over three years ago, can you give us an approximation of how much time it took from the time he took his weapon out and began this instruction process with you involving the placement of the pellets, the bullet, the starter rod, and the push rod?
A. I would say approximately maybe five to ten minutes, at the most.
Q. And during that period of time did anything unusual happen? Did the weapon fall, did he drop it, did anything out of the ordinary occur?
A. No, it did not.
Q. Once he had completed the seating of the bullet, as you

claim, starting his rod down, the range rod, did he explain that process to you?
A. Yes, he did. He said you needed to make sure that you had your bullet properly seated. He emphasized that very much.
Q. Okay. And did you observe him do that, sir?
A. Yes. Yes, I did.
Q. After he seated his bullet, did he remove the range rod?
A. Yes.
Q. What was the next thing that occurred?
A. Well, he had to put a primer in.
Q. Okay. So what's a primer look like?
A. Just a little silver primer. It's just a round circular primer.
Q. Okay. What does it look like? Does it have two sides to it, like the Pyrodex pellet?
A. Yeah. I believe there's a flat side and a rounded side.
Q. And what did you observe him do with the primer?
A. He placed it--he placed it in the muzzleloader.
Q. Okay.
A. In the slot for the primer.
Q. Was that back where the breech plug is?
A. Yes.
Q. And does it fit a certain way?
A. I believe so, yes.
Q. Can you put that primer in backwards or upside down or some

way?
A. I don't believe so. I think there's only one way you can do it.
Q. So he places the primer in. What happens next?
A. Then he wanted to walk a little closer to the target, approximately 30 to 40 yards, to see where we were at from--from that distance, and then just move back from there.
Q. Let's stop and talk about the target for a minute. What was the target that you were shooting at, sir?
A. I have a--it's just a target stand I built out of two-by-fours, and then I had, like, a concrete board nailed on it, and then we had two shoot-and-see targets stuck on it.
Q. When you say concrete, is that a Masonite board, is that what you're talking about?
A. It's like-- Yeah. Just like a concrete overboard for--they use for siding, things like that.
Q. About how thick was it, sir?
A. Three-eighths of an inch.
Q. And is it attached to the shooting stand that you made, sir?
A. Yes, it was. I had it nailed to the shooting stand.
Q. So you nailed the Masonite board to the shooting stand and you put the two targets on it; is that correct?
A. That is correct.
Q. After you had done that, did you walk downfield or downrange with Mr. Katzenmeier?

A. Yes. Like I said, approximately 30 to 40 yards away from the target.
Q. And did you pace it off? Is that what you were trying to do?
A. Yes. Yes.
Q. Okay. And after you'd paced it off, what did you do next, sir?
A. He-- I was standing next to J.D., and he said he was gonna go ahead and take the first shot.
Q. All right. Let me stop you there. Is there anything there in that particular area-- We know that we have the target stand downrange now. Is there any type of bench or seating that J.D. is using at this time?
A. Yes. I had an old barrel sitting there, and he used that as a rest.
Q. Let me ask you to take a moment to open that big black notebook there beside you and go to Tab 9 for me. You'll find in there there is an exhibit sticker that says Exhibit No. 9A. And then if you flip over four pages, you'll find one that says Exhibit 9B that shows an area.
Do you see that, sir?
A. Yes, I see it.
Q. Okay. If you would be so kind as to flip over to the third page, which says 1 of 3 on there, sir, do you see that now under Exhibit 9--

A. Yes.
Q. --the 3 of 7?
A. Okay.
Q. 3 of 7?
A. Okay.
Q. Do you see that now there, the third page?
A. Yes.
MR. SPARKS: Your Honor, this is an exhibit which has been previously introduced by the parties by the pretrial order. May I publish it to the jury at this time?
THE COURT: Yes, you may.
MR. SPARKS: Thank you, sir.
If technology works here in the room-- There you go.
BY MR. SPARKS:
Q. Take a look at that photograph and describe, is this the area where this incident occurred on October the 2nd, 2005?
A. Yes, it is.
Q. Can you describe and explain for me what you see there in that photograph?
A. Just that's down by my house. There's a couple barrels sitting there, and the biggest one is what J.D. used for rest that day.
Q. Okay. There are two--looks like some type of welded loops on the top of that barrel; is that correct?
A. Yes, that's correct.

Q. And there appears to be something laying between those two loops. Do you know what that is, sir?
A. It's just a rubber piece that was glued on top of it. There's a hole on top of that barrel, and that's all it was, just to cover that hole.
Q. So that is the area in which Mr. Katzenmeier was using as a rest; is that correct?
A. That is correct.
Q. And is the--downrange as you look at that photograph, is that directly downrange to where the target stand would be, sir?
A. Yeah. It was just the left of the barn is where I had the target at.
Q. And approximately how far from that location to where the target stand was do you think was the distance on that day?
A. From the--from where we were shooting to the stand?
Q. Yes, sir.
A. Like I said, probably 30 to 40 yards from where I had the stand.
Q. Now, you had told us just a moment ago that Mr. Katzenmeier said he was going to take the first shot; is that correct?
A. Yes, that's correct.
Q. Was there some discussion or agreement what was going to happen after the first shot?
A. We were gonna take the first shot and see where we were at from 30 to 40 yards and then make our adjustments and then

slowly, you know, go back, you know, another 20 yards and see where we were at from there and then approximately get back to the, you know, 100-, 125-yard range and then get sighted in from there.

Q. So you were contemplating firing the weapon more than once?

A. Yes.

Q. And were you going to be firing the weapon that day, if all had gone according to plan?

A. Yes.

Q. Okay. So not only were you sighting it in or watching him sight it in, but you were also going to use the weapon that day; is that correct?

A. That is correct.

Q. All right, sir. So as you told us, Mr. Katzenmeier was getting ready to take the first shot. Tell us what he did relative to that scene that we see on the picture, sir.

A. He knelt down behind the barrel and he placed the muzzleloader on top of one of the old drums there, and he said he was gonna fire. And I was standing in--I believe it was to his right and a little behind him, and I put my fingers in my ears, because usually muzzleloaders are loud when they go off.

And then he fired, and I made the comment, "Man, that was really loud," and I looked to my left, and J.D. was--the gun was broke apart, and J.D. was down laying down and had his hands on his face.

Q. In terms of that picture, sir, where you're looking at the barrel right now, approximately how far away from the barrel was Mr. Katzenmeier or J.D. sitting on the ground or down on the ground at that time?
A. Just, you know, three or four feet, where he had knelt down, and then he just kind of went down on his rear end and was there and then had his hands on his face.
Q. When you turned and looked at him, what was the first thing you saw?
A. He had his hands on his face and gun blown apart and a lot of blood.
Q. What did you do next?
A. I told him to stay right there, and I ran inside and I grabbed a towel and got it wet, and I called 911.
Q. Let's back up. There's a lot of things that went on.
A. Yeah.
Q. You ran into the house. How far are you from that spot that we see in that picture to where your home was at that time?
A. It's approximately maybe 20 yards from that spot. It's just right to the left. There's a little hill, and there's my house right there.
Q. Went in and got a towel?
A. Yes.
Q. Came back to Mr. Katzenmeier. Did you make the call when you went to get the towel the first time or did you go back?

What happened?
A. I ran inside-- Everything happened really fast. I ran inside, and I had a cordless phone, and I grabbed it, and I ran in the bathroom and got the towel wet, and while I was running back outside, that's when I dialed 9111.
Q. Okay. Prior to today's date, have you had an occasion or an opportunity to hear that 911 tape?
A. Yes, I have.
Q. And you have heard that call that was made. Did you recognize the voice on that call?
A. Yes, I did.
Q. And whose voice was it?
A. It was mine.
Q. And was it made during the moment that took place immediately thereafter that explosion; is that correct?
A. Yes.
Q. As you sit here today, can you approximate how much time occurred between the moment you recognized Mr. Katzenmeier had been hurt to the time that you placed that call?
A. Probably within one minute, maybe two minutes, at the most.
MR. SPARKS: Your Honor, we would move to play the audio tape of the 911 call, which is Exhibit 29. For the Court's information, it is a Category B document, and we would address the Court that this was made as an excited utterance under Rule 803.

MR. REYNOLDS: Your Honor, Defendants have no objection.

THE COURT: You're offering the tape to play in the courtroom?

MR. SPARKS: Yes, sir, if the Court will allow that.

THE COURT: It will be received for that purpose.

(Plaintiffs' Exhibit No. 29 was offered and received in evidence.)

MR. SPARKS: Thank you, sir.

(Plaintiffs' Exhibit 29 was played in open court.)

BY MR. SPARKS:

Q. You placed that call on the way back to him; is that correct?

A. Yes.

Q. Now, you said you had a towel. What did you do with that towel, sir?

A. Well, when I came back outside, J.D. had moved from where he initially had taken the shot up to the front of my house. He was directly in front of my house when I came out, and I told him to get down. And he--he sat down on his rear end again, and I got behind him, and I held--held the towel on his face--

Q. Okay.

A. --to try to stop the bleeding.

Q. Approximately how much longer did you have to wait until the ambulance arrived?

A. It seemed like forever, but maybe 15 minutes, 10 to 15 minutes.

Q. Once the ambulance arrived, what occurred next? What did you observe?

A. When the ambulance arrived, they took over from there. I walked away. And then my dad, who is Lindie Phipps, and my uncle, Ray Williams, they arrived on the scene, because I had also called them and told them what had happened, and they arrived right behind the ambulance. And then I was sitting there talking to them, and the paramedics were tending to J.D. and getting him in the ambulance.

Q. Did you see Mr. Katzenmeier again that day, J.D.?

A. Yes. I saw him again at the hospital.

Q. Okay. How did you get to the Boone County Hospital?

A. I drove J.D.'s pickup.

Q. Okay. So you followed the ambulance?

A. Yes.

Q. Approximately how long were you at the Boone County Hospital with him?

A. I'd say maybe another 15, 20 minutes, and then they life-flighted him to Des Moines.

Q. Let's go back to the scene for a minute. You made the phone call to 911. Did you make any other phone calls while waiting on the ambulance?

A. Yes. I called my dad, and I called J.D.'s former wife,

Julie.
Q. Okay. And so when you called Julie and you called your dad, did you call any other party?
A. I called 911 again to make sure that they knew where I was at. I live in a really remote area, and sometimes if you don't know where you're going, it's pretty hard to find, so...
Q. So when you made that trip into Boone, you stayed with him until the helicopter took him?
A. Yes.
Q. Were you back there with him in the emergency room?
A. Yeah. They allowed me to go back in there and, you know, see how he was doing. And they were kind of tending to him and just pretty much waiting for the helicopter to arrive so they could get him to Des Moines.
Q. Let's make sure we're clear. When you got to the hospital, did you go back into the holding area where J.D. was?
A. Not right away. I first was in the waiting room for a few minutes, and then Julie then arrived, and then Julie and I went back and saw J.D.
Q. So you two went back together?
A. Yes.
Q. Okay. What did you observe when you were in the emergency room at that time?
A. They had his face pretty covered up, but they had a lot of bloody rags and just trying to get him to control the bleeding.

And his thumb--his hand was really cut up too, and they were covering that up and trying to--trying to just control everything, control the bleeding and things of that nature.
Q.  Approximately how long were you there with Julie Katzenmeier and J.D. before he was taken by helicopter here to Des Moines?
A.  I was probably in the room with J.D. five, ten minutes, total time at the hospital maybe 20 minutes, and then the helicopter arrived.
Q.  Now, after J.D. is transported or leaves Boone County, what was the next thing you did, sir?
A.  I went and--  I believe I was going to drive Julie's car back to Ogden for her, because she was going to take J.D.'s pickup to Des Moines.  And I couldn't--I couldn't get her car to start, so a co-worker of J.D.'s and I at the time, Chris Williams, he came and picked me up and took me back to my uncle's house, where my dad was at.
Q.  Did you go back to the scene later that day?
A.  Yes, I did.
Q.  Approximately how long after this event occurred did you go back to the scene, sir?
A.  Approximately hour, hour and a half.
Q.  Was it still daylight?
A.  Yes.
Q.  And when you got there, sir, was there any type of law enforcement officials present?

A. No, there was not.
Q. Were there any law enforcement officials that came with the ambulance?
A. Not that I recall. I believe it was just the ambulance.
Q. There's been some testimony that the Boone County Sheriff's Department had possession of the pieces of the weapon. Do you know how that came about?
A. No, I don't know how that came about. I know the--
Q. That's good enough for right now.
A. Okay.
Q. When you went back on the 2nd, at approximately what time did you get back home from the hospital on the 2nd?
A. I'm not sure of the exact time. Sometime that afternoon. I'd say--
Q. Was it still daylight?
A. Yeah. Maybe 2:30, 3:00.
Q. Did you at that time undertake to examine the area where this incident occurred?
A. Yes.
Q. And what did you find at that time?
A. Found there was a lot of blood, and I found some pieces from the muzzleloader.
Q. What pieces did you locate from the muzzleloader at that time?
A. I located the hammer and the metal that forms around the

hammer.
Q. Anything else, sir?
A. That was it for parts of the muzzleloader. And then all of J.D.'s equipment was still down at my house as well.
Q. What did you do with those two pieces that you found, the hammer and the metal around the hammer, as you described it?
A. I believe I took pictures of them and--and put them in a Ziploc bag, and I believe I later gave them to J.D.'s brother--
Q. Okay. That would be--
A. --or J.D.
Q. --Travis?
A. Yes.
Q. Approximately how long after that did Travis come by that you gave him those parts or pieces?
A. Well, I gave-- After J.D. got back out of Iowa City and was home, I stopped by J.D.'s house and gave him--brought all his equipment to him.
Q. Okay. So it was all done in one fell swoop with all the other stuff?
A. Yes.
Q. And that's why I guess you met Travis and surrendered it to him?
A. Yes.
Q. So you made a mention a while ago that you took some pictures, and those have already been received into evidence,

and we'll talk about those for a moment, but did you take the pictures of the pieces that you found that day, sir?
A. Yes.
Q. And the other pieces that were there--and I use "pieces," the other parts of the Pyrodex, the bullets, things of that nature, did you take pictures of those?
A. Yes.
Q. Did somebody instruct you to do that?
A. I just thought it was gonna be a good idea to--to get all the information.
Q. You did that on your own volition?
A. Yes.
Q. You were not instructed by anyone to do that? That's my point.
A. No.
Q. Law enforcement didn't tell you to do it?
A. No.
Q. Mr. Katzenmeier didn't tell you to do it on the way?
A. No.
Q. He didn't tell you, while he was in the emergency room, to do it?
A. No.
Q. So when you got home and surveyed the scene, you made that decision yourself?
A. Yes.

Q. Okay. In that big notebook in front of you, if you'd take a moment just to look at it for me, again, under Tab 9, beginning at Exhibit 9A, if you'd take just a moment to take a look at that, there are a series of pictures there that are numbered 1, 2, 3, and 4. Do you see that at the bottom of them, sir?
A. Yes.
Q. All right, sir. Would you take a moment and flip over to what would be the third picture. Is that a copy of--or is that a picture of the materials that you took pictures of that day?
I'll get it spit out here right in a minute, I'm sure, but is that a photograph of the Pyrodex box and pellets that you took that day, on October the 2nd, 2005?
A. Yes.
MR. SPARKS: Your Honor, may I publish that to the jury? It's already been--
THE COURT: You may.
BY MR. SPARKS:
Q. So that's the original box and the pellets that were there; is that correct, sir?
A. Yes, that is correct.
Q. And along with it you had indicated in Exhibit 4 was the bullet that's in front of you--in front of you, Mr. Phipps, in the plastic?
A. Oh, yes.
Q. That was also there; is that correct?

A. Yes.
Q. And you took a photograph of it?
A. Yes.
Q. It's a little fuzzy, though, isn't it?
A. Yes, it was.
Q. And you took a couple other photographs that somewhat depict all those same items together at the same time?
A. Yes.
Q. When you took those photographs, who did you give those photographs to and at what time later?
A. It was the same time that I took all of J.D.'s equipment over to his house and gave it to his brother.
Q. During the next several weeks, did you have an occasion to begin looking for any other parts or pieces of the weapon at your location?
A. They were-- I was trying to find the breech plug, if I recall.
Q. Did you personally undertake to do that?
A. I never really looked for it, no. I believe my dad did a little bit and I never really did.
Q. But what you found on that day at that scene, you've turned over to everyone what you located; is that correct?
A. Yes, that is correct.
MR. SPARKS: All right. Just a second, Your Honor.
I don't think I have anything else at this time, Your

Honor, of this witness.

THE COURT: Thank you.

Cross-examination?

CROSS-EXAMINATION

BY MR. REYNOLDS:

Q. Mr. Phipps, good morning.

A. Good morning to you.

Q. I'm Kevin Reynolds. We met, I think, at the time of your deposition earlier in this case.

First of all, on behalf of everyone here, thank you for your service to your country. I wanted to make sure I covered that.

I just have a couple of areas I'd like to clarify, Mr. Phipps. First of all, you had talked about that you were good friends with Mr. Katzenmeier at or about the time of the accident; is that correct?

A. Yes. We were--we were friends, yes.

Q. And you had socialized together on various occasions, correct?

A. Yes, that's correct.

Q. You had been over to his house and he had been over to your place, correct?

A. Just a handful of times. Not-- You know, it wasn't every weekend, every weekend thing. It was just every once in a great while we might spend a little time together.

Q. And is it also true, Mr. Phipps, that you and J.D. worked together at Northern Natural Gas Company?
A. Yes, that is correct.
Q. And, in fact, I think you told me at the time of your deposition that, in fact, J.D. was the person at the gas company that hired you for that position; is that correct?
A. That is correct.
Q. Now, a second area I wanted to cover, and Mr. Sparks is exactly correct--
MR. REYNOLDS: And I wanted to apologize. I referred to Mr. Eaton yesterday as Mr. Sparks. I'll try to keep myself straight.
BY MR. REYNOLDS:
Q. But Mr. Sparks mentioned, and it's certainly true, that not everyone in this courtroom is necessarily familiar with muzzleloading rifles, but one of the terms that was used during your direct examination was sighting in the gun. Do you recall that?
A. Yes.
Q. Can you describe for the folks on the jury what you mean in connection with the muzzleloading rifle when you are sighting in the gun?
A. Well, what you do is fire--fire whatever weapon you're firing, look where you're hitting your target, and adjust your sights so you're hitting where you're aiming.

Q. And, in fact, is that one of the things that you and J.D. were attempting to do on the date of the accident?
A. Yes.
Q. And I think you had talked earlier about you were gonna start at approximately 40 yards, I think you said 30 to 40 yards, in your deposition you said 40 yards. Were you starting at somewhat of a shorter distance, you were gonna see where the slug hit the target, perhaps adjust your sights, and then maybe back up to a longer distance, fire again, see how far you were off, and then, if necessary, make further adjustments?
A. Yes, that is correct.
Q. Is that kind of how the sighting-in process generally works?
A. Yes. Yes.
Q. Now, as I understand it, Mr. Katzenmeier's muzzleloader had a scope on it, correct?
A. That is correct.
Q. And did you have an understanding on the date of the accident as to which target he was aiming at at the time of the accident?
A. I'm not sure which target he was aiming at. There was two targets up on the board. I'm unsure of which one he was exactly aiming at.
Q. There were two targets, and did you call those, like, shoot-and-see targets?
A. Yes.

Q. And are they actually paper targets of some kind?
A. Yes. And then they have a sticky side on them. You can stick them to whatever you want to, and then they're black, and if you hit them, they turn green, hence the name shoot-and-see.
Q. Okay. And did you have one target mounted vertically directly above the other target?
A. Yes.
Q. And these shoot-and-see targets, is it a pattern on a piece of paper that's like concentric circles, if you know what I mean, like a smaller circle, a wider, kind of like a dartboard would look like?
A. Yes.
Q. Now, after the accident or at the time that you returned to the scene, did you ever determine, Mr. Phipps, whether the bullet in the rifle that was fired at the time of the accident, whether that ever hit the target?
A. It-- The slug actually hit in between the two targets.
Q. Okay. And I think you told me at your deposition that it was your understanding that J.D. was aiming at the lower target?
A. Okay.
Q. Does that refresh your recollection?
A. Yes.
Q. Okay. Now, if-- And how did you determine that the slug hit in between the targets? I mean, was there a hole there?
A. Yes, there was a hole there.

Q. And does a .50-caliber slug leave a particular type of hole that you can recognize based on your gun experience?
A. Be about the size of an average man's thumb. It's pretty--pretty big hole.
Q. And a .50 caliber, is that equivalent to a one-half inch? Is that the diameter of the bullet?
A. Yes. Yes, it is.
Q. Now, back to these shoot-and-see targets, can you give the folks on the jury, Mr. Phipps, an estimate of approximately where that bullet hit the target and how far that would have been from the center of the lower shoot-and-see target?
A. Approximately 6 to 8 inches.
Q. Okay. And just so I'm following you, you and J.D. are sighting in his gun, so would this indicate to you, for example, if we assume--and J.D. will testify later, but if we assume J.D. was aiming at the lower target and that if he had the cross hairs-- By the way, does the scope have a cross hairs or some kind of an alignment device in the scope?
A. Most common scopes do. I'm not sure if J.D.'s was that way, but I would imagine so, yes.
Q. You never had a chance to look through his?
A. No, I didn't.
Q. Okay. If we assume--and, again, we'll talk with Mr. Katzenmeier, but if we assume his scope had some kind of a cross hairs or alignment device, and if Mr. Katzenmeier had

those cross hairs or alignment device aimed at the middle of the lower target, based on your look at the Masonite board and the target after the accident, am I to understand that he was approximately, did you say, six to eight inches off?
A.  Yes.  I'd say approximately, yes, six to eight inches high.
Q.  And, as a muzzleloading person or a target shooter, would that indicate to you, then, that you would need to make some kind of an adjustment to the scope or the sighting of the gun?
A.  Perhaps somewhat, but just depends because you're--at a shorter range like that, your bullet's going to be rising.
Q.  It's going to be rising?
A.  Yes.  Coming out of your barrel.
Q.  And so if, in fact, J.D. was aiming at the lower target and his bullet actually hit a little bit above the target, that would be consistent with what you just said, that your bullet tends to rise a little bit at short range?
A.  Yes.
Q.  Now, these scopes on these guns, do they have any kind of adjustment?
A.  Yes.  Most--most scopes do.
Q.  And when you're sighting in a gun and going through this process, are you doing some kind of fine-tuning adjustment so that, at the end of the day, where you're looking at through that scope and where you're aiming at the target is hopefully where the bullet hits the target?

A. Yes. When you're commonly sighting, that's what we did, but we didn't get a chance to do anything like that that day.

Q. Right. Because this happened on the first shot?

A. Yes.

Q. Now, let me go to a different area. You mentioned that you were observing as J.D. was demonstrating some of these things in connection with, you know, cleaning and operating a muzzleloader and loading the Pyrodex pellets and loading the slug, correct?

A. Yes.

Q. Now, you talked about different rods. Is there a rod that's known as a cleaning rod?

A. Yes.

Q. Is there a different rod that's known as--and I'm sure you'll correct me if I don't use the right terminology, but used as some kind of a starter rod to get the bullet initially started the first few inches down the muzzle?

A. Yes. Yes.

Q. And then did J.D. have a third rod, and this would be a longer rod than the starter rod, but this third rod would be used to then take the bullet from its position a few inches inside the muzzle to take that all the way down to the bottom and seat that bullet against the Pyrodex pellets?

A. Yes.

Q. So on that day Mr. Katzenmeier had three different rods?

A. Yes. He had his cleaning rod and then his push rod and then

his short starter rod.
Q. Okay. And then you mentioned earlier today that he had some kind of a mark on a rod. Was that--was that a mark by a pencil mark or a pen or was it a tape mark, or what kind of a mark was that?
A. I believe he had a piece of tape on his rod, if I recall.
Q. And that begs my next question. Which rod are you talking about?
A. The full push rod.
Q. Okay.
A. The full-length rod.
Q. Well, in fact, I asked you that question at your deposition, did I not, and did you not say that you did not know which rod that he had the mark on? Do you recall that?
A. I don't recall that, no, I don't.
Q. Did you retain the shoot-and-see targets and also the Masonite board?
A. Yes, I did have the board.
Q. And do you know, has that been marked as an exhibit in evidence in this case?
A. I don't believe so.
Q. You don't believe so? Have you-- I mean, is that still in your possession or did you give that to J.D.'s lawyers?
A. I really-- I was down at my house and I left, but, I mean, I was gone from my house for a year and a half, so I know they

had dealt with my father some, but I'm not sure what had happened in those.

Q. Okay. Fair enough. Now, I talked about this hole made by the .50-caliber slug from the muzzleloader. Were there any other holes in those shoot-and-see targets or in that Masonite board at or before the time of the accident?

A. If I recall correctly, I believe that my cousin had shot at that board with a .22-caliber rifle maybe several days before that.

Q. And if, for example, the folks on the jury today were to see either the shoot-and-see targets or the Masonite board, would they be able to clearly tell a difference between the hole made by the .50-caliber slug from the muzzleloader versus the holes made by the .22s?

A. Yes, they would. .22 caliber's less than a quarter of an inch. .50 caliber is half an inch.

Q. And when you went back to the scene that day, do you specifically recall, Mr. Phipps, in your own memory, as to seeing the differences in those holes and that it was clearly apparent to you which one was caused by the slug from the muzzleloader?

A. Yes.

Q. Do you know approximately how many .22-caliber holes were in the Masonite board?

A. No, I do not. I'm unsure of how many.

Q. In your deposition, you said there were approximately 20 to 25. Does that refresh your recollection?
A. That's probably about right, yes.
Q. Finally, sir, you stated that at the time the shot was fired you actually had your fingers inside your ears, correct?
A. That's correct.
Q. And similar to what I'm gesturing here in front of the jury?
A. Yes.
Q. And with your fingers in your ears, as I understand it, the report or the noise of the shot itself was very loud?
A. Yes, it was loud.
Q. Was it a lot louder than what you expected?
A. No. It was just, I mean, muzzleloaders are typically loud, you know, and I hadn't shot one in a very long time. But it was loud.
Q. In fact, your statement was taken earlier in this case, was it not, Mr. Phipps, by Mr. Wise, one of the investigators for the plaintiffs' lawyers?
A. Yeah.
Q. And do you recall telling Mr. Wise when he asked you about that that you--you made a remark to J.D., and this was--this was just in a second or two before you realized he was injured, but you made a remark at that time to J.D. along the lines of, "Man, that was loud"?
A. Yes, I did.

Q. And would you agree with me, sir, that the shot or report or the noise of that explosion was a lot louder than other muzzleloading gun reports that you had heard before that time?
A. No. I just--I hadn't fired a muzzleloader in a very long time, been around them, and kind of-- You know, it's louder than a typical shotgun, and so...
Q. Simple fact of the matter is even though you had your fingers in your ears, you still made a remark to J.D. along the lines of, "Man, that was loud," and, in fact, your testimony here today is that it was, in fact, very loud?
A. Yes, it was loud.
Q. Did Mr. Katzenmeier, to your knowledge, lose any consciousness?
A. Not to my knowledge, no.
Q. And, as I understand it, he--he actually walked himself up toward the front of the house from where the accident occurred at the point in time when you were in the house getting the towel and getting it soaked and getting the phone to call 911?
A. Yes.
Q. And then you--you instructed him to sit down and take it easy, correct?
A. Yes.
Q. And from your National Guard training, sir, you have some first aid training to some extent?
A. Yes, I do.

Q. And to be fair, did some of that training come in handy at the time of the accident?
A. Yes. Very handy.
MR. REYNOLDS: That's all. Thank you.
THE COURT: Redirect?
MR. SPARKS: Just a few redirect questions, Your Honor.

REDIRECT EXAMINATION

BY MR. SPARKS:
Q. Mr. Phipps, let's back up for just a minute. I'm going to talk about a couple of things. The day that you were doing the sighting, on the accident date of October 2nd, 2005, do you, sir, have knowledge of the difference between sighting with a scope and sighting with the iron sights?
A. Yes, I do.
Q. Is there a difference when you sight with iron sights versus sighting with a scope?
A. No, not really, except with a scope you can go out at some farther distances. But it's--you know, you shoot and see where you want to hit and then adjust your sights properly.
Q. Which sights do you adjust?
A. Well, on--
Q. If you're using iron sights or the scope, which would you adjust?
A. Well, if I was using iron sights, I would adjust the iron

sights; if I was using the scope, I would adjust the scope.
Q. That's what I want to make sure of. There are two different things on that gun that can be adjusted for sighting; is that correct?
A. That is correct.
Q. Now, do you know in your own mind on that day which was being sighted in? Do you know whether it was the scope or whether it was the iron sights were being sighted in?
A. I don't know.
Q. You and J.D. didn't discuss that, did you?
A. No, we did not.
Q. And there's a difference between sighting with iron sights because the firing and moving and firing and moving, in some respect, is there not?
A. Yes.
Q. All right. Now, the other thing, let's talk about the target board. That seems to strike a cord with the defendants in this case.
You left to go to Iraq when?
A. I left in January of--be January of '06. I left for--went to Camp Shelby, Mississippi for two months and Fort Polk, Louisiana for a month, and then shipped to Iraq in April.
Q. Came home when?
A. Came home July 25th of '07.
Q. So between October and January, where was this

sighting--this board or this target that you had put together that was at your place?

A. I believe it was down in my shed.

Q. Okay. And after you left, you have no idea what happened to it, do you, sir?

A. No, I do not.

Q. You have no independent knowledge one way or the other what occurred with it, do you?

A. Last time I saw it, it was down in my shed.

Q. You didn't give it to anybody?

A. Not that I recall, no.

Q. And your father-- You have no knowledge that anybody gave it away to anyone?

A. No.

Q. All right. Let's go for just a moment--

MR. SPARKS: Your Honor, may I approach the witness for just a moment?

THE COURT: You may.

BY MR. SPARKS:

Q. Let me hand you a copy of your deposition, and I want to make sure the testimony is correct from what Mr. Reynolds just said. I want to hand you a copy of your deposition that was taken on or about February 22, 2008, in Mr. Reynolds' office, and I'm going to direct your attention to page 11, beginning at-- Well, actually, it says page 11. There's a lot of text

that's associated with it in the copy that we got from Mr. Reynolds.

But I'm going to direct your attention to the top of the page, beginning at line 21, and it moves down through a page break, which says 25, and then down again to line 13.

And would you take a moment to read that, not out loud, just read that for a moment.

A. Okay.

Q. At the beginning of that line 21, the question was posed to you by Mr. Reynolds--

MR. SPARKS: And if I might, Your Honor.

THE COURT: You may.

BY MR. SPARKS:

Q. --"How many different rods did he have?"

Could you tell us what your answer was, sir, at that time? It's line 22, right after that, at the top of the page there.

A. Oh, okay. "He had"-- I said, "Well, I believe he had a cleaning rod and there was a push rod for pushing your bullet down the barrel."

Q. The next question Mr. Reynolds asked you, "Do you remember which rod it was that had a mark on it?"

A. I put--I said, "No, I do not."

Q. And then the next question Mr. Reynolds asked you, "And what did that mark consist of? What was that piece of tape and how

would you describe it?"

Would you read your answer there?

A. "I remember his push rod had a piece of tape on it to make sure you'll be able--he said you'll be able to feel when the bullet gets seated, he said, and this is kind of help you to show you you know your bullet is seated and then you know it's okay."

Q. So you did know on the date you gave your deposition, as you've told this Court today, that the push rod had the piece of tape on it; is that correct, sir?

A. Yes, sir. The push rod had the piece of tape, not the cleaning rod.

MR. SPARKS: Thank you, sir. I have nothing else, Your Honor.

MR. REYNOLDS: No further questions, Your Honor.

THE COURT: You may step down. Thank you.

(Witness excused.)

THE COURT: You may call your next witness.

MR. EATON: Your Honor, at this time the plaintiffs would present the video--the designated portion of Jon Muniategui's video deposition. What we'll present is the portions designated by the plaintiff in the pretrial order, Your Honor.

THE COURT: Thank you.

MR. EATON: And for the Court's information, the way

we've put that on the video, there's a little informational label that will say page such-and-such, line such-and-such to page such-and-such, line such-and-such, about a five-second break, and then that's played, and then the next segment the same way.

THE COURT: Thank you.

Mr. Singer?

MR. SINGER: Might I have just a moment to confer with counsel?

THE COURT: Certainly.

MR. EATON: Your Honor, after talking to Mr. Singer, there's two versions of that, and he would request that we play the part that's Plaintiffs' designations and Defendants' designations that were agreed to by Plaintiffs.

THE COURT: That's fine.

MR. EATON: We'll play that version. And it runs about 43 minutes, I believe.

THE COURT: Counsel, would it be any problem to break at noon?

MR. EATON: I don't think so because it's broken in segments. We'll know what segment we broke at by the label between deposition segments.

THE COURT: Okay. Thank you.

(The following portions of the deposition of Jon Muniategui were played in open court: Page 7, line 8 through

page 8, line 19; page 9, line 11 through page 11, line 2; page 18, line 25 through page 19, line 13; page 21, line 20 through page 30, line 1.)

THE COURT: Counsel, why don't we take our noon recess at this time.

Members of the jury, we're going to be in recess until 1:15 this afternoon. During the recess period, please bear in mind the admonition given previously, and we'll see you at 1:15.

Thank you.

(In open court, out of the presence of the jury.)

THE COURT: Counsel, please be seated.

I regret having to interrupt the deposition. I'm the only one in my particular job in the District at this time, and I've had to set a bond hearing and two initial appearances over the noon hour, so I have people waiting for me. Ordinarily, I would have gone until the completion, as long as we didn't go too far in the noon hour.

I'm planning to be back at 1:15, and I'll cut things off or be here, if I have to. If I'm a little late, that will be the reason, but I hope not to be.

We'll see you about 1:15. Thank you.

(Recess at 12:00 noon, until 1:40 p.m.)

AFTERNOON SESSION (1:40 p.m.)

(In open court, in the presence of the jury.)

THE COURT: Please be seated, everybody.

Members of the jury, you'll observe it's somewhat past 1:15. We have one of those occasions when the Court had to take some matters up with counsel outside your presence. I told you those would happen from time to time, and that's what we were doing. And I appreciate your patience with us, but we now are ready to proceed.

And we can resume the deposition that was being played.

(The following portions of the deposition of Jon Muniategui were played in open court: Page 31, line 24 through page 33, line 25; page 40, line 20 through page 42, line 2; page 42, line 13 through page 44, line 19; page 46, line 17 through page 47, line 13; page 47, line 14 through page 48, line 22; page 49, line 20 through page 50, line 9; page 50, line 10 through page 50, line 25; page 51, line 9 through page 51, line 20; page 54, line 13 through page 56, line 17; page 56, line 19 through page 60, line 16; page 65, line 25 through page 66, line 1.)

THE COURT: You may call your next witness.

MR. EATON: Your Honor, at this time the plaintiff calls Lester Roane. I believe Mr. Roane's out in the hall.

THE DEPUTY CLERK: Please step forward and raise your

right hand.

LESTER WAYNE ROANE, PLAINTIFFS' WITNESS, SWORN

DIRECT EXAMINATION

BY MR. EATON:

Q. Good afternoon, Mr. Roane.

A. Good afternoon.

Q. Would you state your full and correct name for the record, please, sir.

A. Lester Wayne Roane, that's R-o-a-n-e.

Q. And, Mr. Roane, what is your occupation, profession, or business, please?

A. I'm the chief engineer at the H.P. White Laboratory in Street, Maryland.

Q. And what is the H.P. White Laboratory? What kind of an operation is that?

A. It's a ballistic testing laboratory. It's been around since 1935 or 1936, I'm not sure exactly. We test guns, ammunition, and armor and do some incidental things.

Q. What are the-- You said that company's been around for how many years or since when?

A. Since the mid-thirties. It was either '35 or '36.

Q. And when did you first go to work at H.P. White Laboratory?

A. 1984, I think.

Q. And when you first hired on at H.P. White Laboratory, what was your first job title, job description, job duties?

A.  It's a very small company.  It was the same then as it is now.
Q.  All right, sir.  All right.
A.  I was hired as the chief engineer.
Q.  All right.  Do you have--  You've provided us previously with what's called a curriculum vitae or resume; is that correct?
A.  Yes, sir.
Q.  And does that document sort of set forth your formal education, your professional experience, cases you've been involved in, and other pertinent materials to your area of expertise?
A.  Yes, sir.
Q.  Would you turn to the book on your left there, Exhibit No. 23, and see if that includes--or if that exhibit is your curriculum vitae.
A.  Yes, sir, it is.
Q.  All right.
MR. EATON:  Your Honor, we'd move to offer Plaintiffs' Exhibit No. 23 and publish at least certain portions of it to the jury.
MR. SINGER:  That's an A exhibit.  There's no objection.
THE COURT:  I think it's a Category A exhibit.  In any event, it's received.

(Plaintiffs' Exhibit No. 23 was offered and received in evidence.)

MR. EATON: A little light coming up on mine, my monitor here.

BY MR. EATON:

Q. Mr. Roane, that first entry on there looks like is your-- There we go. It's hard to focus in. Let's see if we can get a little better.

Your education. Where did you attend college?

A. I went to undergraduate school at Virginia Tech.

Q. And what year did you-- Did you graduate?

A. Yes, sir.

Q. What year did you graduate? Is that on here?

A. 1958.

Q. All right, sir. And what degree did you obtain?

A. Had a bachelor of science in aeronautical engineering.

Q. And after achieving that degree, did you do any further formal education in any other universities or colleges?

A. I have taken courses at Southern Methodist University, University of Michigan, University of Delaware, and then I got a master's degree in public administration from Harvard University.

Q. These other universities you just mentioned prior to your degree from Harvard--

A. Yes.

Q. --what subject matter did you study there? Was it kind of focused in a single area?
A. It was a variety of things. None of them was intended to lead to a degree. They were special courses in engineering and, I think at the University of Michigan, in engineering materials. They were, like, short summer courses, that sort of thing.
Q. Were those courses primarily focused on the kind of work you've done at H.P. White for the last number of years; in other words, scientific engineering materials, that--
A. They were generally in that area, and also I took some courses in economics--
Q. All right, sir.
A. --graduate courses at the University of Delaware.
Q. All right, sir. Now, your CV seems to indicate that after that you--from '58, '59, you were a design engineer at Chance Vought Aircraft Company, where you worked on design, development of automated control systems from pilotless aircraft; is that correct?
A. That's correct.
Q. Is that some of the predecessor to this Predator craft I think we hear about today from time to time?
A. It was sort of like that. It was a--they were actually the predecessor for the submarine-launch ballistic missiles. They were cruise missiles that were launched from a submarine.
Q. And from '59 to '66, you worked as an engineer at the White

Sands Missile Range in New Mexico developing, testing, and operating unguided missiles, target missiles and special instruments and sounding rockets.

Now, who was your employer there?

A. The Army.

Q. Were you in the Army or were you a civilian employee of the Army?

A. Both. I was drafted in 1959. I was in the Army for two years, and then I just stayed on as a civilian.

Q. All right. So when your two years in the Army was formally over, you stayed at the same facility and continued to work in the same area; is that a fair--

A. I did. I stayed at the same desk.

Q. All right. All right. Now, from '66 to 1970, you worked as a general engineer for the U.S. Army Test and Evaluation Command. Tell us a little about that stint.

A. Well, the Army Test and Evaluation Command is just an organization that the Government is filled with that is set up to oversee a lot of other organizations. In that case the other organizations were all the test agencies that the Army has. The Army has specialized test facilities for everything from mess kits to ballistic missiles and tanks, and we--the part that I was working on was to provide test instrumentation for those facilities.

Q. And from '70 to '73, you worked as division chief for the

U.S. Army Small Arms System Agency. Tell us a little about that three years or so of experience.
A. Yes. That was when I came back from graduate school. That was with the agency that was charged with all the development and implementation for what the Army called small arms, which is the things that we normally think of as guns; pistols, rifles, machine guns, grenade launchers, that sort of thing, the personal weapons that individuals use.
Q. Was that your first, let's say, significant experience with regard to design, development, testing, and evaluation of so-called small firearms?
A. Yes, it was. I had been interested in small arms since I was probably 12, but that was the first job that I ever had working in the area.
Q. And what specific-- I mean, can you identify specific firearms that you worked on insofar as design, development, evaluation, and testing that we, as lay people, might be familiar with?
A. Okay. The M-16 rifle had developed some problems--or some problems that were inherent in the design had showed up in Vietnam. We developed some product improvements on the M-16 rifle that is--are still in use, as far as I know.
We did the initial work on moving from the traditional Army sidearm, the .45, the Colt .45 pistol that had been carried forever and ever, to a 9-millimeter gun, which is what

they use now. Those are probably the things that people would be familiar with.
Q. All right.
A. We worked on a bunch of other things that are not so familiar.
Q. All right. Then after that assignment, it looks like you worked for the Social Security Administration for about ten years, from '73 to '83; is that correct?
A. Yes, sir, I did.
Q. That have anything to do with firearms?
A. Not a thing.
Q. All right. From '83 to '85, looks like you were teaching at a community college, some science and math courses. Were you involved at all in firearms evaluation, testing, design during that two-year period?
A. No, sir. Except for one year, the '84 to '85, I worked part-time at H.P. White Laboratory and taught full time at the college.
Q. And then that brings us from 1984 to the present time, where you're working as the chief engineer at H.P. White Laboratory, Inc. You've mentioned that that company does design, development, testing work for firearms, munitions, and what else did you say?
A. Armor. The bulk of our work today is in testing body armor, the vests and helmets that the GIs wear, and also body armor for

police protection.

We do a lot of testing of what we call hard armor, which is the steel, aluminum, glass, the kinds of things that go in buildings and on vehicles.

Q. And so does your evaluation of those various armor systems include firing projectiles from small arms into that armor?

A. That's correct. We-- That's what we do.

Q. Okay. That's a big part of your business now?

A. It's virtually all of our business now.

Q. Okay. When did that aspect or that particular field become the bulk of your company's business?

A. Well, H.P. White Laboratory actually started as a hobby business for a rich man, whose name was H.P. White, and he was--he had it focused on what we normally think of as guns, shotguns, pistols, rifles, machine guns, and the ammunition connected with them.

Before I got there, probably in the early to mid-seventies, the whole concept of body armor started to enter the scene with-- There had been attempts to make body armor prior to that. All the way back into the sixties, I remember seeing some of it tested. It was heavy and it was awkward. But the appearance of Kevlar made relatively lightweight, relatively high-performance body armor a reality, and from that point on, because we were there, because the lab was there and it was equipped to do the kind of testing that they needed, it's

probably been the preeminent body armor testing laboratory in the world.

Q. Now, let's focus on firearms themselves. During your 16--24 years at H.P. White Laboratory, if you could, summarize for us your experience in testing and evaluating small arms.

A. Okay. The most common situation is when a new rifle, pistol, or shotgun is either being--is being introduced to the American market, either because it's a new design from a domestic company or because it's being imported for sale in the United States. We do basic safety testing on them.

It's not immediately comforting, I guess, to people, but there's virtually no regulation for manufacturing of firearms in the United States, no government regulation, and so the industry has set standards, primarily for situations not unlike we're here for now, for litigation. They protect themselves.

The-- It's an organization called--it's Sporting Arms & Ammunition Manufacturers Institute, or SAAMI, and it's exactly that, it is an organization made up of manufacturers of ammunition and firearms who have gotten together and said, since there are no Government standards, we want to sell safe firearms, we want to be sure that our--the ammunition that the ammunition manufacturers make will function and not blow up in the firearms that--the firearms manufacturers make.

And so they've set a group of--a set of basic

standards, and the most common thing that we do is to test these guns newly entering the market for basic safety.
Q. In accordance with these SAAMI standards?
A. In accordance with those standards. We do what's called proof-testing. We do drop safety testing. Those are the two things that are-- Probably 50 or 60 percent of anything we have to do with firearms involves those things.
Q. And do you have some estimate as to what percentage of your company's business was devoted to testing these firearms in accordance with SAAMI standards prior to its emphasis on the armor issue?
A. As I said, I wasn't there when the shift to armor testing came, but my sense is that it was probably a pretty large part of their effort, maybe 25 to 50 percent, but I don't know that.
Q. And do you have some estimate as to during your tenure at H.P. White how many different--and I'm not going to say individual firearms, but how many different models of firearms you have tested for safety, for integrity of the product, that sort of thing?
A. Never really thought about that, but it would be certainly more than 50, probably less than 500. I--I don't know.
Q. And insofar as individual firearms, would you have some judgment or estimate as to how many individual firearms you've actually tested because of these SAAMI standards?
A. Again, probably the same. I--I really-- It would be in the

dozens or maybe the low hundreds.
Q. And during--in that evaluation work, have you ever had occasion to test these small arms to failure?
A. Oh, yes. We sometimes have manufacturers who bring in their--their firearms and they ask us to deliberately destroy them. In fact, the laboratory, H.P. White Laboratory, has a test standard designed to do that. It's not an industry standard because SAAMI doesn't publish it, but it's our standard, and they deliberately ask us to blow the guns up.
Q. What's the purpose of testing a firearm, small firearm, personal firearm, to failure?
A. Okay. It's pretty much a given that at some point most firearms will be subjected to extreme conditions one way or another. The most common thing is that people reload their own ammunition and they make a mistake, and so the ammunition becomes dangerously overpressure.

And so the responsible firearms manufacturers and importers want to know that their guns have a very wide safety margin. They ask us to go well beyond proof testing up to a point where the gun actually fails. Ideally, the failure will be that the gun becomes inoperable without blowing up. That's the best of all possible--
Q. All right.
A. --conditions.
Q. Now, you mentioned a moment ago proof testing--

A. Yes, sir.
Q. --that your company performs for private customers or for clients.
A. Yes, sir.
Q. By the way, does your company do--during your tenure at H.P. White, has it ever done any kind of firearms development, evaluation, or testing for the military?
A. Yes, sir. We've done considerable amount.
Q. Okay. Again, what military firearms, if you can identify them by name or model, has your company done for the United States military?
A. Okay. The-- Actually, when I was at Small Arms Systems Agency, I sent work over there to have part of this handgun testing, the shift over from the .45 Colt, I sent some of that work over to H.P. White Laboratory to have it done. I also had sent work over at that time for comparison testing between the M-16 and various European comparable weapons.
Since I have been there, we've done a significant amount of testing on what's called the squad automatic weapon. It's the light machine gun that you see on the news every night coming from the Middle East. We have done testing on the somewhat larger level on the 25-millimeter gun that is the main armament for the Bradley fighting vehicle. That's the main troop carrier that the U.S. troops have used for the last 20 or 30 years.

We have pending right now, waiting to reach a mutual scheduling time, some testing of shotguns for the military.

Q. Shotguns for the military?

A. Yes, sir.

Q. Any others that come to mind?

A. I can't think of anything as we sit here, no.

Q. During your tenure at H.P. White, has your company tested shotguns for private manufacturers?

A. Oh, yes.

Q. Can you name some of those customers for us?

A. Well, Krieghoff is a manufacturer of extremely high-end shotguns. They're one of the manufacturers who ask us to blow up their guns. We have tested not for the manufacturers, necessarily, but we've tested Remington and Winchester shotguns, a number of guns that are imported from Turkey, from Spain, and from the Far East, mainly China.

Q. Has your company, while you've been there these last 24 years, had occasion to test, safety test, muzzleloader rifle products for any clients?

A. I don't recall ever testing for a manufacturer muzzleloaders. The problem-- I don't know that it's a problem. That's perhaps not the right word. The situation is that there is nothing in the muzzleloading field that's comparable to SAAMI in the cartridge field, so there's no set of industry standards out there to test against.

We have--the most involvement that I've had with muzzleloading firearms has been in alternative propellants to black powder. Black powder, traditional black powder, has been around for hundreds of years. It's dirty, and it's smoky when it goes off.

So as there is an interest in widespread use of muzzleloaders in the United States for hunting, it's come about there have been a number of alternative propellants that have come along that you can muzzleload with. We've done a fair amount of testing for that.

But in terms of testing the guns, probably every time that we have done it, it has been for the same reasons we tested guns for you, because there's been an incident, and now we're asked to reproduce it or to attempt to reproduce it.

Q. So this SAAMI organization, this American organization that sets forth some testing standards, are you saying the SAAMI organization does not have any sort of standards for muzzleloader rifles?

A. That's correct.

Q. It does have standards for what are referred to as center fire rifles?

A. Cartridge.

Q. Cartridge?

A. Cartridge. Shotguns, rifles, pistols, and rim firearms.

Q. To your knowledge and with your many years of experience,

are there any published standards by any firearms trade or manufacturers' associations for muzzleloaders?
A. Not that I know of. And I've looked. There have been a couple of muzzleloading associations that have--over the years, I think, have tried to get started, but it's never gotten anywhere.
Q. You've had lots of experience working or being in the Army and working with firearms, being a civilian employee of the Government working on firearms, and now you've worked at H.P. White Lab for about 24 years. To your knowledge, are there any Government standards in the United States for safety and quality of muzzleloader firearms?
A. Absolutely none.
Q. Now, I want to go back to proof testing.
A. Yes.
Q. You mentioned that earlier in your testimony. What is proof testing?
A. Proof testing is a--it's a term that was adopted probably in Europe, at least from what I know, and probably several hundred years ago, to indicate that a particular firearm has been subjected in Europe, again, in a government-run or government-sponsored what's called a proofhouse, in which they take the firearm, fire a load that is in excess of what the normal pressures are, examine it for damage, and if it is still in proper condition, they stamp it with what's called a

proofmark that attests to the fact that that gun has been proof-fired.

Q. So proof--proof testing is a technique for testing the ability of an individual firearm to withstand specified load or charge; is that correct?

A. Yes, that's correct.

Q. And then if an individual firearm withstands that load, is there some custom and practice with regard to providing assurance that it's passed that particular pressure test?

A. Traditionally, the method has been to take a steel die and stamp it so that it's in the--a mark that's in the steel. It's essentially engraved. More recently, some techniques--some gun manufacturers have adopted a technique of basically laser-engraving a mark on the firearm.

Q. Now, while there may not be an industry standard or requirement for proof testing, to your knowledge, are there manufacturers of firearms in the United States that proof-test their firearms individually and proofmark them before they're marketed to consumers?

A. To the best of my knowledge, all the firearms that are manufactured in the United States, at least by responsible manufacturers that I'm familiar with, are proof-fired. They do it in their own facility because there isn't a Government requirement, but they--nevertheless, SAAMI sets the pressure standards for proof testing, ammunition manufacturers then sell

special proof ammunition, and that's fired in the gun one or more times, depending on what the company standard is, and then they put a proofmark on it, and then it's ready for sale.
Q. And so some of these individual companies that do that, I mean, what are the names of some of them that proof-fire and have their proofmarks they put on guns?
A. Oh, Winchester, Savage, Remington. My mind has gone blank.
Q. All right.
A. Thompson/Center, I know, does it.
Q. So when a consumer has a firearm, purchases a firearm and it has stamped or engraved on it a proofmark, does that have significance to a consumer? Does it convey a message to a consumer?
A. It conveys the fact that it has been proof-fired.
Q. The individual gun or, let's say, a sampling of that gun, of a model of a gun?
A. The individual gun. The manufacturers have their--in the United States, the manufacturers each have their own unique proofmarks, and...
Q. Now, guns may have-- Have you had occasion, in your career, to inspect and test guns manufactured in Europe?
A. Yes, sir.
Q. And what have you observed, if anything, with regard to proofmarks on those guns?
A. I almost always see them, whether they're made in Europe or

the Far East or wherever--
Q. Turkey?
A. Sir?
Q. Turkey?
A. Turkey, yes, sir.
Q. All right. So when you see a proofmark on a gun, it conveys a message to you about the history of that gun, that individual specific gun?
A. Yes, sir.
Q. All right. Have you ever had occasion to research or become aware of proofmarks from a Government proofhouse in Spain called House of Eibar?
A. Yes, sir.
Q. And are you familiar with the House of Eibar's proofmark--
A. Yes.
Q. --or marks?
A. Generally, yes, sir. I don't know that I could draw it for you, but it's a shield with a helmet on top.
Q. Would you turn to Exhibit 90 in the book there with you.
A. 90?
Q. 90. It's the second book, I think. That only goes to 34.
A. Oh, okay.
Yes, sir.
Q. Have you ever seen that document before or the original of that copy?

A. Yes, sir. I copied that page out of a National Rifle Association handbook, and actually in connection with this case, and then when I was deposed about it, it was made an exhibit.
Q. Okay.
MR. EATON: Your Honor, we'd move to offer Plaintiffs' Exhibit 90 into evidence.
MR. SINGER: Your Honor, I'd like to just see that briefly because I think it was left out of the book I got.
THE COURT: Certainly.
MR. SINGER: No objection.
THE COURT: 90 is received.
(Plaintiffs' Exhibit No. 90 was offered and received in evidence.)
MR. EATON: May we publish that to the jury, please?
THE COURT: You may.
BY MR. EATON:
Q. All right, Mr. Roane. And the proofmark on the left, the shield with the knight's head--
A. Yes, sir.
Q. --what does that mean with regard to a firearm that that mark appears on it?
MR. SINGER: Object to form; outside the witness' qualifications.
THE COURT: As to the form of the question, I'll sustain.

A. I can tell you what it means to me.
BY MR. EATON:
Q. Okay, sir.
A. I don't--
Q. Have you seen that proofmark that's in the upper left-hand corner on any firearms involved--muzzleloader firearms involved in this case?
A. Yes, sir.
Q. Did it appear on--etched onto Mr. Katzenmeier's muzzleloader?
A. Yes, sir.
Q. And the three little balls to the right in a triangular configuration, did you observe those marks on Mr. Katzenmeier's rifle--
A. Yes, sir.
Q. --muzzleloader rifle?
A. Yes, sir.
Q. The Kodiak rifle?
A. Yes, sir.
Q. And did you also inspect--perform certain inspections and tests on some exemplar Kodiak muzzleloader rifles that were like Mr. Katzenmeier's gun but had not been fired?
A. Yes, sir.
Q. Did you observe those same proofmarks on that gun?
A. Yes, sir.

Q. Now, do you recognize those two proofmarks we're talking about as being, I'll say, Government proofmarks as opposed to manufacturer proofmarks?
A. My understanding is that the Eibar proofhouse is a government operation, but I don't know that for certain.
Q. Okay. And what information-- You've seen proofmarks on imported guns from other countries besides Spain, haven't you?
A. Yes, sir.
Q. And they simply have a different proofmark, but it's the same concept?
A. Yes, sir.
Q. What does that proofmark mean in Europe; do you know?
A. My-- Never having lived in Europe, I can't say with certainty, but my understanding is that it means the same thing there that manufacturers' proofmarks mean in the United States, and that is that the gun has been proof-fired in whichever proofhouse the mark goes with.
Q. And have you, through your many years of experience with firearms, become familiar with the purpose of putting a proofmark on a firearm?
A. Well, it's my understanding that it is to provide assurance, same kind of assurance that you would get looking at a hallmark on a piece of silverware that somebody responsible has tested it and found that it is what it purports to be.
Q. Now, when you did some work in this case at our request, in

addition to being provided with Mr. Katzenmeier's firearm to inspect and certain exemplars to inspect, did you also come to see some documents produced by Defendant Dikar?
A. Yes, sir.
Q. In fact--
A. Quite a large stack of them.
Q. In fact, just a few days before you sat for your deposition?
A. Yes, sir.
Q. When you were provided with those documents from Dikar, did you find any surprises insofar as proof testing and proofmarking is concerned?
A. Yes, sir.
Q. Okay. What surprises did you find?
A. Well, apparently when they manufactured these rifles for export to the United States, not every one of the barrels is proof-fired, but, in fact, as I recall, they randomly take five per month, without regard to how many that represents for the month's production, and have those proof-fired, and then they put the proofmarks on all of the unfired guns as well.
Q. And insofar as your understanding of what proofmarks convey to consumers, did you make--come to any conclusions as to whether the proofmarks you found on Mr. Katzenmeier's muzzleloader and the exemplars of his muzzleloader provided misinformation to consumers?
MR. SINGER: Object, Your Honor.

THE COURT: Overruled.

BY MR. EATON:

Q. You may answer, sir.

A. Well, it misled me. When I saw the proofmark on there, I believed that it meant that that firearm had been proofed by Eibar. In fact, based on the documents that you provided, there's no assurance that it was at all.

Q. Now, you have had experience testing many guns, rifles, shotguns, and muzzleloaders to failure; is that correct?

A. Yes, sir.

Q. And when we say testing to failure, we're talking about creating pressures in the barrels of those guns that lead to a failure of that unit; is that correct?

A. That's correct.

Q. Now, when a gun, whether it be a rifle, a shotgun, or a muzzleloader rifle or shotgun, is overpressured, subjected to pressure that's in excess of its design pressure, and it fails, does it typically fail in predictable ways?

In other words, when it's subjected to overpressure, are there certain characteristics or features of the failure that tell a person in your profession that it's failed from overpressure?

A. Yes, sir.

Q. And tell the ladies and gentlemen of the jury, if you would, please, what some of those characteristics and features are when

a gun fails or a gun barrel fails due to overpressure.
A.  Okay.  Well, the first thing that happens--  We usually inch up on it in our tests.  When we're doing it on purpose, we start at proof loads and then we move up in increments until something bad happens.
The first thing that you usually see is a swelling of the barrel.  Other things can happen that--  It depends on how the gun is designed, but that's the first thing you see.
And then usually when the failure itself actually occurs, it's kind of like what you would--a popped balloon, say. It just--things just come apart at several different locations--
Q.  So swelling--
A.  --as opposed to one.
Q.  Swelling is kind of a symptom of an impending failure if pressures have been increased a bit is what you're saying?
A.  Yes.
Q.  All right.  Now, when you received the Katzenmeier muzzleloader rifle, which is the subject of this action, before you did any tests on it or made any measurements of it, did you just perform, like, a gross inspection of its overall appearance?
A.  Yes, sir.
Q.  And as you did that gross inspection of the Katzenmeier gun, did you see any evidence of it being subjected to overpressure?
A.  Well, it was certainly enough pressure to cause the plug to

blow out in the condition that it was in. I didn't see the classic symptoms of a high-pressure load.
Q. All right. Maybe--maybe you're saying--
A. Like swelling or cracking of the barrel.
Q. All right. What you observed was a failure in the breech area of the gun; is that right?
A. Yes, sir.
Q. And what was the failure mode as far as you observed? What happened?
A. Well, this particular muzzleloader is what's called an in-line muzzleloader, meaning that the ignition occurs from the rear. The barrel is here. There's a plug in the back that is designed to hold the ignition source that occurs from the rear and proceeds forward. The plug in the back had blown out.
Q. The breech plug?
A. The breech plug, yes, sir.
Q. And in this particular type of firearm, what's the purpose of a breech plug in the back or breech end of the barrel?
A. Okay. It's a pretty relatively modern or recent introduction in muzzleloaders. Again, I am not a muzzleloader shooter, but my understanding of the way this has evolved is that the traditional muzzleloader that you see in reenactments of Colonial battles and European battles and all kinds of things like that, I know that they function in a slow and awkward way.
The ignition is the issue. The very earliest ones

actually use a thing that was a burning fuse that came down. When the hammer dropped, it dropped the fuse into a little bowl that held some gunpowder, and that flashed, and the flash then was transmitted through what's called a flash hole into the main charge and whole thing would blow out the front.

That, incidentally, is where the term "flash in the pan" comes from, because that pan held flash powder.

There were also flint locks, where instead of lowering a burning fuse into the flash pan, you had a flint striking a piece of steel, and it made a spark, and that would start the flash in the pan, if you wanted to do it.

Those are very slow techniques. The muzzleloading interest in the United States has largely been, as I understand it, in the last few decades for hunting purposes, and that's a very awkward way to go hunting. For one thing, it's slow. For another, it allows your flash powder to get wet.

Another phrase that we're familiar with is "keep your powder dry." That goes back to that.

And so what more modern manufacturers have done is to design muzzleloaders that are more like cartridge-fired weapons, and they use shotgun primers, the same shotgun primers that you would use in an ordinary cartridge-fired shotgun, and they fire from the rear, and flash from that shotgun primer ignites the propellant, and then the event occurs.

In order to do that, instead of having the back end of

the barrel completely enclosed, which is the way traditional muzzleloaders always work, you have to have access from behind, so virtually all of these in-line muzzleloaders have a screw-in breech plug that's designed to do two things; it's to hold the pressure in the rear so that it will--when the gunpowder goes off it will push the bullet--excuse me, please--push the bullet out, and to provide a place for the shotgun primer to go and transmit the flash into the powder. And so they're usually screw-in breeches from the rear.
Q. The breech plug then serves a purpose to contain the pressure of the blast so that the expansion of the gases will drive the bullet out the front end of the barrel?
A. That's correct.
Q. All right. And these more recent in-line models have utilized a screw-in plug at the rear called the breech plug; is that what you're telling us?
A. That's correct.
Q. All right. Now, did you perform a gross inspection of the breech area of Mr. Katzenmeier's gun?
A. Yes, sir. The plug was not there.
Q. Right. The breech area of the barrel, where the plug would have screwed in?
A. That's correct. A female thread.
Q. What, if anything unusual, did you observe in the breech area of Mr. Katzenmeier's gun?

A. Well, initially, I just observed that they--the threads appeared to have been kind of stripped out. The breech plug is typically a harder material than the barrel, and in this case that did, in fact, prove to be true, but in the initial inspection I was just assuming that it was harder than the barrel and that it had stripped out the threads that were inside the rear of the barrel.
Q. Now, in that manner of inspection, where you've still just basically got a tube with this area in the breech that's open, were you able to visually inspect or observe the full length of the threaded area in the breech of the barrel?
A. Yes, sir.
Q. And did it appear to you to have threads--at least upon the visual inspection, threads stripped out from the muzzle end of the threaded area clear back to the breech end, or could you tell?
A. I really couldn't tell at that point. You're looking in down into a tube that's about the size of a dime or a nickel, the hole is, and it's threaded, and the threaded portion is about that long, and you can't see too well down in there--
Q. Okay.
A. --from one end.
Q. Did you then proceed to make some measurements--take some measurements of that area in the breech end of the barrel of the Katzenmeier gun?

A. Yes, sir.
Q. And what kind of instruments does a person in your profession use to make those measurements?
A. Well, the first thing I did was to just use a digital caliper, which is a device that expands this way (indicating), two teeth, so that I could find the interior what's called the minor diameter of the thread, meaning the smallest part. And that was--that was essentially it. I just recorded that.
And then I measured the--what's called the major diameter or the largest part of the exemplar plugs that you provided, and--but later I, you know, did it a different way.
Q. All right. Did you also perform the same type of measurements with the calipers of exemplars that were provided to you?
A. I did, yes, sir.
Q. And then did you compare the measurements of the diameter of the Katzenmeier--the breech area of the Katzenmeier barrel to the diameter of the barrels in the two exemplars?
A. Yes, sir.
Q. Did you find anything unexpected or unusual when you did that?
A. Yes. The diameter of the threads at the back of the breech area on the incident gun were--was larger than it was on the exemplars.
Q. How much larger?

A. I--
Q. Have you got that information?
A. I'm not sure. It was several thousandths. It seems to me it was somewhere in the neighborhood of ten to twenty-five-thousandths, but I don't remember off the top of my head.
Q. And what was the significance, if any, of those differences to you, of those differences in the diameters of those three particular firearms?
A. Well, at that point I thought it just meant that the threads had probably been ripped out and that what I was seeing was the remnants of the thread, that they had been stripped out and the others, of course, had not had the threads stripped out, and that was what I attributed it to initially.
Q. Did you ultimately utilize your measurements to determine that the diameters were somewhat different toward the muzzle end of the firearm as compared to toward the breech end of the threaded area of the firearm?
A. Yes, sir. That's what I said, when I measured it a different way--
Q. All right.
A. --subsequently, I had reason to go in and measure the--as best I could without damaging the gun, cutting it open.
Q. And what did you find? What did you find?
A. Yes. I measured the rear diameter and the forward diameter

by using what's called plug gauges. They're small pieces of hardened steel that are machined to precise dimensions, and you get them in sets that increase or decrease by one-thousandth of an inch, usually, at a time, and you just slide them in until you find the largest one that will go in the hole.

Q. And what did you--what were the results of those measurements?

A. I found that there was a really significant difference between the diameter up at the front of that female thread and the diameter at the back of the female thread. In other words, the thread was basically what we call bell-mouthed, it got larger as it went to the rear.

Q. And insofar as practical operation of these firearms, what--would that bell-mouthing create any potential for failure of those products?

A. Yes, sir.

Q. And why is that?

A. Means that only the threads on the very foremost part of the breech plug would be engaging the threads of the barrel, and in the rear, because threads of the barrel were larger, the threads of the breech plug were not really engaging.

Q. In my opening statement to the jury, I made sort of a crude demonstration of bell-mouthing by the glass that's tapered. Is this shape what you would call bell-mouthing?

A. Yes, sir.

Q. And how a cylinder might fit into a bell-mouthed component and only partially engage the threads on the plug, is that what's--
A. That's exactly it.
Q. --the concept you're trying to communicate?
A. That's exactly right, yes, sir.
Q. All right. So if this breech plug that fit into these guns had a particular thread form, which is included in the documents here, it's basically 13 threads, if only 3 or 4 or 5 of them engaged with the barrel, would that create a potential problem?
A. Absolutely.
Q. And, I mean, what could be the outcome of that kind of lack of engagement of the threads of the breech plug with the threads of the barrel?
A. Well, it just means that the threads can't carry the load that they're intended to, and it would be much easier to blow the plug out.
Q. Now, you found that bell-mouthing in the two exemplars that had not been fired; is that correct?
A. I did. But it was not nearly as pronounced.
Q. And to a lesser degree in the unfired guns than the Katzenmeier gun; is that correct?
A. That's correct.
Q. Did you measure the outside diameter of those barrels of those guns for comparison purposes?

A. I didn't. Someone else did later.
Q. Okay. You did or you did not?
A. I did not.
Q. All right, sir. But I believe you told us you observed no external evidence of swelling or excess pressure in the Katzenmeier gun; is that correct?
A. I did not, that's correct.
Q. All right.
A. There was nothing gross.
Q. Now, after you did those things, did you make some recommendations for some additional study or testing or inspections that you felt like needed to be done?
A. Yes, sir.
Q. And what additional tests or inspections did you recommend be performed?
A. Okay. Well, I'm not a metallurgist, and ours is not a metallurgical lab, and I thought that, really, two things should be done that would be best done by metallurgists. One is that an analysis of the steel itself should be made. I had done some gross hardness measurements that indicated that it was fairly soft steel, softer than I expected to see in a gun application, but still steel. But I don't know the composition of the steel or anything, nor do I have a way to do it. Metallurgist would have to do that.

And the other thing was that I thought that chamber

area should be sectioned properly and in a metallurgical laboratory so that you could actually see the threads in cross section.
Q. So basically two recommendations. One is section the barrel so one can get a direct visualization of the entire length of the threaded area; is that correct?
A. That's correct.
Q. To see what the profile of the threads looked like?
A. Yes, sir.
Q. And then the metallurgical evaluation, what would that consist of?
A. Well, not being a metallurgist, I'm not sure.
Q. Well, but what kind of characteristics, I guess, would such an examination reveal?
A. I would expect a metallurgist to be able to tell the basic composition of the steel, you know, how much carbon, how much iron, how much whatever other elements might be in there, sulfur or whatever.
Q. Now, I believe it's-- Would you turn to Exhibit 8 in the exhibit book. That's the bigger one.
A. I'm sorry?
Q. The bigger book has Exhibit 8, Tab 8.
A. 8?
Yes, sir.
Q. And would you turn to the section that has a photograph that

I believe you took. It's labeled B.
A. Yes, sir.
Q. Do you have it in front of you there?
A. Yes, sir.
Q. All right. Now, just describe in words what are depicted in that series of--what is depicted in that series of photographs.
A. Well, the top photo is just a picture of what we received, the pieces laid out in their relative locations.
Q. That's Figure 1?
A. Figure 1. Figure 2 is a close-up of the engraving, the marking that was on the incident rifle, the Katzenmeier gun.
Q. Okay.
A. Figure 3 is a photo of the marking that was on one of the exemplars that you sent me, the unfired exemplars, the one that was referred to as black.
And Figure 4 is a photograph of the markings that were on the other exemplar gun that we referred to as a camo--
Q. Okay.
A. --and it was like the Katzenmeier gun.
Q. And Figure 5 is what?
A. Figure 5 is a picture of two--the two exemplar breech plugs that you sent me before we fired them.
MR. EATON: Your Honor, I believe those photographs have been admitted into evidence as part of the pretrial order. Could we publish those to the jury briefly, please?

THE COURT: You may do so.
MR. EATON: Thank you, Judge.
BY MR. EATON:
Q. Okay. Now, the top one of those first three photographs is the Katzenmeier gun; is that correct?
A. Yes, sir.
Q. And over toward the right side of that it has a serial number. Do you see that and read it?
A. Yes, sir.
Q. And would you just read that serial number into the record, please.
A. Is it okay if I read it off the--
Q. Sure. Whichever you can see better.
A. Mine's a little blurry.
61-13-128824-04.
Q. And does that photograph of the barrel of the Katzenmeier rifle also have some proofmarks on it?
A. Yes, sir.
Q. And would you just tap where those proofmarks are, and I think that arrow will go up there and designate them or circle them. Circle the proofmarks with your finger.
A. (Witness complied.)
Q. Now, on that Katzenmeier gun, were they basically the same photographs that appeared on Exhibit 90 from your handbook, the NRA handbook?

A. Yes, sir.
Q. The House of Eibar proofmarks?
A. That's what I took them to be.
Q. Now, also, then, if we look at exemplars, the black exemplar barrel and the camo barrel, do they show the same House of Eibar proofmarks?
A. Yes, sir.
Q. And do they have-- When I say similar serial numbers, I'm simply talking about the series of numbers, 61-13, and then some other numbers.
A. Yes, sir.
Q. All right. And those are the other barrels that you inspected and compared to the Katzenmeier barrel, correct?
A. Yes, sir.
Q. Now, down toward the bottom we've got some photographs here that you took of exemplar breech plugs that we talked about a bit.
A. Yes, sir.
Q. Now, those are the plugs, then, that screw into the breech end, threaded end of the barrel; is that right?
A. That's correct.
Q. Now, when you were performing your inspections of the exemplars, did you observe something unusual when you took a breech plug out of one of the barrels?
A. Okay. You had asked us to do some firing on the exemplars.

Q. Right.

A. And at one point one of the exemplars got fouled--as I mentioned before, black powder is dirty--and the gun needed to be cleaned, and in order to do that, I pulled the breech plug out, and at that point I noticed that the anti-seize compound that apparently was put on at the factory, because it was on there when I took them out of the package, was not uniformly missing from the breech plug.

Anti-seize compound is--usually it has a lithium and graphite content. It's a little bit greasy. And if you take a threaded connection and it's dry and you tighten it up real tight, then sometimes it will be very, very difficult to get it back unloose. And so anti-seize is a compound for exactly that purpose; it keeps the threaded joint relatively free to move without inhibiting its strength or its ability to seal.

And if that had been applied at the factory or before it was shipped, anyway, and I noticed that on that particular exemplar gun, the anti-seize compound had been pretty much cleaned off in the forward part of that breech, up in this area, and it was pretty much still intact in the rear part back here (indicating). And that's when I began to be concerned about bell-mouthing.

Q. All right. So your first hint that the barrel in these guns might be bell-mouthed was when you removed the breech plug, correct?

A. That's correct.
Q. And that observation of-- I mean, the significance of having some anti-seize grease or compound on the rear several threads of that breech plug indicated what to you?
A. That those threads hadn't been fully engaged with the female threads.
Q. Did you say had or had not?
A. Had not.
Q. All right.
A. Had not.
Q. So that indicated to you that the rear end of the barrel, threaded area of the barrel, was somewhat larger than the front portion of the threaded area of the barrel?
A. That's correct.
Q. And that was on an exemplar?
A. That's correct.
Q. And it was large enough at the back that it had not even disturbed the compound that was on the last three, four threads; is that what you're telling us?
A. That's correct.
Q. All right. So that, to you, indicated there was no engagement of the last three or four threads at all?
A. Very little, if any. Not enough to clean out the anti-seize compound.
Q. And then those forward seven or eight threads, did they

appear to have the grease or compound removed from contact with the threads of the barrel in a uniform way, or was it nonuniform, or could you even distinguish by gross observation?
A. It was reasonably uniform.
Q. All right. Now, after you completed your various inspections-- Well, I'm going to ask you one other thing. You mentioned the test-firing that we asked you to do. Just summarize for us what test-firing you carried out.
A. Well, you had sent me a set of instructions with what you wanted done with the two exemplars, and they were to be fired with various overloads. You sent powder, you sent the bullets. And we did those and record-- We basically-- We instrumented the barrels.
We put instruments on the outside of the barrels that would allow us to measure the pressure that was generated, and that's because when even a normal load goes off in an undefective gun, there's always going to be a brief swelling of the barrel when it goes off, and these instruments that we glue to the outside detect that swelling, and then electronically that's converted into an indication of the pressure.
Q. Well, we asked you to fire it with one 50-grain pellet, two 50-grain pellets, three 50-grain pellets, and, in one instance, four 50-grain pellets, correct?
A. I think that's correct. I--
Q. And the one, two, and three were loads that the manufacturer

had approved or recommended, correct?
A. I don't honestly know.
Q. All right. All right. By the way, do you have your report with you there?
A. I don't. I left it back--
Q. Okay.
A. Oh, okay.
MR. EATON: May I approach the witness with his file, Your Honor?
THE COURT: Yes.
BY MR. EATON:
Q. Would it refresh your recollection, Mr. Roane--
A. Sure.
Q. --to see your report about what firing tests you performed?
A. Yes, sir.
Q. Okay. Was I correct in what I described as the four different charges that we asked you to fire it at?
A. That's correct, you did. In the black one, we did 50, 100, 150, and 200 grains. In the camo one, we did only 150 grains.
Q. And that was of the Hogdon Pyrodex pellets?
A. That's correct.
Q. And only the 200-grain or the four-pellet load was a load that exceeded the manufacturer's recommended load specifically?
A. I don't know what the manufacturer's recommended load was.
Q. All right. All right.

A. I've read--
Q. Okay.
A. --in some of the depositions that it was supposed to take three--
Q. Okay.
A. --pellets.
Q. At any rate, you measured the pressures generated by those several different loads; is that correct?
A. That's correct.
Q. And did those pressures fall within ranges that you had anticipated, based on your experience with pressure-testing other muzzleloaders?
A. Generally, yes. Every muzzleloader is a little bit different, and every propellant is a little bit different, but those are numbers that didn't particularly surprise me.
Q. Then what were those range of pressures that you recorded?
A. They ranged from 9,500 pounds per square inch up to 29,000 pounds per square inch.
Q. And those fell within an anticipated range for those loads, correct?
A. They didn't surprise me.
Q. All right. And those guns did not fail--
A. They did not.
Q. --correct?
And it was after you did that test-firing that you

removed the breech plug from one of those guns and discovered that there was no anti-seize grease on the rear several threads of it?

A. That's correct.

Q. And that started you on your investigation about the bell-mouthing?

A. That's correct.

Q. And led to your recommendations for further testing?

A. That's correct.

Q. All right. Now, did you perform any inspection--attempt to perform any inspection of the threaded portion of the barrel on the Katzenmeier gun by a technique using a metal alloy, a low-melting-point metal alloy?

A. Oh, yes. That was another way to get a view of the bell-mouthing.

Q. All right. Now, tell us about that technique, what the purpose of that technique is--

A. Sure.

Q. --in your profession.

A. Okay. There are some specialized alloys that are made up that have a very low melting temperature, but they have the happy characteristic of providing very precise image of what they're cast into once they return to room temperature. Their trade names are Cerrolow, Cerro Flow--not Cerro Flow--Cerrolow, Cerrosafe, and some other terms like that.

We use them commonly to cast the chamber area of firearms, especially cartridge firearms, because you can't see in there very well. We have cameras that will look inside this narrow long slender tube, but you don't get a really good view and it's hard to take precise measurements from the outside, and so you make the cast, you pull it out, and that gives you a mirror image of what the inside looks like.
Q. Now, would you turn to Tab 17 in the exhibit book, please.
A. Yes, sir.
Q. Attached to Tab 17 is a little plastic envelope containing an object. See it there?
A. Yes, sir.
Q. Would you identify that for the record, please.
A. That's the cast that I took of the inside of the chamber area, the threaded area on the Katzenmeier gun.
Q. The Katzenmeier barrel? Now, also in Exhibit 17, I believe there's a sheet of paper that has the product that you used, a copy of the product; is that right?
A. Yes, that's correct.
Q. All right. And that particular sheet lists several of these what are called eutectic metals; is that correct?
A. That's correct.
Q. Does that sheet depict one of the eutectic metals or the eutectic metal that you used in preparing this casting?
A. This particular cast was made with Cerrosafe.

Q. Well, is that one of the eutectics that's shown on that sheet?
A. It is.
Q. And the other eutectics that have certain information about their characteristics and features are also contained on Plaintiffs' Exhibit 17; is that correct?
A. That's correct. Sometimes we use Cerrolow. It just depends on what the guy in the machine shop has bought.
Q. All right. I'm going to ask you some questions about these materials in just a second here.
MR. EATON: Your Honor, we'd move to offer Plaintiffs' Exhibit 17 into evidence, that consisting of the casting that Mr. Roane made of the Katzenmeier gun, along with the specification sheet of the material he used to make the casting.
MR. SINGER: No objection.
THE COURT: Okay. 17 is received.
(Plaintiffs' Exhibit No. 17 was offered and received in evidence.)
MR. EATON: May we publish that to the jury, Your Honor?
THE COURT: You may.
BY MR. EATON:
Q. Now, I'm going to call your attention, first of all, to the one that's labeled Cerrosafe.
A. Yes, sir.

Q. Is that the material that you used to make the casting of Mr. Katzenmeier's gun?
A. Yes, it is.
Q. And would you simply-- It's hard to see on the monitor, those things are just typed in such small letters. Would you read that information that's contained in the right of the Cerrosafe product?
A. Okay. It says, "Cerrosafe alloy was originally made for toy soldier castings. One of its most popular uses today is casting to check gun chambers. Cerrosafe shrinks during the first 30 minutes and at the end of one hour is exactly the chamber size. Some other uses are casting cavities such as threads, dies, molds, blind holes, duplicate patterns in foundry, matchplate making, support work pieces while machining, spray coating wooden patterns, dental lab techniques, masks for electroplating. Cerrosafe is a non-eutectic alloy with a yield temperature of 162.5 degrees Fahrenheit."
Q. Okay. Now, is this material something that you use in the ordinary course of conducting your business in evaluating firearms?
A. Yes, sir.
Q. Is there any other product on that page that you and your company use from time to time for performing this--basically the same kind of work?
A. Something called Cerrolow, which is down at the bottom.

Q. All right. And would you just read that little bit of information into the record, please?

A. It says, "Cerrolow 1117 alloy is used in jigging and fixturing delicate parts for machining, dental molds, prosthetic development work, proof casting (internal measurements), fusible element in safety devices, radiopaque contrast medium in X-ray, low temperature solder, and many craft applications such as castings. Cerrolow 117 is a eutectic alloy with a melting temperature of 117 degrees Fahrenheit. It can be melted in a double boiler. Initial expansion then shrinks to" less than a thousandth per inch--thousandth of an inch per inch in 30 minutes.

Q. Now, are these two products basically interchangeable for purposes of performing your work?

A. They are. The Cerrosafe is a little bit harder when it's set, and so it doesn't have an exact melting temperature like Cerrolow does. Cerrolow melts at 117 degrees. Cerrosafe melts somewhere between 158 and 190, nominally 168 degrees. But they're both low-temperature, safe alloy that are used widely for casting just like this. They don't damage anything.

Q. The Cerrosafe specifically stated that it was appropriate for casting threaded fixtures.

A. Yes, sir.

Q. Do you know, as you sit here today, which of those two compounds you used in casting the breech area of the Katzenmeier

gun?
A.  Yes, sir.  I went--  This is not--this is something that you--you buy a bar of it that weighs a couple of pounds and you use it for years.  You melt it, make a cast.  When you're through with that, you just melt down the cast and make the next one.  Obviously, we didn't in this case; we preserved it.
So I went downstairs before I got ready to come here to check and make sure, and what we had been using at that time was Cerrosafe.
Q.  All right.  Now, specifically what were you trying to find out when you melted that material down and made a cast of the threaded breech area of Mr. Katzenmeier's muzzleloader?
A.  I wanted to see what--as well as I could, without doing any damage to the actual evidence item, the incident gun, I wanted to see what the inside of that thing looked like, and I wanted to be able to confirm that, in fact, the thread diameters were different by many thousandths of an inch--
Q.  Okay.
A.  --from the front to the back.
Q.  And did your Cerrosafe cast confirm those suspicions to you?
A.  Yes, sir.
Q.  All right.  Did you measure your cast to see that it was considerably larger at the rear than it was at the front?
A.  Yes, sir.
Q.  And what about--  Did it give you an image, so to speak, a

reverse image, of the threaded area of the breech of the barrel?
A. Yes, sir.
Q. And what did it indicate to you with regard to how many of the threaded helix had been stripped or partially stripped? Could you make that determination?
A. I really couldn't.
Q. Could you confirm that there had been stripping of the threads to some significant degree?
A. In the forward portion of the barrel, it certainly did appear that way.
Q. And what about the rear portion of the barrel, what was significant about the--or the casting, the rear portion of the casting, what, if anything, was significant that you observed?
A. Well, it was much larger. I mean, by much larger, we're talking in thousandths of an inch.
Q. Maybe let me ask it this way: What, if anything, did the breech or rear portion of your casting indicate with regard to thread engagement or lack of thread engagement?
A. From the casting, it really didn't look like the rear threads had been engaged much, if at all.
Q. And so this casting you made was something that you had done many times before in other investigations; is that correct?
A. Yes, sir.
Q. Is that a standard type of technique for inspecting the interior of gun chambers and barrels and other components?

A. Yes, sir.
Q. And is it sort of a preliminary to doing some kind of a destructive testing where you can actually get a direct visual observation?
A. Yes. There are some times you're just not allowed to do the destructive testing, for whatever reasons--
Q. I understand that. I understand that.
A. --and it's the only way that you could get a look at what the inside looks like.
Q. Next--
A. Some people use other media, but this is standard for us.
Q. All right. And then that confirmed to you that destructive testing of getting that direct visualization would provide additional useful information in determining the reason for the failure of this gun, correct?
A. Yes, sir. There was no way from this that you could, or from just looking in at the end, get a reasonable idea of what the individual thread profiles actually were. You know, it had to be cut, and it was more--most properly cut in a metallurgical laboratory.
Q. And I'm not going to ask you anything about the findings there, but you are aware that subsequently your recommendations were followed and there was destructive testing so that actual--or more direct visualization could occur?
A. Yes, sir.

MR. EATON: Your Honor, we'd pass the witness for cross-examination. Thank you.

THE COURT: Thank you. We'll take our midafternoon recess at this time. Court will be in recess for 15 minutes.

Members of the jury, during the recess period please bear in mind the admonition given previously. We'll see you in 15 minutes.

(Short recess.)

THE COURT: Please be seated.

Mr. Singer, you may cross-examine.

MR. SINGER: Thank you.

CROSS-EXAMINATION

BY MR. SINGER:

Q. Good afternoon, Mr. Roane.

A. Good afternoon.

Q. We've met before, when I took your deposition.

A. I think we did.

Q. Isn't it true that you do not know the diameter of the threads of the Katzenmeier gun when it left the factory?

A. That's absolutely true.

Q. And you don't know what the tolerances of the threads are?

A. No.

Q. And you don't know whether the threads were inside or out of tolerance?

A. I don't. I have not seen the Dikar specs. No.

Q. As a matter of fact, your understanding is that breech plug apparently cannot be found, right?
A. I'm sorry?
Q. The breech plug apparently cannot be found; that's your understanding?
A. I--I was not given a breech plug. I don't know.
Q. And without the breech plug, you can't tell whether the breech plug was engaged or whether the breech plug itself was the breech plug that came from the factory; would that be fair?
A. Yes, sir.
Q. Now, you would agree that yield strength and tensile strength are very important in a metal in determining how a metal acts and what its proper uses are?
A. I'm sorry. I'm having-- I've been around guns too much.
Q. I'm sorry.
A. I'm having trouble hearing you.
Q. Would you agree that yield strength is an important quality of metal in determining an application for that metal?
A. Absolutely.
Q. And tensile strength?
A. And what?
Q. Tensile strength as well?
A. Yes, sir.
Q. You don't know the yield or the tensile strength for the Katzenmeier Kodiak, do you?

A. I did not do any of that testing, no. I took hardness measurements and I related the hardness measurements to standard charts which list yield and ultimate strength.
Q. Would you agree that, based upon what you saw, you cannot render an opinion as to the number of threads which were engaged at the time this gun failed?
A. That's correct. One of the sad things about any firearms incident is that the best evidence no longer exists. That's always true. Because the best evidence would be the condition of the gun before the accident and the condition of the ammunition before the accident, and by definition, those things are gone.
Q. Would you also agree that also you do not know the percent engagement of whatever threads were there?
A. That's correct.
Q. You've done no measurements to calculate it, nor have you been able to do any calculations to help determine that, correct?
A. I wasn't asked to.
Q. Do you know what type of machines this barrel is made on at Dikar?
A. I only know that the threads are rolled, but beyond that, no.
Q. Do you know how?
A. I'm sorry?

Q. Do you know how, what machine is used and how they're calibrated?
A. No, I do not.
Q. I guess just kind of to sum it up, there's really no way for you to tell what the inside of this gun looked like in the breech area before the incident, is there?
A. That's exactly what I just said, that the best evidence is gone. There's no way anyone can tell.
Q. And we'll talk about your casting and your measurements in just a moment.
A. Fine.
Q. But that, obviously, was done after the breech plug has pushed the threads out and gone out the back, right?
A. It was done after the incident, yes, sir.
Q. Have you been asked by counsel to render an opinion about the psi pressure that was in this gun at the time of the incident?
A. I have not.
Q. And you do not know or have an opinion about the pressure that was in the gun to cause this failure, do you?
A. I do not.
Q. Now, you spoke a moment ago about this anti-seize.
A. Yes, sir.
Q. Well, let me--let me see if I can get the chronology right. Is it your testimony that you fired these guns in your lab

before you measured them, or did you measure them when they were received by Mr. Eaton before you started firing them?

MR. EATON: Your Honor, I just object to the form of the question.

A. I--

THE COURT: Just a minute.

Overruled.

A. I--I believe that I measured the interior threads before I fired, but I'm not certain.

BY MR. SINGER:

Q. I think that's what you testified to in your deposition.

A. Yes.

Q. And that would make sense, wouldn't it, you would measure it--

A. Yes.

Q. --before you started shooting?

A. Sure.

Q. Because one of the things you thought you might do when you overloaded that gun was try to make it fail similar to what Mr. Katzenmeier's did, correct?

A. I didn't know what would happen. I didn't design the test. I did what I was asked to do.

Q. Who designed the test?

A. Sir?

Q. Who designed the test?

A. Mr. Eaton did.

Q. Now, so when you took the measurements, you knew that the exemplar--that the Katzenmeier gun was wider at the back than the front after the incident? I mean, you can measure it with pin gauges and you can tell that when you go into that area, it's wider opening in the back than the front?

A. Yes, sir.

Q. Okay. And you measured the exemplars before you shot them. Nothing stood out at the time, correct--

A. That's correct.

Q. --even though you measured them?

So then you put-- And let me talk to you about the breech plugs you used. Isn't it true that Mr. Eaton actually brought to you the two guns he wanted you to shoot?

A. He-- I think he sent them to me, but yes. He provided them.

Q. A black Kodiak and a camo Kodiak?

A. That's correct.

Q. And we've kind of interchangeably-- I think in your report and with Mr. Eaton, you refer to them as black and camo, correct?

A. That's correct.

Q. And they did not have the original breech plugs from the factory in them, did they?

A. I honestly don't remember.

Q. Don't you remember, as you said earlier, that when you took the breech plugs out of the package, they had the seize on them? If they were actually--

A. No. He provided breech plugs for me, but I don't remember whether there were original breech plugs in there or not. I--I can't honestly tell you.

Q. Do you remember whether they were aftermarket breech plugs that you got in a package?

A. They were in a packet, and I would assume that they're aftermarket.

Q. Okay. So they came in a clam pack package, separate and distinct from being in the gun when you got it, right?

A. They came in a package. I can't tell you what kind of a package it was.

Q. And you have done no calculations to attempt to determine the psi, that was pounds per square inch, of pressure in this gun when it failed, have you?

A. There's no way that anyone can do that. I did not. I wasn't asked to.

Q. Now, you've told us about shooting the guns, and we'll get to that in more detail. Do you have an opinion as to what pressure it would take to blow out a breech plug if the threads were the same as the ones that you shot?

Do you follow me?

A. I follow you, and I--I have not done any calculations, so I

don't have an independent opinion. I saw your expert, Mr. Hutton, did some calculations and came up with a number, but I have not done it.
Q. And you've done no testing and no analysis to attempt to determine that, correct?
A. That's correct.
Q. You do not know, do you, Mr. Roane, how much psi one thread in a Kodiak barrel will hold, do you?
A. No, I don't.
Q. Or two threads?
A. If I don't know one, I certainly don't know two.
Q. Or three or any combination?
A. Or three or four or any, no. That's correct.
Q. And you did not assess the probable cause of failure here, did you?
A. I did not.
Q. You've done nothing to analyze, to test, to experiment, or to work any of that to allow you to render an opinion as to the pressure generated when the breech plug came out of the gun that we have here, did you?
A. And I have not offered such an opinion. It was sufficient to blow a breech plug out. That's all I know.
Q. And you did not make any effort, did you, to determine whether there was smokeless powder in there, did you?
A. There was no indication that there had been smokeless

powder, but I didn't do any analysis. I've seen black powder guns fired that had smokeless powder fired in them.
Q. They blow up, don't they?
A. And they didn't look anything like this.
Q. They blow up?
A. They look like a hand grenade went off inside.
Q. They break, don't they?
A. Yes, they do.
Q. Now, you know here the threads were torn out? I mean, you know that, don't you?
A. I--I know it from information that I've seen in other experts' reports.
Q. Okay. Well, you've seen the pieces of the gun. You photographed the pieces that you got, didn't you?
A. I did.
Q. And you know the breech plug is not there anymore?
A. That's correct.
Q. And the interior of the breech area, when you got it, looked very damaged, didn't it?
A. It did.
Q. And you know that the back of the receiver, the part of the trigger mechanism that's metal that houses the striker in the trigger part, that was broken, right?
A. I believe so. I don't really recall, but I think that's right.

Q. And the hammer was broken?
A. I think that's right.
Q. And the stock was broken?
A. Stock certainly was broken.
Q. Well, you knew all that, correct?
A. Yes, sir.
Q. Did you talk to Mr. Katzenmeier about what happened?
A. I've never spoken to Mr. Katzenmeier in my life, as far as I know.
Q. Did you read his deposition?
A. I'm sorry?
Q. Did you read his deposition?
A. No, sir.
Q. How about that other witness, did you talk to the eyewitness?
A. I'm sorry. I'm having trouble--
Q. Excuse me.
A. I really am.
Q. Did you talk to the eyewitness?
A. No, sir.
Q. Did you read the eyewitness' deposition?
A. No, sir.
Q. Has anybody, Mr. Eaton or anybody else, made you aware that in addition to all these pieces breaking, that the 295-grain PowerBelt bullet went 30 or 40 yards downrange and through a

concrete board?
A. No, sir.
Q. This first you've heard of it?
A. Yes, sir.
Q. Now, have you ever designed a muzzleloader for consumer use?
A. No, sir.
Q. Have you ever manufactured one?
A. No, sir.
Q. Have you ever been involved in the design or manufacture of a component part of a muzzleloader?
A. No, sir.
Q. Have you ever been retained to proof-fire muzzleloaders?
A. Yes, sir.
Q. Okay. So you've proof-fired every muzzleloader made by that company?
A. That is not what I said, and that's a ridiculous thing.
Q. Okay. I'm talking about just by the company you were hired for. You proof-fired all the ones they made?
A. No. That is not--
Q. Your proof-firing was an overpressure test on--
A. I--
Q. --a developed product, wasn't it?
A. I have done overpressure tests on firearms, yes, on black powder muzzleloaders.
Q. And you refer to that as a proof test, don't you?

A. No, I don't.
Q. You just did, though. Is that how you answered my question?
MR. EATON: Your Honor, I object as argumentative.
A. I'm--I'm not--
THE COURT: Just a minute.
A. I'm not sure--
THE COURT: Whoa. Back up. When somebody objects, then it's my time.
I'm going to overrule the objection to the prior question, but I think the record is confused at this point.
MR. SINGER: I think it's confused.
BY MR. SINGER:
Q. I don't mean to be rude or disrespectful to you, Mr. Roane, and I don't want to put words your mouth, and so let's kind of start over.
A. Okay.
Q. You've described earlier, you've talked about proof testing for manufacturers that your company has done, and you've talked about proof testing done at proofhouses and by manufacturers by shooting off guns; is that correct?
A. Yes, sir.
Q. They're two different things, aren't they?
A. Yes, sir.
Q. Okay. An overpressure test to evaluate the quality and safety and integrity of a gun is a proof test, isn't it?

A. Proof test is proof pressures are--is something that carries a very specific definition, depending on who is applying, because proof pressures in this country may be slightly different from proof pressures in Europe, but they are very specific pressures.

When you fire--when we do deliberately destructive tests, we start at proof pressures and work up on the assumption that the gun is a well-manufactured gun, it carries a proofmark, and so it already has indicated--has demonstrated its ability to handle proof pressures, and then we work up from there.

When we are doing proof tests on a gun for a manufacturer, only that, it is--it's a confirmatory test that we're doing for them. These are guns that have come in from overseas, and they're asking us does this gun or these guns, sometimes they send me multiple guns, withstand American proof pressures. But it's a confirmatory test; it's not a proof test.

Q. So it's a-- You use the term "confirmatory test"--

A. Yes.

Q. --because you're not testing every one made?

A. That's correct.

Q. It's a confirmatory test that confirms that the integrity and safety and quality of the gun is there and it can withstand the loads that it's expected to be subject to in service--

A. Actually--

Q. --off--

A.  Actually, proof pressures are above service pressures.
Q.  Well, let's talk about that a minute.  What is the government-mandated proof pressure for a proof test of a muzzleloader in the United States?
A.  There is none.
Q.  What is the government-suggested proof pressure for a muzzleloader in the United States?
A.  Government has no set standards for muzzleloaders or cartridge guns in the United States.
Q.  What is the industry standard for proof-pressure tests of a muzzleloader in the United States?
A.  As far as I know, there are no industry standards.
Q.  If I wanted to go, quote, proof-test a muzzleloader to, quote, these very specific proof loads, it's not going to be written anywhere, is it, in the United States?
A.  Not in the United States, that's correct.
Q.  And you talked earlier that a number of manufacturers of U.S. guns proof-fire all their guns, correct?
A.  That's correct.
Q.  Remington does on all the .22s?
A.  To the best of my knowledge, all of them do.
Q.  Except .22s.  You don't think Remington does .22s, do you?
A.  I do believe they do .22s.  There are proof loads for .22s.
Q.  Thompson/Center does not proof-fire all their muzzleloaders, do they?

A. I don't know what Thompson/Center's procedures are for muzzleloaders.
Q. And Knight doesn't either, do they--
A. I don't know.
Q. --Knight?
A. I don't know.
Q. Have you ever designed a test or a protocol for a test to establish or measure the strength of a threaded connection in a gun?
A. Not in a gun, no.
Q. Let me talk to you briefly about the shooting that you did. Having looked at your report, isn't it true that the first thing you did when you began the shooting is you hooked the gun at--the black gun first up to string gauges, three of them, correct?
A. I hooked it up to string gauges. I don't remember offhand how many. And I can't think of any reason to have more than one on the gun, but we might have been asked to do it in multiple spots. I don't remember. The data that I have just show one pressure, so there probably was just one gauge.
Q. Didn't you put one over the--where the first charge, pellet charge, would be, that pressure, and then another one over the middle and another one over the front part?
A. Okay. I--I think that I centered-- I think you're right, now that you mention that. I put the gauges over where the

center of the charge, whatever it would be, was.
Q. Trying to measure the maximum pressure generated, correct?
A. That's correct.
Q. And you, in fact, videotaped that, correct?
A. I believe that I did.
Q. Did you look at your videotape before you came to testify today?
A. No, I didn't.
Q. Have you seen it in the past year?
A. No.
Q. So you hooked a gun up, and isn't it true that the first series of firings you went through on the black Kodiak .50-caliber gun--
A. Uh-huh.
Q. --was the maximum magnum load allowed, three Pyrodex pellets and 295-grain bullet?
A. For the black one?
Q. Yes.
A. That's not correct.
Q. What did you do first, sir?
A. 50 grains.
Q. Okay.
A. One pellet.
Q. All right. And then you fired it ten times?
A. I believe so, but I don't remember off the top of my head.

Q. Isn't it true you fired it ten times but you couldn't get a reading ten times on the 50-grain?
A. That's entirely possible. It's not unusual. It's been a long time, and I don't remember the details, but that's probably so.
Q. Well, you have your file here. You have the--
A. I do.
Q. --graph reports, do you not, of the pressures generated?
A. Yes, I do.
Q. Okay. Can you just take a moment to be accurate and look through those? We don't want to misrepresent anything.
A. Okay. On the black one, yeah, we got two traces. The other ones, we did not get.
Q. And then you fired it ten more times at 100 grains, correct?
A. That's correct.
Q. Okay. And then you fired it ten times at 150 or, in fact, 13 times because three of them didn't register?
A. That's correct.
Q. So you'd fired the gun-- And all these took place on the same day, correct?
A. Yes, sir, I think so.
Q. You would fire, you would get the measurement, load from the barrel end, put the percussion cap on it, fire it again?
A. That's correct.
Q. And so after these 33 firings, you then loaded it, as

Mr. Eaton had asked you to do, with 200 grains of Pyrodex pellets; is that correct?
A. That's correct.
Q. And a 295-grain PowerBelt bullet, correct?
A. Whatever the bullets were that he provided, yes, that's correct.
Q. Can you look at the top of your computer-generated--
A. I am. That's what I just looked at, 295-grain PowerBelt.
Q. Now, a moment ago you maybe weren't clear, and I'll ask you, having looked at that, if your memory's been refreshed as to whether 200 grains of Pyrodex pellets is a substantial overload, even more than 30 percent more than the maximum allowed in that gun.
A. I don't know what the maximum allowed in that gun is. I've never read the literature that came with it.
Q. All right. But you shot it ten times at 200 grains, correct?
A. That's correct.
Q. And you observed the gun, correct?
A. I'm sorry. We shot it, actually, more than ten times because we didn't get traces on all of the first ones.
Q. All right. And the--
A. And what was the second part of your question?
Q. Okay. And you examined the gun after these shooting tests were concluded?

A. Yes, sir.
Q. There was no abnormality in the gun, correct?
A. No, sir, that is correct, there wasn't.
Q. No defect noted, no problem with the gun firing, it functioned fully as intended, correct?
A. That's correct.
Q. And so all those firings and even the overpressure?
A. Or if it was overpressure, if the pressure's there you got.
Q. That's fair enough. And tell us, if you would, please, the average psi when you shoot 150 grains, as you found in your studies in your measurements on the black gun.
A. Well, on the black gun, it was 21,400.
Q. And how about on the camo gun? Because I think you then came and shot the camo gun with 150 grains ten times?
A. That's correct.
Q. And what did that average?
A. 19,700.
Q. Okay. A moment ago, Mr. Eaton questioned you, you said the range of pressures was 9,000 on the low to 29 on the high. Isn't it true that the 29,000 you obtained was the most pressure that could--that you generated on 200-grain load?
A. I don't know if it was the highest individual pressure or the average, but I think that's the average.
Q. Why don't you look real quick at your 200-grain chart and graph, computer, and tell us the minimum and the maximum and the

average on the 200 grains.
A. For the 200-grain load?
Q. Yes.
A. 25,6-- Yes, that's correct.
Q. Could you tell us the minimum and the maximum and the average?
A. The minimum was 14,400, the maximum was 25,600, and the average was 17,500.
Q. I think that may--you may be looking at a different one than the 200 grains, in fairness.
A. No. It's the one that says black 4X at the top.
Q. Would it not show the grains of powder on that?
A. Yes.
Q. And what are--
A. And it says 200 grains.
Q. Okay. So the maximum pressure you got from 200 grains was what again, please?
A. 25,600.
Q. Now, you were provided, as Mr. Eaton elicited from you, a large stack of Dikar documents produced in this case, correct?
A. Yes, sir.
Q. And you saw in those documents that five guns a month are tested at over 41,000 psi?
A. I saw that they sent out five guns a month. I don't recall what the pressure was.

Q. Now, you described earlier that you thought there was a very slight taper, maybe a thousandth or so of an inch, a difference in measurement from the front threads to the back threads in the exemplar guns that you fired; is that correct?
A. I think that's correct.
Q. In fact, after you fired the camo gun-- Was it ten times or more than ten times at 150 grains?
A. Camo we fired ten times.
Q. Okay. And then you took a saw and you cut that breech section open, didn't you?
A. Yes, sir.
Q. And you looked at it-- Even though Mr. Eaton didn't ask you to, you were curious, so you looked at it under a microscope, right?
A. No. I asked--talked to Mr. Eaton about it before we cut it.
Q. Okay.
A. That was not anything that I did on my own initiative.
Q. But you cut it open and looked at it under a microscope?
A. I cut it out and looked at it. I don't-- I probably did it under a microscope. I'd be surprised if I didn't.
Q. Okay. Would you care to look at page 93 of your deposition and see if that refreshes your recollection?
A. I don't have any opposition-- I've never seen my deposition transcript.
MR. SINGER: May I approach, Your Honor?

THE COURT: Yes.

BY MR. SINGER:

Q. Mr. Roane--

A. As I said, it would not surprise me if I did.

Q. --please look at page 93 and see if that refreshes your recollection of whether you looked at it under a microscope.

A. I don't see a page 93. Where are we? Is this in two sections?

Q. Yes. You may be in the second deposition.

A. Oh, okay.

Q. There's a first deposition, and then we--remember, we were running late that evening and we came back the next morning?

A. No, I don't remember.

Q. I'm sorry.

A. Okay. Is there anything I examined under a scanning microscope, electron microscope? No. Do you have that? No.

Q. Let me--

A. "I looked at the breech plugs and I looked at the sectioned chamber of the camo gun. As far as I can recall, that's what I did."

Q. Now, you don't have a scanning electron microscope, do you?

A. No.

Q. And you don't have an X-ray machine?

A. No.

Q. And didn't do that on either of these?

A. No.
Q. But does that not reflect your recollection--read that page and on to the next page, 94--whether you would have, out of curiosity, looked at the camo section under just a regular microscope?
A. Obviously, I did. I think I said it would not surprise me if I did.
Q. Well, it's not in your report, though, because you didn't see anything that was significant; isn't that right?
A. No.
Q. And when I asked you about it, you said you also didn't put what you had for breakfast, right?
A. Okay.
Q. Because it was just not--you didn't see anything when you looked at it that was of concern or alarm to you, correct?
A. That's correct.
Q. Now, then you also--because of this anti-seize, you thought that if you put the breech plug back that you might not see that the threads were all engaged, right?
A. I think that's correct.
Q. But when you put it back in, as far as you could tell, they were all properly engaged?
A. As far as I could tell, yes.
Q. Okay. And isn't it also true that when you have a cylinder or a tight sphere like this and you cut it so that it opens up,

it's gonna expand it a little bit?
A. Not necessarily. It's possible. It depends on the--on the stresses that were in it at the time you cut it. It can also contract a little bit.
Q. Now, Mr. Roane, you've testified a lot, haven't you, a number of times?
A. A number of times, yes.
Q. You were aware, when Mr. Eaton brought you these exemplars and asked you to do the tests he wanted you to do, that we were in federal court?
A. That you were in what?
Q. Federal court.
A. No, I didn't know that, really, until I came here today.
Q. All right.
A. I knew it was potentially a court issue, but I didn't know it was federal court.
Q. And you did know from Mr. Eaton that you were required, under our rules of evidence and civil procedure, to prepare a report that reflects your opinions and conclusions that are relevant to this case, correct?
A. I prepared the report that--on what I had found, yes.
Q. Matter of fact, you prepared it and then you prepared a supplement to it, correct?
A. That's correct.
Q. Neither of those reports mention that Cerrosafe casting, do

they?
A. Cerrosafe casting?
Q. Right.
A. I don't think so.
Q. Okay.
A. I-- No.
Q. We were not made aware that you were gonna pour molten metal down inside the barrel, were we?
A. I talked to Mr. Eaton about it--Eaton about it before I did it.
Q. You have been in many inspections where the plaintiff's lawyer and the defense lawyer and experts for both sides are there when destructive testing is done, haven't you?
A. I've been at one or two. Not many, no.
Q. Okay. Well, let's talk about how you did it, what you did. You have a gun that's hollow--
A. Yes.
Q. --and you're gonna try to pour this metal that you melted--
A. Yes.
Q. --and certainly whatever temperature it is, it's hotter than the hot water in your house that you clean the dishes with, right?
A. Actually, it's not hotter than my hot water.
Q. Oh. You got some good hot water.
A. I do.

Q. But somewhere in the high 100 degrees--
A. It's nominally 167 degrees, yes.
Q. But you heat it up until it melts and it all melts, right?
A. That's correct.
Q. And then you--isn't it true that, as you say, what you use it for is chamber casting for chambered guns, not threaded areas, but chambers, round smooth bores?
A. That's what we normally use it for, but as I read earlier from the manufacturer's statement, it's--they said it's suitable for casting threads.
Q. Okay. Now, when you turn the gun up and you go to pour it in, it's gonna run out unless you have a damn or something to stop it, correct?
A. That's correct.
Q. And you want it to get up in the threads, don't you?
A. Yes.
Q. Okay. That's the purpose of doing it, in part, right?
A. That's correct.
Q. What kind of brush was used to clean out the threads so the material would get in there and give you a good indication?
A. I didn't use any brush to clean it out beforehand.
Q. Didn't?
A. No.
Q. All right. Well, how did you make the damn and what did you make it out of?

A. A cotton swab that I poked in from the muzzle.
Q. Okay. And what did you poke it in with?
A. A rod of some sort, probably a ramrod that was lying around the lab.
Q. So just a loose piece of cotton held that hot metal and kept it from keeping out?
A. It was packed in pretty solid.
Q. Okay.
A. It was a solid wad that I had packed up. It's what we do all the time when we make these casts. We make a good solid cotton plug and push it in from the muzzle, and then that holds it, yes.
Q. And the idea is to make that cotton wad so tight and so thick that it won't let the metal run down the barrel?
A. That's correct.
Q. And so you put it in the muzzle end and you drive it up to where you want it to be with a rod of some kind, correct?
A. That's correct.
Q. All right. Did you use any oil or anything to do that, to make it go in easier?
A. No, you do not.
Q. Then, as I understand it, after you melted this material that had been used, perhaps, before and remelted and used for other things, right--
A. Quite possibly.

Q. Okay. No telling what's in it. Then you pour this molten stuff inside the threaded area of the barrel, right?
A. That's correct.
Q. And you took a shotgun choke tool and ground it down, correct?
A. Yes.
Q. And then you put a notch in there so it could use it like a screwdriver, right?
A. No, that's not correct.
Q. What did you do?
A. I put the shotgun choke tool in there before I poured the cast.
Q. Okay. So you put a shotgun choke tube in there so you can screw the cast out?
A. That's correct.
Q. And you poured it in there and let it harden, correct?
A. That's correct.
Q. And then you twist it and twist it and twist it until the whole thing came out?
A. That's correct.
Q. And then you took the Cerrosafe plug and you mailed it to Mr. Eaton?
A. Did which?
Q. Mailed it to Mr. Eaton?
I'm sorry. Did you mail that to Mr. Eaton, after you

had--

A. Oh, gave it to him. I don't know if I mailed it to him or handed it to him, but I gave it to him.

MR. SINGER: Just a moment.

THE WITNESS: And I apologize for my hearing.

MR. SINGER: I'm sorry. I don't speak very clearly either. I apologize.

Just a moment, Your Honor, if I could?

BY MR. SINGER:

Q. You've told us you don't know what Knight and Thompson/Center do on their muzzleloader. Are you aware of any muzzleloader manufacturer that proof-fires every muzzleloader that it makes?

A. I don't know what the standard--what the practice is.

MR. SINGER: Thank you, Your Honor. No further questions.

THE COURT: Redirect?

MR. EATON: Briefly, Judge.

REDIRECT EXAMINATION

BY MR. EATON:

Q. Mr. Roane, do you know of any manufacturer of any firearm that puts a proofmark on a firearm that's never been proof-tested?

A. I've never heard of it.

Q. All right. That's why, when a gun's got a proofmark, one

can safely, usually, usually presume that it's been proof-tested?
A. It's what I would presume. And I called several other people when I found out about that, and they all told me the same thing.
MR. SINGER: Excuse me. I object.
THE COURT: Just a minute.
MR. SINGER: Hearsay.
THE COURT: Sustained.
BY MR. EATON:
Q. Let me ask you this. One of the things I want to clear up, when we sent you the two exemplar Kodiaks, did those guns have breech plugs in them?
A. I--
Q. Let me explain.
A. I really don't remember.
Q. Let me ask you--
A. I don't believe they did, but I don't remember.
Q. That was really the point of my question. I was going to ask you, did we send you brand new, completely assembled exemplars, as well as some aftermarket breech plugs of CVA?
A. That's my recollection, yes.
Q. All right. Fully assembled, completed guns with breech plugs and aftermarket breech plugs in the separate little plastic bubble container?

A. I believe so.
Q. All right.
A. But I don't recall exactly.
Q. All right. And you're aware that those aftermarket plugs are also manufactured--or sold by CVA/BPI; is that correct?
A. Yes, right.
Q. Same company?
A. Yes, sir.
Q. And you can go down to any sporting goods stores and get breech plugs manufactured or sold by all the muzzleloader manufacturers, can't you?
A. Sure. You can go to Wal-Mart and get them.
Q. Go to Wal-Mart, you can get CVA breech plugs, you can get Thompson breech plugs, you can get Savage breech plugs and others, can't you?
A. As far as I know, yes.
Q. Now, something was interesting to me. Mr. Singer asked you what a muzzleloader firearm looks like when smokeless powder has been fired through it. Do you remember that question?
A. Yes, sir.
Q. And what was your response?
A. I said it looked like a hand grenade went off inside it or a stick of dynamite. It blows it up.
Q. Mr. Katzenmeier's muzzleloader didn't look like that, did it?

A. No, sir.
Q. And this Hogdon Pyrodex pellet material that's used or recommended by CVA or Blackpowder Products, Inc., it is not smokeless powder, is it?
A. No, it's not.
Q. It's an approved and recommended substitute for black powder, correct?
A. That's my understanding, yes.
Q. So if you had been told-- Strike that.
If you had--if Mr. Katzenmeier's muzzleloader had been presented to you and it was all snarled up and split apart and blown apart, you might think smokeless powder had been fired through it; would that be fair?
A. That's correct.
Q. Did it have anything about its appearance, anything at all about its appearance, which would suggest or hint that smokeless powder had been fired through it?
A. No, sir, it didn't.
Q. Did it have any characteristic that you've ever seen associated with smokeless powder?
A. That's correct.
Q. No, no. Did it have any characteristic that you would associate with having smokeless powder fired through it?
A. That's correct, it did not.
Q. All right. Now, he also asked you, and I think I'm about

through, that after the breech plug was screwed back into the exemplar muzzleloader that you were inspecting and testing that you could not tell whether the threads were engaged; is that correct?
A. That's correct. And there's a reason for that.
Q. Exactly. Explain that reason, please.
A. Okay. It's the same reason that I had suggested that the evidence gun be sectioned in the metallurgical laboratory. We could not or my machine shop could not reliably cut at the exact center line of the threads. And what they did was--ended up with was what we saw when we sectioned it was a little bit more than half, which means that the female threads, the things of concern, were curled around slightly at the edges.
Q. What I'm really getting at is if the threads of the barrel are partially engaged, in other words, if three or four or five threads are engaged, and someone screws a breech plug in that's got 12 or 13 threads, the sense they're going to have is that it's fully screwed in and properly engaged; is that correct?
A. Yes, sir. If it screws it in until it's tight, you would assume that it's fully engaged.
Q. And it could feel tight to someone who screwed it in and yet be--have no thread engagement on the last four, five, six threads; is that true?
A. That's correct.
Q. You would have the tactile sensation that it was fully

screwed in and properly engaged when, in fact, it might only be a third of the way or half of the way engaged?
A. That's correct.
Q. But it would still be weakened at that connection, correct?
A. That's correct.
Q. All right, sir. Now, the Cerrosafe. Did that or does that material reach a high enough pressure--pardon me--high enough temperature when you made your cast to have altered the surface of the interior of Mr. Katzenmeier's gun?
A. No, sir, it didn't.
Q. What is the melting point of a carbon steel comparable to Mr. Katzenmeier's gun?
A. I don't know for sure, but it would be, you know, measured in thousands of degrees and not hundreds.
Q. Far in excess of 165 degrees?
A. Oh, yes. Sure.
Q. You don't melt steel at less than several thousand degrees, do you?
A. No, you don't.
Q. Now, insofar as chemically reacting or contaminating the surface, the fracture surfaces in the breech area, would Cerrosafe have any kind of compounds or materials in it that would create a chemical reaction which might change or alter the surface of the interior of Mr. Katzenmeier's gun?
A. Not that I know of, no, sir.

Q. Are these eutectic materials, Cerrosafe and several others, intended not to chemically react with the vessels that they are placed in?
A. That's correct.
Q. That's why, one of the reasons, may be others, but one of the reasons they're used for this purpose, isn't it?
A. Used for what?
Q. That's one of the reasons that those materials are used for casting purposes?
A. Yes.
Q. They give you an image of the vessel without contaminating the material or the surface of the material; is that correct?
A. That's correct. And, as we read earlier, they even use it for casting dentures. I mean, it's a--
MR. EATON: I have nothing further, Judge. Thank you.
MR. SINGER: Two very brief areas--
THE COURT: Recross?
MR. SINGER: --on recross.

RECROSS-EXAMINATION

BY MR. SINGER:
Q. Mr. Roane, do you still have your deposition there, please, in front of you?
A. Yes.
Q. Would you please refer to page 186.
A. Okay.

Q. Do you have that? Please read along with the questions that I asked and your answer.
"Question: I was a little bit confused by your testimony. When you received the two exemplars that you shot, the black gun and the camo gun as received from Mr. Eaton on the 17th of November, did they have the breech plugs installed in them?"
Read your answer, please.
A. "There shouldn't have been any confusion. I was very clear about it yesterday. The breech plugs were in separate packages."
Q. Okay. Next question: "Were they new breech plugs in a clam pack or some type of marketing package you could buy off the shelf?"
And what was your answer?
A. "Yes."
Q. And then I said, "Or were they," and then what did you say?
A. "I told you yesterday. There shouldn't have been any confusion. I said that they appeared to be aftermarket devices that were sold separately."
Q. And those are the ones you used for your test that Mr. Eaton asked you to do, correct?
A. That's correct.
Q. Have you ever been to the proofhouse in Spain?
A. I have not.

Q. Have you ever been to the Dikar factory in Spain when the proofhouse personnel are there, as they're making guns and marking guns?
A. I have not.

MR. SINGER: Thank you. Nothing.

THE COURT: Anything further, Mr. Eaton?

MR. EATON: Not from this witness, Judge.

THE COURT: Thank you.

You may step down, sir. Thank you.

THE WITNESS: Thank you, sir.

(Witness excused.)

THE COURT: You may call your next witness.

MR. EATON: Your Honor, at this time the plaintiffs would present the video deposition--at least begin the presentation of the video deposition of Dr. Nancy Bauman.

(Portion of the videotaped deposition of Dr. Nancy Bauman played in open court.)

THE COURT: Counsel, why don't we take our evening recess at this time, shall we?

Members of the jury, we'll be in recess until tomorrow morning at 9 a.m., 9 a.m. During the evening hours, please bear in mind the admonition given previously. We'll see you at 9 o'clock tomorrow morning. Have a good evening.

(In open court, out of the presence of the jury.)

THE COURT: Have a good evening, everybody.

Mr. Singer, that podium does go up and down.

MR. SINGER: Does it?

THE COURT: It was about at your knees.

MR. SINGER: If it would, I'll figure out how to make it move.

THE COURT: There's a button that makes it go up and down.

MR. SINGER: Gary had it all the way down.

MR. EATON: I've got to.

THE COURT: Have a good evening.

(Recess at 5:03 p.m., until 9:00 a.m., Friday, December 5, 2008.)

C E R T I F I C A T E

I, the undersigned, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that I acted as the official court reporter at the hearing in the above-entitled matter at the time and place indicated;

That I took in shorthand all of the proceedings had at the said time and place and that said shorthand notes were reduced to typewriting under my direction and supervision, and that the foregoing typewritten pages are a full and complete transcript of the shorthand notes so taken.

Dated at Des Moines, Iowa, this 27th day of February, 2009.

/s/ Kelli M. Mulcahy
CERTIFIED SHORTHAND REPORTER