IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JON D. KATZENMEIER and JULIE KATZENMEIER, Husband and Wife, | |
| Plaintiffs, | |
| vs. | Case No. 4:06-cv-00169 |
| BLACKPOWDER PRODUCTS, INC., a Corporation, d/b/a CONNECTICUT VALLEY ARMS; and DIKAR S. COOP, | TRIAL TRANSCRIPT |
| | Volume III |
| Defendants. | |

Courtroom, Second Floor
U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa
Friday, December 5, 2008
9:00 a.m.

BEFORE: THE HONORABLE ROSS A. WALTERS, Magistrate Judge, and a Jury.

KELLI M. MULCAHY - CERTIFIED SHORTHAND REPORTER

APPEARANCES:

For the Plaintiffs:

GARY A. EATON, ESQ.
WILLIAM E. SPARKS, ESQ.
Eaton & Sparks
1717 East 15th Street
Tulsa, Oklahoma 74104

For the Defendants:

JAMES E. SINGER, ESQ.
Bovis, Kyle & Burch, L.L.C.
200 Ashford Center North
Suite 500
Atlanta, Georgia 30338-2668

KEVIN M. REYNOLDS, ESQ.
Whitfield & Eddy, P.L.C.
317 Sixth Avenue
Suite 1200
Des Moines, Iowa 50309-4195

# I N D E X



| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiffs: | | | | | |
| Dr. Nancy Bauman (By videotaped deposition) | 214 | | | | |
| Dr. Steven Michael Tipton | 215 (Eaton) | 331 (Singer) | 357 (Eaton) | 365 (Singer) | 239 (Singer) |
| Dr. Steven Michael Tipton (Offer of Proof) | 326 (Eaton) | | | | |
| Dr. Richard Hastings | 367 (Sparks) | 398 (Reynolds) | 413 (Sparks) | 418 (Reynolds) | |



# E X H I B I T S



| PLAINTIFFS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 11 - Panoramic microphotographs | 275 | 275 |
| 12, page 2 - Microphotographs | 286 | 286 |
| 13 - Microphotographs | 330 | 330 |
| 15 - Enlarged comparative microphotographs | 280 | 280 |
| 18 - Images of breech area of rifle | 262 | 262 |
| 19 - Measurements of diameters of breech areas | 253 | 253 |
| 26 - Premier MRI & Imaging X-rays and report | 387 | 387 |
| 66 - Exemplar gun - Serial No. 61-13-083332-04 | 295 | 295 |
| 71 - Exemplar gun - Serial No. 61-13-031173-05 | 293 | 293 |
| 74 - Exemplar gun - Serial No. 61-13-199166-04 | 292 | 292 |
| 75 - Exemplar gun - Serial no. 61-13-169203-04 | 294 | 294 |
| 76 - Exemplar gun - Serial no. 61-13-169314-04 | 294 | 294 |
| 97 - Illustration of rolled thread forms | 289 | 289 |
| 100 - Animated illustrations | 301 | 301 |
| 101 - Animated illustrations | 311 | 311 |
| 102 - Animated illustration | 313 | 313 |

P R O C E E D I N G S

(In open court, in the presence of the jury.)

THE COURT: Please be seated, everyone, and good morning.

I think we're ready to resume the deposition of the doctor; is that correct, Mr. Eaton?

MR. EATON: Yes, Your Honor.

THE COURT: All right. You may do so.

(Portion of the videotaped deposition of Dr. Nancy Bauman played in open court.)

THE COURT: Call your next witness.

MR. EATON: There's about five or ten minutes left of this.

THE COURT: Oh, there is? Okay.

(Conclusion of the videotaped deposition of Dr. Nancy Bauman played in open court.)

THE COURT: Mr. Eaton.

MR. EATON: Yes, Your Honor. At this time the plaintiff would call Dr. Steve Tipton. I believe Mr. Tipton is out in the hallway.

THE COURT: Thank you.

THE DEPUTY CLERK: Please step forward and raise your right hand.

DR. STEVEN MICHAEL TIPTON, PLAINTIFFS' WITNESS, SWORN

DIRECT EXAMINATION

BY MR. EATON:

Q. Would you state your full and complete name for the record, please.

A. It's Steven Michael Tipton.

Q. Mr. Tipton, what's your occupation, profession, or business, please?

A. I'm a professor of mechanical engineering at the University of Tulsa.

Q. How long have you served in that capacity, Dr. Tipton?

A. This is my twenty-fifth year.

Q. And, let's see, do you have your curriculum vitae with you?

A. I do not.

Q. Okay. Well, let's see. I think we've got a copy of it here. Somewhere we've got a copy of it.

It's Exhibit 19, I believe, in that book beside you. Would you check there?

A. 21? Yeah, there it is. I found it.

Q. I'm going to ask you some questions about that.

MR. EATON: Your Honor, may we publish Dr. Tipton's CV as we go through it with him? It's Exhibit 21.

MR. SINGER: No objection. It's admitted.

THE COURT: You may do so.

MR. EATON: Thank you, Judge.

BY MR. EATON:
Q. Dr. Tipton, just the first page of your CV--
A. Yes, sir.
Q. Just a minute. Let's get it to come up here.
Where did you do your undergraduate work, Dr. Tipton?
A. Oklahoma State University.
Q. And did you graduate, and, if so, what degree did you achieve?
A. Graduated, a BS in mechanical engineering.
Q. And what year was that?
A. 1978.
Q. And did you do some graduate work at some other universities?
A. Yes, sir. I went to Stanford University and got a master of science in mechanical engineering in '79. Actually worked for about a year and a half and then went back and got a Ph.D. at Stanford in '85.
Q. Was that in mechanical engineering also?
A. Yes, sir.
Q. Okay. Now, while you were doing your undergraduate or your post-graduate work, did you focus on or specialize in any particular areas or emphasize any particular areas of mechanical engineering?
A. It was--it was primarily metal fatigue, and in order to study metal fatigue, you had to study how materials deform and

how they are--how they behave under loading, so particularly I was interested in studying how they plastically deform because that's the root cause of metal fatigue. And so it was metal fatigue and plasticity analysis--
Q. All right, sir.
A. --in design situations.
Q. And then on your curriculum vitae, there's a segment called "Areas of Specialization." Do you see that there?
A. Yes.
Q. I don't want to go through all of those areas, but there's a couple of them I want to talk to you about in some detail.
About the third item over, fracture analysis, tell us a little bit about what that encompasses.
A. What I primarily was interested in is the structural integrity of mechanical components; are they going to fall apart or not. And once they are experiencing fatigue loading, they can incur--they can--cracks can develop and grow.
And so the behavior of a component with a crack is very important, and that's what we're talking about as fracture analysis. When something actually fractures, how it behaves with a crack in it is different than how it behaves without a crack in it.
Q. Does fracture analysis include failure under impact loading?
A. It can, yes.
Q. Then mechanical design, what kinds of areas or can you give

us some examples that mechanical design encompasses?
A. It's structural. What I'm looking at is primarily structural analysis. If you're going to design a mechanical component and it's got to carry loads, whether it's a pressure vessel or the--an axle on your car, it's got to carry the loads, and you don't want it to break. But you don't want it to be too heavy, you don't want it to be too strong, because then it's going to be too heavy and cost too much to make. So a designer is going to pick the right geometry and the right material to carry a certain kind of loading, and that's mechanical design, in a nutshell.
Q. You mentioned pressure vessels, and I'm going to come back to that. But would such mechanical things as threaded metal fasteners fall under mechanical design?
A. Yes, sir.
Q. And pressure vessels, what are we talking about there that you had a particular interest in?
A. Pressurized tubes and--are of importance, and when-- I happen to live down in Oklahoma, and I've done a lot of work with the oil companies, who are--who deal with a lot of pressurized tubes, and so that's where a lot of my experience has directly come from, working with petroleum companies on making sure that their piping systems are adequately designed.
Q. Now, before we go on to maybe some other parts of your curriculum vitae, I want to talk about the application of those

particular areas of specialization; fracture analysis, mechanical--which would include the pressure vessels, and mechanical design.

How, if at all, do those specialties relate to the analyses you performed with regard to the Katzenmeier case?

A. Well, that--that particular rifle, any particular rifle, for that matter, is nothing more than a pressure--for a very short instant, is just a pressurized tube, and the pressure--the pressure that builds up in that tube when the--when the propellant ignites is extremely high, and that's what, obviously, causes the big forces that push the bullet out of the muzzle, but it also pushes back on the breech plug and it also expands and tries to swell up the gun barrel itself.

So you've got to make sure that that gun barrel is adequately designed so it's not going to explode, and you've got to make sure that the--you've got adequate threading--threaded engagement of your breech plug so it doesn't come out the back. So it's pretty simple mechanical problem.

Q. Is there some engineering concept or principle with regard to designing and manufacturing pressure vessels to the effect that they should be manufactured in such a way as not to fail at connections or orifice closures?

A. Yes, that is pretty standard. If you're going to design a pressure vessel, you've got a general geometry that you want to hold the pressurized fluid, and it's going to be stressed to a

certain level. And if it was a perfectly smooth vessel, it would explode at a certain--it would have a certain limit pressure.

If you've got to put an orifice in there, if you've got to put an opening in there that's threaded, you generally don't want that--you don't want that to become a weak spot, so you'll overdesign that part of the pressure vessel.

Q. In your career-- Well, we'll come back to that.

You told us you're a professor at the University of Tulsa. In addition to working as a professor and teaching students, do you also do work for outside entities, business entities, for instance?

A. I've done quite a bit of consulting over my career.

Q. Can you give us some examples of your outside consulting work? And as you go through that, tell us, maybe, who you've worked for, if it's been an oil company or some company that makes these pressure vessels you've talked about, and maybe a little bit about the project.

A. Pertinent to this case, I've done work with Baker Oil Tools in the past. I have reviewed all of their design equations that they use to assess the structural integrity of their down-hole oil tools.

Under-- There's-- Down-hole oil tools are subjected to a lot of different pressure states; external pressures that are trying to collapse them, internal pressures that are trying

to blow them up, twisting. And when you get all that combined, it gets confusing.

So they had a manual that they were using, and they ran into a situation where they did some destructive testing and found out that the numbers from their manual didn't match their test, so they hired me to review their entire manual.

And I found quite a few errors in there that were just fairly simple minus sign errors and that weren't really their fault. They weren't-- A couple of them may have been typographical, but a couple of them were conceptual errors because it gets kind of confusing as to whether or not the negative sign on a certain stress date's important, so they would leave it off, and it would affect their answer tremendously.

And so we went through and reviewed their pressure vessel design equations, corrected all of them, did several tests, and they were real happy with it because it seemed to match their results more closely after that. That's one job that I did.

Q. What about I think you had told me on one occasion about Schlumberger?

A. I worked during the year--the calendar year of 2001, I took sabbatical and worked for Schlumberger and did several jobs for them, but one of the jobs that they had me do was design the threaded connections for their down-hole oil tools.

These were pressurized threaded connections, and they said these were tricky, tricky design situations because they're trying to--they're trying to minimize the wall thickness of their vessels because they want fluid to flow up and down, and wherever you've got metal, you can't have fluid.

So when they try to make those walls thinner and thinner, they're more susceptible to failure, so they were really--and the threaded connections were sort of weak links.

So I spent that year, one of the jobs that I did was to design, basically, a little computer program that they can use to design their threaded connections that are under--that are pressurized and dealing with external forces such as tension, compression, and twisting. So they--to this day, they still use that--that equation to design their threaded connections.

Q. Now, without going in maybe to as much detail about the project, have you done other research with regard to threaded metal fasteners or threaded connections for any other industrial or manufacturing-type appliance?

A. Not for any clients that I can-- I might think of one later. Not that's coming to mind right now.

Q. All right.

A. We've done research on the fatigue of threaded fasteners. We've done-- I've had some master's students write a-- We came up with a different way to tighten bolts that increases their

fatigue life, and we did some work on that.
Q. Do you teach, in any of your mechanical engineering courses, about threaded metal connections?
A. Yes, sir. My senior-level mechanical design class, I teach it.
Q. For how many years have you taught students with regard to the design of threaded metal fasteners or threaded metal connections?
A. This is my twenty-fifth year.
Q. And the same type of question with regard to pressure vessels: Have you taught students with regard to design of pressure vessels?
A. Every year, in two classes, I teach a sophomore-level mechanics and materials class where they learn sort of the basics for thin-walled pressure vessels, and when they get to be seniors we go through thick-walled pressure vessels and making sure that they're designed properly.
Q. These muzzleloaders, the Katzenmeier gun and some exemplars that you did some work on, would you categorize those as thin-walled pressure vessels or thick-walled pressure vessels?
A. They're thick-walled pressure vessels.
Q. All right. For instance, the Schlumberger project, and I believe you said the Baker Tool project, what magnitude of pressures were you working with in performing that research?
A. They were--that was on the order of-- We were pressurizing

their down-hole tools at pressures on the order of 15,000 psi, but these were--these were big four-inch diameter tubes. They were-- So the stresses that that causes in the material is quite a bit bigger. It was quite large.

Q. And with regard to other work you've done with pressure vessels, what magnitudes or, let's say, range of magnitudes have you worked with insofar as designing vessels or evaluating vessels for withstanding pressure?

A. We did a pretty substantial project for--that was--involved Schlumberger again, it was a research project, and it involved-- They make something called positive displacement pumps. These are just big pumps where pistons push fluid and really apply it with a big engine and really apply a lot of pressure.

So they're pressurizing fluid. Under their operating conditions, they're operating with fluid that's pressurized between 15,000 and 25,000 psi. These are for going down and doing the fracturing jobs in oil wells where they pump high-pressure fluid down into the earth and fracture rock so that oil will flow out.

So their piping systems and their pump components have to be able to sustain those pressures. One of the things that they do is they'll pressurize those pumps--they'll overpressurize those pumps when they manufacture them to pressures way higher than they'll see in service, and that sort of--that intentionally causes the material to get--to

plastically permanently deform at the inside of the pressure vessel, and then when they release that, it induces what they call residual compressor stresses, and it will improve the life of those components.

They'll pressurize those components at ranges on the order of fifty to sixty thousand psi on purpose. When they go into service, they'll never see anything greater than twenty-five to thirty thousand psi, but that overpressurization, if it doesn't cause to vessel to rupture, can actually make it more fatigue-resistant and work longer in the field.

Q. Now, prior to becoming involved in this Katzenmeier case, had you ever designed or worked on the development of any firearms of any kind?

A. No, sir.

Q. The concepts that you've sort of told us about with regard to pressure vessels, threaded metal fasteners, that sort of--that aspect of mechanical engineering, how does it translate, if at all, to the work you did in the Katzenmeier case? How does it apply, if at all, to the Katzenmeier case?

A. It's directly--it's directly applicable.

Q. And how so?

A. Well, if you have--if you have pressure in the muzzle of the gun, and especially particularly right by the breech area, when the gun fires, that's when the pressure's the greatest, the action of that pressure on that tube is identical to the action

of the pressure in the tubes that we analyzed for Schlumberger.

So that tube can't fall apart. The forces on the breech plug that are trying to eject it out the back are exactly the same as the forces on the threaded bolts that you're trying to pull apart when you bolt anything together.

Q. Have you recently done some research with regard to threaded metal fasteners?

A. Yes, we did. We got-- I got interested in--

Q. By the way, when you say "we," who are you talking about?

A. When I say "we," sometimes talking about myself and some students. I'll get some students involved because they like to do this stuff and they're cheap labor. But they're interested, they want to learn, and it's a good opportunity for those guys to do some research.

And there's another professor at the University of Tulsa named Jeremy Daily, who is a colleague of mine, and he's--we have some of the same interests, and Jeremy's gotten involved in some of these as well.

Q. Okay. Sometimes the politicians say "we," and they mean me or mean I--

A. Yeah.

Q. --and I just wanted to know what you were talking about when you said "we."

Okay. Pardon me for interrupting you. Go ahead and tell us a little bit about this recent project, research project

you did, with regard to threaded metal fasteners.
A. I got curious about-- In this particular situation, these rolled threads were interesting to me because the geometry that we saw in the rolled threads was surprising. It's not what I expected to see, and so I was curious about why it happened.
So we--I went out and bought some one-inch diameter tubes that had a half-inch diameter bore, and we had those machined out with different IDs, different internal diameters, that were really--carefully bored them out and measured them so they were precisely, you know, what we wanted them to be.
And we made them the recommended size for a thread-forming tap, but then we made them a little bit smaller and we made them a little bit bigger in different increments. We formed threads in these little samples, and then we took standard five-eighths-inch diameter threaded plugs and pushed those in there. We put those in our machine, our test machine, and we measured the force required to push them out for different--for the different thread configurations that resulted from those different diameters.
Q. And, now, you've done, as I understand it, some--one of the other ideas or areas of specialization is materials science.
A. Right.
Q. Tell the ladies and gentlemen of the jury a little bit about what that is and how it may apply or how it does apply to this Katzenmeier case.

A. Materials science, as you say that, you say a lot. It's a broad field. It involves everything from plastics to wood to metal. I really--my main focus was engineering metals, and primarily steels and aluminums, and occasionally I'd get into some titaniums and magnesium, but it's metal that engineers use to make things.

And metals are--metals are what you call crystalline materials. The atoms in metals sort of stack together like balls in a crystalline lattice. They sort of hang in certain spots and they form planes, and when you--when you load an engineering metal enough-- If you load an engineering metal under normal conditions, you know, like you usually design, the distance between the atoms will separate a little bit and then it goes back. It's like a spring. It goes back to where-- It will flex, and then it will come back. That's what you want to happen. That's called elastic deformation. If you load it a little too much, planes of atoms will slide over each other, and that's called plastic deformation.

So I spent a lot of time studying how metals deform plastically, because that tends to be the root cause of metal fatigue and the ability--or the cause of a structure to lose its ability to carry its load to the surface.

So I--

Q. Now, are you a member in any professional societies that relate to mechanical engineering?

A. Quite a few. American Society of Mechanical Engineers, American Society--
Q. Rather than go through the whole laundry list, just give us two or three that are the most prominent and that you consider the most relevant.
A. Well, American Society for-- It used to be called American Society for Metals, now it's called American Society for Materials, ASM International.
Q. Right.
A. That's--
Q. American Society for Materials, is it focused on materials of various kinds?
A. Right. It's actually involved with everything, but there's--
Q. When I said that, I'm talking about steels, ceramics--
A. Yes.
Q. --plastics, across the board?
A. Yep.
Q. But your area of most interest is metals?
A. Right.
Q. All right. Now, in that particular professional society, have you achieved any particular honors or status?
A. Well, this year I was actually named as a fellow of ASM.
Q. And what does that mean?
A. It--it means that you've achieved a lot in the area over

your years, you've achieved some substantial breakthroughs and you're recognized by your peers. It's an honorary thing.
Q. I mean, is it something you just pay a little extra dues and become a fellow--
A. No.
Q. --or is it something that other fellows in the society have to invite you or nominate you for this particular status?
A. That's correct. You have to be nominated by another fellow, and then you have to--the nomination material has to document the things in your career that make you worthy of becoming a fellow, and you have to have references from at least five other people that are knowledgeable of your career.
Q. And with regard to mechanical engineering, are you a member of any of those professional societies?
A. Yes. I mentioned--
Q. Again, one or two of the most prominent?
A. ASME, Society of Automotive Engineers, and then Society for Testing & Materials. There's an International Coil Tubing Association because I do a lot of--
Q. Tell us about the Testing & Materials. What does that society focus on?
A. Well, that's pretty much what they--it's-- To do--to test a material for its strength is--can be subjective, so the ASTM establishes standard practices for conducting, say, a tensile test.

If you say this material has a yield strength of something, well, that means-- If I take a piece of steel and say, "How strong is that," well, it's got a yield strength and it's got a tensile strength. The yield strength is when you start to get plastic deformation. If you load it and you let it go back, it does it-- That's what you'll want. If you permanently deform it, you've yielded it.

So there's a certain load level, a certain stress level, that will cause it to plastically deform. In order to test for that, it can be tricky. You can give a piece of steel to ten different engineers, they'll come back with ten different definitions of when it yields. So ASTM has standard procedures, and if you use those procedures, then ten different places will come back with very similar or identical results.

Q. Now, your CV's about 31 pages long. It's got a whole laundry list of publications, professional publications that you've done, honors, awards and grants. I don't want to go through that whole thing, but I just want to ask you, is this curriculum vitae, which is Exhibit 21, is it pretty much a compilation of your professional history?

A. Yes, sir.

Q. All right. It will tell the folks on the jury pretty much everything they may want to know about your professional qualifications, experiences; is that right?

A. Probably a lot more.

Q. Probably more than they want to know? Okay.

At any rate, on this list of publications, are there any particular publications that you've done that you think have particular relevance to or relationship to the work you did in the Katzenmeier case?

A. Let's see. Refereed publications-- It's kind of funny, a lot of the-- We have some-- "Design Curves For Maximum Stresses in Blocks Containing Pressurized Bore Intersections," that was--that was the work that we did for the pumps, and that's--that's directly applicable.

Any of the proof loading. I've got quite a few papers on proof loading and how that--how that affects the fatigue life. But that's--that's loading to induce plastic deformation, which is something that's of interest here, so any of those papers. And there's quite a few of those. I won't go through all of them.

Most of the papers that say--that have the word "plasticity" in them are applicable to this because we want to make sure-- What you're trying to do when you design a pressure vessel that gets loaded with anything, and in this case it's pressure, you want to make sure that it doesn't plastically deform. So any plasticity analysis is studying what causes plastic deformation to occur and what happens after it occurs, and so any of the papers-- And there's quite a few of those.

Q. Well, I think you've probably covered that adequately. Let

me ask you this. You talk about the papers you've done on proof loading. Elaborate on that just a little bit of what is proof loading, what's its purpose, what are its effects on the materials?

A. Well, proof--proof loading is done for a number of reasons. And any kind of--any time you buy anything like chain, if you go out and buy a chain from the hardware store, that chain was all proof loaded.

So if you buy a chain and they said you're gonna buy--how strong is this chain, well, that chain will lift 2,000 pounds, chain is generally proof loaded at about 2 1/2 times its working load limit, so it would be loaded at 5,000 pounds, if it's 2,000-pound chain, just to make sure that it didn't--just to make sure that it's safe.

That proof loading is actually enough to cause a little bit of plastic deformation, and it can actually cause the chain to become just a little bit stronger under fatigue loading.

So that--we did quite a bit of work quantifying that. The people that manufacture chain didn't fully understand-- We worked with some chain manufacturers who didn't really even understand that concept totally. So we did some research projects with some oil companies, with Amoco at the time, because they were interested in chain for mooring these offshore oil rigs, making sure they didn't come apart.

Q. Now, are you familiar with the concept of testing to failure with regard to mechanical loading?
A. Yes, sir.
Q. And what is that?
A. Well, that's just loading something under--usually under a--you load something until it fails to carry that load anymore.
Q. Have you ever done any research work that involved testing to failure of pressure vessels?
A. Yes, sir. Quite--quite often.
Q. Pardon me?
A. Quite regularly. I've done it several times.
Q. All right. So you've done that over the past 25 years?
A. Uh-huh.
Q. And give us some examples of the types of pressure vessels that you have tested to failure.
A. High-pressure pump components, coil tubing samples. We've pressured them from--with external and internal loading. Down-hole oil tool samples. Out at Baker, we've gone to their lab, and after we've come up with these design equations for certain geometric-- The pressure vessels are generally not smooth, they've got some kind of a notch going around the circumference on the inside or outside.
So we'll put those notches in there, we'll put these things into a test chamber, big bunker, it's got a big concrete--steel reinforced concrete with a lid on it. We'll

pressure it up with transducers all over the thing and then we'll pump it up until it explodes.
Q. Now, in doing that work over the years have you come to recognize certain characteristics and features of an impending failure in a pressure vessel?
A. Most engineering--most pressure vessels--all the pressure vessels that I've ever looked at are made up of metal you'd characterize as being ductile metal, ductile steel. Ductile means that it will plastically deform, it will yield before it breaks. And that's by design. It makes it tougher, it makes it more susceptible--or less susceptible to failure by impact loading.
If it was really, really, really hard, if you made that steel as hard as can you make it, it would have very low impact resistance, so if it got hit with an impact load, it would shatter like glass. So by design, engineering alloys are ductile, so they will tend to yield and get bigger in diameter before they burst.
Q. And how is that relevant to the work you did in the Katzenmeier case?
A. Well, I didn't--I saw no signs of any plastic deformation in the gun barrel, none.
Q. Are you talking about the Katzenmeier gun barrel?
A. The Katzenmeier gun did not show any signs of plastic deformation in the gun barrel on the--

Q. And what was the significance of that no sign of plastic deformation in the Katzenmeier gun barrel?
A. Well, the pressures that should have been required to eject a fully-formed breech plug were--are large, and I've seen some estimates of those on the order of 50,000--pressures on the order of 50,000 psi.
A pressure-- I'm gonna look at this because I did some calculations. It would--
MR. SINGER: Excuse me, Your Honor.
A. The pressure required to yield that gun barrel--
THE COURT: Excuse me.
MR. SINGER: I don't have any problem, I don't want to interrupt his qualifications, but before he enters his opinions, I would like to voir dire the witness.
MR. EATON: Well, I'm really not finished with qualifications, and I'll leave the Katzenmeier thing off until we finish that, then.
THE COURT: Fair enough.
MR. EATON: All right. Other than to how it may analogize to the Katzenmeier case.
THE WITNESS: Sorry.
BY MR. EATON:
Q. All right. Let's see here. Have you had occasion, in your career, to test tubes, pressure vessels in the form of tubes, to failure?

A. Yes.
Q. All right, sir. And have you become familiar with certain characteristics or features of tubular pressure vessels as they approach failure and what they look like mechanically?
A. Yes, sir, I have.
Q. In your career, have you had occasion to perform mathematical, engineering calculations with regard to design of tubular pressure vessels?
A. Yes, sir.
Q. And does that type of calculation also include consideration of the hardness of the metal as well as, let's say, surface areas or surface areas of engagement?
A. Yes.
Q. All right. And if an engineer designs or reviews someone else's design of a pressure vessel, and let's be specific, a tubular pressure vessel, is it important to--in the proper design process, to perform engineering calculations and then utilize certain inspections or tests to verify the efficacy of those calculations?
A. I would--I would say yes. You document your calculations to the point where other people can read them and understand them.
Q. Well, what I'm really getting at is, as part of the engineering or design process, is it typical or even mandatory to verify the calculations with inspections or tests of the actual design, empirical testing?

A. Usually, yes, sir. Usually that's done. It's--
Q. And--
A. It's because--
Q. And what's the purpose of that or the value of that, from an engineering standpoint?
A. Well, the theory never matches the reality 100 percent. You do your best, but you have to make assumptions about--in order to come up with something that can be solved mathematically.
So you'll--so an engineer will come up with equations that try to match the physics as closely as possible, but there can be discrepancies, so you'll run some tests, you'll measure what happens, you'll compare that, and sometimes you can derive things like empirical factors that will bring those two--that will eliminate the difference between those so in the future you've got a better model.
MR. EATON: Your Honor, at this point the plaintiff would offer Dr. Tipton as an expert in the fields of mechanical engineering, materials, and design of tubular pressure vessels and ask that he be allowed to render opinions in that case or in those circumstances in this case.
THE COURT: Did you wish to voir dire?
MR. SINGER: Yes, Your Honor.
THE COURT: You may do so.

VOIR DIRE EXAMINATION

BY MR. SINGER:

Q. Good morning, Professor Tipton.

A. Mr. Singer.

Q. I figured out I can make this go up. Maybe you can hear me a little better.

Have you ever designed a muzzleloader?

A. No, sir.

Q. Have you ever designed a component part for a muzzleloader?

A. No, sir.

Q. Have you ever manufactured a muzzleloader?

A. No, sir.

Q. Or a component part for a muzzleloader?

A. No, sir.

Q. Have you ever worked for a company that either designed or manufactured muzzleloaders or component parts for muzzleloaders?

A. No, sir.

Q. Have you ever worked for a company that tested either muzzleloaders or component parts for muzzleloaders?

A. I've worked with Sherry Laboratories, who's tested everything, so they may have tested muzzleloaders, but I'm not sure.

Q. You say worked with Sherry. That's the lab that you--

A. Correct.

Q. --farm some stuff out to and ask them to do--

A. Correct.
Q. --that you can't do at the school?
A. Correct.
Q. You're not an employee of Sherry?
A. I'm not employed. I have worked with them on projects in the past but never--never to test a muzzleloader.
Q. Have you ever been inside a factory where a muzzleloader was made?
A. No, sir.
Q. Have you ever designed any firearm?
A. Not directly.
Q. Okay. Have you designed the component part of a firearm?
A. I've--I've formulated analytical tools that have been--that can be used to design firearms, that are used to design firearms.
Q. Okay. And what company did you do that for?
A. I've done--I didn't do that for a specific company. I did--published research results that could be directly and have been directly applied to things like autofrettage cannon and artillery barrels, and that sort of thing.
Q. Okay. Have you ever been in a situation where you've been employed to manufacture a firearm?
A. No, sir.
Q. Have you ever been employed to test a firearm?
A. No, sir.

Q. Have you ever been in a factory where a firearm was made of any kind?
A. No, sir.
Q. Are you a metallurgist?
A. I have a metal-- I'm a mechanical engineer, but I have a metallurgical background.
Q. But you are not a metallurgist by trade?
A. No, I'm not a metallurgist.
Q. And before you entered academia, obtained your Ph.D. and did research and then became a professor, I believe you worked at Bell Labs, correct?
A. Yes, sir.
Q. And you, as an engineer, worked on modular phone jacks, that was your job?
A. Yep.
Q. Have you ever been retained, other than in this situation by Mr. Eaton, to evaluate or assess a matter involving a muzzleloader?
A. No, sir.
Q. Or a firearm?
A. No, sir.
Q. Have you ever fired a muzzleloader?
A. Not a muzzleloader.
Q. Okay. Have you ever fired a rifle?
A. Yes, sir.

Q. Pistol?
A. Yes, sir.
Q. Okay. When I took your deposition, you'd only fired a gun one time, and that was at a skeet range?
A. That's true.
Q. Well, what kind of gun was it?
A. I-- Just recently, actually, a couple weeks ago, a friend of mine has some land out in Sand Springs, which is a little town outside Oklahoma, and we went out there and shot a lot of different pistols and rifles that he has.
Q. Okay. Your opinions and conclusions in this case were complete before two weeks ago; would that be fair?
A. Yes.
Q. Okay. Before two weeks ago at your buddy's place, had you fired a rifle or a pistol?
A. Just a shot--just shotguns.
Q. Okay. And that was one time at a skeet range?
A. And a .22-caliber--a .22-caliber rifle when I was younger.
Q. Have you ever-- Do you hunt?
A. No, sir.
Q. Now, your specialty, as I understand it, and as you described it, is really in fatigue, correct?
A. That's one of them.
Q. And fatigue--isn't it true fatigue is the study of metal or what happens to metal or other objects when, over time, at

acceptable loads--
A. Uh-huh.
Q. --stress, cracks can build up such that a part breaks, correct?
A. Right.
Q. Before this case and when Mr. Eaton hired you, isn't it true that you were not familiar with the cold forming of female threads inside a tube?
A. No, that's not true.
Q. Okay. You had--you were familiar with the cold forming of threads, the cold-forming tap inside a circle, female threads?
A. I know you can what they call roll thread on the outside and the inside of vessels, but I had no direct experience with that.
Q. Okay. That's what I want to break down. There's a difference between-- And sometimes we'll use that term interchangeably here, rolled threads, but, in fact, what you were familiar with before Mr. Eaton hired you in this case was where there was an object that would, in fact, roll a thread on the outside of a device, whether it's a tube, like a piece of pipe--
A. That's correct.
Q. --or whether it's a bolt?
A. That's correct.
Q. It would roll it on there, right?
A. Right.

Q. And that's a cold-forming process that presses it down?
A. That's correct.
Q. You were not familiar, isn't it true, with the type of forming tap that's used to make the threads on the inside of those barrels; is that fair?
A. I was not-- I was aware of them. I was not familiar with them or I had no experience with them until this.
Q. You had not seen those before, had you?
A. No.
Q. Your experience and your textbook knowledge and your--and your familiarity was with that object that goes around the outside; would that be fair?
A. Correct.
Q. Isn't it true that the way you learned about the rolling tap that we're talking about is from looking at the Internet and from talking to the people that you found on the Internet who sell taps and from the literature that they sent you when you bought a tap?
A. That's partially true. I've also talked to other manufacturing engineers who make, form, and cut internal threads all the time, and I--I learned a little bit about this from them. I've learned a lot about this over the last year and a half.
Q. And that's exclusively in association with your work in this case; is that fair?

A. Yes. Yes, sir.
Q. In fact, isn't it true that when you first looked at the thread profile in this case, based upon what you knew of an outside-rolling tap, you thought the threads you saw were completely backwards, didn't you?
A. I don't think--
Q. You thought the threads--
A. I don't think so. I'm not sure what you're asking me.
Q. Well, you issued a report in this case that said the thread profiles are all wrong, right?
A. Oh, when I first looked at it, I had not--I had not looked at internal threads, that's correct, and they weren't all-- I--I got confused about the length of the land and the length of the root. I was--I was given some misinformation by one of my friends that I talked to. I later found out, after I looked in the handbooks, that that was wrong, that's true.
Q. Right. And I want to just ask you about that very briefly.
A. Uh-huh.
Q. You issued a report--
A. Yeah.
Q. --basically, that these threads are all wrong, correct?
You talked to a buddy in a machine shop who told you you need to go look at an ANSI standard--
A. No. I looked at an ANSI standard anyway, and I discovered that he had given me erroneous information.

Q. Okay. And then--
A. So no one told me that. I discovered that on my own.
Q. And then you realized it's proper, these threads were, in fact, proper profile threads, generally?
A. They weren't properly profiled threads. The length of the-- The only thing I had backwards was the length of the root and the length of the land. I had that backwards.
Q. Okay. But you abandoned your first report and issued a new report that made that correction; would that be true?
A. That's true.
Q. And you did that based upon realizing you were wrong, looking at the ANSI standard, and then calling the person-- looking on the Internet about these taps, and then calling and getting the information about a tap, and, in fact, you bought one?
A. I bought several.
Q. Okay.
A. And used them.
Q. And would you agree with me that the reason you went on-line to investigate this was because this form was new to you?
A. To this--to this degree, it was. It wasn't new to me. I knew-- I've drawn the pictures of the UNF--of the unified thread profiles on the board in teaching to my students, but it was always for external. It was always for the external thread because that's the example in the textbook, and we don't go to

distinction between external and internal very often. So that was new to me, but I learned about it quickly.
Q. Okay. In this case, for this case?
A. In this case, yes.
Q. Now, you were provided by Mr. Eaton the substantial volume of documents that Dikar provided in this case, correct?
A. Correct.
Q. And you were aware that the yield strength of the metal in the barrel was 79,000 psi, correct?
A. Correct.
Q. By a certificate from the manufacturer of the barrels, right?
A. Uh-huh.
Q. And you even had Sherry Labs pull that apart, correct?
A. Uh-huh.
Q. But isn't it true that part of what you base your opinions and conclusions on in this case is your calculations on shearing of threads, correct?
A. Correct.
Q. And for that you used a different yield strength, didn't you?
A. I think so.
Q. 63,000 psi, didn't you?
A. Right.
Q. And, in fact, you had the material specs for the breech

plug, did you not, the stainless steel 416 breech plug, at 94,000 psi?
A. I don't recall if I had those.
MR. EATON: Your Honor, I'd object basically for the same reason that Mr. Singer objected during my direct, and that is he's getting beyond qualification and getting into the specific merits of this case.
THE COURT: Yeah. The purpose of the voir dire is only for the purposes of an objection.
MR. SINGER: Yes, Your Honor. I think, to explain what I'm trying to do, is I think that the qualifications go to two different areas; first, education, training, and experience applicable to this particular set of circumstances, and, second, the attempt to render opinions based upon incorrect information or information that's based upon improper assumptions and contrary to the evidence.
THE COURT: Well--
MR. SINGER: Because it goes to reliability under Daubert and, therefore, the qualifications.
THE COURT: Let's conclude rather quickly.
MR. SINGER: Okay. Thank you, Your Honor.
BY MR. SINGER:
Q. Did you know anything about the manufacture or design process of the Kodiak when you rendered your opinions and conclusions?

A. Yes, sir.

Q. Okay. And that was from the information provided by Dikar?

A. Yes.

MR. SINGER: Thank you, Your Honor.

THE COURT: Thank you. Your objection?

MR. SINGER: Yes. We have an objection that this witness is not qualified with respect to the internal female threads which are at point of issue in this case.

THE COURT: Thank you. Any further record as it relates to the voir dire?

MR. EATON: Pardon me? I didn't--

THE COURT: Any further questioning as it relates to the--put it this way--the qualifications of the witness?

MR. EATON: No, Your Honor. The plaintiff would simply renew the offer or request to declare this witness competent in his field of engineering and materials science to render opinions in this case.

THE COURT: First, the objection is overruled. Second, the Court will not declare anybody an expert, whether or not the defendant--or the witness is an expert, and the credibility of his testimony is solely for the jury to determine, but I'm not going to cut off his questioning at this time.

Of course, I do not know at this point what his opinions will be, as none have been offered, and if there are

specific objections to specific opinions, I will take those up when the opinions are solicited.

You may go forward.

MR. EATON: Just by way of response, Your Honor, the only reason we made the formal offer, request of declaring him an expert witness, was because of Defendants' counsel's request to voir dire.

THE COURT: That's fine.

DIRECT EXAMINATION (Resumed)

BY MR. EATON:

Q. All right. Mr. Tipton--Dr. Tipton, let's talk about some things that are more specific to the Katzenmeier case now.

Do you remember what you were initially presented with in the way of an assignment to perform some work with regard to Mr. Katzenmeier's rifle--muzzleloader rifle?

A. I was initially presented with some exemplar rifles.

THE COURT: Mr. Eaton, I think I lost track of the time while we were talking. This will be a good time, I think, for a midmorning recess.

Members of the jury, we'll be in recess for 15 minutes. During the recess period, please bear in mind the admonition given previously. We'll see you in 15 minutes.

(Short recess.)

THE COURT: Please be seated.

Mr. Eaton.

BY MR. EATON:
Q. Dr. Tipton, when we took our recess, I had just begun to ask you about how you first got involved in this case and what your first exposure to this case was, and you mentioned something about a couple of the exemplars.
Would you just go ahead and complete that answer, please?
A. Right. We had--I think I-- Well, as I recall, we got--I got to look at the actual Katzenmeier rifle but also some exemplars that were identical guns that had been--one had been fired, a couple of them were brand new.
Q. All right. You mentioned Katzenmeier gun was part of your first exposure. I want to proffer to you the barrel of the Katzenmeier gun, which has been received into evidence as Plaintiffs' Exhibit No. 2, and I'm going to ask you some questions about that.
A. Okay.
Q. When you first inspected the Katzenmeier gun, a gross inspection, just like you're looking at it now with your naked eye, what, if anything, did you observe with regard to any indications of excess pressure?
A. The first thing I did was--was rub my hand up and down the barrel. I was trying to feel if the barrel--if I can tell any notable swelling in the outer diameter, because I thought if the gun ejected the breech plug, then, you know, if the breech plug

was properly formed and properly inserted in the back of that thing, those threads were fully engaged, there would be a lot of pressure, and there--you would have been able to feel a swelling in the outer diameter, possibly. I didn't feel that. That's the first thing I did.

So I had some very accurate digital micrometers that will measure diameters to within a half of a thousandth of an inch, and I took measurements along--at discrete locations along the length of the pipe that I put in my report. Even at that point, I didn't know if there had been any swelling because I don't have any--I had nothing to compare it to, except the exemplar.

So, like, the next thing I did was measure the exemplars in the same locations, and it was very obvious right away that the outer diameter of this barrel was identical to the outer diameter--essentially identical, within a couple of a thousandths of an inch, it was identical to all those other rifles.

Q. Now, did you document those measurements?
A. Yes, sir, I did.
Q. And would you turn to Tab 19 in your exhibit book there.
A. Yes.
Q. And is Exhibit 19 a tabulation of the measurements you took of the external diameter of the Katzenmeier gun as compared to the external diameters of a couple of exemplar guns?

A. Yes, sir.

MR. EATON: Your Honor, we would move to offer Plaintiffs' Exhibit No. 19.

MR. SINGER: If I might briefly see that, Your Honor.

I have no objection.

THE COURT: 19 is received.

(Plaintiffs' Exhibit No. 19 was offered and received in evidence.)

MR. EATON: May we publish Exhibit No. 19, Your Honor?

THE COURT: You may.

BY MR. EATON:

Q. All right, Dr. Tipton. The jurors can't see all of that exhibit because about the bottom half of the page is cut off, but take that first top of the page there and explain to us-- And, by the way, on your monitor in front of you, if you want to point something out, you can just touch that monitor and draw an arrow to it or draw a circle around it, and if you want to clear that, I think you just tap the screen and it should clear.

A. All right.

Q. Okay. Now you know how the monitor works.

All right. At any rate, what are you depicting there with the illustration? What was the point of that illustration?

A. When I took the-- I had read in other--in another expert's report that there was a discrepancy between the diameter at the inside of the thread, and that's what's labeled as $d_2$, sort of

right there, in the front and the back (indicating).

I don't-- You can't see the-- The $d_1$ is the-- Can I just stand up and point at that screen?

MR. EATON: Sure. May he have permission?

THE COURT: Okay.

A. I measured the inside diameter here and here. I have a real nice set of internal--it's an internal diameter measuring tool that's--that I was able to put in this thing and dial in, and it measures, to within about a thousandth of an inch repeatability, an internal diameter.

So I measured the diameter here and the diameter here because I'd read in another report that there--that the outer diameter--that the diameter here was greater than there. There seemed to be some sort of tapering, so my initial thought was, well, maybe it expanded and it blew out.

So I was curious as to whether or not the diameter here would also be greater. If it used to be nice and parallel and now it's bigger in the back, then perhaps--and I reasoned that, well, $D_1$ should be bigger than $D_2$ should be bigger than $D_3$ since this little diameter is bigger than this diameter.

So I measured the diameter here and I measured the diameter here on all the incident--on the incident rifle and all the exemplar rifles, the rifles that were identical to this that didn't fail, and I found out that to within a couple of thousandths of an inch, the diameter here and here on all those

other rifles was identical, but this diameter at the back was about twenty-three-thousandths of an inch bigger than the diameter in the front.

And I also found out that this diameter and that and that one were virtually identical on this rifle to all the other rifles that didn't fail, indicating that there was no swelling, no swelling occurred back here or back here. These diameters-- Because if the gun was overpressurized, you would expect to see a lot of swelling right out in this region, but there was none evident. (Indicating throughout.)

BY MR. EATON:

Q. Now, the five numbers you've got marked capital $D_1$ through $D_5$, those--and those outside lines, that's to represent the outside diameter of the Katzenmeier gun?

A. Right. Yes.

Q. The outside diameter of the two exemplar Kodiaks, correct?

A. Correct. The distance between my fingertips right now (indicating).

Q. Right. And the small $d_1$ and 2 represent the inside diameter of the--the threaded area we're talking about?

A. Correct.

Q. So, in a sense, that would be like looking at a cross section of the barrel?

A. Just like that.

Q. All right. And so you found that the outside of all of the

guns, the Katzenmeier guns and the two exemplars, were basically the same?
A. Correct.
Q. And then did you take some measurements of the inside diameter of the threaded area?
A. Yes. I did that on the--I did that on the exemplars and the Katzenmeier rifle.
Q. Now, and were those measurements tabulated down here at the bottom?
A. Yes, they are. You can see the d--
Q. You can get up again if it's easier for you to point it out.
A. The $d_1$ is towards the back, and you can see that it's .623 inches here, but it's about .581 inches in both of the exemplars. That .581 on $d_2$ is about--it was exactly the same in one of them, and it was .579, it was two-thousandths of an inch-- Just for--what does two-thousandths of an inch mean? A piece of paper is about three-thousandths of an inch thick. Paper you're writing on, if you put a pair of mikes on, it's about three-thousandths of an inch thick. So within two-thousandths of an inch, these measurements were the same.
But this--the difference between here and here, I've tabulated those differences. There's no difference here between the diameters, you know, along the length of this. There's only two-and-a-half-thousandths in one of the rifles. In the incident rifle, in this rifle, it was twenty-seven-thousandths

of an inch there. (Indicating throughout.)
Q. So that would be, what, the breech end of the Katzenmeier inside diameter was about ten times greater than in the exemplars?
A. It was ten times greater than that one and infinity times greater than that.
Q. All right. And so what did that tell you about the threaded area of the Katzenmeier gun?
A. There was--there was something unusual there. I mean, it was--it was difficult to understand what that was until we sectioned it apart.
Q. All right.
A. All I knew is that's not--that's not normal.
Q. So, basically, you really couldn't draw much in the way of conclusion as to why those difference in measurements at that point, and you said some got--without sectioning the gun?
A. Without cutting it and doing some investigation, it was--
Q. In other words, could you look--did you have any instruments you could look down inside the barrel to evaluate the quality of that thread form without doing destructive testing?
A. There were--there are instruments available, bore scopes, where you can poke it in there and look. I just did not have one of those at my disposal. And so without cutting it open, there was no way to look at it.
Q. Are there some limitations or disadvantages with trying to

conduct an inspection of the interior of a pressure vessel with a bore scope?

A. There's not, not particularly. If you have a good one, if you have a good expensive one, you can do a pretty good investigation, but you can't look at the cross--you can't look at the metallurgy at all and you can't look at the cross section.

Q. That's--

A. So you learn a lot more by doing the section.

Q. That's what I'm getting at. If you used a bore scope, all you'd really see is just the interior?

A. Right.

Q. It would be like standing in this room and looking at the wall.

A. Correct.

Q. But you couldn't see the what's behind the wall; you couldn't see the studs, you couldn't see the wiring, that sort of thing?

A. Correct.

Q. Whereas if you cross-section that barrel, you'll then get a profile of the actual material right up to the surface--

A. Correct.

Q. --in other words, behind the wall, so you can evaluate its quality or character?

A. That's correct. It was imperative to do the sectioning.

The sectioning had to be done eventually, but--
Q. All right. Now, did you recommend any kind of indirect testing to get another sense of the interior characteristics of the Katzenmeier gun short of destruction?
A. Well, we did--we did a little bit. We did some laser scanning of the inside of this to try-- A laser scan will give you a three-dimensional profile of the inside, and we--we attempted to do that to characterize what the geometry of these threads were as completely as possible.
Q. Now, this laser measurement, is that a technique that you had used before to evaluate the inside of pressure vessels, things like tanks and barrels or pipe?
A. We've used it on our research on coil tubing at the university. We're interested in what effect little things like corrosion pits and scratches and nicks do. But if you think about it, it's kind of difficult to measure the geometry of those little--of a little irregular scratch in a pipe, so what we've come up with is a way that we do laser scanning, and just basically it measures the position of every point on the surface so it will give you a three-dimensional map of what that defect looks like.
So you can blow that up on the computer and you can measure--you can take accurate--fairly accurate measurements of how deep and how wide and how long and all the geometry of that little defect.

So we were using that in our lab. One of the vendors for the equipment that we were looking at purchasing was out in Washington, the state of Washington, out near Seattle, so we went out to Seattle, and he was able to put his commercial device down in here and measure, with a fair bit of accuracy, the geometry of these threads before we had to do any sectioning, before we had to do any cutting.

Q. Now, would you turn to Tab 18 of your exhibit book, please.

A. Yep.

Q. It's not up yet.

A. Oh, okay.

Q. I just want you to verify something. Is Tab 18-- You should have three pages there on Tab 18.

A. Right.

Q. All right. Now, just tell the ladies and gentlemen of the jury and the Court what those three pages under Exhibit 18 represent.

A. They represent--the first page represents that we took an exemplar set of threads from a rifle that had not been--that had not failed and had rolled--had formed threads in it, and we did a laser scan of the inside of that, and that's what's in the first. Then we did the same laser scan on the inside of the Katzenmeier rifle.

And on the third page, we took--I took both of those and was able to numerically go back and make--make measurements

of the diameter along the length of the bore in both cases. So I was able to measure the--measure from those--from those topographical maps.

Those maps were just little--how can I explain it--they were the location of all the points on the surface of the inside of this gun and on the inside of the other gun. So I was able to go from one--measure the distance from one side to the other and get the internal diameter measurements quite accurately that can compare those to the measurements that I took with my little measurement device.

Q. Now, did this laser measurement or laser mapping procedure provide you with additional and more detailed information of the interior of the Katzenmeier--the interior of the muzzle--pardon me--the interior of the breech area of the Katzenmeier muzzleloader?

A. It did. There's--there was some interesting features in there that--that mimicked-- It was almost like taking a form, taking a-- It would be almost like putting the mold material in and taking it out. We had a computer-generated model of what the inside of this looked like and could compare that to the threaded version.

And not only that, but we could measure things like the height of the teeth on the other-- The model that didn't fail, that still had teeth in it, we could measure the height of those teeth, and they corresponded with the measurements that we

took later when we sectioned the rifle and actually measured the height.

MR. EATON: Your Honor, we'd move to offer Plaintiffs' Exhibit 18, a three-page exhibit.

MR. SINGER: No objection.

THE COURT: 18 is received.

(Plaintiffs' Exhibit No. 18 was offered and received in evidence.)

MR. EATON: May we publish this to the jury so Mr. Tipton--or Dr. Tipton can explain in a little more detail?

THE COURT: You may.

BY MR. EATON:

Q. All right. Dr. Tipton, page 1 of Exhibit 18-- I'm going to rotate it here.

A. This is the exemplar rifle that we checked, and you're looking at--what you're looking at would be similar to if you put a bunch of jello in there and let it solidify and pulled it out. That's what the jello mold would look like.

So the teeth-- Now, the teeth would actually be coming in from out here. They look kind of funny because, as you'll see later, the tops of these teeth actually have a little ridge that goes along them.

And the way this--the way this laser scanner works, it shoots a laser down and the beam bounces off. And so a laser shoots a beam, and then another beam detects where it--detects

the beam, it measures a reflection of the beam, and it uses that measure--it uses that detection to sort of calculate the coordinates of this point.

There's sort of-- Because it comes at an angle, there's sort of a shadow, so it could get one side of that groove but it couldn't get the other because it was like a shadow. I don't know how to explain it. (Indicating throughout.)

Q. Let me interrupt. The image that you're showing to the jury and explaining to the jury about, it's not an imagine of the breech plug that fits inside the barrel, is it?

A. No.

Q. But, rather, it's an image of the actual inside of the barrel?

A. Correct.

Q. In other words, just like you were looking from the outside to the inside of the barrel?

A. Correct.

Q. All right.

A. It's similar to the breech plug, but it's going to be a little bit bigger because there's space between the breech plug and the material that comes down. So this fills up all that volume.

And it's not a perfect--it's not a perfect representation, because if it was you would see--you would see

that little-- Those little tips that you see, you'd see another one coming from the other side, if it was a perfect representation. (Indicating throughout.)
Q. So that's an image of what the undamaged interior of one of the exemplars would look like--
A. Correct.
Q. --correct?
All right. And then you and the laser technology person that you worked with took an image of the interior of the Katzenmeier barrel; is that correct?
A. That's correct.
Q. And that would be 18, Exhibit 18, page 2?
A. Thing that's interesting here is you can sort of--you can visually see the increase in the diameter from here--between here and here.
You can also see how there was a--there was a thread at the very top of this. So when the plug went in, there's one thread that gets cut, and it's not actually used by the--by the plug, it's not actually engaged by the plug. It's called a lead-in.
When a tap of any kind goes in, it will start cutting a little bit, and then the taps--the cutting part of the tap gets deeper and deeper, so it's sort of making a progressively deeper and deeper thread. It works its way in.
So this is the lead-in. It's not a fully engaged

thread. It's not a fully-formed thread so the plug won't get into it right, but-- So you can see the plug went to about here, and--because everything behind there just got sheared out of there, except for these little dimples that we can explain later when we show you the cross section.

Q. Now, you mentioned a cut thread. The Katzenmeier barrel is a rolled thread. Mr. Singer had asked some questions about that.

A. Cold form.

Q. Cold form or rolled mean the same thing--

A. Right. Yes.

Q. --is that correct?

A. Yeah. We'll assume they do.

Q. And both of those processes create threads; they simply are a little bit different in the profile after they're created, correct?

A. Yes.

Q. Okay. Well, you're going to explain that later.

But at any rate, the Katzenmeier laser image basically shows, as compared to the exemplar image, areas where threads have been stripped away, correct?

A. Yes, sir.

Q. All right. Now, page 3 of Exhibit 18, I'm going to post it and ask you to explain some things to the folks on the jury about it.

And then your table there, this simply shows the two images we've just looked at together for comparison purposes, and then you've got some calculations or the results of those calculations graphed below. Would you explain that to the jury, please?

A. Right. What I did is I took--I took the actual--the coordinate points. I actually know the positions of points that are directly opposite.

You can see on this one, on the little dark line, that's the profile of this guy. And the tip of one of the threads, if you go directly across from it, is gonna be the root on the other side because the threads are forming a helix, right?

So I can measure the distance from here to here, the distance from here to here, so I took those kind of measurements and showed that they were pretty uniform from one end to the other on this one, but there was a progressive sort of tapering going on here.

This is-- I can't hardly read that, but the diameter along the length-- These measurements both came out to about .582, but if you went on this rifle right here, it went from .583 at that end to .640 down on the other end, so there was-- (Indicating throughout.)

Q. And so what is the significance of those measurements that you've tabulated there insofar as describing the interior of the

Katzenmeier barrel compared to the interior of an exemplar barrel?
A. What was interesting--what was very interesting is that this diameter was big enough--was big enough that it would more than likely not even engage a breech plug. That's where that was part that was--
Q. And that area you were just talking about toward the bottom that you said was large enough it would not even engage a breech plug--a thread, was that the measurement in the previous tabulation that was .623?
A. Right.
Q. All right. As compared to the measurement of an undamaged barrel or one of the exemplars that was .58 something--
A. Right.
Q. --.585, or so?
So the image on the right shows the bell-mouthing or tapering of the interior of the Katzenmeier barrel as measured by the laser?
A. Right.
Q. Okay. Now, that image, while it gave you some dimensional information, some geometrical information, I presume it provided you with no metallurgical information--
A. Correct.
Q. --is that correct?
A. That's correct.

Q. All right.
A. And--
Q. So as your investigation was proceeding, you confirmed bell-mouthing by mechanical measurement with your calipers, by laser measurement that was more precise, but you still had nothing about the geometric or--pardon me--the metallurgical quality?
A. I want to clarify a little, if I may.
Q. Sure.
A. The laser measurement is probably not more precise.
Q. Okay.
A. It's more comprehensive, gives you the more bigger three-dimensional. There's probably a little more uncertainty as to the actual-- You know, it's probably accurate to within five or--five-thousandths of an inch, or so, on either side.
So it's not going to be as accurate as you can do with your micrometers in terms of just measuring the diameters, but it gives you more of the three-dimensional picture all the way around on the surface.
Q. So after doing the mechanical measurement with the calipers and the laser measurement, what was your next recommendation insofar as the need for any further investigation?
A. I--I was anxious to cut this--to cut this--section this like we did and look at the cross section and then look down into the threads themselves.

Q. And why did you feel like you needed to do that in order to form some opinions or conclusions as to the cause of the failure?

A. There's-- I tried to understand what could cause that, if the--what could cause a hole--what could cause that hole to be tapered. And it didn't seem likely to me, I could not think of a scenario where a straight hole would become tapered like that because of the explosion, explosion of the breech plug. It seems physically impossible to me.

If anything, it's going to explode more toward the front, it's going to swell up more toward the front than the back because the pressure is going to be greater there, it has to cause the barrel to swell.

So something had to be wrong. Either the hole that was drilled in this before the tap was put in, either that hole was tapered, or somebody had a lousy tap that was tapered. You could make a tap that--that puts bigger threads on one end than the other and run it in there and you'll have a tapered hole. You'll have a tapered threaded hole. In fact, people do that. Drill pipe threads are made with tapered threads. But that's not what this calls for. This calls for nice straight threads.

So one of those two things had to happen. The only way to really discern that would be to slice this open and look at the cross section, which is what we did.

Q. What would be the operational problem presented by a tapered

bore hole in one of these muzzleloader rifles?

A. The problem is a tapered--if you have a tapered bore hole in there, it's gonna be difficult to--it could be difficult to find that out with your typical quality control, especially in this situation, because that hole is recessed a little bit.

What I mean by recessed is there's a little--there's a little lip right here, and so when you're looking--if you have a full gun, you're trying to look down, you can't hardly see down in there.

So if you put a little gauge down in there to try to measure the diameter or sense that the diameter is right, you may--you may be too big in the back, but you'd go in a little bit and you'd engage material and think you're good.

It would be possible to have that tapered hole in there, drilled into that gun before you tap it, and not detect that with a gauge, with the typical gauges that they use to see if-- What they do is they drill a hole and they use a gauge to make sure they put the right hole in there. It's possible to have a tapered hole and not know it with those gauges.

Then, when you--when you run your thread-forming tap in there, you can just have little tiny insignificant--almost insignificant threads that form at the back because you don't have any material to--to form into a thread. It will be enough to catch the tips of the breech plug, you can screw a breech plug in there and think you're good, but you can have virtually

no engagement for a big--over a big length of the breech plug.
Q. All right. So ultimately some destructive testing was done on the Katzenmeier gun; is that correct?
A. That's correct.
Q. And were you present when that destructive testing was done?
A. Yes.
Q. Was it done at the Sherry Labs in Tulsa, where you work--people you work with on occasion?
A. Yes.
Q. Work with regularly, as a matter of fact, correct?
A. (Witness nodded.)
Q. And I believe--I was present, I believe Mr. Sparks was present when that was done?
A. Yes. Yes.
Q. Do you remember if Mr. Singer was present?
A. Mr. Singer was there and--
Q. Do you remember if one of Mr. Singer's experts, Mr. Schmidt, was there?
A. Mr. Schmidt was there.
Q. By the way, are you personally acquainted with Mr. Schmidt?
A. Only through this-- Only through this.
Q. I believe you told me you bumped into him a few weeks ago at a--
A. When I became an ASM fellow, I ran into Mr. Schmidt there.
Q. At the meeting?

A. Yes. He's also an ASM--
Q. So you and he had met during the course of this case, and you saw him again at an ASM meeting?
A. Yes.
Q. All right. And so those are the folks that were present for the plaintiff and defendant when the destructive testing was conducted, and did you direct the performing of that testing?
A. I did that with--with Dr. Schmidt. We both did.
Q. All right. And after the Katzenmeier gun was sectioned-- And you've had the Katzenmeier barrel there. Would you just, again, raise it up, kind of point to the jury where it was sectioned and cut.
A. What we did is we cut--we cut through it down this way, and then we turned it up and we cut it down that way, so we had this little piece that came out. We took that piece and cut it in half so that it became-- I think we actually-- I think I took my piece and made it a little shorter. I didn't need all this. Took that piece and cut it down the middle this way so we had a quarter, and I think Mr. Schmidt got a quarter and I got a quarter.
So I took my quarter and made it an eighth because there wasn't any need to-- And what I wanted to do with that eighth was mount part of it so that we could look at the edge. We wanted to look at the--we wanted to look at this shiny piece and we could see the profile of threads that way.

And then we wanted to look straight down, and we used something called an electron microscope, which gives you a very, very high magnification. You can go down and-- It can give you very high magnification or you can zoom back and get a fairly low magnification, but it gives you a very clear picture of the profile, has very deep field of vision so you can get a nice picture of what the profile--the surface profile looked like.

So we wanted to look down on the surface of these threads and we wanted to look at the cross section. We could see how the material--how the grains of the material-- Like I mentioned, steel is a crystalline material, and it actually has little grains. You can see the structure or the microstructure of the material when you polish it.

And then you put a little-- It's called etching, and you take-- If you take a piece of steel and you polish it like a mirror and then you drop a little acid on it, the acid will eat away the material and sort of preferentially exposes the fact that this stuff's got a structure to it. It's not just amorphous shiny stuff. It's actually got different phases or different things going on down there. And when you etch it with acid, it shows you the--it reveals the microstructure.

MR. EATON: Your Honor, may I approach the witness?

THE COURT: You may.

BY MR. EATON:

Q. Dr. Tipton, I just want you to open this envelope. This is

part of Exhibit 1--or 2, pardon me, Katzenmeier. Just verify those are the sections that you've cut away and prepared for microscopic evaluation. Just kind of hold those up so the jury--

A. One of those-- This is the eighth. That's the one-eighth of a section that we cut. This is a piece that has the threads in it. It came from right in here, like that.

Okay. And I took another piece-- So we had this because we wanted to look down at it with an electron microscope and see what that surface looked like, okay?

Now, then the other ones--the other piece that I took, we mounted it like this and then polished it, and we looked at the-- This is-- The shiny piece that you see right here, that's kind of what that--that's what this is. But we took this thing and we ground it perfectly flat and polished it until it was like a mirror. You could see yourself in it. Then you take--you put a little bit of special acid on this, and it will--it will reveal the microstructure of that steel. (Indicating throughout.)

Q. Let me have those two things. I want to see if they'll show up on the video imager. The jurors will maybe see a little better.

A. These were just the ends of those pieces that we didn't really need.

Q. I don't know if the jurors can really see much detail there,

but the image that's in the round circle there, is that the same image that is depicted on Plaintiffs' Exhibit 11, which we've enlarged in poster fashion?
A. Yes.
Q. Okay. Somebody's helping me focus there or the machine's doing something.
A. Can I show--
Q. Would this Plaintiffs' Exhibit 11 help you explain and demonstrate a little better the profile that you obtained with the section?
A. It sure would. That's a more clear picture.
MR. EATON: Your Honor, we'd move to offer Plaintiffs' Exhibit 11.
MR. SINGER: If I--
MR. EATON: It's the same image that's--
MR. SINGER: No objection.
THE COURT: 11 is received.
(Plaintiffs' Exhibit No. 11 was offered and received in evidence.)
BY MR. EATON:
Q. You can use Exhibit 11, Dr. Tipton, to show the jury the profile that's taken with the section of the Katzenmeier barrel and explain the significance, please.
A. Okay. This is--this is back at the rear of the gun, where you stick your--you stick the plug in. The teeth would come

down, and these little things here are the grooves. That's where the teeth would-- The teeth should just barely be coming into those grooves.

You can see that up here, this one is a little shallower. That's that lead-in. When you run a tap in, it cuts its way through here, and it's making--it's making cuts that are parallel to each other. They're nice and--they're nice-- These are the roots of the threads at the inside of the gun.

This one is a little shallower than that one because that's the lead-in. That's that first cut that goes in, all right?

So the threads--the threads from the breech plug probably came all the way back--all the way into this guy right here, and then the plug stopped.

You can see that between here and here there used to be a--there used to be a little crown sticking up, but it got ripped off, and then that one got ripped off and that one got ripped off, and so forth.

As you move down, though, what becomes apparent, if you look at the microstructure, you see ripping and tearing here and here, but not in the middle. It's like there wasn't any material to be torn right there or there.

So towards the middle of this thing, the center of these, what you expect to be full sort of little triangles sticking up, that got sheared away. There was just little tips

coming up here that got sheared here and sheared here but not in the middle. Back here there was nothing going on except right next to these these--where these roots came in.

This picture and the other--the electron microscope picture, which I'd like to show you here in just a second, explain-- When I saw this, it was a slam-dunk, I knew what happened. This hole, when it was drilled, was tapered. When the tap went in, it could not form threads. It only barely engaged the material right here. There was no material here available to carry--to carry the breech plug at all.

There were little tiny tips sticking up here and here and here that grew progressively along the length where they were nearly full threads. The first 1, 2, or maybe 2 1/2 threads were nearly fully formed, but there were no threads beyond that. There was only enough threads there to engage the tips of the breech plug so that you could screw it in and think you had a good connection. (Indicating throughout.)

Q. Now, during the course of the investigation, did you perform some similar cross sectionings of exemplar barrels so to compare them to the Katzenmeier barrel?

A. After we did this, we took the other little piece that I--

Q. That's right there.

You're wanting to talk about topography. I know what you're getting ready to do. Before I get there, I want to talk to you a little about comparing the thread form of the--

A. Right.
Q. --exemplars.
A. Right. Okay.
Q. Did you do that with some--
A. We did that as well. We were-- And we did that on a number of rifles. They're in my report.
Q. Okay.
A. We went back and cut some more out of the exemplars. The way we-- By the way, I should just mention, I don't know how important it is, but the way we formed that picture that I just showed you was we took a microscopic picture of one area and we would move over and take another one, move over and take another one, and that's a big panorama. We were able to piece those pictures together like a jigsaw puzzle to make that long image that you saw.
Q. Now, did you do essentially the same thing with some exemplar barrels?
A. We did.
Q. All right. And I believe that photograph or micrograph is--let me get reorganized here--is in a different--
MR. SINGER: To speed things up, may I approach, Your Honor, just to see what--
THE COURT: Please.
MR. SINGER: Is this what you're looking at?
MR. EATON: Yes. It's No. 15, I think.

BY MR. EATON:
Q. Would you turn to Exhibit 15 that's in your book, Dr. Tipton.
A. We cut--
Q. Have you got it there? Have you got 15 there?
A. Yes.
Q. What is Exhibit 15?
A. Exhibit 15 shows those--a panoramic image--panoramic images that we made on four different rifles, including the incident rifle. We cut through a Winchester exemplar, and the Winchester, the difference between it and the others is that those--those threads were--those internal threads were cut with a--you said they used a thread-cutting tap, not a thread-forming tap.

A thread-forming tap squeezes its way in and kind of squashes the material out to form the threads, plastically deforming the material to form the threads. The cutting just goes in and it cuts a groove out and it leaves behind a cut thread.

So that top profile-- This is what the-- This is what--

MR. EATON: Excuse me.

MR. SINGER: For the record, no objection, Judge.

THE COURT: Okay. All right.

MR. EATON: It got displayed before--

THE WITNESS: I'm sorry.

MR. EATON: Now we offer Exhibit 15, Judge.

THE COURT: 15 is received.

(Plaintiffs' Exhibit No. 15 was offered and received in evidence.)

THE WITNESS: But this is a picture--these are all similar to-- This is the Katzenmeier rifle down here. You've seen that already. This is what fully-formed--a fully-formed thread profile should look like, okay?

The rolled--the rolled-- The thread-forming tap or the thread-rolling tap pushes a hard-- The hard tooth, essentially, or a hard thread on this thread-forming tap pushes its way into here and squashes and squeezes the material upward.

Ideally, you'd want that material to come all the way up and form that profile, but if the hole is just a little bigger than it should be, it won't push that material all the way up, and you'll get these--these grooves in the top of the teeth--or the top of the threads. Excuse me.

So it's well--it's sort of well-established that if you use a thread-forming tap you get these little--they'll refer to them as grooves at the top of the threads, but I don't--it's not common knowledge that if you slice this open-- That's not the kind of groove that you expect to see. That was surprising to see--to see. That looks like more of a cavity than a groove.

The pictures-- If you look at pictures in textbooks

or pictures in machinists' books that talk about the kind of groove you expect, they show a tiny little groove at the top of this formed thread, but they don't show--I've never seen a big cavity like this in any of the books that I saw. So that was--that was surprising.

So now you go down to here, and this is, of course--These have never--these haven't failed, so these were still new--new rifles, rifles that had never failed or never been fired.

So here's what we saw down here, and you can see that these grooves here show evidence of shearing and tearing right here.

And what this picture is, this picture is a look down on-- (Indicating throughout.)

Q. Here?

A. --on this piece. So the same profile that we took with the other one, we were able to take the profile, with this piece, we're able to go back and do a panoramic view along--along here, and that's what this picture is.

So you can see that this first thread, from here to here, there was a full thread that got ripped off. From here to here, there was a full thread, and it got ripped off. But here is where it starts to get interesting. This guy right here, you can still see circumferential marks from the hole that was drilled to make this. And that--those become more and more

visible as you move on.

When you get back here, these little grooves, this is where the thread from the tap went. It pressed in and formed the groove. It raised material here and here that got sheared away, but here, when you look at those pictures, you can see the circumferential marks left by the drill bit that went in there and drilled that hole.

That should have been a full bit of material from there to there that got ripped out, if this hole had been properly drilled. It's just it's obvious. When-- I said when you see this, it's just--explains everything. (Indicating throughout.)

Q. So the topographical view of the Katzenmeier gun, when compared to the topographical view from the exemplars, demonstrated some destruction of the first three or four threads, a little bit of destruction of the fifth, sixth, seventh, and eighth threads, and virtually no destruction toward the tail end, 9, 10, 11, 12, because there was no engagement; is that what you're saying?

A. That's correct.

Q. All right, sir. And then you mentioned something in your testimony about you were surprised at the size of the grooves or cavities at the crown of the threads in the barrel; is that correct?

A. These (indicating)?

Q. Yes.
A. Yes.
Q. And what would be the effect of, let's say, larger than normal grooves or cavities in the crowns?
A. The problem with that is that when a threaded part engages here, it will then push on the side of this little hill and try to-- And what holds it in is the material here. If you push it too hard, you shear that away.

That's-- If your tooth or your thread is really deep, it's gonna engage the whole side of this hill and it's going to try to shear it across the base here, and that cavity won't be significant.

But if your threaded part that you're putting in here is a little bit too small or if the overall size of the threaded hole is a little bit too big, your threads on your piece that you screw in are going to engage this little hill further up, further away from the ground here, up towards the middle, and you could be relying on this little tiny tip to sustain that loading as opposed to this big piece of material across the entire width of the tooth--width of the thread.

So you're losing your sort of safe-- You can't--you don't manufacture anything to within one-thousandth of an inch. It just costs too much money. It's too difficult to do that. There's a tolerance.

If you happen to--if you happen to have a threaded

part that's just a little bit too small, you can lose your factor of safety.

A full thread just provides you a margin of safety, like this. Then you'd have to shear-- You could have a thread that just barely came down here, and you'd have to shear all that material off. Down here you just have to shear those little caps off, and there would just be less material to carry the threaded part you screwed in there. (Indicating throughout.)

Q. So you're saying the larger the cavity or gap, groove at the top, the less strong it is to resist loading?

A. Yes.

Q. If it is large enough, it won't hold any significant load?

A. A hollow thread is not as strong as a full thread.

Q. Now, would you turn to Exhibit No. 12 in your book.

MR. SINGER: May I?

THE COURT: You may.

BY MR. EATON:

Q. Have you found Exhibit 12?

A. Yes.

Q. I believe it's a two-page exhibit?

A. Yes.

Q. Pages 1 and 2?

A. Yes. These were some--

Q. Now, just tell us--tell us what Exhibit 12 is.

A. Exhibit 12 are some micrographs that we took. We took some--we took some rifles out to Sherry that had a breech plug in the back, and we had them cut through the breech plug area while the plug was still in them, in the--while the plug was still in the back of the muzzle. So we then took those and mounted those, and so we've got a picture of how the plug engages the--how the threads from the plug engage the threads inside the rifle barrel.
Q. Okay. Now--
A. These were exemplars.
Q. --the second page of Exhibit 12, does this show three of those areas of engagement or partial engagement?
A. Yes. It shows a close-up of--
Q. And these are from some of the same micrographs--
A. Yes.
Q. --that were taken of some exemplars, just blown up, correct, enlarged?
A. Yes.
MR. EATON: Your Honor, we'd move to offer Exhibit 12 into evidence.
MR. SINGER: Can I see, Your Honor? I thought that was a blow-up, I'm sorry.
BY MR. EATON:
Q. You're looking at Exhibit 12, page 2, correct?
A. Yes.

MR. EATON: Okay. We'd move to offer Exhibit 12, page 2, Judge.

MR. SINGER: No objection.

THE COURT: Page 2 of Exhibit 12 is received.

(Plaintiffs' Exhibit No. 12, page 2 was offered and received in evidence.)

MR. EATON: May we publish that to the jury?

THE COURT: You may.

BY MR. EATON:

Q. All right.

A. This will help me explain a couple of things I've been talking about. These were polished--

THE COURT: Let's wait for a question, okay?

THE WITNESS: Oh, I'm sorry.

BY MR. EATON:

Q. All right. Now, just tell us what that image depicts.

A. This depicts we had a plug, which is up here, pushed in--or threaded into a--into the back of a rifle, and we cut it and mounted it and polished it and etched it with acid, and it shows the microstructure.

And you can see the plug material is a stainless alloy, and it has a different sort of microstructure than this material. This is carbon steel.

So they-- You know, I teach about this in my materials science class to my junior mechanical engineering

students. And so you can see--you could see the difference in the microstructure here.

If-- This breech--this plug is obviously not under load. If it was, it would be pushed to the right. It would engage the threads in the gun along here and here and here.

If you really, really pushed it, if you really push it to the part where it went out, it would shear the material across here and it would shear off the material across here, and you could see that that area that's gonna get sheared is getting dangerously close to the--to these cavities.

A properly formed thread would be up here, come over, and down. You'd have material up here to help you avoid any problems with this guy, say, climbing up the hill a little bit. If this guy slides up the hill a little bit, it's going to be more likely to shear that--to shear that little tip off and go flying out the back of the gun, all right?

So you're losing some margin of safety by taking what should be the top of this little plateau and replacing it with a crater. (Indicating throughout.)

Q. And you had indicated earlier that, from your observations, these grooves or cavities were larger than you expected. Had you done some research to determine what a thread profile--a rolled thread profile or a formed thread profile for five-eighths 18 pitch UNF thread form should look like?

A. I--I had never done it before I saw this. After I did this,

it piqued my curiosity. That's why I went out and bought those plugs and drilled, and we did look at--we did look at those.

Q. And did you form--or do some comparison with that?

A. I did--we did some comparison in there, qualitative.

Q. Would you turn to Exhibit 97 in your book.

MR. SINGER: Your Honor, may I?

THE COURT: Yes.

THE WITNESS: I see it, yes.

BY MR. EATON:

Q. Have you found Exhibit 97?

A. I found it.

Q. Okay. Is that a diagram or illustration that's been prepared to compare the Kodiak thread forms that were typical that you found in the exemplars that were cut and compare it to the same kind of rolled thread form as found in certain engineering texts?

A. Yes. I went out and--I went out and looked for manuals, technical handbooks, and was able to find some profiles that are--that describe the crown thread surface topography for rolled--for formed threads.

MR. EATON: Your Honor, we'd move to offer Plaintiffs' Exhibit 97.

MR. SINGER: We do object. It's our understanding Dr. Tipton cannot authenticate the diagram from the manual, the type metal, or anything like that. Lack of foundation.

THE WITNESS: With the--

THE COURT: Just a minute.

As this concerns some material from the literature, I'm going to receive it only for the purposes of demonstrative purposes in the courtroom, rather than as an exhibit to go back to the jury. You may use it for that purpose. You may publish it, but this is simply--I am treating it as, in essence, a form of learned treatise.

MR. EATON: I understand the ruling, Judge.

THE COURT: All right.

(Plaintiffs' Exhibit No. 97 was offered and received in evidence.)

MR. EATON: With that admonition, could we publish to the jury?

THE COURT: You may publish.

THE WITNESS: One--

MR. EATON: Just a second.

THE WITNESS: I'm sorry.

BY MR. EATON:

Q. I think that's about as good as I can get.

All right. Would you explain, then, the comparison of the typical thread form you found in the Kodiak exemplars and as demonstrated in Figure 4 and the thread form you found to be typical from learned treatises in engineering texts?

A. This is the--some pictures that we took of the Kodiak

exemplar. You can see the cavities at the top of the threads. This is more like--this is the geometry that is schematic. It's just a schematic cold-form thread profile published by a Danish tool system that makes these thread-forming taps.

This was another technical handbook that showed some schematic thread profile, a thread profile for some steel they designate as C-45, and then for comparison was the Kodiak exemplar, again, scaled to be the same size.

And so you can see that the voids at the top of these threads are considerably bigger than what are published to be typical. (Indicating throughout.)

Q. Thank you, Dr. Tipton. Now, I want to talk to you some more about the topography which is shown on Exhibit 15. Hand this back to you.

In the bottom portion of that--pardon me--the bottom two figures, the one from the Katzenmeier gun, the topography and the profile, when you prepared the topography to look at the surface of the little segment that you've told us about, did you discern or find any areas of contamination or change of the surface material other than that caused by the shearing away of those threads?

A. No, I did not.

Q. Did you find any evidence, any metallurgical evidence, that there had been any kind of changes brought about by temperature?

A. No.

Q. Did you find any evidence, from a metallurgical standpoint, of any changes brought about by chemical changes; in other words, a reaction of any material with the steel of the barrel?
A. No.
Q. I'll take that from you now. Thank you.
Now, after all of that inspecting and testing of these materials for the Katzenmeier gun and the-- Well, we've shown micrographs and enlarged photographs of portions of several exemplars, but it's my understanding you performed those same operations on quite a number of exemplars; is that correct?
A. Correct.
Q. And you found, basically, the same thread form with the cavities or gaps in the tops of those several guns; is that correct?
A. Right.
Q. Call your attention-- Well, let me strike that.
We have several of them here. I'm going to proffer to you Plaintiffs' Exhibit No. 74. Plaintiffs' Exhibit No. 74--
MR. EATON: Mr. Singer, if you--
MR. SINGER: May I, Your Honor?
THE COURT: You may.
MR. EATON: Actually, it might be easier, could the witness come down here and identify these several firearms, Judge, rather than lug them up?
THE COURT: You may.

MR. SINGER: May I stay here?
THE COURT: Please.
MR. SINGER: Thank you.
BY MR. EATON:
Q. I'm going to proffer to you, Dr. Tipton, Plaintiffs' Exhibit 74, identified as exemplar Kodiak Magnum, Serial No. 61-13-199166-04.
Is this one of the guns that was sectioned for comparison purposes?
A. Yes. This is one that was one of the early ones that we did.
Q. Okay.
A. This one's been fired a few times.
Q. I believe, by serial number, that's one of the ones that Mr. Roane fired and was sectioned. All right.
MR. SINGER: No objection, Your Honor.
MR. EATON: We'd offer Exhibit No. 74.
THE COURT: 74 is offered.
MR. EATON: I think Mr. Singer had no objection.
THE COURT: It's received.
(Plaintiff's Exhibit No. 74 was offered and received in evidence.)
MR. EATON: Thank you, Judge.
BY MR. EATON:
Q. 71, basically same thing. It's identified as exemplar blue

Kodiak Serial No. 61-13-031173-05. I believe it has-- You recognize this one, I know.
A. Oh, yeah.
Q. Tell us which one this was.
A. Well, this is one we took and we pulled it apart to get the--we did a tensile test and pulled it apart to try to make--
Q. It was sectioned and then the tensile strength test done?
A. Right.
MR. EATON: We move to offer 71, Judge.
MR. SINGER: No objection.
THE COURT: 71 is received.
(Plaintiffs' Exhibit No. 71 was offered and received in evidence.)
BY MR. EATON:
Q. And then we'll identify Plaintiffs' Exhibit 75, which is another blue Kodiak Magnum, Serial No. 61-13-169203-4.
Is this one of the guns you had sectioned, Dr. Tipton?
A. Yes, it is.
Q. And in these boxes, it also has the section that was removed?
A. Right.
MR. EATON: And we'd offer 75 into evidence, Judge.
MR. SINGER: No objection.
THE COURT: 75 is received.

(Plaintiffs' Exhibit No. 75 was
offered and received in evidence.)

BY MR. EATON:

Q. 76, another exemplar that you sectioned, I believe?

A. Yes.

Q. And box also contains the segment that was cut away, segment of the breech area of the barrel?

A. I believe so.

MR. EATON: Okay. We'd move to offer that 76, which has Serial No. 61-13-169314-04.

MR. SINGER: No objection.

THE COURT: 76 is received.

(Plaintiff's Exhibit No. 76 was
offered and received in evidence.)

MR. EATON: Thank you, Judge.

BY MR. EATON:

Q. Now I'm going to hand you, Dr. Tipton, what's marked as Plaintiffs' Exhibit No. 66 and ask you if you can identify that particular thing.

And, first of all, why don't you just identify it by serial number and then tell us what it is.

A. Serial number is 61-13-083332-04.

Q. And what is it?

A. It's a Kodiak rifle that we sectioned with the breech plug in place like I described, where we put the breech plug in, cut

it, and then took that piece out and mounted it like this and took those pictures that I showed earlier.

Q. We're going to put some images up there in a second.

And what was the purpose of sectioning that particular Kodiak in that particular fashion?

A. We just want--I just wanted to get a look at how the breech--how the plug was engaging those--that thread form.

Q. All right. And this was an exemplar. This is not the Katzenmeier gun that you're doing now, correct?

A. Yes.

MR. EATON: We move to offer Exhibit No. 66, Judge.

MR. SINGER: No objection.

Is that 66?

MR. EATON: Yes, sir.

MR. SINGER: No objection.

THE COURT: 66 is received.

(Plaintiffs' Exhibit No. 66 was offered and received in evidence.)

THE COURT: Mr. Eaton, when we're at a convenient breaking place for the noon hour, why don't you let me know.

MR. EATON: This might be a good enough place.

THE COURT: All right. Members of the jury, we'll take our noon recess at this time. Court will be in recess until 1:15 this afternoon. During the noon hour, please bear in mind the admonition given previously. We'll see you at 1:15.

(In open court, out of the presence of the jury.)

THE COURT: Counsel, very briefly, since we're outside the presence of the jury, let me just give a brief explanation as to why I overruled Mr. Singer's objections with regard to the qualifications of this witness.

I certainly understood all of the points Mr. Singer made. A lot of them are valid ones to make, but, in my judgment, most of them went to the weight of the evidence.

The witness is, of course, a professor of mechanical engineering, has substantial experience, education and training. He's a fellow now in the professional organization that he belongs to.

It seems to me-- And he also--his expertise, according to the record, is in pressure vessels and also fasteners and devices used to seal orifices or openings in pressure vessels.

It makes sense to me that a rifle is a form of a pressure vessel and that his area--his experience and expertise would be readily transferrable to a rifle or a muzzleloader.

So, in my judgment, the lack of the defendant's--or the witness'-- Excuse me. I keep calling you a defendant. That's usually who I often deal with.

But the witness' lack of experience with muzzleloaders, and specifically the interior portion of the threads in the barrel, goes primarily to the weight of the

evidence rather than a disqualification of him as a witness in this case.

I'd also note that, at least to this point, much of the witness' testimony has concerned his physical observations, both grossly and under microscopic analysis, and also measurements that he's taken, which, in my judgment, would in any event be admissible.

So that explains the reason for my ruling, which I thought I'd place on the record. I generally don't like to explain too much in the presence of the jury, and that's why I'm taking the time to do it now.

We'll see you about 1:15.

MR. EATON: Thank you, Judge.

THE COURT: All right.

(Recess at 12:01 p.m., until 1:21 p.m.)

AFTERNOON SESSION (1:21 p.m.)

(In open court, in the presence of the jury.)

THE COURT: Please be seated.

Mr. Eaton.

MR. EATON: Thank you, Your Honor.

DIRECT EXAMINATION (Resumed)

BY MR. EATON:

Q. Dr. Tipton, shortly before we recessed I'd asked you some questions about this area on Exhibit 15 and whether it would have been affected by some of the casting material. Do you remember that subject we talked about?

A. Right.

Q. Would you turn to Exhibit No. 17, please.

A. Okay.

Q. And I believe there's an envelope there marked Exhibit 17--

A. Right.

Q. --as part of that exhibit.

Have you seen that exhibit before?

A. Yes. Yes, I have.

Q. And what is it?

A. This is a casting made of the inside of the incident rifle before it was sectioned.

Q. Is that something that was provided to you by our office during the preliminary part of your evaluation?

A. Yes.

Q. And also part of Exhibit No. 17, and it's been admitted, was a sheet of specifications for certain casting materials, including the one for the cast marked as Exhibit 17. Do you see that?
A. Yes, sir.
Q. Okay. Now, are you familiar with--generally familiar with these casting alloys--
A. Yes.
Q. --that are depicted on Exhibit 17?
A. Yes. Yes, I am.
Q. Okay. And do those various casting alloys have application in areas that you've worked in in the past?
A. Yes. Yes, they do. We've--
Q. And do you have an opinion as to whether those are appropriate materials to form the cast of the inside of a barrel in order to proceed with an inspection?
A. Yes. It's fine.
Q. Do you have an opinion as to whether those casting materials would, I'll say, chemically contaminate an area where there had been some fracture surfaces like in the Katzenmeier barrel?
A. Yes, I do.
Q. What is your opinion?
A. They--they would not contaminate surfaces.
Q. Would they contaminate the surface-- And when I say "contaminate," I am talking about by covering the surface in

such a manner that would impede or prevent a proper metallurgical evaluation of this item.
A. No. They're--they're designed not to do that.
Q. Do you have any criticism at all of Lester Roane for this particular casting action and technique?
A. Not--not from a metallurgical standpoint.
Q. What about from a mechanical standpoint?
A. Nope, I would not. It's so soft, it wouldn't affect mechanics.
Q. Now, you, of course, did a metallurgical evaluation, and we've talked about that, producing the microphotographs, photographing the topography and the profile of the Katzenmeier gun, as well as exemplars--
A. Right.
Q. --is that correct?
A. Yes.
Q. All right. Do you have an opinion as to whether Mr. Roane's activities in any way adversely affected the ability of a mechanical engineer or a metallurgist to investigate the aftermath of the Katzenmeier failure?
A. No way at all.
Q. Your opinion's what?
A. In no way at all did it affect.
Q. All right. I want to move on, then. You have prepared some PowerPoint presentations to illustrate and demonstrate what you

believe occurred insofar as shearing of the threads in the Katzenmeier barrel; is that correct?
A. Yes, sir.
Q. And one of those PowerPoint presentations has been marked as Plaintiffs' Exhibit No. 100; is that correct?
A. That's correct.
Q. And during the noon recess, you reviewed that?
A. Yes.
Q. Okay.
MR. EATON: And I think we discussed that with defense counsel. Your Honor, at this time we move to offer Plaintiffs' Exhibit No. 100, which is an animation or PowerPoint presentation.
MR. SINGER: No objection.
THE COURT: 100 is received.
(Plaintiffs' Exhibit No. 100 was offered and received in evidence.)
BY MR. EATON:
Q. And then after it's shown, I may want you to explain some things about it.
A. All right. What this--this is sort of representing is this is looking at the side of the gun right now. This is looking at the side of the gun in the breech area, and what happens next is (indicating)--
THE WITNESS: Go ahead and click it, Dean.

A. This is a section view, and you can see that there's a hole there, and that's the wall. And what I'm going to attempt to show with this animation is how the threads get formed into that wall and then how they--how they got--how they'll get sheared away by a breech plug. (Indicating throughout.)

THE WITNESS: And go ahead and click the--

A. There's a close-up of the wall, and this--the first illustration shows a nice straight board. This is a nice straight hole that's got the same diameter at the back and the front of the hole, so this is what should happen and what normally happens on these--like on the exemplars that we looked at.

So there's the--this is an illustration of how the thread-forming tap would push its way into the material and raise those threads in the profile that you see. (Indicating throughout.)

THE WITNESS: So go ahead and click it again.

A. That's what gets left behind by the normal thread-forming operation.

The next slide shows that's the first thread of the breech plug, and if you screw the breech plug it in, it engages those threads in that manner.

And then if it were to shear out, what would happen is it would have to remove--

THE WITNESS: Okay. Hit it.

A. --all that material that you see (indicating).

THE WITNESS: Go ahead and hit it again, Dean.

A. All that material there gets sheared longitudinally. So if you're going back and examining this area, you're going to see longitudinal shear marks across-- Between every root of a tooth that you see, you're going to see this longitudinal shear mark along the axis of the gun as that plug went out the back of the gun, okay? So that's what happens if you've got a nice straight bore. (Indicating throughout.)

THE WITNESS: So go ahead now.

A. This taper that you see here is comparable to what I measured in the Katzenmeier gun (indicating).

THE WITNESS: So go ahead.

A. And, see, what happens now is when you put a straight thread-forming tap into there, you raise nearly--nearly complete threads here, but less and less--you get less and less of a thread that forms back at the back and virtually nothing that forms back here, except these shallow grooves (indicating).

THE WITNESS: Go ahead and--

A. So that's what's left behind. Unfortunately, that will accept a breech plug. When you screw a plug in there, the tips will engage in these grooves, and you can thread it in and think you're good to go.

But now, to shear that out of there, you've just got a lot less--you've got a lot less area to overcome, a lot less

shear area to overcome.

And I believe that explains--that explains what happened, in my opinion. That hole was tapered, and it matches exactly what got left behind there. (Indicating throughout.)

BY MR. EATON:

Q. Now, how does that PowerPoint presentation relate to what's previously been admitted as Exhibit 12 insofar as--

MR. EATON: May I approach the witness, Judge?

THE COURT: You may.

BY MR. EATON:

Q. --insofar as these last few threads, numbers, let's say, 9, 10, 11, 12, and 13, insofar as machining marks left by the original drilling or boring of the barrel hole?

A. If these were full--if these were good fully-formed threads in between these roots, you should see sheared-off material. And you can still see the circumferential marks that were left by the drill bit that formed the tapered hole before this thing was--before the tap was inserted to form the threads.

Q. Now, show again--

A. Does that make sense?

Q. --show again what you call the marks of the previous drilling are shown on Exhibit 12.

A. There you can see these marks, and they're circumferential in nature. Had we had a nice formed thread in it from that groove to that groove, all that material would have been raked

off in that manner, like it was back here (indicating).

Q. All right. So what you're really saying is threads 9, 10, 11, 12, and 13 seem to be undisturbed because there was no thread engagement?

A. That's true. But this material is as it was before the--before the--

Q. Before the gun was fired?

Very good. I understand. Thank you.

Now I want to-- While we're on this subject, you mentioned that because of this tapered or bell-mouthed hole, bore, someone could screw the breech plug in and think they were good to go was your phrase.

A. Yes.

Q. Now, why is that? If there were certain threads not engaged or very little engaged, why would someone have the sensation, the tactile sensation, that the breech plug was fully engaged if they screwed it in?

A. Well, the tips of the breech plug threads, the outermost part, would engage those grooves and still be able--which are still nice and helical, and that would--that would be all it would take to carry that--to carry that in.

When you get to the bottom, you've got some fully-engaged threads, which is a little bit of meat, that you can torque down. I think they apply a torque by hand, hand-torque that into position at the end.

So you've got enough--enough of a helical thread path such that that plug can go into that--into the back of that gun and be seated and seem to be good.

Q. I've heard the word thread "purchase." Is that a term you're familiar with?

A. I've--I think I've read that.

Q. Is that what you're really talking about, that that's purchase or engagement of the threads up front but not in the back?

A. Correct.

Q. Okay. Now, how, if at all, would that condition in the Katzenmeier gun, before it failed in service--how would it affect quality control for inspecting that product before it leaves the factory? How would bell-mouthing or tapering of the barrel affect quality control procedures?

A. The way that those holes are checked is with those go/no-go gauges that-- I don't know that that's been discussed here yet or not.

Q. Haven't yet, but we're getting ready to.

A. Okay. Now, if you drill a hole into a piece of material that's supposed to be a particular diameter, it might be a little bigger, but no one can say you have to drill this hole exactly this diameter because it's--it's almost impossible to do something exactly. So you give--you give the guy that's drilling the hole a bit of a tolerance. It's got a range

between this maximum diameter and this minimum diameter.

So after the hole is drilled, to make sure that hole is within that range, a gauge is used, and all the gauge is is it's a little plug that's got--it's a little physical object that's got the--it's got the minimum diameter on one end and the maximum diameter on the other. The minimum diameter is called the go gauge. You put it in there, and if it goes in, then it means you're good.

And then you--you have the no-go gauge. It's so big that it shouldn't go in. It's just slightly bigger than the biggest allowable hole size. You put it in. If it doesn't go in, that's good. So if both those things happen, the hole's the right size.

The problem with a tapered hole, particularly in the back of this--the back of these guns where the hole is recessed and you can't really see into the hole, is the go gauge is not a problem. If the go gauge goes all the way through, it--

Q. That means it's big enough?

A. That means it's big enough. But if the no-go gauge goes in, and it may go in and it may actually-- It's not supposed to go. It may actually go, but you don't--you can't tell it's going because you can't see down there. Once it--once it gets into the tapered region, it doesn't go, and you think it didn't go, so it's fine.

But it will not tell you that there's a tapered hole

in there. So there can be a tapered hole in there and the go/no-go gauge will not--will not show that to you, will not reveal that.

Q. Now, is there a similar quality control technique or instrument for evaluating threaded holes?

A. There is. The way that the technique works in this situation is the--the tap hole itself is checked with a go/no-go gauge to make sure it's within tolerance, then the thread--then the tap is inserted and the threads are formed, cold-formed.

Then a go/no-go gauge is inserted that only checks the internal diameter, the inside diameter. It's not a-- It's a very similar gauge to the one that was used to check the tap hole except it's smaller because the internal diameter of those threads is now smaller because you squirt--you kind of extruded material inward.

So you check the internal diameter with a little plug gauge that goes--that either--that goes in and doesn't go in, if everything's right. Then you can get a threaded go/no-go gauge. If it-- And it's a little--it's like a small breech plug, and it's the minimum size, and if it screws in, that means you're good. It should go in. It's the smallest possible size.

Then you get one that's slightly bigger than the biggest permissible size, and if it doesn't go in, that means you're good. If that big one goes in, it means your threads are too big, it's not going to pass.

Q. Now, these go/no-go gauges, do they have industrial and manufacturing application other than for manufacture of firearms?
A. Oh, absolutely. They're used industry throughout. Uh-huh.
Q. Are those go/no-go gauges you've told us about utilized for quality control of threaded metal fasteners for lots of different applications?
A. Correct.
Q. All right. Now, are there--how do I want to say it--inefficiencies or inadequacies, I guess, in these mechanical go/no-go gauges insofar as evaluating the quality or completeness of the threading of a threaded hole, the female component of a threaded metal fastener?
A. The only--the only problem that exists has sort of been, I believe, brought out in this situation, is that it's possible to not--to have a tapered hole that passes a go/no-go case. That is unless you are--unless you're very--unless you're monitoring the axial--the position that--the depth to which that gauge goes into your tube, then you don't know whether or not there's a tapered hole there or not. You'll pass the test, but you've got it--it won't--
Q. Well, I'm talking about, for instance, even if you don't have a tapered bore hole, if you've got a cylindrical bore hole, but the threads that are formed are incomplete or inadequate. In other words, with that go/no-go process, can you still have a

go/no-go that seems to the operator to work perfectly fine but there's very little thread engagement or inadequate thread engagement to withstand the load?
A. That can happen.
Q. All right. And, for instance, with these cavities or defects at--the top cavities or voids at the top of these threads that you've seen in the exemplars, would those, perhaps, in some cases, reduce--or would it be possible for that kind of a--that size of a void space to pass go/no-go but be inadequate to withstand the mechanical load applied?
A. It's possible, particularly if you put in a slightly too small plug. Then that plug would engage the tops of those.
Q. Now, these go/no-go concepts you've explained to us, you've prepared PowerPoint presentations for them as well; is that correct?
A. Yes, I did.
Q. And I want you to--I'm going to identify them here in a minute, but I want you, if and when the Court allows them into evidence, to give us a little further explanation with the illustrations. Can you do that?
A. I can do that.
MR. EATON: And the Exhibit No. 101 is a PowerPoint presentation for the quality control measurement relating to simply assuring that the size of the bore, the inside diameter, is sufficient. We'd move to offer 101, Your Honor.

MR. SINGER: No objection.

THE COURT: 101 is received.

(Plaintiffs' Exhibit No. 101 was offered and received in evidence.)

BY MR. EATON:

Q. You can just narrate this one as you did kind of the first one.

A. Okay. This is looking at the side of a round bar.

THE WITNESS: Go ahead, Dean.

A. Now, this would be like slicing through it, and now you want to bore a hole through it.

THE WITNESS: Go ahead.

A. So there's the hole. That's the diameter that you desire to get. That's the sort of desired diameter, but, in reality, the--

THE WITNESS: Go ahead and click.

A. --there's a minimum and a maximum, and this is exaggerated a little bit.

THE WITNESS: Go ahead and click it again.

A. A minimum and maximum diameter that will suffice, okay, so that's your tolerance. If we can get a hole in that range, we're good to go.

So with a go/no-go gauge--

THE WITNESS: Go ahead.

A. The go gauge is designed to just be a tiny bit smaller than

the minimum hole diameter, and the go--the no-go gauge, you flip it around, it's bigger, and it's designed to be a tiny bit bigger than the maximum. So if that doesn't go and the go goes, then you're good.

BY MR. EATON:

Q. So that falls within the engineering tolerance or design tolerance for that particular tube?

A. Correct.

Q. All right.

A. That's for just a hole. Now, you can do the same thing--

THE WITNESS: Go ahead to the next one.

A. You can do the same thing after you form the threads to check the internal diameter only.

THE WITNESS: Go ahead and click it again.

A. It shows the same little thing coming in, and it's small enough that if it goes in, it means you're small enough.

Flip it around, if it doesn't go in, then it means the inner diameter is big enough. So--

BY MR. EATON:

Q. So what you've shown there is that's the way it should go or not go--

A. Right.

Q. --it's if within engineering tolerance?

A. But that only checks your internal diameter. To check the entire thread form, including the outer diameter, you can use

the next--the next slide will show how you can use a threaded go/no-go gauge.
Q. Is that Exhibit 102?
A. I believe so.
MR. EATON: Your Honor, we'd move to offer 102.
MR. SINGER: No objection.
THE COURT: 102 is received.
(Plaintiffs' Exhibit No. 102 was offered and received in evidence.)
THE WITNESS: So 102 will come and check--
Go ahead and click it.
If it goes in, that's good. That means it's not too--it's not too small. And if the no-go doesn't go in, if you try to put it in but it doesn't go in, that means it's not too large.
BY MR. EATON:
Q. So those are well-established, frequently used quality control instruments and techniques for evaluating bore holes and threaded bore holes, correct?
A. That's correct.
Q. Okay. But they do have their limitations, as you've explained, if the tolerances are so close?
A. They don't have the ability to check concentricity; that is, is the hole--is the hole tapered or straight.
Q. Right.

A. They don't have the ability to do that.
Q. And they don't have the ability, really, to check about the size of the cavity in the top of a thread?
A. Correct.
Q. So you can have some little thin ears sticking up and a big cavity there, and you could do this go/no-go test and you pass the test, but when you apply the load, there's really no substance to the thread or not enough substance to resist the load, correct?
A. That can happen.
Q. Is there any way you know of that one could, in an economically feasible way, do an inspection with a threaded go/no-go that would detect a tapered or bell-mouthed pilot hole or detect too big a defect of crowns of the threads? Is there any manual technique by which you know of that that can be done?
A. There's probably-- It would require a fairly sophisticated little setup where you'd have to run a gauge in that would measure the profile. It would measure the diameter along the length. And it wouldn't--it could be made feasible, but it would require a little work.
Q. Okay. Now, after all of this work, investigation, inspection, testing you performed, did you come to any opinions or conclusions with regard to whether there were any manufacturing defects present in the Katzenmeier muzzleloader at the time--moments before it was fired?

A. I--I have.
Q. What is that opinion?
A. I--I believe that those--that the threads were not fully formed because I believe that the hole that--the tap hole that was used to--that was put into the back of that rifle before the threads were formed was a tapered hole and that these--therefore, the threads were not fully formed and could not sustain the pressure induced on the breech plug under a normal firing.
Q. Do you have an opinion as to whether that defect caused or contributed to causing the failure which injured Mr. Katzenmeier?
A. I'm--I'm certain that it caused the--caused the injury, caused the accident.
Q. Now, I want to talk a little bit more about quality control. You've read Mr. Belategi's deposition in this case; is that correct?
A. Yes.
Q. Mr. Belategi was an engineer at Dikar at the time Mr. Katzenmeier's gun was made; is that correct?
A. Yes. Yes.
Q. He described in significant detail the quality control process, limiting it to this quality control evaluation of the drilling of the bore hole, the tapping of the bore hole, and then measuring with the instruments that we've just looked at,

the go/no-go rods.

Did you find or conclude that there were any deficiencies in that quality control process as it was performed or conducted by Dikar?

A. Well, it--it-- Not--not-- I believe in this case there was. I believe that it was unable to find this tapered hole.

Q. Well, let me be a little more specific. You read the deposition that the go/no-go test with the round or cylindrical gauges that tested the inside diameter--

A. Right.

Q. --were performed on 100 percent of the units--

A. Correct.

Q. --that went through the manufacturing process, correct?

A. Right.

Q. And you also read that only 1 in 25 of the units underwent the go/no-go test with the threaded instrument; is that correct?

A. Correct. Right.

Q. Do you have any criticism of that 1 in 25 frequency of inspection?

A. The reason-- I understand the reasoning for doing it. If they find one, then they go back and check the other 25, and the reasoning is that they believe that the problem would have developed over that last 25--over the last 25 units. So I understand their rationale for doing that.

But it seems that they seem to--it will not account

for the one rogue situation where you have a tapered hole that happened one time, it doesn't happen the next time. And so there's a 24 out of 25 chance you're going to miss that one situation. So in this case, it doesn't serve them very well.
Q. You've seen a little animation presentation the defendants have put together as a potential exhibit in this case, haven't you?
A. Right.
Q. Okay. And it shows this go/no-go process being performed in the factory in Spain--
A. Yes.
Q. --correct?

And based on the time required to perform the inspection with the threaded rod, the go/no-go threaded rod, do you think it's reasonable engineering--or manufacturing practice to perform that test on only 1 of every 25 units?
A. I don't--I don't think it would be unreasonable to do that, given the safety critical nature.
Q. You don't think it would be unreasonable what?
A. I don't-- I believe it would be reasonable to inspect 100 percent of them that way.
Q. Just like the round go/no-go?
A. Right.
Q. Is there anything about testing only 1 in 20-- Or if you tested every one of the units with the threaded go/no-go, would

that add any significant or consequential costs to the manufacturing process?

A. That's-- I'm not sure about that.

Q. Well, you saw how long it took--

A. Right.

Q. --for the man to do the go/no-go test.

A. Right.

Q. Would it add significant time to the manufacturing process to at least check 100 percent of the threaded tubes just like they check 100 percent of the threads before they're tapped?

A. Not in my opinion, no.

Q. Now, have you seen-- Strike that. I want to ask you one other thing.

In reading Mr. Belategi's deposition, you saw where Mr. Belategi acknowledged that during his four or five years there or several years there, he was aware of at least 25 to 50 bell-mouthed units that had been discovered during the manufacturing process; is that correct?

A. Hadn't noticed that.

Q. So this was a phenomenon that was obviously known by and apparent to Dikar; you agree with that?

A. I agree.

Q. In reviewing his deposition and some other depositions, did you see any evidence that Dikar had done anything to reduce the likelihood or frequency of these bell-mouth situations or to

protect against it?
A. I--I didn't see anything like that.
Q. Now, have you personally seen other Dikar guns that have had the threads stripped out?
A. I've seen a couple.
MR. SINGER: Your Honor, may we approach?
THE COURT: Yes.
(Side-bar conference off the record.)
THE COURT: Members of the jury, there's a legal issue that the Court has to talk to the lawyers about. This will be one of those times when you're going to have to wait for us while we deal with some matters, so I'm going to let you go back to your jury room. I don't know how long it will take, but we'll get you back here just as soon as we can. Please bear in mind the admonition given previously.
(In open court, out of the presence of the jury.)
THE COURT: Mr. Singer?
MR. SINGER: Yes, Your Honor. The sole purpose of filing a motion in limine was to prevent the kind of question he just asked. This Court ruled that he could not--Plaintiffs could not get into any other incidents, any other claims, any other guns, other than the ones that are substantially similar.
The Court cautioned counsel in the order that even though there were some that he might hear evidence on outside the presence of the jury, to make sure you do it before you ask

a question. We had a question about it yesterday when we talked about Dikar's deposition. The Court reminded Plaintiffs' counsel not to do that.

He's just asked him about other Dikar guns where the breech plugs have been stripped out. There's none of this happened in the Kodiak or this kind of situation. He's directly violated motion in limine, and we, therefore, move for a mistrial.

MR. EATON: Judge, first of all, Mr. Singer opened this in his opening statement by talking about what fine guns these were, they were used by all kinds of civic groups, they appeared on ESPN and other shooting shows, clearly communicating to the jury that this was a quality product that didn't fail, and so we think we're entitled--he's opened the door for that.

Secondly, in Your Honor's ruling, you did not grant the motion in limine as to the Zenger gun, as I recall. In fact, you reserved ruling on that.

The question I just asked Mr. Tipton is foundational for presentation of the failure of the Cashdollar gun and the failure of the Zenger gun. So we can lay that foundation in camera, in an in-camera hearing outside the hearing of the jury, but I think we're entitled to present this evidence. If Your Honor thinks not, we'll make our offer of proof.

And this is just the foundation for our proof of presenting Mr. Zenger and/or Mr. Cashdollar to give evidence

about the mode of failure in their guns, which was stripping of the threads on the breech--or breech plug stripping of threads of barrels, being injured in the same way, same manner as Mr. Katzenmeier.

And Mr. Belategi has testified that it's the same thread form in all of these guns going back at least ten years. Mr.-- One of their guns is an '06--'96 gun or '98 gun. The other one is an '01 gun. They have the same thread form. So it's--we think it's admissible, and this was merely foundational.

THE COURT: Thank you.

First, as it relates to my motion in limine, the order read, "The motion is granted. No evidence will be offered nor mention made in the presence of the jury of any of the allegedly similar incidents discussed above or of other lawsuits or claims against Defendants unless and until the Court determines the evidence is admissible in proceedings outside the presence of the jury."

Now, the question that was asked and the answer were in violation of the motion--the ruling on the motion in limine. The answer--the question and the answer are both stricken. I will strike them in the presence of the jury when I bring them back. However, I do not believe that the answer was prejudicial to the point that a mistrial should be granted. It was quite brief and it was without detail.

I will let you-- I doubt very much that this witness can lay a foundation of substantial similarity, though he may have evidence that would be relevant to it in connection with other evidence you may present, so at an appropriate time--and we can take a few minutes now if it will only take a few minutes--I'll allow you to make an offer of proof, but at this point, I'm not going to permit him to testify about it.

MR. SINGER: Excuse me, Your Honor. I hate to interrupt counsel, and I know he may want to make his offer of proof, but as a preliminary matter as well, of course, the Federal Rules and this Court's order required that the experts provide their expert reports.

I have received two or three--three different reports from Dr. Tipton. He's never mentioned those guns. He's never mentioned an analysis of those guns. He's never done any analysis on those guns. He's never talked to those people.

And so if he's doing a foundation now, it's with work he's done since his reports and without being supplemented, and that would be unfair surprise and a violation of discovery rules. We think, on that basis, it would be excluded as well.

THE COURT: Did he refer to-- I know he has examined other guns, but did he refer to other incidents in his reports?

MR. EATON: Not that I recall. But I know he-- He looked at these guns like he did all the other exemplars. He didn't mention every other exemplar that he looked at either.

I mean, you know, how far does an expert's report have to go? Dr. Tipton's reports were very lengthy, very detailed. Mr. Singer had deposed him twice. I think if he had asked more specific questions, he would have certainly been able to elicit the serial numbers of every gun that Mr. Tipton looked at.

We've got six or eight more exemplars listed on the pretrial order that Dr. Tipton's looked at. We haven't offered them, we don't intend to offer them just because they're rather cumulative.

But he looked at failed guns that--pardon me--he looked at fired guns, he looked at sectioned guns, he looked at new guns, he looked at used guns, and he didn't specifically identify every gun that he looked at in the reports.

THE COURT: Well, did he look at any other incident guns?

MR. EATON: He looked at the Zenger gun and he looked at the Cashdollar gun and he looked at the Dial gun.

THE COURT: If he drew conclusions from those, wouldn't those have been highly material to his opinions?

MR. EATON: You know, if I had been thinking about substantial similarity, perhaps. I wasn't really at that point in the case.

I just don't think there's any surprise here. I mean, these defendants have both--have settled with both of these plaintiffs--pardon me--with Zenger and with Cashdollar. We

represented Cashdollar. We did not represent Zenger, but we contacted him. And in doing so the defendants have looked at both of these guns. They've seen both of these guns.

And, in fact, I personally think they misrepresented, in their motion in limine, the Zenger gun. Stating that it failed in a way that was different, and that's why Your Honor made the ruling you did with regard to the Zenger gun, I think, or at least part of the reason, because it clearly failed in the same way the Cashdollar gun did, and a gross inspection of it will show that they both failed by stripping the threads out of the breech plug, not coming apart at the receiver.

That was Mr. Hickey's affidavit in support of their motion in limine. That was the argument--the assertion they made and the argument they made was that these were totally dissimilar failures, there had been no failures like the Kodiak gun. One reason, of course, is the Kodiak gun only went into production in 2004. This failure occurred in 2005.

But there's evidence that these guns, the Katzenmeier gun, the Zenger gun, in fact, every muzzleloader they made had the same 18 5/8-inch UNF thread form. And we have at least two here that failed in a manner similar to Katzenmeier, and the defendants knew it but stated otherwise in their papers.

MR. SINGER: Your Honor, if I might briefly respond to that.

Besides it being blatantly incorrect, let me address

the legal part of it. Dr. Tipton issues his report, doesn't mention the Zenger gun, doesn't meaning the Cashdollar gun, whatever they say and whatever they are. Doesn't mention examination of them, doesn't mention inspection of them.

When I ask for his file and I take his deposition, I ask for his whole opinion and every bit of it. I go back through and summarize, "Have you got any more evidence? Are all your opinions in your report?"

Never mentioned relying on the Zenger or Cashdollar gun for any purpose at all in any opinions or conclusions he had or in association even with the work in the case because we reviewed in detail everything he did.

And so now, apparently, after the witness has been qualified as an expert, he's now going to be testifying as to not only a metallurgical or mechanical engineering analysis of another failed gun at another point in time, but he's gonna have to, to meet the law, for them to prove substantial similarity, prove that the defect was the same and the failure was the same.

And it's absolutely uncontroverted from the record that the rolled threads that he so lengthily talked about today only went into effect in about the fall, about October, of 2002, and any gun made in 1996 and any gun made in 2001, as set forth in Mr. Belategi's deposition and as they've seen in the documents we produced when they did the traction test on the rolled thread versus the cut thread, those all had cut threads

versus rolled threads and were tested. And we've, of course, talked at length about the difference in the guns today.

And that's the legal part with respect to this witness.

THE COURT: Well, here's what we're going to do. If you want to make your offer of proof now--

MR. EATON: I do.

THE COURT: --we can go ahead and do that. The foundation has not been raised yet for a substantial similarity, so I'm not going to change my ruling, and it's still excluded, but I'll let you develop what you care to with this witness outside the presence of the jury.

MR. EATON: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. EATON:

Q. Dr. Tipton, I'd ask you, have you seen other Dikar BPI CVA muzzleloaders that had failed because of thread stripping?

A. I have seen those.

Q. I'm going to proffer to you--

MR. EATON: Actually, may he leave the witness stand, Judge?

THE COURT: He certainly can.

BY MR. EATON:

Q. I'm going to proffer to you, Dr. Tipton, Plaintiffs' Exhibit No. 86, identified as the Dikar Gun bearing Serial No.

61-13-030288-01, further identified as the Cashdollar Eclipse.

Dr. Tipton, have you seen the Cashdollar gun before?

A. I have seen this gun, yes.

Q. Have you performed a gross inspection of the--I would say the breech area?

A. Just a cursory inspection, yes. I just looked at it like I'm looking at it now.

Q. No microscope, no magnifying glass?

A. No.

Q. Did you observe anything similar in the area of the threads that you observed in the Katzenmeier gun?

A. Only that they've stripped.

Q. All right. Very good. By the way, one other thing, did you observe any sort of indication of overpressure--

A. I--

Q. --excess pressure?

A. Nothing that I could see or feel.

Q. You did not measure?

A. I didn't measure anything.

Q. Okay. Then Exhibit No. 87, which is, I believe, back here--

MR. EATON: I'll try to speak up, Judge.

BY MR. EATON:

Q. Dr. Tipton, I'll hand you what's marked as Plaintiffs' Exhibit 87, identify that as Dikar gun, muzzleloader firearm, bearing Serial No. 61-13-013872-96, further identified as the

Zenger gun.

Have you had occasion to inspect the breech area of that firearm?

A. Yes. I've--I have looked at this.

Q. And does it have any evidence of overpressure, barrel swelling, deformation, rupture, anything like that?

A. Nothing that I could just see without--without measuring.

Q. Upon gross inspection, could you form any opinions or conclusions as to the mode of the failure of that gun, not the cause but the mode?

A. It looked like the threads had stripped in that gun as well.

MR. EATON: Your Honor, we offer this evidence as merely foundational for presentation of Mr. Zenger and Mr. Cashdollar to testify about their substantially similar incidents.

And, obviously, Your Honor's--we've talked about that with defense counsel in the presence of Your Honor. They object. We've got those folks coming in, I believe, Monday, and we can make further presentation of their evidence in the form of offer of proof at that time.

THE COURT: Fair enough. And I'll make a final decision at that time. For now, I'm excluding this area of inquiry--

MR. EATON: Okay.

THE COURT: --with regard to this witness. Motion for

mistrial is overruled, and when the jury comes back in, I'll strike the last question and answer from the record.

Let's see. Deb, would you get the Court Security Officer and bring in the jury.

(In open court, in the presence of the jury.)

THE COURT: Please be seated, everyone.

Thank you for bearing with us, members of the jury. The last question and the answer propounded to and answered by the witness immediately prior to our break are stricken from the record, and you'll not give either the answer or the question any concern at all in your deliberations.

Mr. Eaton.

MR. EATON: Thank you, Judge.

BY MR. EATON:

Q. Dr. Tipton, would you turn to Exhibit 13 in your exhibit book, please.

A. Okay.

Q. Are those pages in there numbered 1 through something?

A. 1 through 12.

Q. Okay. Now, would you just identify for the record what those 12 pages that constitute Exhibit 13 show?

A. They just show the rolled thread profiles in a number of exemplars.

Q. Okay. Are these photographs of the thread form in exemplar Kodiak rifles that you performed during the course of your

investigation of this case?
A. Yes.
Q. And they're each labeled with a serial number of a particular gun--
A. Correct.
Q. --for identification, further--more specific identification purposes; is that correct?
A. Right. There's four different guns, three different photographs.
Q. Right. And were these photographs typical of all of the Kodiak muzzleloader rifles that you had sectioned and you inspected the thread form and the profile of the threads?
A. Yes.
MR. EATON: Your Honor, we'd move to offer Exhibit No. 13.
MR. SINGER: No objection.
THE COURT: 13 is received.
(Plaintiffs' Exhibit No. 131 was offered and received in evidence.)
MR. EATON: Your Honor, with that we'd pass the witness for cross-examination.
THE COURT: Cross-examination.
MR. SINGER: Bear with me, Mr. Tipton. I'll get a little closer to the mike. It only goes up a small bit at a time.

CROSS-EXAMINATION

BY MR. SINGER:

Q. What was the pressure in Mr. Katzenmeier's gun when the breech plug came out?

A. It was--it was not very great. It was--

Q. What was it, though? Tell me what it was in psi.

A. I--I don't-- I know what it wasn't. I don't know what it was.

Q. Okay. Now, you've done some calculations, right?

A. I've done a lot of calculations.

Q. And we'll get to those in a moment. But you don't know what the psi was, right?

A. That's--that's correct.

Q. Okay. Now, let's see what we can agree on. You looked at Mr. Katzenmeier's gun for the very first time after the incident happened, right?

A. Correct.

Q. And I think you said a couple things, and I don't want to put words in your mouth or misrepresent what you said, but let me see if I can understand, maybe, a couple things.

One of them is that because there was no plastic deformity, no swelling of the barrel--

A. Uh-huh.

Q. --at the back end--

A. Right.

Q. --then that's one of the things that caused you to think, well, it had to be tapered to start with?
A. Right. There had to be something wrong with the threads because--
Q. Okay. And then the other thing I think you said is you just can't imagine what could have made the threads tapered that way--
A. Correct.
Q. --right?
A. Well, aside--aside from a manufacturing--
Q. In a failure. Excuse me.
A. In a failure.
Q. In failure mode?
A. Yes, sir.
Q. What is galling, metallurgically?
A. Galling?
Q. Uh-huh.
A. Galling is when you take a really hard piece of material and rub it really--rub--apply them together and then smear them together, basically.
Q. So metallurgically, it's when metal rubs against metal?
A. Right.
Q. What is plowing?
A. Plowing is probably similar-- I'm not sure that that's an engineering term, but in terms of, you know-- I assume that's

what you're talking about, is if I take two pieces of metal and really remove metal with the other one, that that could--that's called plowing.

Q. Well, what is jetting?

A. Jetting is--is-- I read that in a report. It has nothing-- I can't imagine-- Jetting would be taking fluid and shooting it at very high velocity and removing material that way. The water jet cutting, for instance. You could jet material away by--

Q. What was the temperature of ignition of whatever powder there was or whatever charge there was in Mr. Katzenmeier's gun?

A. I don't know.

Q. But when that ignited, there was pressure created, right?

A. Correct.

Q. Okay. And there was heat created, right?

A. Correct.

Q. You were talking very briefly just a moment ago about the--your understanding of the process, of the quality process at Dikar, right?

A. Right.

Q. And your understanding of that is part of what forms the opinions and conclusions that you have today, correct?

A. Correct.

Q. And you understand that they check, in your understanding, every 25 threaded guns with a threaded go/no-go gauge, right?

A. Correct.

Q. But your understanding is they don't check the size of the threads on 100 percent; is that your understanding?
A. I believe-- My understanding is that they check only 1 in 25 of the tapered holes with--of the tap holes and that they check 100 percent of the inner diameter with a globe gauge but only one in 25 with the threaded go/no-go gauge.
Q. Now, you were critical of the process because you said by checking 1 in 25, it's not going to catch the rogue problem, right?
A. It's-- Yes, that's true. I-- In this case, I believe that you could have checked that tapered hole and still not found it. That's my opinion.
Q. Tell me what rogue process caused that particular gun to be tapered, as you believe it was in the manufacturing process. Specifically, what happened?
A. I don't know specifically what happened. I do know that if a drill is somehow not in alignment with the rotating part when it goes in that that will produce a tapered hole. That can happen when--that could happen if--for whatever. It has to move from a position over here to a position here to go in and out, and when it moved, if something got in the way or something happened to it that caused it to not be in alignment, then that hole can be tapered (indicating).
Q. You don't know what could have possibly caused that 1 in the middle of the 25, arguably, to get off?

A. I don't know what--what caused that or the 25 to 50 that Mr. Belategi saw also--either. I don't know what caused any of those.
Q. Well, you know that taps wear out and drills wear out in the manufacturing process, don't you?
A. Sure.
Q. Isn't that the very reason you have-- People can knock machines, CNC lathe machines that are computerized, and have a problem, right?
A. I'm not sure. I don't understand your question.
Q. There are things that can happen in a manufacturing process when you're drilling or threading that can cause something to get out of tolerance, right?
A. Correct.
Q. And that's why you have-- That's just life; that's a fact?
A. It happens.
Q. That's why you have a checking process, isn't it?
A. That's correct.
Q. That's why you have a quality process, isn't it?
A. That's correct.
Q. And as tools wear out, you're going to find something that's not exactly like your tolerance--
A. That's right.
Q. --when you produce hundreds of thousands or millions of products over a ten-year period of time, right?

A. That's correct.
Q. Now, let's talk about the swelling of the barrel. Isn't it true that-- Well, let's talk about plastic deformation and elastic.
A. Uh-huh.
Q. Because we've been using those terms, and I don't know that it's been described. Elastic is the property in metal that, when you have a strain or a load, for example, with the firing of the gun, there's going to be some excess forces exerted, and there may be some slight movement microscopically, right?
A. There will always be some movement. If you apply any stress to steel, it will exhibit a strain, and you will always have--it will always move under a stress.
Q. And elastic is it comes back to where it was?
A. That's correct.
Q. Plastic is it moves and stays out there where it got to?
A. It doesn't come--it doesn't go back to where it was. It will come back, but not back to where it was.
Q. And isn't it true that to have plastic deformation, you have to exceed the yield strength of the metal?
A. That's true.
Q. Okay. Now, again, you had the certificates of the certifications for the steel. We talked about that when I questioned you this morning?
A. I saw those, right.

Q. And isn't it true that the yield strength of the barrel was right at 79,000 psi?
A. That was--that's the certification that they gave. And those are generally minimum yield strength calculations. Those are--those are certified this material has got to meet a minimum spec.
Q. And it--
A. Seventy-nine is--
Q. Right. So the manufacturer of the metal certified that metal, didn't they?
A. Right.
Q. Okay. Now, that means that you would have to exceed, would you not, the yield strength in the barrel before you would have plastic deformity?
A. That's true.
Q. Now, let me ask you, the breech plug is harder, correct?
A. The breech plug is harder, that's correct.
Q. And the yield strength on the breech plug, at stainless steel, is right at about 94,000, somewhat, 95,000 psi, right?
A. Right.
Q. Now, as you were-- One of these photographs that we had, and I can't remember which one it was, as you look at this thread form here that you have, which is Plaintiffs' Exhibit, I guess, 12, isn't it true that the harder substance--when the harder substance is the male thread, okay, it's gonna transfer

the load further down towards the tip, correct? It's not gonna bend and ride up over the female thread, the softer material, is it?

A. The strength of that material has nothing to do with its--with its elasticity. They both have-- Those materials have the same modules of elasticity. They will deflect elastically the same amount.

Q. But I'm talking about you would expect, if there's gonna be a shear event, that what would happen is the stronger material is gonna shear off the material that's less psi, and it's gonna shear off down in here near where the base of the male thread is, correct (indicating)?

A. If the stress is bigger in that material, then right. If the stress is bigger than the strength, then it's gonna fail there. If the strength of the material is weaker, then the weaker material will fail.

Q. Now, you said you ran some calculations, and we talked about that very briefly this morning, but let me ask you this: Isn't it true that also for your calculations you were aware, when you began doing them, that this gun--

MR. SINGER: Excuse me.

BY MR. SINGER:

Q. --that the gun had an action behind it; the trigger that went down and came out and locked behind it that had the firing mechanism?

A. I--I'm not sure what you're asking. Well, yeah. I mean-- Well, this is a different gun. Are you talking about this thing?
Q. Yeah. Yeah.
A. Uh-huh.
Q. All right. For purposes of your calculations, isn't it true that you just assumed that there was air behind the breech plug?
A. That's probably true.
Q. You didn't do any studies or any analysis to attempt to determine what kind of pressure it would take to break that trigger housing and the striking mechanism and the action that was behind that, did you?
A. Well, there's a little--there's a little bit of-- If you look at this gun, you can see a little bit of a gap, so that would have to move about one full thread--one full thread pitch before it engaged anything behind it.
Q. Okay. But--
A. So, for all practical purposes, there is air behind the breech plug.
Q. Okay. But--
A. So I didn't calculate the effect of that other stuff.
Q. Right. You didn't calculate the effect--
A. It's not going to slow down-- By that time, the breech plug is gone. By the time it hits that stuff, it's already moving and it's gone.

Q. All right. Now, but that is going to slow it down, isn't it?
A. No. Well, it will slow it down, but it's--it's too late at that point.
Q. Excuse me. Asked the wrong way. It's gonna take pressure to not only make it break whatever threads it has, but also to break that piece, right?
A. That's correct.
Q. Okay. And, again, I know you don't know the pressure, but it's gonna take enough pressure to do that too, isn't it?
A. Yes.
Q. And to break the stock?
A. Uh-huh.
Q. Were you made aware that the bullet also went 30 or 40 yards downrange through a piece of concrete board?
A. I think I heard that.
Q. And did you factor that into any of your calculations?
A. I didn't need to.
Q. Were you aware-- You've talked about the quality process at Dikar, so you've seen the substantial amount of documentation that's been produced on the testing, have you not?
A. Yes.
Q. Okay. You did not consider that in your opinions and conclusions, did you?
A. Well, I-- Actually, I didn't.

Q. Okay. Did not?
A. Did not.
Q. And isn't it true that your understanding, as you looked at those materials, is that the pressure generated at the proofhouse, when they proofed the five guns a month and breech plugs and barrels, that that generates to roughly twenty to twenty-five thousand psi?
A. That's correct.
Q. And that's part of--even though you didn't rely upon the testing stuff, you did take that in consideration in your opinions and conclusions, correct?
A. Somewhat, yes.
Q. I want to talk to you a moment about one of the exhibits, the color deal that you made. You went out to Washington state to the people that were trying to sell you the laser deal. Now, let me ask you about that.
Isn't it true that the way that operates is a laser shines-- You put a probe inside that has a mirror at an angle, right?
A. Pretty much.
Q. And you have to adjust the angle, right?
A. Right.
Q. And you don't know exactly what the angle was for this, do you?
A. No. I--

Q. And they did that while you were there, right?
A. Correct.
Q. And then it bounces off the mirror, the laser beam, and bounces down against a surface that it's going towards, it bounces back up, and it uses trigonometry to calculate the information?
A. Correct.
Q. And then if you don't have something exactly centered, then the computer program will--in addition to the trigonometry, will use geometry to calculate what the measurement ought to be?
A. Correct.
Q. And they did all that for you out there, and you generated those colored--
A. Yes.
Q. --things that are in the exhibits, right?
A. Yes.
Q. Isn't it also true that if you put toothpaste, putty, anything in the grooves, that all it's gonna do is shine a light off the surface and you're going to measure whatever the surface is?
A. That's correct.
Q. It won't penetrate, will it?
A. No.
Q. Isn't it true that-- Well, let me back up, because I think that you had said earlier about the Cerrosafe--you were talking

about that. Based upon what you saw-- And let me back up.

I believe it's true, isn't it, that you certainly looked at the guns with the naked eye, and then when Mr. Schmidt--Dr. Schmidt and I were there and the gun got cut open, they put a section under the microscope when we all were there and looking, correct?

A. Right.

Q. Isn't it true that other than that, once they mounted the section for you and took the photographs that you've Photoshopped, correct, Photoshopped into the montage--

A. Correct.

Q. --you never then looked under the microscope at the actual piece?

A. Well, I did myself. I did that a little bit while Mr. Schmidt was there.

Q. Right. But I'm talking about other than that day, you know, once it got mounted and later on, isn't it true that what you did is you made your opinions based upon the photographs that were taken by Sherry Labs?

A. Partially the photographs. We also that day, when we were there, we did some X-ray spectroscopy shots on there to look at the material that was in the grooves.

Q. Right. And isn't true that you saw in the material in the grooves a lot of Cerrosafe?

A. In certain small places, you could find that, that material,

yes. That's--
Q. It's--
A. That's one thing about the SCU is it will look at a little tiny spot. If it sees a spot of material, you can zoom in on that spot and see what that spot is.
Q. And it was smeared over the surface too, wasn't it?
A. I don't-- Not to my knowledge, no.
Q. You have seen, have you not-- Well, let me back up and let me ask you this.
MR. SINGER: May I approach, Your Honor?
BY MR. SINGER:
Q. Okay. This Exhibit 12A that you showed, you've, if I understand it, cut open a barrel, sectioned it dead in half, right--
A. Right.
Q. --and then put the breech plug, laid it in it, right?
A. We actually put the breech plug in and cut them both.
Q. Okay. And then took a photograph of it or had Sherry do it, right?
A. Right.
Q. What was the diameter of the opening-- The minimum diameter we talk about is thread peak to thread peak, right?
A. Right.
Q. And the major diameter would be crown root up to the other side, right?

A. Correct.
Q. What was the diameter of this particular gun, whichever one it was?
A. I don't remember.
Q. All right. And how many thousandths was it bigger-- Well, first of all, did you measure it before it was cut open and the breech plug laid back in it?
A. That, I don't recall. I don't recall if I did or not.
Q. Okay. Isn't it true that when you have a tight thick-walled vessel like this and you cut it in half and relieve that pressure, there's going to be some slight expansion, and we're talking about thousandths of an inch here?
A. No. That's not necessarily true. Unless there's been something done to that stock material to induce residual stresses, there will be no change in the geometry after you cut it.
Q. What is the Poisson effect? Am I saying correctly?
A. Poisson's effect.
Q. Poisson's effect.
A. Poisson's effect has nothing to do with what you just said. If you pull on something, it gets longer, but it also gets thinner. That's Poisson effect.
Q. If you push on something, it gets fatter?
A. If I pull on a rubber band, it gets--the rubber band gets longer, but the rubber band also gets narrower. Steel does the

same thing. The ratio of the strains that you get in the axial direction to the transverse-- The ratio of the transverse strain to the axial strain is called Poisson's ratio.

Steel, if you pull it, gets a little bit narrower. It also gets a little bit longer. If you release it, it all goes back. That's Poisson's ratio. So that's Poisson's effect. So I don't know what--you know, I don't know what-- There's no other definition of Poisson's effect, trust me.

Q. Doesn't it work the other way too; if you push on steel, it gets fatter--
A. That's right.
Q. --and shorter?
A. If you push on it, it gets a little fatter, but when you release it, it springs back. It's-- Poisson's ratio is an elastic property of materials.
Q. The breech plug is a round cylinder, the face of it inside the gun, isn't it?
A. Yes.
Q. And when that ignition goes off, it's pushing against that face, isn't it?
A. That's true.
Q. Okay. With a lot of pressure, isn't it?
A. A lot of pressure.
Q. Okay. And isn't it true that you had the fellow at--one of your colleagues there at the school do a finite element analysis

just assuming some threads and putting pressure in the barrel--
A. Yes.
Q. --and ran it on a computer?
A. Yes.
Q. And isn't it true that the first three threads, three threads were the only thing that had any real significant load?
A. Initially, yeah, because he only put 25 to--about 25,000 psi pressure, that's true.
Q. So he made a computer analysis based upon the information you gave him?
A. Uh-huh.
Q. You gave him dimensions of a tapered hole, you gave him dimensions of a breech plug, you had him run the analysis, and you saw the computer results was that the first three threads were really the only ones that carry a load at 25,000 psi?
A. Right.
Q. Now, you've also seen that Dikar has run similar analysis, have you not, in the documentation you saw in those depositions?
A. I believe so.
Q. And the same thing is true, only the first three threads are the ones really engaged--
A. Under--
Q. --at 25,000 psi?
A. Under properly formed threads, that's true.
Q. And it's also true when you increase it 30,000 psi?

A. I don't know about that.
Q. Well, are you familiar-- What is adiabatic shear?
A. Adiabatic shear? I'm not sure. I know what shear is.
Q. Are you familiar with a book, "The Physics and Mathematics of Adiabatic Shear Bands" by T.W. Wright, Army Research Laboratory?
A. No, I'm not.
Q. Have you read Dr. Schmidt's Ph.D. thesis that discusses adiabatic shear?
A. No, I haven't.
Q. Let's talk about thread forms. Now, we talked this morning that your knowledge of these internal female formed--excuse me--cold-formed female threads came from your work in this case, correct?
A. Plus--plus extra work that I did outside this case because I was curious.
Q. Right. And you got information off the Internet, right?
A. Well, I got some information off the Internet.
Q. Well, you had prepared an exhibit that was shown for illustrative purposes only a moment ago that had a Danish figure from a Danish book in there, right?
A. Right.
Q. And isn't it true that that Danish book did not discuss in any way how big the voids would be, correct?
A. No. No.

Q. Or what's good or bad?
A. No, it didn't.
Q. The bottom line is everybody agrees universally when you roll a thread you're gonna have a cavity, right, some type of a--
A. Some sort of groove on top, right.
Q. Yes. And isn't it true that all the rest of your research you did and all the things you looked at, none of them ever discussed what was too bad or too big or the shape that it should be or should not be, didn't it?
A. It didn't.
Q. Now, how about the book Mr. Eaton provided you in association with your work in this case, "The Guide to Threads, Thread Fasteners"-- What was the name of that book in 2004?
A. I forget the title of it. It was something to that effect.
Q. And in your research in that book, did it in any manner discuss how the first--either the sides of the bore--
A. No, it didn't.
Q. --what was proper or improper?
A. No, it didn't. It gave a--
Q. Or the shape?
A. It gave a recommended tap hole size, but that was all.
Q. Okay. Or the shape, the shape--
A. Shape of the--
Q. --of the--

A. No, it didn't.
Q. And, again, as you described, the typical load bear, isn't it true that the thread, the male thread engaging on the female thread, the important part is how long the male thread is and where it engages on the female thread; is that fair?
A. That's--that's--that has--that tells-- That plays into it, yes. That has an effect for sure.
Q. And if there's good male engagement, the tips of the crowns don't really do much, do they?
A. That's true.
Q. The load is transferred down to the base where the thick part of the thread is?
A. That's true.
Q. And you, of course, know that, as you've seen in all the exemplars you've looked at, they all look just alike, don't they?
A. That's true.
Q. Including the one that you had is in evidence with the strained gauge pieces, the one that Mr. Roane, you understand, fired even at 200 grains of power?
A. That is true.
Q. And that's a 30 percent overload above the maximum allowed?
A. Yes.
Q. And, of course, there's no change, no alteration in that barrel, was there?

A. There wasn't.
Q. Just everything's exactly like the brand new ones out of the box that have never been fired; isn't that true?
A. That's true.
Q. Shot 40-some times in one day, right?
A. Yep.
Q. Now, let's talk about the forms themselves. Isn't it true or kind of conventional wisdom that rolled threads are harder than cut threads?
A. That's the conventional wisdom, but I'm not so sure that that's true.
Q. Okay. Well, let me ask you, isn't it true generically that radius edges are stronger than cut edges, sharp edges?
A. In--in fatigue loading, that's true. Not in static loading.
Q. And isn't it true that when you roll, as you talked about, when you work metal, when you take metal and press into it and make it move and plastically deform, you're changing the microstructure of that metal along that thing and making that metal harder, right?
A. Only if that metal tends to exhibit a property called work hardening.
Q. Well--
A. Not all metal does that.
Q. But did you look at the work-hardening aspect of the micrographic photographs on these threads?

A. Not-- I did not get a chance to do that. We did look at hardness measurements taken right up to the surface, and there was not a substantial amount of work hardening shown in the microhardness measurements that we took. There's a little, but not a lot.
Q. You would agree, would you not, that if the Dikar guns are made pursuant to their design, they're gonna sustain the loads that they sustain and they're expected to sustain, correct?
A. So long as the breech plug's not too small.
Q. Right. And, again, you don't know what breech plug was in Mr. Katzenmeier's gun that day, do you?
A. No.
Q. Did you assume, for purposes of your opinions and conclusions, that there were only three Pyrodex pellets and one bullet in the gun when he fired it?
A. I just assumed that what Mr. Katzenmeier--whatever Mr. Katzenmeier said in his deposition is what was in there.
Q. You assumed it was only a proper load, right?
A. Correct.
Q. And there was no smokeless powder at all?
A. Correct.
Q. Nothing in the barrel that should not have been?
A. Correct.
Q. That the breech plug was not damaged in any way, correct?
A. Yes.

Q. That it was one that came from the factory?
A. I'm assuming that, yes.
Q. And you also assumed that none of the threads at the back or anywhere had been stripped or damaged by anybody before the accident, correct?
A. Correct.
Q. Now, I want to talk to you about some of these photographs just a moment, but let me ask you, did you--was there anything about the thread roots themselves that was significant to you that you relied on for your opinions and conclusions?
A. The thread roots in the Katzenmeier rifle?
Q. Yes.
A. No.
Q. Okay.
A. They were of uniform depth was all I noticed.
Q. And do I also understand for your opinions and conclusions that, as you've described in your PowerPoint presentation and as you've stated, I think, just a moment ago, using the go/no-go gauge that you opined was utilized, it would be possible, in your opinion, for an operator, doing their best job, to, in fact, check it like they were supposed to, but somehow that bad one just got out?
A. I think that's possible.
Q. Because it's shaped in such a fashion that you don't think it would be caught, correct?

A. That's correct.
Q. Other than the substantial testing that's reflected in the documentation provided by Dikar and the testing at the proofhouse each month and the testing done by Mr. Roane, who testified here, I believe, yesterday, are you aware of any other firing testing that's been done on these Kodiaks or any guns that are of the same design and manufacture as them?
A. I'm not aware of any.
Q. And you certainly haven't done any firing tests, have you?
A. No.
Q. You would agree that, as you said, something went wrong that day, right?
A. I know what--I believe I know what went wrong that day.
Q. Well, either there was something wrong in the way it was used or there was something wrong in the way it was made; would that be fair?
A. Not in my opinion.
Q. Well, I understand it's your opinion. Your opinion is there was something wrong in the way it was made?
A. That's correct.
Q. Is that right?
A. That's correct.
Q. But--
A. I--
Q. Go ahead.

A. I just saw no evidence, no evidence that it was something that went wrong that day--
Q. And, as we've described--
A. --as it was used.
Q. --when I first started questioning you, that's based upon a couple of different things; first and foremost, that there's no swelling on the outside of the barrel?
A. There's no swelling on the outside of the barrel and that there's fresh material circumferentially cut where there should have been sheared-out material if it was--if it had caused by something that day.
Q. What was the magnification that Sherry Labs looked at under the microscope for their pictures that you have here in evidence and that you rely on for your opinions and conclusions?
A. I believe-- I don't recall exactly. I believe they were 40X. It doesn't really matter because we-- I mean, the magnification depends on how big the picture is, so it's different there than it is here, but I believe it was a 40X. I looked at-- I looked at those pictures--or I looked under the microscope myself and zoomed in and zoomed out just to convince myself that those--that was nice--that that was actually metal that I was seeing, that was actually steel that had been circumferentially--that was still circumferentially scored.
Q. And the circumferential marks, you just saw--when you looked at it, you saw that they're circular-type marks on the surface

you were looking at, right?
A. Uh-huh. That's true.
Q. Okay. And it really doesn't matter, if I understand, at what magnification you look at this, in your opinion, correct?
A. Well, I looked at--I looked at several magnifications, but the magnifications of those photographs was-- I mean, I don't recall. I could look it up. I believe they were 40X, 40 times, I think, but I might--I might be wrong on that.
Q. So the ones that you looked at that you're-- And let me ask you one more question. Isn't it true that the measurements that you utilized in this case--
A. Uh-huh.
Q. I know you measured the actual inside of the gun before it was cut.
A. Right.
Q. But the measurements of the threads and the measurements of the sectioned guns were all done on the photographs themselves, correct?
A. They were all. But I was always able to use the pitch of the thread to scale my measurements from those photographs because the pitch of the thread is constant. It's one-eighteenth of an inch.
Q. I understand that's how you did it, but you made the measurements based on whatever magnification it was of a photograph?

A. No, I didn't. I made the measurements based on the distance between two threads is one-eighteenth of an inch, and anything I measure gets scaled to that. So it doesn't matter how big the picture was.
Q. I guess what I'm telling you is you scaled it from the photograph, right?
A. More-- Well, I didn't-- I had no idea what the magnification of the photograph was. I took the photograph, I measured the distance between two threads. That distance is one-eighteenth of an inch. Now that I know that, I can measure any other distance on the photograph.
Q. You've answered my question. Thank you.
MR. SINGER: Pass the witness.
THE COURT: Redirect?
MR. EATON: Briefly, Judge.

REDIRECT EXAMINATION

BY MR. EATON:
Q. Dr. Tipton, did you perform some tensile strength tests on some of the exemplars you had?
A. Yes, we did. We did one tensile strength test on the barrel. We actually took a barrel at Sherry Labs and pulled it apart to measure the yield and the tensile strength of that exemplar rifle.
Q. Okay. And did your measurements of tensile strength from one of those exemplars compare closely to the certified tensile

strength as provided in documents from Dikar?
A. It was actually--those strengths were actually a bit higher, which--as is not surprising because the certified values are always minimum values.
Q. In other words, when you did your tensile strength testing, you found tensile strength of that metal to be somewhat higher--
A. Somewhat higher.
Q. --than as certified by Dikar's steel supplier?
A. Correct.
Q. What was the tensile strength that you determined with your independent testing?
A. The yield strength was around 92--92,000 psi. The tensile strength was 95,000 psi.
Q. And how does that relate, if at all, to the failure of the Katzenmeier gun on October the 2nd?
A. Well, you can calculate-- Given that, given the dimensions of the barrel and those strength values, I can calculate the pressure that would be required to yield the barrel and to burst the barrel.
There's some von Mises--standard von Mises approach that I can use to calculate when that barrel yields, because when you pressurize a tube and it tries to swell it out, it gives it what's called a hoop stress. It makes it bigger, but it also tries to stretch it. Because it's pushing on the breech plug and it's pushing, it's actually trying to stretch the

barrel in the long--along its axis as well. It's also trying to push outward on it. The pressure is pushing outward.

So it's pushing in three different directions on the steel, so you can use what's called a von Mises approach to calculate when that combination of loads is going to cause a material to yield.

That material, with that strength, the pressure required to yield that rifle, would have been about 48,800 psi. That's the pressure inside. The pressure required to burst would have been 51,700.

Mr. Hutton calculated that the force that would have been required--the force that would have had to be there to push that breech plug out the back was 58,800 psi. That would have blown the barrel to smithereens. The barrel would have blown up way before that breech plug came out. And I believe he underestimated the force that would have been required to push out a full breech plug.

Q. Okay. What does that have to do with the failure of the Katzenmeier gun where you believe the threads were only partially engaged?

A. It-- The pressure that gets generated under normal loading is on the order of twenty, twenty-five thousand psi. With just those few threads engaged, that's more than enough to eject that plug.

Q. But far less than what would it take--than what it would

take to yield the barrel?
A. Correct.
Q. So your calculations prove to you that the barrel--pardon me--the breech plug could be ejected at far less pressure than the barrel explode--
A. Correct.
Q. --under the conditions that you observed in the Katzenmeier gun?
A. That's-- Yeah. I'm quite sure of that.
Q. And if it would take something in the range of twenty-four to twenty-five thousand psi to blow that breech plug out the back--
A. For--
Q. --how much load would that be on that breech plug, the surface of that breech plug?
A. Let's see. You mean--
Q. Well, you're telling us about psi.
A. Okay.
Q. That's pounds per square inch.
A. The pressure required to cause the barrel to yield plastically is--the pressure that gets generated by gun powder exploding, if that pressure is 48,800 psi, that exerts a backwards force on the breech plug of only 15,000 pounds.
Q. Right. So the load on the breech plug is not the same thing as the pressure in the barrel?

A. That's correct.
Q. All right. And it would have taken, what did you say, to push the breech plug out, how many pounds of load?
A. Well, I've been doing some tests where I've been pushing five-eighths inch plugs out of threaded holes, properly threaded holes--
MR. SINGER: Excuse me.
A. --and my machine is about 35,000 pounds required to eject those plugs.
MR. SINGER: Excuse me. May we approach?
THE COURT: Yes.
(Side-bar conference off the record.)
BY MR. EATON:
Q. Dr. Tipton, talk about another subject very quickly and be done with it.
The X-ray spectroscopy that was done, what was the purpose of doing that when you were sectioning these--the Katzenmeier gun and these other exemplars?
A. You can go--you can-- If you're not sure what material's there, if you see that there could be foreign objects, if you see little inclusions in the material, you can zoom down on those and hit those with an X-ray and see what's there. Sometimes you get silicone carbide inclusions in steel. You can go in and hit those and see a lot of silicone.
And I know when Dr. Schmidt was there he was going in

and hitting the areas that were rich in lead, so a lot of--so when we were looking at the areas that were circumferentially scored, we went down and hit some of those, and they were all iron.

Q. They were what?

A. They were all--they were mostly iron.

Q. All right.

A. Which is--that's a low carbon steel.

Q. The X-ray spectroscopy was intended to identify surface element?

A. Right.

Q. Iron, steel-- Well, steel would be a compound. Iron, lead, other elements, correct?

A. Right.

Q. And what was the significance of that X-ray spectroscopy with regard to the Katzenmeier barrel? In other words, what did it tell you about the surface that had been exposed from the destructive testing?

A. Told me that it was just--it was just steel.

Q. You said Dr. Schmidt hit it here and there and found some lead?

A. Correct.

Q. Were you present when he did that, when he did that inspection--

A. Yes.

Q. --observed?

And was that he would find little-- I guess are you saying he was finding little spots where there was some lead?

A. Correct.

Q. But the X-ray spectroscopy showed that most of the surface was the steel of the parent material?

A. Correct.

Q. You reviewed the Dikar design drawings, among the other Dikar-provided documents; is that correct?

A. That's correct.

Q. Was the Katzenmeier barrel manufactured in accordance with the Dikar design drawings for the barrels?

A. At least the breech. The breech area that I examined seemed to be so except for the dimensions of the thread.

Q. Are you talking about the bell-mouthing?

A. Right. The taper.

Q. Let's qualify this. Was the bell-mouthing included-- The bell-mouthing you found in the Katzenmeier gun, the tapering, the bell-mouthing that you've shown us in several exhibits, was that part of the design, as per Dikar's design drawings?

A. Since it had failed, it's difficult to say what the dimensions were before it failed, so I can't--

Q. Well, you've told us you thought the bell-mouthing occurred during the manufacturing process?

A. Correct.

Q. What I'm really asking you, then, is was the Katzenmeier gun, as manufactured, different from the Katzenmeier--the design of the Kodiak?
A. Yes, it was.
Q. All right. So you found in the Katzenmeier gun a manufactured item that was not in accord with the specific design drawings of the Dikar Kodiak muzzleloader?
A. Yes.
Q. All right. And did you come to any conclusions as-- Well, what was your conclusion as to when that deviation from the design occurred or where it occurred?
A. Conclusion is when the hole--the tap hole or the pilot hole, or whatever you want to call it, that the hole was drilled to tap the breech plug, the breech opening, that's when it happened.
Q. And that that was not picked up in quality control?
A. Correct.
Q. Now, you read Mr. Belategi's deposition, among others, and observed that Mr. Belategi said there were two primary causes for bell-mouthing; is that right?
A. Right.
Q. That one was worn tools, the other was misalignment of the tools?
A. Right.
Q. Are you in agreement with that?

A. Right.

MR. EATON: I have nothing further of this witness, Judge. Thank you. We pass.

THE COURT: Recross?

MR. SINGER: Two very brief follow-up questions.

RECROSS-EXAMINATION

BY MR. SINGER:

Q. Professor Tipton, we've been throwing around numbers and a lot of different things, but just for clarification purposes to the jury of what you just said a moment ago, 48,000-- We've been talking about psi yesterday. Psi is different than foot pounds of force, isn't it?

A. No. Foot pounds is torque, not force. Pounds is force.

Q. Pounds is force. When you're talking about 15,000, you're talking about pounds of force. 48,000 would be psi?

A. Pounds per square inch, correct.

Q. Right. Pounds per square inch.

And, now, isn't it true that if, as Mr. Belategi described, the cause-- You've read his deposition. You understand that every time in the quality process that a part is found out of tolerance, they shut it down and they investigate?

A. Right.

Q. And they determine the cause, right?

A. Right.

Q. And the cause predominantly has been either the drill or the

tap gets worn out so it's not making the right size, right?
A. Right.
Q. So you replace it, and that satisfies it, right?
A. Right.
Q. And then or it's out of alignment somehow, right?
A. Right.
Q. And isn't it true if that happens it's going to keep making so it gets caught?
A. Well, yeah, it could, or maybe it doesn't. Maybe it does it once and it doesn't do it the next time. Maybe one time it didn't get clicked into where it's supposed to--seated to where it's supposed to. I--I don't know. I don't know.

MR. SINGER: You just answered. Thank you.

THE COURT: Anything further?

MR. EATON: Nothing further, Judge.

THE COURT: You may step down, sir. Thank you.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: Call your next witness.

MR. SPARKS: We call Dr. Richard Hastings, Your Honor.

THE COURT: Counsel, bear in mind that we'll be breaking at about 3:15.

MR. SPARKS: Thank you, sir.

THE DEPUTY CLERK: Please step forward and be sworn.

DR. RICHARD HASTINGS, PLAINTIFFS' WITNESS, SWORN
THE COURT: Mr. Sparks.
MR. SPARKS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. SPARKS:
Q. Sir, would you state your full name for the record and the ladies and gentlemen of the jury.
A. Richard Hastings.
Q. And what is your occupation or profession, sir?
A. Physician.
Q. And what states are you licensed in, sir?
A. Oklahoma.
Q. If you would, sir, would you turn to, in the big notebook there beside you, Tab No. 25, and ask you, if you would, sir, to take a look at Exhibit No. 25.
Are you familiar with that document, sir?
A. Yes, sir.
Q. And that is what, sir?
A. It's a curriculum vitae regarding myself.
MR. SPARKS: Your Honor, based upon the pretrial order, this being an Exhibit A document, may I go ahead and publish part of it for the jury?
THE COURT: You may do so.
MR. SPARKS: Thank you, sir.
I lack the ability to be technically challenged, I can

tell you that.
BY MR. SPARKS:
Q. Doctor, on the first part of your curriculum vitae that is there-- Doctor, would you take a moment to look at that and tell the ladies and gentlemen of the jury, just very briefly, where did you go to school in terms of college?
A. I went to college at Cornell College in Mount Vernon, Iowa.
Q. And when did you graduate from Cornell College here in Iowa?
A. 1968.
Q. And what type of degree did you receive at that time, sir?
A. I got a bachelor's in art.
Q. And after you did that, sir, what did you next do in terms of your educational background?
A. Well, I was pursuing a degree in teaching, and I went to Washington University in St. Louis and spent four years in a Ph.D. program in the area of anatomy.
Q. Did you obtain your Ph.D. in anatomy?
A. I did.
Q. What year was that in, sir?
A. 1974.
Q. After you completed your Ph.D. study in anatomy, did you go on and go to osteopathic medical school?
A. I did after I spent two years as an assistant professor at the University of Alaska Medical School in anatomy. And then I went to the Oklahoma State University College of Osteopathic

Medicine in Tulsa, Oklahoma, for my medicine degree.
Q. And when did you receive that, sir?
A. 1980.
Q. Can you tell me, very briefly, and in summarizing and taking a look at your CV, sir, which the ladies and gentlemen of the jury will have at some time later, is this CV a correct and up-to-date curriculum vitae of your experience, sir?
A. Yes, sir.
Q. And in looking at it, I note that you've been an independent medical examiner at the Oklahoma Workers' Compensation Court; is that correct?
A. I have.
Q. And that began in 1994?
A. Yes, sir.
Q. And throughout that it summarizes your other positions that you have held, along with the grants and research you've done; is that correct, sir?
A. Yes, sir.
Q. Doctor, did you have an occasion, at my request, on more than one occasion, to examine Jon Katzenmeier?
A. I did.
Q. On how many different occasions did you examine Mr. Katzenmeier?
A. I've seen this gentleman on two occasions.
Q. And besides examining Mr. Katzenmeier, will you tell the

ladies and gentlemen of the jury what other information you had, besides the physical examination that you performed on the first examination, and the date of that examination?

A. Well, my initial evaluation of Mr. Katzenmeier was on February 13th of 2006. And in conjunction with doing that evaluation, I did review a great number of medical records and documents, X-rays and photographs. Took the history, performed a physical examination, and then completed my evaluation.

Q. At the time that you evaluated Mr. Katzenmeier, would he still have been in what you and I--or what I would describe as the healing period?

A. He was still pretty acute from his injuries. That was about four months after his initial trauma.

Q. At the time that you evaluated him, sir, you told us you reviewed a substantial number of records. Do you know, at the time that you examined him-- You identified those records in a previous report that you provided us, but can you give us a brief summary of the physicians' reports that you had examined?

A. Yes, sir. You want me just to read off the physicians I have seen--

Q. That would be fine, sir.

A. Dr. Sidwell, Dr. Klein, Dr. Depena, Dr. Graber, Dr. Hanfland, Dr. Skeete, Dr. Donigan, Dr. Bauman, Dr. Jones, Dr. Christiansen, Dr. Adams, Dr. Schroeder. I believe that's the doctors. Then there were other citations for various

hospitals and records I reviewed.
Q. Approximately how many hours did you spend reviewing the records concerning the Iowa University Hospital and various and sundry records that were given to you, sir?
A. I don't recall the exact number. I would say I probably spent approximately ten hours in preparation reviewing those records.
Q. And did you correlate those particular records with your physical examination for certain findings?
A. I did.
Q. And what findings did you find at the time that you examined Mr. Katzenmeier on the initial evaluation in February of 2006?
A. Well, I made a list of the clinical findings and diagnostic findings as of that date. Would you like me to list those?
Q. Yes, sir, if you would, please.
A. Okay. No. 1 was traumatic fractures of the anterior and posterior walls of the frontal sinuses.

No. 2 is traumatic fracture of the ethmoid air cells.

No. 3 was traumatic fractures of the nasion displaced superiorly into the frontal sinus and the bilateral nasal bones with fracture of--displacement to the right.

No. 4 was traumatic fracture of the frontal bones.

No. 5 was post-traumatic frontal bone [sic] fracture with fracture displacement of the frontal sinuses.

No. 6 was fracture of the hamulus for the superior

oblique muscle of the right eye.

No. 7 was traumatic oblique fracture of the proximal phalanx of the thumb with a comminuted fracture and tendonous laceration of the right thumb.

No. 8 was current X-ray examinations of the right thumb on September--on January 9th, 2006, confirms a persistent fracture representing a nonunion and cortical defect.

No. 9 was traumatic facial lacerations with traumatic facial burns and traumatic tattooing by black powder.

No. 10 was traumatic fracture extending into the cribriform plate with pneumocephalus.

No. 11 was post-traumatic open skull fracture with right frontal lobe hematoma.

No. 12 was traumatic injury to the left ear resulting in tympanic membrane rupture with persistent tinnitus, hearing loss in the left ear, and intermittent balance disturbances from traumatic vestibulitis.

No. 13 was post-traumatic diplopia.

No. 14 was post-traumatic injury to the right eye resulting in epithelial defects of the right eye, conjunctival and pericorneal regions.

No. 15 was post-traumatic anosmia with the loss of sensation of taste and smell secondary to his post-traumatic cribriform fracture and severe localized trauma to the nasal structures.

No. 16 was post-traumatic stress disorder with associated personality change, mood swings, episodes of anger and outbursts, causing negative impact upon his social, family, and interpersonal relationships.

No. 17 was post-traumatic airflow obstruction involving his right and left nares.

No. 18 was post-traumatic voice change to nasal tones, secondary to his traumatic injuries and surgery.

No. 19 was post-traumatic clinical depression due to the loss of functional life, function activities of daily living, and the presence of self-consciousness due to post-traumatic disfigurement and scarring.

Q. You mentioned No. 9 on that being the lacerations and burns and injuries to his face; is that correct, sir?

A. Yes, sir.

Q. If I call your attention to Exhibit 31A, of the large notebook again, are you familiar with those series of photographs beginning at 31A going 1 through 7, sir?

A. Yes, sir. These were the photographs that I had at the time of my initial examination and which I used in the course of preparing my evaluation report.

Q. Were those particular photographs also the ones that were found within the record from Iowa University Hospital?

A. They were.

MR. SPARKS: Your Honor, may I show a few of these

pictures to the jury, please?

THE COURT: You may. I believe they were Category A exhibits.

MR. SPARKS: They are Category A, yes, sir.

BY MR. SPARKS:

Q. Doctor, are these some of the photographs that you utilized when you were looking at and preparing your report in terms of the different types of structural injuries that you saw on Mr. Katzenmeier?

A. They are.

Q. We're going to go through a couple of them, but if you would take a moment, and that one there-- I don't know if it's the first one in your book or not. Is it, sir?

A. Yes. It's listed as 31A, I believe.

Q. All right, sir. When you take a look at that, sir, what do you see, from the physician's standpoint, on that particular photograph that led you to certain conclusions and opinions and certain findings that were on X-ray that you have reviewed?

A. Well, there was obvious clinical evidence here from a dermatological standpoint of serious facial injury, lacerations, contusions, abrasions. Several of the areas have been sutured. There's stippling here from tattooing processes. This would be indicative of a serious facial injury.

Q. Doctor, is your understanding that these were all taken at the University of Iowa Hospital--

A. Yes, sir.
Q. --on either October 2nd or October 3rd?
A. Yes, sir.
Q. All right, sir. After you examined Mr. Katzenmeier in that particular examination that occurred on or about February 15th of 2006, and you have identified those 19 areas that were being treated or had been treated or issues which had arisen as a result of this incident, when did you next see Mr. Katzenmeier on our request?
A. I evaluated him at your request on July 10th of 2008.
Q. And that would have been how long, sir, after his--your last examination of him?
A. It's roughly 2 1/2 years after his injury.
Q. And you also had an opportunity to review additional treating medical records at that time; is that correct; sir?
A. I did.
Q. And if you would briefly identify what records you relied upon at that time that you saw Mr. Katzenmeier on July 10th of 2008.
A. Well, I saw additional records from University of Iowa Hospital and Clinics; records of Dr. Goins; records from the Department of Otolaryngology at the University of Iowa Hospitals; records from the ophthalmology department and clinic from the hospital; several operative reports, one by Dr. Goins; and records from the ophthalmology clinic on a number of

occasions.
Q. Was the last operative or treatment report that you looked at sometime in June of 2007; is that correct, sir?
A. Yes, sir.
Q. And so from that date until the day you saw him, approximately 12 months had expired or a year; is that correct?
A. Between the last ophthalmology clinic examination and my evaluation, it was slightly over one year.
Q. And during that examination that you performed, sir, did you find some improvement in certain areas concerning Mr. Katzenmeier's condition?
A. I did as I compared it back to my prior examinations.
Q. And what areas of improvement did you find over that length of time at that time?
A. The things that I found that represented areas of improvement were the ringing that was in his left ear from his traumatic left ear rupture had resolved.
He had some improvement in his fine motor movements of his thumb and fingers. Before, when I first saw him the initial time, he was having difficulty using scissors, zipping up his drawers and buttoning his buttons, and that had absolutely improved as far as the fine motor movement types of activities when I saw him the second time, 2 1/2 years after his injury.
When I initially saw him, he was having--he had not attempted to re-enter some of his social activities and

recreational activities, but when I saw him back in July of 2008, he indicated he was attempting to re-enter social activities; softball, trying to get back into doing some hunting and trying to do some of his taxidermy work. So that represented an improvement in his interface with some of his activities, vocational and social activities.

And he also had less eye pain when I saw him. He had had three additional surgeries somewhere between our visits, and the surgeries were conducted to reduce some of their--the tethering of the eye.

So you have scar tissue on his right eye that was coming from the conjunctiva and underneath the lid and it was attaching to his globe, and when that locked up in certain positions he had double vision and had a lot of pain with it. He went through three additional surgeries, and I believe those were outpatient surgeries, to get rid of some of that scar tissue.

So his eye pain was less but he still had some fatigue and weakness in his eye, and he said at the end of the day his eye was pretty tired and fatigued.

Then the other--the fifth area that I found that there was some improvement between visits was the post-traumatic stress disorder symptoms of flashbacks, nightmares, and those kinds of intrusive dream things had become markedly less frequent.

Q. You would have expected to find some improvement in those particular areas, would you not, Doctor?
A. To which one, now?
Q. In any of those areas, you would expect to find some improvement over almost 2 1/2 to 3 years; is that correct, sir?
A. Well, I don't think in medicine you can anticipate anything. I was glad for his--from his standpoint, to see those things happening, but I think it's-- You know, doctors always expect the worst and pray for the best, but to see him improve in those areas was gratifying for me.
Q. But you also saw that he didn't improve in other areas, didn't you, sir?
A. That's correct.
Q. In fact, you found some areas in which he had actually regressed in; is that correct, sir?
A. Well, I found some areas, when I examined him, that stayed--that were the same, and there was at least another area, as far as the bad fractures he had up here in his forehead, that appears not to have healed properly.
Q. On that examination that you had in 2008, did you have certain diagnostic tests performed?
A. I did. I had X-rays of his skull and facial bones conducted on the date that he was seen last at my clinic.
Q. And were you provided a report from those X-rays, sir?
A. Yes, sir. I had the radiologist send me a report on the

X-ray findings.
Q. Did you also look at the X-rays yourself, sir?
A. I did.
Q. I would call your attention, sir, to Tab No. 27, if you would, for a moment.
Excuse me. 26. I apologize, Doctor. Tab No. 26. And if you'd take just a moment to look at it, can you identify that document, sir?
A. Yes. These are the X-rays that I referred the patient to at the Premiere Imaging facility in Tulsa, Oklahoma.
Q. And is that the report that was prepared?
A. Yes, sir. This is a report by Dr. Bokal, a board certified radiologist, who had the films conducted.
Q. Now, I inadvertently have not walked over to the box and picked those up, and I'll do that after the break, but you also have possession of those X-rays, which you brought here to Iowa today; is that correct?
A. That's correct.
Q. And, Doctor, when you looked at those X-rays and you reviewed that report, what did you find clinically significant about those films and your examination and evaluation of those films?
A. Well, one of the--one of the issues that Mr. Katzenmeier did not get better with between our visits was the persistent facial pain and head pain and nasal pain, and I think that these X-rays

gave some light into why that's going on.

If you look at these X-ray reports, there was an area of incomplete fusion in the frontal bone area where the fractures were. Now, they put those little metallic titanium plates in there to attempt to get the bone close together so it will fuse and heal and the bone will grow together, form callus, remodel itself, and actually to have a healed fracture, but the X-rays here would indicate that there was less than a complete fusion of that frontal bone fracture.

The other thing that we saw with these X-rays was that the proximal portion of the nasal bone had showed no evidence of an osseous union or a healing process. And that would be the fractures that were deep inside, up--right up towards the skin here, where the nasal bone first comes off of the skull (indicating). And that bone was still fractured, and it had not healed yet.

Q. So since October of 2005, that bone had not come to a healing process in July of 2008, when you had it examined and X-rayed?

A. That's correct.

Q. And he still had not had a full complete fusion or healing process of the frontal part of his forehead where the titanium plate was, if I understand your testimony, either; is that correct, sir?

A. That's exactly what the X-rays would show.

Q. When you looked at those X-rays, were there any other areas of concern that you saw on the frontal facial examination?
A. Nothing other than the fact that he has those titanium plates in his head, but I don't think those are ones that are going to be removed at any time.
Q. Doctor, throughout-- And let me back up for a minute.
Do you hold any board certifications? And I meant to ask you that a while ago.
A. Oh, I'm board certified in the area of internal medicine.
Q. All right, sir. And you examine a number of people for occupational and work-related injuries for the court in Oklahoma at times, do you not, sir?
A. Yes, sir. Workers' compensation evaluations is probably the largest part of what I do in my practice of injury medicine.
Q. And as a result of that, when you look at these films and compare these films with the records you have, do you have an opinion as to whether or not the nose fractures you were talking about, the nasal fracture, will heal any time in the near future, based upon what you have seen in its current clinical picture?
A. No, it's not gonna heal at any time at that point. If it's not healed in 2 1/2 years, then it's not going to go on and heal spontaneously from this point forward unless there is something done, additional surgical procedure.
Q. Would that also be true of the plates in his forehead, sir,

where the nonunion exists there?
A. You would expect a good fusion to be very sold 2 1/2 years after the accident. Since it's not, I would say that that's a worrisome area that's going to be a chronic and permanent problem for him.
Q. Did you receive or review any medical records or take any history from Mr. Katzenmeier that would indicate that he had sustained any additional traumatic or new injuries to his face area since the date of the original injury?
A. Have not.
Q. So you have nothing to say or base your clinical opinion on, other than it's just simply not healing; is that correct, sir?
A. Yes, sir.
THE COURT: Shall we take our midafternoon recess?
MR. SPARKS: If you would, sir.
THE COURT: Members of the jury, we're going to take our midafternoon recess at this time. We'll be in recess for 15 minutes. During the recess period, please bear in mind the admonition.
(In open court, out of the presence of the jury.)
THE COURT: Mr. Singer, one thing I meant to ask you earlier, those little snippets from Mr. Muniategui's--that's the best I can do--deposition that you wanted to offer at some point, both as it relates to other incidents and the explanation for the testing that was done, could you either make a copy of

those for me so I can take a look at them this weekend or--

MR. SINGER: Yes, Your Honor.

THE COURT: --just leave the transcript with me?

MR. SINGER: Yes, Your Honor. We can do that.

MR. REYNOLDS: I took it back to the office.

MR. SINGER: I don't have it here, but I can run over to the hotel and get it.

THE COURT: Well, no. Don't do that now.

MR. REYNOLDS: After court I can run--

THE COURT: Just fax it in. It's only a couple pages, right?

MR. SINGER: Few pages, yes.

THE COURT: Just fax it in. But mark it somehow so I can see what you're talking about.

Do you know what I'm talking about?

MR. EATON: No.

THE COURT: Remember the little snippets in the deposition of Mr.--

MR. EATON: Mr. Muniategui?

THE COURT: --Muniategui that he wanted to get into yesterday and I said we'd think about it later? I'd like to look at those, so he's going to fax those to me--

MR. EATON: I got it. I understand.

THE COURT: --that part of the transcript.

MR. EATON: Sorry I went to sleep there for a second.

THE COURT: See you in 15 minutes.

MR. SINGER: Your Honor, could we have a moment just before you leave?

THE COURT: Sure.

MR. SINGER: Before the jury comes back, Judge, and this is certainly not that big of a deal-- I just spoke with counsel. I don't know that this witness is going to be that much longer today, and I understand from counsel that after this they're going to play the deposition of Mr. Aitor Belategi--

THE COURT: Right.

MR. SINGER: --or begin it, because it's about two hours long.

MR. WISE: About an hour and 40 minutes.

MR. SINGER: Pardon me?

MR. WISE: Hour and 40 minutes.

MR. SINGER: Hour and 40 minutes. I don't want to impose on the Court, but we had talked about this in scheduling at the initial pretrial conference. The only plane we can catch is 5:40 or we go tomorrow, and I didn't know what the Court would think about breaking at maybe about 4:30 or maybe 20 till today to try to let us get there and catch a break.

THE COURT: I'll certainly do that.

But while we're on the subject, how are we coming in terms of your schedule?

MR. SPARKS: Actually, if we had the other videos,

we'd play them, from the doctors from Iowa City, today instead of Mr. Belategi. So we're waiting for delivery. If they get here before that time, we'll play them instead.

THE COURT: But you're rolling along?

MR. SPARKS: We'll probably move right along. Probably Tuesday for sure.

We're going to stay and help the Iowa economy this weekend. I'm disappointed Mr. Singer's not going to do the same. I'm going to be doing my Christmas shopping out at the Jordan Mall, so I think the Court should make him stay a little longer is what I think.

THE COURT: Well, I can understand why somebody from Georgia wouldn't want a weekend in Iowa.

MR. SINGER: I'll be keeping the clock at a 12-year-old's basketball game rather than shopping. Thank you.

THE COURT: We'll adjourn, then, at 4:30.

MR. SINGER: Thank you, Your Honor.

THE COURT: Is that all right?

MR. SINGER: Perfect.

(Short recess.)

(In open court, in the presence of the jury.)

THE COURT: Please be seated.

Mr. Sparks.

MR. SPARKS: Thank you, Your Honor.

BY MR. SPARKS:
Q. Doctor, I mumbled and fumbled and lurched along a while ago and forgot to do a few things because I was worried about that break time.
Let's go back to the X-ray exhibit and the X-ray report, which is Exhibit 26. You had those ordered on your behalf; is that right?
A. I did.
Q. And you have reviewed them and relied upon them in the ordinary course of your business; is that correct?
A. I have.
Q. And you have the films here with you today?
A. I do.
Q. And the report--and the report there?
A. And the report, yes, sir.
Q. And you relied upon it in formulating your opinions and telling this jury some of your opinions about those X-rays a while ago; is that correct?
A. That's correct.
MR. SPARKS: Your Honor, I'd move to introduce Exhibit 26, being both the report from the MRI, Premiere Imaging Center and the X-rays themselves.
MR. REYNOLDS: Your Honor, we object. It's hearsay, and it will be cumulative with the doctor's testimony.
THE COURT: Just a minute.

MR. SPARKS: It's Exhibit No. 26, Your Honor.

THE COURT: All right. I will receive both exhibits for the purposes of this witness' examination in the courtroom for now. I'll sustain the objection with regard to going back to the jury, but you may have free use of them to publish them in the courtroom.

(Plaintiffs' Exhibit No. 26 was offered and received in evidence.)

MR. SPARKS: Your Honor, I appreciate the Court's ruling. Could I make and interject one thing that the X-rays themselves would not be hearsay, but the report would be, and that they be allowed to go back to the jury room.

THE COURT: I'll give you my reasoning.

MR. SPARKS: All right, sir. Thank you, Your Honor.

BY MR. SPARKS:

Q. Doctor, you have the X-rays there and the report, and you've relied upon them here today; is that correct?

A. Yes.

Q. We'll take a moment, and you indicated a while ago--and see if my technology will work again--that there were fractures in the front part of the skull and fractures in the nose bone area; is that correct?

A. Yes, sir.

Q. If you would be so kind to stand up and point out where those five plates were installed that you have seen on the

X-rays and where the nonunion exists in his skull area.
A. Yes, sir. This is the nasal bone here, and that's the bone that was fractured and has not healed. And the fracture up here, it was in the frontal bone. That's the portion right here. And there are five titanium plates up there, and that is the area that's a bit overlapped on the X-ray and has not healed properly at this point. (Indicating throughout.)
Q. And so those areas are still under some consideration of-- Well, strike that.
Let me do it this way: This is the area which has not healed and has not gotten well since the incident occurred in October of 2005; is that correct?
A. That's correct.
Q. Now, throughout the day, earlier this morning from Dr. Bauman and you made some indication still of his inability to smell and taste, we heard words about the cribriform plate and the cribriform bone. Can you point that out for the ladies and gentlemen of the jury?
A. Yes, sir. If I can orient, obviously, here's the mouth. This is the nasal cavity here, and at the very superior portion of the nasal cavity is the cribriform plate, which is this plate right here, and directly above that is where the brain sits, the frontal lobe of the brain. (Indicating throughout.)
Q. Is that the plate that was fractured?
A. Yes, sir. It's one of the areas that was fractured was this

plate right here (indicating).
Q. Now, in that plate and in that area that you were talking about where the cribriform is, we also heard and looked at-- Let me see if I can get this to do this correctly, because I'm not sure that I can-- There we go.
That's a view of the lateral wall of the nose, and can you orient the jury as to what you see there, Doctor?
A. Yes. Could you move that just a titch more?
Q. I'll try.
A. That will let us get a baseline there that this is the oral cavity here. This is the tooth here, just for purposes of orientation.
And this is the nasal cavity here, and this is the cribriform plate, and I don't know if you can see that well enough from where you're sitting, but there are little lines going vertical, which are, in fact, the olfactory nerves that are penetrating through this bone structure.
Maybe if I stood on this side would be easier for me.
The way that the whole olfactory system works, as far as being able to smell, is that up in this portion of the nose on each side is about a dime-sized specialized group of neurons that are actually the receptors, and they sit there and they have little filaments that are out into the mucus, and it has molecules impacted upon those receptors. Then that information is transmitted along these nerves here, yeah, olfactory nerves.

You can see them here.

And then they penetrate up through this bone, the cribriform plate, and after they penetrate through they get to what's called the olfactory bulb, and the olfactory bulb sits on the bottom side of the frontal lobe of the brain. So here's the frontal lobe of the brain back behind your eyes, and the olfactory bulb is right there.

And relative to his ability to ever smell again, which is not gonna happen, he's had damage to the actual area where the receptors are located up here in the nose. He's had damage to the cribriform plate, fractures of the cribriform plate.

And this is the area of the frontal sinus up here, and that area was actually fractured, both the anterior, posterior tables of it, such that there was actually a hematoma or damage on the brain itself of the frontal lobe.

So we've got areas of damage to the olfactory receptors, we've got areas of damage to the cribriform plate with fracture, which is causing fracture along where those little nerve bundles are going through, and then we have damage up here at the level close to where the olfactory bulb is. So you've got the three major sites of transmission of olfactory or smell information from the nose to the brain.

Because after the-- If you successfully-- In a normal person, as this impulse comes up here, after smelling something and it gets to the olfactory bulb, that's the weigh

station. And from there it spreads out around the brain, crosses over. There's all kinds of connections, and it ends up here in our head in what is called the somatosensory cortex.

Because most smells that we learn as an adult are smells that we figure out in regards from growing up, and the human body can--human person can identify over a thousand different smells, it's those learned types of things.

So the whole concept of smell and taste is so interrelated that if you can't smell, you won't be able to taste. And it's a little technical to say that, but if you look at what we actually taste on our tongue, there are receptors on there that taste salt, sweet, bitter, and sour smell--tastes. Now, there are also fibers in there that will taste hot and cold and spicy types of things, but those are more sensory fibers than they are in the taste buds.

So when we think about tasting something, we're not tasting. Last night I had a steak, okay? I'm tasting the salt of the steak, and that kind of stuff, but the actual taste that my brain told me it was a steak was because of what I was smelling.

And when you take in food in here-- Well, before you get the food in your mouth, obviously, the aroma is going to strike--those molecules are going to strike up here and start the process, and when you start to masticate food, that releases more of those molecules of smell--for smell.

They run up the back side, because there's an opening back up here, and they go directly upstairs. They hit on the olfactory mucosa as well. So it's sort of combined thing.

So even if you blindfolded somebody, put a clamp on their nose, and put a piece of steak in their mouth, they'd figure it out, after they started chewing on it a while, because the taste would come back up this way and activate the olfactory system.

The problem with Mr. Katzenmeier is he's had damage to all three major areas, and the chances for any regrowth of these little microscopic nerves through this bone is almost negligible. (Indicating throughout.)

Q. You examined him again in July of 2008?

A. Yes.

Q. Did he give you any indication he had increased his ability to taste or smell any better than he had when you examined him in 2006?

A. I found no evidence that there had been any improvement in that particular area.

Q. Doctor, as you examined him in July of 2008, what were his complaints that he gave you?

And, again, when I use the word "complaints," Dr. Bauman also said "symptoms," but what were his complaints or symptoms that he gave you in July of 2008?

A. His complaints-- Can you hear me okay?

Q. Yes, sir.
A. His complaints were that of substantial loss of a sensation of taste and smell. He said he indicated he could recognize certain smells that include very strong smells, like turpentine or gasoline, but he had marked reduction in his sensation of taste or smell for--relative to food products.

He's not able to tell if foods are sour or rancid. He found that very frustrating. Because of his permanent loss of taste and smell, he was making alterations in what he eats and attempting to find a substitute, and he found that changing the texture of his food and going to food that was hot and spicy was an alternative that he was attempting to utilize because he couldn't smell, taste food that he normally routinely enjoyed.

Mr. Katzenmeier has been a very avid hunter and fisherman for a long time, and he indicated he no longer can tolerate eating the game he's trying to secure by these recreational pursuits. And I believe what he said, it tasted like mush in his mouth. So what he's gone to is trying to eat stuff that's very crunchy or very spicy as an alternative.

He was still experiencing mood swings, personality changes, occasional outbursts of anger he did not have before his injury. He was still depressed and angry over his permanent loss of function.

He was having a lot of facial pain, nasal pain, nasal breathing problems, and was still somewhat self-conscious about

the disfigurement, scarring his face and those obvious areas.

The ringing in his ears had resolved at the time of this examination. He did have periodic episodes of dizziness, and he did have some persistent hearing loss in the left ear.

He still had pain involving his right hand and thumb, complained of weakness when attempting to make a fist or grasp objects, but he did indicate he had improvement in applying motor function of certain activities. I listed those, being able to zip a zipper and use scissors, and those kind of things.

Q. When you saw him, with his right hand, did you do any type of testing on it, sir, in comparison to the left hand?

A. Yes, I did.

Q. What type of testing did you do, Doctor?

A. Well, the type of test I did on his right hand was to--excuse me--identify the scars, which were over the thumb, primarily. I evaluated his thumb for mobility, and he had reduction in motion of his MCP joint, which is here in the thumb.

His wrist was stiff and not fully flexible, and the grip strength involving his hand using a dynamometer, which is a hand grip strength device for an objective measurement, was reduced for his age and was actually less than his left hand by about 50 percent.

And the pinch strength in his thumb and finger, we call that the T-1 pinch strength, thumb and then the first index

is T-1, his pinch strength had improved from 3.5 to 5.0 but was still weak compared to his left hand.

Q. What is a goniometer, Doctor? What is that?

A. Well, actually it's a dynamometer.

Q. Dynamometer?

A. It's got a dial on it and a hand grip thing, and it converts the hand grip into a dialed number. I always report it in kilograms, because that's how most of the textbooks of the American Medical Association certify, using the kilograms.

But it actually gives us some objective finding. You actually put your hand on their forearm when they're doing the forceful gripping to make sure they're giving full effort, because if you don't feel the forearm contracting, you know they're not giving full effort. So there's sort of a guide to make sure the person's giving their best efforts.

Q. When you performed that examination, was Mr. Katzenmeier giving you his best effort?

A. I'm sorry?

Q. Was he giving his best effort when you performed that examination?

A. Oh, yes, sir. I thought so, yes, sir.

Q. And did you find that-- Do you know if he's right- or left-handed, sir?

A. He's right-handed.

Q. And--

A. And--

Q. --your findings were that--were his right hand as strong as his left hand, sir?

A. His right hand-- I'll give you the exact numbers here in a second.

The grip strength on the right hand measured in kilograms was 30 kilograms of grip strength. In his left hand, he had 67 kilograms of grip strength.

Q. So significantly less grip strength in his right hand than his left hand is what your tests would indicate; is that correct, sir?

A. Yes. Less than half in his dominant hand compared to his nondominant hand.

Q. And that is now some two-plus years after the injury; is that correct, sir?

A. Yes, sir.

Q. Doctor, after you examined him, reviewed the X-rays, reviewed all the other specific information that you have had at your disposal over both the first and second examinations, were there any types of recommendations that you would have for Mr. Katzenmeier concerning any future need for medical treatment?

A. Well, what I recommended to him-- And I was seeing him as an consultant, and we'd spread out these examinations such that enough time would have reasonably elapsed between my

examinations to expect the patient to be at a point of completion of his protocols.

However, there were a number of recommendations as far as follow-up evaluations that I made for him that included ongoing follow-up evaluations regarding his visual injuries, ongoing follow-up examination with orthopedics regarding his hand and thumb injuries, and ongoing follow-up examination by the board certified ear, nose and throat people who had done the surgery on his head and face.

Q. So, in your opinion, he's going to require continued follow-up in terms of medical care on, what, a yearly basis?

A. Yes.

Q. For about how long, sir, in your estimation?

A. Well, I'm not doing the follow-ups. Whatever doctors he will choose would do that. I would assume that it would probably be prudent to go kind of extended on this facial stuff because he still has those nonhealed fractures.

The last X-ray that I looked at involving his thumb, back in January of 2006 was the last X-ray I saw, that hadn't healed yet. So I'm not even sure-- And I told my office staff to get X-ray of his thumb when he came to town in July, but they did not do it, so I can't tell you what it shows.

But the last one I had seen before that did not have--he did not have a healed thumb fracture. There was still a little bit of displacement in a linear vertical line that was

evidence of nonhealing.

So I think it's going to depend upon what ear, nose and throat doctor follows him, but certainly for the type of frontal injuries of fractures through both tables and actually to the point where you have created a skull fracture and they've gone into that frontal sinus and they've tried to get all the mucosa out and obliterate the mucosa by putting in the fat, there are a lot of physicians that would want to look at CAT scans for, you know, ten years every year.

Q. So those would be possibilities that his ENT doctors would recommend for him; is that correct?

A. That's a possibility, yes.

MR. SPARKS: All right, sir. Just a second, Doctor.

I don't have anything else at this time, Your Honor.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. REYNOLDS:

Q. Good afternoon, Dr. Hastings.

A. Afternoon.

Q. Late on a Friday afternoon, I know better than to have a lot of questions for you, sir.

As I understand it, you are an internal medicine specialist, you're board certified, correct?

A. Yes, sir.

Q. And you practice in Tulsa, Oklahoma?

A. I do.
Q. And at your deposition you told us, sir, that an internal medicine doctor deals with evaluation, diagnostics, diagnostic evaluations, and treatment of patients, correct?
A. Yes, sir.
Q. Now, most recently, you understand that Mr. Katzenmeier has been treated and evaluated and diagnosed at the University of Iowa Hospital and Clinics, correct?
A. Yes, sir.
Q. And are you aware of the fact that the UIHC is what is known as a tertiary care center?
A. Yes.
Q. What does that mean, a tertiary care center?
A. Well, it's a care center that supplies an additional expertise level of physicians, generally in big medical centers. The Mayo Clinic's a tertiary care center, the Dallas hospital is a tertiary care. So it's a more scientific, academic expert kind of an area relative to a community-based hospital.
Q. To your knowledge, does the University of Iowa Hospital and Clinics have a good reputation as a teaching hospital and as a tertiary care center?
A. I would have to say, being a former Iowa boy, that I think they do.
Q. In fact, I've heard some people actually compare them, from time to time, with the Mayo Clinic. Have you also heard that

from patients?
A. I haven't heard that. I know one time I came down with something funny in my chest and they thought maybe I had lymphoma or cancer or something, and they cut me open, took the pieces out, and found out it was a thing called sarcoidosis, and so I am now the Oklahoma expert on that condition.
But there were two places in the country that provided the best care for that interstitial lung disorder that was associated with that, and one was University of Iowa, and the other one was the Jewish National Respiratory Center in Denver.
Q. Okay.
A. So they--in certain areas, I think that they are leaders in what they do as far as medicine.
Q. Very good, Doctor. One of the things you did, of course, was to review a fairly thick stack of medical treatment records for Mr. Katzenmeier, correct?
A. I did.
Q. Based on your review of those records, and I presume most of those came out of the University of Iowa Hospital and Clinics, are you critical to any degree or extent whatsoever of the evaluations that Mr. Katzenmeier has had in Iowa City?
A. No. I wouldn't take any exception to any of the physicians that were treating him in Iowa City.
Q. Are you critical to any degree or extent whatsoever of any of the diagnostic evaluations that were done of Mr. Katzenmeier

in Iowa City?
A. No.
Q. Or any of the treatment that was given and/or recommended to him?
A. No. From what I can see, that there was a good team of physicians doing their very best for this person.
Q. As I understand it, the practice of internal medicine does not involve or include surgical care of patients; is that correct?
A. I do not practice any surgery. I mean, when I was running the intensive care and the coronary care units in Tulsa, I did pacemakers and chest tubes and, you know, cracked chests, and those kinds of things, but I don't do formal surgery and take somebody in the operating suite. Everything is on emergent basis only.
Q. Now, before this case you knew Mr. Gary Eaton as a lawyer in Tulsa, Oklahoma, correct?
A. I did.
Q. And the same with regard to Mr. Bill Sparks?
A. Yes.
Q. And before this case, did you know both Mr. Eaton and Mr. Sparks as attorneys in Tulsa who, from time to time, would refer patients to you?
A. Yes, sir.
Q. And I think you told us in your deposition that over the

last three years Mr. Eaton and Mr. Sparks have sent approximately 30 to 40 of their clients to you for evaluation; is that correct?
A. Yeah. I think what I stipulated in the deposition is I don't have that kind of demographic information--information available, so I don't want to say something on the record that may be inaccurate. Could be more, could be less, but that's an estimation.
Q. Okay. And, as I recall, you told us--or at least I know from reading the deposition that 80 percent of your work at the Harvard Medical Clinic-- Is that the name of your clinic?
A. Yes.
Q. And that's not really associated with Harvard University in Cambridge? I mean, that's Harvard Boulevard or Harvard Avenue in Tulsa, right?
A. Yeah. I wish it was Harvard University, but it's not. My clinic's on Harvard Avenue, so I picked a very unique name and called it Harvard Medical Clinic.
Q. But as I understand it, 80 percent of your work, Doctor, at that clinic is looking at patients that are involved in some form or fashion in a litigation or a lawsuit or a legal claim, correct?
A. Well, I'm not sure if I said it that way. I would say 80 percent of the people I see have some associated injury. I think maybe-- If I didn't clarify at my deposition, I

apologize, because some of the people I see are just walk-in patients with car wrecks. And I have a pretty good practice in veterans. I treat a lot of the guys coming home from overseas that have some serious medical problems.

But I would say that if you include those in that same group, some of these people aren't--don't have attorneys, some do. I would say most of them probably do.

Q. Okay. And then of the ones that do, I think you told us that 95 percent of those people would be plaintiffs or claimants or people that would be filing lawsuits or claims against other people or companies, correct?

A. Yes. We have an open-door policy, but at present the vast majority, in the 95 percent range, maybe even more that--don't hold me to the exact numbers--are represented by attorneys.

Q. Now, you first saw Mr. Katzenmeier on February 13th of 2006?

A. Yes, sir.

Q. And which doctor from Iowa City was it that referred him to you?

A. No. I think that I made it clear in my deposition that he was referred here by his attorney.

Q. And was that Mr. Eaton and Mr. Sparks?

A. Yeah, I think so.

Q. So it was an attorney referral rather than a physician referral?

A. Yes.

Q. And then you saw him, examined him, evaluated him, determined the extent of his difficulties, tried to look at where his problems stemmed from, considered his potential problems in the future, and made recommendations for additional treatment or additional diagnostic testing, correct?
A. Yes.
Q. Was there anything, in your view, that Iowa City had left out or forgotten about that you thought they should have ordered or should have done in terms of additional treatment or additional diagnostic therapy?
A. Well, if I were the treating doctor in this case, I probably would have had the psychiatric evaluation conducted. I'm pretty sure that I would have had X-rays of his skull conducted. Somewhere during this, I probably would have had more X-rays of his hand to confirm a completion of that healing process.
I'm saying this just as what I would have done if he was living in Tulsa and he was my patient.
Q. Or kind of with the benefit of hindsight, if you will?
A. Well, yes. I didn't see him for a couple years later, and I think the doctors up in Iowa City were doing a fine job. I didn't see that I could do anything to add to the program.
Q. And when you saw Mr. Katzenmeier, that was approximately four months after the accident, correct?
A. Yes.
Q. Was he still being followed by an orthopedic surgeon in Iowa

City?
A. I don't recall the answer to that.
Q. Was he still under the treatment of an ENT, an ear, nose, and throat specialist?
A. He was still going to the--I think he was still going to ear, nose and throat clinic and to the eye clinic. I think the last X-ray that I recall, from memory-- As you get a little older that gets a little harder.
Q. I've got the same problem.
A. But I think the last X-ray that I recall was in January of '06 on his thumb. I don't know that I've seen anything since then. So that would have been about a month before I saw him.
Q. And then the eye doctor, that would be an ophthalmologist in Iowa City, correct?
A. That's correct.
Q. Now, before you saw Mr. Katzenmeier, did you talk to any of his doctors from Iowa City?
A. No. I didn't--I didn't communicate with his physicians in Iowa City at any point during my evaluations of this patient.
Q. And have any of his doctors in Iowa City ever contacted you for any reason with regard to this patient?
A. No, they have not.
Q. It looks like, from your report, one of the things you did, and I'm not sure it was after the first visit or the second visit, but you did have him sent out for some X-rays?

A. That was the last time I saw him, in July of 2008.
Q. Did you see in the medical reports where CT scans were done in Iowa City?
A. He had a lot of CT scans done.
Q. Did you ever review those films? I mean, did he bring those with him for the doctor visit or did you contact the doctors to actually look at the CT films or images so that you could see those for yourself?
A. Didn't have those the last visit, and then it's been 2 1/2 years or so since I saw him the first time, but I don't really recall.
Q. What about did he come with any X-rays from Iowa City and/or did you review any X-rays or radiographic films from his treatment in Iowa City?
A. I recall at some point I've seen some films, but I don't--I don't exactly know what I saw.
Q. Okay. The fact that you sent him out for X-ray studies at your request, you didn't mean to imply that there was anything bad or insufficient with the films from Iowa City, did you?
A. No, no. I think what I was doing when I saw him the last time, 2 1/2 years later, I was trying to find out if we were at a point of, you know, full healing of his facial fractures, full healing of his hand fractures. And I apologize for not getting his thumb X-rayed. It was supposed to have been done. Mine was just more of a completeness to my examination, trying to see

where we were at with the final X-rays.
Q. Very good. And then the second visit was on July 10th of 2008, Doctor?
A. Yes, sir.
Q. And did you ever prescribe any medicine for Mr. Katzenmeier, based on your evaluations, after either the first or second visits?
A. No, I did not.
Q. Did you ever prescribe any physical therapy?
A. No, I did not do that.
Q. Did you ever give him any kind of a work excuse?
A. No. When I saw him the first time, I believe he was right at the point of going back to work or had just started back to work or was anticipating going back to work. I mean--
Q. Is it possible he went back to work initially light duty or part time, possibly?
A. I suspect I made a comment about that. I don't recall it independently at this point, but--
Q. I think my question was did you give him a work excuse, and you said no.
A. I did not give him a work excuse, no, sir.
Q. And did you ever at any time make any contact with his employer?
A. No, I never have.
Q. Okay. In your practice on a day-to-day basis, Doctor, if

you see a patient with a specific eye problem, do you customarily refer those patients to ophthalmologists?
A. Well, depending on the nature of the problem. If they have something that I think warrants an ophthalmologic examination, I will, if they've got a structural problem or some type of, you know, abnormality of a pupil area, movement or something. If they've got simple infections or conjunctival infection or some type of pinkeye, I'll just treat this.
Q. Okay. And if a person had a specific problem with their nose, ear, or throat, you might refer that patient to an ENT? And, I mean, I would presume you've done that in the past?
A. Yeah. Normally what I do in my clinic, since we're set up-- My big joy in medicine is figuring things out. I like to be the Sherlock Holmes person, sort of. And I would probably--if a person came in with some type of nasal thing, I would probably do the examination, get a history, run whatever kind of diagnotic tests I thought were proper, X-rays, CAT scans, try to figure out what it was before I just, you know, sort of obliquely sent them to the ENT guy.
Q. And the same answer, essentially, with regard to an orthopedic problem; you'd get a history, go basically as far as you could go as an internist, and then make the referral to the orthopedic surgeon?
A. If I felt that it was necessary, yes, sir.
Q. The X-ray films that you sent Mr. Katzenmeier out for, were

those actually read and interpreted by a board-certified radiologist?

A. They were.

Q. Did you do any work on Mr. Katzenmeier's case between March of 2006 and July 10th of 2008?

A. I don't recall that I did anything in that interval as far as any specific work on his case.

Q. With regard to his eyes, you told us in your deposition that you did not do a slit-lamp examination, correct?

A. That's correct.

Q. And you did not dilate his eyes, correct?

A. That's correct.

Q. Did you check for pupillary response in both eyes?

A. I did.

Q. Were they--were both pupils equal and reactive to light?

A. They appeared to be normal at the last examination.

Q. And then you checked his visual acuity with a Snellen chart, and is that one of those charts that the eye doctor puts up on the wall and then has you--have you try to read the third line down from a certain distance?

A. That's correct.

Q. When you last saw Mr. Katzenmeier, it looks like the acuity that you measured in his injured right eye was 20/30. Does that sound correct?

A. That was correct.

Q. Were you aware of the fact that today he's 20/20 in his right eye?
A. I haven't checked him since July of 2008.
Q. And then his left eye was not involved in the injury, but did you measure the acuity in the left eye to be 20/20?
A. I did.
Q. Have you ever at any time prescribed any contact lenses or glasses?
A. I have not.
Q. By the history that you took and by review of the medical records, was there any indication of any loss of consciousness at the time of the accident?
A. I think his statement to me the first time I saw him, about four months after this, is that he was dazed but he didn't think he was unconscious.
Q. Okay. In your report you mentioned a possible leak of CSF, cerebrospinal fluid. Earlier today Dr. Nancy Bauman testified by videotaped deposition. She was the maxillofacial surgeon, and she confirmed that, in fact, there was no leak of CSF.
Sitting here today, assuming what I've just told you is true, do you have any reason to argue with Dr. Nancy Bauman?
A. I would say that she's entitled to her opinion. The basis for my opinion was--
Q. Was that from Dr. Sidwell at Iowa Methodist?
A. Yes. Sidwell, yeah. I believe he had said something there

was a CSF leak associated with a complex frontal and nasal fracture. That's where my information came from.
Q. Do you know, was that a suspicioned leak or a confirmed leak?
A. Don't know the answer to this.
Q. To your knowledge, was Mr. Katzenmeier ever or did he require any treatment by any neurosurgeon?
A. No, I don't believe a neurosurgeon's ever called in to see him.
Q. You have never at any time recommended any vocational retraining for Mr. Katzenmeier, correct?
A. That's correct.
Q. And you've never placed any work restrictions on him, correct?
A. I have not.
Q. With regard to the PTSD, now, you're not a psychologist or a psychiatrist, correct?
A. That's correct.
Q. Notwithstanding his PTSD, in your opinion, is he, nevertheless, able to work at Northern Natural Gas Company, to your knowledge?
A. Absolutely.
Q. And does that PTSD prevent him from working out or lifting weights?
A. No.

Q. Or taking trips?
A. No.
Q. Hunting?
A. No.
Q. Were you aware of the fact that he does bow hunting?
A. Last time we chatted, I believe he was--was--he'd been doing bow hunting for some time, and I believe he was back to bow hunting.
Q. Did you know that he played and had returned to playing in softball leagues?
A. I believe it was--that Mr. Singer told me that when we had our deposition here not too long ago.
Q. If, in fact, that's true, that he plays softball, I mean, that would involve, as a matter of common sense, swinging a bat, catching a ball, and throwing a ball, correct?
A. Yes, sir.
Q. Have you ever at any time prescribed any prescription medications for the PTSD or for the depression?
A. No.
Q. Have you ever prescribed him anything as a sleep aid?
A. I have not.
MR. REYNOLDS: That's all. Thank you.
THE WITNESS: Thank you.
THE COURT: Redirect?
MR. SPARKS: Just a few, Your Honor.

REDIRECT EXAMINATION

BY MR. SPARKS:

Q. Doctor, I call your attention to your earlier report of February 15, 2006. I draw your attention to page 2, item 27 on that. Would you take a moment to look at that.

A. What was the page again? I'm sorry.

Q. It would be on page 2, sir, of the February 15, 2006, report, item No. 27.

A. Yes, sir.

Q. And does that indicate to you, sir, that you had X-ray films to review and CT scans to review from--

A. Yes, sir.

Q. All right, sir. So you did review the films that had been taken of Mr. Katzenmeier between October 2nd and January 15th of 2006; is that correct?

A. Yes.

Q. At the same time Mr. Katzenmeier was treated by an orthopedic surgeon, an ophthalmologist, an ENT, was there anybody that was driving the bus as a general practitioner to coordinate this process that you saw in the records from Iowa City?

A. I didn't see any--I didn't see any general person with an overview. They primarily had their own units that they were taking care of.

Q. Did you see anybody within those records that addressed any

of his current physical impairments or problems that was in charge of his overall health?

A. No.

Q. Is that what you've attempted to do by looking at those various different records and examining this gentleman?

A. I have, yes. I have attempted to give an overview of where he came from, where he is now, and what his permanent problems are.

Q. And, in fact, what happens a lot of times, is it not, sir, at these large facilities and tertiary hospitals, trauma centers, that specialty groups handle individuals and that no one individual is in charge of their overall medical care; is that correct?

A. It's very common, having been to the Mayo Clinic a number of times, that they look at a very specific problem. If you get outside that particular focus, then you're not being taken care of on that other issue.

Q. Is it also a fair statement to say, Doctor, that your examination in 2006 and again in 2008 was not an attempt to render any medical treatment but an attempt to overall evaluate his current medical and physical condition, be able to establish what his impairments or limitations would be?

A. That's an accurate statement.

Q. All right, sir. Now, when you were asked a while ago about the cerebrospinal fluid leak, you had indicated earlier to the

ladies and gentlemen of the jury that he had a hematoma, is that correct, sir, on his brain?
A. Yes, he did.
Q. And that hematoma came from the blunt-trauma force; is that correct, sir?
A. Yes.
Q. And that was a result of you looking at the CT scan; is that correct, sir?
A. Yes.
Q. And the records that were proffered to you from the University of Iowa, which we all agree is a wonderful medical facility, correct?
A. It is.
Q. All right. When you looked at the Des Moines medical records-- I'm going to proffer to you for just a moment under Tab 33, if you would turn to that tab, at the bottom of the page on Tab 33, Doctor, there are a series of numbers and letters. One of them is KZ-DAM 00. It will be a series of numbers and letters like that.
Do you see those at the bottom of the page, sir?
A. We're on No. 33?
Q. Under Tab 33.
A. Yes.
Q. Do you see at the bottom of page a series of numbers and letters?

A. Yes.
Q. Would you turn to the one that says KZ-DAM 0035, sir.
A. Yes, sir. I have that one.
Q. Would you take a moment to look at this. Is this one of the records that was provided to you in your evaluation and examination of Mr. Katzenmeier?
A. It was.
Q. And would you take a moment to look under this heading that is called HEENT, and would you tell the ladies and gentlemen of the jury what that is?
A. That's the heading that refers to head, ears, eyes, nose, and throat.
Q. And, Doctor, as a physician, do you and your colleagues all rely upon the medical records which are produced and created by each of you in the follow-up and care of your patients?
A. Well, you must.
Q. All right, sir. And would you take a moment, sir, to read that paragraph, not out loud but to yourself, for just a second.
A. Yes, sir, I have.
Q. Is this one of the records that you relied upon to determine that Mr. Katzenmeier had what we call a cerebrospinal fluid leak?
A. Yes, sir.
Q. And what does that record say that you relied upon from the doctor here in Des Moines, Methodist Hospital, who triaged him

off the Life Flight?
A. Well, the pertinent part of this says under "Nose - the patient was dripping blood and cerebrospinal fluid from his nose."
Q. Okay. And that is the information that you relied upon; isn't that correct, sir?
A. Yes, sir.
Q. And earlier today, in Dr. Bauman's deposition, and I believe you had an opportunity to see it and to hear it also at some point in time, she indicated that the triage physicians would be the ones that would have cleaned him up and evaluated him at both Boone or Des Moines hospitals. Do you remember that, sir, in her deposition?
A. I do.
Q. All right. So the issue of whether there was cerebrospinal fluid leak and what you relied upon was a record created by a triage trauma surgeon at Des Moines Hospital here--or Methodist Hospital in Des Moines; is that correct?
A. Yes.
Q. All right, sir. You did not come here today, Doctor, with the intent of providing medical treatment, with the intent of providing prescriptions, with the intent of providing vocational rehabilitation services for Mr. Katzenmeier; is that correct, sir?
A. Not today, nor any of my visits previously.

Q. You came here with the intent to be able to take a look at him and the records and try to synthesize them in a little better fashion, be able to explain his impairments and problems that he's currently experiencing in 2008; is that correct, sir?

A. That's correct.

MR. SPARKS: That's all I have, Your Honor.

THE COURT: Anything further?

RECROSS-EXAMINATION

BY MR. REYNOLDS:

Q. Doctor, is it common, your experience, for a person who lives in Ogden, Iowa, to see a physician in Tulsa, Oklahoma in two different times four years apart?

MR. SPARKS: Your Honor, I object; outside the scope of my redirect.

THE COURT: Overruled.

BY MR. REYNOLDS:

Q. Do you recall the question?

A. Well, I don't understand some of the proceedings, so I answer that?

Q. Yes.

A. Oh, I don't know how things work everywhere. I see people from a lot of different locations in Tulsa. I don't think I've ever had one from Ogden, Iowa.

Q. You would never describe the physicians and staff at the University of Iowa Hospital and Clinics as a driverless bus,

would you?
A. No, I would not.
MR. REYNOLDS: Thank you.
THE COURT: Anything further?
MR. SPARKS: I'll let it go, Your Honor. Nothing else.
THE COURT: Counsel, before the witness steps down, would you come up here a minute.
(Side-bar conference off the record.)
THE COURT: You may step down, Doctor. Thank you.
THE WITNESS: Oh, thank you.
(Witness excused.)
MR. SPARKS: We're a little further than where we thought we were going to be, Judge, based upon what we had discussed while the jury was out.
THE COURT: Members of the jury, one thing the Court never objects to is when lawyers are going faster than they anticipate. And it is Friday afternoon, so I think what we'll do is we'll adjourn for the weekend at this time.
Now, remember the admonition given previously, and I'm going to emphasize it a little bit now. You know when you're home over the weekend you'll be talking to people, going to the grocery store, maybe to church and things like that, and somebody might ask you what you've been doing, and if you tell them you're on a jury, they might want to know a little bit

about it. And then you tell them a little bit about it, they may ask you some more questions, and sooner or later you find yourselves starting to talk about the case, and then that other person might give you their opinions as to what they think.

And that's why we ask you not to speak with anyone about the case, including your family members, until the case is all over, because the only evidence and the only things that are supposed to influence you are what you see and hear in the courtroom.

So during the weekend, have a good weekend, but please pay special care to obey the admonition given previously, and we'll see you Monday morning at 9 o'clock.

Thank you.

(In open court, out of the presence of the jury.)

THE COURT: I know you're going to want to cut out, but can I see you just for two minutes back in chambers on a couple quick matters?

MR. SINGER: Yes.

(Recess at 4:23 p.m., until 9:00 a.m., Monday, December 8, 2008.)

C E R T I F I C A T E

I, the undersigned, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that I acted as the official court reporter at the hearing in the above-entitled matter at the time and place indicated;

That I took in shorthand all of the proceedings had at the said time and place and that said shorthand notes were reduced to typewriting under my direction and supervision, and that the foregoing typewritten pages are a full and complete transcript of the shorthand notes so taken.

Dated at Des Moines, Iowa, this 27th day of February, 2009.

/s/ Kelli M. Mulcahy
CERTIFIED SHORTHAND REPORTER