IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| JON D. KATZENMEIER and JULIE KATZENMEIER, Husband and Wife, Plaintiffs, | |
| vs. | Case No. 4:06-cv-00169 |
| BLACKPOWDER PRODUCTS, INC., a Corporation, d/b/a CONNECTICUT VALLEY ARMS; and DIKAR S. COOP, Defendants. | TRIAL TRANSCRIPT<br>Volume IV |

Courtroom, Second Floor
U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa
Monday, December 8, 2008
9:00 a.m.

BEFORE: THE HONORABLE ROSS A. WALTERS, Magistrate Judge, and a Jury.

THERESA KENKEL - CERTIFIED SHORTHAND REPORTER

APPEARANCES:

For the Plaintiffs:

GARY A. EATON, ESQ.
WILLIAM E. SPARKS, ESQ.
Eaton & Sparks
1717 East 15th Street
Tulsa, Oklahoma 74104

For the Defendants:

JAMES E. SINGER, ESQ.
Bovis, Kyle & Burch, L.L.C.
200 Ashford Center North
Suite 500
Atlanta, Georgia 30338-2668

KEVIN M. REYNOLDS, ESQ.
NICHOLAS S.J. OLIVENCIA, ESQ.
Whitfield & Eddy, P.L.C.
317 Sixth Avenue
Suite 1200
Des Moines, Iowa 50309-4195

# I N D E X


| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiffs on an Offer of Proof: | | | | | |
| Troy Cashdollar | 425 (Eaton) | 436 (Singer) | | | |
| Eric Zenger | 451 (Eaton) | 463 (Singer) | 470 (Eaton) | | |
| For the Plaintiffs: | | | | | |
| Aitor Belategi (Via videotaped deposition) | 483 | | | | |
| For the Defendants: | | | | | |
| Aitor Belategi | 484 (Singer) | 550 (Eaton) | 613 (Singer) 626 (Singer) | 621 (Eaton) | 504 (Eaton) |


# E X H I B I T S


| PLAINTIFFS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 86 - CVA/BPI Eclipse rifle | 436 | |

| DEFENDANTS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| J-1 - Barrel drawings, Wolf | 499 | 499 |
| J-2 - Barrel drawings, Optima | 499 | 499 |
| J-3 - Barrel drawings, Apex | 499 | 499 |
| J-4 - Barrel drawings, Kodiak | 499 | 499 |
| K - Breech plug design drawings | 500 | 500 |
| L - Records of monthly testing | 525 | |
| S - October 2002 Dikar testing | 531 | 531 |
| T - Falling-block design documents | 495 | 495 |
| BB - Quality procedures for Dikar | 537 | |
| CC - Batch audit | 541 | |
| EE - Video of manufacturing process | 505 | 505 |

P R O C E E D I N G S

(In open court, out of the presence of the jury.)

THE COURT: We're outside the presence of the jury and it's my understanding that the plaintiff has two offers of proof to make with regard to two witnesses--is that right?

MR. EATON: Yes, Your Honor.

THE COURT: --that have to do with other incidents, and you may call those witnesses at this time.

MR. EATON: Your Honor, at this time the plaintiffs call Troy Cashdollar.

THE CLERK: Raise your right hand and be sworn.

TROY CASHDOLLAR, PLAINTIFFS' WITNESS ON AN OFFER OF PROOF, SWORN

THE CLERK: You may take the stand.

THE COURT: Mr. Eaton?

DIRECT EXAMINATION

BY MR. EATON:

Q. Would you state your full--you can turn your chair around, sir. That was me with the exhibit book, that's why it's turned around that way.

Would you state your full and correct name for our record, please.

A. Troy Cashdollar.

Q. Mr. Cashdollar, where do you live, sir, what city and state?

A. I live in Cooperstown, Pennsylvania.

Q. What is your occupation, profession, business, or

employment?
A. I'm a steelworker.
Q. Who do you work for?
A. Electrola.
Q. Mr. Cashdollar, are you a muzzleloader shooter, or have you in the past been a muzzleloader shooter?
A. Yes.
Q. In the past have you owned muzzleloader firearms that were sold by a company called Blackpowder Products, Inc.?
A. Yes.
Q. When did you first acquire a Blackpowder, Inc., product, muzzleloader, that you can recall?
A. Actually I had two. The first one I got when I was about 13 or 14 years old.
Q. And about how many years ago would that have been?
A. I'm 42 now. Math was never my friend.
Q. Twenty-nine years ago?
A. Okay.
Q. Twenty-eight, twenty-nine years ago?
A. Yeah.
Q. Do you remember the make or model of that particular firearm?
A. It was a CVA Blazer.
Q. Was it what's referred to as a sidelock-type model?
A. No.

Q. Was it what's referred to as an inline-type model?
A. Yeah. Yes.
Q. What kind of propellant did you typically use in that firearm?
A. I used granular black powder.
Q. Did you ever shoot smokeless powder in that firearm?
A. No.
Q. You say "no" with some emphasis. Why not?
A. Smokeless powder is more explosive and it causes pressure that's over the limit for a black powder barrel.
Q. How did you come to acquire that knowledge?
A. That's just common knowledge in the muzzleloader world.
Q. Learn it from other muzzleloader shooters?
A. Pardon me?
Q. Did you learn that from other muzzleloader shooters?
A. Yes, and from reading.
Q. What about the manual? Did the manual have an admonition?
A. Yes. The manual said never use smokeless powder.
Q. Follow that admonition as well as the information you got from other shooters?
A. Yes.
Q. Typically what kind of projectiles would you shoot with that granular black powder back with your first CVA muzzleloader when you were a teenager?
A. A patch and a lead round ball.

Q. Ultimately did you acquire another CVA muzzleloader firearm?
A. Yes.
Q. What make or model did you subsequently acquire?
A. It was a CVA Eclipse.
Q. Do you remember about when you acquired that firearm?
A. About '01.
Q. And did the Eclipse have a feature that included a removable breech plug?
A. Yes.
Q. You might look at Exhibit No. 20 in that book beside you, the bigger book. You can turn around there, if you want to. And under tab 20--that's in the other book, the bigger book.
A. Pardon me?
Q. Not that book. The bigger book has tab 20 in it. Turn to tab 20.
A. Okay.
Q. Take that plastic packet up from the page. It's got a paper clip on it. Now, does Exhibit No. 20 appear to be the breech plug that was used in your Eclipse, the type of breech plug used in your Eclipse model?
A. It's similar.
Q. It has a little different back end on it for the tool; is that correct?
A. Pardon me?
Q. It has a little different back end for the tool to tighten

it?
A. Yes.
Q. But the threaded area, does it appear to be the same as your muzzleloader?
A. Yeah.
Q. Did you become familiar with how to put that breech plug in and remove it for purposes of cleaning, and so forth?
A. Yes.
Q. Now, after you acquired that Eclipse in about 2001, was it involved in some kind of a failure incident when you shot it?
A. Yes.
Q. Do you remember when that failure incident occurred, approximately when?
A. Approximately two or three years later--approximately three years later.
Q. 2004?
A. Yes.
Q. Do you remember what month?
A. October.
Q. Were you out on a hunt when that failure occurred, or were you simply practicing with your gun?
A. I was sighting it in.
Q. Do you remember what sort of a load you had in it when the failure occurred?
A. I was using 95 grains of 2F.

Q. What is 2F?
A. Black powder.
Q. Granular black powder?
A. Yes, sir.
Q. That was your propellant charge?
A. Yes.
Q. What sort of a projectile were you using?
A. I was using a jacketed lead bullet with plastic sabot.
Q. And was that a load--in other words, a charge and a projectile--that was within the limits recommended and approved in the manual?
A. Yes.
Q. Had you fired that type, or a comparable load, from that Eclipse muzzleloader prior to the date of the failure?
A. Numerous times.
MR. EATON: Your Honor, may I approach the witness with an exhibit?
THE COURT: You may.
BY MR. EATON:
Q. You can set this around beside, whatever is easiest for you to handle. I'm going to hand you what's been marked as Plaintiffs' Exhibit 86, and ask you if you can identify that, the contents of Exhibit 86, please.
A. That looks like the barrel of my rifle except it's had a piece cut out of it.

Q. Had a piece sawed out in the breech end?
A. It was sawed more near where the breech plug would screw into it.
Q. All right. Can you read the serial number off your gun?
A. 61-13-030288-01.
Q. All right. By the way, can you see a proofmark anywhere, or proof marks on that gun anywhere near the serial number?
A. Yes, sir, right here (indicating).
Q. Okay. Describe, if you would, for the record, what you see on that gun that you believe are proof marks?
A. It looks like three round balls, two on the bottom, one on the top in a triangle; and it looks like a lion's head sitting on a box with a cross underneath it.
Q. I'm going to ask you to take a look at what I'm going to publish here in a minute, what's previously been received into evidence as Plaintiffs' Exhibit 90. It should come up on that screen in front of you. Is it up on your screen?
A. It's up now.
Q. Are the marks on your gun the same marks that you see at the top of that page?
A. Yes, sir.
Q. All right. Thank you.
Now, Mr. Cashdollar--
A. Yes.
Q. --just describe for us, please, what happened about in 2004,

October 2004, when you fired your CVA or BPI Eclipse model and it failed. Tell us what happened.
A. I had put a new scope on the rifle, and I had to sight it in for the upcoming deer season. So I took it over to my father's house--we have a rifle range over there--and I shot and loaded it twice, loaded it and shot it.
And the third time I loaded it, I asked my nephew if he wanted to shoot it. He said no. He was going to go clean his rifle. So I sat down, I laid it on a sandbag, and when I fired it, the next thing I know, I was laying 180 degrees from the bench on my hands and knees looking down at a pool of blood.
Q. Now, you say you laid it on a sandbag, and then you said when you fired it. Did you pick it up from the sandbag, position it against your shoulder, and fire it downrange?
A. No, sir. I laid it on the sandbag because I was sighting the rifle in. I laid it on the sandbag for stability.
Q. You were using the sandbag like a shooting bench?
A. Yes.
Q. To steady your aim?
A. On my shooting bench I use a sandbag.
Q. All right. It sounded to me like it went off spontaneously when you first described it.
A. No. I'm sorry.
Q. You rested it on the sandbag--put it against your shoulder, rested it on the sandbag--

A. And--
Q. --and pulled the trigger?
A. --pulled the trigger.
Q. And the next thing you knew you'd been rolled backwards?
A. Right.
Q. And did you sustain some injuries to some parts of your body?
A. Yes, sir.
Q. What parts of your body?
A. My face, my nose, my check, and this part of my face here (indicating).
Q. I assume thereafter you got some medical attention and treatment; is that correct?
A. Yes, sir.
Q. Did you or any of your family or friends after the incident occurred gather up the firearm, any component parts of it that were in the vicinity?
A. Actually we found everything but the breech plug.
Q. Are those contents that were found in the box that's been marked as Plaintiffs' Exhibit 86 with your gun?
A. Yes, sir. Everything we found is in this bag (indicating).
Q. And you found--you and your family found everything but the breech plug; is that right?
A. Yes, sir.
Q. And at some time thereafter did you inspect your gun and

those components--well, let's just say--let's talk about the gun, the barrel and the receiver and the trigger apparatus. Did you inspect that?
A. Yes, I did.
Q. A gross inspection? Just an eyeball inspection?
A. Yeah, I looked at it. I put my finger down where the breech plug would screw in, and it was almost smooth. There were no threads left.
Q. Did that surprise you?
A. Yeah, a little.
Q. Other than finding a smooth area in the breech area, where the breech plug had been, did you observe anything else that you thought might be--obviously the gun was broken up into some pieces. Did you observe anything else about the components of the gun itself that suggested to you that it might have failed in some manner other than the breech plug stripping out of the barrel?
A. No. The breech plug stripped and everything came back. It broke the bolt in half.
Q. And how many times would you estimate or--pardon me.
Can you estimate approximately how many times you had fired that CVA/BPI Eclipse muzzleloader before the date that it failed?
A. I used to shoot it quite a bit. Probably a couple of hundred.

Q. And subsequently you turned that gun and those contents over to Mr. Sparks and I; is that correct?
A. Yes, sir.
Q. We undertook to represent you in a claim against CVA--is that correct?
A. Yes, sir.
Q. --Blackpowder Products, Inc.; is that correct?
A. Yes, sir.
Q. And that claim was ultimately resolved; correct?
A. Yes, sir.
Q. Now, since that time, that gun has been sectioned in the area of the breech plug; is that correct?
A. Yes, sir.
Q. And you've had occasion to observe that?
A. Uh-huh. Yes.
Q. Did your observations after the gun had been sectioned through the breech area, did those observations of that open breech area confirm what you had originally thought when you ran your finger down into that breech area where you say you felt like the threads had been stripped?
A. Yes, sir.

MR. EATON: Your Honor, we would move to offer Plaintiffs' Exhibit No. 86 into evidence, and we would proffer Mr. Cashdollar as a witness to provide evidence of substantially similar prior incidents. And with that we would pass the

witness for cross-examination.

(Plaintiffs' Exhibit 86 was offered in evidence.)

THE COURT: Mr. Singer, cross-examination?

CROSS-EXAMINATION

BY MR. SINGER:

Q. Mr. Cashdollar, you do not know the manufacturing process to form your gun, do you?

A. No, sir.

Q. You don't know the steel that it was made of, do you?

A. No, sir.

Q. You don't know the--as you've said, the breech plug that you've been shown by Plaintiff is not even the same kind of breech plug, is it?

A. No, sir.

Q. And doesn't have the same number of threads that yours did on it, did it?

A. Pardon me?

Q. Does not even have the same number of threads, does it?

A. I couldn't tell you that.

Q. Yours was a different length, wasn't it?

A. Pardon me?

Q. Yours was a different length?

A. A different length?

Q. Yeah.

A. To my best guess. I wouldn't be able to say yes or no.
Q. Now, the threads themselves, do you know whether they in fact were cut as opposed to rolled?
A. No, sir.
Q. Is this Plaintiffs' Exhibit 8--excuse me.
MR. SINGER: May I approach?
THE COURT: You may.
BY MR. SINGER:
Q. Is this Plaintiffs' Exhibit 86 your gun?
A. Yes, sir.
Q. And would you agree that if you look down straight into the cut section, where someone has cut your breech area out, the back of that area is actually tighter and a smaller hole than the front of the area, the muzzle end?
A. Yes, sir.
Q. And in this gun the breech plug screwed in where it's shown; correct?
A. It screwed in from this way, yes (indicating).
Q. You had to have a special tool, not a hex nut; right?
A. Correct.
Q. And you access the primer or the crushing cap by putting it through the slot on the side that is missing, that has been cut out?
A. Yes.
Q. Behind that--this was all, as far as you can see, a single

piece of metal, mono-block design for the entire barrel and receiver end?
A. Yes, sir.
Q. And the receiver end is, what would you say, four more inches behind the area of the breech plug?
A. Yes, sir.
Q. Still a part of the same steel that encompasses the breech area and the barrel?
A. Yes.
Q. In the back area of this there was a cap, a threaded cap that went inside?
A. Yes, sir. It's here.
Q. Right. And that threaded cap screwed into the threads in the rear of the barrel?
A. Yes, sir.
Q. And that cap you would take out and put back in every time you cleaned the gun, took out the bolt and cleaned it, and so forth?
A. Yes, sir.
Q. You would say you did that hundreds of times, taking out the end cap, taking out the breech plug?
A. Yes, sir.
MR. SINGER: That's all the cross of Mr. Cashdollar, Your Honor. Thank you.
THE COURT: Thank you.

MR. EATON: We have no direct--redirect on Mr. Cashdollar, Your Honor.

THE COURT: I do have a couple of questions myself. Maybe you know the answer, maybe you don't. One of the purposes for--in fact, the principal purpose for offering similar incidents is to establish notice to the manufacturer of the problem.

I note that, apparently, this firearm was purchased in October of 2004. Mr. Katzenmeier's--or the incident occurred in October of 2004. Mr. Katzenmeier's firearm was purchased in December, Christmastime, of 2004, was not used until about ten months later. Do we know the date of manufacture of the Kodiak Magnum involved in this case, A; and, B, Mr. Eaton, you say that your--you represented Mr. Cashdollar. Do we know when Blackpowder or Dikar received notice of the incident involving Mr. Cashdollar? I guess whoever can answer those questions, I'd like to know.

MR. EATON: I do not have Mr. Cashdollar's file with us. I'm trying to remember how long after his incident it was before he contacted us. It was clearly sometime after--after we were contacted by Mr. Katzenmeier, but I'm not sure of that. I can't answer that.

MR. SINGER: Your Honor, I can answer the question. The Kodiak was manufactured, this particular serial number gun was, in June of 2004, as set forth in discovery, which would

have been months before the failure, regardless of when the notice could possibly have been given.

THE COURT: Is it likely, Mr. Eaton, that Blackpowder or Dikar would have received notice of the incident involving Mr. Cashdollar after the purchase of the Kodiak by Mr. Katzenmeier's father?

MR. EATON: I'm looking here at a note we had about the contact with Mr. Cashdollar. It says that we were contacted on 10-11, 2004, with Mr.--by Mr. Cashdollar. So...

THE COURT: That would be within a week of the incident.

MR. EATON: It was a week after the Katzenmeier incident, and I don't think we were contacted by the Katzenmeiers until sometime in 2005, shortly after the first of the year in 2005.

THE COURT: I'm interested, if you know, and you told me you don't, but my question is when the defendants would have received notice of the incident involving Mr. Cashdollar.

MR. EATON: Well, it would have been after the manufacture of Mr. Katzenmeier's gun.

THE COURT: All right. Would it have been also--I guess my more specific question is would it have been after the purchase of the gun by the elder Mr. Katzenmeier, which I believe occurred early in December of 2004?

MR. EATON: I feel confident we first--we got notified

10 of '04. We gave notice of a potential claim. We never filed a lawsuit on behalf of Mr. Cashdollar, but I feel confident that we gave notice within probably--at least before the end of December in 2004. I can check later with our office, maybe get a better date on that, but we just don't have the Cashdollar file with us, and I just don't know.

THE COURT: I'll hear you in argument as it relates to the offer of proof. You want to argue the offer of proof any further for the record?

MR. EATON: The only argument we'd make is, I think there may be one bit of evidence that is not yet before the Court that links Mr. Cashdollar's incident, as well as Mr. Zenger's incident, sufficiently to establish substantial similar conditions, and that is the testimony of Aitor Belategi, which will be presented next by videotape.

Mr. Belategi testified that the same thread form, the 18-pitch, 5/8 UNF thread form had been used at least since 1993 in all of their models of guns. And we think that's one more similarity that links Mr. Cashdollar's case--or claim, and Mr. Zenger's claim, to the Katzenmeier claim. They all have the same thread form common to all muzzleloaders manufactured by Dikar since 1993.

And we believe there has been enough substantial similarity to allow this evidence to go in. These are different models of guns, they are made by the same manufacturer, they

have the same thread form in the breech plug area, they all failed in substantially the same way, that is a catastrophic explosive failure which expelled the breech plug loose from the barrel, stripped threads along the way.

We offered evidence so far there is really two defects in the Katzenmeier gun. One is the formation of the threads in the barrel. The other is the tapering of the barrel which is another aspect of the defect in the barrel.

In this case Mr. Singer brought out on cross-examination that it appeared that there was more--or a greater diameter muzzleward than breechward in the Cashdollar case. We think that's a distinction without a difference. It's still a defective thread form that failed to contain the blast with the--in the face of a recommended projectile and a recommended propellant.

So we think that what we're talking about here is defective formation of the threads in the breech area of the barrel, whether it be the actual form of the thread itself not being complete or fully formed, and/or bell-mouthing. Those are both defects.

In Mr. Cashdollar's case, there may not have been bell-mouthing, but it appears there was a defective formation of the threads which failed to hold the breech plug in place under a load that was approved and recommended by the defendant.

So we think there is substantial similarity sufficient

to allow this testimony to go before the jury.

THE COURT: What would the similarly-situated incident involving Mr. Cashdollar, what would it be relevant to in this case?

MR. EATON: To show that these folks had been producing defective barrels apparently for some time. Not just to prove notice, but to prove common defects that had existed and persisted through their manufacturing process, at least back to the time when Mr. Cashdollar's gun was made in 2001.

So it's not just merely notice. We think that there's more--there's more bases for admission of this evidence than merely notice to the defendants.

THE COURT: Thank you.

Mr. Singer?

MR. SINGER: Thank you, Your Honor. Initially we would stand on each and every one of the grounds and the authority we set forth in our motion in limine, which sets forth very clear what the law is in this circuit on substantially-similar circumstances. It's very clear that there's no testimony from this witness that in any manner can either establish substantially similar in the design or the manufacture; but, in fact, has established it is different.

In addition to that, as we've set forth all along in the motion, not only did we put on proof that it was not the same, but they could not put on proof that it was, and they

haven't.

As Your Honor can see, and if you remember the testimony of Professor Tipton, their theory of this case--remember, we're talking about an object, a barrel manufactured in the Katzenmeier gun that is a piece of tubular steel. And at the very back edge is where the drill for the breech plug threads, and it's a whole form. And according to Professor Tipton, what happened is that that somehow was misaligned, or the tool was worn, or something happened, and it had became bell-mouthed at the back. Not that by itself, but, in fact, the fact of that in combination with the rolled threads made the threads too weak that were there to hold it. So it has to be the combination, according to Tipton. That's the only possible relevance of these rolled threads and the voids in the threads.

The testimony from this witness certainly can't establish what those threads were. We set forth in the records from Mr. Belategi, beginning in the late summer, early fall of 2002, they began making rolled threads, not cut threads. This was a cut thread back in 2001. That makes it substantially different, not substantially similar.

If Your Honor looks at the plaintiffs' exhibit, Your Honor will notice it is what's called, as we set forth in the briefing papers, a mono-block design, which means from a single piece of steel you have the barrel and then you have a receiver

that proceeds many inches rearward of the breech area. As the drill would go in to form that breech area, if, as Dr. Tipton testified, that it was bell-mouthed way four, six inches up inside the barrel, it would have been much more exaggerated and bell-mouthed to the back of it, such that that end cap can't go in and the threads there can't be properly formed. So that's another reason why this gun is clearly substantially different in design and manufacture. The testimony is clear it's not even the same breech plug.

And so, again, it's the plaintiffs' burden under the law, regardless of what the purpose is they want it in for, whether notice or defect, to prove a substantially similar design and manufacture. They can't do it. The proof is it is not.

Second--that's just the initial threshold. The initial purposes, as set forth in the briefing papers, is there must be proof that the defect existed in this other allegedly substantially similar incident, and the cause of that failure. There is zero competent proof under Daubert, or anything else, as to whether this gun, the breech threads, were improperly formed, or even an opinion that they were.

There is zero testimony that these breech plug threads, even today as sectioned, are out of tolerance. There's no measurement of them. There is no testimony whatsoever in this record. The plaintiff bears that burden, that the

allegedly substantially similar incident contained--or gun contained a substantially similar defect and which proximately caused a substantially similar method of failure, and in point and fact there is none.

I would also point out, as we set out in the briefing papers and also briefly in chambers the other day, most importantly, as well as all the above, is that, you know, we are here in Federal Court more than two years after this case has been filed. The plaintiffs answered mandatory discovery, they answered interrogatories, they answered--and none of this was set forth. They provided expert reports. None of this was set forth. There is not a single opinion that has been set forth in this case that Mr. Cashdollar's gun, or anybody else's gun, was similarly designed, or was similarly manufactured, or the method or mode of failure, and that is critical.

Not only do you have to have that proof, which they don't, but they've got to let us know about it in advance, and they didn't. And so that would be independent grounds to exclude it as well, on that basis.

For those reasons, as well as all the others, we object to it and move to exclude it.

THE COURT: Anything further, Mr. Eaton?

MR. EATON: Your Honor, just a very brief rebuttal. Your Honor, "substantially similar" does not mean identical. Mr. Singer focused on a lot of different features and

characteristics between these two models of firearms. What he fails to appreciate in his remarks, however, is that these guns failed in substantially similar ways; that is, in the connection of the breech plug and the barrel of the gun. That's the substantial similarity.

The Cashdollar gun was designed and manufactured in a substantially similar way, and it failed in a substantially similar way, stripping of threads in connection with the breech plug and barrel of the gun. That's sufficient.

Some of these other features that are distinctive, they're distinguishing, but they do not constitute a substantial difference in the mode of failure, and that's all that's required. Mr. Cashdollar's case--claim is certainly no surprise to these defendants. They chose not to litigate it. They chose to settle it and not get into the minutiae of his claim.

So we think that the burden has been met, particularly when Mr. Belategi's testimony is played, that will complete the link, and respectfully move the Court to allow this evidence in the trial of this case.

THE COURT: Thank you. Thank you both. Because there appears to be no dispute that Mr. Katzenmeier's firearm was manufactured prior to the incident involving Mr. Cashdollar, and in all probability, although I guess it's not completely clear, Mr. Katzenmeier's firearm had reached the Ace Hardware store even before the defendants had any knowledge of the incident,

even if the incident involving Mr. Cashdollar was substantially similar, it would not be evidence either of notice or, in addition to that, the defendants' appreciation of the risk of harm if the barrel is not threaded properly. It's offered really at this point only as additional evidence that there was--that manufacturing defects had occurred in other firearms. I'm less certain that that's an appropriate basis to admit it, although I'm not--I'm going to take a look at that one more time.

As to whether or not there are substantially similar defects, alleged in this case are the improper rolled taps that created the threads. And Mr. Cashdollar's threads, as far as the record indicates, were done by a cutting process rather than rolled taps. So that part of the defect is different.

The more I understand the plaintiffs' case, I think their focus is primarily on the bell-mouthing. Here, we have kind of the reverse of bell-mouthing, sort of, if I can continue the analogy, of bell-firthing, it was wider at the other end, toward the muzzle end. That may or may not be a distinction without a difference, I'm not sure the Court could tell in the absence of expert testimony, but those are two circumstances.

In addition to the other things that Mr. Singer mentioned, and some of them I indicated in my limited ruling I didn't think were particularly germane, although this firearm had had a lot more use that Mr. Katzenmeier's, I'm not convinced

at this point that they're, A, substantially similar to be admitted; and because this particular incident is no evidence of notice, nor is it evidence of appreciation of the danger on the part of the defendants, I can't receive it for that purpose. And I'm reluctant to receive it only to indicate that--as further proof that something wrong had happened before in the forming of these threads.

I'm going to adhere to my ruling for now, the evidence will be excluded with these caveats: I'm going to take a look at the proffered reasons again that Mr. Eaton has raised, and while I think I'm going to probably end up to continue to exclude it, I might change my mind on that.

And, also, one purpose that this evidence could be admissible for would be for impeachment, if the defendants offer evidence of this idea of a breech plug being expelled is a strange and unusual thing that they never heard of before. I don't care if it's just in reference to the Kodiak rifle because I think that is an untrue impression. So the door can be opened to Mr. Cashdollar's testimony.

And I'm inclined, also, to direct that I would think any argument to the jury that there had been no evidence of any other breech plug being expelled would be improper argument in view of the offer of proof that has been made. So I would not permit an argument along those lines.

So this evidence could become admissible, but it is

not yet, in my judgment, and it is not admissible for the usual purposes for which similarly-situated incidents are received. So we're not going to receive the testimony at this time.

Shall we go ahead with Mr. Zenger?

MR. EATON: Yes, Your Honor. May this witness be excused?

THE COURT: Yes. Mr. Cashdollar, you've come a long way. Thank you for coming today. The Court appreciates your testimony. There are certain legal issues that are concerning, which I've outlined. Your testimony has been helpful in highlighting this.

THE WITNESS: Thanks.

MR. SPARKS: Your Honor, would the Court entertain Mr. Cashdollar sitting in back to watch the rest of the proceedings?

THE COURT: Any problem? In open court can he sit in the back?

MR. SINGER: To the extent that the Court has indicated some possibility of his testimony being admissible, it seems--

THE COURT: He's already testified. If he testified different--I think it's fine, though I'm not sure he wants to.

MR. EATON: I asked him to wait out there for a minute. Mr. Wise can tell him to come back in when he gets Mr. Zenger. We're ready to present Mr. Zenger now, Judge.

THE CLERK: Please step forward and raise your right hand.

ERIC ZENGER, PLAINTIFFS' WITNESS ON AN OFFER OF PROOF, SWORN

THE CLERK: You may take the stand.

DIRECT EXAMINATION

BY MR. EATON:

Q. Mr. Zenger, you can turn your chair around to face us.

Would you state your full and correct name for the record, please, sir.

A. Eric Steven Zenger.

Q. Mr. Zenger, where do you live, what city and town, please--city and state?

A. I currently live in American Fork, Utah.

Q. How long have you lived in Utah, sir?

A. For about 14 years now.

Q. What is your occupation, profession, business, or employment, sir?

A. I am a physician's assistant in dermatology.

Q. And how long have you worked at that profession?

A. About a year.

Q. What did you do before you became a physician's assistant?

A. I sold real estate and did real estate development in Park City and Deer Valley Utah.

Q. How old a man are you, sir?

A. I am 41.

Q. Are you a muzzle--in the past have you been a muzzleloader shooter?
A. Yes.
Q. About how many years ago did you first take up muzzleloader shooting, if you can recall?
A. The first time I shot a muzzleloader was when I was 14 out at Scout camp.
Q. And over the years have you owned muzzleloader firearms?
A. Yes, I've owned several.
Q. Have you been a participant-- Do you remember what the first muzzleloader firearm you owned was, what make and model?
A. I don't recall the exact make and model, but it was a kit that I sanded down the barrel and built the gun.
Q. During your tenure as a muzzleloader shooter, did you ever attend any firearms courses that were focused upon muzzleloader shooting as opposed to other types of firearms?
A. No. We--only at that Scout camp that had the--they had a guy that was a police officer that taught us all about black powder, how to shoot them, et cetera.
Q. Is that when you were a teenager?
A. Yeah.
Q. Other than that instruction, did you ever receive any other formal instruction on firearms that included instructions regarding muzzleloader firearms?
A. No.

Q. Did you ever own any CVA or BPI muzzleloader firearms?
A. I did.
Q. Do you remember how many CVA or BPI firearms you've owned in your lifetime?
A. One.
Q. Do you remember what year or approximately what year you acquired that firearm?
A. I believe it was in 1999.
Q. 1999?
A. Yes.
Q. Did you buy that firearm new?
A. I bought it used at a gun shop, but they had said it had never been fired, but it was secondhand.
Q. Secondhand, but never fired?
A. Yes.
Q. All right. Do you remember the name of the gun shop?
A. American Fork Gun and Sport, I believe is what it was.
Q. When you looked at that gun, did it appear to you to be new?
A. It did in fact.
Q. Was it in a box that looked like it was new, or it hadn't been taken out of the box?
A. When I originally saw it, it was in a gun case with all the other new guns, and it wasn't until I decided to buy it that he informed me that he had taken it on trade, or something, and that he had the box in the back.

Q. So when you made the purchase, you got the gun and the box; is that correct?
A. Yes. Yes.
Q. Did it have an instruction manual with it?
A. It did not at the time.
Q. Did you seek to obtain an instruction manual for that particular model?
A. We did. I downloaded one off of the internet, I believe.
Q. Is that from the BPI or CVA website?
A. Yeah.
Q. So you got the gun which appeared to be new, was represented to be new, you got the box that it came in. And then from a subsequent source you got the manual; correct?
A. Uh-huh.
Q. Is that yes?
A. Yes.
Q. And ultimately you were involved in an incident where that gun failed and you were injured, but did you shoot it for a time--a number--several times before the failure incident?
A. I did. I probably shot it somewhere over 20. Maybe 30 times before the failure.
Q. By the way, what model was that gun of yours?
A. It was a Pro Hunter.
THE COURT: I'm sorry? I didn't hear.
THE WITNESS: Pro Hunter.

THE COURT: Pro?

THE WITNESS: Pro Hunter.

BY MR. EATON:

Q. So you shot it 20 or 30 times before the failure incident; is that correct?

A. Yes.

Q. Do you remember the date, month, or the year of the failure incident?

A. November 4th, 2001.

Q. 11-4 what?

A. 2001.

Q. Prior to that incident, had you hunted with that gun?

A. Yes.

Q. Had you taken any game with that gun?

A. I tried. I don't think--I don't believe I ever got anything.

Q. At least 20 or 30 times you fired it before the failure incident. What kind of propellant did you use?

A. The pellets, 50-grain pellet.

Q. Do you remember what brand or make of pellets, who's the manufacturer?

A. Not exactly. I'm sure there were probably different brands that we used over the course of the years.

Q. You used a pelletized form of black powder substitute; is that correct?

A. Yes.
Q. Did you consult your manual about using that form of propellant?
A. I did, and I also talked extensively with the owner of a separate gun shop that sells black powder rifles.
Q. At the time the gun failed, do you remember what your load was that was shot through that gun when it failed?
A. We were using two 50-grain pellets.
Q. Two 50-grain pellets?
A. So 100 grains total.
Q. Do you remember the projectile?
A. I don't remember exactly, I just know that it was--it came with, I guess, a polyurethane sabot, and the projectile sat inside of it.
Q. Had you fired that same load through that gun on prior occasions?
A. Yes.
Q. Had you ever had any adverse consequences as a result of firing that load through that gun on prior occasions?
A. No.
Q. Were you alone when the injury incident occurred, or did you have people with you?
A. I was with my younger brother at the time.
Q. What's your brother's name?
A. Michael Paul Zenger.

Q. Had Michael been a muzzleloader shooter?
A. Yes.
Q. And I believe you said you were sighting it in?
A. We were at a target range just sighting the rifle in.
Q. Just describe for us, if you could, please, your perception of the incident, how it occurred. And you might just start with loading of the gun, and then whatever position you may have taken, and then what happened.
A. Yes. We were at a shooting range, and there was actually a table that was there for that particular use, for sighting in rifles. And my brother actually had shot the gun seven times. We were trying to get it sighted in. He told me his arm was a little bit sore and asked me if I would take the next couple shots.

I sat down at the table, and we had our sandbags there, and I sighted in on the target, and I pulled the trigger, and nothing happened. I had forgotten to take the safety off. He kind of made fun of me and we laughed about it.

I took the safety off, sighted it again, pulled the trigger. And the next thing I knew, I woke up laying on the ground about five minutes later, I guess, and there were people around me, and I could hear my brother in the background screaming on the phone to a family member that he thought I was dead. And I heard people saying an ambulance is on the way. Another man said he couldn't find a pulse.

And it was about at that time that I moved, I said something, and they realized that I, in fact, wasn't dead. And then I blacked out again. I came to when I was in the ambulance on the way to the hospital, and that was kind of the beginning of the whole thing.

Q. After this incident occurred--I think you were injured quite badly and down for a while. Did anyone gather up your gun and any component parts of it, that you're aware of?

A. Other than myself or my brother?

Q. Your brother, or any of those other folks that might have been at this shooting range.

A. Yeah. Well, it was actually a day or two after I had the accident I received an interesting phone call from a gentleman by the name of Mark Marvin, I believe, who said he had seen a story on the news about me being injured, and his son had suffered the same injury, and wanted to know what type of gun I was using. I told him, and he said that was--"That's the exact gun my son was using." He proceeded to tell me there was a history of failure, and that I needed to go and find all the parts of the gun that we could because we would probably need it eventually if this was to turn into an issue.

Q. When you had that phone call, were you back at your home?

A. I was.

Q. And did you and/or your brother and perhaps others make an effort to gather up the gun and as much of the components of the

gun as you could?
A. Absolutely.
Q. Do you know who took possession of the gun immediately after the incident?
A. I believe the police had it for a brief period, and I don't know whether that was an hour or two, or whether it was a day or two. I kind of left that to my brother while I was home convalescing.
Q. Are you telling us your brother was the one who rounded up the gun?
A. Yes. Yes. They spent a considerable amount of time up at the shooting range to try to find the different pieces.
Q. Do you know if any other pieces were found?
A. They found the bolt--they found the bolt because it was in my face. They found the little black cap, a piece of it. They did not find the breech plug, which is what they were actually looking for.
MR. EATON: May I approach the witness, Judge?
THE COURT: Yes.
BY MR. EATON:
Q. Mr. Zenger, I'm going to proffer to you Exhibit No. 87. I'm going to proffer to you Plaintiffs' Exhibit No. 87, and ask you if you can identify Plaintiffs' Exhibit No. 87?
A. That is my gun. That's the gun I was shooting.
Q. If you would, please, look at it and read off of it the

serial number into the record.
A. It is 61-13-013872-96.
Q. By the way, can you see any little proofmarks on there anywhere, what you understand to be proofmarks near the serial number?
A. Yeah. I guess there are some right there at the edge.
Q. Can you just describe those for the record, please, what you see?
A. There's three little circles that form kind of a triangular shape, and then--I didn't think I was so old that I needed glasses, but this is tiny enough--maybe it looks like a little shield, or something, next to it.
Q. Do you recognize those two images you described as proofmarks?
A. I do now.
Q. Before you fired this gun, did you know anything--and you were hurt--did you know anything about proofmarks?
A. No.
Q. Now, once you recovered enough from your injuries to take a look at this gun, after the incident occurred, take a look at this gun, did you notice anything about it that seemed unusual to you? Did you inspect it close enough to discern anything unusual?
A. Well, at the time I was a little surprised to see that the--what I had understood to be the breech plug, that it was

missing completely. I noticed, of course, that the side of the gun, there's a part that the steel is bent and twisted, and that was kind of--those were the two things that kind of struck me at the time.
Q. Now, you ultimately retained legal counsel; is that correct?
A. I did.
Q. Filed a lawsuit?
A. I did.
Q. And went pretty much all the way through the legal process, as I understand it, got down close to trial?
A. I believe so. I don't know what that whole process is to know where we were in it, but, yeah, at some point in time we--
Q. Do you have a recollection of sitting for a deposition in your case?
A. Yes.
Q. Did you attend any other depositions in your case?
A. If I recall, I believe it was just the one time.
Q. All right. Any other depositions of any other witnesses besides you?
A. I didn't.
Q. Did not?
A. Did not.
Q. Now, did you ever, after this incident occurred, and during the course of that litigation, inspect the breech area of that barrel any closer than what you just told us about?

A. I certainly on several occasions, as we were preparing the case--we had a couple of expert witnesses that had the gun and looked at it, and since then I've had other people look at it and tell me that the failure was a failure of the breech plug, the way that it was put in there and the threads and everything.

MR. SINGER: Your Honor, object and move to strike as hearsay, even for the offer, as to what other people say.

THE COURT: I note the objection. If I were to allow it to go to the jury, I would exclude it. But this is an offer of proof. We'll see what he has to say.

BY MR. EATON:

Q. When you say the breech plug and threads, are you talking about the connection of the breech plug to the barrel?

A. Yes.

Q. After you were advised of that, became somewhat aware of that, did you inspect it closer yourself to see if you could see any evidence of stripping of the threads in the barrel?

A. I did.

Q. Did you observe such a stripping of threads in the barrel?

A. I don't know what I'm looking for, what I'm looking at. To be honest with you, I don't like spending a lot of time with my gun, so I just don't look at it much.

Q. I understand. And you said a search was made, or at least to your understanding a search was made. No one ever found the breech plug?

A. No, it was not ever found.

MR. EATON: Your Honor, we pass the witness for cross-examination.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. SINGER:

Q. Good morning, Mr. Zenger. Good to see you again, even though it's not under the best of circumstances.

Let me ask you a couple things. You knew that--let me back up.

When you bought the gun in 1999 at American Fork Gun, you didn't know that a recall had been called on that gun in 1997, did you?

A. I did not.

Q. In fact, that was one of the things you learned when, I think, Mr. Marvin's father called you?

A. Yes.

Q. And you know now, not only from your lawyer and your experts, that this gun was recalled beginning in 1997?

A. Yes.

Q. And let me ask about a couple of things.

A. Okay.

Q. You--first of all, if you will pick up the gun--

MR. SINGER: May I approach, Your Honor?

THE COURT: You may.

BY MR. SINGER:

Q. I know you don't know exactly what you're looking at, but if we can turn it over and look right down inside the area where the breech used to be--

A. Yes.

Q. --you will see that there's a perfectly kind of circular rust mark and the whole barrel is gone, isn't it?

A. Okay.

Q. Would you agree with that?

A. Where I can see, is that what you're saying?

Q. Yes.

A. Yeah. I don't know what you're asking, I'm sorry. The whole barrel is gone? The barrel is right here.

MR. SINGER: May I approach again?

THE COURT: Yes.

BY MR. SINGER:

Q. If you look at the gun--and I'll hold it up so Your Honor can see it as well--you see where the scope is mounted on here, there's a rear portion that's the same substance as the gun, that appears metal, that's much bigger and sits in a different cavity in the stock than the barrel itself; right?

A. Okay.

Q. And you see when you look down inside it, that this barrel is a separate piece from this receiver? Do you see that?

A. When I look down inside of--

Q. Yes. In other words, when you see where the barrel itself-- trace it from the muzzle past the rear sight, before you get to the scope, you will see the receiver begins?
A. Okay.
Q. Do you see that?
A. I'm assuming--it looks like it's one piece, but you're saying it's two pieces here?
Q. What I'm asking you here is do you not see, when you look in there, the seam?
A. It looks like that's just all one piece.
Q. Okay. Let's turn it and look this way. When you look inside it, you will see that the rear receiver area where the breech plug used to be is completely--is not as thick as the barrel, is it?
A. Okay. I see what you're asking.
Q. See what I'm saying?
A. Okay. I see that.
Q. You would agree with me on that; right?
A. Uh-huh.
Q. Now, you got a lawyer, found a lawyer in Salt Lake; right?
A. I did.
Q. And you were aware that one of the lawyers who had one of the first cases, filed before the recall began, involving a 1996 gun, was a lawyer named Peter Perlman in Kentucky; correct?
A. Yes.

Q. And he had going around about 2003, or so, a lawsuit involving a Mr. Timothy Neal; correct?
A. Yes.
Q. And Mr. Neal was also injured well after the recall on a recalled gun; correct?
A. I believe so, yes.
Q. And you gave a video deposition where your lawyer, Mr. King, actually questioned you for the Neal case in Kentucky?
A. Okay.
Q. Do you remember that? I attended by phone?
A. Yes, vaguely, now that you mention it.
Q. And isn't it true that the reason your lawyer in Salt Lake took a deposition for use at trial of you in a case pending in Kentucky was to show that your 1996 gun and its failure were the same as Mr. Neal's 1996 gun and failure?
A. I don't know. I just--what I recall is that Mr. King asked me to testify, or do this deposition for this other guy, this other individual.
Q. Let me show you a letter from your lawyer dated September 11th, 2003, to myself, and others, and copied to you.

MR. SINGER: May I approach, Your Honor?

THE COURT: Yes.

BY MR. SINGER:
Q. I'd just ask if that refreshes your recollection and appears to be a letter sent to me from your lawyer, September 11, 2003,

signed by Colin King and copied to you in dealing with settlement issues in the case that you had filed?
A. Okay.
Q. Is it, sir?
A. It's cc'd to me, yes.
Q. And do you--look at page 2 of that. And it is represented by your lawyer, and was in fact represented by your lawyer in that case, that Mr. Lucien Haag and Mr. Timothy LaFrance were experts retained by you and your lawyer to analyze the failure in your gun?
A. Yes.
Q. And isn't it true that, as that letter reflects to me, in an effort to discuss settlement, your position on liability was as Timothy La France and Lucien Haag had testified before, that the failure in this gun was the scope hole in the rear was drilled too deep into the receiver that it impinged into the barrel and created a fracture point; and that over time stress fractures happen and the barrel itself broke?
A. And it says that here somewhere?
Q. No. No. I just showed you the letter to refresh your recollection that your lawyer, on your behalf, and with your understanding, knowledge, and consent, asked us to settle the case based upon the representation that that was the failure?
MR. EATON: Your Honor, I'd object to the form of the question. It assumes facts not in evidence.

THE COURT: He can testify, if he knows.

BY MR. SINGER:

Q. Go ahead.

A. I guess the answer to that is my attorney certainly did a lot of things on my behalf. I don't believe I ever received a copy of this in the mail, or that was handed to me. Perhaps it went into a file that was given to me at a later date. So I don't know what his assumptions were through this.

Q. All right. Let me back up and ask it a different way.

A. Okay.

Q. We attended mediation, you and I?

A. Yes.

Q. You had a lawyer?

A. Yes.

Q. And Mr. Hickey was there on behalf of DC 1980, which was formerly Connecticut Valley Arms back in 1996; correct?

A. Yes.

Q. Isn't it true, because you said you were dealing with experts, isn't it true that Mr. Timothy La France and Mr. Lucien Haag's opinion on why your gun failed and what kind of a defect it had in it was that a scope hole was drilled too deep into the receiver, that it impinged in the barrel, and that it caused the barrel to have stress fractures and break with fatigue over time?

A. That is definitely one of the things that they discussed,

yes.
Q. Isn't it also true, as you understand it, their opinion was that in addition to that--because somehow the silver solder that soldered the rear of the barrel into the back of that receiver, in the area where the breech plug was, that silver solder additionally failed allowing the barrel chunk with the breech plug in it to move rearward?
A. I don't recall that, but perhaps.
Q. You don't disagree with that, do you?
A. I don't know.
Q. You don't know anything about the mechanism of failure, do you, other than what your experts said, as you've just said?
A. Yes.
Q. Your brother shot it probably more than you did before the failure?
A. No.
Q. He shot it a number of times, 30, 40, too?
A. He shot it a number of times, but I believe I shot it the most. The day of the accident he shot it seven times prior to the one time that I shot it.
MR. SINGER: Just a moment, Your Honor.
Nothing further of Mr. Zenger.
MR. EATON: Just very briefly, Judge.

REDIRECT EXAMINATION

BY MR. EATON:

Q. Now, Mr. Zenger, this barrel never came apart, did it?

A. It's right there. It's whole.

Q. In other words, you don't know of any repairs that were made to the barrel after this incident occurred, do you?

A. No.

Q. What you do know is the breech plug and certain other components came loose from the barrel; is that correct?

A. Yes.

Q. Came out of the barrel?

A. Yes.

MR. EATON: Nothing further, Judge.

THE COURT: Anything further, Mr. Singer? Anything further?

MR. SINGER: No, Your Honor.

THE COURT: Any further argument with regard to this witness?

MR. EATON: Your Honor, we'd just adopt the same arguments with Mr. Zenger that we adopted--or that we put forth with Mr. Cashdollar for substantial similarity.

In Mr. Zenger's case, however, we would add the one argument that the defendant certainly had notice of this mode of failure, that is the breech plug blowing out of the barrel, stripping threads out of the barrel. So the additional purpose

here would be to provide notice of defects in breech plug/barrel connection.

THE COURT: Thank you.

Mr. Singer?

MR. SINGER: Your Honor, we echo what's in our papers, as well as what's in the argument we just made with respect to Mr. Cashdollar. Independently, though, as set forth in the briefing papers, the affidavit of Mr. Hickey, who has seen these failures--and the Court can actually see, if you look in the barrel yourself, or in the receiver, the back of the barrel's gone that contained the breech plug.

So not only--this was the same mechanism of failure that Mr. Hickey has seen, I personally have seen in other cases of guns subject to the recall. It's not the failure of the breech plug. In fact, it's the opposite. The breech plug, in fact, retained its integrity in this gun, that the barrel actually broke and a whole piece of it, including the breech plug, came out the back. There is affirmative evidence in the affidavit of Mr. Hickey. There is zero evidence to the contrary.

In addition to that, as set forth in the briefing papers, this is so not substantially similar. It is a two-piece design with a barrel silver-soldered inside the receiver, cut threads way back there, and a lot of different things that make it substantially not similar.

I would also point out to the Court that as Mr. Zenger admitted, of having discussions with his expert--and I can state the place--we settled this case in part based upon the plaintiff's attorney representation to me as set forth in the letter--and I can mark it and tender it to the Court--that Lucien Haag and Timothy LaFrance had the same opinion that they had in other recall cases. I had deposed them in other recall cases, I know what their opinions are. And as set forth, the opinion is that the alleged defect deals with the silver solder containing the barrel, and the allegation of a problem with the scope hole depth on certain models impinging into the barrel and creating a stress fracture over time, which is radically different.

With that being said, even if the Court doesn't accept my statement in place, there's no proof by the plaintiff under the law of substantially similar in design or substantially similar mechanism of failure, if there were. Thank you.

THE COURT: Thank you both.

Based on the record, I find that the circumstances concerning the failure of Mr. Zenger's gun were not substantially similar to those involved in this case. I find also that the defects that were alleged in his gun, as far as the record indicates, were different than the defects alleged with regard to Mr. Katzenmeier's gun. The firearm was also of a

different manufacturer, which appears to have contributed to the failure--a different kind of design, rather, which appears to have contributed to the failure.

And also as it relates to notice, apparently this was a firearm that had been subject to a recall. So evidently the--I've excluded the evidence as it relates to that recall because it does not involve the defects as alleged with regard to Mr. Katzenmeier's gun. But the recall indicates that apparently the defendants had notice that there was some problem with this gun, so this evidence is also not particularly relevant.

For all those reasons, and the rulings previously made to the motion in limine, Mr. Zenger's testimony is excluded.

MR. EATON: Your Honor, just for the record, if I didn't make a formal offer of proof in the Zenger matter, I do now. It's already been overruled, I just want to make sure, for the record, I actually said those magic words.

THE COURT: I understood you to have done so.

MR. EATON: Is Mr. Zenger excused?

THE COURT: Yes. He may step down. Thank you.

(Witness excused.)

MR. EATON: May I box up the exhibit?

THE COURT: You may.

MR. EATON: Your Honor, that concludes the two offers of proof by the plaintiff with regard to Mr. Cashdollar and

Mr. Zenger.

THE COURT: Thank you. Who is our next witness?

MR. EATON: At this time we will play Mr. Belategi's deposition.

MR. SINGER: Your Honor, while the jury is still out, just a couple of things. We had just a couple of objections to the designated portions, if you have time to take them up. They're very few. And then we would also like the opportunity-- As the Court remembers, because of taking the day off Tuesday because of the unfortunate circumstances last Monday, the Court allowed us--Mr. Belategi to be scheduled after his deposition is played, taking him out of order in the plaintiffs' case. We would like an opportunity for Mr. Belategi to be present in the courtroom when his deposition is shown not only to get through it quicker, but we don't have to go over it, and just to move things along.

MR. EATON: I didn't hear all of that. We don't have any objection to Mr. Belategi being present, but we do object to him appearing out of order.

THE COURT: I thought the two of you had a discussion about that?

MR. EATON: I don't think so. That's not been our position, to allow him to appear out of order. We don't have any objection to him sitting in the courtroom, but we don't want him giving part of his case-in-chief in our case-in-chief.

The defendants did not counter-designate anything from his deposition. Rule 32 allows for that and provides for that. Defendants did not do that. So we object to him appearing out of order. We don't object to him being in the courtroom.

MR. SINGER: Your Honor, very briefly. I think counsel may have misremembered when we had the discussion the evening before Thanksgiving as to when we would start the trial of the case. It was supposed to be set for December 1st, had been set for December 1st for four months, I believe. Counsel was willing to start on Wednesday so that they could not have--just jury selection so they could take doctors' depositions Wednesday afternoon that they had not taken before the trial started. They didn't want to break up their case. They also had expert scheduling issues and wanted to go straight through without an interruption in their case with their experts. And, therefore, wanted to take the entire day off Tuesday and not go, and also take nothing Wednesday, except voir dire, not opening or anything else.

We specifically discussed in a conversation with Your Honor that though we didn't want to do that, and we would prefer to start first thing Tuesday morning, or even possibly jury selection Monday afternoon in the event that the funeral of Mr. Eaton's brother-in-law was not on Monday but over the weekend, we, under the circumstances, agreed to start Wednesday morning with that schedule, provided Mr. Belategi, coming all

the way from Spain, could get on as soon as his deposition is shown and get back to the factory and his family. We've had him here since last Thursday for that very purpose.

My understanding was that it was a specific agreement where Mr. Eaton said yes, he agreed with that, and the Court acknowledged that that's the procedure we would go with.

THE COURT: Mr. Eaton, we did have a discussion about that, didn't we?

MR. EATON: I don't remember ever being agreeable to that, Judge, because that would be just contrary to the way we planned our case. We discussed a lot of things. But these doctors' depositions were certainly nothing that were the plaintiffs' choice.

THE COURT: That's true.

MR. EATON: We subpoenaed those folks, that was part of our trial schedule. I sure don't want to use my family situation as a reason because I think it's totally irrelevant to this issue. It delayed the trial one day, I guess. I guess we would have started Tuesday rather than Wednesday. But it was never our intent to allow Mr. Belategi to come in and put on his case-in-chief--or his evidence from his case-in-chief in our case-in-chief. The defendants had every opportunity to counter-designate, and Mr. Belategi is present like any other witness they may choose to call.

So I realize it may be an inconvenience for

Mr. Belategi, but it's certainly contrary to our trial strategy, and I just don't believe I ever agreed to that. It's just quite different than our trial plan in this case. That's all I'm going to say.

THE COURT: Is your examination of Mr. Belategi going to be within the scope of direct examination?

MR. SINGER: No, sir.

THE COURT: So it would be proper only as a part of your case?

MR. SINGER: Yes, sir. It's going to be both.

MR. EATON: It's going to be what?

MR. SINGER: It's going to be both. It will cover the explanation of things in more detail he covered in the deposition, as well as the other information that he's got that's relevant.

THE COURT: Mr. Eaton, I can only go on the basis of my own recollection, but I thought there was an understanding concerning Mr. Belategi; because of the scheduling, that he would be presented out of order after the reading of his deposition. I'm sorry, that's what I recollect. We weren't on the record at the time, I don't believe, otherwise I'd check.

MR. EATON: I don't remember one way or the other. Obviously if we were on the record we can check, and we would certainly stand by what we said on the record. If Your Honor remembers that, you're the boss in this case, and that's fine.

We can certainly live with that, it's just not our preference.

THE COURT: I understand. I recall the discussion Mr. Singer mentions. If it was a misunderstanding, perhaps it was, but that's as I understood it. That was the Wednesday before Thanksgiving when all this came up.

MR. EATON: If that's Your Honor's recollection, we'll certainly live with it.

THE COURT: We'll go with that. That's my best recollection.

Now, what are the objections you have?

MR. SINGER: Your Honor, with regard to Mr. Belategi's deposition, there's a couple of pages and lines that counsel has designated that we believe under the doctrine of optional completeness should be read. Three of them--a few of them are immediately after the testimony, a couple are before, because the testimony is taken out of context.

Your Honor, do you have a copy of Mr. Belategi's deposition?

THE COURT: No, I don't.

MR. SINGER: I can hand up my copy.

THE COURT: This has all been prepared on CD; right?

MR. SINGER: Yes.

THE COURT: The additional parts are not on?

MR. SINGER: That's correct. We would just want to read--as counsel represented, and as in the other deposition, it

begins with a blank screen, and it says these pages and lines, and then it plays, and then the next one comes up with pages and lines, I believe.

Is that right, Steve?

MR. EATON: Yeah. Just like the others.

MR. SINGER: May I pass up a copy?

THE COURT: That's fine, but my suggestion, why don't you read what you think is necessary for completeness at the conclusion of the video portion of the deposition, since we're not going to have it on video conveniently now, right?

MR. SINGER: Right. I don't want to show it on video. He takes--in one of these things he asks about a taper. You heard the testimony about taper. There's two kinds of taper. One is the plaintiffs' theory of taper, when the hole is formed. Another is an intentional taper on the outside of the barrel formed during the manufacturing process to make the muzzle end smaller, therefore lighter and more aesthetically pleasing. He talks about the taper, and there are a couple of misrepresentation issues like that that we would have.

And then in particular--for the record that's just adding--

THE COURT: Have you shown this to Mr. Eaton? Have you shown these portions of the deposition to Mr. Eaton?

MR. SINGER: No, Your Honor.

MR. EATON: Let Mr. Singer finish, and then I'll

respond.

MR. SINGER: He's designated page 12, line 7, to page 14, line 13. We would think that after 13, lines 14 through 15/12 should be read. He's designated page 15 through 18, line 11. We think that 18, line 12 through 19/18 should be read for completeness.

We think that page--he's got 28 through line 15, and we think 16 through 19 should be read.

Before his designation beginning on page 50, line 16, we need to go back to page 49, line 23. Two of them begin in the middle of an answer. Page 84, line 1, is one of his designations, and page 11, line 3 begins in an answer.

And so we have those issues that we think would be appropriate to either read the appropriate part of it, happy to do it in a reading fashion, and some additional would need to be included at--therefore, page 49, lines 23 to 50, line 15; page 83, 24 to 25.

THE COURT: How long is the portion of the Belategi deposition you'll play?

MR. EATON: I think it runs somewhere between an hour and half and two hours.

THE COURT: Here's what we're going to do: You may recall at the final pretrial conference I said--I know I said this because I always do--if you're presenting a deposition, I want all the objections and everything raised beforehand so that

we don't have to keep the jury waiting while we sort out objections, which is exactly what we're doing now. This should have been brought to my attention before now.

B, we're not going to spend any more time leaving this jury waiting. We're going to bring them in, we're going to play this deposition as it is here. The two of you are going to talk over the noon hour, and you let me know if you have objection to the portions of the deposition that he wants to read for the purpose of completeness. If there is, we'll get back here about 1 o'clock, I will rule on those objections, and, Mr. Singer, you can read them, put in the portions of the record you want to from the deposition prior to presenting Mr. Belategi out of order. And that's the way we'll handle it.

MR. EATON: Judge, I can say right now we can object to Mr. Singer reading parts of the deposition of Mr. Belategi and then putting Mr. Belategi on to explain everything. If Mr. Belategi is here and wants to go out of order, and Your Honor is going to allow him to go out of order, we see absolutely no reason to read counter-designations in the deposition that were never raised until today.

THE COURT: I understand your point, but even if Mr. Belategi were testifying here live right from the beginning, and you impeached him with his deposition, if I felt that for reasons of completeness that additional portions of the deposition should be read, I would order it read. So I don't

think that's a reason to reject it, but--I don't know, it's simply a fairness thing.

MR. SINGER: Your Honor, if I might, I think I can clear this up and make it easy for everybody. In light of the Court's ruling as well as if we're going to go ahead anyway right now and not interrupt him, I will just wait. And then at the end I will talk to Mr. Eaton, if he has a problem. Otherwise, we will just have Mr. Belategi read that part when he is up on the witness stand as opposed to reading from the deposition before we put him on.

THE COURT: Let's go ahead with the deposition transcript you want to present.

Let's call in the jury.

(In open court, in the presence of the jury.)

THE COURT: Good morning. I want to particularly thank you for your patience this morning while the Court and the attorneys went over certain issues while you're waiting. I know it's frustrating, but the purposes of our discussions are to smooth things over and actually make things go more expeditiously. As I told you earlier, I'm still resolving legal issues that have to be resolved, and that's where we've been at.

But it was a lengthy period of time, and I regret we kept you waiting this long a period of time before we got to you, but it's something that happens from time to time in a case, and I ask you continue to be patient with us.

At this time, Mr. Eaton, your next witness is going to be?

MR. EATON: Your Honor, at this time the plaintiffs call Mr. Aitor Belategi who appears by deposition.

AITOR BELATEGI, PLAINTIFFS' WITNESS BY VIDEOTAPED DEPOSITION

THE COURT: Play the deposition.

(The designated portions of the deposition of Aitor Belategi were played in open court.)

THE COURT: Members of the jury, we're going to take our noon recess at this time. Court will be in recess until 1:15 this afternoon. During the noon hour, please bear in mind the admonition previously given.

We'll see you at 1:15. Thank you.

(Recess at 12:10 p.m., until 1:20 p.m.)

AFTERNOON SESSION (1:20 p.m.)

(In open court, in the presence of the jury.)

THE COURT: Counsel, I believe we're going to take a witness out of order; is that correct?

MR. SINGER: Yes, Your Honor.

THE COURT: Members of the jury, the next witness is being presented by the defendants. This witness is being taken out of order for scheduling reasons. You're to consider this next testimony as if it was offered during the defendants' case-in-chief.

With that, you may call your witness.

MR. SINGER: Thank you, Your Honor. I'll call Mr. Aitor Belategi.

THE CLERK: Please step forward and raise your right hand.

AITOR BELATEGI, DEFENDANTS' WITNESS, SWORN

THE CLERK: You may take the stand.

DIRECT EXAMINATION

BY MR. SINGER:

Q. Mr. Belategi, you've seen your videotaped--portions, selected portions, of your deposition?

A. Yes.

Q. How long was your deposition? How long did Mr. Eaton question you?

A. He took one day and a half.

Q. Are there some portions of the questions and answers that he played that are taken out of context?
A. Yes, I think so.
Q. How--I don't want to go into your background. You went over that on the video before, but how big of a city, for those of us who aren't familiar with the north part of Spain, is Bilbao?
A. I'd say around two million people.
Q. Guggenheim Museum there?
A. Yes.
Q. The university that you went to there for your advanced engineering degree was a recognized university?
A. Yes. It's one of the most reputable in Spain.
Q. And the seven-and-a-half year program that you were on, is that the normal?
A. Yes, it is.
MR. SINGER: Now, we have Nick here as the interpreter, if necessary. I don't know whether we should have him sit closer, or to just keep trying in English and get as far as we can get.
THE COURT: Why don't we go as far as we can go. If he does need interpreter services, if you could come forward at that time, we would appreciate it.
BY MR. SINGER:
Q. Do you understand English pretty well?
A. Yes, I do.

Q. How often do you get to speak English?
A. More or less a couple of weeks every year, more or less.
Q. And you were agreeable to trying to do this in English to speed things up and move it along?
A. Yes. That's all right.
Q. If you don't understand what I ask you, or what Mr. Eaton asks you, please ask and we'll have it interpreted for you, okay?
A. Okay.
Q. Now, you were involved in the development and bringing to market the Kodiak; is that correct?
A. Yes.
Q. The falling-block design?
A. Yes.
Q. What is a falling-block?
A. A falling-block is a kind of gun where the preloading system, where the gun--down the frame, I would say, to load the gun, to put the primer on. It's the system where the primer is.
Q. Were you involved in the testing of the Kodiak with respect to its function, its features, its integrity, and its safety in the development stage?
A. Yes, I was.
Q. And after the development stage?
A. Yes.

Q. I want you to tell us, if you don't mind, has the--Dikar, do they do ongoing testing in addition to what was done in the development stage?
A. Yes.
Q. Are there additionally ongoing tests that are required in Spain to be done?
A. Yes.
Q. Now, have you personally put a Kodiak brand new, right out of the factory, up to your shoulder and shot it with a magnum primer?
A. Yes.
Q. How many times?
A. A lot of times. Maybe 50.
Q. And where do you do that?
A. In the Proofhouse of Eibar.
Q. Have you watched other people at Dikar do those same shooting tests?
A. Yes.
Q. Now, was there proof-testing done in the development stage of the prototype?
A. Yes.
Q. In the pre-series stage?
A. Yes.
Q. And when we say "proof-testing," what do you mean?
A. Proof-testing means for me doing tests. One of them is the

functional test, I mean that the gun works, it fires with no problem. We do also the drop test, which means we fall the gun to the floor to see if it fires, if the safety works. This is our functional test, this is one part of the development. And the second part is the firing test that we perform in the Proofhouse of Eibar.

Q. Is there any other Dikar designed muzzleloaders that incorporate the same barrel and breech plug configuration, made on the same machines, made out of the same materials, use the same breech plug, as the Apex and Kodiak you described?

A. Yes.

Q. What are those?

A. The break-actions.

Q. What models are the break-actions?

A. The Optima, the Pro, the Wolf.

Q. Are the Optimas, Pros and Wolfs, and Apexes and Kodiaks the same barrel material?

A. Yes.

Q. Same breech plug?

A. Exactly the same.

Q. Interchangeable?

A. Interchangeable.

Q. Same breech plug threads?

A. Yes.

Q. Same breech plug hole?

A. Yes.
Q. Same machines made it?
A. Yes.
Q. Same operators made it?
A. Yes.
Q. Some tap formed threads?
A. Yes.
Q. Now, I want to talk to you just a little bit about the general development of the falling-block design. Tell, just generally, the ladies and gentlemen of the jury how that product came to be, what steps it went through in the development stage.
A. The development of the design of the Kodiak started in around February 2002, and the development also was done with a Spanish center, a laboratory named Ikerlan. They developed the design under the supervision of the Dikar people, and some prototypes were prepared.
Q. Well, let me--I want to walk you through the process. So it began in the design phase at Ikerlan?
A. Yes.
Q. With Dikar representatives in February of 2002?
A. Yes.
Q. And then after--well, first of all, does Ikerlan have computer design equipment?
A. Yes.
Q. Does Ikerlan have the ability, and did it, to do computer

analysis on the forces and the stresses involved in the gun as it was designed?
A. Yes.
Q. And did Dikar engineers also have input, with Ikerlan, in the design of the gun?
A. Yes.
Q. Once the design is approved--did Ikerlan approve the design?
A. Ikerlan and Dikar both.
Q. Once it got approved, what was the next step, first step done?
A. The first step is obviously make the drawings and prepare the prototypes.
Q. Now, the prototypes, how are they made?
A. The prototypes were made partially by Ikerlan and partially by Dikar. Some parts of the falling-block were made by Ikerlan. The barrel, the breech plug were done at Ikerlan.
Q. The first prototypes, were they shooting prototypes?
A. Yes.
Q. Where were they shot, and how were they shot?
A. They were shot in the Proofhouse of Eibar always, and two different firing tests were performed. One was with two guns. Each one of them was shot with a 50 magnum charges, magnum shot, and then later two other guns were shot with a 5--
Q. You're going to have to slow down just a little, please.
A. Sorry.

Q. You created within the barrel what kind of pressure at the proofhouse?
A. Forty-two thousand psi. It's double what the pressure that the manual shows is created in the barrel.
Q. So double the maximum magnum load?
A. Yes.
Q. Now, in addition to that testing, which was the firing testing done by the Dikar employees--
A. Yes.
Q. --and then the overpressure testing done by the proofhouse--
A. By the proofhouse, yes.
Q. --what else is done in the prototype phase, if anything?
A. You mean apart from the functional test and the firing test?
Q. Yes. Anything else? Functional test and firing test. Is that it in the prototype stage?
A. Yes.
Q. Did the gun pass, the falling-block design?
A. Yes. No problem.
Q. It sustained the overpressure test?
A. Yes.
Q. It sustained the functional test?
A. Yes.
Q. It sustained the firing test of the magnum load by the employees of Dikar?
A. Yes.

Q. Once it got by that prototype stage, what is the next stage in the development process?
A. Once the prototypes are approved, then the next step is to start with a pre-series of the manufacturing.
Q. Describe what pre-series is.
A. The prototypes are normally prepared with not a--or not with the final equipment. The machines are not prepared, tolerances on the machines are not prepared, so some of the parts are made by outside suppliers. But the pre-series is done with the final equipment, the final machines, the machines that will do the big production, with the same people, with the same checking tools, with the same everything so that way we know when mass production arrives, what kind of problems we'll have. The purpose is to solve the problems before it is mass produced.
Q. So before you start the production, you actually make a series that you call a pre-series of a number of guns in the manufacturing process?
A. Yes.
Q. As you said, same people, same equipment, same everything?
A. Yes.
Q. And what is then done with those guns?
A. Okay. Those guns are tested again. Mainly the same thing, the functional test to see the performance of the gun, and also the firing test.
Q. Did you fire those in the pre-series?

A. Yes, I did.
Q. Did you watch others fire them?
A. Yes.
Q. At magnum load?
A. Yes.
Q. Did you also send those guns to BPI in the U.S.?
A. Yes, sir.
Q. Do you know what they did exactly?
A. No.
Q. Do you know they fired them?
A. Yes.
Q. Now, just having made those guns and having fired them again, could you begin, in the country of Spain, manufacturing the Kodiak at that point in time?
A. No.
MR. EATON: Objection. The question calls for a legal conclusion.
THE COURT: Sustained.
BY MR. SINGER:
Q. Did Dikar begin its manufacturing at that point?
A. Not yet.
Q. What did you have to do before you began manufacturing?
A. Okay. We have to send a sample to the proofhouse for it to get their approval to start the production.
Q. And did they provide that approval?

A. Yes, they did.
Q. Now, let me show you what we've previously marked as Defendant's Exhibit T, pages 1 through 12.
MR. SINGER: May I approach?
THE COURT: You may.
BY MR. SINGER:
Q. I'd ask you just to identify that document, please, the 12 pages just generally.
A. Yes. These are the documents of the design of the falling-block model, documents that we made when we do the design of the falling-block model.
Q. Does it confirm the testing done internally and externally?
A. Yes.
Q. And overpressure test and the shooting test?
A. Yes.
Q. Were those documents, Exhibit T, maintained in the regular course of business?
A. Yes.
Q. Were they prepared by somebody with knowledge, personal knowledge at the time?
A. Yes.
Q. And was it in the regular course of business to prepare those documents at the time they were made?
A. Yes.
Q. And have they been maintained in the regular course of

business?

A. Yes.

Q. Is that a Dikar business record?

A. Yes.

MR. SINGER: Move Exhibit T.

MR. EATON: Plaintiff does not object to Exhibit T if that's Dikar documents 354 through 365, Bates Nos. 354 through 365.

THE COURT: You can check.

MR. SINGER: That is correct.

THE COURT: T is received.

(Defendants' Exhibit T was offered and received in evidence.)

BY MR. SINGER:

Q. When did Dikar actually complete the design phase with Ikerlan, the prototype testing phase, the pre-series testing phase, and finally complete all the shooting tests for the falling-block design and the Kodiak?

A. The procedure was tested in May 2003, and we can say that the design was finished in May 2003.

Q. And at some point after that, the proofhouse gave you approval, and you began manufacturing or production?

A. Yes.

Q. Now, you talked a moment ago that the identical same breech plug and thread connection and barrel is utilized in the break-

action gun?
A. Yes.
Q. Did the break-action undergo the same process?
A. Yes.
Q. Was it going on about the same time?
A. More or less the same time, yes.
Q. Was there anything different about--was it independently developed separate from the Kodiak?
A. Yes.
Q. And what was different, if anything, about the development of the break-action gun at the time of the Kodiak as you've described?
A. Okay. One of the differences is that the design of the break-action gun was done in Dikar by ourselves, and the design of the falling-block was done at the Center of Ikerlan. So the main reason Ikerlan did the design of the falling-block was too much for our company, was two important new designs, was too much, so we decided it was for them to do it.
Q. Did it undergo the same quality audits and testing of the prototype that you've described for us and is documented with Kodiak?
A. Yes, almost the same.
Q. And the same shooting test?
A. Yes.
Q. Same pre-series?

A. Uh-huh.
Q. The same sending to BPI in the U.S.?
A. Yes.
Q. And then did you also obtain approval, Dikar, from the proofhouse to begin manufacturing the break-action?
A. Yes. We must have this approval, otherwise we're not allowed to start production.
Q. When did you start, approximately, the break-action?
A. Around, more or less, the same as the falling-block, January 2003, January or February 2003.
Q. A little bit before?
A. Pardon me?
Q. A little before the falling-block?
A. More or less at the same time.
MR. SINGER: Your Honor, may I approach?
THE COURT: You may.
BY MR. SINGER:
Q. I will show you Exhibit J-1 through J-4 and ask if you can identify these documents, please, sir.
A. The first document is the drawing of the Wolf barrel which is a break-action barrel, .50 caliber, carbon steel.
Q. Does it have the same--does it have the drawing on it that reflects the threaded area for the breech plug?
A. Yes.
Q. And is it the same as you've previously described?

A. Yes.
Q. And what is document No. J-2, please?
A. It is a drawing of an Optima barrel, which is also a break-action barrel, .50 caliber, carbon steel.
Q. And it also has the same--at the point that we're talking about, the rear of the barrel, the breech threaded area, the same configuration, the same--everything is identical?
A. Yes.
Q. And what is page 3?
A. Page 3 is the drawing for an Apex barrel, which is a falling block model. It's .50 caliber, carbon steel.
Q. What is Exhibit 4--J-4?
A. It is a drawing for a Kodiak barrel. It is falling block barrel, .50 caliber, carbon steel.
Q. Again, those are the same as well?
A. Yes.
Q. As far as those drawings go, they have the actual model name on them?
A. Yes.
Q. As far as Dikar is concerned, is there any difference when we're talking about the making of the hole, the tapping of the hole, the rolling of the threads, the barrel, its metal or breech plug, any difference for any four of those?
A. No. They're the same.
MR. SINGER: Move J-1 through 4 in, please.

MR. EATON: Your Honor, I don't think the Plaintiffs have any objection to those. Without the Bates stamp, I don't know exactly what documents--

MR. SINGER: We had bigger copies that are not Bates stamped.

MR. EATON: I don't think we object, I'm just not sure which document it is.

Plaintiffs have no objections to Defendants' J-1 through J-4.

THE COURT: Thank you. J-1 through 4 are received.

(Defendants' Exhibits J-1 through 4 are offered and received in evidence.)

BY MR. SINGER:

Q. Now, you mentioned the breech plug.

MR. SINGER: May I approach, Your Honor?

THE COURT: You may.

BY MR. SINGER:

Q. Let me show you what we've marked as Exhibit K which is Bates No. Dikar 0167, and ask if you can identify that document, please, sir?

A. Yes. This is the drawing of the breech plug for the falling-block and for the break-action.

MR. SINGER: Move that be admitted.

MR. EATON: Which one is that?

THE WITNESS: K-1.

MR. SINGER: It's K, and it's Bates No. 0167.
MR. EATON: No objection to Exhibit K.
THE COURT: K is--
MR. EATON: It's one page out of the Exhibit K. No objection.
THE COURT: It's received.
(Defendants' Exhibit K was offered and received in evidence.)
BY MR. SINGER:
Q. Was this breech plug different from the breech plug used before then for other Dikar muzzleloaders?
A. Yes, it's different.
Q. How is it different?
A. Okay. You say breech plug?
Q. Is it different on the back end, how it's put in, taken out?
A. Yes. The previous breech plug for other models have the one spring to hold the primer. This one doesn't. This breech plug, the total length is shorter, but the thread is actually larger.
Q. It's a larger thread than the other one?
A. Larger thread, yes.
Q. All right. Thank you. Now, let me get you to walk through very quickly, don't spend a lot of time, but we've talked about how this gun is made, and I'd like you to tell the jury just generally--and I may interrupt you. Start with a piece of steel back in the receiving plant for the barrel, and just walk us

quickly through how this gun is made, please.
A. The main steps of the process?
Q. Yes, main steps.
A. Okay. We receive the barrels. And the first step of the process is making the thread for the breech plug, open the hole and make the thread. Second step is do the outside contour of the barrel. Third step is the polishing.
Q. Let me back up and ask you this, because in the questions that were played to this jury out of your deposition, the word "taper" was mentioned.
A. Yes.
Q. Was that out of context?
A. Yes.
Q. Okay. Is there any taper in the hole for the breech plug, or inside the barrel at all?
A. No.
Q. Is there any taper in the thread forms?
A. No.
Q. Is there a taper on the outside of the barrel?
A. Yes, there is.
Q. Down at the muzzle end?
A. Yes.
Q. Is the barrel made narrower as it goes out?
A. Yes.
Q. What is the purpose of that?

A. One purpose is to make the barrel more beautiful, as we say; and another reason is to reduce the weight of the barrel, make it lighter.
Q. So a hunter going around is not carrying a very heavy piece of steel?
A. Yes, otherwise very heavy.
Q. I'm sorry. I interrupted you. Please keep going.
A. After making the contour of the barrel, we polish the outside of the barrel with different sandpapers to get a bright finish of the barrel. Then we weld parts on the bottom of the barrel, some parts are welded. Right then we go to milling machines, to machine into the barrel the holes for the sights, and machine for the finishing of the barrel.
Then we sandblast the barrel to make it a matte finish. Later we brew the barrel in different tanks where we introduce the barrels. After the brewing process we make the marking on the barrel with a marking machine.
Then we start the breech plug, and once the breech plug is done, the barrel is finished in the assembly line. In the assembly line we assemble the falling-block, the stock, and put the gun in the box and ship.
Q. Let me talk to you about the machine that actually makes the first part of the barrel. You're talking about where you drill the hole in the back and you thread it. Now, on your videotaped deposition you describe the various checks that were done in

that process; correct?
A. I'm sorry, sir?
Q. The quality checks?
A. Okay.
Q. Have you prepared a video that shows the manufacturing machine making a hole in the barrel?
A. Yes.
Q. Have you showed video of the worker checking the size of the opening?
A. Yes.
Q. With the go/no-go gauge that's utilized in the factory?
A. Yes.
Q. And have you prepared a video that shows the tapping, the forming of the hole for the tap--
A. Yes.
Q. --I mean the actual threads?
A. Yes.
Q. And the checking of the threads is done on 100 percent?
A. Yes.
Q. And also the threading go and no-go?
A. Yes.
Q. And that utilizes the gauges that you use, those operators?
A. Yes.
Q. And do you also have a video of the lady who puts in the breech plugs doing that on the Kodiak barrel?

A. Yes.
Q. And this video is of a Kodiak; correct?
A. Yes.
Q. And the machine is the same machine that was there in 2004 when Mr. Katzenmeier's Kodiak was made?
A. Yes.
Q. Same machines?
A. Yes.
Q. How about the worker?
A. Same worker.

MR. SINGER: We would like to show that at this time. It's EE.

MR. EATON: May I--

THE COURT: Just a minute. Mr. Eaton?

MR. EATON: Before we object or don't object, can I ask this witness a couple of questions to voir dire this witness?

THE COURT: You may.

MR. EATON: Thank you, sir.

VOIR DIRE EXAMINATION

BY MR. EATON:
Q. Mr. Belategi, were you present when these several different segments of video were taken?
A. Yes. I record them myself.
Q. You're the man that took those--made those?

A. Yes.
Q. It's your testimony that's a true and correct depiction of those segments along the way in the manufacturing process?
A. Yes.
MR. EATON: We don't object to the admission of that video, Judge.
THE COURT: Exhibit EE is received.
(Defendants' Exhibit EE was offered and received in evidence.)
MR. SINGER: May I publish at this time?
THE COURT: Yes.
THE WITNESS: I think the video may be more helpful than my explaining this.

DIRECT EXAMINATION (Resumed)

BY MR. SINGER:
Q. Let me go through this kind of quick.
Just describe what we're seeing here.
A. Okay. This is the lathe where we make the opening of the hole for the breech plug and the thread for the breech plug. This first step, this is the drill that will open the hole for the breech plug.
Q. That's the hole that we're talking about that you understand, from reading Dr. Tipton's deposition and report and the plaintiffs' complaint in this case, is at issue?
A. Yes.

Q. Now, let's run through that again because it will play again, and if I can stop it--well, I'm going to ask you a question in just a moment as this comes in closer.

Now, that is the drill that is used in the CNC lathe machine; correct?

A. Yes.

Q. Describe--is it a straight drill?

A. Yes.

Q. Does it have three sections to it?

A. Yes.

Q. What is the little knob or first part that's on that drill?

A. It is the guide for the tool to follow the barrel, the guide for .50 caliber.

Q. So the front of that drill has a part of it that is not a drill itself, right?

A. It doesn't cut. Just a guide.

Q. It's just something fitted into the hole?

A. Yes.

Q. Now, I see that the barrel, if you look at it, the barrel is being held in a collar of some type, and it's actually what turns, is it not?

A. Yes. The barrel is turning, the drill is not turning.

Q. Behind it, is this also in the tube holding the barrel? It's just about the size of the barrel as it's spinning?

A. Yes.

Q. Now, as we walk through this again, we will see that the guide starts in and it doesn't have any cutting, and then it starts some kind of shavings, and then it looks like a different kind of cutting; is that correct?
A. Yes.
Q. Is that the third step of the drill?
A. Yes.
Q. What does that part of the drill do?
A. After the guide there is one diameter that will be the one which will hold the threads in the breech plug later. On the end of the tool there is a bigger diameter which will be the part of the barrel that has no threads. So they have to put that through. The guide for the hole, where the threads will be, and the bigger diameter, got more pressure.
Q. You described earlier that after that hole is formed, the stock--it's calibrated on that machine; correct? The machine is calibrated, that CNC lathe machine?
A. Yes.
Q. And the operator, when it's made, then checks every 25th part?
A. Yes.
Q. And you described in your deposition a go/no-go gauge?
A. Yes.
Q. And we have a video that will show that. This is pretty quick.

A. Okay.
Q. I want you to kind of describe, first of all, as he's doing that first step, that's the go gauge?
A. Yes.
Q. And that next step is the no-go gauge; right?
A. Yes.
Q. And that is--that shows that the go/no-go is, as you described it, a bar?
A. Yes.
Q. With round cylinders on each end?
A. Yes.
Q. They are the same diameter all the way up and back, are they not? In other words, the go is a straight cylinder?
A. Yes.
Q. And the no-go is a straight cylinder?
A. Yes.
Q. It is not a round ball, is it?
A. No, it isn't.
Q. Now, the next step you describe was the making of the threads; correct?
A. Yes.
Q. And we'll get that going here in just a second. Would you just kind of--is that the tap that you see? It's kind of a blurry zoomed-in view, but that's the tap that forms the threads?

A. Yes, this is our rolling tap.
Q. Rolling tap.
A. The barrel is turning in one direction, and when the tool comes out, it turns in the other direction.
Q. That is what we've been hearing about, you've described as the forming and the working of the metal up to form the threads inside the barrel?
A. Yes, sir.
Q. Here's where that turns and goes the other way; right?
A. Right.
Q. And that tap is straight, is it not?
A. It is straight.
Q. Now, you describe checking the no-go/go--an additional test?
A. Yes.
Q. There are two more tests done just by that worker; correct?
A. Yes.
Q. One is every 25 pieces, once they're formed with the thread, are checked with a threaded go/no-go; right?
A. Yes.
Q. And the other one is 100 percent of the pieces, every single one, is checked with a go/no-go for size; correct?
A. Correct.
Q. Do you have video clips to show these two checks?
A. Yes.
Q. And I'll just run those as well. You can just explain them.

Use the big screen here in a second, see if I can get it back so you can see. Can you tell, first of all, what worker that is?
A. You mean the name?
Q. Yes.
A. His name is David DePrado.
Q. And describe what he's doing here, please.
A. Well, he takes the barrel out from the machine, the barrel is finished. He takes the go/no-go, the one we use on 100 percent of the parts. He puts the pole into the barrel, and then he tries to put into the barrel the no-go, but there's no way, it must not enter.
Q. Does he lightly touch it?
A. No. The no-go must be done strongly, something like "boom, boom, boom." Like this, you have to do it hard (indicating).
Q. Straight and push it in?
A. Yes.
Q. Now, you have seen, have you not, circumstances when the--when something is wrong with the alignment, or something is wrong with the tap, and a no-go goes; correct?
A. Yes, correct.
Q. And you've described that, in the nine years you've been there, 25, perhaps as many as 50 times; right?
A. Yes. More or less, uh-huh.
Q. It's not usual, but it happens?
A. It happens.

Q. Is that why you do the checks?
A. Absolutely.
Q. What happens, in your experience, what you've seen, what you felt, what you've done yourself, when you put in the no-go and it goes? Can you tell it?
A. Yes. You have a taper thread, the no-go will go in the barrel until a certain point. So it will go in, the no-go, do something like (indicating), and it will be difficult to take it out because you're introducing a cylinder into a cone. It will do something like (indicating). It would be even difficult to take it out.
Q. But it's very easy to detect?
A. Yes.
Q. And, again, this shows David with the go/no-go, using the go first, and then the no-go?
A. And the no-go.
Q. And the no-go also has--you can see a thin part of the tool sticks out if the no-go doesn't go like it should, correct?
A. This is important because you can't clearly see that it doesn't go. It's something like "clunk, clunk, clunk," you can't even hear the noise like this. So it's a feel test.
Q. And if you--not only can you feel it if it goes beyond where it should, but you can see it with the eye on that tool?
A. Yes.
Q. And that's why that tool is made that way?

A. Exactly.
Q. Now, you discussed the threaded go/no-go?
A. Uh-huh.
Q. I want to talk with you about that in just a minute. You described it earlier, but it's similar, as you see it up on the screen, it is a similar gauge; correct?
A. Yes.
Q. It is a cylinder that's the same at the front edge as it is at the back edge of the go?
A. Yes.
Q. It's linear, it's not tapered, it's not round?
A. Linear.
Q. At the other end it is the same, too; correct?
A. Yes.
Q. But it is used to thread it; right?
A. Yes.
Q. And is this also the job of the operator, to do the threading, once that's made?
A. Yes.
Q. Now, again, how many of the size go/no-go are--how many pieces are checked?
A. Repeat, please.
Q. The one we just looked at, the no-go and go, after the threads are formed, just for the size, to check the size of the opening, how many are checked, how many of the pieces?

A. All the parts, 100 percent.
Q. How many of the threaded ones are checked?
A. One every 25 parts.
Q. If something is found out of the ordinary in that 25, as you said in the videotape, you have to go back and check the previous 24?
A. Yes.
Q. You also have to stop the production and call quality?
A. Yes, for sure.
Q. We'll go through this quick and I'll just play David doing the threading because it takes a moment.
Is this the go?
A. Yes, it is. This is the no-go.
Q. Okay. Now, the barrel, once it finishes that process, does it then go to the outside to be worked on?
A. Yes.
Q. Is the inside, from that standpoint, complete--
A. Complete.
Q. --once it's been checked?
Now, are there additional quality audits that are done on that part each day?
A. Yes, there are.
Q. You were almost talking about it in the video deposition but it was cut off and didn't play. Was that another area that was out of context?

A. Yes.
Q. I want you to describe for this jury what additional checks are done every day on using the go/no-go for the diameter of the opening of that barrel?
A. There are mainly two additional checkings that are done to the parts. The first one, when the worker starts, the first part must be checked by the quality people, one person from the quality department must do all the checking and must give our worker approval to start the production.
The second quality control that is done by the quality control people, they do random checking in the whole factory of the different machines. They go and they check different parts. This is their job, they do it every day.
Q. Are quality people trained on every machine?
A. Yes.
Q. Can they operate every machine, do every job in the plant?
A. Yes.
Q. Are they somehow different, or can you see that they're not just a worker that day at a machine?
A. Yes.
Q. How can you tell a quality person apart from another person?
A. They wear different clothes.
Q. What do the quality people wear?
A. They wear different colored clothes. They're dressed in green. The workers you see here are gray, as you can see.

Q. Again, I just want to go back to what you just said. Before the machine--the first part is made, a part is made, it is checked by the worker. Each of the checks is made, the calibration of the machine is checked, and when that piece comes out and it passes that work, before you can begin production and send that barrel or make any other barrels, the quality department has to come and approve it?
A. Yes.
Q. And then independently, totally separate and distinct, during the course of the day the quality people come by and do checks?
A. Yes.
Q. And they do it throughout the plant?
A. Yes.
Q. Do they especially do it in the area of the forming of the barrel?
A. Yes.
Q. Why is that?
A. Because the making of the thread for the breech plug is critical step of the process.
Q. Is it important to have good safety for that?
A. Yes.
Q. It is possible in engineering and in mechanics that tools wear out and things get out of line and there may be an out-of-tolerance part?

A. Yes.
Q. That's why you do these checks?
A. Exactly.
Q. Is that also why the quality people come back and check it as well?
A. Yes.
Q. Describe the checking that the quality person does each day of the barrels made in that process.
A. Okay. The quality people go to the machine and they see all the different checkings of this barrel, and--for example, it's very easy to check a go/no-go, to check, see if the thread is correct, because when barrels are finished, they are put in a rack. They're all in a row. So you can check with a go and no-go one by one to see if they are or are not correct.
For example, in ten minutes you can check 200 parts. It's fast and easy, but important.
Q. So the quality people, after the barrels have already been made and gone through the 100 percent quality audit that the operator does, the quality people each day check a whole bunch of them, too?
A. Yes.
Q. Do they check every single one?
A. No.
Q. Some days they do, some days not?
A. Some days they check 100 percent, some days no.

Q. But they just come to verify everything is accurate?
A. Yes.
Q. You described that the barrel then goes to the outside work, then goes to various processes through the plant. But you told us that it gets to a point where the breech plug is installed; correct?
A. Yes.
Q. Now, is that another step where the critical safety factor of the engagement of the breech plug in the barrel and the forming of the threads is inspected?
A. Yes.
Q. Describe that for the jury.
A. The person who assembled the breech plug into the gun must look at the barrel, the tip of the barrel, must check it, if they see anything strange in it. He has to install the breech plug by hand to feel if there is anything strange in the threads. The assembly of the breech plug must be small, otherwise they may have something broken.
Q. We have a video of that as well?
A. Yes.
Q. All right.
A. This is a breech plug installing process for a Kodiak.
Q. Who is this madam here? Who is the lady?
A. The name you mean?
Q. Yes.

A. Her name, Ampara Lijo.
Q. Was she also a breech plug installer and doing this function in 2004 when this gun was made?
A. Yes. It was the person who installed the breech plug in the batch with this gun.
Q. You checked the records and she was the one who was the breech plug installer on the Katzenmeier's batch of guns?
A. Yes.
Q. And was David the lathe operator on the Katzenmeier batch of guns?
A. Yes.
Q. Just describe what she is doing, please.
A. She checks the inside of the barrel.
Q. Both ends?
A. Both, yes; the muzzle to see if it's rightly done, turn the barrel and checks the threaded area for that breech plug, if everything is correct. Then she takes the breech plug and puts this grease on it.
Q. Anti-seize compound?
A. Sorry?
Q. Anti-seize lubricant for the breech plug?
A. Yes.
Q. And she puts it in by hand?
A. She puts it in by hand to feel with the hand that everything is correct. She first install the breech plug with a pneumatic

tool in the end, then some threads back, and she finally finishes by hand again.
Q. She's also about to go through another checking. And describe what that is before we go on.
A. This is another go and no-go to check if the position of the breech plug is correct, it's not too far on the other side, too far to plug.
I think it's finished.
Q. Now, I think Exhibit 102 and 101 was introduced yesterday by the plaintiffs. You have not seen it. It's an exhibit prepared by Mr. Tipton whose deposition you have read, I believe; correct?
A. Yes.
Q. I would like you to look at the exhibit of his artist rendering of what he thought the go/no-go looked like.
Mr. Belategi, that obviously looks absolutely nothing like the gauges you used, is it?
A. No.
Q. How many countries have you been in where you have seen go/no-go gauges in use in factories? Or just tell us the countries.
A. I've seen this kind of go/no-go as the one we use in Germany, Swiss, Spain, of course, United States, even China.
Q. Have you ever seen a round-shaped go/no-go in your life?
A. No, never.

Q. Would any engineer ever use a round shaped go/no-go gauge to try to measure the shape of a hole?

MR. EATON: Objection, Your Honor. Lack of foundation.

THE COURT: Sustained.

BY MR. SINGER:

Q. Would you ever use or allow a Dikar person to use any round go/no-go gauge shaped in a ball like Mr. Tipton had--Professor Tipton, to check the size of an opening?

A. No. It's not appropriate to use this kind for the go/no-go.

Q. And you buy no-go gauges; is that correct? That's part of your job at the factory?

A. Yes.

Q. And have you ever even seen one shaped like that in a catalog offered anywhere for sale?

A. No, never.

Q. Okay. Thank you. Now, you described earlier that in addition to the testing done in the development, Dikar does and the guns undergo ongoing testing; is that correct?

A. Yes. Uh-huh.

Q. I want to ask you first of all about test shooting that Dikar employees do of the guns. Do they shoot the guns?

A. Yeah, they do.

Q. Where?

A. In the Proofhouse of Eibar.

Q. Can you just go out in Spain to a farm and take your employees and shoot?
A. No.
Q. It's not allowed?
A. No.
Q. How often are Dikar employees at the Proofhouse of Eibar on the gun range putting guns to their shoulders and shooting?
A. They go at least three days per week. The proofhouse shooting gallery is reserved for Dikar people on Monday, Tuesday, and Wednesday of every week for one-and-a-half hours.
Q. Have you, yourself, gone and shot those guns?
A. Yes.
Q. What's the purpose? What do you use that for?
A. Okay. They are different purposes, but they want to--one is training our people. We think it's important for them to know how the guns work, how they perform, it's a gun, how it works. And we do some production tests, accuracy tests, this kind of thing, accuracy tests, different powder, different bullets, I mean this kind of stuff.
Q. Is that a required testing?
A. No. It's voluntary test.
Q. Is there any paperwork kept when you do that every Monday, Wednesday, Friday?
A. No.
Q. Is there anybody at the factory, anybody at Dikar that does

not participate in that shooting?
A. No. Everyone participates in the shooting.
Q. The people upstairs who are in the office, they go to shoot?
A. Yes.
Q. And everybody does?
A. Yes.
Q. And that includes these falling block and these break-actions?
A. Yes.
Q. And have over the years?
A. Yes.
Q. Now, those guns, how are those chosen for the employees to go out and load them with magnum loads and shoot them?
A. Randomly they're chosen from the production. I mean, we go to the factory and we take randomly one or two or three or whatever.
Q. Does the worker know which gun is going to be pulled out to go shoot?
A. No.
Q. And after those guns are shot, what happens to those guns?
A. They are normally cleaned properly and they keep in production.
Q. Now, you described in the deposition, I think, the monthly tests.
A. Yes.

Q. Describe for the jury what monthly tests are required.
A. Okay. The monthly tests are one requirement of the proofhouse, that we must send five guns every month for them to make the overpressure test.
Q. And have you been at the proofhouse when this is done?
A. Yes.
Q. Have you watched it being done?
A. Yes.
Q. And what pressure is the overpressure test done at?
A. 42,000 psi.
Q. Roughly 100 percent more than the gun is expected to see in service?
A. Yes.
MR. SINGER: May I approach, Your Honor?
THE COURT: You may.
BY MR. SINGER:
Q. I will hand you what is marked Exhibit L, pages 1 through 70, which I'll represent to you are tests in 2003 on the break-action and/or falling-block, tests in 2004, monthly tests of the break-action or falling-block, and the ones in the 2005 that were break-action and falling-block.
Dikar had other guns; correct?
A. Yes.
Q. As you said, they were a little different than this?
A. Uh-huh.

Q. I'd ask, first of all, do you recognize that document?
A. Yes. These are the official reports from the proofhouse of the monthly test.
Q. Is that a government record?
A. Yes, it is.
Q. Is it something that is prepared by the proofhouse each month?
A. Yes.
Q. Is it something that Dikar is required by law to keep in their files?
A. Yes, it is.
Q. And do these--are they made by someone with personal knowledge at the time?
A. Sorry?
Q. Are they made by someone with personal knowledge of the information in those documents?
A. Yes.
Q. And at or about the time that they're issued?
A. Yes.
Q. And they're maintained by Dikar in the regular course of its business?
A. Yes.

MR. SINGER: Your Honor, we would move that they be admitted?

(Defendants' Exhibit L was offered in evidence.)

MR. EATON: Your Honor, Plaintiffs object. Those documents are clearly hearsay. They're not prepared by Dikar. I can't cross-examine the maker of those documents.

MR. SINGER: It is both a government record and business record.

THE COURT: These are prepared by the proofhouse?

MR. SINGER: Yes.

THE COURT: Objection sustained.

MR. EATON: Lack of authentication.

BY MR. SINGER:

Q. Well, let me just ask you, and if you need to look at the exhibit before you can tell, tell the jury was the break-action and the falling-block sent to the proofhouse for overpressure tests, five barrels per month, during 2003?

A. Yes, they were sent in.

Q. And were they also sent for 2004?

A. Yes.

Q. And were they sent in 2005?

A. Yes.

Q. And you know that from your own personal knowledge, too; right?

A. Yes.

Q. Without the documents; correct?

A. Yes.
Q. Now, Dr. Tipton in his testimony last week indicated that he was under the impression, and based his opinions upon an understanding that the tests were 20 to 25 thousand psi. Are those tests done by the proofhouse at 42,000 psi?
MR. EATON: Object to the form of the question, Your Honor. It misstates Dr. Tipton's testimony. Form of the question.
THE COURT: Overruled. The jury will recall what the prior testimony was.
You may answer, sir.
A. Would you repeat the question, please?
BY MR. SINGER:
Q. What is the pressure that Dikar is required to test five guns a month at, that the proofhouse has to do the testing?
A. 42,000 psi.
Q. Forty-two. Okay. Now, as an executive within Dikar, can you make a gun and ship a gun without the proofhouse approval?
A. No.
MR. EATON: Objection, Your Honor. Lack of foundation; calls for a legal conclusion.
THE COURT: Overruled.
BY MR. SINGER:
Q. Go ahead.
A. No.

Q. Now, a moment ago there was some--in the deposition there was a--Mr. Eaton again took out of context a certain part of a document that's a Dikar document that describes certificates, proof certificates; correct?
A. Correct.
Q. Are guns sold in the U.S. required to have proof certificates?
A. No, we don't.
Q. Does the government require Dikar to overpressure test--for them to overpressure five guns per month sold in the U.S.?
MR. EATON: Your Honor, Plaintiff objects to these questions. It calls for a legal conclusion on the part of the witness, lack of foundation.
THE COURT: Overruled.
BY MR. SINGER:
Q. Go ahead.
A. Please repeat the question, please.
Q. Does Dikar submit five of the guns each month, the barrels and breech plugs, to the proofhouse--
A. Yes.
Q. --as a requirement for overpressure testing before they'll be allowed to ship any to the United States?
A. Yes.
Q. Now, does Dikar proof-fire every one of its guns going to the U.S.?

A. No.
Q. The overpressure tested guns that get tested at 42,000 psi, 100 percent more than the service load, what is done with those guns after the proofhouse tested them?
A. One of the barrels is sent to the laboratory to check the inside of the barrel, see if there is any kind of a small crack or any kind of a problem. And then later they come back to Dikar and we destroy them.
Q. Why does Dikar feel like they need to destroy those guns--first of all, have any of those Kodiak falling-blocks failed that overpressure testing?
A. No.
Q. Why would Dikar take them out of service?
A. Because 42,000 psi is a big pressure that may cause, how you say, formations inside the barrel, may cause accuracy problems, for example. So we decided not to send any one of them.
Q. Just don't want to take the chance?
A. Yes.
Q. Now, are there periodic tests that Dikar does from time to time?
A. Yes.
MR. SINGER: Your Honor, may I approach?
THE COURT: You may.
BY MR. SINGER:
Q. Let me show you what we've marked as Exhibit S.

MR. SINGER: Bates Nos., counsel, 264, 66, 67, 271, I think.

BY MR. SINGER:

Q. Do you recognize that?

A. Yes.

Q. What is that document, please?

A. This is a traction test.

Q. What is--what was Dikar--when was that done?

A. When? 2002, I think October or July--I think it's October, maybe July.

Q. What is the--why did--when you say "traction test," why did Dikar have a traction test done, and why did they have a traction test done in 2002?

A. Because we wanted to know, obviously, the performance of the gun regarding the safety. I mean, we know the gun is safe because we have done the personal tests, but we wanted to know where we were. I mean, the gun may be safe, very safe, very, very safe, or super safe. And I think during these tests we found out that they were super safe.

Q. What is the test that was done? Was that comparing cut threads and rolled threads?

A. No. Not exactly.

Q. What was it?

A. The purpose of the test was to know where we were according to the safety of the guns.

Q. What was done, though? What was done on the test?
A. Two barrels were tested, one with a cut tap, another one was done with the rolling tap. So we prepared a section of the barrel with a breech plug in the end to hold, they've got a machine, and they test the barrel. So this machine checks if something breaks.
Q. As a result of that test did Dikar verify that the rolled thread was strong for the application it was used in?
MR. EATON: Your Honor, I object to this. There's a lack of foundation, and there's no foundation that Dikar performed this test, so the results of it are hearsay.
THE COURT: At this point the objection is sustained on foundational grounds.
BY MR. SINGER:
Q. Did you commission the test yourself?
A. No.
Q. Was it done at Dikar with your knowledge?
A. No. It was done in our laboratory.
Q. Were you aware the laboratory was doing it?
A. Yes.
Q. Did you review the results of it?
A. Yes.
Q. Did the laboratory issue a report at your request?
A. Yes.
Q. Was it made in the regular course of business, to make that

report at the time?
A. Yes.
Q. And did they provide that to you, and has it been maintained in your quality records in the course of your business?
A. Yes.
Q. And was it the course of business to maintain it at the time?
A. Yes.
Q. And did you in fact keep it and has it been produced to counsel in this case?
A. Yes.
MR. SINGER: We move it be admitted.
MR. EATON: Same objection, Your Honor. It's hearsay.
THE COURT: The objection is overruled. However, the jury will consider this testimony and--is the exhibit offered?
MR. SINGER: Yes.
THE COURT: --the exhibit not for the truth of anything contained in the exhibit, but only for the purpose of showing what information was provided to the defendant.
With that instruction it's received.
(Defendants' Exhibit S was offered and received in evidence.)
MR. SINGER: May I approach?
THE COURT: Go ahead.

BY MR. SINGER:
Q. Let's me show you what Plaintiff introduced earlier as Plaintiffs' Exhibit 15. Let me--first of all, the threads at the top, are they cut or rolled?
A. Cut threads.
Q. Is this a stainless steel barrel? The Winchester, is that stainless steel?
A. Yes, it is.
Q. The Winchester Apex, some of them were rolled taps?
A. Yes.
Q. Carbon steel was rolled?
A. Carbon steel, yes.
Q. Only stainless was cut?
A. Yes.
Q. Why, again, was that?
A. Stainless steel is a difficult material to work with rolling taps. It doesn't work properly.
Q. These others were made with the rolling tap; correct?
A. Yes.
Q. The 2004 Kodiaks?
A. Yes.
Q. Now, they show voids in the top?
A. Yes.
Q. Is this something that Dikar was aware of--you were aware of before Dikar began using rolling taps?

A. Yes.
Q. And when did Dikar begin using rolling taps in the manufacture of the threads of these guns?
A. We started around 2003, around.
Q. After the test that we've just described where they check the traction of the rolling threads--
A. Yes.
Q. --in part?
I may have asked you this, and I apologize: Would each of the relevant periods of time, 2003 to about 2005, all of the falling-blocks, Apexes and Kodiaks and Kodiak Pros, and all of the break-actions, Optima, Optima Pro, and Wolf, all those were made with the same rolling tap?
A. Yes.
Q. The same as we've seen in the tape?
A. Yes.
Q. Now, is there any standard, any book, any engineering treatise, any pamphlet, any literature anywhere that you're aware of in the world that describes the size of voids in the top of rolling taps?
A. No.
Q. Or describes what is acceptable or unacceptable?
A. No.
Q. It's all uniform, that it's going to be there; correct?
A. Yes.

Q. You described in your videotape earlier that one of the disadvantages of a rolling tap is the top of the thread, if the engagement of the male is not good, it can be weak at the top; correct?
A. Correct.
Q. Now, if the engagement is proper in a Dikar thread, and the breech plug is down where it should be, does the load carry from the male to the thick part of the breech plug--of the barrel? Excuse me.
A. Repeat that, please.
Q. If the engagement is proper in a thread even with female voids and male--particularly if the male is harder steel than the barrel, and the engagement is down below where the voids are, is the load going to be transferred from the male thread into the thick part of the female thread?
A. Yes.
Q. So the voids will not have any interference at that point in time; is that correct?
A. If the engagement is correct, the effects of the void is very small.
Q. You described earlier that there's advantages to the rolling tap?
A. Yes.
Q. Describe, again, what are those. I don't want to belabor that. What are the advantages?

A. Advantages of working with rolling tap you mean?
Q. Yes.
A. I think there are two main advantages working with a rolling tap. One is as far as the thread is not cut, it is formed. The material is compressed and compressed, so this gives additional strength to the thread. There are no chips because there are no cuttings. The process is very stable. Chips may cause some problems in the tools because it can be, like, welded to the tool, or attached, and this may cause some problem. The rolling taps, it does not occur because there are no chips. So this means that the process is very uniform, very stable, very repetitive, all the parts in the same way. This is one and two main advantages.
Q. In part of the nine years you've been there, back when Dikar was using the cutting threads tap, have you seen the circumstance where--in one of those 25 or 50 that you saw--where the barrel did not have the proper thread form as a result of a chip being caught in a thread of the tap and making a hole an improper size?
A. Yes, I saw that.
Q. During the course of the years, has Dikar done other tests?
A. Yes.
Q. Has Dikar tested additional--done additional tests, even in 2004, on the traction of the rolling threads?
A. Yes.

Q. And has Dikar done additional tests, shooting tests over the years?
A. Yes.
Q. And continues to do so?
A. Yes.
Q. Both in-house and at the proofhouse?
A. At the proofhouse, yes.
MR. SINGER: Your Honor, may I approach?
THE COURT: You may.
MR. SINGER: This is BB, which is Bates No. 0366 through--
May I approach?
THE COURT: You may.
BY MR. SINGER:
Q. I'll show you what is marked as Exhibit BB. Can you identify those Dikar documents for us, please.
A. Yes. These are the--quality system has a different person do it, a different person do it to show how to do our work, I would say. And this is the summary of the hours of the quality work done in 2004 to this different person, quality person.
Q. So those would be the procedures for the quality work done on the 2004 guns made, which would include the Katzenmeier gun?
A. Yes.
Q. Were they maintained, prepared by Dikar?
A. Yes.

Q. By someone with knowledge?
A. True.
Q. At or about the time of the information contained in them?
A. Yes.
Q. Were they maintained in the regular course of business?
A. Yes.
Q. And has it--was it the regular course of business to keep the documents, to maintain them at the time?
A. Yes.
Q. And prepare them when they were prepared?
A. Yes.

MR. SINGER: Ask that they be admitted.

(Defendants' Exhibit BB was offered in evidence.)

MR. EATON: Your Honor, the plaintiffs would object to this particular exhibit for the reasons stated in the pretrial order. It's not relevant to any issue, it's hearsay, and it's--I'll add one. It's not reliable because it's all in Spanish.

MR. SINGER: That document is in Spanish, too. This is the next one. This is BB.

MR. EATON: It was Spanish in my book, too.

THE COURT: Is it Spanish?

BY MR. SINGER:
Q. Is that in Spanish?
A. Yes.

Q. Does it have any English translations?
A. Not here.
Q. That's a copy of the original?
A. Yes.
THE COURT: Is there an English translation that you can authenticate?
MR. SINGER: Not that I know of.
THE COURT: I'll sustain the objection.
BY MR. SINGER:
Q. I'll show you Exhibit CC and ask if you recognize these documents?
A. Yes.
Q. And what are they, please?
A. These are the--what was done by quality people on different machines in the production of parts of this rifle we are talking about.
Q. So those are the actual quality records, handwritten, done on the batch of the production that Mr. Katzenmeier's gun was made in?
A. Yes, it is.
Q. Was that maintained in the ordinary course of business?
A. Yes.
Q. Was it made in the course of business?
A. Yes.
Q. By someone whose job and responsibility was to record it at

the time it was recorded?
A. Yes.
Q. Has it been maintained in the course of business since then?
A. Yes.
Q. And is it a Dikar business record?
A. Yes.
Q. Would there be any--if there was a problem noted, like you've described earlier the bell-mouthing was noted, or any other problem, would that be noted on those documents?
A. Yes.
Q. Is it? Is there any such notation?
A. No. No.
Q. If there had been--check again, please.
A. There are some comments written in, but not--
Q. What are the comments about?
A. Pardon me?
Q. What are the comments written on there, what are they about?
A. They're saying some parts have some burrs, in the muzzle.
Q. Let me go back. I want to slow you down. I asked you, first of all, if there was a tapered hole, or a hole out of size, would that be found. Would that be reflected in that document?
A. Yes.
Q. Is there any such comment about that?
A. No.

Q. If there's any other quality problem, would that be noted?
A. Yes.
Q. Is there a notation that some of the barrels had burrs on the outside of them?
A. Yes.
Q. Any other comments during that quality audit of this entire batch?
A. Yes. Again, some burrs in the welding of the parts.
Q. In the welding?
A. Yes.
Q. So the welds had a burr?
A. Yes.
Q. Detected either by the worker or by the quality department?
A. Sorry?
Q. The burr was detected by either the worker or the quality department?
A. It doesn't say here. Maybe any one or both.
Q. Any one of those two?
A. Yes. They say that there are one guy in the quality department, he said he has permission to sign the first part. When the first part is produced, he can sign. This is a new guy I would say.
Q. It's a notation that the new guy has the authority to sign?
A. Yes.
Q. All right. If there was a tool that was worn, would that be

reflected in that?

MR. EATON: Objection, Your Honor. There's really no foundation for this. There's no explanation as to the methodology by which this is compiled, so it's lack of foundation. It's not establishing that it's foolproof, and it's in Spanish, and it's not been offered or admitted, so we object.

THE COURT: Overruled.

BY MR. SINGER:

Q. Go head and answer, please.

A. Where are we?

Q. If the tools had been worn or needed to be replaced, or there was some improper part formed, would that be noted in the quality notes you have there?

A. No. When we change the tools, they are recorded in some record different from this.

Q. If there was a part that was out of tolerance, would it be noted?

A. Yes.

Q. Was there any such note, other than you've described for us?

A. Nothing.

MR. SINGER: I move Exhibit CC be admitted.

(Defendants' Exhibit CC was offered in evidence.)

MR. EATON: Your Honor, we make the same objections. It's hearsay, it's lack of foundation, it's not reliable because

it's in Spanish.

THE COURT: For the present, I'll sustain the latter objection. We'll make further record on this later. For now it's sustained.

BY MR. SINGER:

Q. Let me show you Exhibits V, DD, U, and N. Do you recognize each of these documents as documents provided to Dikar as a result of various and additional overpressure tests, voluntary tests sought out by Dikar and done by the proofhouse?

A. Yes. There are some additional voluntary overpressure tests asked by the people at Dikar by the proofhouse.

Q. And that's a routine thing that Dikar does?

A. Yes.

Q. And the proofhouse would generate the official documents even if it's a voluntary test you request be done?

A. Yes.

Q. What is the purpose that Dikar does that?

A. The purpose of these tests are to see the performance of the gun, the guns with different--with different, I'll say, things on them, or seeing how they work for our own knowledge to know more about our guns, to know how they perform in different ways.

Q. There is an exhibit, and I'm sorry, I had it with me, it's a Plaintiffs' exhibit. It's a photograph of a barrel taken by Mr. Roane. Are you familiar with the markings on the barrel of the Kodiak and other Dikar guns?

A. Yes. Yes.
Q. What is--first of all, let's talk about the serial number. It's 61. What does that mean?
A. That means the gun.
Q. What's 13 mean?
A. It means muzzleloading gun.
Q. What are the next series of numbers?
A. Of the serial number?
Q. Yes.
A. Finally the year.
Q. 04, for example, would mean 2004?
A. Yes.
Q. Above that there are other markings you described are placed on there by Dikar?
A. Yes.
Q. That is the shield with the knight's head on it?
A. Yes.
Q. And three little balls in a triangle stack?
A. Yes.
Q. What do you understand that to be, those two marks?
A. The knight is a helmet, is insignia of the--emblem of the proofhouse in Spain. The three balls means that it's a muzzle loading gun they have proof-tested.
Q. Does that mean proof-fired?
A. No.

Q. Why are those marks put on that barrel?
MR. EATON: Object, Your Honor. Lack of foundation, and he's going to give a hearsay answer.
THE COURT: The objection is overruled.
BY MR. SINGER:
Q. Go ahead. Why are they on there?
A. Why? Because the proofhouse tells us to mark all these things.
Q. There are two more marks down the barrel, like an X and a number. Are you familiar with that?
A. Yes.
Q. I don't think anybody has talked about that. What is that?
A. This is the qualification of the year for the proofhouse. I mean X.2 means 2004, that would be qualification for them.
Q. What would be 2005?
A. Z.2. Alphabetical.
Q. Alphabetical? So Z.2 would be 2005?
A. Yes.
Q. Now, have you personally been in--first of all, do the government officials come into the Dikar plant?
A. Yes.
Q. How often?
A. Very often. I would say every week.
Q. Do they have the ability to go anywhere they want to go?
A. Yes.

Q. Can they--can they come unannounced?
A. Yes.
Q. Can they check the workers?
A. Yes.
Q. Can they check the procedures?
A. Yes.
Q. Can they check the equipment?
A. Yes.
Q. And do they?
A. They do.
Q. Have you personally seen the government officials, proofhouse officials, stand there and watch as these marks are put on the barrel?
A. Yes, sir. Yes.
Q. To make sure that they're on there properly?
A. Yes, sir.
Q. And as instructed?
A. Yes.

MR. EATON: Objection, Your Honor. Calls for hearsay.

THE COURT: Well, not only that, the question asks about the reason why somebody else did something, so the objection is sustained.

MR. EATON: Your Honor, also at this point could you give the admonition that we discussed earlier about the--about what the proofhouse told us to the jury?

THE COURT: Members of the jury, testimony about what the proofhouse, the House of Eibar, instructed Dikar concerning the marking of its firearms, as well as any testing that they instructed to be done, may be considered by you only as it may explain Dikar's reasons or motives for its procedures in certain testing and marking of muzzleloaders. You should not consider such testimony for the truth of anything representatives of the House of Eibar are said to have done. And, of course, as to any evidence, it is for you to determine what credibility to give it.

With that instruction, you may proceed, Mr. Singer.

BY MR. SINGER:

Q. Have you, in the course of your time at Dikar--there was a small snippet that you heard in the end of your deposition about cutting open the barrel after Mr. Katzenmeier's case. Did you hear that?

A. Yes.

Q. That was also taken out of context, wasn't it?

A. Yes.

Q. Have you cut open barrels and looked at the thread and breech plug connections?

A. Yes.

Q. How many times?

A. A lot of times.

Q. What is the very first job you had that you remember when

you got to Dikar as an engineer?
A. One of my first jobs was to cut the barrel, to check the threads of the breech plug, I remember that.
Q. And the connection to the barrel?
A. Yes.
Q. And did you--do you use that for training?
A. Yes.
Q. Now, had you ever looked under a powerful microscope at the grain structure of the metal before this case and these experts?
A. No.
Q. Had you looked, though, at the thread form and the barrel/ breech plug connection cut in half?
A. Yes.
Q. And had you looked at it under magnification?
A. Yes.
Q. What kind of magnification?
A. We use two kinds. One is a profile projector.
Q. A profile projector?
A. Yes. There's one used in the quality control to measure the parts or to see so many things, so we use that. We use also this kind of--I don't know what the name is. It's the one that Sherlock Holmes uses.
Q. A magnifying glass?
A. Yes.
Q. Do you use it to train your workers?

A. Yes.
Q. And is there in the Dikar office a cut-open section of the barrel with these threads and the breech plug--
A. Yes, sir.
Q. --similar to these exhibits that you've seen with it having engagement?
A. Yes.
Q. Just a couple of more. What--is there a generally--what do you do to check the gauges that you use to check the other style?
A. It's a checking tool, it has its own person checking them, so the quality department checks them from time to time. They bring in the tool. Each tool has a different frequency of checking, so some of them are checked in Dikar, some are sent to the laboratory for them to check.
Q. In addition to the proofhouse monthly test, in addition to the overpressure special test, in addition to the other traction and other kinds of tests, in addition to the shooting tests that your employees do on the falling-block, are there also those kinds done on the break-action, and have been over the years?
A. Yes.
Q. Have you ever hesitated to pick up a gun right off the rack in the manufacturing process at random, take it to the proofhouse, load it with a magnum load, put it to your shoulder, and fire it?

A. No.
Q. Have you ever hesitated to have any of the other employees of Dikar do that?
A. No.
Q. Has any falling-block or break-action made with these rolling threads ever failed the overpressure monthly test at the proofhouse?
A. No.
Q. Ever failed any special overpressure test?
A. No.
Q. Ever failed any shooting test you all have done on the Mondays, Tuesdays, and Wednesdays?
A. No.
Q. I'm talking about from the safety standpoint.
Who at Dikar is responsible for making sure that the products that go out meet the specifications?
A. It's on--every worker of Dikar is responsible for the work, I mean is responsible for the quality control of the work.
Q. At the end of the day, at the top of the food chain, I call them the big dog, who is the man ultimately responsible that Mr. Katzenmeier's gun went out of that factory in the specs that it should go out, and properly manufactured?
A. I am this man.
MR. SINGER: Thank you.
THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. EATON:

Q. Mr. Belategi, that last series of questions that Mr. Singer asked you, are you testifying that you know of no muzzleloader firearms that have gone out of that Dikar factory that are totally free--that have defects? Are you telling me every gun that goes out of there is 100 percent free of defects, is that what your testimony was in the last three or four questions and answers?

MR. SINGER: I object. It's outside the scope and the subject to a prior ruling.

THE COURT: It's not outside the scope. I'll allow it.

A. Repeat.

BY MR. EATON:

Q. Those last three or four questions Mr. Singer asked you and your responses to them, are you attempting to tell this jury that you're confident that every gun that goes out of that Dikar factory is 100 percent free of defects?

A. What I mean with my answers is that every gun that is shipped to the U.S. has been quality tested, all of them, and have been properly manufactured.

Q. Are you saying that they're free of defects? That's what I want to know, that they're 100 percent free of defects because of these quality inspection and control procedures that you've

told us about?
A. Yes.
Q. All right, sir. You don't know of any guns that went out the door that had defects in them; is that what you're telling us?
A. I know, again, that every gun we produced, are produced under strict quality control, and every gun has been properly tested.
Q. I know you told us that several times. What I want to know is, are you confident that every gun that goes out that door is free of defects?
A. I'm confident, yes.
Q. You don't know of any defective guns that have gone out; is that what you're telling us?
A. When we send the guns, I don't send any one that I think have any kind of defect.
Q. I understand you don't intend to send any defective guns out the door. What I'm asking you is, as you sit here today, are you confident you've never sent any guns out the door that had defects in them?
A. No, sir, I cannot say that.
Q. All right, sir. Thank you.
Now, let's talk about these five barrels a month that your company sends to the government proofhouse. And that's what it sends to the government's proofhouse, isn't it, barrels,

not guns?
A. Barrels, yes.
Q. It does not send a finished, completed gun, or five finished, completed guns to the proofhouse every month for these so-called overpressure tests; is that correct?
A. Yes. We send the barrels with the breech plugs installed.
Q. Well, are you sure you send the breech plugs along with the barrels?
A. Yes, we send the barrels with the breech plug installed.
Q. Now, these five barrels that go to the proofhouse every month, you don't send five Kodiak barrels and five Eclipse barrels and five Wolf barrels and five barrels of each model, do you?
A. We try to send every month different model of barrels.
Q. Now, you had some documents in front of you there, and Mr. Singer and you identified them by some numbers, but I kind of got lost because they were never offered. Let me see if I can find those.
Exhibit L, do you have Exhibit L there in front of you?
MR. EATON: May I approach the witness to look at those exhibits, Judge?
THE COURT: Yes.
MR. EATON: I know what I'm looking for.
MR. SINGER: L was the monthly proof test that I tried

to get admitted and Mr. Eaton objected to, and the Court sustained the objection.

THE COURT: Right.

BY MR. EATON:

Q. What I want to know about Exhibit L, because it's in Spanish and I can't read it, I've gone through this exhibit, and I could only find one month in there--I can read "Wolf" and I can read a few other words, but not the whole thing. But I could only see in this Exhibit L, which are the monthly records for 2003, 2004, 2005, these five guns a month being tested, I could only find one occasion, one month where five Kodiaks were sent to the proofhouse for testing. Am I correct about that?

A. There's some Kodiaks in January of 2005.

Q. In what year?

A. 2005.

Q. January 2005?

A. Yes.

Q. Five Kodiaks were sent to the proofhouse?

A. Yes.

Q. For overpressure testing?

A. Yes.

Q. Okay. Would you go ahead and look through there, see if there is any other occasions where Kodiaks were sent to the proofhouse?

A. Some Apexes were sent January 12th, 2004. There are another

five Kodiak Pros in June 2005, and the others are break-actions.
Q. Sir--
A. The other reports are break-actions.
Q. Now, the Kodiak Pro is not a Kodiak Magnum, is it?
A. Yes, it is.
Q. It is? Okay. Okay. So we've got two occasions, at least through 2005, where Kodiak--five Kodiaks were sent to the proofhouse for the monthly overpressure test; is that right?
A. Yes.
Q. Now, how are those five barrels per month that are sent to the proofhouse for overpressure testing, how are they selected? What's the methodology for selecting the five barrels?
A. They are randomly selected from the factory. I mean, we try to send five different barrels--five different models each month to the proofhouse, and the person--I mean, me and my people go to the factory, go to a batch of barrels in production, take five, and we send them to the proofhouse.
Q. You sort of crossed me up there. You're only sending five of one particular model each month; correct?
A. Yes.
Q. And did you say the five that are selected are randomly selected?
A. Yes.
Q. And what's the methodology for achieving the randomness of the production guns? Do you take every 100 guns, or

every--fifth one out of every 50 guns? In other words, what is the sampling methodology to make up the randomness of this testing?
A. We decide what the model of gun we send to the proofhouse. We go to the factory where this model is produced, and we take five barrels of the one batch.
Q. Do you take five consecutive barrels? I thought you told me you took--randomly sampled?
A. Yes.
Q. Yes what?
A. Yes, we select the parts randomly.
Q. When you say--I'm lost about the randomness. Is it randomness that you select monthly which model to send, or is it randomness for selecting the five barrels to actually go?
A. We decide which model we send to the proofhouse, depending on which one we send before. We try to send each month a different model. Then we go to the factory, there are different factories for the barrels, Kodiak barrels, for example, and we select which ones of them, and send five of them.
MR. EATON: May I approach the witness with a copy of his deposition, Judge?
THE COURT: You may.
BY MR. EATON:
Q. Mr. Belategi, here's a copy of your deposition. Have you ever testified that the sampling of the barrels was not random

that went to the proofhouse for the overpressure testing?
A. I don't think so.
Q. Pardon?
A. No, I don't think so.
Q. Would you turn to page 175--174/175 of your deposition?
A. 175?
Q. Yes, sir.
A. Yes.
Q. Do you see 174 and 175?
A. Yes.
Q. Beginning at line 22 on page 174, "Question: Now, are they pulled out, five consecutive barrels in a batch, or are they pulled out one today, one tomorrow, and one the next day? I mean, how does that work? How does the random--how does the selection work?

"Answer: Normally they are taken at the same time. I mean not randomly. I mean they are five together."

"Question: Five together?

"Answer: Yes.

"Question: Five consecutive barrels?

"Answer: Yes.

"Question: And so the five barrels that go to the proofhouse each month may very well be taken from the lathe operator's No. 1's batch at the same time?

"Answer: Yes."

Is that your testimony, sir?
A. Yes.
Q. All right. So that's what you refer to as random sampling?
A. No. Maybe I'm not explaining myself correctly. They're random selection. You may have different batches of Kodiaks in the factory. You select randomly that batch, you take from that batch.
Q. You randomly select from lathe operator No. 1 and lathe operator Nos. 2 and 3, and then you go get five barrels out of 1 or 2 or 3's batch? Is that your methodology of randomness?
A. I didn't understand you, sir.
Q. You said you select which bin you're going to go to to get your five barrels; correct?
A. Yes.
Q. And that could be lathe operator No. 1's bin, or lathe operator No. 2's bin, or lathe operator No. 3's bin. But at any rate, whichever one of those three you select, you go and get five consecutive barrels; correct?
A. Yes.
Q. All right. That's random for you; correct?
A. Yes. Random is the selection of the batch, not selection of the barrels in that batch.
Q. Those tests, those monthly overpressure test that you say generate peak pressures of about 42,000 psi, they are not proof-tests, are they?

A. They are proof-tests, yes.
Q. Do you know what proof-tests are, the difference between proof-tests and just some sort of test to test the design of a particular model of gun?
A. For me one thing is proof-test, another one is firing test. For me proof-test means the quality control checking, for me are proof-tests.
Q. When you say "firing test," what are you talking about?
A. Shooting test, firing test.
Q. Okay. So these five barrels that go to the proofhouse every month, is that type of testing which you say goes up to the 42,000 psi, do you define that as proof-testing, or do you define that as firing testing?
A. I define it as a firing testing.
Q. All right. Now, how do you distinguish that test from what's referred to as proof-testing? What's the difference?
A. The firing test is shooting out, I mean it's fired, the gun. And the proof-test may be some other different things. For example, the different functional tests to the gun is a proof-test to me. Quality checking in the factory, for me they are a proof-test as well, this kind of test. The difference for me is very clear. Firing test, and the others are the proof-tests.
Q. So to you your definition of proof-testing is the drop testing?

A. For example, yes.
Q. And then when you dry fire one of these guns, pull the trigger to see how the hammer strikes the primer, is that a proof-test to you?
A. Yes, it is.
Q. All right. Even though it doesn't ignite any primer, you guys have in your factory a test where you dry fire these guns with no live primer in there, just to find out if the hammer hits the primer cap where it's supposed to?
A. Yes.
Q. No ignition of primer, no ignition of propellant, no explosion, no firing of the gun, that dry firing is just to test how the hammer strikes the primer; correct?
A. Correct.
Q. And you call that proof-testing; right?
A. Yes.
Q. All right. Have you ever heard of a scheme of testing or a type of testing where every gun that comes off the production line is fired at a specified load for purposes of determining the safety of that specific gun, as opposed to this testing of samples like you do monthly at the proofhouse? Have you ever heard of that kind of testing of each and every gun as proof-testing?
A. Yes.
Q. All right. So proof-testing has a very broad meaning to

you?
A. No. Let me explain again. There's firing tests, firing, and another one is a proof-test.
Q. Well, have you ever heard of a methodology of testing where every gun that is produced, a finished production gun, is actually fired with a proof projectile, proof propellant to see if that particular gun, after it's been manufactured, assembled, and inspected, is safe for use? Have you ever heard of that kind of testing methodology?
A. Yes.
Q. And what do you call that type of testing methodology?
A. Firing testing.
Q. That's a firing test, not proof-testing?
A. No.
Q. Okay. I want to get straight on definitions.
Now, is it true that the production guns that go out of the Dikar factory every month--and let's limit this to Kodiaks. Let's limit it to Kodiaks--is it true that all the Kodiaks that have been manufactured since that model was introduced are not live-fired before they are packaged and exported to the United States?
A. Yes.
Q. So we know that since the Kodiak has gone into production, we've had apparently two of these monthly firing tests involving Kodiaks at the proofhouse; correct?

A. Correct.
Q. And those are barrels that are sent to the proofhouse. They're not fully assembled, completed guns, are they?
A. No.
Q. And after they are tested at the proofhouse, they can not go back into production to be sold to consumers in the United States; is that true?
A. It is true.
Q. And absolutely none, zero of the Kodiaks that are production-line guns, absolutely none of them are proof-fired or proof-tested before they go in the box, on the ship, and over to the United States; is that true?
A. Some of them, yes, they are fired by our people in the Proofhouse of Eibar at the end of the production. Overpressure test, 42,000 psi, with magnum charges, yes, a few, quantity of them, are fired.
Q. Are you telling me that some number of production Kodiaks are taken out of the production line and taken over to the proofhouse and fired?
A. Yes.
Q. Have any records been maintained or kept by Dikar of those guns that are taken out of the production line and you say are taken to the proofhouse and fired?
A. No. There are no records.
Q. What you're talking about is this business from time to time

where Dikar employees are given a gun, or a gun is provided to them and they go to the proofhouse and fire it on the range; correct?
A. Yes.
Q. So that would be the only Kodiaks that would ever be fired for testing for safety of that specific unit before they go into a box and on the ship and over the sea; is that correct?
A. Yes.
Q. And there is absolutely no record kept of which of those guns have survived that testing?
A. No.
Q. Right?
A. No. That's correct.
Q. That's not correct, or there's no records?
A. There's no records.
Q. Now, this phenomenon of bell-mouthing that you've seen in the Dikar factory, you've seen that going back as far as nine years or so; is that right?
A. Yes.
Q. So you saw that phenomenon occurring even before rolled threads were introduced by your company; is that correct?
A. Correct.
Q. So you've seen bell-mouthed barrels that have been--that have had cut threads formed in them, and you've seen bell-mouthed barrels that have had threaded--or rolled threads

formed in them; correct?
A. Correct.
Q. And I believe you told us that bell-mouthing is not a desirable thing?
A. No, it isn't.
Q. And it can lead to bad things; correct?
A. Correct.
Q. And your company, in your tenure there, has found 25 to 50 of these barrels that have been bell-mouthed? Those are confirmed bell-mouthed units that were caught by quality control; correct?
A. I'm sorry?
Q. During your nine years at--nine years, or so, maybe it's a little longer now, at Dikar, you know of at least--or in the range of 25 to 50 units that have been bell-mouthed; correct?
A. Yes.
Q. Those were the ones that were discovered somewhere, somewhere along the production line--
A. Yes.
Q. --correct?
And we know that these--after these barrels are tapped, only one in--tapped and threaded, only one in 25 is inspected by the threaded go/no-go instrument; is that correct?
A. Correct.
Q. So 24 out of 25 go through there and never get inspected by

the threaded go/no-go rod; correct?
A. No, they are inspected 100 percent with the cylinder go/no-go.
Q. Pardon me? We know that 24 out of every 25 tapped and threaded barrels go through the factory and are never checked with the threaded go/no-go rod?
A. Correct.
Q. So only 4 percent of them are inspected for proper thread tolerance by the threaded go/no-go instrument; correct?
A. Yes.
Q. And only when one of those threaded and tapped barrels is discovered to be out of tolerance does your company have a policy or procedure of going back and checking the previous 24?
A. Yes.
Q. So you'd acknowledge that there's a significant chance that when you're only testing 4 percent of the barrels that have been tapped and threaded for proper threading tolerance with the threaded go/no-go, there's a significant chance that a barrel that has improper threads--and I include in that bell-mouthing of the threads--can't be detected?
A. No. No way.
Q. You disagree with that?
A. Yes. If you check with a cylinder go/no-go and it's okay, that means that the thread will be okay, even if you don't check with the thread go/no-go.

Q. The cylinder or round threaded go/no-go, it checks the minor diameter of the tapped and threaded barrel, doesn't it?
A. Yes.
Q. It does absolutely nothing to inspect or test the major diameter of the tapped and threaded barrel; would you agree with that?
A. Yes.
Q. The only testing that your quality control inspection--that your company does, as far as the tapped and threaded barrels, is the use of the threaded go/no-go gauge; correct?
A. Yes, but the process itself of the rolling tap ensures that the head of the thread is correct--
Q. Pardon?
A. --the head of the thread--the diameter between the crest of the thread is okay, the thread will be okay.
Q. The rolling tap technique ensures that?
A. Yes. The process is very stable, very repetitive, and no--I mean, don't happen, this kind of thing.
Q. The rolling tap methodology or technique doesn't do anything to ensure that a bell-mouthed barrel forms proper threads, does it?
A. The rolling tap ensures you that if you have one barrel that is bell-mouthed, the next barrel well also be bell-mouthed. It is impossible or almost impossible to have one defective barrel and the next one is not defective. It's very repetitive. I

don't know how to explain this.
Q. Let me say, the tap goes in, and the tap is the same constant shape and configuration on each and every barrel, agreed?
A. Yes.
Q. So it follows the same path in each and every barrel, whether that barrel is bell-mouthed, or not; correct?
A. Yes.
Q. Correct?
A. Yes.
Q. So if that barrel is bell-mouthed--this cup is a bit of an exaggeration. If that barrel is bell-mouthed, and that threaded tap goes in, it follows the same path every time. Would you agree?
A. Yes.
Q. Where the barrel--the diameter of the barrel is the smallest, it will form a more full thread?
A. Yes.
Q. Back here on the back where the barrel has a wider back diameter, that tap follows the same form and it doesn't engage as much metal in the bell-mouthed rear as it does at the smaller front. Would you agree with that?
A. Yes.
Q. And, in fact, if that happens, what you're going to have are some threads impressed into the bell-mouth barrel--I'm

proffering to you Plaintiffs' Exhibit No. 11. If you look at that--I'll step where the jury and witness can see it. Thank you.

If you've got that bell-mouthed barrel, and insert that tap into the bell-mouthed barrel, what's going to happen is that tap, which is the same all the way in, is going to engage more metal up here at the narrow end, and less metal back here at the bell-mouthed end, isn't it (indicating)?

A. Yes.

Q. But it's going to have the same minor diameter and it's going to have the same major diameter as it attempts to make threads; correct?

A. No.

Q. But it follows the same path, doesn't it?

A. Yes, but the threads are different. Some were formed, and others, no.

Q. Exactly. In other words, toward the rear where it's bell-mouthed, you'll get smaller impressions because there's simply no metal there to press up into crowns and down into roots. Would you agree with that?

A. Yes.

Q. I thought you would.

THE COURT: Mr. Eaton, we should probably take our midafternoon recess at this time. We've been going for some time at this time.

MR. EATON: That's fine, Your Honor.

THE COURT: Ladies and gentlemen of the jury, we're going to take our midafternoon recess. We'll be in recess for 15 minutes. Before you leave, let me give you some information. As you probably know, the forecast is that the weather is closing in. We may get some significant accumulation, but as is normal, it varies widely in the forecasts. It's expected to start sometime this evening. I'm going to assume that we're going to get some level of snow with a little ice underneath it. So we'll be starting tomorrow, for your planning purposes, at 10 o'clock tomorrow morning, rather than 9, to let everybody have plenty of time to get here.

Also, there is some chance if it's severe enough, we may postpone the trial tomorrow over to Wednesday. We don't want to do that, but if we really get socked, we might have to do it.

So before you leave you'll be given a phone number you can call sometime after 7 tomorrow morning to find out for sure if we're going at 10 o'clock. And if you don't get through, do it again. And as a fail-safe, I think I'm going to give you the phone number for my law clerk, who will also know, so you can have some information before you set out as to whether or not we're going to go ahead.

Now, since we're going to start late tomorrow and probably since the weather will not be that great, I'm going to

have lunch brought in for you. We'll have an abbreviated lunch hour of a half-hour, and Uncle Sam will pick up the tab for that. So plan on enjoying lunch with us tomorrow.

Hopefully we'll start tomorrow at 10 o'clock, but there is a chance we might have to postpone if the weather is really, really bad because some of you have to come from some distance. We'll give you more information about that later. For now, we'll be in recess for 15 minutes. During the recess period, please bear in mind the admonition given previously.

(In open court, out of the presence of the jury.)

THE COURT: Counsel, a couple things for the record before we take our break. Counsel, we've had discussions in chambers previously about Plaintiffs' counsel's objections to evidence of instructions given to Dikar by the House of Eibar, both with regard to marking and with regard to testing, and I've received that testimony subject to a limiting instruction also as we discussed.

By way of further record, I think there's a Third Circuit case which I think states it most succinctly. That's United States versus Reilly, 33 Federal 3d, 1396, a 1994 case. It states, and I quote, "Instructions to an individual to do something are not hearsay because they are not declarations of fact and, therefore, are not capable of being true or false." A number of case citations are also given.

That quote also quotes in part Graham's Federal

Practice and Procedure, the section on evidence. The quote in the case is Section 6705. Over in the current version of Federal Practice and Procedures it's found at 7005.

In addition to the other authorities cited in my ruling on the motion in limine, I do believe that instructions to somebody to explain why they did something are really not hearsay, but I have given the limiting instruction as requested.

With regard to a couple of exhibits, BB and CC, that are in the Spanish language, I don't doubt that they're business records of this company. But the problem is, unless we have Spanish speakers on the jury--I don't know if we do, and if we do, I don't know about their qualifications to interpret--the contents of the exhibit cannot be known to the jurors. So just to give them something that they can't understand, A, is not helpful to them, I don't believe; and, B, possibly confusing if they try and sort through there and figure out something in a foreign language.

That's really the reason I sustained the objection, not so much that they're hearsay, but that they're in a language that the jury probably can't tell what the contents of the exhibits are. We're going to have enough exhibits in this case without having things the jury can't understand from the beginning. That was the reason for my ruling as it relates to those exhibits, although you might want to withdraw your objection to Exhibit L, I don't know. Hearing nothing, I'll

assume not.

We'll be in recess. We'll take our full 15-minute recess.

(Short recess.)

(In open court, in the presence of the jury.)

THE COURT: Mr. Eaton?

MR. EATON: Thank you, Judge.

BY MR. EATON:

Q. Mr. Belategi, I'm going to refer you to Exhibits J-1 through 4. That's the bigger pages. That's the four pages that's folded up--yup, and Exhibit K for the these next couple of questions.

Do you agree that the drawings for the barrels of the several models, including the Kodiak, the Apex, the Optima, and I believe there was one more model, were all designed to have straight, untapered interior diameters of those barrels?

A. Yes.

Q. All right. When we talked of the tapering of the barrels that was done in the manufacturing process intentionally, that was the tapering of the outside of the barrels; correct?

A. Yes, the outside contour of the barrels.

Q. But Exhibit J, which is the Dikar engineering drawings of the barrels, and Exhibit K, which is the engineering drawing for the breech plugs, Exhibit K is a one-page exhibit, J is a four-page exhibit--in other words, the breech plug is designed to be a straight, untapered cylinder with threads machined onto

it; correct?
A. Correct.
Q. And the barrel, which receives the breech plug, is designed, according to you, and according to the engineering drawings of Dikar, in the breech area to be a straight, untapered area to be threaded to receive the breech plug; is that correct?
A. Correct.
Q. So if a barrel comes out of the factory with bell-mouthing, or tapering in the inside of the barrel, that's different than the way it was designed and intended to be manufactured; is that correct?
A. Correct.
Q. And you testified in your deposition that this phenomenon, this undesirable phenomenon of bell-mouthing, can be caused by misalignment of the tool with the instrument being machined--with the piece being machined, in this case the barrel; correct?
A. Correct.
Q. And bell-mouthing can occur if the machine tool becomes loose; correct?
A. Yes.
Q. And bell-mouthing can occur if the machine tool, the tap, becomes worn and loses some of its material or surface?
A. It's mainly more the tool than the tap.
Q. Pardon?

A. When the tool is very worn out, that was mainly the problem. The tap is not so useful. Even if it is worn out, it is difficult to cause bell-mouthing, the tap itself.
Q. Okay. I follow you. And, by the way, when we talk about wearing out the taps, does your company have any established criteria for when the tap is changed out to form the rolling threads? In other words, has it been determined that a tap is good for X numbers of units before it needs to be changed out?
A. No.
Q. Has there been any kind of study undertaken by your company to try to determine how many units can be tapped and threaded, I mean units of barrels, can be tapped and threaded before the machine tool, the tap, wears out and needs to be replaced?
A. Yes, we know that according to our experience.
Q. And your experience, I believe, is that--what was the low end? I remember you testified about that. The low end of the number of units that are required before you see unacceptable wear on the tap, and the high end, can you tell us what those numbers are?
A. How many barrels can be done with the tool, you mean?
Q. Right, before the tap becomes worn to an unacceptable level. What was the least number that your company found?
A. I think the average parts, of barrels, that can be done with the same tool, somewhere around 1,000 parts.
Q. And I understand that's the average. But to get to an

average you've got to have one that's lower--some that are lower, some that are higher.
A. Yes.
Q. What I want to know is if you remember what you told me was the low number that your company experienced before it found that the tap became worn to an unacceptable level?
A. I don't remember.
Q. Something under a thousand?
A. Yes.
Q. A number like 650 ring a bell with you?
A. Maybe.
Q. Does that sound about right for the low end?
A. Yes.
Q. And on the upper end I believe you told me it had gone as high as 1,500 units before it showed unacceptable wear. Do you remember that?
A. I said 1,500?
Q. Yes, on the upper end?
A. Yes.
Q. Does that sound about right?
A. Yes.
Q. So that's a pretty wide range, isn't it? 650 on the low end before the tap begins to show unacceptable wear, and about 1,500 on the high end before it shows unacceptable wear, thus resulting in an average of about a thousand; correct?

A. Yes.
Q. But your company, knowing that wide range, has never established a given number of units to be machined before changing out the tap; is that correct?
A. Correct.
Q. So how does your company determine, when guns are being produced on the production line, when the tap needs to be replaced? When it has reached a point of machining enough units that it becomes worn to an unacceptable level, how do you make that determination?
A. That's why you would have the checking tools, to see if the thread is proper or not. If it is not, probably will have to change it.
Q. So it's sort of an empirical and observational criteria that you use; is that correct? In other words, you watch the units that come off the production line and check your quality control procedures, and when you begin to see some defective units, or that are unacceptably defective, that's when you change out the tap; correct?
A. Yes.
Q. Now, that doesn't happen suddenly, does it? You're not turning out perfectly acceptable units, and then all of a sudden, bingo, you have the bad one that requires changing the tap? It doesn't happen like that, does it?
A. No.

Q. It happens gradually?
A. Yes.
Q. If that threshold level is reached, let's say on one of the units that doesn't fall within this 24 or 25, you don't know it until it goes--when it becomes--begins to get unacceptable, let's say checking--unit No. 25 has been checked with the threaded go/no-go, and it's found to be acceptable, and then you start over again. The next unit is No. 1, 2, 3, 4, 5. If we begin to get unacceptable units somewhere along there, somewhere at 21, 22, 23, 24, 25, that's where you get into a situation where you can have bell-mouthed units, or unacceptable units that get through the process; correct?
A. No.
Q. No? Okay.
A. Because if you have the bell-mouthing from one of the barrels, you will know it because you check it one by one.
Q. It just has to get worn enough that it becomes observational, and then you change out the tap; correct?
A. Observational?
Q. Observational--
A. Yes.
Q. --by the lathe operators. So on one run the tap may wear out at unit No. 783, and you change out the tap, and it may be good for 1,200 units before it wears out the next time; correct?
A. Correct.

Q. You don't know when it's going to go, but you know it's going to go?
A. Yes.
Q. I believe you testified that prior to the Katzenmeier incident, you had, on occasion, sectioned some of these barrels through the breech end so that you could observe under magnification, but not microscopic magnification, the thread form?
A. Yes.
Q. You looked at them through, what you said, Sherlock Holmes--the magnifying glass?
A. Yes.
Q. And I think there was some projector-type instrument?
A. Yes.
Q. But you never--when I say "you," Dikar--you and your employer, Dikar, never looked at a cross-section of the breech area of one of these barrels under a microscope until after the Katzenmeier incident; correct?
A. Correct.
Q. You've told us that bell-mouthing is an undesirable defect, it's potentially dangerous; correct?
A. Yes.
Q. It can produce incomplete and inadequately formed threads; correct?
A. Correct.

Q. And that, of course, can lead to inadequate or incomplete engagement of the threads, the threaded connection of the barrel and the breech plug; correct?
A. Correct.
Q. Now, on these 25 to 50 occasions when the company has discovered bell-mouthed barrel units in the production line, you told me the policy of the company is to pull that defective unit out of production; correct?
A. Right.
Q. Prepare a rejection report; correct?
A. Yes.
Q. And then do what? And then do what?
A. Scrap this part.
Q. Send it to the scrap heap?
A. Destroy it.
Q. Not analyze, test, inspect, or investigate it any further than to observe that it's defective; is that right?
A. They are destroyed after they're observed.
Q. When you discover the bell-mouthed units, you reject them and your operator writes a rejection report, and it finds its way up the quality control ladder to you?
A. Yes.
Q. Is that fair?
A. Yes.
Q. Then the policy is to throw it in the waste heap or scrap

heap?
A. Yes.
Q. There is no policy about how to--the company has no policy about how to conduct an inquiry or investigation as to how or why that unit got to be bell-mouthed; is that correct?
A. No. We study its defective part.
Q. Well, I thought you said it was rejected and went to the scrap heap?
A. No.
Q. Now you're telling me it's investigated?
A. It's rejected, and then studied, this part, and then it's destroyed.
Q. Is there a written procedure for that?
A. I don't think so.
Q. So now you tell me there's some kind of an inquiry when a part is discovered to be--a barrel is discovered to be bell-mouthed, and some sort of an inquiry is then made before it goes to the scrap heap; right?
A. Right.
Q. And who decides the nature or extent or scope of that inquiry that's conducted with those defective parts?
A. Can you--
Q. Who decides how to go about conducting that investigation or inquiry with regard to that defective rejected barrel?
A. The people from the quality department.

Q. Okay. They don't have any written guidance to go to, do they? In other words, you don't have a standard procedure that you'll refer to conduct that inquiry; is that right?
A. Yes.
Q. All right. And quality control is you?
A. Yes.
Q. Are you the man that gets the rejection report and then you look at that unit and say, "Let's see. What kind of an investigation do we need to conduct?" Are you the guy that makes that decision?
A. Yes. Me and my team, yes.
Q. So without the aid of any standardized written procedure, you commence to work on your own and/or perhaps engage some of your co-workers to investigate how and why that defect occurred? Yes?
A. Yes.
Q. And after that inquiry is conducted, is there a standard policy or procedure for reducing the findings and conclusions to written or report form?
A. Yes.
Q. There is? And are those records maintained?
A. Yes.
Q. Do you remember me asking you about such records in your deposition?
A. I think it matters how big they are. I mean, if you find

one part with a bell-mouthing, and you know it's recent, you don't make out a report.
Q. I understand that. But my question is do you remember me asking you that question in your deposition?
A. Yes.
Q. I believe you told me in your deposition that there was no standard policy for making a report of the findings each and every time bell-mouthing had occurred?
A. We keep a record of each part that we scrap, or each defective part.
Q. Well, that's your rejection report?
A. Correct.
Q. Correct?
A. Yes.
Q. That's not your investigation report?
A. Yes.
Q. Pardon?
A. Correct.
Q. So you're not going to tell us now that for each and every bell-mouthed unit that was found, there's an investigative report corresponding to it, are you?
A. No.
Q. All right. Some of them there might be a written report, but some of them were just not a big enough problem to generate a written report of the investigation or inquiry; is that true?

A. Correct.
Q. And at this time does the company have any standard written policy or procedure about how to conduct, and to what extent to conduct, an inquiry when a defective barrel is found in the production line?
A. Yes.
Q. You now have a written procedure?
A. Of what to do when we find a defective part?
Q. Let me ask it different. You told me that prior to me taking your deposition there was no written policy or procedure about what to do, no standardized written procedure of what to do when a defective barrel is discovered on the production line; correct?
A. No. Sorry. If we find a defective part, there is a procedure what to do with this part, how to proceed, everything to do. It is everything you're supposed to do regarding you have to make a report of each part that we scrap.
Q. Let me try to make sure we're all on the same wavelength. You've told me, and I want to make it clear--if you do not understand me, please tell me. We have an interpreter here that can help us out.
Is it correct that your company does not have a standardized written policy and procedure to follow in conducting an investigation or inquiry after a defective barrel is discovered in the production line?

A. We have procedure.
Q. Now you do have a procedure?
A. Yes.
Q. At the time your deposition was taken, you said there was no such written procedure; correct?
A. I don't remember that.
Q. All right. But now you've got a procedure?
A. Yes, sir.
Q. And does that procedure require that a written report of the findings of that investigation or inquiry be created and maintained?
A. No. This is the difference.
Q. All right. Now, during your nine years at Dikar, have there ever been any changes in the production process that resulted from finding a bell-mouthed or defective barrel unit? Has your company ever instituted any changes in the production methods or practices based on its finding of defective or bell-mouthed units during the production process?
A. I don't understand the question.
Q. Let me ask it a different way. You told me that each and every one of these 25 to 50 incidents where bell-mouthed barrels were discovered in the production process, that some kind of an investigation or inquiry was conducted.
A. Yes.
Q. Yes. And for some of those inquiries, written reports of

the findings and conclusions were generated; is that correct?
A. Correct.
Q. But written reports of findings and conclusions were not generated on some of those 25 to 50; correct?
A. Correct.
Q. Did any of those 25 to 50 investigations result in any recommendations for changes of production methods or quality control methods?
A. No.
Q. So the quality control methods are the same today as they were when these 25 to 50 bell-mouthed defective units were being produced; correct?
A. Yes.
Q. And no changes in the production methods, either; correct?
A. No, regarding this thread.
Q. Now, I believe you told me that the only production guns that might experience proof-testing or live fire testing before being packaged up, shipped across the sea, and sold in the United States, was when an employee of Dikar would go to the proofhouse and shoot certain guns that were taken out of the production process; correct?
A. Yes.
Q. And then those guns would be cleaned and put back into the line to be exported; correct?
A. Yeah.

Q. So there was no standardized methodology for proof-testing each and every gun; correct?
A. Correct.
Q. Now, along the production process itself, is it true that except for those few guns that would go to the proofhouse, be shoot, go back into the production line to be exported, that those guns and their components never underwent any kind of pressurized testing during the manufacturing process?
A. Correct.
Q. In other words, there was no testing with compressed air, there was no testing with fluid under pressure for any of those guns before they were put in a box and put on a ship and came to the United States; is that correct?
A. Correct.
Q. Now, I believe you testified on direct, Mr. Belategi, that somehow the proofhouse directed your company to apply these images of the shield and the knight's head and the three balls in a triangular fashion to the barrels of these guns; is that right?
A. Yes.
Q. Now, no one from the proofhouse ever told you that personally, did they?
A. Apply the marks, you mean?
Q. Did anyone from the proofhouse ever tell you personally to put these images on the guns, the images that looked like

proofmarks?
A. No. I don't remember.
Q. No one at the proofhouse ever told you that, did they?
A. They never did to me. I think no.
Q. Pardon?
A. To me, no.
Q. Directly to you. Did anyone from the proofhouse, directly from the proofhouse, tell Aitor Belategi, say, "Make sure you got that House of Eibar proofmark, and that muzzleloader proofmark, and the three balls on your barrels"?
A. I don't remember if anybody--nobody at the proofhouse telling me that.
Q. In fact, when you gave your deposition, you said that someone at Dikar told you that it was required; do you remember that?
A. Yes.
Q. So that's where you got your information about what the proofhouse supposedly or allegedly told your company? You got that from some other person at Dikar; correct?
A. Correct.
Q. But you couldn't identify who that person was when I took your deposition; is that correct?
A. Correct.
Q. You just said, "That's the way I understand it to be, and that's the way it's been ever since I've worked there"?

A. Yeah.
Q. Have you seen the list of exhibits that Dikar has listed to be offered into evidence at the trial of this case?
A. Yes.
Q. And on that list there is no document from the proofhouse that directs Dikar to apply the image of the House of Eibar or the three balls that designate muzzleloader to its firearm; is that correct?
A. Correct.
Q. In fact, you've never seen a document from the proofhouse which directs Dikar to put that image of the House of Eibar and those three balls on the barrels of its firearms; is that correct?
A. Correct.
Q. Now, we saw in the video, the little five or six or seven part video that you and Mr. Singer talked about earlier--you're the man who took that video; correct?
A. Yes.
Q. And you're very familiar with the operations there, the manufacturing operations. How long does it take one of these lathe operators to perform the functions shown in that video? In other words, to drill the pilot hole to the appropriate diameter, which I think you said was 15.3 millimeters, and then go/no-go check 100 percent of them, and then tap them with the thread forming tap, and to go/no-go for size, and check the

minor diameter of the thread, and then go/no-go one in 25 with the threaded tap, how long does that process take, approximately, if it was one unit like that?

MR. SINGER: Object to form. Mischaracterizes the testimony.

MR. EATON: I can ask it in a shorter form. It got long and out of hand, I understand.

BY MR. EATON:

Q. In the video you show the drilling of a barrel, the tapping of a barrel, and go/no-go checking of the barrel with the several instruments; correct?

A. Correct.

Q. How long does that operation take?

A. The whole operation you mean?

Q. To drill a barrel, to go/no-go it, to tap a barrel, to go/no-go it with the cylinder or a round go/no-go rod, and then to also check one in 25 with the threaded go/no-go, how long does that take?

A. It takes some minutes, maybe four or five. Depending on the employee, maybe more.

Q. I think in your deposition you told me kind of the average lathe operator produces 12 to 13, occasionally 14 barrels in an hour. Is that in the ball park, 12 to 14?

A. Yes.

Q. Now, how long does it take to do that final go/no-go check

with the threaded instrument? Does it take a minute? Does it take a few seconds? About how long does it take?
A. The one we see in the video you mean?
Q. Right. Just the threading--the checking it with the threaded go/no-go, how long does that take?
A. Less than a minute. I'd say 40 seconds, 50.
Q. Okay. So if there's 12 to 14 an hour of these units produced, and to check it with the go/no-go takes less than a minute, what's the rationale behind checking with the threaded go/no-go only one unit in 25 while the sizing, the round go/no-go is used on 100 percent? Why is there that difference?
A. Because we don't consider it necessary. I mean, the process itself ensures you there will be conformity, repetitive. So I think it's enough with the cylinder on 100 percent of the parts.
Q. Well, it would not add much time to the production process, would it?
A. Not normally.
Q. It wouldn't really cost the company any considerable amount of money to go/no-go with the threaded gauge on every unit produced; would you agree with that?
A. Yes.
Q. And you'd agree that the threaded go/no-go is a more exacting quality control step? In other words, it checks for more than simply checking the minor diameter, or the inside diameter of the threaded barrel?

A. No, I wouldn't say it is more important than the singular.
Q. I didn't say more important, I said more exacting.
A. No.
Q. The threaded go/no-go checks the major diameter. In other words, the depth of the roots in which the breech plug is going to be screwed; correct?
A. The threaded go/no-go measures the width of the threads. This is the main measurement of the threaded go/no-go, the width of the threads.
Q. You're talking about the width of each thread from crown to root?
A. No.
Q. Major diameter, root to root? That's what it really measures, isn't it, root to root?
A. Can I use this--
Q. Sure, if you want to refer to one of these illustrations, please. This one or this one (indicating)?
A. This one (indicating).
Q. Okay.
A. It measures this width of the threads, the one that is going to support the strength (indicating).
Q. Okay. That's what you believe the threaded go/no-go instrument does?
A. Yes.
Q. Does it also measure the tolerance of the major diameter?

In other words, the distance from this root on one side of the barrel, 180 degrees across to the corresponding root on the other side of the barrel?
A. Yes, I think so.
Q. But the cylindrical go/no-go does nothing to measure, as you call it, the width of the root, or the major diameter, the length from root to root of the thread; is that correct?
A. Yes.
Q. That's what I meant when I said more exacting. In other words, that threaded go/no-go tells you more about the interior of that barrel than simply running that cylinder through it. Do you agree with that?
A. No.
Q. Okay. If you don't agree, that's fine.
And the lady shown in the video that applies the breech plug, after the go/no-go testing is done, the barrel comes down to her, her job is to apply some lubricant or anti-seize material to the breech plug; correct?
A. Yes.
Q. And to insert it into the barrel, the tapped threaded area of the barrel; correct?
A. Correct.
Q. And in accomplishing her task, she uses a couple of different instruments. What was the first instrument she used to get it started?

A. She starts with her hand.
Q. With her hand? Okay.
A. Starts with her hands, normally, with a small hand tool. Then she uses a pneumatic drill, to finish this with a hand tool.
Q. With the same hand tool she used previously?
A. Yes.
Q. Okay. Now, none of those tools are what are called torque wrenches, are they? Do you know what a torque wrench is?
A. No.
Q. A torque wrench which is preset to a certain foot pound level. In other words, you have a torque wrench and you set it at a certain level so you don't overtorque something and strip the threads. Do you understand that?
A. A pneumatic drill.
Q. Is the pneumatic drill set to some particular foot pound load--
A. Yes.
Q. --or does it depend upon this lady's tactile sensation as to whether it's tight enough or not tight enough?
A. No. It's such a piece--I don't know how you call it, but when you reach the end, even if you push, it will not work.
Q. You're telling me that pneumatic wrench, that pneumatic tool, it looks like a drill--
A. Yes.

Q. --with a fitting on the end of it, it engages the back end of the breech plug, and when it reaches a certain amount of torque, it stops?
A. Yes.
Q. Is that what you're telling me, so it won't strip the threads out?
A. Exactly.
Q. Do you happen to know what that torquing amount is, what it's set to? In other words, how much foot pounds is she allowed to put on it before that wrench or pneumatic drill shuts down?
A. I don't remember.
Q. But you're confident it's a torque-type instrument?
A. Absolutely, yes.
Q. Do you know what the design calls for insofar as the amount of torque to be applied on the breech plug when it's being put into the barrel?
A. No, I don't.
Q. You understand what happens if you tighten it too tight?
A. Yes.
Q. It strips threads? Yes?
A. It may strip threads, yes, with a very high strength.
Q. And after that lady inserts that breech plug into the barrel and tightens it down to whatever--I mean, the final tightening is by hand, isn't it?

A. Yes, it is.
Q. So after she stops with the drill, which has an automatic setting on it to only turn or torque it to a certain foot pound range, this lady torques it some more, doesn't she?
A. She takes the breech plug back a few threads to finish by hand.
Q. She backs it off?
A. Yes.
Q. Not tighten it up?
A. Okay. She goes with the pneumatic drill until the end, changes a few threads back, and then finishes by hand.
Q. That's what I'm getting at. She goes with the pneumatic drill which is set not to exceed a certain foot pound level, you don't know what it is, but you know it's not to exceed a certain foot pound level; right?
A. Yes.
Q. And then after doing that, she manipulates that breech plug by either making it tighter or loosening it up? She has the capacity to do either, doesn't she? She can manually tighten it with her wrench to finish off the job, or she can loosen it up; correct?
A. She must take it to the end, yes.
Q. She has to tighten it some more, is that what you're saying?
A. Yes.
Q. After the tool that is preset to a certain torque foot

pounds, then she tightens it some more?
A. No.
Q. What does she do?
A. She assembles the breech plug with pneumatic drill until she reaches the end. She reaches the end, then she takes the breech plug out a couple threads, back a couple threads, and finished by hand.
Q. It's torqued to whatever level the power drill or power unit is set at; correct?
A. Yes.
Q. And then the lady stops, and she backs the thread out manually a thread or two, a turn or two? Is that what you're saying?
A. No, with pneumatic drill thread it back, thread it back, and go forward again by hand.
Q. The pneumatic drill tightens it up to a certain torque; right?
A. Yes.
Q. Does the pneumatic drill loosen it up a little, or does the lady loosen it up? I'm trying to figure out who loosens it up.
A. Use pneumatic drill, goes to the end. With pneumatic drill, comes back a few threads, takes out pneumatic drill, and by hand finishes to the end, by hand.
Q. That's all I'm getting at. The pneumatic drill is what backs it off. After tightening it down, it then backs it off a

little?
A. Yes.
Q. And then the lady or man, person at that station--it was a man on certain days in certain stations--the human being then applies the final torquing of that breech plug in the barrel by hand and by tactile sensation?
A. Yes.
Q. That person, by virtue of being trained and having experience, has a feel for how tight to tighten it down?
A. Yes.
Q. And after that there's no pressure testing of that barrel with the breech plug in place of any kind; right?
A. No pressure testing.
Q. No firing testing, no proof-testing, and no pressure from water or air or some other fluid; correct?
A. Correct.
Q. In fact, there's no other action to that breech plug barrel connection after that person manually tightens it down to whatever he or she thinks is the appropriate level. Is that true?
A. True.
Q. Now, you've got that exhibit book. Would you turn to the smaller exhibit book that's kind of back there behind you a ways? See the smaller one laying on top of the bigger one?
A. This one (indicating)?

Q. Yes. Yes. I have just a couple of questions about that.
And would you turn to Exhibits--let's start with Exhibit No. 46. Would you turn to tab No. 46, please.
A. Forty-six you said?
Q. Forty-six, please.
A. There's nothing here.
Q. Let's make it 45. And then to the page within that exhibit--I gave you the wrong number. I'm sorry, Mr. Belategi. Turn to page--Dikar 20--no, pardon me.
Exhibit 48. Let's just go to Exhibit 48, and turn to Dikar pages 49 and 50. Do you see those pages there?
A. Yes.
Q. And at the top of page 50--you got it there in front of you?
MR. EATON: This is an exhibit that's already been received into evidence. can we publish this page to the jury, Judge?
THE COURT: You may.
BY MR. EATON:
Q. This is a page from the Dikar policies and procedures manual; is that correct, Mr. Belategi?
A. Yes.
Q. It says right there at the top, "Due to the importance that some parts have in the finished product, they are considered critical and cause for exception in the system indicated. Every lot of such material must be inspected. These materials are

rifle barrels, breech plugs, gun lock parts, trigger." Do you see those parts enumerated there? Do you agree with that?
A. Yes.
Q. That the breech plugs and the rifle barrels--and that's what we're talking about, the rifle barrels, these barrels that are threaded?
A. Yes.
Q. Those are considered safety critical parts. Would you agree with that?
A. Yes.
Q. Now, if you would, please, turn to Exhibit 50. It looks like page Dikar 0015. Do you see that page?
A. 0115?
Q. 0115, pardon me. Yes, sir. Do you see that page?
A. Yes.
MR. EATON: Publish this to the jury, Judge?
THE COURT: You may.
BY MR. EATON:
Q. I want to call your attention to this first item on here in the policies and procedures manual which says that one of the policies is "to establish a system for identifying, marking, and verifying gun barrels throughout the various stages of production, as well as for carrying out tests required by the Proofhouse in Eibar."
Now, the barrels that go to the proofhouse do not have

serial numbers on them, do they?
A. No.
Q. They're taken before the serial numbers and these images of the proofhouse and the muzzleloader image are engraved on them, aren't they; correct?
A. Correct.
Q. So is there any way to identify which batch or lot those barrels that go to the proofhouse came from?
A. Yes.
Q. How is that? If they don't have serial numbers, how does one identify them and relate them back to the production guns?
A. We send a letter to the proofhouse saying that these barrels are from this batch of barrels, so we know from which batch are they.
Q. Okay.
A. And we keep those records.
Q. Now, if you would, please, turn to pages Dikar 11--in that same exhibit, Dikar pages 117 and 118. Find those?
A. Yeah.
Q. I'm first going to point to--direct your attention to page 117 of that procedure about halfway down the page where it says "We should point out a difference in treatment between gun barrels which are to remain in Europe, for which an official proof certificate is required, and gun barrels which are to be exported to the United States, which do not require such a proof

certificate."

Go down to item A: "Barrels which form part of firearms which are to remain in Europe or other countries which require an official proof certificate. 100 percent of gun barrels which fall into this category must undergo tests required by the official proofhouse. The proofhouse will issue an official proof certificate for each unit tested, which must accompany the firearm."

That means that 100 percent of the Dikar firearms that are to be sold in Europe must be proof-tested, have a certificate, and be proofmarked; would you agree with that?

A. Yes.

Q. But since you've worked at Dikar, it has not sold any of its guns in Europe; is that correct?

A. Since I've been with the company, Dikar? Yes, I've sold some guns.

Q. You sold some guns in Europe?

A. Yes.

Q. Did they go to the proofhouse?

A. Yes.

Q. Did they get a proofmark?

A. Yes.

Q. Is it the same proofmark that appears on these guns that come to the United States?

A. Yes.

Q. And the guns that come to the United States do not have--have not been proof-tested; is that correct?
A. No. Correct.
Q. So the same--you're telling us that the same proofmark that is required to be put on guns sold in Europe, and which your company has apparently sold a few in Europe and been required to put that proofmark on it, they then turn right around and put that same proofmark on guns that have never been proofed and come to the United States; is that right?
A. Right.
Q. Let me ask you this: Even though the guns that come to the United States may not require proof-testing before they're sold to consumers, what's the policy decision or reason behind your company's decision not to proof-test any of them?
A. This is not our company decision.
Q. Pardon?
A. This is not our company's decision. This is the decision of the Proofhouse of Eibar. We must do what the proofhouse tells us to do.
Q. You told us the proofhouse, although you don't have personal knowledge of this, but the proofhouse tells Dikar to put a proofmark on guns that have not been proof-fired; correct?
A. Correct.
Q. My question to you is--and that's different than my question to you. Why does your company not voluntarily proof-test at

least some of these guns that come to the United States? In other words, your testimony is Dikar proof-tests none of the production guns that come to the United States, yet put proofmarks on it, allegedly because the proofhouse says so. My question is why doesn't Dikar proof-test at least some of the guns that come to the United States?
A. We test some of them every week, three times a week.
Q. I know you told me you send a few over there for your people to fire.
A. Yes.
Q. You keep no records of that?
A. No.
Q. So you wouldn't know which ones were proof-tested and which were not?
A. Correct.
Q. Does your company--does your company sit down and make a deliberate decision that "We are not going to proof-test all of the guns that go to the United States, even though we're legally required to proof-test all the guns that are sold in Europe"? Does your company make a decision to do that?
A. No, it's not our company's decision.
Q. Let me ask, the proofhouse never directed your company not to proof-test guns that go to the United States, did it?
A. Can you repeat the question, please?
Q. The proofhouse--you say, "The proofhouse tells us to

proof-test all the guns we sell in Europe," right?
A. Right.
Q. But you don't sell any in Europe anymore; correct?
A. Correct.
Q. And haven't since about 2001?
A. Around there, yes.
Q. Pardon?
A. Around there, yes.
Q. Certainly no Kodiaks that came to the United States were proof-tested. They might have been taken over here to the proofhouse and fired a few times, but not a methodical proof-test and described overpressure; correct?
A. Yes.
Q. My question to you is, did the proofhouse ever direct your company not to proof-test guns that are going to go to the United States?
A. The requirement is just to send five every month to the proofhouse.
Q. I understand that. What I want to know is did the proofhouse, the government, ever tell Dikar it was prohibited, it could not conduct proof-tests on the guns it was intending to send to the United States?
A. No.
Q. All right. So your company was free to do that, if it had so chosen; correct?

A. No.
Q. No?
A. We cannot use the proofhouse as part of our company. We have limited time there. We test what we come to test.
Q. So you've got some time to use the proofhouse to at least conduct some proof-testing. Do you agree to that?
A. Yes.
Q. In other words, when these employees go over there and randomly shoot some guns for which you do not keep records, that time could be used to conduct proof-tests according to the requirements of the Spanish Government on some representative sampling, like 5 percent or 10 percent, or whatever time was allowed? Would you agree with that?
A. We cannot do overpressure testing--
Q. Pardon?
A. We cannot do overpressure testing to our gun.
Q. I don't mean for overpressure testing. Those are the tests to the extreme pressure of 42,000 psi. I'm talking about the proof-testing, that if you were going to sell these guns in Europe, you would have to proof-test them at the proofhouse, wouldn't you?
A. Yes.
Q. What I'm asking is why can't you prove-test some of them that you send to the United States?
A. We proof some of them.

Q. Are you talking about the guns your employees go over there and shoot a couple days a week?
A. Yes.
Q. And no records are kept of that?
A. No.
Q. But the vast majority of those guns that come to the United States are not proof-tested. Would you agree with that?
A. Yes.
Q. But they all got a proofmark on them. Would you agree to that?
A. Yes.
Q. Now, the design of these Kodiak guns, I believe you told me was--the actual engineering design was done by a company called Ikerlan; is that right?
A. Yes.
Q. Does your company own any interest in Ikerlan?
A. No.
Q. Does Ikerlan own any interest in your company?
A. No.
Q. Are they completely independent of each other?
A. Yes.
Q. Now, what design criteria did your company provide to Ikerlan for the Kodiak?
A. What do you mean?
Q. Well, did you ask them to design .50 caliber and .45 caliber

barrels for a new model called the Kodiak that had a unique feature of a falling-block?
A. Yes.
Q. What form did you communicate that conceptual design information to Ikerlan?
A. I don't know because I was not involved in the design itself, so...
Q. Was that Mr. Echeberria, would he be the fellow who was primarily involved in that?
A. Yes.
Q. All right. You just know that Dikar, before you got there--was it before you got there that the initial design work was done at Ikerlan?
A. Before I was?
Q. Was it before you got to Dikar that the initial design work was done at Ikerlan?
A. No. I was in Dikar when the design started.
Q. Well, did your company provide information to Ikerlan that what it wanted Ikerlan to design and engineer was a so-called falling-block design?
A. Yes.
Q. Is that some of the information communicated to them?
A. Sure.
Q. Did your company also communicate to Ikerlan that it wanted a firearm that would safely handle the so-called magnum loads?

Was that information that was communicated to them?
A. As I said before, I was not involved, but I'm sure that's the case.
Q. You're an engineer, you know that in designing something one first needs to define the criteria of performance that one wants before one can engineer a design to meet that purpose and function?
A. Yes.
Q. In other words, if you want a muzzleloader that will handle the so-called magnum loads, higher pressures, it would need to be designed to meet the anticipated pressures of that, as opposed to a muzzleloader that was not a magnum load weapon, shot projectiles and loads--or propellants at lower pressure; correct?
A. Yes.
Q. So what I'm really getting at is Dikar really didn't do the engineering or design work, it simply provided conceptual criteria or conceptual design to Ikerlan, and then Ikerlan did all the engineering work; correct?
A. Yes.
Q. Except for the breech plug barrel connection; right? I thought you testified on direct that Dikar designed the connection of the breech plug to the barrel?
A. Yes. You mean the thread?
Q. Yes, sir; the thread and connection.

A. Yes.
Q. What you call the safety critical connection, that was not done by Ikerlan, that was done by Dikar?
A. Yes.
Q. In-house?
A. Yes.
Q. And the procedures for quality control for the barrels and breech plug part of the process, are you the person who devised those quality control procedures?
A. Devise--write?
Q. Yes, write them up?
A. Yes.
Q. You're the one who designed this business of the checking with the go/no-go?
A. Yes.
Q. You're the quality manager; correct?
A. Yes.
Q. So you're the person who decided that we should go/no-go test with a cylinder instrument 100 percent of the barrels after they're drilled but before they're tapped; right?
A. Yes.
Q. And you're the fellow who decided to test with a threaded go/no-go gauge only one in 25 units; correct?
A. Correct.
Q. Now, what is your understanding of the relationship between

Dikar and BPI, Blackpowder Products, Inc.?
A. BPI belongs to Dikar.
Q. Were you an employee at Dikar when it acquired 100 percent of the interest in Blackpowder Products, Inc.?
A. I'm not sure because I don't remember the year. I think so, but I don't remember the year.
Q. I think you gave some testimony that in this early design phase there were certain people involved in approving the design of the Kodiak--here it is. I believe you told me Mr. Muniategui, who we saw testify the other day on video, Mr. Echeberria, who is retired, Mr. Belategi, those people from Dikar were involved in approval of the final design of the Kodiak muzzleloader rifle; correct?
A. Correct.
Q. And then you testified there were some BPI people, that would have been Mr. McGarity, who is the president or chief operating officer, and Mr. Hendricks, who is the technical manager; correct?
A. Correct.
Q. So those gentlemen who were employees of BPI participated in the approval of the final design for the Kodiak; is that right?
A. Right.
Q. And does Mr. McGarity come to Spain from time to time to look over the factory?
A. Yes.

Q. Have you ever collaborated with Mr. McGarity on any of the quality control procedures at Dikar?
A. No.
Q. What about Mr. Hendricks, have you ever collaborated with him? He's a technical man?
A. Maybe. Maybe, yes.
Q. Now, do you claim to have any expertise in metallurgy?
A. Me?
Q. Yes.
A. Yes.
Q. Some expertise in metallurgy? Okay.
After the Katzenmeier incident, did you perform any metallurgical inspections or evaluations of the Katzenmeier gun?
A. No.
Q. Pardon?
A. Of the Katzenmeier gun?
Q. Yes.
A. No.
Q. You have no opinions from a metallurgical standpoint about the Katzenmeier--the cause for the failure of the Katzenmeier gun, do you?
A. No.
Q. Pardon?
A. No.
Q. Now, all of the Kodiak guns had the threaded--the barrels

threaded according to the rolling taps rather than the cut taps--cut threads; is that right?
A. The Kodiaks?
Q. The Kodiaks. When they went into production about 2004, your company had adopted--or introduced the rolling method of threading the barrels as opposed to cutting the threads, is that right, except for the stainless steel barrels? Apexes have stainless steel. They're cut?
A. Rolling taps, yes.
Q. Stainless steel are threaded with cutting taps, aren't they?
A. Yes.
Q. Kodiaks, are all of the Kodiaks tapped and threaded by the rolling tap method?
A. Yes.
Q. Now, you're testifying now in the plaintiffs' case-in-chief. Do you understand that? You were designated as a witness for the defendants. Do you understand that?
A. Yes.
Q. It's a little unusual, but for purposes of moving the trial along, that's been done. Do you agree that there was no way that we could have subpoenaed you to testify in our case-in-chief, and we could not have compelled you to come to the United States and testify in our case-in-chief, that's why we played your deposition? Do you understand that?
A. So--sure.

Q. We went to Spain to take your deposition we saw here today, right?
A. Uh-huh.
Q. And do you understand that you're being allowed to testify during the plaintiffs' presentation of evidence even though you would normally be scheduled to testify during your employer's case-in-chief? Do you understand that?
A. Yes.
Q. Okay. We could not have made you come to the United States and testify, that's why you're appearing in our case-in-chief. Is that your understanding?
A. I think I'm understanding.
Q. If you and Mr. Singer wanted to put you on again during your case-in-chief, I presume that's his decision and your decision to make. Do you understand that? What I'm getting at is we didn't call you as a witness here today to testify live. Do you understand that?
A. Yes.
Q. We intended to present your deposition because we could not compel you to be here. Do you understand that?
A. Oh, yes.
MR. EATON: I have no further, I guess it would be, cross-examination of this witness, Your Honor, and we would pass the witness.
THE COURT: Thank you.

Mr. Singer?

REDIRECT EXAMINATION

BY MR. SINGER:

Q. A couple of quick things, Mr. Belategi. Some Apexes are carbon steel; right?

A. Yes.

Q. So only the Apexes that are stainless steel have the cut threads?

A. Yes.

Q. I don't want to beat a dead horse, an expression we have here, but let's be very, very clear. As the videotape has said, and as you've testified, so there's no misunderstanding, when the hole is drilled in the barrel on the machine, it's to a certain size, to the setting of that CNC lathe machine; correct?

A. Correct.

Q. And that size hole is checked with a go/no-go one out of every 25 times; correct?

A. Yes.

Q. And if it is out of tolerance, they have to check all the previous 24 to the last checking that was good?

A. Yes.

Q. Have you ever seen--and you have said that you have seen sometimes where there's been a checking and a hole is out of tolerance--

A. Yes.

Q. --in the nine years you've been there.
A. Yes.
Q. And when that happens, have you ever seen-- First of all, let's talk about the machine, because you've seen it happen when the machine had a problem in the set-up; correct?
A. Correct.
Q. And when that happens, does the next part after the bad one get made bad, too?
A. Yes.
Q. Have you ever seen the machine heal itself and make a bad part and then make good parts without any adjustments?
A. No.
Q. Let's talk about the tool. You've seen that the tool sometimes, the drill, will make itself get worn or somehow be out of alignment; correct?
A. Yes.
Q. And as you've seen in these machines, if it makes a bad one, is the next one going to be bad?
A. Yes.
Q. Have you ever seen in your experience a drill that's bad or out of alignment that made a bad one and then healed itself so that the next one was good?
A. No.
Q. And then the other thing I think you said about any other problems that could cause that, you said the worn tap, I

believe, the worn thread. If that happens, it's out of tolerance, is the next one going to be out of tolerance?
A. Yes.
Q. Have you seen it heal itself?
A. Yes.
Q. You've seen it heal itself, make a bad part and then a good part?
A. No. No. No.
Q. Because it is possible for a machine to have different mechanical issues, and taps to have issues, and drills to have issues, you check the hole one out of every 25; right?
A. Yes.
Q. And then you--then once the thread is formed, after it is threaded, that size is checked 100 percent; correct?
A. Yes.
Q. Each and every barrel?
A. All of them.
Q. And the purpose of that is to make sure there is no bell-mouthing; correct?
A. Correct.
Q. And you've described how that is. And then also in addition to that, to make sure that the threads themselves are the proper shape, and so forth, a threaded go/no-go is checked every one in 25?
A. Yes.

Q. In your experience, though, notwithstanding the fact that the hole is straight, the threads are going to be straight--right?
A. Yes.
Q. --and in tolerance?
A. Yes.
Q. One of the beauties of the rolling machine; right?
A. Right.
Q. Now, you said that BPI participated to an extent in the design. Are you aware of anything that BPI did, other than interface with Dikar on what they thought the market would be looking for in the U.S., and doing their shooting, and giving their approval?
A. What was the question?
Q. BPI's participation in the design of the Kodiak. Did they make drawings, engineering drawings?
A. I don't know.
Q. As far as you know, did they do anything other than shoot the gun and give input to Dikar?
A. Yes.
Q. Okay. What else?
A. Nothing else.
Q. Okay. Now, let's put this whole proof thing to bed real quick. In Europe is there a written law, a requirement of the Government of Spain, that a gun manufacturer selling a gun

there, and in particular let's talk about muzzleloaders, for use--that stays in Spain, must send that gun and have a certificate?
A. Yes.
Q. And who proofs that gun? Who fires that gun?
A. The proofhouse does.
Q. Not you?
A. No.
Q. And you're not allowed to, are you?
A. No.
Q. And that written procedure has the requirements to do it; correct?
A. Yes.
Q. And how it's to be done?
A. Yes.
Q. And isn't it true that the pressure on those guns is less than even a magnum charge that you put to your shoulder?
A. It is true.
Q. So isn't it true that if Dikar wanted to and the proofhouse allowed them to, and they wanted to send a Magnum going for sale in the United States to the proofhouse officials to run their European proof tests on it, it would be, quote, tested at a pressure less than it's going to be used?
A. Correct.
Q. It is theoretically possible that anything could happen in

the manufacturing process, isn't it?
A. Yes.
Q. For this Katzenmeier Kodiak to have left the factory bell-mouthed would have required, would it not, first of all, that the hole, when it was drilled, was made tapered, and no other one was made tapered after that; correct?
MR. EATON: Object to the form of the question, Judge.
THE COURT: Overruled.
BY MR. SINGER:
Q. Go ahead.
A. Correct.
Q. And then it would have required that in the one in 25 checking, that operator missed it, made an error, or didn't find it--correct?
A. Correct.
Q. --for that to be possible; right?
And then it would have required the operator of the rolling tap--and the rolling tap, it doesn't have a guide on it, does it--
A. No.
Q. --to form the threads, like the drill does that stays in the center of the hole, does it?
A. No.
Q. It would have required the operator, when they made that tap, to--threads, to have made a thread that was not a little

out of tolerance, but way out of tolerance?
MR. EATON: Your Honor, Plaintiff objects. These are all leading and suggestive questions. He's merely asking the witness to affirm what he says.
THE COURT: Sustained.
MR. SINGER: May I approach?
THE COURT: Yes.
BY MR. SINGER:
Q. Mr. Eaton showed you this picture, Plaintiffs' Exhibit 11. If, Mr. Belategi, the forming tap had not formed threads in the back in Mr. Katzenmeier's gun, the--you have never seen a circumstance where it did not form--the hole was too bell-mouthed, it did not form threads, but then the next one it did?
MR. EATON: Your Honor, object. Again it's leading and it's cumulative.
THE COURT: It is leading. Sustained.
MR. SINGER: I'm trying to move it along and I apologize.
BY MR. SINGER:
Q. If a bell-mouthed thread, a bell-mouth shape was made, is that the purpose of checking 100 percent with the go/no-go gauge?
A. Yes.
MR. EATON: Object. I don't know which go/no-go gauge

he'd be using.
BY MR. SINGER:
Q. One hundred percent one, to check the size.
A. Yes.
Q. And if, if, a gun had been made with a diameter like this as manufactured, with no threads back here at all, would the no-go gauge go in?
A. Absolutely.
Q. It would go way in, wouldn't it?
A. Yes.
Q. So if it is theoretically possible that one got out, the operator who checked with the no-go gauge would have made a mistake; right?
A. I suppose it could happen.
Q. In a critical part of their job; right?
A. Yes.
Q. And then in addition to that, in the initial--there's an additional check the quality department does; right?
A. Yes.
Q. And the quality department would have to miss it as well; right?
A. Yes.
Q. And is it also true that the--it would be such a rogue that it wouldn't even be caught in the next ones because apparently the next ones would be perfect; right?

A. Right.
Q. And the--what is her name again, the grease one?
A. Ampara.
Q. Her, if she looked in the end of the barrel and looked in it, she would have to miss that barrel, wouldn't she?
A. Yes.
Q. She would have put the breech plug in with her hand, and she would have missed that, too, wouldn't she?
A. She wouldn't be able to engage because there are no threads.
MR. SINGER: Nothing further. Thank you.
MR. EATON: Very brief.

RECROSS EXAMINATION

BY MR. EATON:
Q. Mr. Belategi, this lady at the final station inserting the breech plug, she would be able to engage a breech plug into a bell-mouthed barrel if the first three or four threads, or four or five threads engaged, wouldn't she?
A. Yes.
Q. All right. The final five, six, seven, or eight threads might not be engaged, but if the first three or four threads are engaged, she would be able to put that breech plug in there, wouldn't she?
A. Yes, but--
Q. Those tolerances are so slight she would not feel any wobble, would she?

A. She would.
Q. She would have a tactile sensation that it was in there good and firm?
A. She would feel the difference.
Q. You believe she would be tactilely able to discern a difference?
A. If the breech plug is very--
Q. We're talking thousands of an inch. These are tiny threads in this breech plug; correct?
A. Yes.
Q. And if the first two or three or four of them engaged, you're telling me the back end would wobble? You're an engineer and you're telling me that; is that right?
A. Repeat that question, please.
Q. These threads are pretty tiny. We've seen them here. We've seen pictures of them. They're pretty tiny relative to the thickness of the barrel, aren't they? Just thousandths of an inch in height?
A. Yes.
Q. And if the first three or four of those threads engaged when the breech plug goes in, that is going to be sufficiently tight that that breech plug is not going to wobble when the entire tolerance is a few thousandths of an inch? As an engineer are you telling me that would wobble if the first three or four threads are engaged?

MR. SINGER: I'm going to object to the form to the extent I don't believe he's clarified which are the first three or four of which end.

MR. EATON: Well, threads are not concentric, they're helixes, so you can't really number them in that fashion.

THE COURT: Objection is overruled.

BY MR. EATON:

Q. You may answer.

A. So if I understand correctly--

Q. As an engineer, are you telling me that in a connection of this breech plug and this barrel, that if the first three or four helixes of the thread are engaged, but not the last five or six or seven, that lady could feel a wobble, is that what you're telling me?

A. Once it's engaged, you mean?

Q. Once the first three or four threads are engaged, someone who is working that breech plug, it will feel like it's fully engaged to them, won't it?

A. Yes, but she will notice the beginning of the thread, it must engage from the beginning of the thread, not from the last threads.

Q. The first quarter of an inch or so there's no threads to engage. The threads are recessed inside the barrel about a quarter of an inch, aren't they?

A. Yes.

Q. And in a way, that's a blind insertion. Once you put the breech plug in there and begin to screw it in, you can no longer see the threads at all, can you?
A. Once you put the plug in--
Q. Once you get the breech plug inside that barrel a quarter of an inch or three-eighths of an inch, where it's recessed, where the first thread begins, once you get that breech plug in there and begin to turn it, you're not going to be able to see which threads are engaging. And as soon as it engages, you're going to feel like it's being screwed in, aren't you?
A. No.
Q. You're telling me, as an engineer, that you think if there's a bell-mouthed unit, that I can get that breech plug halfway in there, and if they're not good, full threads, I can feel that? You're telling me that?
A. I'm telling--just three threads?
Q. Right.
A. In this case the lady putting in the breech plug cannot engage because you cannot begin--
Q. Let me ask you this: We have one lady putting breech plugs in, we have three guys, three machinists making barrels to receive breech plugs; right?
A. Right.
Q. How many ladies or men do we have putting in breech plugs for the barrels that are made?

A. Mainly one.
Q. You have one person, that lady, doing the breech plugs in all the barrels three men have produced; correct?
A. Yes.
Q. And they produce--what was it you told me? 12 to 14 an hour apiece?
A. Yes.
Q. So this lady is dealing with 36 to 42 an hour. So she's got about a minute to put that grease on there, hand insert it, and tighten it up, and then tighten it with the pneumatic tool, and then tighten it up again with the wrench; correct?
A. She has to do around 30 per hour, maybe a little less.
Q. She's falling behind, then, right? If she's doing less than 30 an hour, she is falling behind those three guys producing the barrels, isn't she?
A. If the three are working, one is not able to do all the production. Mainly one, but sometimes--
Q. I'm not going to argue with that.
I do want to make one thing clear here. Do you agree that a barrel can be bell-mouthed, but not bell-mouthed sufficiently to allow the go/no-go instrument to be--pardon me--that is not bell-mouthed sufficiently for the no-go to go in--the go/no-go to go in?
A. The no-go will not go.
Q. What I'm really asking you is, do you agree that a unit can

pass--a barrel, a unit can pass the no-go test with the threaded instrument and still be bell-mouthed, or do you disagree with that?
A. A barrel with very little bell-mouth, yes.
Q. Pardon?
A. It may have very little bell-mouth.
Q. It can be bell-mouthed, and it can still pass the threaded no-go test? In other words, the threaded instrument will not go in it, but it will still be bell-mouthed? Do you agree with that?
A. Yes.
MR. EATON: I don't have anything else.

FURTHER REDIRECT EXAMINATION

BY MR. SINGER:
Q. One quick clarification. If it's bell-mouthed, at all out of tolerance, at all, it will not pass the size go/no-go, will it?
A. Yes.
MR. EATON: That's been asked and answered, Judge.
THE COURT: The objection is overruled.
Are we done with this witness?
MR. EATON: Yes, Your Honor.
MR. SINGER: Yes, Your Honor.
THE COURT: Members of the jury, we're going to take our evening recess at this time. Here is what's going to

happen, as I understand it, the clerk will correct me if I'm wrong: We're going to adjourn tonight, you're going to come back tomorrow at 10 o'clock in the morning.

If the storm is such that we decide to cancel for tomorrow, the clerk's office and my law clerk are going to make an effort to call you, and I think we have your cell phones. One of you doesn't have a cell phone. We'll try to call you at whatever that number is. Please have your cell phones on, and as I tell my kids, please pick up.

If we call you tomorrow, it will probably be sometime after 7 a.m., sometime between 7 a.m. and 7:30. If we don't call you, that means we're going ahead. But if you're not sure, you want to double-check, you can call the clerk's office here. We're going to give you a number you can call the clerk's office, but there probably won't be anybody there until about 7:30. And if you can't get through to them, you can call my chambers, and we'll give you that number, but we might not be there at 7:30, it might be a little bit later. We'll give you enough numbers, hopefully, to check. But we're starting at 10 tomorrow. We'll try to.

We'll call you if we cancel, otherwise we're going to go ahead. But if you want to make sure, we'll give you some numbers you can call.

Deb, is that about it?

THE CLERK: That's it. And they've got the numbers

already.

THE COURT: And you've got the numbers. They're way ahead of me. They've told me not to worry about this, just let them handle it. So I hope I have not told you anything inconsistent.

We'll see you tomorrow morning at 10 o'clock. During the evening hours, please bear in mind the admonition previously given.

(In open court, out of the presence of the jury.)

THE COURT: I'll see everybody tomorrow.

Mr. Eaton, remember before we began I was asking you at some time I'd like to know on design what the alternative safe design is going to be? I've not heard that yet, but you're not done yet, but that helps me work on instructions, if you would.

MR. EATON: Judge, I've got some supplemental instructions. I did work on that. However--and I can e-mail them to your clerk if you want to work them over. I've got a hard copy. But I've got a secretary who went to Denver because her daughter had a baby, and I don't know how to e-file these things. So if you've got an e-mail address that I can send these to you in Word Perfect or Word format, I'll be happy to do that so nobody will have to retype them.

THE COURT: That's fine. Kathy will give you the e-mail address.

See you all tomorrow, I hope. Call my office 8-ish and we'll let you know.

(Recess at 5:10 p.m., until 10 a.m. Tuesday, December 9, 2008.)

C E R T I F I C A T E

I, the undersigned, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that I acted as the official court reporter at the hearing in the above-entitled matter at the time and place indicated;

That I took in shorthand all of the proceedings had at the said time and place and that said shorthand notes were reduced to typewriting under my direction and supervision, and that the foregoing typewritten pages are a full and complete transcript of the shorthand notes so taken.

Dated at Des Moines, Iowa, this 27th day of February, 2009.

/s/ Theresa Kenkel
CERTIFIED SHORTHAND REPORTER