IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - - X

JON D. KATZENMEIER and JULIE KATZENMEIER, Husband and Wife,

Plaintiffs,

vs.

BLACKPOWDER PRODUCTS, INC., a Corporation, d/b/a CONNECTICUT VALLEY ARMS; and DIKAR S. COOP,

Defendants.

- - - - - - - - - - - - - - - - X

Case No. 4:06-cv-00169

TRIAL TRANSCRIPT

VOLUME V

Courtroom, Second Floor
U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa
Tuesday, December 9, 2008
10:25 a.m.

BEFORE: THE HONORABLE ROSS A. WALTERS, Magistrate Judge, and a Jury.

THERESA KENKEL - CERTIFIED SHORTHAND REPORTER

APPEARANCES:

For the Plaintiffs: GARY A. EATON, ESQ.
WILLIAM E. SPARKS, ESQ.
Eaton & Sparks
1717 East 15th Street
Tulsa, Oklahoma 74104

For the Defendants: JAMES E. SINGER, ESQ.
Bovis, Kyle & Burch, L.L.C.
200 Ashford Center North
Suite 500
Atlanta, Georgia 30338-2668

KEVIN M. REYNOLDS, ESQ.
NICHOLAS S.J. OLIVENCIA, ESQ.
Whitfield & Eddy, P.L.C.
317 Sixth Avenue
Suite 1200
Des Moines, Iowa 50309-4195

# I N D E X


| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiffs: | | | | | |
| William James Bruchey, Jr. | 634 (Eaton) | 676 (Reynolds) | 701 (Eaton) 706 (Eaton) | 705 (Reynolds) | |
| Brian Adams, M.D. (Via videotaped deposition) | 707 | | | | |
| Kenneth Goins, M.D. (Via videotaped deposition) | 707 | | | | |
| On His on Behalf: | | | | | |
| Jon David Katzenmeier | 707 (Sparks) | | | | |


# E X H I B I T S


| PLAINTIFFS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 22 - Curriculum vitae of Dr. Bruchey | 636 | 636 |

P R O C E E D I N G S

(In open court, in the presence of the jury.)

THE COURT: Good morning to you all. Thank you, members of the jury, for making it to court today. I know some of you had more difficulty than others getting here, and it's not easy to move around today in this weather, and we appreciate you being here.

We're ready to proceed now with another witness, I believe, Mr. Eaton; is that correct?

MR. EATON: Yes, Your Honor. At this time the plaintiffs call Dr. William Bruchey.

THE CLERK: Please step forward and raise your right hand.

WILLIAM JAMES BRUCHEY, JR., PLAINTIFFS' WITNESS, SWORN

THE CLERK: You may take the stand.

DIRECT EXAMINATION

BY MR. EATON:

Q. Good morning, Dr. Bruchey.
A. Good morning.
Q. Would you state your full and correct name for the record, please, sir.
A. Williams James Bruchey, Jr.
Q. Dr. Bruchey, where do you live, sir? City and state is good enough.
A. I'm from Port Deposit, Maryland.

Q. What is your occupation, profession, business, or employment, sir?
A. I'm a retired government employee, government employee who worked for the Army for roughly 40 years, a civilian employee. I currently work part-time for a civil engineering firm, Survice Engineering, and I do independent consulting.
Q. Just tell us kind of in a thumbnail fashion what your employment as a civilian employee of the Federal Government involved for those years you were active.
A. My general experience, whether it was with the government or with the engineering firm, or private consultant, always centered around ballistics. I started my career with what was then called the U.S. Army's Ballistic Research Laboratory, now called the Army Research Laboratory; been involved in interior ballistics, that's what happens inside the gun, when the powder is burning, how the projectiles comes out; I've been involved in the studies with the exterior ballistics, accuracy, velocity, things of that nature. And then I will say probably most of my experience has been in the area of terminal ballistics, and that is what happens when the bullet hits a target. How does armor work? How does a bullet perform when it hits armor, and things of that nature.
Q. Now let's go over your formal education a bit. Would you turn to tab 22 in the exhibit book behind you there, please. You got it there?

A. I'm there.
Q. Would you identify Plaintiff's Exhibit No. 22 for the Court, please.
A. This is my CV, resume.
Q. Your education and professional experience?
A. I received a--
Q. Is that what it is?
A. Pardon?
Q. This is a resume of your education and professional experience?
A. Yes. Sorry.
MR. EATON: Your Honor, we move to offer Plaintiffs' Exhibit 22 into evidence.
MR. REYNOLDS: No objection.
THE COURT: 22 is received.
(Plaintiffs' Exhibit 22 was offered and received in evidence.)
MR. EATON: May I publish this, Judge?
THE COURT: You may.
MR. EATON: Thank you.
BY MR. EATON:
Q. Let's just start with your formal education, Dr. Bruchey. Did you attend undergraduate school?
A. Yes.
Q. Where did you attend undergraduate school?

A. I went to the University of Maryland in College Park, Maryland, I received a bachelor's degree in physics.
Q. What year did you receive a bachelor's degree in physics?
A. You say when?
Q. What year.
A. 1960--'64, rather.
Q. Did you then attend some graduate school? Where did you next attend school?
A. Well, what happened, when I graduated, I found out very quickly that you couldn't do a whole lot with a bachelor's degree in physics, and so I went to work.
Q. Who did you go to work for?
A. Basically I ended up with the Federal Government, and I went to graduate school, obtained my master's degree part-time in the evenings at the University of Delaware.
Q. What did you obtain a master's degree in, what field of endeavor or study?
A. My master's was in statistics and computer science.
Q. Your master's?
A. Yes.
Q. Statistics and computer science, all right. Did you then go on and get further education after your master's degree?
A. Yes, I did. I, again still working for the government, about that time I thought, "You know I'm not going to do this anymore." This part-time just burned me out, and I stopped.

And then a couple years later found out that there was another area that I found extremely interesting, and that was materials science and engineering. I took a couple part-time classes, said, "I got to go back to school full-time and get all this out of the way." So I went back to Johns Hopkins University and got my Ph.D. in materials science and engineering.

Q. What year was that that you got your Ph.D.?

A. That was 1980.

Q. You had worked for the government prior to getting your Ph.D. in materials science; is that right?

A. I worked for the government continuously. It was the government who paid for me to go back to school.

Q. All right. And then on your curriculum vitae, it looks like it just lists your various assignments as a civilian employee of the Federal Government from a period from about--what would it be? 1967 up through your retirement in 2003; is that correct?

A. Yes.

Q. And you'd summarized that for us previously, so I'm not going to get into each and every assignment and what it involved. It's an exhibit, and the folks on the jury can look at that.

Have you testified in firearms cases in Federal Courts--or in any courts, State or Federal Courts, before today?

A. I don't believe I have.

Q. You don't believe you've testified in court?

A. Right.
Q. Until today?
A. Yes.
Q. This is your first time in court?
A. No, I'm sorry. On firearms.
Q. Okay. This is your first time in court on firearms?
A. Yes.
Q. All right. On your CV on the bottom of the second page there's a heading that says, "Court recognized firearms/forensic expert," and then it lists about ten states. Do you see that?
A. Yes.
Q. Did you appear in state courts with regard to firearms?
A. I said in the beginning all my experience concentrates in the general area of ballistics. I appeared in court, testified in the area of ballistics, not necessarily this type of work, but it involved the ballistics, the operation of firearms, but not a failure analysis, per se.
Q. Okay. I follow you. Your appearances in courts in these ten states, or so, listed, you categorize that more as testimony in the field of ballistics, which involves firearms; correct?
A. Yes. I do a number of cases that are involved in crime scene restoration, for instance.
Q. All right. But not specifically as to failure analysis of a firearm?
A. Right.

Q. All right. So this is your first time in court for failure analysis in a firearm?
A. Yes.
Q. Okay. I follow you. Have you worked or consulted in cases involving firearm failure analysis prior to this Katzenmeier case?
A. I've worked on cases off and on since 19--roughly 1976 until the present.
Q. Involving analysis of firearms?
A. Failure analysis of firearms.
Q. All right. But this is the first one of those cases that you've really come to court to testify on?
A. Yes, sir.
Q. All right. Now, can you give us some judgment as to how many cases you've been involved in that did not actually come to trial, but wherein you performed failure mode or failure analysis with regard to firearms?
A. I probably--probably every time it averaged out to two to three cases a year.
Q. And that's been for 20, 30--
A. Thirty-two years.
Q. Thirty-two years?
A. Right.
Q. During those 32 years, those several cases per year, have you had occasion to become familiar with the metallurgical

characteristics or features that are involved when a firearm fails?
A. Yes, sir, I have.
Q. And have you had occasion to investigate and evaluate firearm failures that resulted from overpressuring of a firearm?
A. Yes, sir, I have.
Q. Now--
MR. EATON: May I approach the witness with an exhibit, Your Honor?
THE COURT: Yes.
BY MR. EATON:
Q. I'm not going to bring the whole Katzenmeier case to you, but I'm going to bring to you the barrel, which is part of Exhibit No. 2. Have you seen this exhibit before?
A. Yes, sir, I have.
Q. And have you conducted--let's first of all start with a gross inspection of that gun.
A. Yes, sir. I first got this gun, the barrel, to do just a visual inspection. At that time it was complete, the top end of the breech had not been removed, and I did no destructive testing on it.
Q. Do you remember about when that was that you did your first gross inspection of the Katzenmeier muzzleloader rifle?
A. I'm thinking about March a year ago.
Q. 2007?

A. I believe so.
Q. And when you first performed that gross visual inspection, did you see any indication or signs that that firearm had been subjected to excessive pressures?
A. No, sir, I did not--well--no, I did not.
Q. Now, have you had occasion in your experience over the past 32 years to observe firearms that had failed as a result of having smokeless powder fired through them?
A. Yes, sir, I have.
Q. Did this Katzenmeier gun exhibit any of the characteristics-- Well, strike that.
What distinctive characteristics or features had you previously observed in other firearms that had failed due to having smokeless powder fired through them?
A. Well, generally with the smokeless powder failures, you--the powder burns much more intensely, involves much higher pressures, things happen a lot faster. You tend to get bulging or fracture of the barrel either just--well, there's no chamber on this, but a few inches down the barrel you'll develop extremely high pressures and you'll get bulges or fractures of the barrel because of that.
Q. Did this firearm, the Katzenmeier firearm, exhibit any of the features of the smokeless powder overpressure failure?
A. No, sir, not that I observed.
Q. You mentioned something about pressures down the barrel, or

muzzleward of the barrel. In your experience and study, have you come across a term called "peak pressure"?
A. Yes, sir.
Q. What did peak pressure mean in the context of firearm failure mode analysis?
A. Well, everybody tends to think that peak pressure in firearms is the pressure in the barrel as a whole. It's pressure that occurs at one point as the bullet passes down through the barrel. It normally is a few inches down the barrel because think of the gunpowder as a fuse that you light on one end and it burns to the other end of the fuse. The gunpowder is doing this much faster, but in the very beginning it's just a little bit of powder burning, and more powder, more powder, more powder, and cumulatively you build up the pressure, at the same time the bullet is starting to move down the bore. So when the powder reaches peak pressure, it's already down-bore a few inches.
Q. Now, have you also had experience in analyzing failures of firearms where black powder or black powder substitute, such as Pyrodex or Triple Seven, have been fired through them?
A. Yes, sir, I have seen those.
Q. And do firearms that have failed under excessive pressures of smokeless powder exhibit different characteristics than firearms which have failed when having black powder or black powder substitute, like Pyrodex, fired through it?

A. Generally I would say that the black powder is a--pressure is built up a little more slowly, it's a little more gentle push, whereas the smokeless powder you have a more rapid rise in pressure. When things go, they go really bad, you would get a catastrophic failure. You would be more likely to get a bulge in a barrel or a split in a barrel with black powder, but not necessarily catastrophic failure.

Q. Deformation?

A. Yes.

Q. But not coming apart?

A. Right.

Q. Why is that?

A. One of the main reasons is the black powder--typical loads in a black powder loaded gun are much lower peak pressure than smokeless powder with the same volume or weight, and the higher the pressure, the more catastrophic the failure.

Q. Now, after you did your gross--while you were doing your gross inspection of the Katzenmeier gun, and you told us that it exhibited none of the features of the smokeless powder or an excess pressure failure, did you observe any characteristics or features of the Katzenmeier gun which indicated some other failure cause to you?

A. I did see evidence of tapered threads, or bell-mouthing within the chamber.

Q. How did you observe that? What was there about your gross

observation of the Katzenmeier gun which led you to that conclusion about bell-mouthing?
A. I didn't do any measurements. I looked visually down into the breech area of the barrel, and I could see what appeared to be tapering. I was also--I also had the information at the time that there should be white--Mr. Lester Brown had already taken those measurements, and I just saw the visual evidence of what he had actually measured.
Q. When you did your gross visual inspection of the Katzenmeier gun, had you talked to Mr. Roane about the gun?
A. Yes. We talked back and forth quite a bit.
Q. And had you seen any kind of notes or reports or any kind of written documentation that Mr. Roane had created?
A. I saw his original report.
Q. And, in fact--well, let me ask it a different way.
Mr. Roane testified earlier in this case, and testified that he recommended further analysis after he'd examined it, by a metallurgist and by a mechanical engineer. Are you the metallurgist he recommended have another look at it?
A. I think I am.
Q. Have you known Mr. Roane for a number of years?
A. I've known Mr. Roane for probably the better part of 30 years.
Q. And have you worked with Mr. Roane from time to time on cases?

A. I originally started working with Mr. Roane when he was a government employee. He worked for the Army's Small Arms Systems Agency. I worked with him then in developing new ammunition for small arms. And then within the time frame that I retired, I got involved with him in terms of doing some of the metallurgical work for him.
Q. Now, at some point after your first gross inspection of the Katzenmeier gun, did you perform some more, I'll say, detailed metallurgical evaluation of the gun?
A. Since then I have.
Q. Right, that's what I'm asking. After that initial inspection, were you called upon to perform a more detailed metallurgical evaluation of the Katzenmeier gun?
A. Yeah. After everybody else got done doing--finished doing their thing with the destructive testing and evaluation, I received a sample from the breech area for further analysis and inspection.
Q. And tell the ladies and gentlemen of the jury, if you would, please, what further analysis you did with the section or sample that had been taken from the breech area of the Katzenmeier gun.
A. I sectioned that, polished and mounted it to bring out the microstructure to see if there were any defects in the material that were a result of manufacturing or processing of the steel. In the end, the bottom line was it looked like pretty good stuff to me.

Q. So from a metallurgical standpoint you had no criticism of the material itself; is that correct?
A. That's true. Of course I also did the exemplars, and did the same analysis on the exemplar rifles, and found that the microstructure of all three materials were acceptable, were well-formed to handle the stresses and pressures that you normally see in these type of firearms.
Q. Now, did you have an occasion after your initial gross inspection after the destructive testing was done to inspect the breech area of the Katzenmeier gun after it had been sectioned and opened up? Have you had occasion to inspect it?
A. Yes.
Q. All right. And what, if anything, did that inspection of the interior of the breech area of the barrel tell you with regard to your initial impression that there had been bell-mouthing in the gun?
A. I think it just reinforced my initial impressions I had from the visual examination prior to the destructive testing.
Q. And what does bell-mouthing actually mean in the context we're talking about it?
A. Well, in a sense it's a tapered hole. It can be due--generally it occurs due to the machine process. You could have a worn tool, a tool that wobbles as the hole is being drilled. Until it gets in far enough for the material to support it properly, you'll have a wider diameter at the

entrance and then it will taper down to the final--proper diameter it should have.

Q. And have you also been provided with exemplar breech plugs for this Kodiak Magnum model firearm which is Mr. Katzenmeier's?

A. Yes, sir.

Q. And are those breech plugs, those exemplar breech plugs that come in those guns, tapered breech plugs?

A. No, sir. They're straight threads.

Q. Are there any problems with regard to inserting a cylindrical nontapered breech plug into a bell-mouthed breech area of a barrel? Does that present any operational problems--

A. Well, the operational problems--

Q. --hazards?

A. --is safety. You no longer--if I'm a mechanical engineer designing this product, I designed it to handle, you know, expected pressures. And I know how many threads it takes to hold those pressures. Maybe it's 20 threads, and everything is fine.

Now, if I have a tapered hole and put in a straight plug in there, instead of having 20 threads in a case, I may only have ten. It may not hold those pressures. That's what comes out of the tapered versus straight.

Q. Inserting a cylindrical breech plug into a tapered barrel, tapered breech area of the barrel, does that also create some threads where there's only partial engagement?

A. Yes, sir.
Q. So it's a gradual diminution in thread engagement from muzzle to breech? Would that be a fair description?
A. Yes, sir, that's exactly it.
Q. Now, did you--you said you performed a metallurgical evaluation, you took some slices and you etched them, and they told you the grain structure of the steel was satisfactory for this application; is that correct?
A. Yes, sir.
Q. Did they tell you anything else about the thread profile of what you described as a bell-mouthed breech area in the barrel?
A. Well, it told me, first off, that threads weren't fully engaged from the muzzle to the breech end of the barrel, the thread chain from front to back.
I also--if you look at photographs, you see that the root of the threads is roughly parallel, but the taper within the barrel is not.
Q. Now, did you have occasion to observe some microphotographs of the profile of the threaded breech area of the barrel in the Katzenmeier gun that were performed under the direction or supervision of Dr. Steve Tipton?
A. Yes, sir, I did.
Q. And were those basically similar to what your photographs showed, your micrographs showed?
A. Well, I'll say he did one heck of a job because they were

excellent photographs, I'll say much better than mine.
Q. Now, let me ask you another question. Did you perform a metallurgical analysis or investigation of the surface area, not the profile of the threads, but the topographical surface area of the sample that you received?
A. Yes, I did.
Q. And what did that tell you, if anything, about the failure mode for the Katzenmeier gun?
A. I may be answering this wrong because I'm not sure of the exact intent of the question, but what I saw in looking at the topography was that if you went from front to back, or from the muzzle to the breech end of the chamber, the width of the remaining threads got wider and wider. Had there not been any bell-mouthing, the width of the remaining threads would have been constant from one end to the other.
Q. What about the height--not that. Let me ask you a question and I'll show you an exhibit.
Are you familiar with a phrase called "adiabatic shearing"?
A. Yes, I am.
Q. What is adiabatic shearing?
A. It might be a little long-winded for you, but it's a fairly specialized form of failure in metals. And I think probably it was first discovered eons ago in the field of ballistics having to do with high strain-rate, just do something extremely fast.

You clearly--you shoot a bullet in armor. It's a very short time, fast event. And what can happen is I can keep changing the piece of armor steel expecting that ballistics resistance is going to get higher and higher. But in some steels, all of a sudden they get weaker and weaker as it may get stronger and stronger because of the unique phenomenon that occurs that's called adiabatic shearing. It's very localized and very catastrophic when it happens.

Maybe an example would be, I'm sure sometime in your past you've taken a piece of wire, tried to bend it back and forth to break it. If I had a wire, was sort of bending it like this to break it, I'll be bending it forever. The only way to break it is to bring my fingers together and then bend it very locally. And as I do that, I'm putting work into--I'm working on the metal because I'm plastic forming it. And when I do, that work has to show up somehow. It shows up as heat. As I bend this wire back and forth you'll feel your fingers get hot. In a way that's adiabatic shearing.

In a metal that has different grains, different microstructures, and I want to shear one surface over the other, what happens, I'll start to push very quickly, and so much heat will build up in such a small volume that the metal goes molten, and the two surfaces--the metal will slide across each other as if it was a greased interface between them. That's an adiabatic shearing. It's a very localized failure of metals, mainly.

In steel it's evidenced in the microstructure by small bands--you'll see it in the--on the failure surface, or near the failure surface, there will be white bands. Those are bands that originally in a split section turn molten and then froze in a blink of an eye. (Indicating throughout.)

Q. When metal, steel, fails under adiabatic shearing, does that leave a distinctive pattern or signature?

A. Yes, sir. Those white bands are a signature of the adiabatic shearing.

Q. And do those white bands go in the same direction as the shearing?

A. Yes, sir.

Q. They're parallel to the direction of the shearing?

A. Yes.

Q. Now, we've previously received in evidence Plaintiff's Exhibit No. 12.

MR. EATON: Mr. Wise, would you put that up, please?

BY MR. EATON:

Q. I've got an enlargement of it. I'm going to let you either go up to the monitor and point out something about the shear pattern, or use this enlargement if you think that's easier to use.

MR. EATON: Pardon me, 15. 15. I'm sorry.

BY MR. EATON:

Q. All right. Have you seen that image before?

MR. EATON: May the witness leave his seat, Your Honor?

THE COURT: He may.

BY MR. EATON:

Q. Have you seen that image before, or those images before?

A. Yes, sir, I have.

Q. All right. Now, let's focus on the Katzenmeier CVA Kodiak image--or images that are shown at the bottom of the page. As I said before, you can get up there. And, in fact--or from your monitor you can circle or point to by touching the screen, areas that we're talking about at any given moment.

First of all, the Katzenmeier image, is there a topographical image there?

A. Yes.

Q. Which image is that? Just kind of draw an arrow to it on your monitor.

A. I would say both of these are topographical images.

Q. You're talking about the two images at the bottom?

A. Yes.

Q. Is the second from the bottom the topography of the Katzenmeier barrel?

A. Yes, sir.

Q. All right. Now, does that image show any sign whatsoever of adiabatic shearing?

A. I'll answer it no, but I believe if you have an image--a

close-up image of either three or four I can explain it better.
Q. I don't know what you mean "three or four."
A. I believe in one of the reports there's a blown-up photograph of this area (indicating).
Q. Are you talking about a topographical or profile?
A. Profile.
Q. I don't know if I can enlarge that or not.
MR. EATON: Can you enlarge that, focus in on that, Mr. Wise?
THE WITNESS: It may not have good resolution.
MR. EATON: There we go. Can you just enlarge it just a little more? Maybe bring it down just a little bit, just a little bit down.
BY MR. EATON:
Q. Is that large enough to show what you're trying to talk about, about adiabatic shearing?
A. I'm not sure that it is. I'm going to say that in this general area of this thread, this thread in particular--you see this trailing material? The breech plug, when it came out, was heading this direction, left to right. And that's why there's material downstream of the direction that the plug was moving. This is part of the thread. Had it been adiabatic shear, that piece of the thread would be gone. This piece actually turned over and is laying backwards. Had it been the adiabatic shear, that plug would have gone across it like that and it would have

been a nice smooth surface. That material would not have hung on, it would have gone along with the plug. (Indicating throughout.)

Q. So what we're looking at here is not adiabatic shearing?

A. Not in my opinion.

Q. Now, what is the significance, if any, of the fact that it was not adiabatic shearing in the case of the Katzenmeier failure?

A. Well, from a manufacturing perspective, I don't want adiabatic shear--well, for two reasons I don't want adiabatic shear. It's a catastrophic failure. I don't want to put something in my gun that will do that.

Secondly--this is a manufacturing comment. Machinist want to stay away from steel that adiabatically shears because it will also happen in a lathe or a drilling operation. And when that happens, the tools will chatter, chips will come off, and you get a very rough surface finish, not what you want in manufacturing. Manufacturers are going to select a steel--as a consideration are going to select a steel that doesn't adiabatically shear in its operation. The steel that's in this gun, which is C10E, is the low carbon steel, which is not going to adiabatically shear.

Q. So we can rule out adiabatic shearing in the Katzenmeier case according to you?

A. Yes.

Q. Now, did you see any indications from these microphotographs of whether or not there was failure of the threads all along the length of the breech area of the Katzenmeier muzzleloader?
A. Well, there are degrees of failure.
Q. Okay.
MR. EATON: Mr. Wise, take it up about full screen.
A. To the left where the diameter--the inner diameter of the breech area is the smallest, and the threads are most well formed, you have more material being removed. As you get to the right, where the bell-mouthing is pronounced and there's less engagement, you see less material being removed from the threads.
Q. What does that tell us about the degree of thread engagement at the front end of the threaded area as opposed to the breech end of the threaded area?
A. Well, you have much--you can see that here. You have much more thread engagement toward the front because you can see the sheared deformed materials across the threads. As you get to the back end here, you can see that the material in the thread, the thread body itself, is undamaged. It's only on the very edges. So you don't have full engagement of the thread. (Indicating throughout.)
Q. What about--does the image there of the Katzenmeier gun back toward the muzzle--pardon me--the breech end show what are called machining marks, let's say, in the area of threads 13,

12, 11, 10, 9?
A. It's easier to see--this is a Scanning Electron Microscopy image of the surface, this is optical. The electronic image shows the marks from the machining operation that were put in there when the hole was drilled. And if in fact those threads had been fully formed, these marks would have been obliterated, they would be gone. So there was no contact between the breech plug and the barrel or the chamber towards that end.
Q. Now, on the Katzenmeier gun, I understand this may be a different type of photograph under a different magnification, but can you observe machining marks in the area of threads 9, 10, 11, 12, 13 in the Katzenmeier topographic photo?
A. Yes.
Q. What is the significance of machining marks in that area of the breech in the Katzenmeier gun?
A. That's an indication that that portion of the thread was not in contact with the breech plug.
Q. In other words, is that telling us that as the breech plug went out the back of that gun, the surface area toward the back of it was undisturbed by contact with the breech plug?
A. Yes.
MR. REYNOLDS: Objection. Leading.
THE COURT: Sustained.
BY MR. EATON:
Q. What significance, if any, are the residual machining marks

in the area of threads 9, 10, 11, 12, and 13 in the Katzenmeier image?

MR. REYNOLDS: Objection; repetitive.

THE COURT: Overruled.

You can answer.

A. The significance is that toward the breech end of the chamber, the back end, there was either no engagement or only partial engagement of the breech plug as it left the barrel.

BY MR. EATON:

Q. And what effect, if any, would that have on the strength of that breech plug barrel connection?

A. Significantly reduces the load-carrying ability of that assembly.

Q. Not knowing exactly what the size or the extent of formation of the threads were in the Katzenmeier gun before it failed, would there be any way to calculate mathematically how much force or load was required to eject the muzzle--the breech plug from the muzzleloader barrel?

A. I'm not the guy to do it, but I think someone who can do finite element analysis could do that for you.

Q. Would that involve some assumptions as to the size of each of the threads in the breech area?

A. Yes. But, again, it's a computational exercise. You can vary that all over the place to find out the sensitivity.

Q. All right. Now, did you ever talk to Mr. Roane about his

attempt to measure or get some idea of the configuration of the inside of the breech area of the Katzenmeier gun?
A. Yes, sir.
Q. Did you become aware of him forming a cast of the inside of that barrel?
A. Yes, sir, I am.
Q. Did you ever observe the cast that he made?
A. I don't believe I did.
Q. Are you aware of the materials that he utilized in forming that cast?
A. Yes, I am.
Q. And do those materials have a particular name, the type of materials they are?
A. Well, typically the one that's used by gunsmiths, people in the business, is called Cerrosafe.
Q. Cerrosafe?
A. Yes.
Q. Does that particular metal have--has it been designed to have certain characteristics that make it appropriate for such a technique that Mr. Roane did?
A. Yes.
Q. What are those metallurgical characteristics that Cerrosafe have that make it appropriate for that kind of an inspection or measure?
A. That particular material, oddly enough, was originally

developed, I don't know, 100 years ago, or whatever, for making lead toy soldiers. It has a very low melting point. In fact, the alloy we're talking about here, that metal--it's a combination of bismuth and lead, and it will actually melt at about 190 degrees. So if you plunk it into a pot of boiling water, the metal will melt, that's how soft and--it is.

Any steel at there--I mean, if I worried that that 190 degrees was enough to affect the steel, I'd be afraid to drive my car on a hot deck. It's just not high enough a temperature to alter the material properly. You need to get in the 400, 500, 600 degree range to affect any of the properties of the steel. So it's an appropriate material to use for casting.

Q. Basically what you're telling us, because of the low melting point--does it have any potential to melt the steel--the carbon steel which constitutes the barrel of the Katzenmeier gun?

A. No.

Q. And chemically, from a chemical metallurgical standpoint, does Cerrosafe react chemically to change or alter or destroy any of the carbon steel in the barrel of a gun like the Katzenmeier gun?

A. No, sir, it does not.

Q. Have you ever had occasion to use Cerrosafe to cast the interior of a barrel or a chamber in a gun?

A. I've done barrel casting, but I've never used Cerrosafe.

Q. Have you observed Mr. Roane use Cerrosafe on any occasions

in the past?
A. I know he uses it, but I've never actually watched him do it.
Q. What material do you use for that particular purpose?
A. What--at the time, what I was trying to do was remove--or polish the inside of a barrel. One way to do that is to cast a lead slug for the barrel and use it as a polisher, run it back and forth along inside the barrel because it will take the shape of the lands and the grooves and clean and polish it.
Q. I guess what I'm getting around to, you ultimately performed your own metallurgical evaluation from the sample taken from the Katzenmeier gun; is that correct?
A. Yes.
Q. And was your investigation and analysis, metallurgical investigation and analysis of the Katzenmeier gun, impeded or prevented in any way by the casting that Mr. Roane prepared using Cerrosafe?
A. No, sir, it was not.
Q. Now, you told us earlier that part of your professional education and training was in the field of statistics; is that correct?
A. Yes, sir.
Q. And during your career as a civilian employee of the military involved with ballistics and firearms and armor, have you had occasion to be involved in quality control programs?

A. Yes, sir, I have.
Q. Have you ever headed up any quality control programs for any of the government projects that you've worked on?
A. Yes, sir, I have.
Q. How many, let's say, quality control programs, if any, would you estimate that you've written or created?
A. I don't know that I do it formally--I don't do quality control, per se, of production. Most of my work is done in an R & D atmosphere, and I want to be sure that when I get a result from the research and experiment, that I can believe it. So I fold in the statistics into that experimental design.
Q. Are you familiar with the techniques of the go/no-go instrumentation in quality control processes?
A. I understand what it is.
Q. And you're aware in this case that Dikar, the manufacturer of the Katzenmeier gun, had some quality control procedures that involved go/no-go instrumentation?
A. Yes, sir.
Q. Is that correct?
A. Yes, sir.
Q. Now, I want to focus specifically on the threaded go/no-go portion of their quality control program. Have you seen any of their documentation that relates to that?
A. I've seen documentation, and I also saw a video of the inspection procedures.

Q. The video where the barrel was drilled before being tapped and threaded, and then tapped and threaded--
A. Yes.
Q. --and using go/no-go instruments, you've seen that?
A. Yes.
Q. I'm not sure what the defendants' exhibit number was on that, but I think we all know what we're talking about.
At any rate, having observed that, did you see anything about the threaded go/no-go technique which you found to be not a reliable method of evaluating the completeness or adequacy of the thread form?
A. I think that the go/no-go gauge is designed as if you're working with a cylindrical hole. When you have a tapered hole, it's not always going to give you the right answer.
Q. And why is that?
A. As I insert the gauge into the threads, somewhere along the way it's going to eventually get to a portion of the chamber that is the right dimension. As soon as it does that, you say it's acceptable.
From what I saw from the videos, there did not appear to be any way of knowing whether it went into a tapered hole, or a cylindrical hole. Those are relatively fine--they're small details that someone on the assembly line would not necessarily recognize as they were trying to put these gauges in.
Q. And let me ask you this: If there's a tapered hole, a

tapered barrel, breech area of the barrel that has some incompletely formed threads, when the threaded no-go gauge is inserted, will it engage partially formed threads?
A. It will.
Q. And to the person who's doing the test, if it encounters partially formed threads, will it have the same tactile sensation or feedback that it would have had it engaged fully formed threads?
A. Yes.
Q. All right. And I believe in--
A. It's in the last picture you showed.
Q. Pardon? Last picture? Right. Let's put it back up. Can you illustrate that to the ladies and gentlemen of the jury based on Exhibit 15 that you were looking at before?
A. Sure.
Q. It will come up in a second. Just explain that process to the jury of how and why the test will give, let's say, a false positive reading?
A. Well, the first thing, the go/no-go gauge, in my opinion, measures the dimensional tolerances on the reamer that went in to making those threads. It's not measuring the tapering of the hole, it's saying that the reamer was the proper diameter, the proper number of threads per inch, and that tool was not worn when it was used.
So if I'm putting a go/no-go gauge in there, and this

is a straight--the threads are straight and true because the reamer was straight and true, I can thread that in there or not thread it in there and it's going to pass. So it's going to give me the wrong answer--it can give me the wrong answer.

Q. Well, for instance, thread--what would be--the threads in the area of 12, 13--11, 12, and 13, will there be, when the threaded go/no-go gauge goes in, will there be some slight engagement back there?

A. Sure. You can get engagement, but engagement does not tell you the strength of the engagement. If I only have partial threads, I have engagement, but I only have, say, half the load-carrying ability, or less, depending on the amount of engagement.

Q. Does that mean to the person performing the test it will feel like there is good and true engagement?

A. It can, yes.

Q. When there may not be good and true engagement?

A. That's right. The other thing that the go/no-go gauge doesn't tell you is how much of that thread is incompletely filled. Again, these little ears from a tactile feel will tell you that you have a perfectly formed finished thread when in fact the load-carrying ability may be significantly reduced because it's hollow.

Q. So, do you have an opinion as to whether the threaded go/no-go gauge is an acceptable method for evaluating the

integrity and strength of the threaded metal connection such as we have in the Katzenmeier barrel and breech plug?

A. No, sir, I do not believe so. I don't think it's acceptable.

Q. You don't have an opinion, or do you have an opinion?

A. I don't think it's an acceptable technique for weeding out the defects.

Q. Now, also in the quality control area, if that threaded connection is only inspected by a threaded go/no-go in one out of 25 manufactured units, do you have an opinion as to whether that is an acceptable sampling for a product that will be subjected to several thousands--an anticipated operational pressure of several thousand psi?

A. I would say I would expect not.

Q. Why is that?

A. Well, if you were only inspecting a percentage of the products you make, you've made a conscious decision somewhere along the line, in most cases I would expect it's a business decision, "How many defects can I tolerate? Is one out of a thousand more than I want? Two out of a thousand? Three?"

A lot of times what you'll do is say, if I'm making light bulbs, "I don't care if I have a certain number of defects--defective light bulbs. If they're defective, I'll give the customer a new one." I know how many I have to give away before it starts impacting my bottom line. So that helps decide

the sample size. The only way I'm going to know if I have no defective light bulbs is I have to test every light bulb.

Your original sample size and how many you pick is a business decision. This is a little different because for me, personally, I don't want to put my cheek next to a gun that is going to have one defect in a thousand, just like I don't want to get on a plane that's not been inspected.

Q. Now, that brings us--this quality control issue brings us to the subject of proof-testing of a firearm. Do you know what proof-testing of a firearm is?

A. Yes, sir, I do.

Q. And what is the purpose--what is proof-testing? Just tell us what proof-testing is.

A. Proof-testing is you're basically subjecting a firearm to an overpressure, pressure higher than the usual, whatever it will see in normal operations, and you want it to--you know, you overload it with the idea if there's any defects, you're going to pick them up and it's going to come apart.

Q. And why is proof-testing important with regard to firearms, specifically?

A. Well, firearms come apart very violently when they fail. And, again, your face is sitting two inches away from where all this is happening. It's a safety issue.

Q. Well, I guess in the context of--we know what quality control techniques Dikar uses in the manufacture of its guns,

and you've told us what your criticism is of their methodology of go/no-go inspecting of the threaded area. Would proof-testing of each and every firearm compensate for the deficiencies you've told us about in the go/no-go testing?
A. Yes, sir, it would.
Q. Now, is proof-testing or--is there a custom and practice in the manufacture and dissemination of firearms, let's say, in this country with regard to proof-testing?
A. Yes.
Q. And what is that custom and practice in the industry?
A. The custom and practice in the industry, as far as proof-testing is concerned, is that when I tell you it's been proof-tested, and it has a proofmark, that actual weapon, firearm, was proof-tested. Not that design, not one in a thousand, it's every one has been proof-tested.
Q. And you've been a civilian employee of the military. Does the United States military have a custom and practice with regard to proof-testing of small arms?
A. Each and every firearm produced for the U.S. military is proof-tested. It's one of the--as an aside, one of the biggest problems in Iraq was the Army ramped up so fast that the arms manufacturers could not hire proof-testers fast enough to keep up with production. That's how important the Army considers proof-testing.
Q. You've done consulting work with private firearms

manufacturers in the United States, haven't you?
A. Yes.
Q. Have you done any consulting with firearms manufacturers from any foreign countries?
A. I've been involved--all the firearms I've been involved with--it's a question whether they're made in the U.S. or by a foreign company. I don't know how to answer that. Some of them are foreign, but not necessarily made in a foreign country.
Q. All right. At any rate, in your experience, just give us an estimate, how many firearms manufacturers would you estimate that you've performed consulting work with over your career?
A. I think just about all of the major U.S. companies, and a few foreign companies.
Q. And what is the custom and practice with regard to proof-firing, proof-testing with regard to the domestic companies you've worked for?
A. It's not required by law, but major firearm companies all--they proof-test every firearm they make.
Q. When we talk about proof-testing, is that performed by some human being standing up there holding a gun and firing it?
A. No.
Q. I think we've talked about proof-testing a lot in this case, but not really made it clear how proof-testing is actually performed. Tell us about that, whether or not a human being actually stands there and fires the firearm, or whether there's

some kind of remote firing of the gun.
A. It's all done remotely. The firearm is mounted in a rest or a fixture of some sort that holds it in place, and it's mechanically fired from a distance.
Q. Now, you've seen the Dikar documents in this case with regard to their monthly--to their practice of having five muzzleloader rifles a month pressure tested at the government proofhouse in Spain; is that correct?
A. Yes.
Q. Now, that testing that's done, is that proof-testing?
A. Not by the common definition of proof-testing.
Q. And that testing they have done is testing that's done at much higher pressures than are anticipated during the field service of their products; is that correct?
A. Yes.
Q. All right. Would that testing be more of a test of the design, the sufficiency of the design of a gun as opposed to the manufacture of each and every unit?
A. I would say it was closer to design verification. It's not representative of the unit.
Q. In other words, that five guns a month that goes to the proofhouse, that doesn't verify the safety of any of the production guns, does it?
A. No. It just tells you how well the barrels are made.
Q. That tells you that the design--if the manufacturer of a

particular gun is in conformity with the design, what the design will withstand--

A. Yes.

Q. --correct?

But proof-testing is very different than that, isn't it?

A. Yes.

Q. Proof-testing is more a test of the manufacture, the efficacy of the manufacture than the efficacy of the design?

A. It's a test carried out on a fully-assembled firearm.

Q. Not just a barrel?

A. Right, not just a barrel. One of the reasons you do that, I can have a barrel that is in tolerance, all the gauges and all say it's a good one, but it's on a hairy edge, it barely meets tolerances, but it's a good one. I can say the same thing about a breech plug, it meets all the tolerances, but it's on the hairy edge of being a reject. When I put the two together, now I do have a reject because it will come apart.

That's why you proof-test the entire firearm, to make sure that the whole firearm, every piece, part, goes together and there are no weak points.

Q. And testing of individual components separately is not a good substitute for testing a fully assembled, ready to go out the door firearm; would you agree with that?

A. I agree, sir.

Q. Now, you saw the video that Dikar prepared and played, played yesterday during Mr. Belategi's testimony. And it depicted the go/no-go inspections with the round or cylindrical instrument, and its one in 25 unit inspection with the threaded go/no-go instrument?
A. Yes.
Q. Do you have an opinion as to whether it would be, let's say, technically feasible for Dikar to at least perform the threaded no-go inspection of every unit as opposed to just one in every 25?
A. I think it's technically feasible.
Q. Would it be economically feasible? Do you have an opinion whether it would be economically feasible to test with a threaded go/no-go each and every unit just like they do with a cylindrical go/no-go?
A. I would assume if American manufacturers can afford it, foreign manufacturers can afford it also.
Q. I guess what I'm really asking you is you saw in the video the relative amounts of time that are required. Those were real-time videos.
A. Yes.
Q. Do you have an opinion as to whether to test each and every one of them with a threaded go/no-go, would that add significantly to the cost of the manufacturer, based on time?
A. I don't believe it does.

Q. Do you have an opinion as to whether it's reasonable for Dikar to inspect by threaded go/no-go only one unit in twenty-five?
A. I would say off the top, it's probably not reasonable.
Q. Do you have an opinion as to whether it's reasonable, considering the environment of anticipated use for these products, to not proof-test each and every firearm that comes out of its plant?
A. I think it's unreasonable not to proof-test.
Q. Now, you've seen the Katzenmeier barrel and gun; correct?
A. Yes.
Q. And you've seen a number of exemplars that were provided to you to inspect; is that correct?
A. Yes.
Q. And you've seen photographs of more exemplars that were inspected by other people; is that correct?
A. Yes.
Q. Do those units, those muzzleloader rifles, all bear proofmarks?
A. They do.
Q. And do you remember, without looking, as to what the proofmark emblem or emblems are on these products?
A. I can't remember. It had some circles in it, but I don't remember the details.
Q. It had some what?

A. Circles.

Q. Circles? Why don't you look at the Katzenmeier barrel. Do you see proofmarks on the Katzenmeier barrel?

A. I can't see in the light here. I can't see any, but I can't--it's been a while since I looked at them. I don't remember--

Q. It's in the area of the serial number.

A. I see the serial number.

Q. Let me see. I don't think it was removed from the section, but in this light it might be hard to see. Let me point it out to you.

It's in the photographs. I can't see--I'm like you, I'm kind of blind.

THE COURT: Mr. Eaton, watch where you're pointing the barrel.

MR. EATON: Okay, Judge. I'm trying to see here. I can't see in this light.

I can't see it in this light, either. The photographs show it. They're in the exhibits.

BY MR. EATON:

Q. I guess my question to you is, if a firearm--assume the Katzenmeier barrel has a proofmark on it. What does that tell you, sir, inform you, sir?

A. That tells me it's been proof-tested, that that firearm has been proof-tested.

Q. In the documents--the Dikar documents that you reviewed, did you see any procedure for performing any proof-testing of those guns?
A. No, sir, I did not.
Q. Did you see in the documents that there were certain tests, development type tests, mechanical type tests, that were performed in developing the design? Do those tests provide any assurance to an end user that the gun they receive is safe to use?
A. No, sir.
Q. Is there any test that's identified in Dikar's policy or procedures manual, or any of the depositions you've read, which provide a procedure for testing each individual product for safety for the end user?
A. No, sir.
Q. Did you find any tests at all in their procedures for providing any kind of--any kind, any kind of pressure testing of the firearm during the production process?
A. No, sir, I did not see any.
Q. Do you have an opinion, after all this study, as to whether this product, the Katzenmeier gun, was defectively manufactured?
A. I believe it was, yes, sir.
Q. And do you have an opinion as to whether that defect from the manufacture caused, or contributed to causing, the failure in which Mr. Katzenmeier was injured?

A. I believe the manufacturing defects were a direct cause of the failure.

Q. Did you see any evidence--and obviously when you saw the gun it was after the fact. Did you see any evidence of abuse or misuse on the part of the user?

A. None that I could see.

MR. EATON: Your Honor, we pass the witness for cross-examination.

CROSS-EXAMINATION

BY MR. REYNOLDS:

Q. Dr. Bruchey, good morning, sir. My name is Kevin Reynolds. I introduced myself to you out in the hallway yesterday. We were hoping to get to you yesterday, but were not able to do that. We're glad that we did get to you today.

I think--you met Mr. Singer at the time of your deposition or depositions; correct?

A. Yes, sir.

Q. And you haven't had a chance to meet me before, but I'm very glad to make your acquaintance.

As I understand it, you have a Ph.D. degree in materials science; is that correct?

A. Yes, sir.

Q. I have a BA degree in political science, and some might say that political science is an oxymoron, but I kind of come from a liberal arts college, and you obviously come from a science

college. So with that--
A. Most people think of Johns Hopkins as a liberal arts college.
Q. With that introduction, please go easy on me, okay?
Let me start out by defining a few terms that have been used over the last few days that I'm not sure that we have defined, or that everybody understands. Would you agree with me, Dr. Bruchey, that just because a gun fails does not mean that the gun was defective?
A. True.
Q. In other words, it depends on how it was used; correct?
A. Yes.
Q. Depends on how it was loaded; correct?
A. Yes.
Q. Would you agree with me that one potential cause of making a gun fail is an obstruction or something in the barrel that creates an obstruction?
A. Yes, sir.
Q. For example, if you had mud in the barrel, could that possibly be an obstruction?
A. Could be.
Q. If you had your finger in the end of the barrel, could that be an obstruction?
A. Yes.
Q. Is there some kind of a--do you own or hunt with shotguns at

all?
A. Yes, I do.
Q. I don't, so I'm going to be at a severe disadvantage here, but is there some kind of a plastic wad, or something in the shotgun shell that actually carries some of the BBs and actually comes out of the barrel in the process of discharging a round?
A. Yes, sir.
Q. And that plastic wad, if you would put one of those in a barrel, could something as seemingly minor as that pose an obstruction?
A. Yes.
Q. And cause a gun to fail?
A. Depends on the gun.
Q. And, in fact, something like that could even blowup a barrel; correct?
A. It could.
Q. Now, another term that has been used in the last several days is vessel, or pressure vessel.
A. Yes.
Q. And, again, I apologize, I'm doing this as much for myself as I am for anyone on the jury. They're probably way ahead of me on this. But, for example, would the chamber of a gun, as the propellant or the gunpowder is being ignited, would you consider that to be an example of a pressure vessel?
A. Yeah, it is a pressure vessel.

Q. In very general terms?
A. I mean, in fact, the whole barrel, including the chamber, is a pressure vessel.
Q. And there's pressure behind the bullet, and, of course, that's what pushes the bullet out the muzzle toward the target; correct?
A. Yes.
Q. Another real life, everyday example of a pressure vessel, what about like a gas tank or an LP gas tank for your backyard grill? If you know what I'm talking about, does that hold, like, liquid petroleum, which I think is LP, and then once it comes out under pressure, it is vaporized, and that's what fuels the grill?
A. Yes.
Q. So would that gas bottle be another everyday example of a, quote/unquote, pressure vessel?
A. Yes, it is.
Q. I remember when I was a small child we would go to my grandmother's house for Thanksgiving dinner, and she would cook some of the dinner in something called a pressure cooker.
A. Yes.
Q. You don't see a lot of those these days, but it was some kind of a container, it was stainless steel or a metal, and it seemed like there was some kind of a gauge sticking out of the top of this pressure cooker. Would that be another example of a

vessel, or a pressure vessel?
A. Yes. My wife still has one.
Q. You don't see those much anymore with the advent of microwaves and whatnot.
A. Nope, but they do work.
Q. Now, another term that has been used is--or it's the concept of having an air gap. What I have in my mind's eye as an air gap is some kind of a distance inside the barrel between the bullet, or the slug, and where the propellant is located. Are you with me so far?
A. Yes.
Q. And I think there's been witness testimony in this case thus far that when you load a muzzleloading gun, after you put the propellant or the black powder into the gun, or whether you're using black powder substitute, or whatever, you then load the bullet. And I think someone testified or referred to the fact that it was important to have the bullet properly seated down against the charge. Do you agree with that?
A. That's accepted practice, yes.
Q. And is the reason why you want to have that bullet properly seated so that you do not have an air gap? In other words, some kind of an open distance between where the bullet is and where the powder charge is?
A. Yes.
Q. Now, if you have an air gap either through--by mistake, or

whatever, can that cause a catastrophic failure of a gun?
A. Should not.
Q. Can it?
A. I've not seen an example where it has.
Q. Okay. And you've never heard of that happening before?
A. I've heard that hypothesis, but I've not actually seen it.
Q. Very good. Myself, I used a couple of terms a few minutes ago. Black powder--we've heard the terms "a black powder gun or rifle," and "a muzzleloading gun or rifle." Those two terms are synonymous; correct?
A. Yes.
Q. Now, is there a black powder that is something that's kind of granular that you would actually kind of pour down the barrel in very small grains and--I guess you would measure it out, the proper quantity, before you would do that, and that's how some people shoot these guns; correct?
A. Traditionally muzzleloaders will always use granular black powder.
Q. Was that something that was loose and then you would have to measure it out in the proper quantity before putting it into the barrel?
A. Yes, sir.
Q. And then there's been reference, of course, to Pyrodex pellets, and/or black powder substitute. Are you familiar with those terms?

A. Yes, sir.
Q. What are Pyrodex pellets?
A. It's not--it's a black powder substitute that has been compressed so that all the grains are bound together mechanically, and you just drop a pellet in and--they're preweighed, premeasured, so you don't have to worry about measuring out a volume of powder or weight in powder.
Q. I think someone referred to earlier, perhaps it was Mr. Phipps who was with Mr. Katzenmeier at the time of the accident, but reference was made to 50-grain pellets of Pyrodex. Would that mean that, if that were the case, that one of these pellets of Pyrodex amounted to 50-grains, or would be the equivalent of 50-grains of the loose black powder stuff?
A. All of the--all of the black powder substitutes are volume equivalents. 50 grains of black powder, granulated, may fill up a volume the size of my finger. The manufacturers who make this powder substitute adjust the volume so that it still fills exactly the same volume. It may not weigh 50 grains, it may weigh 75, but the pressure-generated capability is based on the volume, not the weight.
Q. So the pressure that would be generated by 50 grains of black powder, or, on the other hand, one pellet of Pyrodex that's a, quote/unquote, 50-grain pellet, the pressures created inside the gun would be expected to be roughly the same?
A. Yes.

Q. And then if--do you agree with me that a magnum load for this Kodiak muzzleloader would be--if we were using Pyrodex pellets, it would be three 50-grain pellets, or a total of 150 grains of powder?
A. I'm not sure what your definition of "magnum load" is.
Q. If you don't know what a magnum load is--
A. I know what "magnum" means.
Q. Feel free to tell us.
A. I don't know what you mean by "magnum" load.
Q. Do you know what a magnum load means in this lawsuit as it concerns Mr. Katzenmeier's Kodiak muzzleloader?
A. I think in general I know what you mean. I don't know that I--that would be my definition of a magnum load.
Q. What do you think I mean in general? What is a magnum load?
A. Higher than average, I would say would be a magnum.
Q. Higher than average?
A. Yeah, something of that sort.
Q. What would an average load be? Tell me how many Pyrodex pellets, 50-grain pellets?
A. Depends on--I don't know how to answer that question.
Q. Would it be fair to say that most of your experience in the Army is with the end of ballistics that takes a close hard look at what happens when the bullet or the shell strikes the target?
A. I'd say probably 50/50.
Q. The other half would be the ballistics around the firearm?

A. Yes.
Q. Would you agree with me, Dr. Bruchey, that most of your work for the U.S. Army as a civilian employee did not involve muzzleloading firearms?
A. I'm old, but not that old.
Q. In fact, none of them did; correct?
A. I don't know anybody who works with muzzleloaders in the Army anymore.
Q. The last time you looked, the U.S. Army doesn't use any black powder muzzleloading guns; correct?
A. No, but the military does.
Q. Like a Kodiak gun?
A. No.
Q. Now, Pyrodex, black powder substitute. Another term that's been used is smokeless gunpowder.
A. Yes, sir.
Q. Is smokeless gunpowder the same as black powder or black powder substitute?
A. It's different from both.
Q. It's radically different; correct?
A. Yes.
Q. What is smokeless gunpowder?
A. Well, it's just that it's--black powder, basic combination of carbon sulfur and potassium, mainly; and smokeless powder is a nitroglycerin/nitrocellulose mixture. Different chemical

composition.
Q. You correct me if I'm wrong. Again, I'm political science, you're hard science. But as I understand it, with smokeless gunpowder the rate of rise is very fast and very steep and you get a very high pressure in a relatively short amount of time. Do I have that correct?
A. Yes.
Q. As compared to black powder or black powder substitute where you get more of a gradual rise in pressure over a longer period of time?
A. You get a more gentle push.
Q. A more general push?
A. Gentle push.
Q. Gentle push?
A. Yes.
Q. With the black powder?
A. Yes.
Q. And a very harsh, severe push with the smokeless?
A. Yes.
Q. Now, smokeless gunpowder, is that what people use who reload their own ammunition?
A. If by that you mean metallic cartridges, the answer is yes.
Q. Okay. What about--do some people, for whatever reason, you know, they have an interest in this area, do they reload their own shotgun ammunition?

A. Yes.
Q. And do they use smokeless gunpowder to do that?
A. Yes.
Q. Do you know whether, in fact, Mr. Katzenmeier at or about the time of this accident, or at any time in the past, reloaded his own ammunition?
A. I have no information that says that.
Q. Now, one other distinction I want to cover with regard to smokeless and black powder, if I have 50 grains of smokeless gunpowder, will I get a higher psi or a higher pressure than I will get if I ignite 50 grains of black powder or Pyrodex?
A. I would say generally, yes.
Q. I mean, there's no question in your mind about that, is there?
A. Sure there is.
Q. Well, I mean--in fact, would you agree with me that 50 grains of smokeless gunpowder might give you 60,000 psi, whereas 150 grains of black powder or Pyrodex might only give you 25,000 psi?
A. I would agree with that.
Q. You would agree with that?
A. Yes.
Q. Assume this for purposes of my question: Assume that a magnum load is 150 grains of black powder, or black powder substitute. Would you agree with me, Dr. Bruchey, that as

designed, this Kodiak gun will not fail with a magnum load, as designed?
A. I've never tested with pellets, Pyrodex.
Q. No opinion one way or another?
A. I'm not going to give an opinion when I don't know.
Q. Let me move to a different area here. There's been testimony in this case about cut threads versus rolled threads.
A. Yes.
Q. Are you generally familiar with what I'm referring to?
A. Yes, sir.
Q. Of course here in the breech section of this gun we're talking about the threaded section where the breech plug fits into the back end of the barrel; correct?
A. Yes, sir.
Q. Would you agree with me, Dr. Bruchey, that in general, cold forming threads by rolling them work hardens the steel and gives that area greater strength?
A. From a materials perspective, the answer is yes.
Q. Greater strength than cut threads, all other things being equal; correct?
A. All other things being equal, yes.
Q. Would you agree with me that one disadvantage to cut threats is when you put the tap in there to cut those threads, you're actually removing material?
A. Yes.

Q. And when you remove material, all other things being equal, do you make that area less strong than it was before, all other things being equal?
A. I don't--maybe I'm not understanding your question, but my answer is--
Q. Let me ask it this way: Five minus one is four, right?
A. Well--
Q. Now, is four less than five?
A. To end up with the same dimension starting with the same barrel, you end up with the same amount of material in both cases, there's no difference.
Q. Okay.
A. And that's all things being equal, in my mind.
Q. But let's just talk about making a cut thread with a tap that would cut the thread as opposed to roll it. Before you cut the thread, you've got X amount of material; correct?
A. Yes.
Q. After you've formed the thread by cutting it, you've got X minus some amount of material; correct?
A. True.
Q. And when you cut a thread, there is no work hardening that is making that area stronger, that you would have when you're roll forming threads; correct?
A. Not as much, you're right.
Q. Now, as I understand it, when you were--when you became

involved in this case, Mr. Roane had previously done his work and examination; correct?
A. Yes.
Q. And Mr. Roane is not technically a metallurgist; correct?
A. Right.
Q. And you've worked with Mr. Roane before; correct?
A. Yes, sir.
Q. And it sounded like to me, since Mr. Roane was not a metallurgist, one of the suggestions that Mr. Roane had was "Let's get this barrel to a qualified metallurgist to look at the material in the barrel." Is that basically how it happened?
A. I think that's it, yes.
Q. And so you were the guy elected to be the metallurgist at that time?
A. Yes.
Q. And your Ph.D. is in materials science, but are there Ph.D.s in metallurgy? I mean, is it kind of like six of one and a half-dozen of the other?
A. They're all the same.
Q. Okay.
A. I mean, if you ask me what I am, I'd say I'm a modern day blacksmith. A blacksmith is a modern day metallurgist. So it doesn't make any difference, materials science or metallurgist, they're all the same.
Q. In the course of your work, you received the Katzenmeier

barrel; correct?
A. Yes, sir.
Q. I'm not going to pull it out and point it at anybody. By the way, have you ever heard anybody being shot by a quote/unquote unloaded gun?
A. Happens all the time.
Q. But at any rate, you got from Mr. Roane the Katzenmeier barrel; correct?
A. Yes.
Q. Had Mr. Roane, had he cut any sections or smaller pieces out of that barrel before it came to you?
A. No, sir.
Q. Now, you did a gross or an overall examination; correct?
A. Right.
Q. And then later did you actually make a cut or a section yourself of a small piece of material?
A. Yes, I did--out of the Katzenmeier?
Q. Uh-huh?
A. Yes, I did.
Q. It was out of the breech area of the barrel; correct?
A. Yes.
Q. But it was not directly adjacent to the threads; right?
A. Yes.
Q. In fact, I think you stated in your deposition that you were intentionally trying to preserve the threads?

A. Yes.
Q. And you wanted to take a piece of the barrel material in that area so that you could do a more detailed metallurgical examination; correct?
A. Yes.
Q. And you did that?
A. Yes.
Q. And you cut it. The fancy word for that is sectioned it; right?
A. Yes.
Q. You cleaned the sample; correct?
A. Yes.
Q. You polished it to, I think someone earlier said, a mirror finish?
A. Exactly.
Q. And then you etch it with some kind of acid?
A. Yes.
Q. Etching it allows you to more easily see the grain and the very small structure of the actual material; correct?
A. Yes.
Q. And you did all of that; correct?
A. Yes.
Q. And your conclusion after doing that was that the microstructure was well-formed; correct?
A. Yes.

Q. It was clean steel?
A. Yes.
Q. It was of reasonably good quality?
A. Yes.
Q. The steel was not defective in terms of microstructure and strength; correct?
A. Yes.
Q. And so as a result, you, yourself, have ruled out, as a possible cause of this accident, the fact that there was bad or substandard material being used in the barrel; correct?
A. Yes.
Q. There was a little bit of discussion about your prior deposition testimony, and this is your first time in court on a gun case.
A. Directly related to a firearm failure.
Q. Okay. As I understand it, your testimony falls in two general categories. First of all, it would be like a civil case or a product liability case, and that's what we're here about today; correct?
A. Yes.
Q. And then the second type of case that you've done a lot of work on involves crime scene reconstruction?
A. Yes.
Q. Like ballistics around a crime scene?
A. Yes.

Q. And you told us in your deposition, Dr. Bruchey, that in those criminal cases more than 75 percent of the time you are testifying on behalf of the criminal defendant; correct?
A. Yes.
Q. Or the accused?
A. Yes.
Q. And in civil matters your work is almost exclusively for plaintiffs, or people that file lawsuits; correct?
A. I've also done it for the defense.
Q. But it's primarily for plaintiffs?
A. Yes.
Q. Let's talk--try to cut this down here. Let's talk a little bit about proof-testing and proof-firing.
A. Okay.
Q. When Mr. Eaton was asking you some questions, I have written down that Mr. Eaton asked you a question, "Is there a custom and practice in the United States for any proof-testing?" You said yes. "What is that custom and practice?" I think your answer was--in so many words was "Every manufacturer that I'm aware of proof-tests their firearms," correct?
A. Yes.
Q. You weren't talking about muzzleloaders in that question, were you?
A. Primarily my experience has been with black powder--not black powder--smokeless powder weapons, but those companies

still make muzzleloaders.
Q. Okay. But when you answered that question, you did not qualify your answer by saying, "Well, if you're not talking about muzzleloaders, you know, if you're talking about pistols and shotguns and rifles that are not muzzleloaders, don't use black powder, yes, that's the custom and practice in the industry"? You didn't say that, did you?
A. No, I didn't say that.
Q. Do you think that's a little bit misleading not to qualify your answer there and point out that there's actually a different practice and custom in the industry with regard to muzzleloaders or black powder rifles?
A. Not misleading. It's just my experience every manufacturer I've dealt with proof-tested their firearms.
Q. I mean, you know the vast majority of the cases--or manufacturers you've dealt with, it's not a muzzleloader case or issue; right?
A. I've been involved with Thompson Center, and I know they do proof-testing.
Q. Well, let me ask you a question. Is it your testimony that you know for a fact that Thompson Center--first of all, they're a U.S. manufacturer; correct?
A. Yes.
Q. They also make muzzleloaders; right?
A. Yes.

Q. Is it your testimony that Thompson Center in the U.S. in fact proof-tests 100 percent of all of their muzzleloaders?
A. I know they proof-test all of their cartridge firearms, and I assume it's across the product line.
Q. So that's an assumption on your part; correct?
A. Yes.
Q. In effect, we--Mr. Singer asked you the same question in your deposition, and the bottom line was you didn't know for a fact from your own personal knowledge whether Thompson Center 100 percent proof-tested every muzzleloader they make; correct?
MR. EATON: Your Honor, I object. The form of the question, the use of the deposition, is improper. It's improper without finding him the portion of the testimony.
THE COURT: Well, you can ask him if he recalls if that was his testimony.
BY MR. REYNOLDS:
Q. Do you recall that was your testimony, sir, the bottom line was you weren't sure?
A. I believe my recollection was that I said to my knowledge U.S. manufacturers of firearms 100 percent proof-test.
Q. What about--I'm sorry. Did I interrupt?
A. No.
Q. Is there another U.S. manufacturer, to your knowledge, of muzzleloaders by the name of Knight, K-n-i-g-h-t?
A. Yes.

Q. Do you know whether Knight, a U.S. manufacturer of muzzleloaders, 100 percent proof-tests each muzzleloader they sell?
A. I don't know the answer to that.
Q. Other than Thompson Center, are there any other U.S. manufacturers that you're willing to guess about in terms of whether or not they 100 percent proof-test their muzzleloaders?
A. I'm not aware.
Q. Are you aware of any foreign manufacturers of black powder rifles or muzzleloaders that you know for a fact 100 percent proof-test all their guns?
A. I don't know about the foreign manufacturers.
Q. Would you agree with me, Dr. Bruchey, that just because you proof-fire a gun does not mean that gun cannot fail?
A. Anything can fail.
Q. I mean, it depends on how it's used; right?
A. Yes.
Q. For example, if a proof-fired gun is misused, that proof-fired gun can fail; correct?
A. Yes.
Q. With regard to the threads and the tapering or the bell-mouthing, as I understand it, you didn't specifically measure that stuff; correct?
A. I did do measurements, yes.
Q. I mean--when your deposition was taken, it sounded like

you'd made a visual observation of that, but you hadn't specifically measured it, or maybe measured it as closely as some of the other experts?

A. At the time of the original deposition, that was true.

Q. But you've since measured it?

A. I've since made measurements. Actually, you know, when I got the sectioned Katzenmeier barrel.

Q. Okay. Let me ask you a couple of questions about that. There was, on your direct exam with Mr. Eaton, there was some discussion about the go/no-go quality control checks that Dikar uses at the factory. Do you recall that?

A. Yes, sir.

Q. As I understand it, you correct me if I'm wrong, but one of the go/no-go instruments was used to check the size of the hole that's originally drilled in the back end of the barrel; correct?

A. Yes.

Q. And then was there a second threaded, if you will, go/no-go test that was used to specifically check the threads?

A. Yes.

Q. And it's the threaded go/no-go that's used on every 25th rifle barrel that comes down the line; correct?

A. Yes.

Q. And is it your understanding that the go/no-go with regard to the size of the hole, that's done on 100 percent of the

barrels; correct?
A. I'm not sure I remember that specifically, but I'll accept it if you tell me it's true.
Q. You talked about ways in which the hole might get bell-mouthed or tapered.
A. Yes.
Q. And if my memory serves me correct, one possibility you talked about was if the tool that's forming the hole is, like, out of alignment, or not tight, it could wobble, and that could cause some bell-mouthing. Do I have that generally correct?
A. That's correct; or it's worn.
Q. Did you know that at the Dikar factory, the actual tool that's used to create that hole in the first place, the first section of that tool, is actually a guide to make sure that the tool is straight and in alignment with the barrel?
A. I would expect that you would do that.
Q. Now, with regard to the threaded go/no-go, if there's a problem with forming the threads, that test could find that problem; correct?
A. It could.
Q. And are you aware of Dikar's explanation or philosophy to support why they do that on every 25th gun, and that is if there's a problem, you know, in forming the threads, or in rolling the threads, if there's a problem with the equipment, that problem will continue, it will show itself on the 25th

barrel, and then at that point production is stopped, they go back and look at all the barrels and find out what the problem is?

A. It sounds somewhat reasonable.

Q. And so that sounds reasonable to you. Would you agree with me that if there's something out of whack with the machine that's forming the threads, that out-of-whack condition isn't going to magically cure itself and then create, like, 23 more barrels that are perfect?

A. That's possible.

Q. I mean, you would expect if there was a problem with the equipment, that that problem with the equipment would continue, and would continue to exist and show itself on the parts, unless and until the problem with the equipment is fixed; correct?

A. Well, I'm still going to say sort of.

Q. That sounds like common sense to me. Do you disagree?

A. I disagree a little bit.

Q. Okay.

A. Only in the sense that, you know, there are parts that are--probably have normal replacement scheduled on the assembly line, if you made a thousand barrels, a hundred barrels, whatever, you change out the tools.

Q. Sure.

A. So saying they're always going to come through the same way depends on whether you've updated or replaced worn tools. In

the meantime, you don't know that.
Q. My question is just a little bit more general. I'll try it one more time and then I'll move on.
If there's a problem with the machine, the CNC machine, and if it's not making the proper parts, wouldn't you expect, Dr. Bruchey, as a matter of common sense, for that problem to continue to exist with that machine until it's fixed?
A. With that machine, yes, that's true.
Q. I don't know if you know the answer to this one, but I'm supposed to ask you what, in your opinion, would be the maximum pressure that you would expect in a muzzleloader with three Pyrodex pellets constituting a total of 150 grains, and then a 295-grain PowerBelt bullet?
A. I could just hazard a guess, that's all I can tell you right now.
Q. Go ahead and humor me.
A. I would say 25,000 psi.
Q. 25,000?
A. Yeah, something in that area.
Q. There is no U.S. Government proofhouse; correct?
A. Correct.
Q. Have you ever been to the proofhouse in Spain?
A. No, I have not.
Q. Have you ever been at the Dikar factory when people from the proofhouse in Spain are at the Dikar factory?

A. No, sir.
Q. You said that the--although the stuff in this barrel was good and proper--you called it C10E?
A. Yes, I did.
Q. Mr. Belategi called it ST35. Do you know what the difference is between C10E and ST35?
A. Not off the top of my head, no. I believe I got the designation from the documentation, their documentation.
MR. REYNOLDS: That's all I have, sir. Thank you.
MR. EATON: Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. EATON:
Q. Dr. Bruchey, do you remember when I asked you about proofmarks on the Katzenmeier gun--
A. Yes.
Q. --and I couldn't find them? Would you turn to Exhibit 8 in the exhibit book, please?
A. Okay.
Q. Actually I believe it's page 8B.
A. What was it? I'm sorry. 18?
Q. 8B, it would be about the fifth or sixth page over where there's figures 1, 2, 3, 4, 5.
A. What tab was it?
MR. EATON: May I approach the witness, Judge?
THE COURT: You may.

A. Tab 8?

BY MR. EATON:

Q. Tab 8.

MR. EATON: Your Honor, Exhibit 8B was previously admitted into evidence. We ask to publish to the jury to ask Dr. Bruchey questions about it.

THE COURT: You can publish it.

BY MR. EATON:

Q. The second figure, figure 2, the incident rifle, in the area above the serial number, do you see that?

A. Yes.

Q. That portion has been cut off on Mr. Katzenmeier's gun after destructive testing. Do you see a proofmark on the muzzleloader barrel bearing serial number 61-13-128824?

A. Yes, I do.

Q. All right. And do you recognize--what do you recognize as a proofmark? What are the symbols that show a proofmark?

A. The two symbols above the 13 in the serial number.

Q. Just describe in words what those symbols are, please.

A. I believe it's a shield and three adjoining circles.

Q. Thank you, Doctor. And that was, apparently, cut off--I forgot about that--during destructive testing. So it's a good thing the photographs were made.

All right. Mr. Reynolds asked you a few questions about some of your other forensic work. You told us you'd

worked in criminal cases where you worked for--about 75 percent of your work there was for criminal defendants; correct?
A. I'd say probably--there's more on the product--well, a higher percentage on the product liability side.
Q. All right. In the product liability side, have you done consulting work for manufacturers of firearms, as opposed to plaintiffs like Mr. Katzenmeier?
A. I can only remember two cases where I did consulting work for the firearms manufacturer.
Q. Have you--
A. The remainder, worked for the plaintiff.
Q. Have you done consulting work for CVA?
A. I've been involved in cases with CVA.
Q. Never testified, have you?
A. No.
Q. You mentioned something about when you did your first day inspection of the Katzenmeier gun, you did not take any measurements; correct?
A. Everything was done visually.
Q. Subsequently you did perform some measurements of various aspects of the Katzenmeier gun; is that right?
A. Yes, I did. I made measurements of the threads.
Q. Did that corroborate your earlier opinions?
A. Yes, it did.
Q. About how it failed and why it failed?

A. Yes.
Q. Now, insofar as proof-testing by muzzleloader manufacturers, I believe you indicated that some of the companies that you were aware of that did 100 percent proof-testing manufactured centerfire firearms as well as muzzleloaders?
A. Yes.
Q. And that was in particular Thompson; is that right?
A. That was an example, yes.
Q. The companies in the United States that perform proof-testing, do you know if they typically apply proofmarks, like the proofmark you've seen on the Katzenmeier gun, to their guns?
A. They put a proofmark on their guns, yes.
Q. It's a company proofmark, isn't it?
A. Yes.
Q. It's not a government proofmark because the United States doesn't have proofhouses?
A. Yes.
Q. And so individual manufacturers do their own in-house proof-testing and apply their in-house corporate proofmark in the United States?
A. Yes.
Q. As a standard custom and practice?
A. Yes.
Q. On the Katzenmeier gun, and all the exemplars of the Dikar guns, the proofmarks that are on them are not private company

proofmarks, but rather government proofmarks; correct?
A. They're government authorized proofmarks.
Q. And can you think of any good reason for a manufacturer to put a proofmark on a gun that's never been proofed?
A. Not to my--not in my mind I can't give you a good reason.
Q. Can you think of any logical or rational reasons why putting a proofmark on a gun that's never been proofed would be a bad idea?
A. Well, you know, the guy using it thinks it has been proof-tested, and it could be defective.
MR. EATON: I have no further questions on redirect. I appreciate it. Thank you, Judge.

RECROSS EXAMINATION

BY MR. REYNOLDS:
Q. Just one follow-up question. It's real simple. I think I can do it over here if I keep my voice up.
Dr. Bruchey, that CVA case, your work was primarily ballistics work on that case, right?
A. Define "ballistics."
Q. Weren't you talking about whether, if the person had been wearing shooting glasses, whether they would have been protected by those glasses?
A. That was one of the cases I worked on, yes.
MR. REYNOLDS: Thank you, sir.
THE COURT: Anything further?

FURTHER REDIRECT EXAMINATION

BY MR. EATON:

Q. Have you worked on more than one CVA case?

A. Yes, I have.

Q. How many?

A. Three that I can remember.

MR. EATON: Thank you.

THE COURT: Anything further?

MR. REYNOLDS: Nothing further. Thank you, sir.

THE COURT: You may step down, sir. Thank you.

(Witness excused.)

THE COURT: Members of the jury, I'm told that lunch is here, so I'll take our noon recess at this time. We're only going to be in recess for 30 minutes. During the lunch period please bear in mind the admonition given previously, and we'll see you at approximately a quarter to the hour.

Court is in recess.

(Recess at 12:20 p.m., until 12:55 p.m.)

AFTERNOON SESSION (12:55 p.m.)

(In open court, in the presence of the jury.)

THE COURT: You may call your next witness.

MR. SPARKS: Your Honor, we would call Brian Adams by video deposition.

BRIAN ADAMS, M.D., PLAINTIFFS' WITNESS BY VIDEO DEPOSITION

(The videotaped deposition of Brian Adams, M.D., was played in open court.)

THE COURT: And the next witness is going to be?

MR. SPARKS: Dr. Goins by video, Your Honor.

THE COURT: Thank you.

KENNETH GOINS, M.D., PLAINTIFFS' WITNESS BY VIDEO DEPOSITION

(The videotaped deposition of Kenneth Goins, M.D., was played in open court.)

THE COURT: Call your next witness.

MR. SPARKS: Call Mr. Jon D. Katzenmeier to the witness stand, Your Honor.

THE COURT: Sir, would you come forward, please.

THE CLERK: Please raise your right hand.

JON DAVID KATZENMEIER, WITNESS ON HIS OWN BEHALF, SWORN

THE CLERK: You may take the stand.

DIRECT EXAMINATION

BY MR. SPARKS:

Q. Would you state your name for the ladies and gentlemen of the jury, please.

A. Jon David Katzenmeier.
Q. Where do you currently reside, sir?
A. Ogden, Iowa.
Q. And how long have you been a resident of Ogden, Iowa?
A. Since 1997.
Q. With whom are you employed?
A. Northern Natural Gas Company.
Q. What is your occupation with them, sir?
A. My title is a team leader.
Q. What does that entail?
A. A team leader for Northern entails first-line supervision between the team of workers and the management.
Q. How many workers do you oversee or manage at this time, sir?
A. I have nine men on my team.
Q. And when did you bring--when did you come to Ogden, come to Iowa, and why here, sir?
A. I interviewed in 1996 and came to Iowa in 1997.
Q. And so you've been a resident here since that time; is that correct?
A. That's correct.
Q. Prior to being a resident of Iowa, sir, where were you living?
A. Liberal, Kansas.
Q. What type of work were you doing for Northern Natural in Liberal?

A. Same type of work, primarily, but at a lower level.
Q. How long did you live in Liberal doing that job?
A. How long did I live in Liberal?
Q. Yes, sir.
A. I lived in Liberal for approximately 20 years.
Q. Is that where you grew up?
A. Yes.
Q. Is that where you went to school?
A. Yes.
Q. So worked your way back to Kansas, then; correct?
A. Yes.
Q. All right, sir. Let's start with that. You grew up in Liberal, Kansas, sir. Did you graduate from high school there?
A. Yes.
Q. Did you obtain any other education other than your high school degree?
A. I went to Seward County Community College for two years.
Q. Did you get a degree or certificate or anything there, sir?
A. No, I did not.
Q. All right, sir. In the course of growing up in Liberal, did you have any brothers or sisters?
A. I have one brother.
Q. Who is that?
A. Travis Katzenmeier.
Q. We met your father, Ron, the very first day; is that

correct?
A. That's correct.
Q. Would you tell me what types of hobbies or activities did you and your brother, Travis, and your father, Ron, engage in in and around Liberal, Kansas?
A. You name it, we did it. We played almost every sport that there was to play, football, baseball, softball as we grew older, fished, went hunting, things like that.
Q. When were you first introduced to the outdoor world, sports and activities in the outdoor world?
A. Sports since I was probably four years old.
Q. In terms of hunting or fishing in the outdoor world, when was that, sir?
A. Fishing, probably since I was able to cast a lure, which probably would have been five years old; and hunting, probably when I was about 12 years old.
Q. What type of hunting did you begin with when you were 12, sir?
A. Well, I really didn't begin hunting too much when I was 12, but I went hunting with my dad when I was 12.
Q. Let's clarify that, then. When you were 12 years old, did you actually go out and try to take game or participate in a hunt with your family?
A. No, I just went, participated.
Q. Went out and followed Dad around?

A. Excuse me?
Q. You followed your dad around?
A. Yes.
Q. Would you explain what type of weapons did you begin to learn to hunt with when you were younger, sir?
A. Probably the first weapon I hunted with was, like, a .22 caliber rifle.
Q. Is your family from the Kansas area? I'm talking about your dad, your dad's immediate family.
A. Yes, they are.
Q. Do you have property there?
A. We do have property in central Kansas.
Q. And how far is that away from Liberal?
A. It was about 230 miles, approximately.
Q. And as you were growing up, did you spend any time on that family land?
A. All the time.
Q. Who owned that land?
A. My grandfather.
Q. So you spent a lot of time with your grandparents as you were growing up?
A. Yes, sir.
Q. Was he involved in any of your hunting activities, sir?
A. My grandfather?
Q. Yes, sir.

A. Yes, sir.
Q. During your formative years, 12, 13, 14 years old, what type of other weapons did you learn to use or fire at that time?
A. At that young, basically just a .22 rifle and maybe, like, a 20-gauge shotgun.
Q. Did you do any bird hunting at that time?
A. Yes.
Q. That was with the use of the shotgun?
A. Yes.
Q. Tell me, sir, how did you first learn how to use a weapon?
A. Through my granddad and my dad.
Q. And what did they teach you, sir? What basics did they teach you about firearms?
A. Firearm safety.
Q. Such as?
A. Loading, unloading, how to carry the weapon, how to cross fences with it, how to store it, how to clean it.
Q. And it was with a .22 shotgun?
A. Yes, sir.
Q. When did you get your first hunting license?
A. In Kansas you have to be a licensed hunter at 16.
Q. What is required--is there any requirement to get a license in Kansas, sir, to be a hunter?
A. Yes, there is.
Q. What are those requirements, as you recall them?

A. You have to be a resident of the state, and you have to have completed a hunter safety course.
Q. Can you tell us about that course? How long did it take? Where was it done? Can you give us any information about that from those years ago?
A. It was done--I attended a course in Liberal. I think I did it in the evening, over the course of three evenings, like a Tuesday, Wednesday, Thursday, something like that, about three hours a night.
Q. Once you attended that course, is there a test at the end of it?
A. Yes, sir.
Q. At the conclusion of that test, were you able to get a hunting license?
A. Well, at the completion of the course I received a hunter's safety certificate which you needed to buy the hunting license with.
Q. So you got--you went from learning with your parents, your father and your grandfather, and passing the safety course, to getting your own license; is that correct?
A. That's correct.
Q. How old were you when that took place, sir?
A. I was 16 years old when I got my first hunting license. I was probably 14 years old, or so, when I received my hunter safety course.

Q. Now, when you were 16 years old and had your license, did that allow you to hunt by yourself?
A. Yes, sir.
Q. And did you engage in that activity by yourself, sir?
A. Occasionally.
Q. What was the method or form by which you hunted--you liked to hunt at that time, sir? Was it with weapons, or what kind?
A. Well, primarily we're bow hunters, and at that time when I was going out with my father, we would bow hunt, and I would sit with him in a tree stand with him. And then when I was 16, I started bow hunting on my own.
Q. And you continued to do that up until when?
A. I still do bow hunt.
Q. All right, sir. While you were there in Liberal, Kansas, did you get married?
A. Yes, sir.
Q. Did you have some children along the way?
A. Yes, sir.
Q. How many do you have?
A. I have three children.
Q. And what are their names?
A. Jade is my youngest daughter; Lauren is my middle daughter; and Nick is my oldest son.
Q. How old is Nick?
A. He's 17 now.

Q. And how old is Jade?
A. She's 14.
Q. And Lauren?
A. Lauren's 15.
Q. Besides hunting, sir, did you undertake any other type of activities in the sporting world that you learned or had some enthusiasm for through your adult years?
A. Besides hunting?
Q. Besides hunting.
A. Outdoor recreation?
Q. Outdoor recreation, any type of social activities, whatever you might have done, J.D.
A. Sure. I like to fish, we go water skiing, we do tubing. Like I said, play softball, play volleyball out in the backyard. I coach Little League programs.
Q. You've had an active sporting life, in other words?
A. Yes.
Q. All right, sir. Back when you were 16 years old, had your hunting license, at what age, if you recall, from the age of 16 on, did you first become involved in the sport of muzzleloading?
A. Well, I didn't start getting involved in muzzleloading until I was probably 30 years old, somewhere around there.
Q. So it's been over the last, what, eight, ten years or so?
A. Yes.
Q. So from the time you were 16 up until you were about 30, in

that 13 or 14 years in there, you were not engaged in the sport of muzzleloading; is that correct?
A. No, sir.
Q. Had you ever picked a muzzleloader up and fired it during that time?
A. No, sir.
Q. What brought you to the sport of muzzleloading?
A. Well, when I lived down in Kansas, when you hunted big game down there, you had one opportunity to hunt big game and you had to pick your weapon, and I grew up around bow hunting, so I bow hunted.
So when I moved to Iowa--or when I transferred to Iowa, state laws allow you to hunt two seasons, and you can pick your seasons. And I still bow hunted, and the other season that I elected was muzzleloader hunting primarily because of the style of hunting.
Q. What do you mean by "style of hunting"?
A. It's like bow hunting in a way. It's more challenging. You normally hunt by yourself, which I think is safer. It's just more my style.
Q. All right. Where did you first see and fire a muzzleloader?
A. When did I first see one? I'm not sure I can answer that.
Q. Where did you first fire one?
A. The first time I fired one was I was with my dad.
Q. And that was where, sir?

A. On our section of property down in Kansas.
Q. And what type of muzzleloader was that, sir?
A. I'm not real sure. I think it was a CVA Hawken.
Q. Now, you've heard throughout the testimony for the last several days what is called an in-line muzzleloader. Is that Hawken an in-line muzzleloader?
A. No, sir.
Q. What type of muzzleloader was that weapon, sir?
A. This type of muzzleloader is what's referred to as a sidelock muzzleloader. It's more the Daniel Boone type looking muzzleloader. It's got an octagon barrel, it's got the hammer on the side, it's got a wooden stock. It's a more primitive-looking rifle.
Q. Primitive-type firearm. As we've referred to it, a Daniel Boone type weapon; is that correct?
A. That's correct.
Q. In that particular weapon do you use the pelletized pellets in it?
A. No, sir.
Q. What do you use in it?
A. Granular powder.
Q. Now, you've used the words "granular powder." What kind of--type of granular powder?
A. Granular muzzleloader powder.
Q. Also known as black powder?

A. Yes, sir.
Q. Is there a difference between that and smokeless powder?
A. Yes, sir.
Q. How do you know the difference between black powder and smokeless powder?
A. Black powder is real fine. Smokeless powder, depending on what kind you're talking about, you know, like a rifle smokeless powder, is, oh, it's kind of long and cylinder shaped and hard. It's still broken up, but--
Q. What about shotgun?
A. I'm not real sure.
Q. When did you first learn about the difference between smokeless powder and black powder?
A. When I started shooting muzzleloaders.
Q. And do you use smokeless powder for any particular reason? I'm talking about you, personally. Do you personally use smokeless powder for any particular reason?
A. Yes.
Q. And what reason would that have been?
A. That I would use smokeless powder?
Q. That you would use smokeless powder.
A. You would use smokeless powder in reloading shells, or whatever.
Q. Did you ever use smokeless powder in the operation or use of a muzzleloader?

A. No.
Q. Have you ever used smokeless powder in the operation or use of a muzzleloader?
A. No.
Q. Do you, sir, reload your own shells for other weapons other than muzzleloaders?
A. No.
Q. When was the last time, if you have--strike that. Let me do it this way: You've never reloaded shotgun shells?
A. Yes, I have.
Q. When did you last do that? I misunderstood you, I'm sorry. When did you last reload your own shotgun shells?
A. The last time I reloaded shotgun shells was when I was in college in Liberal.
Q. What location were you when you did that?
A. Where was the location?
Q. Yeah. Were you at your dad's home, or were you at the farm, or where were you, sir?
A. No. I was at my house.
Q. Have you reloaded any shotgun shell while you've been residing in Ogden, Iowa?
A. No.
Q. Have you purchased any smokeless powder while living in Ogden, Iowa?
A. No, sir.

Q. Did you bring any smokeless powder with you from Kansas?
A. No, sir.
Q. So it's a fair statement to say that the last time you had any smokeless powder in your possession was in the State of Kansas before you transferred to Iowa?
A. That is correct. And when I was in college--when I was going to Seward County, I was taking criminal justice courses, and I was also a member of a trap and skeet club down there. And when I was going to college there, my parents did not live in Liberal at the time, they lived in Houston, and so I would reload my shells at the skeet club.
Q. Do you still have your equipment--
A. Yes.
Q. --still in Ogden?
A. Yes.
Q. And I may have asked this, and I don't want to beat a dead horse if we said it a couple times, do you have any smokeless powder in your residence whatsoever in the City of Ogden?
A. No.
Q. Have you ever had any smokeless powder in any of your muzzleloading equipment, or kept it there, at any time?
A. No.
Q. You understand the difference between smokeless powder, that it's not to be used in a muzzleloader? You learned that from who?

A. From my father, and from reading, and from warning labels, and TV shows.
Q. You understand what would happen if you put smokeless powder in a muzzleloader?
A. I think I understand what would happen.
Q. You've sat here the last four or five days and heard people describe what would happen; is that correct?
A. That is correct.
Q. When you talked about black powder awhile ago and we talked about Pyrodex pellets--do you have any black powder?
A. Yes, I do.
Q. And where did you learn to use black powder?
A. Well, initially from the Hawken rifle that I described earlier.
Q. Let's talk about that rifle for a minute and its use of black powder. How did you determine how much powder to put in that weapon if you're going to use it, sir?
A. You know, depending upon your pellet that you're going to shoot, we always shot approximately 90 to 110 grains of black powder.
Q. How do you determine--you know what? I've never fired a muzzleloader until I saw this case. How do you determine black powder grains? What is it you do to get that 90 to 110?
A. You refer to your ballistic charts, and depending on your projectile.

Q. That's the information that comes with the projectile?
A. That is correct.
Q. How do you measure that 90 to 110 grains? Does it come premeasured?
A. No. The loose stuff is not premeasured.
Q. How do you measure that to put that into the barrel, then?
A. You buy these cylinder-type devices that are adjustable. They may start at, like, 50-grains completely--and I'm describing mine.
Q. That's fine. What you understand.
A. People have other things, but it's collapsible. It starts at 50 grains. If you want to measure out a 90-grain load, you raise it up four notches, which makes the cylinder a little bigger. And then you take the loose powder, you pour it in until it fills it up to the top, kind of like you're measuring sugar, or something like that.
Q. Kind of like a measuring cup?
A. It is a measuring cup.
Q. Is it clear or solid? Can you see through it? How do you determine when you get to the right level on yours?
A. Of course I'm describing mine, again. My measuring cup, if you want to call it that, is brass. My flask that holds a large volume of powder is clear and it's plastic.
Q. When it gets to that line, you stop it?
A. Yes, sir.

Q. When you were learning to use this primitive firearm that CVA made, explain what you learned about its use and operation from your father. I'm going to talk about, first of all, in terms of loading and firing it, and then we'll talk about other steps along the way from there.
A. Okay.
Q. What did you learn in terms of how to load and fire the weapon?
A. Well, first of all, you know, we discussed how the gun operates, we talked about the loading sequence of it, we talked about the safety aspect of it, once the gun is loaded.
Once we fired the gun, we talked about the cleaning aspect of the gun. Muzzleloading can be a very dangerous--I don't know if you call it a sport, but activity. You're dealing with powder and, of course, probably as everybody has learned, you're loading it from the barrel. So we discussed all that.
Q. When you discuss it, what types of measures, in terms of safety, did you discuss? Did you pour powder just down the barrel of the gun after it's measured, go on about your business?
A. Can you repeat that?
Q. Yeah. You take the muzzleloader, you got it sitting there, you pour the powder down the barrel. Can you do that after every time you pull the trigger?
A. Well, you could.

Q. What would happen?
A. Well--safety-wise?
Q. Safety-wise.
A. Well, first of all, it depends. You could have flashback of your powder if your barrel is hot.
Q. So there are steps and procedures along the way, other than just putting powder in the gun, is what I'm trying to get around to, J.D.?
A. Yes, there's steps and procedures. The first thing about muzzleloaders is you have to be consistent. You have to be consistent. It's a very dirty operation, so you have to be clean.
So, you know, the first thing you would do is you would make sure your firearm is clean because, as you've heard the saying, you keep your powder dry. So you want to make sure your barrel's clean, there's no moisture in your barrel, there's no oil in your barrel. You get something like that in your barrel--
Q. How would you do that with this primitive weapon, to make sure the barrel is clean?
A. You would swab it.
Q. Back then what would you swab it with?
A. You use something called a ramrod and a patch, which looks like a piece of paper towel.
Q. What would you do with that ramrod and patch?

A. You put the patch over the barrel, and you take your ramrod, you push the patch and ramrod down to the end of the barrel, and you pull it back out.
Q. How is the patch attached to the ramrod?
A. It doesn't really attach to it, it just--once it goes down in the barrel, it seems to wrap around the ramrod, and then it kind of sucks to it, and then you pull it back out, and it's attached to the ramrod.
Q. That's how you clean the barrel?
A. That's one method to clean the barrel.
Q. We're talking about the primitive weapon. We're not talking about the in-line. We're talking about the primitive weapon. What other way did you learn to clean the barrel on that primitive weapon?
A. The process I described is more in-the-field cleaning.
Q. Okay.
A. Let's say you've shot the weapon throughout the course of the day and you bring it home and you want to break it down and clean it to put it away. So the method I use is I use hot water. And I fill up a tub of hot water, and I put the barrel--one end of the barrel in the hot water. And, of course, on these muzzleloaders you can have both ends of the barrel open. So you submerge one end of the barrel in the hot water, stick your patch on the other end of the barrel with your rod, you push your patch in and start pulling your patch out, and

what that does is create a suction through that barrel. You sit there and you ramrod it, or pump it back and forth. As you're pumping it you're sucking water in and pushing water out, and the hot water breaks down the black powder and cleans your barrel.

The reason I use hot water is because once you swabbed out the barrel, the heat of the water will help it dry better, it will evaporate it off better, not leaving any rust or water in your barrel.

Q. You learned to clean it that way as a primitive weapon. What else did your father teach you with the use of that primitive weapon on how to--what to do if it misfires?

A. Yes, sir.

Q. Explain to us what a misfire is.

A. Well, a misfire happens when for some reason you don't ignite your powder. The way these things operate is you have a primer, or ignition source, and then you have your powder, and then you have your bullet. A misfire can occur from a primer, which is easy to fix, because you just take off the primer that didn't fire and replace with another primer.

Another way a misfire occurs is from whatever reason your powder didn't ignite.

Q. What do you do if the powder doesn't ignite, you have a misfire?

A. Well, the first thing you need to do is treat it like a fire

cracker that didn't go off, make sure that you don't--keep this thing down range pointed away from anybody because you never know when it could go off. And the best way to handle a misfire on something like that is to soak it in water, make sure your powder is completely absorbed up with water, which will prevent it from igniting.

And then you go in, because you have your powder and you have your bullet in your barrel, and then you go in with what they call a bullet starter--or a bullet remover. You attach that bullet remover to your ramrod, you go in and you push it in until you feel it hit your bullet, screw it in your bullet, and pull your bullet out.

Then you disassemble your gun and plunge out the powder and clean your barrel as I just described earlier after you fire it.

Q. What do you do if you're in the field and you have a misfire?

A. Well, first--something you should always try to do is get it to fire, okay? If you would pull the trigger and the primer just goes off and doesn't fire the load out of the barrel, you should try a couple more times to get that thing to fire.

Q. When you were learning to use this weapon with your dad you talked about measuring the powder and putting it in the barrel. What type of bullet did you and your father use in that weapon?

A. With the primitive weapon?

Q. Yes, sir.
A. It was like a lead ball, you know, a round ball.
Q. So you used a round ball and not a bullet that we've talked about today, or throughout the course of this trial; correct?
A. Right. The ball basically is the bullet.
Q. How do you get that bullet or the ball in the barrel?
A. Start the--start the ball in the barrel, and then they have what they call a starter rod. It's a ramrod but it's only about this long. It's got a ball on the end of it. It's basically a ball with a rod coming out of it. You start your bullet in the barrel, and on one end of the ball there's a short tip, and you can put that tip on the bullet and just tap it, and it moves your barrel--moves your bullet in your barrel maybe a quarter, a half-inch.
And then you stick the longer part of your rod on that, and you push it in, and it goes in maybe six inches. And then once your bullet is in your barrel from the top of your barrel six inches, then you put your long ramrod in, you put it all the way down to your powder, seat it firmly.
Q. We're talking about the round ball now, push it all the way down to the powder. How do you know it's seated firmly?
A. Well, you push it all the way down until it seats, and then the method I use is I tap it, make sure it's seated. How do I want to describe it? Well, like, I do a lot of mechanical stuff, so when you hit the bottom of something, it doesn't feel

loose, it feels seated. You know, I guess I would describe it like tapping your hammer on a wall, you know, you're tapping across sheetrock, you can feel something hollow back there, it just doesn't--it's not solid. But when you hit the stud of the wall, then you feel it's solid.

Q. What's the purpose of making sure it's seated properly?

A. To make sure it fires properly.

Q. What happens if it's not seated properly? And I'm talking about the primitive weapon right now. What happens?

A. I don't know. I don't think I've ever had one not seated properly.

Q. You've never experienced that problem?

A. No. I couldn't tell you what would happen.

Q. We've heard the term "short start." Do you know what that means?

A. Yes, I do.

Q. Is that the term you use when the bullet is not seated properly on the powder?

A. That's the term that is used in the muzzleloader talk, short starting, yes.

Q. Did your father teach you all these things while you were working with this Hawken?

A. Yes.

Q. About how old were you in that period of time when that started?

A. When I was working with the Hawken?
Q. Yeah.
A. About 28, 29, 30 years old, somewhere in there.
Q. How long did you and your father fire that weapon, over what period of time?
A. How long?
Q. Uh-huh.
A. Oh, probably a couple hours.
Q. And did you--how many times did you fire it initially on that particular day?
A. I don't recall how many times I fired it. Several, more than three.
Q. Enough to familiarize yourself with the operation and use of it; is that correct?
A. That's correct.
Q. How did this weapon come about? Is this a weapon you buy out of a store? Does it come fully assembled? Do you know anything about that weapon?
A. This particular weapon, I think you bought it as a kit.
Q. So it's put together as a kit, then; is that correct?
A. Yeah, and either he put it together, or someone put it together for him, but it was what they call a kit rifle. It comes in a box, and it's kind of a project rifle. You build it, you stain it, you make it your own little project, and then you go out and fire it, similar to what they used to do in the

primitive days.
Q. And you have that weapon today?
A. I do, yes.
Q. Is that the weapon your father referred to as the mantelpiece?
A. Yes, sir.
Q. Have you fired that weapon-- When was the last time you fired that weapon?
A. I actually hunted with that weapon in Iowa. I want to say 2001, 2002, somewhere in there.
Q. And you haven't hunted with that weapon since then; is that correct?
A. That is correct.
Q. Back when you were in Kansas learning with your dad about muzzleloaders, is there any other weapons you learned to hunt with or fire or target practice with that were muzzleloaders?
A. Yes.
Q. What other weapons did you have an opportunity to fire and/or learn to hunt with, sir?
A. Came across a CVA Apollo that was--of course through this whole course of the muzzleloading thing, things have gotten better. So I started out with a Hawken, and actually my uncle had a CVA Apollo. Once again, he had it in his gun cabinet, he didn't use it, he knew I could use it in Iowa, so it wasn't really a gift, I guess, but he says, "Here, J.D. You're going

to use this gun a lot more than I will, so you might as well take it to Iowa."
Q. How long ago was that?
A. That was probably 2003, maybe, somewhere around there.
Q. Explain the operation of that weapon. Is it similar to the Hawken you were talking about?
A. No, this gun is an in-line rifle as we've seen in this courtroom. It was more that style of weapon.
Q. Did it require black powder, or did it require Pyrodex pellets?
A. Well, that particular weapon we continued to use the loose granular powder.
Q. How many times would you say, sir, you fired that weapon, either target practice or in hunting?
A. Thirty, maybe fifty times.
Q. And how long did you own that weapon?
A. I owned that--well, I technically didn't own it.
Q. How long did you take possession of it, let's put it that way?
A. Since he gave it to me--I got rid of the weapon in--it must have been early 2006.
Q. When you were using that weapon, sir, were you using it in the same form and fashion as you did the Hawken? In other words, did you use a round bullet with that one?
A. No, sir.

Q. What type of bullet did you use, sir?
A. I used a more modern-day projectile bullet.
Q. And did you use it in the same form or fashion that you described to us earlier on how you loaded the Hawken weapon?
A. The Hawken?
Q. Hawken.
A. Yes, sir.
Q. And that would be what, again?
A. Oh, basically make sure--are you asking me the loading sequence?
Q. Yeah. I'm asking do you do the same thing with that weapon as you told us awhile ago?
A. Yes, basically the same exact way, it's just a more modern type rifle.
Q. Do you clean it the same way?
A. You clean it the same way. Like I said, on this Apollo, CVA Apollo weapon, we used the black powder, the granular powder. You would pour the powder in the barrel, then you would put your bullet in, as I described earlier, seat it against your granular powder.
Q. What was the next muzzleloading weapon that you had an opportunity to fire or use?
A. That would have been a Thompson Center Black Diamond rifle, in-line muzzleloader rifle.
Q. Is it similar to the weapons that we've been talking about

here during the course of this trial?
A. It is very similar, yes.
Q. Is that a weapon you fired black powder, granular black powder?
A. No. At that time, when I started shooting the Black Diamond, the Thompson Center Black Diamond, that's about the time that the industry came out with the pelletized pellets, and at that time is when we made the switch from the granular powder to the pelletized pellets.
Q. How did you come about to obtain this Thompson Center firearm?
A. You're going to think I'm a bum, but my dad gave it to me.
Q. So at this point in time you hadn't gone out and purchased any muzzleloader on your own; is that correct?
A. That's correct. I didn't need to, they were all being given to me at the time.
Q. When you got that muzzleloader, where did you first begin to use that weapon, either in target practice or in hunting, if that's what you did, where did you first begin to use it, operate it, learn about it?
A. The same, down at our farm in Kansas.
Q. And about how long ago was that?
A. That probably would have been around 2004.
Q. When you received that weapon, did it have a manual with it?
A. Yes, it did.

Q. Did you have an opportunity to review that manual?
A. Yes, I did.
Q. Did you read that manual from cover to cover?
A. Yes.
Q. And did that manual have certain admonitions in it about--that said "Don't use smokeless powder in the weapon"?
A. That is correct.
Q. This weapon you talked about you used the Pyrodex pellets; is that correct?
A. That is correct.
Q. How many Pyrodex pellets would you use in this weapon?
A. In this Black Diamond weapon we were using two 50-grain Pyrodex pellets.
Q. That would be 100 grains?
A. That's correct.
Q. What type of bullet were you using?
A. We--or I was using the PowerBelt bullet as we've seen in this courtroom.
Q. Why is that?
A. The PowerBelt bullet, in my opinion, it shot very well, first of all, and it loads very nicely.
Q. What do you mean by loads nicely?
A. Some muzzleloader bullets have--well, they are tight, seem extremely tight in the barrel. So when you have this gun sitting on the ground, you have your ramrod and you're trying to

push this bullet down your barrel, some bullets, they push down really hard, and it seems like you almost have to stand on that ramrod to get some of the bullets to go down. And these PowerBelt bullets load very nicely, in my opinion, they go down nice and smooth. Your ramrod's not flexing. They just load nice.

Q. When you obtained the Black Diamond weapon, centerfire Thompson Black Diamond weapon--it sounds to me like there are lots of moving parts in this muzzleloader, lots of functions you need to perform; is that correct?

A. That's correct.

Q. Describe for me, sir, how would you keep these parts together?

A. Well, I keep a--it's a tackle box, it's a fishing tackle box, and I keep all of my muzzleloading equipment in this tackle box.

Q. That will fit in it?

A. That will fit in it, yes.

Q. Let's talk about muzzleloading equipment that you have that work with the in-line weapon now, let's deal with that. Forget about the primitive weapons. What all would you have in that tackle box that you would use with your in-line weapon?

A. Well, you have your solvent in the tackle box, you have your bullets in the tackle box, you have your cappers in the tackle box. The cappers are something you put your primers into to

keep them, you know, from being loose and flying around.

You have your patches in your tackle box, you have--I keep my starter rod in my tackle box. I keep all my tips for my ramrod in my tackle boxes--tackle box, I keep my cleaning brushes in my tackle box, I keep the tools that you use to disassemble the gun in the tackle boxes--in the tackle box. Let's see what else I keep in there. I keep my grease, my anti-seize in the tackle box, nipple picks, I keep that in the tackle box. I keep a few, you know, like, little screws, little screwdrivers, a couple little punches, things like that that you need when you take the gun apart. I keep all that--I keep all that in that one box.

Q. Let's talk about some of those things that are in there because I want to make sure the ladies and gentlemen of the jury understand you've got a big old tackle box that's got a bunch of stuff in it. You talk about tips for your ramrod. What tips are necessary for the use of a muzzleloader that are kept in your tackle box?

A. You have different types of tips that you can screw on your ramrod. One tip, for example, as we talked about, is a cleaning tip. You have another tip that's a bullet remover tip. You have another tip in there that's--you have different shapes of bullets. You might have a bullet that's shaped at a point, so it would take a certain type of tip to go around that point so when you push your bullet down into your barrel you don't deform

that point, which would throw off your bullet when you shoot it. You have all those different tips.

Q. I know this may sound repetitious, but let's talk about how you load an in-line muzzleloader. Walk me through the steps of when you take your weapon out of its case, take it out on the range. What is the first thing you do?

A. The first thing you do when you take the weapon out of the case is make sure it's on safe.

Second thing that I do is I swab out my barrel to make sure that there's nothing in the barrel, hammer and barrel is dry.

Q. How do you do that?

A. I use my ramrod and a cleaning patch, or a clean patch that you would use for cleaning.

Q. They make special patches to do this with?

A. Yes. It's--they're white, they're round, they're cleaning patches.

Q. We're talking about the Thompson centerfire; correct?

A. I think we're still talking about the Black Diamond.

Q. Black Diamond, I'm sorry. So you swab that barrel with this clean patch. What happens if you find something on the patch when you pull it out?

A. It all depends what you find on the patch.

Q. What are some of the things you could find?

A. Well, you could find rust, you could find cobwebs. It all

depends on what you find. If you find rust, which will be corrosion, it's probably best you disassemble your gun and have it very thoroughly cleaned and maybe inspected because black powder is high in sulfur, it's a very corrosive type powder.
Q. What if you found a cobweb or two in there?
A. Excuse me?
Q. What if you found a cobweb or two, as you talked about?
A. A cobweb, you just swab it out.
Q. In other words, you make sure there's no obstruction in the barrel?
A. That is correct.
Q. What would you do next?
A. After you make sure your barrel's clean, you would proceed to load the gun with your propellant.
Q. Are these black Pyrodex pellets that we talked about?
A. Yes.
MR. SPARKS: Your Honor, may I approach?
THE COURT: Yes.
BY MR. SPARKS:
Q. We previously had marked Exhibit No. 3. Is this the type of pellet we're talking about, sir?
A. Yes, it is.
Q. Would you take one of those out of the box for me, sir.
Now, as you understand it, that pellet is equivalent to what?

A. This should be a 50-grain pellet.
Q. And you'd use how many of those with the Black Diamond?
A. Two.
Q. Is there something unique about those particular pellets?
A. I think there is.
Q. And what is that, sir?
A. Well, this particular pellet, like I said, is 50-grain pelletized black powder, and basically what they've done with this is they've compressed black powder into a pelletized form, which makes it very handy for a hunter or a shooter, loads it a little bit faster for you in the field.
This particular pellet has a hole in it, and the only thing the hole does--normally there's a little piece of felt. Stick--as you seen, when--these pellets are normally stacked on top of each other like this, so when you shoot the whole--when you use up all the powder on this--on the top level, now you have all these pellets down in this box like this. They're hard to get out without dumping them all out. There's a little felt tip that comes with it, and you can put that little felt tip in this hole and it bring them out of that box very easily. (Indicating throughout.)
Another thing I like about this pellet is, as I explained to Mr. Phipps, is that these pellets have an up side and a down side.
Q. How do you discern or determine what the up and down side

is?
A. Well, I determine it as one side is dark, a little bit darker black, and one side is more the gray color of the whole pellet. So what I do, to be consistent, because consistency is important in the sport to make these guns shoot accurate and fair every time, is when I load my gun, I put the black side down in the barrel so when it slides down in the barrel, the black side goes down, which is basically up against your ignition system. If the manufacturers made this where it would ignite better, that's what they've done. I'm not real sure on that. I didn't design these bullets. That's the way I do it.
Q. You didn't design the pellet?
A. I didn't design this pellet, yes.
Q. That's the way you load, dark side down through the barrel?
A. That is the way I load. I don't think it would be right to put a dark side down and then take another pellet out and put the dark side up. It's just not consistent to me.
Q. So you put two pellets in there. Do you put one at a time, or both in the same time?
A. You put one at a time in.
Q. Why just one at a time?
A. Well, when I load a gun, I put one at a time because these things slide down the barrel so nicely and easily, slide down the barrel.
Q. You can hear them hit?

A. Yes.
Q. You put two in. What do you do next when you load this Black Diamond, sir?
A. Once the two pellets are in the bottom of the barrel, then you take out--what I use is the PowerBelt bullet, and you start it in the end of the barrel at the muzzle end, get it started in there a couple inches, and they load so nicely that you can go ahead at that point and take your long ramrod and go ahead and seat them down at the end.
Q. We've also previously marked in this trial Exhibit No. 4. I'd ask you if you're familiar with what that is, sir?
A. Yes, I am.
Q. And what is that?
A. That's a 295-grain PowerBelt bullet.
Q. Did you shoot a different type of bullet in the Black Diamond than that one, sir?
A. I don't believe I did.
Q. So that's a bullet which you're familiar with?
A. Let me clarify myself.
Q. Okay.
A. These bullets come in different grains, of course, different shapes, as I explained earlier. This is the bullet that I shoot. So if I did shoot a different bullet in there, it might have been a different shape or maybe a different grain, but I highly--I honestly can't tell you for sure.

Q. It would have been the same manufacturer?
A. Yes.
Q. It would have been a PowerBelt bullet? That's what you would have used in the gun, PowerBelt bullets?
A. Yes.
Q. That is the bullet of choice; is that correct?
A. That is the bullet of choice for me.
Q. You slide that bullet down, you take your rod out because you said the bullet will slide down much more efficiently; is that correct?
A. Yes, you take this bullet with the green side down like this. If you're barrel is right here, sit your bullet in like that, go ahead and start it, and take your ramrod, push it on down (indicating).
Q. The top of that particular bullet has got a hollowed out place there; is that correct?
A. That is correct.
Q. Is that for the ramrod use, or is that what you call a hollow-point bullet?
A. That's a hollow-point bullet.
Q. So the hole there doesn't have anything to do with the ramrod?
A. No, sir.
Q. Doesn't have anything to do with those tips that you're talking about?

A. There is a tip that will fit that bullet pretty well.
Q. What's its purpose?
A. To make sure you don't deform it.
Q. What do you mean by deforming it?
A. Well, if you was to, you know, deform that bullet, which means to move some of the metal around, or whatever it's made out of, you know, it would deform it.
Q. In other words, keep it straight?
A. You want to keep it good, straight, and round.
Q. You drop the bullet in. What do you do next?
A. Once the bullet's in the barrel, you shove it down to your powder and seat it.
Q. And how do you seat it?
A. As I've previously described, get your bullet all the way down to your powder, and then once it's at your powder, you give your ramrod a good tap.
Q. Let me stop you. You used the word "powder" awhile ago when you were talking about the primitive weapon, and you're using the word "powder" now when you're talking about the in-line weapon. How do you distinguish the two?
A. Well, if you want to split hairs, it's all powder.
Q. I want to split hairs for a minute.
A. This is pelletized powder, propellant, and then there's loose powder. I can call this pelletized propellant, or pelletized powder, but when I say "powder," this is what I'm

talking about. It's like sugar. You have sugar in a bag, you have sugar in a cube, but it's still sugar no matter how you split it.
Q. Let's separate now the Apollo, which was the black granular powder weapon, and we're talking about the Black Diamond weapon which fires the pelletized pellets. Did you ever fire black granular in the Thompson?
A. No, sir.
Q. Now, would a hunter for any reason at any time ever put a granular black powder measure, and drop a Pyrodex pellet on top of it, put a bullet on it, seat it, and fire it?
A. No. I think that would be silly. No, I don't think they'd be able to do that.
Q. You wouldn't engage in that type of activity, is that what you're telling me?
A. I can't imagine why.
Q. Did you ever do that?
A. Did I do it? No.
Q. Did you do it--I'm jumping ahead--on October 2nd, 2005?
A. No, I've never done that.
Q. So let's jump back again. I want to make sure. Once you seat your bullet, as you've explained to us--we're still at the range, and I know this seems tedious, but we're going to hear about it ad nauseam because we want to make sure the ladies and gentlemen of the jury understand your safety factors. What do

you do after the bullet is seated if you're at the range or target firing?
A. Okay. Well, the gun is loaded at this point. So the next thing you need to do is find your spot on the range or on your bench because you have to load these guns standing up. You normally set the butt of the gun on the ground and you load it with your pelletized pellet and your bullet, but you don't have any ignition on your gun right now, and you do have a safety on the gun. So your gun is relatively safe. There is nothing that can make that gun go off at this point.
So then you find your spot on the bench. Make sure you have your safety equipment ready. And then you add your primer to the gun.
Q. Is this what we're talking about, the primers (indicating)?
A. That is correct.
Q. What type of primers did you use, sir, do you remember?
A. On which gun?
Q. We're talking about the Black Diamond Center gun, that's the only one we're talking about right now.
A. I use the 209 primer.
Q. Is that kind of a universal primer for in-line muzzleloaders?
A. It is now-a-days.
Q. You got your primer in, what's the next step you take?
A. Once your primer is in, your gun is ready to fire, except

for your safety mechanism on it, and you steady rest it. I use sandbags, I sandbag it, that way your sandbags basically kind of hold your gun for you. All it does is keep it in place. It keeps your sites real square, and you click it off safety and fire the weapon.

Q. Now, what is the purpose when you're out--I've heard the term "sighting" it. What is the purpose of sighting it?

A. Sighting in is very important. First of all, it familiarizes yourself with your weapon. Second of all, as far as hunting goes, it's very important that you hit what you're shooting at. And if you're going to shoot at an animal, make sure you can make a vital shot, not cripple the animal, wound the animal. It's just ethical, it's very ethical that you sight a new weapon.

Q. How do you go about sighting it? Let's start with the firing sights. The Thompson, did it have a set of iron sights on it, sir?

A. Yes.

Q. Did it have a scope on it?

A. Yes.

Q. Can you sight both an iron sight and a scope that's on a weapon separately? Do you understand my question, because I'm not a hunter, I'll be the first to tell you that?

A. You can, yes.

Q. How would you go about sighting in your iron sights?

A. Well, on these weapons you have iron sights, what they refer to as iron sights, are actually sights on the barrel. The manufacturers put these sights on there for you. And the iron sights are basically a ball on one end, an adjustable, say--like a V-notch affair on the other end. And when you sight in these iron sights, you adjust your back sight according to what direction you're shooting.
Q. What length of range is that iron sight good for?
A. I imagine it varies with different hunters. Personally I use my iron sights at 50 yards or less.
Q. Why is that?
A. Well, because if you get an animal--well, if you have a scope on your gun, and you get an animal in at 20 yards, or say the length of this courtroom, and you put a scope on him, all you see is brown. You don't--you can't determine where you're aiming at and what you're going to hit.
Q. So for lack of a better phrase, when you sight in your iron sights, it's for a short shot?
A. Yes.
Q. On this Thompson, when you sighted it for a scope shot, how far away would you sight in for that, sir?
A. 100-plus yards. Anything over 50 I would probably use my scope.
Q. How long did you fire this particular Thompson Black Diamond weapon?

A. How long did I fire it?
Q. How many years? How many years did you have it?
A. I still have it. I'm still firing it to this day.
Q. You got that weapon when, sir? You said 2002, or so?
A. Yeah, 2004, somewhere in there, the Black Diamond.
Q. How many times would you say you've fired that weapon?
A. Over a hundred.
Q. Have you ever taken game with it, sir?
A. Yes.
Q. We talked awhile ago about short starting it. You said it never happened. Did it ever happen when you used the Thompson Black Diamond weapon?
A. No.
Q. Again, this is, as we like to say back home, that was sort of a hand-me-down gun? It wasn't brand new? You didn't get it brand new previously?
A. It was my dad's previously.
Q. You inspected it, looked it over?
A. Yes.
Q. You still had the owner's manual and warranty information that came with it?
A. I still do, yes.
Q. You keep that with your weapon at your home?
A. Yes, I do.
Q. All right, sir. You talked awhile ago, you talked about the

pellets, you talked about the bullets, you talked about the rods. You identified three rods. You identified a starter rod that has a round ball on it; is that correct?
A. That's correct.
Q. Second rod you mentioned, the range rod?
A. That's correct.
Q. What does that mean when you use the term "range rod"?
A. My term "range rod" is a rod that you use on the range.
Q. Is it a rod--
A. On the firing range.
Q. Is it a rod that comes standard with the weapon, or is it a different type of a rod?
A. The range rod is something you buy separate from the weapon.
MR. SPARKS: Your Honor, if I might, this is Exhibit No. 72, which is an exemplar.
BY MR. SPARKS:
Q. J.D., this is an exemplar of a weapon, and I want you to take a moment and make sure--I'm going to ask you to point out that rod that comes with the weapon to the ladies and gentlemen of the jury, and make sure you put that weapon in a manner--there you go.
The range rod you're talking about, as you're standing there holding it, that's a different type of rod than what comes with that weapon; is that correct?
A. Yes. My range rod is different from what's on this gun.

Q. Show the ladies and gentlemen of the jury, if you can, the rod that's on that weapon, the exemplar.
A. You want me to remove it?
Q. Please. That's a rod that comes with the weapon; is that correct?
A. That is correct.
Q. You're talking about a different kind of rod when you use the term "range rod." Is that correct?
A. That is correct.
Q. Why do you have--if I count that one and the starter, that's three rods, but the gun comes with two; is that correct?
A. The gun does not come with two rods, it comes with this rod.
Q. It comes with one rod?
A. Yes, sir.
Q. You have to go get a starter rod?
A. Yes, sir.
Q. That's more of that stuff you have to buy to put in the tackle box?
A. That's correct.
Q. The only rod that you get--that you got--strike that. I'll redo this question.
That gun has a rod that comes attached to it, and it's purpose is what, sir?
A. This is the rod that you use when you're hunting, it stays with the gun.

Q. What do you use the range rod for?
A. I use the range rod when I'm target shooting. I never take this rod out.
Q. And you use the starter rod if and when you have a problem, I guess, placing the bullet in the barrel?
A. That is correct.
Q. Have you had that problem using a PowerBelt bullet?
A. No.
Q. So we can somewhat forget about the starter rod with the modern day in-line weapon using those PowerBelt bullets you had the occasion to use; is that correct?
A. That's basically correct, yes.
Q. Now, when you use your range rod, is it the same length as that rod that's on the weapon?
A. No, it's not.
Q. How much longer is it than this one?
A. It's probably six to eight inches longer than that.
Q. Do you have any marks on your rod?
A. Which rod would that be?
Q. Your range rod?
A. No.
Q. Why is that?
A. Well, my range rod, I use it to load about three different muzzleloaders. When I'm target shooting, depending on what gun I'm sighting in, I use that range rod to load that particular

gun.
Q. So the rods are different on the--strike that. Let's do it this way: The rod that comes with the Thompson centerfire is not an interchangeable rod, per se, with the rod that comes with the CVA Kodiak Magnum?
A. Run that by me one more time.
Q. The rod which is attached to the Black Diamond is not necessarily interchangeable for use with the CVA Kodiak Magnum?
A. No.
Q. So the range rod is the one you use for target shooting for ease or simplicity, for your purpose; is that correct?
A. That is correct.
Q. So throughout the course of your testimony, when we refer to the range rod, we're not referring to the rod that is attached to the CVA weapon; is that correct?
A. That is correct.
Q. That's the rod you use for hunting purposes?
A. Yes.
Q. Why are there two different rods? Explain that to the jury. Why do you use two different rods, other than the fact the one is longer that you use for target practice?
A. Well, the rod that comes on the gun, as you've seen, when I had the gun up, is the same length as the barrel. And when you're target shooting, you're loading and firing, and loading and firing, and loading and firing, however many times. And

those rods that come with the gun, they're short.

So if you're loading and firing and loading and firing and loading and firing, when you stick that rod down in the barrel, you're only dealing with a few inches of that rod sticking out, which makes it awkward to do it repetitively, time and time again when you're on a firing range. It works fine when you're in the field because you're shooting once, maybe twice. You may load the gun one other time if you shoot it.

So that's why I use my range rod when I'm target shooting, because the rod is longer, it's better to use, you have a better grip on the rod, it's simpler.

Q. After you had become proficient with the Thompson weapon, did you begin looking for another muzzleloader personally?

A. Not really.

Q. Christmas of 2004, you sat here and heard your dad talk about that a little bit.

THE COURT: Mr. Sparks, I think we'll take our midafternoon recess.

MR. SPARKS: Thank you, sir.

THE COURT: Members of the jury, we'll be in recess for 15 minutes. During the recess, please bear in mind the admonition given previously. We'll see you in about 15 minutes.

(Short recess.)

(In open court, in the presence of the jury.)

THE COURT: Mr. Sparks?

MR. SPARKS: Thank you, Your Honor.

BY MR. SPARKS:

Q. J.D., let's back up just a little bit because I probably got in too big of a hurry a little while ago with a couple of things. You're employed with Northern Natural Gas; is that correct?

A. That's correct.

Q. You tell us you're a team leader; is that correct?

A. That's correct.

Q. Where is the facility you work at located, sir?

A. It's northwest of Ogden about a mile.

Q. Would you describe for us what that facility is?

A. I should probably give you some background on the company. Northern Natural Gas is a natural gas transmission company. What happens is they take natural gas out of the ground down at the Gulf of Mexico, Oklahoma, Texas Panhandle, Kansas, there's gas wells down there. They put that gas into the pipe and that gas starts being transported up through Kansas, through Nebraska, through Iowa, comes into the Ogden station. And then from there it splits and goes up into Minneapolis, comes down here to Des Moines, and goes out east to Waterloo, and then on out east.

And the Ogden station is one of those stations that compresses, transports this natural gas at high pressure. And my job at Ogden for Northern is--my job duties include I make

sure that everybody on the team is qualified to do the proper job. I'm in charge of environmental aspects of the whole facility, I'm in charge of the safety performance of the team, I'm in charge of the budget of the team, or the location. I'm in charge of all the compliance of the team because when you work for a gas pipeline company, you work under DOT regulations.

So I make sure that all the records are in place, proper people are qualified to do certain jobs, jobs are done safely, right amount of team members are doing certain jobs. I do all the scheduling, I do all the time sheets, I submit all the projects that needed to be done, I oversee projects that are going on. Any type of contractors that come on-site, I orientate them as far as safety orientation at the location, just to name a few. I am a working--what they call a working team leader.

As I stated before, I'm the connection between management and the team. So one day I may sit in a budget meeting for eight hours, the next day we may have a failure out there, which what I mean by "failure" is a unit or a valve, or whatever, is not operating properly, and we have to go out and fix this piece of equipment, get it back online.

So it's my job to make sure everybody is properly trained, make sure all the paperwork is completed, submitted on time. I have a really broad range of what I do. I enjoy my job thoroughly because I may be in an office one day on a computer,

and the next day I may be working in the field, what we call the field. The next day I may be going to another part of the company to help out another team, or to train somebody, or whatever it could be. My job changes every day.

Q. You used the word four different times in that explanation of your employment, the word "safety." Are you a safety coordinator?

A. We have at the location safety coordinators. And safety coordinators are responsible for setting up the safety meetings, presenting safety topics, and conducting safety audits at the location. That is their primary job. And a member of my team, myself and nine other men, one of those men, along with his regular duties, is the designated safety coordinator.

Q. How long do you spend in a week, or a pay period, or a month, dealing with safety issues in this natural gas facility?

A. Our company is MAHC, which is a Mid-American Holding Company. They are very strict on their safety. In fact, our number one goal, my number one goal, the team's number one goal is safety.

We spend every morning talking about safety, every Monday morning we have what we call safety tailgate, and that's the whole location, which is 22 men and women, and the manager. And then every morning in our planning meetings, in our team planning meetings, I have a job list to do, and we talk about safety that is going to be involved in those jobs that we're

doing.
Q. So safety is a priority of yours at work; is that correct?
A. That's the No. 1 priority of mine, my manager's, and the whole organization.
Q. How does that translate and turn over into your personal life, the safety operations you use at work?
A. Well, you practice what you preach. I feel like--and I've been an employee of Northern for somewhere around 18 years, and they have driven safety into my mind, and it has to be driven into your mind when you work around the type of equipment we work around. Our equipment out there runs 24 hours, seven days a week, 365 days a year. We have equipment out there as old as 1949 is when it was installed, and it still runs to this day.

So as far as safety goes at home, we have safety meetings, we have driver training, driver safety training at home--or at work, excuse me. And, of course, I have three teenage kids, so I bring that safety aspect at home to them.
Q. What do you employ at your home?
A. What do I employ at our home? Smith System driving is one. That's a driving topic we use at work, and, you know, they emphasize things like when you're driving, keep your eyes moving, watch out for the other person, keep a safe distance, things like that. I bring that type of stuff home to my young drivers at home.

I also--emergency training is big at work. I bring

home the emergency training aspects to my kids at home. I have fire extinguishers mounted in my garage and I have a fire extinguisher mounted down in my basement. They know how to use a fire extinguisher, they know how to use it, in case there is a fire in the house. I just do things like that as far as bringing it home.
Q. Back when you were firing the Thompson weapon, the Black Diamond we were talking about, did you ever take your son, Nick, with you?
A. No. Nick didn't go with me--you mean when I was target shooting this weapon?
Q. Uh-huh, when we were talking about target shooting.
A. Nick did not. When I was target shooting that Black Diamond, he was not with me at that time.
Q. And was there, prior to the December 2004 Christmastime, when you took Nick out and taught him how to use a muzzleloader?
A. Yes.
Q. How old was Nick when you taught him how to use a muzzleloader?
A. Nick hunted youth season in Iowa--he's 17 now. He would have hunted when he was 13; four years ago. Probably 2004 he hunted the youth season in Iowa with a muzzleloader.
Q. Which one was that?
A. It was the CVA Apollo .54 caliber.
Q. That's the one we talked about putting the black powder in

earlier; is that correct?
A. That's correct.
Q. Not using the pellets, but the black powder?
A. That is using the granular powder, yes.
Q. When did you first teach Nick how to use that weapon?
A. That was probably that fall, prior to that hunting season.
Q. Had you taught him to use other weapons before that?
A. Yes.
Q. What other types of weapons?
A. Nick experienced the same thing I experienced when I was a young kid, you know, shoot a .22 rifle, starting out with a .22 rifle, and then advancing up to, like, a .410 or a 20-gauge shotgun.
Q. What is--and maybe everybody in Iowa knows this, because, again, I told you I wasn't a hunter. When you use the term "youth season," what does that mean?
A. "Youth season" is a season they offer for kids to go hunting. In Iowa it's prior to regular hunting seasons. So you just have a kid and his guardian out there hunting, and you don't have to deal with the general public out there hunting. Basically they condense it down for a week of just for the kids to be out there only, no adults can hunt.
Q. So it's the adults supervising the child?
A. That's correct. In the youth season you can have an adult with you. An adult can't carry a weapon. He's there to

supervise the kid.
Q. And that season you said that Nick used the Apollo; is that correct?
A. That is correct. And, actually, Nick went out, and there's another kid that doesn't have a dad, and I took him, too.
Q. And you had taught Nick how to use that Apollo before you went on the youth hunt?
A. That is correct, and, you know, I familiarized him with the gun, although I did all the loading of the gun. I just wasn't going to stand there and let him load it. I just wanted to be responsible for that, so I did all the loading and basically got the gun ready to go. We got in our little blind, and all he had to do was flick it off safety and fire it.
Q. Clarify a couple more terms before we move on a little bit. We talked about rods, we've talked about pellets, we've talked about powder, we've talked about smokeless powder. We've talked about that bullet (indicating). That bullet there in front of you has a green jacket or bottom to it, does it not, sir?
A. That is correct.
Q. When one fires that projectile out of the Thompson centerfire, is that green plastic left behind?
A. No.
Q. Have you ever found that green plastic in the barrel?
A. No.
Q. So you can be assured that you don't leave plastic in the

barrel, we can be assured you haven't used smokeless powder, we can be assured you haven't put black powder and pellet Pyrodex in there together. I'm going to ask the last thing I heard Mr. Reynolds ask. You haven't ever stuck your finger in the barrel and pulled the trigger, have you?
A. No, sir.
Q. Okay. So we've ruled out all those things that he talked about with the expert that you haven't done, those types of things; is that right?
A. No, sir.
Q. When you graduated with Nick in teaching him how to use that weapon, have you yet let him load that weapon--and I'm talking about any muzzleloader that he's been taught on--by himself?
A. Yes.
Q. And when did that start?
A. Last hunting season.
Q. And what type of propellant did you use with him at that time?
A. I used the 50-50 Pyrodex pellets.
Q. That you talked about in Exhibit 3?
A. Yes.
Q. So that would have been the hunting season of 2007; is that correct?
A. That is correct.
Q. All right, sir. Now, let's go back to what we have all

talked about and heard as being the Christmas of 2004. From what we understand from your father, Christmas of 2004 was held in Ogden that year; is that correct?
A. That's correct.
Q. And I know that in some families there's a special wish list that the older kids, moms and dads, want from their moms and dads. Did you make any indication what you might want for Christmas in 2004?
A. No.
Q. Tell me about when your dad arrived for Christmas in 2004. Your mom was with him, I trust; is that correct?
A. That's correct.
Q. And who all was at your home in Ogden for Christmas in 2004?
A. My family, and I believe just my mom and dad.
Q. Travis, your brother, didn't make it in?
A. No.
Q. We all have different types of Christmas traditions. Mine was probably a little different from yours. Would you tell the ladies and gentlemen of the jury, let's start with Christmas Eve, what was the tradition that you folks engaged in at your home that led to the giving of your gift that year?
A. What is our Christmas tradition?
Q. Uh-huh.
A. Our Christmas tradition is we have wrapped gifts under the tree, and we open our wrapped gifts on Christmas Eve. That's

with whoever is there, my parents, or her parents, or whoever. And then Christmas Day is just for me and my kids, our family, our direct family. That's the Santa Claus day, if you want to call it that.

Q. So you open presents for everybody that's around that tree, and Santa makes his appearance sometime that night for the next morning?

A. That's correct. They're not wrapped gifts. Most gifts are just sort of set out as Santa would do.

Q. On, then, Christmas Eve when you began this process of opening presents--from what I've seen of your testimony and know of you over the years, you're somewhat organized. Explain to the jury how that happens. What goes on when someone opens a present on Christmas Eve at your house?

A. Since I was a kid at my grandma's house, instead of everybody just tearing in and opening gifts, it's tradition that we go around the room. We start with the youngest person in the room--first of all, the youngest person hands out all the gifts, and the youngest person starts with their gift. They open their gift, and then it moves to the next youngest, and moves around the room. That way everybody can see what was received for Christmas.

Q. It's the oohing and ahing session, as my mother used to call it. Hold up your gift and everybody oohs and ahs?

A. That's correct. You get a gift, you knew who it was from,

and what was received.
Q. On that Christmas 2004 you received a package from your father; is that correct?
A. Yes.
Q. What was that package when you unwrapped it?
A. That Kodiak Magnum CVA in-line muzzleloader.
MR. SPARKS: Your Honor, again may I approach?
THE COURT: You may.
BY MR. SPARKS:
Q. I'm going to hand you what has been previously marked as Exhibit No. 7. It's an exemplar box. Is it similar to the box you received at Christmas?
A. Yes, it is.
Q. I have taken the weapon out of here, so it's pretty light. Tell us, sir, when you opened that up, what was the first thing you did when you saw the yellow box?
A. I knew that it was a CVA muzzleloader.
Q. Big words on the box would tell you that. What did you do then?
A. I probably smiled--
Q. Okay.
A. --and said thanks.
Q. Did you take the weapon out of the box at that time?
A. I would imagine I did. I would imagine that I opened the box to see exactly what it was, and I imagine I picked it up,

you know. You guys call it gross inspected, whatever, I just picked it up, identified what it was, and put it back in the box.
Q. When you opened it and looked at it and grossly inspected it, as we say around here sometimes, or give it a gross inspection, what did the weapon look like? Was it black? Was it green? What was it, sir?
A. It had a camo synthetic stock on it with what I call a blue barrel. The color kind of looks black, but--
Q. Was there a scope in the box?
A. No.
Q. Do you recall at that time when you opened it and looked at it what was in the box in terms of the other items?
A. Yes.
Q. What other items were in the box when you opened it, sir?
A. There was a plastic bag in there, some tools that came with the gun; there was an owner's manual in the box; a bunch of white Styrofoam that it was packaged in.
Q. Was there a scope with the gun?
A. No.
Q. Was there any clam packs--we've heard the term used in this trial--with pellets or bullets in it, sir, plastic packages in the box?
A. No.
Q. Was there any other literature or information about either

the weapon or the bullets to use, or information about CVA and the company, BPI, other than the owner's manual?
A. I believe there was a deal on the bullets.
Q. PowerBelt bullets?
A. Yeah, a little brochure on--
Q. Would you take a moment and open the box for me, sir, tell me--I believe that's accurate--what was in there? Would you identify what is in that box, exemplar No. 7, that you would have received on Christmas Day--
A. Yes.
Q. --or Christmas Eve? Excuse me.
A. You want me to take this out?
Q. Yeah, if you can.
A. This is the owner's manual.
Q. Okay.
A. This is a subscription card for *Black Powder Guns and Hunting*.
Q. Okay.
A. This is the bullet thing I was just referencing to on the PowerBelt bullets.
Q. The type of bullets you used?
A. Yes.
Q. You said it was a good bullet.
A. And this is--there's a parts kit here, CVA in-line parts kit. And then a plastic bag with some--a couple pieces of metal

in it, which are tools for the gun.
Q. What are those tools for, if you know, sir?
A. This is the wrench--tools that you would use to take the breech plug out with.
Q. Do you recall anything else that was in the box other than the weapon?
A. The weapon and the plastic stuff that held it--the box from shifting around.
Q. We showed the ladies and gentlemen of the jury this weapon long ago. This was the type of weapon in there, with a camo stock; is that correct, sir?
A. That's correct, sir.
Q. That type of weapon, sir, is what type and model of weapon, sir?
A. It's a CVA in-line muzzleloader Kodiak Magnum.
Q. What does "magnum" mean to you?
A. "Magnum" means to me that it's a magnum rifle.
Q. Does it make it different from CVA Kodiak in-line muzzleloader?
A. Yes. There's a difference.
Q. What's the difference, in your mind?
A. A magnum rifle should be able to handle a magnum charge.
Q. And what's a magnum charge, in your mind?
A. In my mind, all my muzzleloaders I've shot, I've shot with approximately 100-grain, and the magnum load should be able to

handle more than a hundred-grain load.

Q. That little brochure you've got there that has the bullets that was in the box, do you see it right here (indicating)?

A. This (indicating)? Yeah.

Q. That is also part of Exhibit No. 6, and I would ask you--which is in the exhibit book--

MR. SPARKS: I believe Exhibit No. 6 is already pre-admitted.

MR. SINGER: Yes, Your Honor. That's an A. We have no objection.

MR. SPARKS: Thank you, Mr. Singer.

BY MR. SPARKS:

Q. I would ask you, sir, if you would take a moment, and when you look at that brochure--do you have that there, sir?

A. Yes.

Q. And do you have the section where it says "Recommended loads for PowerBelt bullets"?

A. Yes. Yes.

Q. And is there a slot on there, sir, for what says a 50 magnum?

A. Yes. It's the green slot, and I will say the green on this bullet matches the green on this chart. And when you shop for these PowerBelt bullets, three different calibers, you have a .45 caliber, .50 caliber, and .54 caliber.

Q. They're color coded?

A. They're color coded, exactly.
Q. For ease of use in getting the correct bullet; is that correct?
A. Yes. You've got the green--you've got the bronze bullet, whatever this is made out of, the green casing. You match it up with the green stripe in the book.
Q. Just below that chart that shows you the green--the reason I didn't want to put this up on the screen is because my color copy is not really green, it's more blue. I didn't want to confuse anybody--there are some words there. Do you see those words?
A. Yes.
Q. Would you, sir, for just a moment, read that first paragraph to the jury?
A. Right below the red stripe, is that what you're asking me?
Q. Yes, sir, right below the color coding that's on there.
A. It says, "Warning: These loads are recommended for Magnum, 150-grain capable rifles only. Check your owner's manual. Be sure your gun is indeed magnum capable before loading a magnum charge. Loading a magnum charge in a rifle not designated to handle such heavy loads may result in severe injury or damage to your rifle. Never load any amount of modern smokeless powder"--and this is in bold letter.
Q. Just finish reading.
A. --"in any muzzleloader."

Q. You told us you never put any smokeless powder in any muzzleloader in your entire life; is that correct?
A. That's correct.
Q. And you have looked at this particular PowerBelt information because you knew the color coding; is that correct?
A. That is correct.
Q. So when you got Exhibit No. 7, this box, and you looked at it, and you opened it, what did you notice about that weapon that was in there?
A. I noticed that it was a magnum rifle.
Q. It was a rifle that was designed to shoot 150 grains; is that correct?
A. That is correct.
Q. What you've also told this jury is that three Pyrodex pellets--my math is three times 50 is 150. Am I correct on that?
A. That is correct.
Q. So when you received that weapon, you knew it was different from the Apollo in terms of the Apollo was not a magnum weapon; is that correct, sir?
A. No, it was not.
Q. And the Black Thompson--or Black Diamond Thompson, was it a magnum weapon?
A. No.
Q. So you knew there was a special distinction when you looked

at that weapon on Christmas Eve; is that correct, sir?
A. Yes.
Q. And had you known about that special distinction before you received the gun as a gift?
A. Could you repeat that?
Q. Sure. Had you known about that distinction between regular and magnum before you ever received the gun?
A. Yes.
Q. Is that something you learned throughout the course of your hunting years?
A. Yes. You get into that with shotguns, too, you know, and there's all sorts of magnum-type guns, not just muzzleloaders.
Q. Magnum means something particular in the gun world, I guess for lack of a better term?
A. Magnum is kind of like the heavy duty, the super-charged, the powerful. That's what the magnum means.
Q. Now, let's take a little sideline here. Things never go in an order, I apologize to you and the jury. We talked about you learned about that over a period of time. Do you take any types of magazines or periodicals or publications that you pick up and go through that deal with hunting? I'm not talking about *Newsweek*. I'm talking in particular what we're talking about today.
A. Since my passion's for bow hunting, I subscribe to *Bow Hunters* magazine.

Q. Any other type of magazines you picked up along the way, or any other type of reference materials?
A. I get fish and game type magazines, and I also get, although not at my request, I also get *American Hunter* magazine.
Q. Is that a gift from someone?
A. No. Actually, I think it's a mistake.
Q. Okay. Fair enough. Are there any other types of periodicals or publications that you pick up along the year that you might get when you go get supplies for your muzzleloader, or for any of your weapons?
A. No, I don't think so.
Q. So back to Christmas Eve. You've examined the weapon, you realize it's a different kind of weapon than ones you had previously owned?
A. I wouldn't say I examined it.
Q. Grossly inspected?
A. Sure.
Q. After you grossly inspected it, what, at that time, while Christmas is still going on, did you do with the weapon?
A. I didn't want to interrupt Christmas, so I just put it back in the box and set it off to the side. That's it.
Q. And did you keep it within your general sphere of eyesight or closeness throughout the evening at that time while the rest of the presents were being opened?
A. Yes, it probably sat right next to me or sat right in front

of me.
Q. But Christmas Eve was over that night, all the presents were unwrapped. What was the next thing you did with that box with the gun?
A. Well, we cleaned up, and the kids took all their presents away, and I took this, and I have an oversized hunting closet, and I took that gun to that closet. It's a room. It's kind of like a closet.
Q. You tell us, do you have a house with a basement downstairs?
A. Yes.
Q. Where is this hunting closet? Is it on the first level or second level?
A. It's in the basement.
Q. This hunting closet, how big is it, sir?
A. It's probably a six-by-ten room.
Q. Does this particular room have a lock on the door?
A. No.
Q. Do you have any other means by which you secure your weapons?
A. Yes.
Q. What other means do you secure your weapons?
A. I have a gun cabinet.
Q. Does that gun cabinet come with a lock?
A. Yes.
Q. How many keys are there?

A. One.
Q. And what do you do with that key during the course of every day? Where does it go? Where do you put it? What do you do with it?
A. Let's just say it's hidden.
Q. You keep it away from where your children can find it?
A. Yes.
Q. So you take the gun down to the gun room in the basement, as I understand it, and you take the box with you?
A. Well, the--yeah. Go ahead.
Q. You take the box with you?
A. Yes.
Q. Who's with you when you go down to the gun room--or hunting room?
A. I don't recall that.
Q. What did you do with the weapon when you took it down there?
A. I probably just put it in there, you know, laid it on the--I have a chest freezer there, I've got some shelving there. I think I just laid it there.
Q. Did you do anything else with it that night?
A. No.
Q. Did you take anything out of the box and look at it that evening after that?
A. That evening?
Q. Yes, sir, that evening.

A. No.
Q. So once you put it in that room, you were done with it for Christmas Eve?
A. Yes.
Q. About what time did you put the weapon away?
A. Maybe 9 o'clock or so.
Q. When was the next time you saw the weapon in the box?
A. Next morning.
Q. Christmas morning?
A. Yes.
Q. About what time?
A. I can't answer that.
Q. Was it before lunch? After lunch?
A. It would have been before lunch.
Q. Was there anyone with you when you went and looked at the weapon then?
A. Yes.
Q. Who?
A. My dad.
Q. You're back down the basement again?
A. Yes.
Q. When you and your dad were looking at the gun, or looking at the box, what did you and your dad do with the box and the gun that day on Christmas Day?
A. Something--I remember the conversation. We talked about the

gun, I was pretty excited about it. This had been--this was actually going to be my official gun I owned, and I remember talking about the magnum because I guess this is going to be very handy for what I do here in Iowa.

And we gross inspected it, as you guys would call it, you know, put the gun up, felt it, became familiar with it, looked it over. I had it out of the box. I think I put the box outside the door, and I was going to put the gun in my gun cabinet and lock it up. And before I put my muzzleloaders away for however amount of time in my gun cabinet, I run a swab through the barrel, and I normally put on what they call butter bore on the swab.

Q. What is butter bore?

A. Butter bore is a--it's kind of like a--oh, it's a lubricant. It's thick, it's normally yellow in color, it's kind of like--I don't know how to describe it, actually. It's a lot thicker than Vaseline, but it's kind of like Crisco Oil, the hard Crisco Oil. And the purpose of butter bore is to--it lubricates or protects the inside of your barrel during storage.

Q. On that Christmas morning did you lubricate that barrel and run a patch through it as we're talking about?

A. On Christmas morning?

Q. Yes, sir.

A. Yes.

Q. And who was with you when you did that?

A. My dad.
Q. When you ran that patch through the barrel and prepared it and put it in the gun case, did you notice anything on the patch?
A. Well, no.
Q. Did you see any--did you look down the barrel at any point in time?
A. Did I look down the barrel?
Q. Uh-huh.
A. I don't think I looked down the barrel.
Q. Okay.
A. You mean--how look down the barrel? Look in the hole of the barrel or sight?
Q. No, look in, down into it when you were doing this patching and ramming job that you were talking about?
A. No.
Q. Did you put more than one patch in there, or just one patch?
A. Just one.
Q. And after you performed that task, what did you do next?
A. I put the gun away.
Q. Where did you put it?
A. In my gun cabinet.
Q. Did you lock the gun cabinet?
A. Yes.
Q. So that's on December the 25th of 2004; is that correct?

A. That's correct.
Q. When you put the gun in the gun cabinet, did you put the components with it, that came in the box?
A. No. I put the components in my tackle box, or my muzzleloader hunting tackle box.
Q. Did you put the safety manual or the owner's manual in there?
A. Yes.
Q. At that time in December of 2004, Christmas Eve, or Christmas Day, or Christmas night, did you open and read the owner's manual at that time, or at any time?
A. I remember flipping through it reading it, familiarizing myself with what I had.
Q. Did you see anything unusual or unique about this gun that was different from the Thompson Black Diamond that you fired?
A. No.
Q. Other than one was a magnum and one was not; correct?
A. Right.
Q. Was there anything, other than the fact that the Apollo that you had was different, other than it was not a magnum weapon?
A. No. It's all generally the same information.
Q. From December 25th, 2004, until October 1st of 2005, did you have an occasion to remove that gun from the gun cabinet?
A. I only removed it once.
Q. And when was that?

A. October 1st, 2005.
Q. So it stayed in the gun cabinet from Christmas Day of December of 2004, until October 1st of 2005; is that correct?
A. That's correct.
Q. It was not fired?
A. No.
Q. It was not tampered with, to your knowledge?
A. No.
Q. It was in the same place you left it when you left it on Christmas Day in 2004 when you went to go get it on October 1st, 2005; is that correct?
A. Yes.
Q. Prior to you getting on the stand--and the jury heard earlier a gentleman by the name of Blake Phipps' testimony, as you recall; is that correct, sir?
A. That is correct.
Q. How do you know Blake Phipps?
A. I came to know Blake when he was in high school. I watched him play high school football, and I'm not real sure how I got to know his family, but I just knew Blake from around town.
And then more directly, we have what we call temporaries, or red hats at the plant. And that particular summer I was looking for a temporary employee. And what we like to do is we like to hire kids during the summer, give them a job for the summer out at the plant.

I kind of knew Blake's work ethic, I knew he would be dependable, he will be a good worker, I knew he didn't mind getting dirty, I knew he didn't mind doing jobs other people might not like to do, I knew he could handle the heat. So I ran down his dad, I asked his dad if Blake was looking for a job. Of course his dad said he was. I told him to come out and talk to me. Blake did. We got an application filled out. I turned it in, they approved it, and so we hired Blake for the summer--or for temporary work at the plant.
Q. Would that have been the summer of 2005?
A. Yes, I believe so. Yes.
Q. So beginning the summer of 2005, while he was on the summer job, you were somewhat his--what were you? His supervisor?
A. Of course, yeah, I was his work director. I was between him and management, so I was his first-line supervisor.
Q. As the summer came to an end, did Blake continue to stay on there at the plant?
A. Yeah, he did. He had graduated from high school, and I think he was making, you know, some decisions on what he was going to do with his life, and our policy is, as a temporary employee, you can work up to a thousand hours. So that was available to him, and, of course, I had the money in the budget to do that, so we did keep him on. He turned out to be a good employee, so we kept him on beyond the summer months.
Q. Kept him on past the end of the summer?

A. Yes.
Q. During that time that you had him under your employment or tutelage at the plant during the summer, later on, up until October 1st, 2005, how would you characterize your relationship with Blake?
A. In what time period?
Q. From the summer of 2005, up until October 1st, 2005? Let's just stay in that frame right there.
A. Okay.
Q. How would you characterize your relationship with Blake? Let's do it by professionally and personally.
A. Well, I'm probably--well, first of all, professionally I'm his boss, so it was merely a working relationship while we was at work. And personally, you know, I'm about 15 years older than Blake, but we have a lot of the same interests, so we talked a lot, you know, we got along well, because we have the same interests, so...
Q. So during the course of his employment there, you two realized you had some of the same interests?
A. Yes. I'm not saying that we're chumming around buddies, but we just--we have the same interests, and he's the type of kid that's learning and--so, you know.
Q. How much older would he have been than Nick at that time, your oldest son?
A. In '05? Six years, probably.

Q. So as the relationship unveiled with you and Blake, what types of similar interests did you two have at that time?
A. College football, hunting. That's really, I guess, about it.
Q. When was the first time that you recall in that period of time, in that August of 2005 through October 1st of 2005, that you and Nick discussed anything involving the sport or the use of muzzleloaders, do you recall?
A. Me and Nick?
Q. No. You and Blake. I apologize.
A. Well, probably, and I can't recall exact days, but, you know, probably when it started cooling off, late August, early September, you know. Fall starts to roll in, college football starts up, and the leaves start changing, and hunting season is around the corner. That's probably when we started talking hunting muzzleloaders.
Q. During the summer of 2005, had you and Nick ever--you and Blake--excuse me--ever gone target shooting?
A. No.
Q. Ever gone out and done any type of outdoor sports, such as fishing, together?
A. I don't believe so.
Q. So it's a fair statement to say that your activity with him through the summer and into the fall was not one that was done in the outdoors?

A. Well, it was during the summer, and then into the fall it was all primarily working. During the summer we worked, that's our project season. We put in extra hours in the summer.
Q. Let me back up again for a second, I got out of order again. When you had the weapon back on Christmas Eve and Christmas Day in 2004--I've heard the phrase "dry fire." What does "dry fire" mean to you?
A. "Dry fire" on a firearm means that you cock the gun and you pull the trigger, dry fire, with no load in the gun, no bullet, no load, nothing's in the gun.
Q. Is there any particular reason to do that, that you know of?
A. I don't see any reason to do that.
Q. Did you do that with the weapon you had for Christmas, this Kodiak Magnum CVA in-line muzzleloader?
A. No. I'm a bow hunter, been bow hunting for several years. If you dry fire your bow, that means shoot it without an arrow, you do a lot of damage to your bow, several hundred dollars to it, throws it out of whack. So dry fire to me is a bad term. That's a no-no.
Q. So you didn't do that with the weapon?
A. No.
Q. I got out of sequence. Did you take the breech plug out?
A. No, sir, I did not.
Q. Did you mess with the breech plug?
A. No.

Q. Did you look at it while it was in the gun?
A. I might have seen it in the gun, but that's as far as I looked at it.
Q. Did you have any reason to take it out while you looked at the gun that evening or that morning?
A. No.
Q. Would you have any reason to remove the breech plug before putting it in your gun cabinet, before taking it out for the next hunting season?
A. There would be no reason for doing that.
Q. Before we get into what transpired, I want to make sure of a couple other thins. Sometimes we talk about the term of firing, and the term of shooting. I want to make sure you and I are square on that. When we start talking about this, what do you mean by the term "firing"?
A. Firing the weapon?
Q. Talk about muzzleloader--you're good at this. We're talking about muzzleloaders. What does it mean to you to talk about firing that muzzleloader?
A. Discharge it.
Q. What does it mean to you when I say "I'm going to go shooting my muzzleloader"?
A. Well, shooting can be either hunting with it or target shooting.
Q. More than one firing?

A. Excuse me?
Q. Does that mean more than one firing of the weapon?
A. Shooting?
Q. Uh-huh.
A. Oh, yes. Well, yeah, on a target range, if you're going to--if you're going shooting, it means that you're going to go shoot it more than once.
Q. Okay. So to fire your weapon when you're hunting, you fire it. When you target practice for the day, you may go out shooting for the day. Is that what you're saying?
A. That's correct.
Q. Those terms may become important in a minute. When you were firing your weapon at the end of the day, what would you do with your Thompson Black Diamond weapon when you got home?
A. Break it down and clean it.
Q. What did that require you to do?
A. Disassemble it.
Q. Did that require you to remove the breech plug?
A. Yes, it does.
Q. What do you do when you remove the breech plug?
A. You want me to explain how you remove the breech plug?
Q. I want you to explain it because we're going to talk about what happened October 1st. I want the ladies and gentlemen of the jury to understand what you believe you're supposed to do when you get through shooting your weapon at the end of the day.

A. This is the Thompson Center Black Diamond gun?

Q. That's what we're talking about first.

A. When you're done shooting that gun for the day, you bring it home. You start back in the bolt action of the gun, which is the breech plug area of the gun, actually behind the breech plug area of the gun. There's a bolt back there, and you relax your bolt, which means that--it would be in the same position as the gun just went off. It would all be relaxed, it wouldn't be cocked, and you start taking that bolt action apart, you know. There's pieces that unscrew, there's a pin you got to press out. You start taking that apart to get the back end of the gun apart so you can get to your breech plug.

Once you get to your breech plug, you take this wrench, similar to this--I wish I had something to show it. Let's say your breech plug is right here, and this bolt mechanism is right here of the gun. You stick this wrench through here connected to your breech plug and then unscrew it so it--unscrew your breech plug and it would come out. And then at that point the whole back end of your gun, basically, the firing mechanism and the bolt, will all be disassembled laying on your bench. You may have five or six pieces laying on the bench.

At that point the back of your gun is disassembled, and your barrel is hollow all the way through because you don't have a breech plug and don't have a firing mechanism on your

gun. Kind of just a barrel and stock at that point. (Indicating throughout.)
Q. When you clean that weapon, do you have an organized process? You start at the barrel or breech plug, or how do you go about cleaning that weapon at that time?
A. There is an organized process. You have to take one component off to get to another component, so on and so on.
Q. Do you take them off and then clean them before you move on?
A. The way I do it, I have a bench. I take this piece off, I set it here, take this piece off, set it here, that kind of sequence, until I get all the way down to the barrel. And then I clean my barrel and reattach my barrel, and then I start the sequence over again.
Q. Cleaning of the barrel, do you put it in hot water, on the Thompson Diamond center?
A. No, I don't. On that one I use patches, solvent.
Q. So it got a little more progressive as the guns got a little more modern?
A. Yes.
Q. When you clean the breech plug, what do you do, sir?
A. The breech plug, I'm not sure everybody has seen a breech plug, but a breech plug is this long (indicating), it's threaded, got a hex head on it, got a little tiny hole that goes through it, about the size of a needle, like a sewing needle.
You take that breech plug out and you take, like, a

little wire toothbrush looking thing, and you clean your threads. You take a nipple pick, as they call it, which is a little needle looking thing, it's a pick, you run it through the hole of your breech plug. And then I use my solvent. I clean my breech plug, make sure they're shiny again because they're stainless steel and they'll shine when they're good and clean.

One end of the breech plug is concave--or convex--anyway, it's kind of inset. It's kind of where your powder sits up in there, kind of up against it. I clean that out really well. That's basically all there is to cleaning a breech plug.

Q. You say you use a pick to clean out the hole in the center of it?

A. Yes, sir.

Q. The pick go all the way through the hole?

A. Yes, it does.

Q. You said when you clean that, it gets all nice and shiny like it's new again; is that correct?

A. That's correct.

Q. Do you do anything in the barrel where the breech plug is seated?

A. Yes.

Q. Do you do anything special to that?

A. That's part of the barrel. Your breech plug has threads on it. I described cleaning those threads with that brush. In the barrel--there's also threads in the barrel, and they make kind

of like a beaker, beaker tube cleaner for inside the barrel. It's a steel brush, it's on a handle. You put solvent in your barrel, you put your beaker cleaner in there, what I would call your beaker cleaner, your breech plug type cleaner, and you twist it. That cleans the threads in the barrel where the breech plug sits or screws into the barrel.

Q. Is there anything you do with the breech plug before you put it in the barrel after it's cleaned?

A. Yes.

Q. What is that?

A. They have a product called anti-seize. We use it at Northern all the time, too. Anti-seize is a compound that it prevents things from locking up. So you buy these tubes of anti-seize grease, if you want to call it that, and you smear that on the threads of the breech plug. And what that does is it keeps your breech plug from locking in there. I mean, the next time you want to take this gun apart and clean it, you can get it apart.

Q. So for use and ease of removing the breech plug at a later time after it's been fired again; is that correct?

A. Yes. Like at Northern, we put anti-seize on our exhaust bolts because they're, you know, they're hot all the time. A year later you can't get those exhaust bolts out if you don't anti-seize them. They just seem to lock in place from the heat.

Q. You clean the rest of the parts just as you described with

the solvent; is that correct?
A. That is correct. Like in the Thompson Center, it's got a bolt-type action. You clean the bolt, you clean the lever that screws into the bolt--it's actually your action--you clean the area where your primer would go in, of course you swab out your barrel with solvent, you swab out your barrel with--once you're done with the solvent and you're getting down to clean patches, and then you run good, dry patches in there. That dries out your barrel, gets all the solvent out of it, gets all the oil out of it.
Like I said earlier, when I'm done, I run a patch of butter bore through it, just a light coat of butter bore. That prevents any moisture from building up, or any rust from happening in your barrel.
Q. Then you put the weapon away?
A. Then you put it away. You're ready to go hunting again, if you're in a hunting situation.
Q. If you're out on the target range--and as you said earlier, you use your sandbags, I believe; is that correct?
A. That's correct.
Q. There's a lot of parts to this--brushes and bags and all kinds of things, but you're out on a target range, you got everything set out, you're doing this. Is there anything you do in particular at the end of each firing of the weapon? In other words, you're sighting your weapon in at 40 yards, and you fire

the weapon. After the barrel cools, do you do anything with that weapon next before you load it again?
A. Well, in muzzleloading shooting it's critical, in my opinion, that you do everything the same way every time. That's the way you get the best results. So if you're target shooting and you want to drive tacks with them, and your first bullet is--what I mean by "driving tacks," to make this all clear, is to shoot in really tight groups. Some guys shoot them, swab out the barrel, run a solvent patch, run a clean patch, so they're always shooting a good clean barrel. Some guys shoot them four or five times before they clean them.
Q. You run a patch through yours?
A. There's different methods.
Q. You run a patch through yours every time you fire the weapon?
A. When I sight in a weapon, when I'm setting that weapon up to hunt with it, I know that when I go hunting it's not going to be the fourth time I shoot. It's the first time. I'm not starting with a dirty gun, so why--so you can't sight in on a dirty gun. So, yeah, when I sight in, I shoot, then I clean, until I'm clean, just like it was coming out of the gun cabinet, and then I shoot again. And then I clean, just like it was coming out of the gun cabinet, and then I shoot again. So if my gun will perform in that situation to shoot good tight groups, kind of like in this picture right here--

Q. Right.
A. --it's not shooting all over the place, then I know that when I take it out of the gun cabinet and I go hunting with it, that it's going to hit where it should.
Q. What I want to make sure is clear is that you're running a dry patch through every time you're firing on the target range?
A. I'm running--yeah, along with--I'm cleaning it.
Q. Right. Are you breaking it down and cleaning it?
A. Oh, no, sir.
Q. That's what I want to make sure. You said cleaning it. You run the patch through when you fire it, but you're only cleaning it when you go home at the end of the shooting session?
A. There's--you have your barrel of the gun and components of this gun, so your bullet only goes through the barrel of the gun. So I make sure that every target shot I shoot I have a clean barrel.
Now, at the end of the day, I take the gun down, I break it all the way down into pieces, I clean the components, and put it all back together. I wish I could have--I could demonstrate it, actually.
Q. That's okay. We're good.
A. It's hard to explain.
Q. I understand. Now, when you're in a hunt, and you fire, and let's say you're unfortunate and not hitting game. Do you still do the same thing you would be doing on a target range with the

dry patch while you're on the hunt?
A. You can, but normally you don't carry solvent and a whole bunch of patches with you when you're out hunting. Muzzleloader hunting is similar to bow hunting. You get one chance, opportunity, and if you blow it, you're probably done for that session.
Q. Let's go back to Blake and you and him working back in October of 2005 together. In September of 2005, had you and Blake made any arrangements to do any hunting together that year?
A. Blake explained some interest in muzzleloading hunting, yes. I'm not sure that we had actually planned something out, to go hunting, but he'd expressed some interest in it.
Q. Had you ever been to Blake's home before?
A. Yes.
Q. How many different occasions had you been out to Blake's home?
A. At least a couple.
Q. And when you were there, what type of activities did you engage in?
A. I know one particular time I was out there I was sighting in practice--sighting in--I don't know what we're going to call it--one of my muzzleloader rifles.
Q. Was it the CVA Kodiak Magnum?
A. No, sir.

Q. Do you remember which one it was?
A. I don't right offhand.
Q. Do you remember approximately what time of the year it was? In the summer or in the fall?
A. I think it was--it was cold, so it might have been early December, or maybe right around the Thanksgiving time frame.
Q. 2004?
A. I'm not sure.
Q. Of 2004 or 2005?
A. No, I think it was earlier than that.
Q. So you'd been out to his home back before the incident occurred?
A. Yeah. I think I was--I think I was actually shooting the Black Diamond out there.
Q. So you were familiar with the area, you were familiar with this property, and you'd been out there to use a weapon before, a muzzleloader before; is that correct?
A. That's correct.
Q. How did you and Blake pick October the 1st, 2005, to be a day that--strike that. We'll do this differently.
On October 1st, 2005, what was your intent that morning when you got up, in terms of using your weapon that day, or anytime that weekend?
A. Can you kind of repeat that again?
Q. Sure. On that Saturday morning, on October the 1st when you

got up, did you have any intent to take your weapon out of the gun case, the CVA Kodiak Magnum muzzleloader?
A. On Saturday or Sunday?
Q. On Saturday.
A. Okay.
Q. Did you have any intent to take your weapon out of the case that morning?
A. Yes, I did.
Q. What was your intent? What were you going to do with it?
A. On Saturday, October 1st, I took the Kodiak CVA Magnum muzzleloader out of the gun cabinet. I put it in a gun case, a soft-sided gun case that you transport guns in vehicles with, and I took it over to Boone, Iowa, took it to a gun shop, and I was having the guy at the gun shop put a scope on it for me.
Q. When you took the gun out of the gun case, did you inspect it--I'm talking about the gun cabinet at your home--did you inspect the gun?
A. Thoroughly, no.
Q. Is that the first time you'd taken it out since Christmas of 2004?
A. Yes. Yes.
Q. This scope that you were going to have mounted, where did you purchase that scope?
A. I don't remember. I think I bought it from the gun dealer.
Q. Okay. And you were going to put a new scope on your new

gun; is that correct?
A. That is correct.
Q. I'm going to hand you what's part of Exhibit No. 2. I'm going to ask you if you remember seeing this?
A. That is my scope.
Q. Is that the scope that you went to go have put on the Kodiak Magnum muzzleloader that was camouflage in color?
A. Yes.
Q. We talked earlier about the difference between scope sighting and iron sighting. Can you do both with that particular scope mounted on your gun?
A. Yes, you can.
Q. Would you explain how that's done?
A. Well, this scope mounts on top of the gun, and the scope rings that I put on it, or that I purchased for it, is what they call see-through scope mounts or scope rings. So a person that puts this scope up to them, they have an option to look through the scope, or look below the scope at your iron sights that are mounted on the gun from the manufacturer.
Q. So that scope's equipped to do both, to use the scope and the iron sights?
A. That's correct.
Q. Do you remember the name of the gun shop that you went to have this scope installed, sir?
A. Yes.

Q. What was the name of the gun shop?
A. It was called Lindy's Gun Shop.
Q. Now, earlier in this trial we heard Lindie Phipps' name used, or was used or talked about. Is that the same Lindie that owned the gun shop?
A. No, they're not even related.
Q. Two different Lindys?
A. Yes, sir.
Q. When you went into Lindy's Gun Shop--strike that. Let me do it this way: When you took the weapon out of the house in the soft-sided case, put it in the vehicle, went to Boone--is that correct?
A. That's correct.
Q. --did your weapon stay in your possession the whole time to Boone?
A. Yes.
Q. Did you ever leave it unattended?
A. No.
Q. Did you drop it?
A. No.
Q. Did you do anything to the gun, other than place it into your vehicle in a soft-sided case?
A. No.
Q. When you took it to the gun shop, did you give it to the gunsmith?

A. Yes.
Q. Were you able to keep vision on that gun the whole time?
A. Yes.
Q. While the scope was being placed on it, did you ever lose control over the visual sight of that gun?
A. No, sir, I did not. I laid it on his counter in my gun case, he took it out, I told him what I wanted done. I bought the components that I needed from him, and he installed it. He put it on his bench and he had, like, a vice-type thing, a gun vice that the gun lays in and it cradles it, and he laid the gun in there, and he proceeded to put the--he proceeded to mount the scope on it.
Q. Did you see him do anything to it in any way to the breech plug area?
A. No, sir.
Q. When he mounted the scope, tell us what he did, briefly, if you were watching him.
A. Well, he took the mounting brackets and some little tiny screws and he put the mounting brackets on there, and he put what they call a thread lock on the screws, and it was thread lock blue. I remember him telling me if you ever want to take it off, all you got to do is put your screwdriver on the slot of the screw and tap the screwdriver. It will kind of, like, break that thread lock loose so you can get the screw out. The purpose of the thread lock is to make sure your screws don't

back out while you're hunting or transporting, whatever, and that will throw your scope off. I remember talking about that.

And then he just--we made small talk, and I just stood there. There was no one else in there. I just stood there and kind of watched how he was doing it, what he was doing.

Q. Did he take any power tools to the barrel?

A. Power tools?

Q. Yeah.

A. No.

Q. He used just a screwdriver?

A. He used a screwdriver and small screwdriver.

Q. He didn't drill any holes in the barrel to put that scope on?

A. He did not drill. No, the holes are predrilled. They're already there.

Q. The holes come drilled by the factory?

A. Yes.

Q. So when you had that scope mounted, all he did was put little tiny screws on it?

A. That's correct, that put the brackets on. And as you can see from that scope, there's more brackets around the scope, and those brackets attach to the brackets that were mounted on the gun.

Q. When he handed you back your gun, what did you do with it?

A. Well, we talked about bore sighting, and I don't remember if

we bore sighted it there, or not.
Q. What's bore sighted?
A. Bore sight is a--you can bore sight a firearm, like, for example, in a gun shop, or wherever, if you have the proper tools. What you do is you put a plug in the end of the barrel and it's got a laser on it. And basically that laser shoots against the wall, and then you can adjust your sight. It comes pretty close to the little red laser spot on the wall. It's not an exact thing. It's just a bore sight gets you within inches, gets you close, so you're not way, way off. And that's bore sighting. I don't believe that we bore sighted, but I really don't remember.
Q. Well, after you paid him and took the weapon back, what did you do with it next?
A. Took the weapon back from him?
Q. Yes, sir.
A. Took the weapon back from him, put it back in my soft-sided gun case, paid him, went back to my vehicle, and left.
Q. With the gun?
A. With the gun.
Q. Where did you go?
A. I believe I went home.
Q. And what did you do with the weapon when you got it home?
A. I took it out of my back seat, took it inside, took it out of the gun case, and put it in the gun cabinet.

Q. You locked the gun cabinet again?
A. Yes, sir.
Q. At any time along the way did you dry fire it, drop it, do anything to the weapon that might have done some type of damage to it?
A. No, sir.
Q. Did you take the breech plug out of it when you got home?
A. No.
Q. Did you do anything with it other than put it back in the case--gun cabinet? I'm sorry.
A. Gun cabinet. I took it from my gun case, soft-sided gun case, and put it in the gun cabinet.
Q. Locked it back up?
A. Locked the gun cabinet back up.
Q. In terms of getting ready to shoot the weapon, what arrangements had you made, if any, with Blake to go target shooting?
A. In terms of shooting the weapon?
Q. Yes, sir.
A. My first goal when I was going to shoot it that day was to sight the iron sights.
Q. We're talking about on Saturday first. Haven't got to Sunday yet. We're still on Saturday. Had you made some arrangements with Blake on that Saturday to go out to his place?
A. I don't believe so on Saturday. We had talked about it at

work that past week.
Q. What other preparation did you do to get it ready to go fire the weapon that next day, on Sunday?
A. Saturday night I gathered up all my stuff--I want to say stuff--my tackle box, my muzzleloading equipment. I hadn't, since Christmas, I hadn't familiarized myself with it, so I grabbed the manual out of my box, out of my tackle box, read through it, felt pretty comfortable with it, and that's about all I did Saturday night.
Q. Flip to page--or tab No. 5 in the big notebook there.
A. I think it's there already.
Q. All right. I think I put it there while you were on break. Would you pull that exhibit out that looks like this (indicating). And that's Exhibit No. 5; is that correct?
A. That's correct.
Q. And is that the book that you were talking about reviewing awhile ago on Saturday evening?
A. Yes, this is the owner's manual.
MR. SPARKS: Your Honor, may I have him demonstrate with the owner's manual--it's already been admitted, I believe, as Exhibit No. 5.
THE COURT: You may.
BY MR. SPARKS:
Q. J.D., let's take a moment and look through that book, and does that appear to be the same or very similar manual you

received--or owner's manual that you received with your Christmas present?
A. Yes.
Q. And how do you know that?
A. It looks like it.
Q. Looks like it. Good enough for me. When you got this particular manual on Saturday night, did you sit down and go through it?
A. Yes, I did.
Q. What parts of it did you pay attention to when you were going through the manual on that Saturday evening?
A. It was--there was a few things that I wanted to touch on. It had to do--because I was going to--it was a magnum gun, and I was going to use it as a magnum gun, so I wanted to familiarize myself with that aspect of it.
Q. In other words--strike that. Let me ask this: Had you ever fired a magnum charge before October the 1st, 2005?
A. Out of a muzzleloader?
Q. Out of a muzzleloader.
A. I don't believe so.
Q. So when you went to go familiarize yourself with this, it was to familiarize yourself in terms of the use of a magnum load; is that correct?
A. That's correct.
Q. What pages did you look at in this manual to familiarize

yourself with it?
A. I believe I looked at every page in it.
Q. Okay. So you went through it from cover to cover?
A. Yes, sir.
Q. Did you read it?
A. Yes.
Q. And you saw all those warnings in there?
A. Yes.
Q. Things like not to use smokeless powder?
A. Yes.
Q. Things that you'd never done before?
A. Correct.
Q. All right. And as you read through it, did you see anything that was unique or unusual in the operation of this particular weapon--and I'm talking about the Kodiak Magnum muzzleloader--as opposed to the Apollo or the Thompson that you had fired previously?
A. Did I see anything unusual?
Q. Yeah, different or unusual in its operation?
A. I just know that this recommends using Pyrodex pellets as the propellant.
Q. Did you have some of those?
A. Yes, I did.
Q. Was that in your tackle box?
A. Yes.

Q. Did you have some of those green-jacketed bullets in your tackle box that you showed us?
A. Yes, I did.
Q. Did you look at the recommended load table on page 8, which is very similar to what you looked at on the PowerBelt bullets?
A. I looked at that specifically.
Q. And what does it tell you when you were looking at it?
A. It says .50 caliber firearm, .50 PowerBelt sabot bullet, magnum pellet 150.
Q. So you familiarized yourself with that prior to going out on the next day to fire it; is that correct?
A. That is correct.
Q. Did you take the time to make a decision about whether or not you thought you needed to clean the gun before you took it out on the hunt--not on the hunt, but on the target practice?
A. I did not clean the gun that Saturday night.
Q. Okay.
A. I didn't feel I needed to clean the gun Saturday night.
Q. Okay.
A. I hadn't used the gun prior to that, so...
Q. When you took the gun out of the gun cabinet before you had the scope put on it, and after you had the scope put on it, and you were taking it back, did you grossly inspect it, as we like to say, to see if there was anything unique, different about it since you'd last seen it?

A. Yes.
Q. Did you find any rust or corrosion on the weapon?
A. No.
Q. Did you find any damage on the weapon?
A. No.
Q. On Sunday morning, October the 2nd, when you got up, tell me what the weather was like.
A. Typical beautiful fall day in Iowa. It was absolutely perfect. It was sunny, just a hair cool, I don't know, 70 degrees, probably, very, very light wind. It was just a perfect day as far as weather-wise.
Q. Is that a decision--was the weather a decision on whether or not you were going to go target practicing?
A. It was a major decision, I think.
Q. Why was that?
A. Well, first of all, it was a nice day to be outside. Second of all, I prefer, when I sight in or--I guess we're going to call it sighting in--my rifles, I like it to be calm, that way weather is not a factor. I mean, if you shoot two inches to the left, you know, is it you? Is it the gun? Or is it the wind? You know what I mean? And, definitely, rain and muzzleloaders, you know, it makes it difficult.
Q. They don't mix?
A. Yeah. Well, and then cold is the same way because you're dealing with small parts, and it's hard to wear big thick gloves

and deal with small parts. And so, actually, I think the type of day that it was that day was probably a major decision.

Q. What was your overall general state of health on the morning of October 2nd of 2005, that Sunday morning?

A. I thought I was great. I know it was great.

Q. Could you smell?

A. Absolutely.

Q. Could you taste?

A. Yes, sir.

Q. Did you have any problems with the use of either one of your hands?

A. No.

Q. Did you have any problems breathing?

A. No.

Q. Did you have any problems with headaches at that time?

A. No.

Q. Any vision problems?

A. No.

Q. Had you been out the night before after you read the manual and gotten drunk?

A. No, sir.

Q. Consume any alcohol?

A. No, sir.

Q. Taken any medication that affected your thought processes?

A. No, sir.

Q. So when you woke up on that Sunday morning, October the 2nd, that beautiful fall day, you were clear-headed, in good spirits, and good health; is that correct?
A. That is correct.
Q. What did you do that morning when you got up, surveyed the weather, and made a decision it was a good day?
A. Well, I think I got up that morning and I piddled around the garage, the yard, things like that. And then I thought this would be a good day, so I called Blake.
Q. And when you talked with Blake, what did you and he discuss?
A. I asked him if he had any plans that day. He told me that he did have a few things to do, but he could put them off. I said, "Well, I'm thinking about coming out and shooting. What do you think?" He said, "I think it would be great."
Q. About what time of day was it that you made that decision to go shooting?
A. I would say it would be--the time of day we made the decision, it would have been maybe around 9 or 9:30.
Q. How far away is Blake's place from yours, or his father's place, Lindie's?
A. Fourteen miles, maybe.
Q. What did you do after you and he decided that would be a good day to go shooting? What was the next step you took in the process?
A. Started gathering my stuff up.

Q. Tell me what all you gathered up.
A. Started getting dressed, you know, preparing for it.
Q. What all did you gather up?
A. I grabbed a sweat shirt, grabbed my ball cap, I put on a pair of leather boots--
Q. Okay.
A. --jeans, grabbed my tackle box, my muzzleloading tackle box.
Q. Before you left the house with that muzzleloading tackle box--or muzzleloader tackle box, did you examine the contents of it?
A. Well, I made sure I had my bullets and my pelletized powder and all the equipment I was going to need. My range rod, my patches, I made sure that was all there. You have to understand not all this stuff will fit in this box at once.
Q. Okay. So you gathered up all the tools of the trade?
A. Yes, sir.
Q. Take your gun out of the cabinet?
A. Yes, sir.
Q. Load it in the pickup truck or car? Which was it?
A. My pickup.
Q. And you went off to Blake's house; is that correct?
A. Yes.
Q. After you got the gun out of the cabinet--I know this sounds tedious--did you drop the gun, did you do anything to it that would harm it in any way before you put it in the car--pickup

truck? Excuse me.
A. No.
Q. It was in the same form and fashion that you got it at Christmas as when you put it in the truck to go to Blake's that morning of October 2nd, 2005?
A. That's not correct.
Q. It had a scope on it, didn't it?
A. It had a scope.
Q. What else?
A. What else beside the scope?
Q. Yes.
A. Nothing.
Q. Did you have a sling on it?
A. No.
Q. You didn't add a sling to it?
A. I was going to add a sling to it, but not at that time.
Q. What time of day did you get to Blake's house?
A. 10:30, maybe; 10:30, 11.
Q. When you drove up to Blake's house, what did you see? What was the first thing you recall seeing at the house?
A. Blake lives on an acreage down by the Des Moines River. I saw his house. He's got a couple old barns out there. He lives in a wooded area.
Q. Was Blake set up for your arrival?
A. A little bit.

Q. What did you see he had set up for your arrival?
A. He had a picnic table at the end of his lane that he had placed there in order to shoot off of, use it as a bench.
Q. To put your materials on?
A. Yeah.
Q. All the parts that you brought with you?
A. Yes.
Q. And is that where you went, again, to put your materials on that bench?
A. That is correct.

MR. SPARKS: Your Honor, I know the Court wants to go to 5, but what I'm going to start getting started with is kind of critical to be all at one time. If the Court would not mind giving me some leeway this evening, or are we going to work late?

THE COURT: We'll take our evening recess at this time.

Members of the jury, we'll recess until tomorrow morning at 9 a.m. During the evening recess, bear in mind the admonition given previously. We'll see you tomorrow morning.

(Recess at 5 p.m., until 9 a.m. Wednesday, December 10, 2008.)

C E R T I F I C A T E

I, the undersigned, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that I acted as the official court reporter at the hearing in the above-entitled matter at the time and place indicated;

That I took in shorthand all of the proceedings had at the said time and place and that said shorthand notes were reduced to typewriting under my direction and supervision, and that the foregoing typewritten pages are a full and complete transcript of the shorthand notes so taken.

Dated at Des Moines, Iowa, this 27th day of February, 2009.

/s/ Theresa Kenkel
CERTIFIED SHORTHAND REPORTER