IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - - X
JON D. KATZENMEIER and :
JULIE KATZENMEIER, :
Husband and Wife, :
:
Plaintiffs, :
:
vs. : Case No. 4:06-cv-00169
:
BLACKPOWDER PRODUCTS, INC., : TRIAL TRANSCRIPT
a Corporation, d/b/a :
CONNECTICUT VALLEY ARMS; : VOLUME VI
and DIKAR S. COOP, :
:
Defendants. :
- - - - - - - - - - - - - - - - X

Courtroom, Second Floor
U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa
Wednesday, December 10, 2008
9 a.m.

BEFORE: THE HONORABLE ROSS A. WALTERS, Magistrate Judge, and a Jury.

APPEARANCES:

For the Plaintiffs:

GARY A. EATON, ESQ.
WILLIAM E. SPARKS, ESQ.
Eaton & Sparks
1717 East 15th Street
Tulsa, Oklahoma 74104

For the Defendants:

JAMES E. SINGER, ESQ.
Bovis, Kyle & Burch, L.L.C.
200 Ashford Center North
Suite 500
Atlanta, Georgia 30338-2668

KEVIN M. REYNOLDS, ESQ.
NICHOLAS S.J. OLIVENCIA, ESQ.
Whitfield & Eddy, P.L.C.
317 Sixth Avenue
Suite 1200
Des Moines, Iowa 50309-4195

# I N D E X


| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| On His Own Behalf: | | | | | |
| Jon David Katzenmeier (Resumed) | 818 (Sparks) | 877 (Singer) | 897 (Sparks) | | |
| For the Defendants: | | | | | |
| Dudley McGarity | 928 (Singer) | 958 (Eaton) | 1007 (Singer) | 1010 (Eaton) | |
| Jon Muniategui (Via videotaped deposition) | 1016 | | | | |
| William Chapin | 1017 (Singer) | 1045 (Eaton) | | | |

# E X H I B I T S

| PLAINTIFFS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 32 - Boone County Hospital records | 902 | 902 |
| 33 - Iowa Methodist Hospital records | 902 | 906 |
| 34 - University of Iowa Hospital records | 902 | 906 |
| 35 - Anosmia safety recommendations | 868 | 868 |
| 36 - W-2s, Jon Katzenmeier | 871 | 871 |
| 40 - BPI/CVA advertisement | 966 | 966 |
| 103 - Medical expenses | 865 | 865 |

| DEFENDANTS' EXHIBITS | | |
|---|---|---|
| I - Breech plug | 957 | 957 |
| MM - Curriculum vitae, William Chapin | 1018 | 1018 |
| FF-1 - Photograph | 1027 | 1027 |
| FF-2 - Photograph | 1027 | 1027 |
| FF-3 - Photomicrograph | 1028 | 1028 |
| FF-4 - Photomicrograph | 1031 | 1031 |
| FF-5 - Photomicrograph | 1031 | 1031 |
| FF-6 - Photomicrograph | 1031 | 1031 |
| FF-7 - Photomicrograph | 1031 | 1031 |
| FF-8 - Photomicrograph | 1031 | 1031 |
| FF-9 - Photomicrograph | 1031 | 1031 |
| XX - Photograph | 928 | 928 |

P R O C E E D I N G S

(In open court, in the presence of the jury.)

THE COURT: Mr. Sparks?

MR. SPARKS: Thank you, Your Honor.

JON D. KATZENMEIER, WITNESS ON HIS OWN BEHALF, PREVIOUSLY SWORN

DIRECT EXAMINATION (Resumed)

BY MR. SPARKS:

Q. Mr. Katzenmeier, when we left last night you had arrived at Blake's house; is that correct?

A. That's correct.

Q. Tell us, sir, once you arrived at Blake's house, what was the first thing you did there?

A. I arrived at Blake's house, I pulled in his lane, stopped the vehicle by the picnic table he had sitting there at the end of his lane, got out of the pickup--or my Avalanche, and went over to the picnic table. I was just hanging out by my truck until he came out.

Q. Did he make his way out to see you?

A. Yes, he came out of his house and came down to my pickup.

Q. What transpired between you and Blake at that time?

A. We just--we made small talk for a little bit, shook hands, proceeded to get the equipment out of the truck.

Q. What equipment did you get out of the truck at that time, sir?

A. I had with me my sandbags, homemade-type sandbags, my rifle

in the gun case, and had my tackle box, had a couple targets, paper targets, like sheets of paper-type targets.
Q. Walk us through what you did next, then, sir.
A. Talked about what we were going to do that morning. I remember looking down at the target, talking about the yardage. I think the target was--and I say "the target." The frame he had built earlier, I think it was turned a little bit, it wasn't straight with where we were at, so we walked down and straightened it up, came back, went to the vehicle, to the table. The vehicle is behind the table, kind of parked next to it.
We had placed--while we were down there at the target, we put the stick-on--or the paper targets on the target, you know, on the board, and then came back to the vehicle, to the table, and proceeded to get the gun out and get all the equipment laid out.
Q. Mr. Singer made reference in his opening statement about a Masonite board, and he later on somewhere in the course of the trial called it a concrete board. What was the target material you were shooting at?
A. It was a weathered piece of wood. I mean, it was, like, compressed Masonite board, you know. It was four-by-four, or so, and it was kind of weathered. It wasn't perfectly flat, you know. It had some waves in it, some wrinkles in it because it had been sitting outside, you know. But it was a quarter to

three-eighths of an inch thick. It was just, I would describe it as, particle board or wood board or chip board, or some type of compressed board material.

Q. You said you placed the targets against that particular piece of wood, or whatever it was?

A. Yes.

Q. How did you align the targets?

A. I believe we had, like, one target at the upper part of it, and then one target below it--

Q. What was the purpose--

A. --pretty much in the center of the target.

Q. What was the purpose to align them in that fashion?

A. Well, when you're target shooting, what I like to do is, especially on a new firearm, or one that hasn't been sighted in, I like to take one piece of paper or one target, start with that one, because you might be kind of shooting all over. And once you get it in a little tighter group, then you move down to your second target, and that's when you can focus on the bull's eye and see how tight your shooting is instead of having all these holes all over getting you confused where your bullet is.

Q. Do you know if that piece of material that you put the target on had any prior holes on it, sir?

A. It did.

Q. It had been used before for target practice?

A. Yes, it was, or had been.

Q. Had you ever used that particular piece for target practice previously at Blake's house?

A. No, I had not.

Q. After you went-- You said you walked back from the target. How far, approximately, was the target away from where you walked back to?

A. Well, the target that was set up to my vehicle, where the shooting bench was, 80 to 100 yards.

Q. And after you got back to the shooting bench--or shooting area, what was the next thing you did with the weapon and/or Blake?

A. Well, I took my firearm out, laid it on the table--actually I think I took it out, had my soft case lying there, laid it on top of the soft case. I gathered up all my material, my pelletized pellets, my bullets, had my range rod laying there. I opened up my container of patches, separated everything so I have all my supplies all sitting out somewhat organized on the table.

Q. Where was Blake in position to the table and you at that time?

A. He was standing right next to me.

Q. And during this time that you are setting out your materials, are you and Blake engaged in any type of conversation?

A. Yes, talking.

Q. What are you talking about?
A. Well, the reason I was out there shooting this muzzleloader was, No. 1, it was a brand new rifle, and my goal was to sight it in. The second reason that I was out there shooting with Blake was because he had never fired a muzzleloader before. He may or may not have a muzzleloader at that time, I don't know. He did not have one out there with us at that moment. If he had one in his house in his gun safe, I don't know that. He expressed an interest in it--
Q. Hold on a second. So we're clear, there was only one gun at the gun sight; is that correct?
A. That is correct, and it was my gun.
Q. Go ahead. I didn't mean to interrupt you, but I wanted to make sure we were clear about that.
A. The reason we were there was to sight it in and to teach him about muzzleloading, loading the gun, firing the gun, handling the gun, cleaning the gun, orientating himself with muzzleloaders.
Q. Once you had laid your materials out and had the weapon, what was the next step you took?
A. Well, as I was laying my materials out, I was talking to him about the materials. I showed him the pelletized pellets that I was using at that time. I told him that this was something that was relatively new in the muzzleloader industry. I opened up the box, I showed him, I described the cover of the box, what

the 50-50 meant on the box of the pelletized pellets. I showed him what kind of bullet I was going to use. I told him the same thing I told you folks about how I like these bullets because of the way they load.

I explained the primers they use on these new type of firearms. They were 209 primers, the same primer you would find with a shotgun shell. I explained my equipment, I told him, I said, "You know, you're going to have a lot of parts and pieces to this sport. It's probably best you get yourself a little tackle box, keep your stuff together." Just kind of explain to him what he was going to have to buy, what he was going to shop for, what has worked good for me in the past. That's the process I was going through as I was laying my material out on the picnic table.

Q. As you were laying the material out and talking with him, sir, what was the first step you showed him with the weapon?

A. Well, I took my--I took my rifle in hand and we talked about the rifle. I told him that I just put a scope on it, and I told him that I wanted to sight the rifle in--excuse me--I told him I wanted to sight my iron sights in first prior to sighting in my scope on the rifle. I explained to him that I had just received the rifle, which is a brand new rifle, it was a Christmas gift, it was a mag rifle. I told him I was going to load it to 150 grain, the pelletized pellets--I'll get into that here in a minute--looked the rifle over.

At that point in time I told him that muzzleloading is--it can be dirty, so the main thing with the muzzleloaders is--to make sure they are safe and operate correctly, is you keep them clean.

I showed him patches. I took a patch, I took my range rod, put the patch over the barrel, I put the gun on the ground, I ran the patch through the barrel, pulled it up, explained to him, you know, how that process worked, how it worked because that can be confusing because you don't really attach the patch to anything. You just set it over the end of the barrel. When you push the range rod in, it forms around the range rod and goes down and comes back out. Came back out--

Q. When the patch came out, did you show him the patch?
A. Yes.
Q. And what did the patch look like?
A. It looked clean.
Q. Did you have to put more than one patch in the barrel?
A. No, sir.
Q. What was the next thing you talked with Blake about?
A. Then we started loading the firearm, and I took my pelletized pellets out of the case one at a time.
Q. That's the box of pelletized pellets you're talking about?
A. Yes.
Q. Go ahead, sir.
A. Took the pelletized pellets out of the box one at a

time--can I open these?
Q. Sure.
A. And I explained to him on these pelletized pellets when I took one out, I showed it to him, I said, "Blake, these pellets have a dark side and a light side. The way I do it is I put the dark side in first. I don't know if it makes it fire better, fire in a row better, I don't--I didn't design them, but this is the way I do it. I put all my pellets in dark side first."
So I took the firearm, took one pellet, and I dropped it in. And when I dropped it in, you could hear it go (indicating), and I even commented to him, "Did you hear that slide down the barrel and hit?" He said, "Yes."
I took out another pellet, slid it in--showed him the dark side, slid it in (indicating). It made a noise where it hit the other pellet. I took a third pellet, dark side down, slid it in and seated, went all the way down, slid down and hit.
Q. Stop right there. Did you put any other type of propellant in the barrel at that time?
A. No, sir.
Q. Did you put more than three pellets in the barrel at that time?
A. No.
Q. Did you explain to Blake at that time the purpose of three pellets and the type of rifle you had, or explain that to him?
A. Yes, I did.

Q. What was the next step you took after you put the three pellets in the barrel?
A. Well, I explained to him that we had three pellets in the weapon, so we had 150 grains of pelletized powder in the gun. So then I took out my PowerBelt bullet, you know, showed him the bullet, put it in the top of the barrel, started it, started the bullet in the barrel. Took my range rod, went ahead and slid the bullet on down and seated it. I specifically remember I told him, I said, "All you need to do is seat these bullets. You seat them down against your charge, and then what I do is I just give them a tap. You do not have to sit there and beat them and crush them and pound them in there like you would see on TV." The primitive guys are just ramming these things like crazy.
Q. What we're talking about, using a primitive ball weapon, like the Hawkens we talked about yesterday; correct?
A. Correct, because back in those days they had powder, patch, ball. Balls were not always perfectly round. You get some fouling in the barrel, they would--they would have to use, like, short strokes to get them all the way down, back in the primitive days. The way that this material loads, as is recommended in the book, it loads very easily.
Q. The bullet that you used, is that in Exhibit 4, that you testified to yesterday?
A. Yes.

Q. That's the same package that you had that day?
A. That is correct.
Q. After you seated the bullet, what did you tell him next?
A. After I seated the bullet, this is where I explained to him about the marking of the rods, and when you load a gun--when you load a muzzleloader, it's a good practice to mark your range rod, or to mark your hunting rod, okay? What that does is that gives you a baseline. Once you have that gun loaded with three pelletized pellets and a bullet, you can put a mark on your rod, when your rod is in the barrel, you can put a mark on that rod, and that tells you the depth of that rod in that barrel, okay? So that's what I explained to him next.
Q. Okay.
A. "Now is the time to mark your rod," okay? That way, from this shot to the 10th to the 20th to the 30th shot, however many shots you take that day, every time you load that gun, when you stick that rod down there and seat that bullet, all you have to do is look at where that rod is in that barrel and see that mark. You can use tape, you can use pencil, you can use paint, you can use whatever you want on there, you can scratch it on there. I don't recommend that because it's permanent. You can use whatever you want to mark that rod at that point.
Q. About how long did this explanation of muzzleloading and firing take place at that time?
A. Maybe ten minutes.

Q. And after you had completed that process of explaining to him marking his rod, what was the next thing you did in the sequence of events?
A. Took my rod, my range rod out and I told him, I said, "I want to walk up to those tanks over there." He had some, like, water tanks or something off to the side a little bit. I said, "I want to walk up to that water tank and I want to shoot the first shot from there," which is a closer distance to the target. "I want to shoot with my iron sights to see where they're at straight out of the factory, see how close they are." I told him I'd like to sight in a little bit with my iron sights, and then we'll move back here to the table with the scope sighting in, sighting in my scope.
Q. When you moved to the water tank, approximately how close were you to the target?
A. I would say 40 yards.
Q. And what all did you take with you up to the water tank? I know you mentioned sandbags. Did you take those with you?
A. No, I did not.
Q. Why not?
A. Because I was just going to steady rest it against a tank--or on top of the tank, and I just felt like the tank--you know, I put myself in a position to keep the gun steady enough to shoot a 40-yard shot. You asked what else I took with me, I took my gun, of course, and I took a 209 primer with me.

Q. You took your gun and the primer. Anything else?
A. No.
Q. Blake came along with you?
A. Yeah, he followed me.
Q. Tell us once you got to the water tank, what was the next thing you did, sir?
A. I got up to the water table--or the water tank, and I put the primer--this is an action-type gun. I don't know if I need to explain that, but action, you kind of open the action and put the primer in and close it over the top of the primer. I did that. I put my primer in there so the gun is ready to fire at this point, still on safe. I knelt down on one knee, kind of a military-type shooting position, laid my gun across the tank, sighted the firearm in.
At this point I told Blake I was ready to fire, and he was back behind me, a little bit off to one side, and I clicked my safety off, and pulled the trigger.
Q. So that we're clear, this is the first and only time this weapon was ever fired; is that correct?
A. Absolutely. Yes, that is correct.
Q. Once you pulled the trigger, what is the next thing you recall?
A. When I pulled the trigger, it was just--it was just black. It was just--it just went "ping." I don't know if I can really recall it or explain it. It happened so fast, it was just--I

don't know. I mean, I could tell you what happened a few seconds after I pulled the trigger.
Q. We'll get to that.
A. At the time that trigger went off, like I said, it was just like--if you've been kicked in the face by a horse, you slammed your head on something, because it just went black. It was just a pinging/ringing sound, and it was just totally confusing to me.
Q. Under tab No. 9 there's a series of photographs, in the big notebook there beside you.
A. Tab 9?
Q. Yeah, tab No. 9. Take a look at those photographs under tab No. 9, and I'll ask you if you are familiar with them.
A. Yes, I'm familiar with all of them.
Q. Can you tell us briefly what they are photos of? And I just really want to start with those of the property.
A. Okay. The photos of the property is his acreage he lives on.
Q. You're talking about Blake's property?
A. Yes, sir.
Q. And that's the area you were shooting in?
A. Yes.
Q. There's one particular photograph I want you to turn to showing the tank in which you were using as a rest. Do you see that photograph in there, sir?

A. Yes.

Q. Just a singular picture of the tank. That one right there (indicating).

A. Yes.

MR. SPARKS: Your Honor, this one has already been marked as an exhibit under the A category. Can I publish it to the jury?

THE COURT: Yes.

MR. SPARKS: Thank you, sir.

BY MR. SPARKS:

Q. Is this the water tank you were talking about using as a shooting bench?

A. Yes.

Q. You said you would kneel down in a military style and rested the weapon as a seated area there; is that correct?

A. That is correct.

Q. And looking at that photograph right there, is it fairly accurate in terms of where the tank was at the time that you were at Blake's property?

A. Yes.

Q. From where you were at that tank, sir, what happened to you next, after you pulled the trigger? Where did you end up in relation to that tank?

A. Well, I probably ended up--that may be a little close right there (indicating). Actually it would be off the picture.

Q. Okay.
A. Back in that area right there (indicating).
Q. Which direction were you pointing when you first had the first conscious thought that you can recall?
A. The target is on this side over here, so I was facing that direction (indicating).
Q. And what was the first conscious thing you recall after pulling the trigger?
A. I know I was very confused about what happened. I couldn't see. It felt like my face was on fire. I heard Blake say--I think he said, "Oh, my God, your gun just blew up," and he was gone.
Q. How do you know he was gone?
A. Well, I don't remember if he told me he was going to call 911 or he just--he wasn't there with me, I know that. He wasn't touching me, or anything like that.
Q. All right, sir.
A. As far as a conscious thing I felt, I sat back on my heels, put my butt on my heels, had my hands over my face. I was leaning forward, and I was trying to figure out what just happened. I thought to myself, "I don't know what just happened." I don't want to know what happened, but you have to stay in control of the situation," that's what my gut feeling was telling me.
I was in a lot of pain, I could feel blood

coming--running through my fingers, running down my arm. I didn't know if I had eyes, I didn't know if part of my head was sheared off, I really didn't know what had happened, but I just--one thing I did know was my hands were on my face and I was conscious, and that's the way I was going to stay because that's what was working for me at the time.

And I sat there for a minute just totally confused. Of course my adrenalin is running, I'm thinking, "You're thinking, J.D., your brain's working, you're thinking." And then after a few moments I started getting--I started to panic. And whenever you're hurt really bad, you look for help. I don't care what happens to you, when you're hurt real bad, you look for help and you start to move.

Q. So what happens next?

A. So I stood up because I started panicking. I knew his house was to the left of me.

Q. Is that his home in the picture that we're looking at that's behind there--

A. Yes.

Q. --in the background?

A. I knew his house was to my left, I knew he had went that way, so I stood up and I was going to go to his house for help, and that's what I proceeded to do, start to stumble. Someone said walk earlier in this trial. Trust me, it wasn't a good straight walk. It was a stumble because that pinging, the

blackness, the blood, it's all still there, the panic, the adrenalin, it's all still there. So I was finding my way to his house.

Q. As you were making your way toward his house, what happened to you along the way?

A. Well, I don't know exactly what path I had taken to his house, but the blood trail would tell you that, but in this area right here there was a pickup or a Blazer or some type of vehicle parked in that area. It could have been further back here, or maybe it could have been further up here, I'm not real sure. I ran into it as I was--my hands still at my face, I'm finding my way to his house, I ran into his vehicle, or someone's vehicle. (Indicating throughout.)

At that point I started feeling it, where I was at, and I felt the windshield, I felt the windshield wipers, so I found my way down the hood, and I went around it, and I ended up in this area, which is--it's a hill, it's got some rocks and stuff on it (indicating).

Q. A little berm there?

A. Yeah, a little berm, and I couldn't walk up that hill, so I sat down right there, I sat back down. I put my knees to the ground, I sat down back on my heels, just like I was sitting back here, still with my hands on my face like this, still thinking, "Stay awake. You're in control of the situation. Stay awake." (Indicating throughout.)

And then at that time Blake come out of the house and he put a towel on me, put a towel up to my face. I moved my hands. He held the towel there. I didn't want to move my hands because I didn't know if I was holding something together at that point, but with the towel there I moved my hands around, I pushed on the towel against my face, and I just sat there with the towel on my face.

And I told him at that point, I said, "My face is on fire," because it was burning. He left again and I think at that point is when he went--he got a wet towel. He brought it back to me. Brought the wet towel back--go ahead.

Q. Just a second. Once you got to that berm, did you ever move from that berm again until you were picked up by emergency personnel?

A. No, sir.

Q. So you staggered to that berm, you stayed at that berm, and he brought you a second towel, a wet towel; is that correct?

A. Yes.

Q. Tell us what happened after that.

A. He brought me the wet towel. I put the wet towel on my face, and I remember how good that felt. And then I think he left again. He was going back and forth. I remember thinking, "Stay in control of the situation." I was always leaning forward to make sure the blood would run out and not run down my throat because I didn't want to choke, I didn't want to lay

down, I didn't want anything like that to happen.
Q. During this whole period of time, was there ever any period of time you lost consciousness?
A. No, sir, I wouldn't--I guess I wanted to, I think my body was telling me to, either go into shock, lose consciousness, whatever. But, like I said, I had a fear of laying back, choking on blood, losing control of the situation. I knew my brain was working. When I was awake and I was thinking, I knew it was working. It was like I didn't want to shut anything off. That's what I was thinking.
Q. After you got the wet towel and you think Blake left you again, what is the next thing you recall in the series of events that transpired?
A. I remember Blake came back out, and I have this towel on my face, and he comes around me and he grabs me, and he's just holding me up. He's got one arm around me. He might have had one arm in front of me, kind of like a bear hug type thing, and he was just holding me there, and he says, "The ambulance is coming. Just hang on, they're coming, they're coming."
He was panicked. I told him, I said, "Make sure you call my wife." I remember saying, you know--he was making some comments like trying to take my mind off of it, or something, you know. I was thinking, "This isn't supposed to happen today, Sunday," you know. "My daughter has a flag football game this afternoon," you know. "Why?" I was just confused.

Q. When the ambulance got there, what, if anything, do you recall about that process?
A. Could you repeat what?
Q. When the ambulance arrived--strike that. Let me do it this way: Do you have any idea in terms of time how long you were there before the ambulance arrived?
A. No, I don't.
Q. That's good enough.
A. I just know--I was thinking safety in numbers kind of thing. I knew Blake was there, thank God he was there, and I just knew that when someone arrived, two people is better than one, three people is better than two when you got that kind of situation. So I was thinking, "I wish they would hurry up," which I think that's what he was thinking, too.
Q. How far is Blake's location, or Lindie's, his dad's house, from you?
A. Twelve miles, fifteen miles, somewhere in there.
Q. Do you recall when the ambulance arrived, J.D.?
A. I don't recall when the ambulance arrived. I do recall people around me, starting to come around me. So I would assume that's when the ambulance arrived, or somebody was arriving.
Q. Do you remember leaving the--Blake's house in the ambulance?
A. I remember getting moved around. And, once again, I was not taking my hands off my face. I didn't want to hear, "Oh, I seen his eye," or "I seen part of his brain." I didn't want to hear

any of that. I didn't want to hear any of the injuries, so I stayed covered up as best I could.

I remember moving around, getting moved around, people talking, real busy. It was real busy around there. I remember getting picked up, and I remember what I think was being loaded in the ambulance at that time. It wasn't that I recall any sirens or anything like that.

Q. As you were loaded into the ambulance, just take a second, take an inventory of what you were feeling at that moment physically in terms of your injuries. Had any of the burning subsided?

A. No.

Q. Had any of the ringing subsided?

A. No.

Q. Had any of the bleeding subsided?

A. Well, the towel kept it from running off of my body, put it that way, but it had not subsided at that point.

Q. Were you conscious of any other problems that you were experiencing at that time, other than those to your face and head?

A. You know what? This thumb was blown apart, and I don't think I even noticed it.

Q. When you got into the ambulance, from what little recollection you have, what is the next thing you recall?

A. One thing specifically I remember about that ambulance was a

lady's voice. It must have been one of the paramedics. For some reason a woman's voice was comforting, and she was in charge, and I remember her saying--she must have been right over top of me, but I remember her saying to the driver of the ambulance, she said, "Get Life Flight coming to Boone." And at that point I knew it wasn't good. I don't think they call Life Flight for any reason. She must have seen something she didn't like.

And the next thing I heard her say was, "Let me know when you get on a straight stretch of road so I can start this IV."

Q. Down at Blake's residence, is it on a paved road?

A. No, it's a gravel county road.

Q. So once she got--or the ambulance got to a paved straight section of road, I'm assuming you got your IV; is that correct?

A. Some time or another, yes. Blake lives down in the Des Moines River valley, and it's really hilly down there, and sometime or another between his house and the hospital I think I received an IV.

Q. You got to the Boone Hospital; correct?

A. Correct.

Q. Do you remember anything about getting to the Boone Hospital?

A. You know, I really don't. I'm not sure emotionally what I was doing at this point. I felt like, you know, with medical

people around me I could relax a little bit. I knew I was in a safer condition than I was prior to that.

I remember being in the Boone Hospital. I don't remember getting off the ambulance or, you know, crashing through the emergency doors like you see on TV, I don't remember any of that stuff. I just remember being in the hospital on a bed or a table, or something, with more people around me working on me, evaluating me.

Q. Do you have any recollection of time, of how long you were at Boone Hospital?

A. I do not. I know my wife was there, my daughter was there, and my son was there. There was some friends that showed up. I was told my friends showed up afterwards, after, you know, after the whole incident. I didn't talk to him that day.

Q. While you were there in the Boone County emergency facility, you said your wife appeared, your kids--some of your children appeared; is that correct?

A. Yes.

Q. Were you able to communicate with them at that time?

A. Julie came back there, saw me. Nick came back there and saw me. I don't think my youngest daughter, Jade, was with Julie at the time of the accident. I don't think Jade came back there.

Q. Do you remember seeing them?

A. Excuse me?

Q. Do you remember seeing them?

A. My family?
Q. Uh-huh.
A. No. I didn't see them.
Q. Did you see anything at that time?
A. But I felt them. I touched them. I talked to them.
Q. Were you able to see anything at that time?
A. No.
Q. Were your eyes open?
A. No. They were closed. I kept them closed.
Q. What's the next thing you remember about your medical treatment at that time?
A. At that point at Boone County I just remember people working on me, you know, medical staff working on me. Julie and Nick were back there for a brief--it seemed like just a brief minute. I do remember one thing I told Nick is I kind of reached out and grabbed him and I said, "Nick"--I said, "Nick, I'm glad this happened to me, not you."
Q. What's the next thing you recall in terms of--
A. Then he told me, he said, "You're going to be all right, Dad." That's all I remember.
Q. Do you remember leaving Boone County, J.D.?
A. Yes.
Q. What about leaving Boone County do you recall at that time?
A. What I remember about leaving Boone County was I don't remember getting on the helicopter, but I remember the

helicopter sounds. I remember specifically the whirly-birds, the sounds of the props rotating. Whether that was taking off, turning, whatever it was doing, I just remember I could hear every now and then that fluttering sound, the sound the helicopter makes when it operates.
Q. Do you recall or know where that helicopter took you at that time?
A. Des Moines Methodist.
Q. Do you recall how long you were in Des Moines Methodist?
A. I do not, I just remember something--something else I remember about the helicopter ride, of course I changed medical staff at that point, and I was pretty adamant that I did not want to lay down. I wanted to always be up, or sitting somewhat up. That way things come out and do not go down.
And the helicopter ride, there was a man on the helicopter, I felt like something was starting to plug up, and I don't know if I coughed or blew or something, and he told me, "Do not do that again," because that was going to help stop the bleeding, my bleeding. I was starting to plug up, and he told me "Do not do that again." That's all I remember.
Q. You got to Des Moines Methodist here in Des Moines. When you landed with the helicopter, taken into the hospital, what's the next thing you recall from there, sir?
A. Every stage it started to get a little bit fainter, and I don't know if they were putting medication in me, or not, but I

don't remember landing, I don't remember getting off the helicopter, I just remember more people working on me again, you know, people around me, busy. It was busy again. I don't remember how long I was there. Des Moines Methodist is probably the one stop that I do not--I just don't recall, remember much about that stop.
Q. At any point in time while you were at Des Moines Methodist, did you ever lose consciousness, do you recall?
A. No, sir.
Q. Were you ever able to see while you were at Des Moines Methodist, or try to open your eyes?
A. No, sir.
Q. What happened next at Des Moines Methodist, if you recall, in terms of your medical care? Were you transferred somewhere else?
A. Yes.
Q. Where were you transferred to?
A. The staff at Des Moines Methodist, apparently, after their evaluation, had determined that there was just too many different types of injuries, and they just made the decision, a great decision, that I should go to Iowa City. So they made that decision.
Q. Did they put you back in a helicopter, or they put you in an ambulance? How did they get you there?
A. No, they put me in an ambulance and told me I was going to

go by ambulance. I do remember that.
Q. Do you remember anything about that ambulance ride?
A. Excuse me?
Q. Do you remember anything about the ambulance ride?
A. I don't. I don't remember anything about the ambulance ride. I think there was a man in back there with me on that ride, maybe two. Like I said, they tell me they were taking me by ambulance. Every now and then I could hear like the shifting or the acceleration, the passing gear, or whatever of the ambulance, but it was--other than that, I don't remember.
Q. You got to Iowa City to the University Hospitals; is that correct?
A. Yes.
Q. You were taken into the emergency area and seen there initially; is that correct?
A. Yes.
Q. Do you remember anything about early on or that initial examination there in Iowa City?
A. I do. Once again, when I was in Iowa City, I remember more people around me evaluating me, but they were a lot more--they were doing different things to me than they had done before. They were making me move certain parts of my body, move my legs, move my fingers, they were doing those types of tests to me, you know, pinching me here and there, or whatever, seeing if I could feel this or that. They were making me try to open my eyes.

I remember seeing--what I recall, it was--of course they had bright lights, and it was, like--it was kind of like ghost figures. It wasn't anything clear, it was just people dancing around and these figures moving around. It seemed like there was a person everywhere around me, at my feet, at my head, on the side of me. It just--it seemed like there was a lot of people.

Q. While you were there with them working on you trying to triage you, were you able to open your eyes and see around?

A. They were forcing me to open my eyes in Iowa City.

Q. Were you able to see anything when you opened your eyes?

A. No. They were just forcing me--like I said, it was just blurriness, couldn't focus on anything, you know. Being able to see something to me is a broad statement. I could see ghost figures dancing around. I definitely couldn't see--read a sheet of paper at that point.

Q. Did you see anybody's face or make out their features on their face?

A. No, sir.

Q. Do you remember anything else that went on in the emergency room or the triage area there in the hospital?

A. I remember them cutting my clothes off.

Q. Do you remember them cleaning you up?

A. Yes.

Q. Tell us what happened when they attempted to clean your

facial area and your hand area?
A. Well, I remember the cleaning up process, you know, people working on me, changing bandages, just cleaning, changing out, you know, the pads that they used, the cloths that they used. I just remember--I don't know if they were dipping it in something and wiping, you know, I just remember that wetness feeling, and I just remember being cleaned up.
I know my--when I was laying on the table--laying back on the table, my hand was out here like this (indicating), and I remember people--different people working on my hand, and people cleaning off my face.
Q. There were--if you will turn to tab 31 of the big notebook, if you don't mind, sir. Just take a minute to flip through those real quick first. Take a look at them before we talk about them to the jury. Go ahead and flip through those photos that are under tab 31 there, if you don't mind.
That first series of photos were taken in the hospital by the medical staff, as you recall; is that correct?
A. That is correct.
Q. And then the second set of photographs were taken by family members of yours while you were in the hospital; is that correct?
A. Without the green sheet behind there?
Q. Right.
A. Is that what you're referencing to?

Q. Right, the next set.

MR. SPARKS: Your Honor, we ask the jury be allowed to see some of Exhibit 31, again which have been previously admitted.

THE COURT: You may publish.

MR. SPARKS: Thank you, sir.

BY MR. SPARKS:

Q. J.D., the first photograph we're going to see, that's a photograph taken of you at the Iowa City Hospital; is that correct?

A. That's correct.

Q. Do you recall if that was taken on Sunday or Monday, sir?

A. That was taken either, like, on Monday--it wasn't taken on Sunday. It was taken on Monday or maybe even Tuesday. This photograph was taken by Dr. Bauman's group.

Q. She was the surgeon who repaired your face and put the plates in your head; is that correct?

A. That is correct.

Q. The next photograph that was taken, was that also a photograph taken by Dr. Bauman, as you recall?

A. That is correct.

Q. Are those pictures, then, in 48 hours after the initial--approximately 48 hours after the initial incident; is that correct?

A. That is correct. These photos here were taken in my room at

least a day later, maybe two. You know, I was stable, I was cleaned up, I was sewed together.
Q. Let me ask you, at the time those photographs were taken, had you had surgery on any part of your body?
A. At that time?
Q. Yes, sir, if you remember.
A. No.
Q. Let's look at the next one. Go ahead, J.D. These were all taken as you were in the hospital waiting for surgery; is that correct?
A. That is correct.
Q. When was the first surgical procedure that you underwent, if you recall, sir, the order they were done in?
A. The first thing they operated on was my hand.
Q. Which hand was that?
A. My thumb. Excuse me.
Q. Which hand and thumb was that?
A. My right thumb.
Q. Are you right- or left-handed?
A. Right-handed.
Q. So your dominant hand was the first thing they operated on; is that correct?
A. That is correct.
Q. What do you recall seeing of that injury before surgery, or what was your understanding of the injury that you had before

surgery?
A. What do I understand my injury was?
Q. Yeah, what do you remember seeing about your right thumb and hand before surgery?
A. I don't really remember anything about it.
Q. Okay.
A. Like I told the Court, I think I was using, you know, during this accident, I was using that hand, and I just think I had other issues I was concerned about other than my hand. I really didn't realize I had an injury to my hand. I mean, I did at this point when I was stable, but at that point it was clean and bandaged.
Q. Do you remember the day you had surgery on it?
A. I think it was Tuesday.
Q. Do you remember seeing Dr. Adams and having surgery on your right hand?
A. No.
Q. When was the next surgery you had in Iowa City?
A. After these two surgeries?
Q. After this first surgery to your thumb, when was the next surgery?
A. It was a day or two later.
Q. Who performed that surgery?
A. Dr. Bauman.
Q. She's the young doctor we saw on the videotape explaining

your injuries; is that correct?
A. That's correct.
Q. And did you have any other surgeries performed on you other than the one by Dr. Adams and the one by Dr. Bauman at that time?
A. Not at that time.
Q. We saw Dr. Goins by video deposition. Did he come in and see you while you were in Iowa City?
A. I was taken to him.
Q. From the hospital?
A. Well, I was taken to Dr. Goins, from my room in a wheelchair to see Dr. Goins.
Q. So he examined you while you were there in the hospital?
A. That is correct.
Q. How long were you in the hospital, J.D.?
A. Seven days exactly.
Q. Do you remember much about that period of time?
A. Yes.
Q. What else do you recall that went on in those seven days in the hospital concerning your medical care and treatment?
A. Very uncomfortable, I remember walking up and down the hall, I remember my dad giving me baths, I remember Julie slept in the recliner the first night, my dad slept in the recliner the second night, maybe the third, and my brother slept in a recliner or next to me the whole rest of the time.

I remember medical staff coming in, it seemed like, every hour. I mean, a teaching hospital, just like--you get ran through the ringer in that hospital. They're constantly evaluating you, someone's always checking on you, someone's always doing something to you. I just remember there's always someone in there evaluating me, and that's part of the teaching process. I understood that, that you had interns and residents, and things like that, that had--that were doing their work.

There was one day, one morning in particular I remember. I had the stockings on my legs for the blood clotting, and I was told that I had a blood clot on my brain. I remember the day--the morning, 4 o'clock, 4:05, to almost be exact, that the neurosurgeon came in--I can't tell you his name--with part of his team. It must have been his residents and things like that, about four people. He walked into my room, had some papers in his hands, he says, "Mr. Katzenmeier, I have some good news for you today." He says, "That blood clot on your brain, it's going away. We don't have to worry about that any more."

That was a huge relief to me because that was always on my mind, you know? You don't hear good things about blood clots. I insisted I get up out of my bed, and I walked, and I just--it's like I wanted to help my body as much as I could.

I remember itching, scratching all over my body, like there were bugs on me, and that was, from what I understand,

part of the medication that I was on.
Q. Your right arm, hand--
A. I also remember specifically one of the doctors, it must have been under Dr. Bauman's staff, he came in to scope my nose. When he stuck that scope up my nose, I wanted to hit the ceiling, and I told him, and I think my wife told him, and probably firmly, if he understood my nose was shattered, because it felt like he hit every bone when he went up there with that scope.
Q. Your right hand, thumb, you heard Dr. Adams say it was in a splint initially; is that correct?
A. Yes.
Q. Ultimately it was placed in a cast; is that correct?
A. That's correct.
Q. You heard the doctors talk about the follow-up visits you had over a period of time; is that correct?
A. That's correct.
Q. J.D., you left the hospital on October the 9th, 2005. I'm going to kind of jump a little bit ahead and then come back again. When did you go back to work, if you recall, for your employer?
A. I probably couldn't tell you the date. I think I was at home probably around eight or nine weeks. I did--in those eight or nine weeks, I didn't go back to work, but I went out and I visited the plant, you know. I was able to walk. I went out

there and said hi to the guys, and hi to my boss, and I visited a few times. Actually going back to work, where they let me go back to work, I can't tell you the day.

Q. Can you tell me the month?

A. I believe it was in December.

Q. When you went home on the 9th of October to convalesce, tell us what type of physical complaints and problems were you experiencing at that time with your injuries?

A. To be honest with you, they came in and said they were going to release me--they came in on Saturday and told me that I would be released on Sunday, and that made me nervous. I asked them, "Are you sure I'm ready?" And I remember one doctor said, "Yeah, you'll be okay. The longer you stay in this hospital, the more risk you have for infection, so you need to go home, start healing."

I was nervous about leaving on Sunday. It was exactly a week later, from the accident.

Q. But when you got home, can you tell us what type of physical complaints or problems you were having?

A. When I got home my nose is full of cotton, or whatever medical material they used to pack up in your nose, my hand was in a cast, I had to cut all my sweat shirts and stuff that I was wearing so I could get them on. My brother volunteered to stay with me while I was at home to help me out. I was in a lot of pain. I was on pain medication. I had to sleep in a recliner,

a chair. I couldn't lay down and sleep.

My nights and days got turned around for some reason. I'd stay up all night almost, and then want to sleep during the day. I just remember it being miserable.

Q. Where was most of your pain localized or centralized during that period of time, the early recovery period?

A. It moved around. I know up in here, you know, that's where the noticeable pain was (indicating).

Q. In your forehead as you were indicating?

A. Yes. That's--you know, the thumb, it throbbed, my eyes hurt, burned, but as far as everyday pain, waking up with it, all day long, it was always up in my head.

Q. That packing material you told us about that was in your nose, how long did that material remain in your nose?

A. A long time. I can't tell you how long. That was placed in there to--as packing, to keep things in place while the healing process was going on. It all kind of runs together. I got out of the hospital, and it seems like within a couple days I was going back, and it all runs together.

Q. When was--strike that. You began seeing Dr. Goins on a more regular basis after you left the hospital; is that correct?

A. That's correct.

Q. For what type of problem were you seeing Dr. Goins for that time, sir?

A. Well, the injury to the eye--

Q. Which eye?
A. My right eye had a lot of debris and stuff in it. He was treating that. As far as being burned, that had healed while I was in the hospital. The eye healed really fast. There's so many blood vessels to them.
You know, he was--I'm not a doctor, but he was just treating the injury to the eye, and then later on is when he started treating the scar tissue problem that I was incurring.
Q. That's when he testified about what you heard him talk about the other day, about doing the treatment on your eye; correct?
A. Yes.
Q. And that went on until when? When was the last time you saw Dr. Goins?
A. I believe it was January of '07 was the last time I seen him--excuse me, January of '08. Yes, this year. January of '08.
Q. As you convalesced and attempted to heal, you did return back to work, as we know, at some point in time; correct?
A. That's correct. I returned back to work, to what our company called light duty, under doctor's restrictions. The doctor will give you restrictions on what you can and cannot do, how long you can work. It's all spelled out on a doctor's note.
Our policy on that is very strict. It's one of my jobs to--say an employee of mine was to be sick or injured and he was on a doctor's note. It's my responsibility that I make

sure his doctor's note gets to my manager and is reviewed, and then my job is to make sure that that employee follows that doctor's note.

Q. You were followed up by Dr. Bauman for a period of time, and then she left, as we know, to Maryland/Washington, D.C. Who did you follow up with? Anyone from her service after she left?

A. Dr. Lee.

Q. One of her associates?

A. Yes.

Q. And do you have any scheduled appointments with Dr. Lee in the near future?

A. I don't have anything scheduled. What Dr. Lee and I have talked about is the left side of my nose, which took the brunt of the injury, this side of my nose is collapsed, or smaller, the passageway is smaller than my right side, and I may sound nasally when I talk. That's just the way I talk.

Q. Is there some discussion about trying to correct that at a later time?

A. Yes, I discussed that with Dr. Lee, and he told me that--

MR. SINGER: Excuse me, Your Honor. I'm sorry. I have to object. I've been as patient as I can, but what other people tell him is hearsay, what doctors are telling him is hearsay.

THE WITNESS: Okay. That's fine.

THE COURT: Just a minute.

Members of the jury, I will allow the witness to testify. However, you will not consider the testimony you are about to hear for the truth of the matter asserted by Dr. Lee; rather, you may consider it only as it may explain this witness' plans, emotions, and feelings. It's received with that limiting instruction.

MR. SPARKS: Thank you, Your Honor.

BY MR. SPARKS:

Q. J.D., there was some discussion between you and your physician about maybe repairing that at a later time, your nose; is that correct?

A. That's correct.

Q. You have not been back to see Dr. Adams since he released you in January of '06, as he testified?

A. Dr. Adams?

Q. Yes.

A. No.

Q. The last time you saw him was in January of '06, or thereabouts?

A. That's correct.

Q. At what point in time did you realize you could not taste or smell any longer?

A. When I was home from the hospital.

Q. How did you learn about that in terms of your understanding?

A. Well, I think I just had to figure it out. I mean I could

just tell something was different.
Q. Can you taste what we call the soft smell--strike that. Can you smell anything like we call the soft smells, coffee, bread, cookies, cut grass?
A. No.
Q. Have you been able to smell at any time? Has smell ever attempted to come back at any time over the last three years?
A. No.
Q. Tell me about taste. What is your physical sensation concerning taste?
A. Well, when you--I rely a lot on texture. My food now, I'm selective with it. If it--how do I explain this? It needs to be the way it's supposed to be.
Q. What's that mean?
A. Well, if it's supposed to be crunchy, it needs to be crunchy, okay? If it's not prepared right or mushy, it makes me gag. If it's supposed to be juicy, it needs to be juicy. It's a lot of texture now.
Q. But you don't have any sensation of taste?
A. No.
Q. Do you have any sensation besides--if it's not food you're chewing, but in terms of anything you drink?
A. Yes, there's sensation there.
Q. What type of sensation do you have when you drink something?
A. Well, you still get the fizz, or whatever, off pop, you

know? When I buy my orange juice, I buy it with the most pulp in it. You can get that sensation, the thickness, the pulp to it, you still have the sensation.
Q. This inability to taste and smell, how has it affected you personally?
A. It actually makes me very angry.
Q. Have there been any incidents that involve your inability to taste or smell that caused you any additional physical harm or concern?
A. I know of one instance, yes.
Q. And what was that, sir?
A. One night Julie and I were eating out, we was eating in a bar and grill type atmosphere, restaurant. I had ordered the hot roast beef sandwich. I don't remember what she had ordered, probably some type of club sandwich or something. She eats a lot of that. We were just having supper, just talking together, her and I alone, and she reaches over and takes some of my food. And she just takes a little bread and a little gravy and a little meat and eats it and says, "Oh, my God. J.D., that stuff is rancid."
I was just--she called the waitress over there, and, of course, I was about half done eating, and she says, "His meat is rotten." And, of course, they apologized. They gave us a free meal. And she says--
Q. Just a second, J.D. You couldn't taste that meat; is that

correct?
A. That's correct.
Q. You didn't know whether it was good or bad?
A. That's correct.
Q. Is that true with all the food that you eat?
A. That is correct, yes.
Q. Have you had any incidents in your home that's caused any concern in terms of your ability to smell?
A. Well, one.
Q. What was that?
A. I know that I have all gas appliances in my house, and I left the gas on the stove, the valve was cracked open, and my kids hammered me on that a little bit.
Q. Can't smell the natural gas in your house?
A. You can't smell natural gas in its original form.
Q. Right.
A. But in the household form they add odorant to it, which is what the people smell when they have a natural gas leak, that's what they smell. It's not the gas, it's the odorant.
Q. You can't smell the odor in the natural gas, you can't taste your food.

Dr. Bauman talked about the problems in the forehead and what she repaired. Do you have any feeling in your forehead, J.D.?
A. No, not in the front section of it.

Q. How far back does the numbness or lack of feeling go?
A. Probably--well, can I show you, or do I need to tell you?
Q. Sure.
A. Probably right up in here, probably where about my hairline is at (indicating).
Q. You have no feeling or sensation there?
A. I have no feeling or sensation in this part of my forehead, in the front part of my forehead.
Q. Do you have any pain in your forehead, sir?
A. Pain, not on a daily basis. Constantly there's not pain there, no.
Q. Do you have any pain in your nose?
A. Well, my nose is not working properly, you can consider that.
Q. Do you have any sensation of pain there, though, when you breathe in or breathe out, try to blow through your nose?
A. No, not breathing there's no pain.
Q. There's tattooing around your eye from the debris; is that correct?
A. That is correct. Tattooing, that's black powder embedded in my skin that will not come out. It's not going to work it's way to the top, it's not going to fall out. There could be a little fiberglass in there, maybe, maybe a little bit of metal, but it's embedded.
Q. Tell us about your right thumb and hand a little bit.

A. My right thumb and hand?
Q. Yes. Tell us a little bit about it, how it affects you here today.
A. Well, my right thumb, as Dr. Adams testified, I had the tendon severed, the bone broke, and to this day I use my thumb, but my thumb is not like a normal thumb, it's not near as flexible. It's stiff. And I've lost a lot of strength in my thumb.
I'll give you an example. As you've seen on this video that we watched where this lady is running what I call an impact wrench, running these breech plugs in and out, we have those at work, and we use those to take machines apart and disassemble machines, but ours are that size and a lot larger. They can go up to one inch where we work. And there's times when I run those pieces--those tools.
And I know that if I have to grip something and hold it, steady it for an amount of time, I get soreness in my hand, and my hand tingles, like it fell asleep.
Q. Had you had that problem before the accident in October of 2005?
A. No.
Q. I look at your forehead and I see that it is not smooth; is that correct?
A. That is correct.
Q. Can you describe what it--that location is, what you see

when you look in the mirror?
A. Yes, I can describe it. My forehead, right in the center of it, that's where the breech plug hit me. You can look at my pictures, and you can see the threading from the plug, from the breech plug on my skin. So that breech plug hit me about like this angle with the threads on it.
I think whatever happened to make that breech plug go from that gun, two inches, and tumble like this (indicating), hit me in the head, probably saved my life because if it had come straight out, just like that bullet comes straight out--that's what that breech plug becomes, is a bullet.
So I don't know if it shredded across my hand, or my thumb, and then tumbled and hit me in the head, or as it ripped through the back part of the gun, taken out the rear section of the gun, if that's what made it tumble and hit me at that angle.
Whatever happened--maybe it was both. Maybe it was my thumb and the back part of the gun. I think it saved my life.
Q. But it left an intention in your forehead; is that correct?
A. That is correct. It hit and dented it. Some of the things you see, to get back to the original question where Dr. Bauman did an operation--and Dr. Bauman is a great, great doctor, and I just think that the fat that she put up in there, I think after time it just sunk in, or maybe moved around a little bit, and that's what caused it to be uneven and sunken in, and there's a bump there. That's why I think it looks the way it looks.

Q. J.D., I want to cover one other thing before we go on to some other things. You don't appear to be an overly emotional person, but tell me psychologically how this has affected you?
A. Well, first of all, it has affected me.
Q. How has it done it?
A. It's affected my family, it's affected my wife. When I say my family, I'm talking my entire family, not just my immediate family. And you know what? I have a chip on my shoulder. I feel like no one has taken responsibility for this.
Q. Tell me, though, how that affects you in your everyday world, that chip on your shoulder, the problems you have today.
A. Well, I don't like to whine about it, I just feel like, I guess, I'm tired of being accused, I'm tired of being jabbed, I think someone needs to step up to the plate.
Q. Are you mad?
A. Yes, I'm mad.
Q. Have you been mad for a while?
A. Yes, I have been.
Q. Have you been mad since this incident occurred?
A. Yes.
Q. Have you taken that mad out on any members of your work staff or your family?
A. No. I may be more curt with people. I don't ever try to let this accident overflow onto somebody else. I take full responsibility for it.

Q. During the course of the last two or three years, J.D., you've been to multiple doctor visits, you've seen multiple physicians, you even incurred some medical expenses as a result of this, have you not?
A. Yes, I have incurred--yes.
Q. Would you take a moment and turn to the smaller of the notebooks there? And I'll ask you if you would briefly look at tab No. 103. Do you see Exhibit No. 103?
A. Yes, sir.
Q. Does that appear to be a summary of your medical expenses from Boone County, Iowa Methodist, and the University of Iowa Hospitals and Clinics and follow up?
A. Yes, sir.
MR. SPARKS: Your Honor, we would move to introduce the summary, Exhibit No. 103.
MR. SINGER: I think we stipulated to that, Your Honor.
THE COURT: Thank you. 103 is received.
(Plaintiffs' Exhibit 103 was offered and received in evidence.)
MR. SPARKS: Thank you, sir.
Judge, I have a few follow-ups. Is this a good place to take a recess?
THE COURT: It is.
Members of the jury, we'll take our recess at this

time. Court will be in recess for 15 minutes. During the recess, please bear in mind the admonition given previously. We'll see you in 15 minutes.

(Short recess.)

(In open court, in the presence of the jury.)

THE COURT: Mr. Sparks?

MR. SPARKS: Thank you, Your Honor.

BY MR. SPARKS:

Q. J.D., when we were talking about the--awhile ago, you had made a comment that you took full responsibility. Are you taking responsible for this gun blowing up, sir?

A. No, sir.

Q. What did you mean when you used that term, "full responsibility"? What were you thinking and talking about to the jury at that time?

A. Well, you were asking me how it affected my family. About my attitude.

Q. Your responses to them you take responsibility for?

A. That's correct.

Q. You didn't do anything to cause this weapon to malfunction in any form or fashion, did you, sir?

A. No, sir.

Q. Now, we were talking about the problems that you had in terms of taste and smell. I'm going to ask if you would turn to--I think it's the big tabbed book, Tab No. 35. I take it

back. I think it's probably in the small tabbed book. I apologize.

A. Yes.

Q. Do you see those two pages there, sir?

A. Yes.

Q. Have you seen those two pages before?

A. Yes.

Q. And how did you come to obtain those two pages?

A. University of Iowa gave them to me.

Q. Did they give them to you upon discharge?

A. Yes.

Q. And you've had them in your possession and turned them over to us; is that correct?

A. Yes.

Q. They're also a part of your medical records under Bates No. KZ-DAM 369 and 370, but you were specifically given these two pieces of paper upon discharge from the hospital; is that correct?

A. That's correct.

MR. SPARKS: Your Honor, may I move to admit Exhibit 35 and publish it for the jury?

MR. SINGER: May I ask counsel is that the instructions?

MR. SPARKS: Yes.

MR. SINGER: Oh, I have no objection.

THE COURT: 35 is received.

(Plaintiffs' Exhibit 35 was offered and received in evidence.)

BY MR. SPARKS:

Q. As soon as I can get technology to work here--I'm going to have this figured out before I leave here.

J.D., you have that document in front of you, do you not?

A. Yes, I do.

Q. That's the Anosmia safety recommendations that you had before you left the hospital; is that correct?

A. That's correct.

Q. Go through those and read some of those to the ladies and gentlemen of the jury, some of those things you have to undertake as a result of your inability to smell.

A. You have to maintain functioning smoke detectors, change battery every six months; have a buddy system to check for--checking gas appliances for leaks. Gas detectors are available for home use. Call your local gas company for more information.

Routinely inspect odor-prone areas, such as trash cans, cat litter, and baby diapers. Label foods when they are opened. Discard foods that have passed the expiration date. Take care when cooking. Watch food closely to prevent burning. Keep hot pads and other kitchen linens away from burners. Use timer when baking or cooking foods.

Q. These are all things you have to employ now in your household?
A. Yes. I do not have gas detectors in my house. I have smoke detectors, but not gas.
Q. Are there any changes you had to make, aside from what's on this sheet that the doctor's office gave you, sir?
A. I can't think of any at this time.
Q. When we were talking about some of your medical issues a moment ago. I watched--when you got a little emotional on the stand during direct, your face switched up. Was there something else going on beside the emotions that were present at that time?
A. I didn't quite understand your question there.
Q. It was a bad question, too. Let me do it a different way. You told us awhile ago that you were having problems with your nose. What are some of the more specific problems that maybe we didn't get into about your problems with your nose?
A. Well, my left side of my nose is partially blocked, and my right side is a full passageway. It makes me sound nasally. If you want to know what it feels like, it feels like when you have a sinus infection and one side of your nose is blocked with fluid, and the other side is open, and the next day that switches. That's exactly what it feels like to a common person. That's every day, it never goes away.
Q. It makes it difficult for you to get a full breath?

A. Through my nose, yes.
Q. Are you prone now to breathing more through your mouth?
A. Yeah, when you need to. That's habit.
Q. You told us you've worked at Northern Natural Gas for 17 years; is that correct?
A. Yes.
Q. Take a moment and turn and look at tab No. 36 for me, please, sir.
A. Okay.
Q. Can you identify those documents for the ladies and gentlemen of the jury?
A. These are my W-2 statements, 20--
Q. What years do they cover?
A. 2003, 2004, 2005, 2006, and 2007.
Q. Would you, sir, take a moment and look at the wage statement for 2004, and can you tell me, sir, what your gross wages were for that year?
A. $85,579.41.
Q. And can you turn and look at 2005, sir, and tell me, if you can tell me, what your wages were for that year, the year of the accident.
A. $77,968.10.
Q. And can you look and tell me, sir, when looking at the year 2006, what your wages were in that year?
A. $79,934.36.

Q. That was also a part of the year you were off because of the accident; is that correct?
A. That is correct.
Q. And would you look and tell us what you made in 2007?
A. $85,051.06.
Q. And 2005, was there anything which you lost, any time from work other than from the incident that we're here about today, that would have reduced your pay?
A. Repeat that one more time.
Q. Sure. Was there anything that happened in 2005, other than the accident, that you lost time from work for that would have reduced your pay in that year?
A. Not that I recall, no.
Q. Anything in the year 2006?
A. Not that I recall, no.
MR. SPARKS: Your Honor, we'd offer to move Exhibit 36 into evidence.
MR. SINGER: We stipulated to that. No objection.
THE COURT: Thank you. 36 is received.
(Plaintiffs' Exhibit 36 was offered and received in evidence.)
BY MR. SPARKS:
Q. J.D., when was the first time that you saw the remains of your weapon?
MR. SPARKS: May I approach, Your Honor?

THE COURT: You may.
A. It had to be--it was after I was back home from the hospital. Five or six days later after I was home from the hospital. I'm not real sure, but I was home.
BY MR. SPARKS:
Q. Where did you first see the weapon when you got it--or had an opportunity to see it, excuse me?
A. The first time I saw the weapon, we went and picked it up at the sheriff's office.
Q. You say "we went." Who is "we"?
A. My brother and I.
Q. Would that be Travis?
A. Yes, sir.
Q. And is there a tag on that weapon from the police department?
A. Yes.
Q. I said police department. Sheriff's department. Which law enforcement agency did you pick that weapon up from, sir?
A. It was the Boone County Sheriff's Office.
Q. Do you have any idea how that weapon got into the Boone County Sheriff's Department's possession?
A. Not really. I just know it was at the sheriff's office in their possession.
Q. You took possession of it; is that correct?
A. At that time, yes. Travis and I went to the sheriff's

office, and they turned the weapon over to us to take home.
Q. What did you put the weapon in to bring it home in? What did you store it in to bring it home?
A. I don't think we were planning on picking it up. We didn't bring anything to bring it home in. We were just going to look at it. From what I understand, since this wasn't a criminal case, they don't need to hold it. So he just gave it to us. So we probably carried it out in pieces like it is right now.
Q. When you got it home in pieces, did you do anything to that barrel or the breech plug area?
A. No, sir.
Q. Did you attempt to alter it or clean it, or do anything to it to examine the weapon at that time?
A. No. We did nothing with the weapon.
Q. At any time before you gave that gun to Mr. Wise in my office, did you in any form or fashion alter or change the barrel or the breech plug area on that gun?
A. No.
Q. Did you do anything to any of the component pieces on that weapon in terms of changing or altering them in any form or fashion?
A. No. We didn't want anything to do with it.
Q. Where did you store that weapon and its pieces before our office took possession of it?
A. I think they were just put in a box or some type of

container just altogether, put downstairs in my hunting closet.
Q. Okay. You took it out. You didn't take it out and try to run any test or try to analyze what occurred or happened, did you?
A. No.
Q. You have talked, and you have heard throughout this trial almost as much about your injuries as you have heard about proof-testing and proofmarks, as you've sat here in front of the jury, have you not, sir?
A. That is correct.
Q. When you received your Kodiak magnum weapon and you examined it, and once you had your Apollo weapon, had you ever noticed those proofmarks on the guns before?
A. Yes.
Q. And the--if I may, Your Honor?
THE COURT: You may.
BY MR. SPARKS:
Q. The section of the breech plug which has been cut away, which has the serial number on it, I draw your attention to that piece and ask you if you recall seeing that symbol or mark on that barrel before you fired the weapon?
A. Yes.
Q. And have you seen the same or similar mark on the Apollo muzzleloader?
A. Yes.

Q. And did you have an understanding or belief and knowledge of what that mark meant?
A. My belief was it was proofed, it was--
Q. You used the word "proofed." Is that what I understood you to say?
A. Yes, proofed.
Q. What did that mean to you?
A. Somebody somewhere along the line had taken responsibility for that weapon.
Q. Where did you learn or hear about those types of things?
A. Gun knowledge, trademark of the gun, or--
Q. Had you seen that kind of mark or similar marks on other weapons that you'd owned?
A. Yes.
Q. And what type of weapons--other marks had you seen on weapons that you'd owned?
A. Well, they're proofmarks.
Q. What types?
A. What type of weapons?
Q. Yes, sir.
A. Are you asking me what type of weapons do I have?
Q. Yes, sir. You've seen them on other guns. Have you ever seen proofmarks other than these two?
A. Yes.
Q. Those weapons or guns, which ones are they?

A. Remmington has a proofmark; Ruger has a proofmark; Colt has a proofmark.
Q. So this is something you had some knowledge about?
A. Yes.
Q. All right, sir.
MR. SPARKS: Just one moment, Your Honor.
BY MR. SPARKS:
Q. J.D., you told us about those proofmarks, that you'd seen them, that a similar mark was on the Apollo, too; is that correct?
A. That's correct.
Q. You've seen various and sundry pictures of them in the courtroom throughout this trial; is that correct?
A. That's correct.
Q. You said awhile ago that you believed it had been proofed. What did you mean by that? I want to make sure I understood it.
A. Well--
MR. SINGER: Objection. Asked and answered.
THE COURT: Overruled.
A. I can relate to it as--like my job. Whenever we would put piping together, gas pipeline together, you know, there's a document we fill out, and whoever welded that piece of pipe together or made that weld in that area, we call it a welder's mark, and that identifies what welder is responsible for that weld. That's what I relate a proofmark to.

BY MR. SPARKS:
Q. Did you rely upon that proofmark like you would a welder's mark?
A. Sure.
MR. SPARKS: I don't think I have anything else at this time, Your Honor.
THE COURT: Cross-examination?
MR. SINGER: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SINGER:
Q. Mr. Katzenmeier, do you have a copy of your deposition up there?
A. I don't know if I do or not.
MR. SINGER: May I approach, Your Honor?
THE COURT: Certainly.
BY MR. SINGER:
Q. Mr. Katzenmeier, you remember you testified yesterday that you did not reload shotguns, and had not since you were in college?
A. Correct.
Q. And that was when you lived in another state; right?
A. Correct.
Q. Do you remember when I took your deposition in September of 2006?
A. Yes.

Q. And you were under oath, just like you were here today and yesterday?
A. That's correct.
Q. That's a copy of it, the original, as a matter of fact, prepared by the court reporter for the Court.
A. Yes.
Q. Would you please open the deposition and turn to page 22.
A. Okay.
Q. I'm going to read the questions and you read your answers, please, at line 4. "Do you reload your shotguns, rifles, .22s?" What was your answer?
A. "Shotguns."
Q. "How long have you done that?"
A. "Approximately 15 years."
Q. "Do you have a reloading station or a bench you dump the stuff on it?" What was your answer?
A. "No."
Q. "You just get the equipment out and do it when you want to?
A. "I have a shotgun reloader, that's all.
Q. "Do you shoot your shotguns, you and your boy, at skeet or targets, other than pheasant hunting?"
A. "Yes."
Q. Would you please turn to page 35 at line 9. "Where did you keep your shotgun shells?" And your answer?
A. "In the garage."

Q. "How far is that from the basement? Is it a different room, same level?" Your answer?
A. "It's upstairs and outside."
Q. "Question: And where did you keep the equipment you used for reloading your shotgun shells?" And your answer?
A. "Out in the garage."
Q. Please look now at page 40, line 7.
"Question: You said your dad reloads and you reload shotguns. Do the other guys that you mentioned, Ron Hay or Van somebody, Shawn, any of those guys reload?" What was your answer?
A. "No."
Q. You were under oath at the time?
A. Correct.
Q. And you had an opportunity, even 30 days, to read and sign and make any corrections to the deposition; correct?
A. Correct.
Q. And you did not do that, did you?
A. I think I did, yes.
Q. You didn't correct any of these, though, did you?
A. No, I did not.
Q. Okay.
A. Any of these statements we just read, I did not correct.
Q. Let me ask you this: You talked about the other guns you had, the Apollo and the Hawken from CVA. You shot and you

hunted with those guns before this incident, correct, and before you got the Kodiak?
A. Yes.
Q. And as a matter of fact, that Christmas your son shot the CVA and took a deer with it, didn't he?
A. What year would that be?
Q. 2004, when you got the Kodiak.
A. I believe so. That was the year.
Q. And your parents, they have a farm, land you've described earlier that you can go to down in Kansas, and you and your family would go there frequently, three or four times a year; correct?
A. No, it's not correct.
Q. Okay. Would you go there summers with your kids?
A. Where?
Q. To the farm?
A. Whose farm?
Q. To the land in Kansas?
A. Yes.
Q. Okay. And would you fish and shoot guns and do outdoor things?
A. Yes.
Q. And when your kids got old enough, they would do that with you?
A. Correct.

Q. And you turkey hunted there in the spring as well; right?
A. No.
Q. You never turkey hunted in Kansas?
A. I turkey hunted in Kansas, but not on my farm.
Q. And you zeroed some guns when you would have occasion to shoot at the farm in Kansas; correct?
A. Correct.
Q. Now, this TC Black Diamond, Thompson Center Black Diamond you discussed earlier, you only had it a year or so before this accident happened--a year or so before you got this Kodiak? Excuse me.
A. Approximately, yes.
Q. Your dad, how many years had he had it before he loaned it to you?
A. I don't know.
Q. Three? Five?
A. I don't know.
Q. Had you shot it a number of times?
A. Shot what a number of times?
Q. The Black Diamond?
A. Have I shot the Black Diamond a number of times?
Q. Yes.
A. Yes.
Q. Before you got the Kodiak?
A. Yes.

Q. And were you familiar with it, how to use it?
A. I believe I was, yes.
Q. Feel comfortable with it?
A. Yes.
Q. And do you believe that that was the last muzzleloader you fired before you got this Kodiak?
A. I'm not sure.
Q. Now let's talk about when you got the Kodiak. Christmas Day, and you've described that for us, I don't want to go back into it. Almost every muzzleloader, or every muzzleloader comes, essentially, with a ramrod. Would you agree?
A. That's correct.
Q. This particular ramrod on the Kodiak--you've got big hands--it's not the kind you described you would use on a range, is it?
A. You could.
Q. You could?
A. Use it on a range, yes.
Q. It's going to be cumbersome because it only sticks out an inch and a half to two inches from the barrel; right?
A. Right.
Q. You know that because you looked at it that day and put it in the barrel and realized it's not good enough for your hands?
A. That's correct.
Q. So you used your range rod that day, Christmas, to in fact run the patch down it that you told us about, when you ran the

patch down; right?
A. Yes.
Q. Mr. Katzenmeier, isn't it true that that patch was dark, had some stuff on it?
A. The first initial patch I ran through the gun?
Q. Right.
A. The brand new gun?
Q. The gun you took out of the box on Christmas Day, you ran the patch down it. When it came out, it was not white, was it?
A. It was mainly white, yes.
Q. You want to look at page 43 and 44 of your deposition, please? It was a dry patch, too, wasn't it?
A. What page?
Q. 43 and 44.
A. Okay.
Q. 43 at the bottom.
A. 43 at the bottom.
Q. "Question: Did the patch look clean when it came out?" And what was your answer?
A. "It was not white."
Q. "And isn't it true that you think it was a dry patch you put down it?"
A. My answer was "I believe it was a dry patch." As I stated before in my testimony, I may or may not have put butter bore on that patch when I stored that gun.

Q. Now, your testimony is you put it in the closet that day, never took it out again from September (sic) 25th until October 1st of the next year; correct?

A. That is incorrect.

Q. October 1st?

MR. REYNOLDS: December 25th.

BY MR. SINGER:

Q. December 25th, I apologize. Christmas Day of 2004 until the day of the incident--day before the incident, October 1st, that's Saturday, of 2005?

A. I did not put it in a closet.

Q. Okay. I'm sorry. You put it up at your house?

A. To be specific, I put it in my gun cabinet.

Q. Now, do you still have the range rod?

A. Yes, I do.

Q. You went hunting the next day, the day after Christmas, didn't you, 2004, after you got this Kodiak?

A. I don't recall.

Q. Do you recall whether or not you hunted at least ten times after Christmas?

A. I possibly could have.

Q. You want to look at page 53 of your deposition and see if that refreshes your recollection?

A. Okay. I'm there.

Q. Just look at it, pages 52 and 53, and see if that refreshes

your recollection. Do you believe you hunted the day after Christmas with your son when he took a deer, and then hunted at least ten times?

A. Give me a second. If you want me to be familiar with it, I need to read both pages.

Q. Take your time. I just want to see if that refreshes your recollection.

A. Okay. Okay.

Q. Does that refresh your recollection?

A. Yes.

Q. And is that correct, about ten times?

A. Approximately, yes.

Q. You would agree September of '06, more than two years ago, and less than a year after the accident, your memory would be fresher about that Christmas than it is today?

A. Would you repeat that?

Q. Would you generally agree that your memory in September of '06 about how many times you hunted would be clearer than it is this morning?

A. No.

Q. Okay.

A. This statement says "in the woods." You're saying I hunted 15 times. You asked me, "How many times did you go to the woods?" I said, "15." You can go to the woods twice a day, just to make myself clear.

Q. I don't mean to argue with you, Mr. Katzenmeier. The bottom line is, a number of days after Christmas you went outdoors and you took a gun with you and you either hunted or went shooting after Christmas of that year; correct?
A. That is correct.
Q. Thank you. Now, let's come back full circle, then, to October 1st, the day before your incident. As I understand you, you went to the store in Boone and got a scope?
A. Correct.
Q. You had put scopes on guns before, had you not, yourself?
A. Yes.
Q. But this one you asked the store to put on for you?
A. Correct.
Q. And isn't it true that they, for some reason, just could not bore sight that gun that day?
A. Possibly, yes.
Q. Look at page 60, please, line 5, "And did they bore sight the scope?" And what was your answer?
A. "No."
Q. "Why not?"
A. "I don't recall. There was something. I don't know. Didn't have time, or whatever."
Q. Now, you said before you did not take out the breech plug on Christmas Day or any other day, did you?
A. I did not touch the breech plug in that--in this firearm.

Q. Did not alter or change the ramrod that came with it in any way?
A. No, sir.
Q. Didn't alter or change the gun in any way?
A. No, sir.
Q. Now, I want to ask you a couple of questions about the injuries you had sustained, and how you're doing. You would agree that as the doctor testified yesterday, your vision's returned to normal?
A. Yes.
Q. And, in fact, as the doctor said, it had before your deposition in September of '06, less than a year after the accident?
A. I believe that is correct.
Q. You have no hearing aid, and none has been suggested; correct?
A. I have no hearing aid.
Q. You had some hearing loss before this accident, is that correct, in your left ear?
A. Some.
Q. Now, you had also been hit in the head and your ear cut and stitches from a bar fight, is that correct, before this incident?
A. I've had stitches in my ear, not from a bar fight. It was from being hit in a bar.

Q. Okay. Excuse me. That was before this incident; correct?
A. That is correct.
Q. Your fingers and wrist healed with no problem; correct?
A. My wrist, I still have my chiropractor adjust my wrist. My finger, did you ask?
Q. Fingers--
A. Did you ask about a finger?
Q. Finger--
A. Which finger would that be?
Q. Not your thumb. Your fingers and your wrist, other than your thumb?
A. Okay.
Q. That healed with no problem?
A. My index finger is healed, and I still have my wrist adjusted by my chiropractor.
Q. You want to look at page 97? At least as of the time of your deposition, September of '06, your wrist had healed and you had no problem; would you agree with that?
A. What page?
Q. 97, question, line 6, "Did your sprained wrist heal?" And what was your answer at line 7?
A. I said, "Yes."
Q. "Question: Any problems with that now?" Answer?
A. "No."
Q. Let me ask you, did you have any physical therapy outside of

physical therapy for your thumb?
A. Actually going to a physical therapy clinic, no.
Q. Did a doctor write you a prescription to go to a physical therapy clinic for it?
A. No.
Q. You can shoot like you did before; correct?
A. That's a broad statement, but, yes.
Q. And you do shoot now?
A. I do.
Q. And continue, bows and guns?
A. Yes.
Q. As a matter of fact, within about six or eight months after the accident, you got out your bow and you started practicing on it to get ready for the elk hunt you were going to go on in the summer of 2006 over in Colorado?
A. Possibly, yes.
Q. You went on an elk hunt with your father and brother in the summer of 2006; is that correct?
A. I would say that's correct, yes.
Q. That's an annual thing you all try to do?
A. That's correct.
Q. And you would have practiced and gotten your bow ready and gotten where you could, as you say, ethically hit what you shoot at and what you aim at before you went?
A. That is correct, yes.

Q. And you were able to do that; correct?
A. That is correct.
Q. Now, you got a hunting license in '06; correct?
A. In what state?
Q. Any state.
A. Yes.
Q. Okay. By the spring of 2006 you returned to competitive softball?
A. Yes.
Q. Played for two different railroad teams, a co-ed team and a regular team; right?
A. Yes.
Q. Played outfield before and outfield after?
A. Yes.
Q. And that summer after the incident, you hit just as many home runs as you did the year before?
A. I can't answer that.
Q. But approximately? You didn't see a decrease in your home runs, did you?
A. Well, we don't keep stats. So I can't answer that correctly.
Q. You want to look at page 113 and see if that refreshes your recollection--
A. 113?
Q. --of what you told me in 2006?

A. Played for the railroad team. Okay.
Q. I apologize. I asked you how many home runs you got. You told me you got six that summer?
A. That is correct. It says nothing about the year before, and I said "six, maybe." Like I said, we don't keep stats on our softball team.
Q. Now, you belonged to the Y when this happened; correct?
A. I believe so.
Q. But then in about January you joined another fitness club?
A. Yes, I believe so.
Q. Work out with weights at the time?
A. Would you repeat that?
Q. You started working out with weights, or began working out with weights at the new facility?
A. Began when?
Q. After you joined the facility in about January of 2006?
A. I would exercise, and that included working with weights, weight machines, and weights, treadmills.
Q. Running, doing cardio?
A. Correct.
Q. Swimming?
A. No, they don't have a swimming pool.
Q. Have you been doing any swimming as a part of your fitness activity since the incident?
A. Since the incident?

Q. Yeah.
A. I've been swimming. I'm not sure if it's for cardio reasons.
Q. Now, a couple of weeks after this incident happened, your brother-in-law got married down in Arizona; right?
A. That's correct.
Q. In October of 2005?
A. I believe that's when he was married, yes.
Q. And you all flew down there; right?
A. Yes.
Q. Was the packing still in your nose at that time, or had it been taken out?
A. I believe the packing had been removed.
Q. And, of course, you checked, and the doctor said no problem for you to fly; right?
A. That's correct.
MR. SINGER: Your Honor, may I approach?
THE COURT: You may.
BY MR. SINGER:
Q. I'll show you what's marked as Defendants' XX, which is a photograph that was produced to us by the attorneys in the case, Bates No. Katzenmeier 0010. Do you recognize that?
A. I believe so.
Q. And there's some other pictures of it here and in Exhibit 8, if you want to check them, but those are all on the same page.

Do you recognize that is the--excuse me. Turn to tab 8, please, if you would, in the notebook. There's some photographs at tab 8 we've already agreed to, and would you--they're already in evidence. Would you just look at those first few pages? Now, let me stop you as you're turning. The first few pages you just turned to, those are pictures that you took of the gun, or parts of the subject gun; would that be fair?
A. Yes.
Q. And the other pictures immediately after that, they've already been discussed by Mr. Roane as--you can turn the page--that one, and then turn the page again--
A. Yes.
Q. --and those, do you--were you there when Mr. Roane took those pictures?
A. No, I was not.
Q. Look at the next pictures after Mr. Roane's, after--keep turning?
A. 105, or--
Q. Okay. Those five pictures, do you recognize those, as well as Exhibit XX, as photographs taken by Mr. Wise?
A. I'm not sure I've seen these before. I really don't know them. I mean, I know what it is, but--
Q. Is the back of XX and--excuse me. XX that you have in front of you that I marked with a blue tag and those in your book, those are all your gun; right?

A. Those are all my what?
Q. Those are all that Katzenmeier gun that we're here about; right?
A. Yes, it looks like it is.
Q. Thank you. Now, you mentioned a moment ago that you had talked to the doctor, the ENT doctor, I think it's Lee, about maybe something with your--with the left side of your nose. Do you understand that's a deviated septum?
A. I believe so. I'm not sure of the medical term.
Q. And he told you back in 2006 "If you want to get that corrected, we can correct it," right?
A. He did tell me that.
Q. And you've not had that done yet, have you?
A. I have not had that done yet. He left that in my ball field to proceed with, when I was ready.
Q. Now, you had prescription antibiotics; correct?
A. Do I have prescription antibiotics?
Q. I'm sorry. Poorly phrased question. At the time you were in the hospital and discharged, they gave you prescription antibiotics?
A. I don't recall. I was on medicine and pain pills.
Q. You had to be off all your medicine before you could go back to work; right?
A. The medicine that would make you drowsy, yes. I had to be off certain types of medicine.

Q. Okay. And you were?
A. And I was what?
Q. You were off all those before you went back to work, any pain medication that would make you drowsy?
A. I can't tell you for sure. My company wouldn't let me go back to work depending on which medicine I was on.
Q. Were you wearing shooting glasses when it happened?
A. I was not.
Q. Any form of eye protection?
A. No.
Q. Ear protection?
A. No.
Q. Did your dad teach you about that when he taught you to shoot a muzzleloader?
A. He recommended it.
Q. Now, by the spring of 2006, this gun obviously was inoperable; correct?
A. That's correct.
Q. So you got a new gun, muzzleloader?
A. That is correct.
Q. A Thompson Center. What kind?
A. I believe it was 2006, the spring. It was a Thompson Center Encore.
Q. Did you shoot that that spring and summer?
A. I don't believe so, not the spring or summer.

Q. Did you put a scope on that one yourself?
A. I don't recall.
Q. You do recall that you did take it to the store to have it bore sighted, don't you?
A. Yes, I did.
Q. You mentioned earlier that you shoot skeet, or did when you were younger?
A. Years ago.
Q. Okay. If you and I showed up at a skeet range, I got out of my vehicle, and you got out of your vehicle, I went to my vehicle and I pulled out a soft gun case and unzipped it, and I handed you a closed over-an-under shotgun and handed it to you and said, "I want you to shoot this for the day," what would be the first thing you would do?
A. I would think--I would think that would be odd.
Q. I didn't ask you what you would think. What would be the first thing you would do before you carried that gun into the skeet range?
A. The first thing I would do if you handed me your gun, an over-and-under shotgun, I would break it open and see if it was loaded.
Q. Isn't it true when you bought that Thompson Encore you just described, before you fired it, you took that breech plug out, didn't you?
A. I don't recall.

Q. Look at page 129 of your deposition.
A. Okay.
Q. Page 129, "Did you remove the breech plug before you fired it?" And your answer at line 20?
A. "Yes, I did."
MR. SINGER: Thank you. Pass the witness.

REDIRECT EXAMINATION

BY MR. SPARKS:
Q. Mr. Katzenmeier, is there some particular reason you took that breech plug out of that Thompson centerfire and looked at it the first time?
A. You're absolutely right there's a reason I did that.
Q. What was that reason, sir?
A. To inspect the threads of that breech plug of that firearm.
Q. You'd already had one incident where a breech plug wasn't properly threaded in the firearm, hadn't you?
A. That's correct.
Q. You wanted to make sure the second time that problem didn't happen again; is that correct, sir?
A. That is correct.
Q. All right. Mr. Singer wanted to talk to you about your deposition. Let's just cover a couple of quick things about that deposition. When was the last time you reloaded shotgun shells, as I recall from your previous testimony?
A. It's been years ago.

Q. Did Mr. Singer ask you that question in your deposition at page 22, page 35, or page 40?
A. I don't know.
Q. Look at page 22, and look at that page and take a moment and see if the question that was posed by counsel had anything to do with when the last time you loaded a shotgun shell was.
A. No, it does not.
Q. It says "How long have you done that." And you said, "Approximately 15 years." Does it say when the last time you loaded a shotgun shell was?
A. No, it does not.
Q. So did Mr. Singer mischaracterize or take out of context your testimony?
A. Yes.
Q. All right, sir. Now, let's talk about the clean patch. You said it wasn't white awhile ago when you were refreshed with your deposition; is that correct?
A. Correct.
Q. What color was it when you ran the clean patch through at Blake's residence the morning the weapon exploded?
A. White.
Q. Were you comfortable it was white enough to fire the weapon?
A. Yes, I was comfortable it was white, and that tells you that you're clean.
Q. Now, when he asked you about the inability to bore sight

your weapon, you also went into saying in your answer because you didn't think he had time. Didn't indicate that there was something wrong with the ability to bore sight in your answer, did you, sir?

A. I think I explained before, the bore sighting process, it can shorten the time frame it takes to sight in a rifle. You can do it or--you can or cannot do it, it really doesn't matter. It's just the first shot you take may be three feet off, it may take several shots to get it closer to the bull's-eye. If you bore sight it, it may save you that time to get to the bull's-eye.

Q. My point, though, mechanically, that day you went to Lindy's, there wasn't some reason why it couldn't be bore sighted by your answer, is there, sir? In fact, it says, "I don't know. I was out of time"?

A. There's no reason.

Q. When he handed you photograph Exhibit XX a while ago, you were not present when that photograph was taken, were you, sir?

A. No, I was not.

Q. You don't know what the time frame is of when that photograph was taken, do you, sir?

A. No.

Q. The only photographs you have any knowledge of are the ones you made mention of, is the early part of Exhibit No. 8; is that correct?

A. Which ones was that?
Q. You weren't there when Mr. Roane took pictures?
A. No.
Q. All right. Now, you, after this incident, didn't stay home and wring your hands and cry. You tried to continue on with your life and continue your activities, did you not?
A. That's my character.
Q. You've been faced with certain difficulties, but you continued on; is that correct?
A. Correct.
Q. And let me ask you, sir, Mr. Singer asked you about glasses and hearing protection. The manual--I'm sure he's going to ask you, or make some reference to it later in his case--says that you should wear glasses. Did you find any glasses in that box when you opened it up on Christmas Day?
A. No.
Q. Did you find any hearing protection when you opened it up on Christmas Day?
A. No.
Q. And I misspoke. Christmas Eve. I apologize.
When you looked in that box, you found pieces to take it apart with?
A. Correct.
Q. You found literature to sell bullets with it?
A. Correct.

Q. But you didn't find any other safety apparatus they put in that box; is that correct?
A. Correct.
MR. SPARKS: Thank you, sir.
I have nothing else, Your Honor.
THE COURT: Anything further?
MR. SINGER: No.
THE COURT: You may step down, sir. Thank you. You may step down, sir.
(Witness excused.)
THE COURT: You may call your next witness.
MR. EATON: Your Honor, at this time the plaintiff would offer some medical evidence identified as Exhibit 32 in the exhibit book. That would be the medical records from Boone County Hospital.
MR. REYNOLDS: Your Honor, we object based on hearsay.
MR. EATON: Your Honor, we think it's an exception to the hearsay rule, Rule 803(6), business records.
THE COURT: Are you objecting to lack of foundation?
MR. REYNOLDS: No. Substantive; hearsay.
THE COURT: If there's anything in the content--is there anything in the content that you think would be inappropriate and not a medical record?
MR. REYNOLDS: Well, I mean, they would contain opinions and conclusions of doctors and whatnot that are not

currently before the Court.

THE COURT: Is there anything in there that would not be characteristic of a medical record?

MR. REYNOLDS: No.

THE COURT: The objection is overruled.

(Plaintiffs' Exhibit 32 was offered and received in evidence.)

MR. EATON: And, Your Honor, we would offer Plaintiffs' Exhibit No. 33. That's the medical records from Methodist Iowa Medical Center in Des Moines.

(Plaintiffs' Exhibit 33 was offered in evidence.)

MR. REYNOLDS: Same objections for the same reasons, Your Honor.

MR. EATON: Same response, Judge, 803(6).

THE COURT: I have a matter concerning this exhibit. I'll bring it up with counsel later. I'll reserve ruling as it relates to 33.

MR. EATON: And Exhibit 34, Your Honor, those are the medical records from Iowa Medical Center. We'd offer that under the same business records exception.

(Plaintiffs' Exhibit 34 was offered in evidence.)

MR. REYNOLDS: I think those are from Iowa City, Your Honor. Those would be cumulative of the testimony of Dr. Adams,

Dr. Bauman, and Dr. Goins. So in addition to the prior objections that we would incorporate with the Court's permission, we would add that those records are cumulative and put undue weight on testimony that's already in the record.

THE COURT: I'm going to also reserve ruling on 34.

MR. EATON: Your Honor, Plaintiff rests.

THE COURT: Okay. Members of the jury, this is a time when the Court has to go over certain matters with counsel prior to the case going forward. I think the most productive use of your time would be for you to adjourn at this time to return at 1 o'clock this afternoon while I do some work with the lawyers before we go further.

Now, during the noon hour, please bear in mind the admonition given previously. We'll see you at 1 o'clock this afternoon.

(In open court, out of the presence of the jury.)

THE COURT: Counsel, my concerns with--32 is fairly straightforward, medical records, short, we didn't hear anybody from Boone, so that's fine.

The problem I have with 33 and 34, particularly 34, which is about 500 pages of material, according to the numbering, it contains a lot of handwritten notes, a lot of things that are illegible, that would require some explanation to understand. I'm sure it probably, to some extent, repeats testimony that we've heard. It's just a mass of medical

documents, many, many of which are not decipherable.

Now, I do think you ought to be able to get into the record and I would allow--I see the bills, the medical bills are the first few pages of both, and those are fine. But why do you--why do we need to invite the jury to sort through 500 pages of raw medical records? Again, many of the content of which is quite difficult to, A, read; and, B, if you can read it, to understand it without some explanation?

MR. EATON: There may be some of it that a juror won't understand because it's intended to be read by other medical providers while they coordinate their care. As Your Honor is well aware, with the problems we had of bringing doctors to the courthouse or even taking their depositions, we could have subpoenaed every doctor who was named in there, we could have taken video depositions or even oral depositions without video of every single doctor in there to explain every entry, but it was tedious enough as it was.

For example, Mr. Katzenmeier mentioned a neurosurgeon that was mentioned in the records and consulted, but really didn't provide any treatment other than the diagnosis and the watchful waiting until the blood clot had been taken care of with the medications.

Yes, it's cumulative to a limited extent, but it's a more comprehensive compilation of all of his medical treatment, all of his medical diagnostic tests, and that sort of thing. It

would simply be impossible to bring every person into the courtroom who had made an entry in those medical records. That's the purpose of the business records rule, exception to the hearsay rule, 803(6). There's no objection to authentication, there's no objection to relevancy. The only objection is it may be somewhat cumulative, and part of the records may be unable to be deciphered.

I think the probative value of this exhibit overall far outweighs those objections, particularly since there's no objection to authenticity and there's no objection to relevancy. The only objections go to the weight of this evidence, not its admissibility. So we think medical records are certainly relevant in this case. They tell more of the story, the rest of the story, and it would simply be impractical and an imposition on the jury's time and the Court's time, and an undue burden on the plaintiff, to bring every one of these doctors in here, and every one of these nurses, and every one of these technicians to explain each and every entry. That's why we have the business records rule, and that's why we again reoffer, I think, 33 and 34, Your Honor.

THE COURT: Is there any particular content in either of these exhibits that you think would be inappropriate as a medical record, or be unduly prejudicial?

MR. REYNOLDS: No.

THE COURT: Well, I really don't know what the jury's

going to do with most of this, but as there's no worry, apparently, about the content, I'll go ahead and receive them.

(Plaintiffs' Exhibits 33 and 34 were received in evidence.)

MR. EATON: Thank you.

THE COURT: It's unusual in our local practice to get these into the record.

MR. EATON: Next time I try a case up here, I'll try to remember that.

THE COURT: Motions?

MR. REYNOLDS: Yes, Your Honor. At this time at the close of Plaintiffs' case, the defendants, both BPI and Dikar, would move under Rule 50 of the Federal Rules of Civil Procedure, for judgment as a matter of law. We have several grounds.

First of all, our first ground, we believe the design defect claim should be dismissed. We've had off-the-record discussions, I believe, with the Court and opposing counsel about this at a prior point in time. As this Court knows, a design defect claim in Iowa is governed by the Restatement Third of Torts, more specifically, Section 2B, as in baker. And under that, the plaintiff, for a prima facie case, must show two primary elements: No. 1, a reasonable alternative design. Some people call that a RAD; and, secondly, that the product is not reasonably safe without that reasonable alternative design. In

this record there is no proof of any reasonable alternative design.

We are aware of the argument that Plaintiffs have, that Dikar--for example, one of their assertions is that Dikar had a poorly designed, if you will, quality control process. But as a practical matter, we believe that that simply means that a defectively manufactured product gets through the system and is sold to a consumer. But legally that's functionally the same as a manufacturing defect and is not really a design defect within the context of Section 2B of the Restatement Third of Torts. That's our first ground.

Our second ground, Your Honor, we move for judgment in the defendants' favor as a matter of law is on the loss of spousal consortium claim, the claim of Julie Katzenmeier. There's no evidence on that claim in this record. Therefore, that claim should be dismissed.

Our third ground, Your Honor, on behalf of Defendant BPI, BPI moves for judgment of dismissal in its favor on the manufacturing and design defect claims, to the extent there is any design defect claim in this case.

The record in this case establishes that BPI did not design, manufacture, or assemble this particular product. Under Iowa Code Section 613.18 there is legal immunity for a distributor or a wholesaler of a product who is not involved in the design, manufacture, or assembly of his product so long as

the Court has jurisdiction over the manufacturer. And that certainly is the case in this situation as Dikar, the actual designer, manufacturer, and assembler of the product, this Court does have jurisdiction over Dikar. Dikar is present in this courtroom. Dikar has not been judicially declared insolvent. That's the other aspect of 613.18.

We believe there's no evidence in this record to support a separate duty on the part of BPI based on negligence; therefore, all design and manufacturing defect claims in this case should be dismissed against BPI, Inc.

The fourth ground of our motion, both Defendants move to dismiss the failure to test, or failure to inspect claims as neither one of those claims have an independent basis of liability under Iowa law. As we understand it, the plaintiff has asserted or alleged that both Dikar and BPI failed to test, or failed to inspect the gun. The practical effect of a failure to test or a failure to inspect is that, again, manufacturing defect, or so-called gets-through, is not detected, and is sold to the consuming public.

Again, as a practical matter, these claims are functionally the same and are identical with the manufacturing defect claim which is governed by Section 2A--A as in Alpha--in the Restatement Third of Torts. We don't think they're entitled to two or three bites of the apple. They're only entitled to one bite of the apple, and that is a single manufacturing defect

claim under Iowa law. So, therefore, the failure to test, failure to detect claim should be dismissed.

Our fifth ground, Your Honor, Plaintiffs have alleged both against Dikar and BPI failure to warn or instruct. We think these claims should be dismissed. There's no evidence in this record of any failure to warn or instruct that would have been causative of this particular accident. As the Court knows under Iowa law, failure to warn or instruct is, again, governed by the Restatement of Third Torts, Section 2C--C as in charlie. And under 2C, plaintiffs must show that the product lacked a reasonable or adequate warning or instruction which in turn rendered the product not reasonably safe.

No expert has addressed failure to warn or instruct, and we believe in the context of this products case, the issues involved would be beyond that of an ordinary layperson juror; and since there's a lack of evidence, those claims should be dismissed.

Our sixth ground, Your Honor, is that claims of intentional or fraudulent misrepresentation against both BPI and Dikar should be dismissed. First of all, as we understand it, the plaintiffs have pled this claim. Secondly, we would note there is such a thing as the tort of negligent misrepresentation in Iowa, but that would not apply here because those types of claims only apply to defendants that are in the business of providing advise or information, and that's not the case here.

The elements of intentional fraud under Iowa are a representation, it has to be material, a falsity, reliance, scienter, causation, and damages. And, furthermore, the tort must be proven by clear and convincing evidence.

The record here is that this gun was purchased as a Christmas gift for the plaintiff by his father. And factually in this case it pertains somewhat to the proofmarks on the barrel. But there's no testimony or record in this case of reliance on either Mr. Ronald Katzenmeier's part, the purchaser of the rifle, or for that matter, Plaintiff, Mr. J.D. Katzenmeier's part, that he relied to any extent whatsoever on the proofmarks on the barrel.

The testimony from Mr. Katzenmeier this morning was simply that he thought the proofmarks identified the fabricator of the barrel or the maker of the gun. He said Colt has proofmarks, Remmington has proofmarks. There's no testimony from J.D. Katzenmeier, the plaintiff, that he believed, that he looked at those proofmarks and thought that meant to him the gun had actually been fired before he fired it on the date of the incident.

Furthermore, there's no evidence of scienter on either Dikar's or BPI's part, and no evidence of knowledge of falsity.

And I believe that concludes our record--with the Court's permission, would the Court permit Mr. Singer to supplement with one other point?

THE COURT: He may.

Mr. Singer?

MR. SINGER: Thank you, Your Honor. I appreciate that. Independently, and to the extent that Plaintiffs have claimed it and argued it, I believe, in opening, specifically, to kind of piggyback on what Mr. Reynolds said, in the event all claims aren't dismissed, with respect to the manufacturing part of it, and the allegation that the gun should have been proof-fired, or that there was some defect in it as a result of it not being proof-fired, first of all, there's no evidence in the record of a standard by which the jury could judge the conduct of the defendants by any plaintiffs' witness or expert that the--that there's a standard to proof-fire muzzleloaders. In fact, the evidence is that there's no muzzleloader manufacturer which does proof-fire its muzzleloaders.

Second, there's no evidence of a government standard here or there in Spain, and there's no evidence of an industry standard here or there to proof-fire. And, in fact, the testimony is that there in fact is not one. So how could a jury claim to find a defect or a manufacturing defect, failure to do something, that the industry does not do, nor does it require?

Independently, even if there could be some kind of an argument, there's no evidence in this record as to what the test would consist, it should be done in this fashion, and it should be done in this way, and it must be done at this kind of

pressure for this kind of gun. The only testimony from some of the people is, "We think it ought to be overpressure tested."

But critically, there is actually zero testimony as to what that test would be and how it would be. And the testimony, in fact, is there is no such test nor such procedure. In addition to that, there is no testimony at which this gun allegedly failed. If they could arguably create some implied issue that a proof-test would be at X amount of pressure, the evidence from the witnesses of the plaintiffs is they don't know what pressure this failed at.

Therefore, there is no causal link between the failure to proof-fire this gun and the alleged incident because there's no link between the fact that it could have been caught if there was a defect there. It's particularly true when the plaintiffs' own experts admit that proof-fired guns do fail.

So based upon all those, we would also echo and move on that additional ground.

THE COURT: Thank you.

Mr. Eaton or Mr. Sparks?

MR. EATON: Yes, Judge. First of all, I'm trying to get these points down number by number, but I think I may have missed one, so I may jump around.

Your Honor, with regard, first of all, to the consortium claim, Plaintiff acknowledges there's been no evidence been presented as to that, and so I'll make no further

comment.

With regard to design defect, I think the plaintiff has really not presented any evidence that's in accord with Iowa law as to that specifically defined cause of action, basis of a claim. And, again, I'll make no further comment on that other than to say we believe that quality control, defects in quality control, deficiencies in quality control can be interpreted in some context as part of the design of a product.

But we believe the evidence--we've been allowed to present evidence of that particular defect, and under the rubric of manufacturing defect, it's essentially going to go to the jury anyway. So we're not going to split hairs about that, other than to just state that we think that certain states acknowledge that, and I'm not so sure about Iowa. I've read the law and read the law and read the law, and I'm not so sure. But we believe the evidence was presented under the cause--pardon me--the manufacturing defect theory, and it can be adequately covered by the Iowa Uniform Jury Instructions.

With regard to the manufacturing defect, Your Honor, the plaintiff submits that substantial evidence to support that theory or that claim has been presented. We've presented a Ph.D. metallurgist or materials scientist who's testified to that fact. We've presented a Ph.D. mechanical engineer with special expertise in metallurgy to support that defect, as well as causation. And then Mr. Roane, who has degrees in science--a

bachelor of science in engineering and administration. Those three experts in particular we would tender--the testimony of those three experts we would tender as substantially supporting the theory of manufacturing defect and the causation.

Your Honor, with regard to--I guess it was the theory or the motion for judgment on the evidence with regard to whether or not BPI could be held liable for a manufacturing defect or not, and what the Iowa law is that gives immunity to retailers and certain wholesalers. We think under the evidence of this case that the plaintiff has met the burden of proof to submit the liability of BPI as a distributor, wholesaler, retailer to the jury on manufacturing defect. And the evidence that I would specifically point to is the evidence that Dikar owns all of the stock, Dikar acquired BPI sometime before this gun was manufactured. I believe Mr. Muniategui's testimony was that it was acquired in 2000 or 2001, Dikar acquired all of the stock of BPI.

Other witnesses testified that this particular model of gun was in development in 2001 and '2 and came on the market in 2004, which was certainly during the time that Dikar owned all of the stock in BPI.

There was also testimony--I believe it came from Mr. Muniategui and Mr. Belategi, or at least one of them, that BPI participated in the design phase--design and development phase of the Kodiak gun. In fact, I believe it was Mr. Belategi

who testified that final approval for the design of this gun before it was put in production was--included Mr. McGarity, who is the president or the chief operating officer of BPI, and Mr. Mark Hendricks, who is a technical person at BPI.

Additional evidence that would support that unity of interests between BPI and Dikar would be the fact that BPI is Dikar's only supplier--pardon me. Dikar is BPI's only supplier of muzzleloader firearms at the time this gun was made, and at the time this incident occurred. And Dikar's only customer for its muzzleloader products is BPI.

Furthermore, Mr. Muniategui testified that BPI provided all of the content for the user's manual, and that BPI provided the additional information--informational material for the PowerBelt bullets. And that material I believe is Exhibit 5 or 6, specifically describes the loads that are allowed, permitted, and approved to be fired through this gun.

More specifically, the content of the PowerBelt bullet literature and the content of the user's manual, which I think it's undisputed that that informational material was provided by BPI to Dikar, and then it was printed in Spain and put in the boxes bound for the United States, that literature and that user's manual specifically sets forth the projectile size that are allowed, and it sets forth the charge that is allowed. And more specifically, it says that it's a magnum gun, up to 150 grains, which is three pellets.

That literature also describes the 295-grain PowerBelt bullet, which is not only permitted, but it's promoted by Dikar. And then the execution of putting that in the box is carried out--pardon me--by BPI. And the execution of that is carried out by Dikar.

So we think the evidence of these two companies is so unified that we're not talking about the classic manufacturer bright line distinction wholesaler/retailer type situation that is contemplated by Iowa law for this limited immunity. In this case there is no bright line distinction between these two entities. These two entities operate in collaboration and coordination from the get-go to the end of the line, which is the retailing of this product.

I think that particular statute provides protection to retailers and wholesalers that one would think of as a Wal-Mart, that receives goods from any number of manufacturers, and really does not promote or advertise or participate in any way in the design or manufacture, or even the marketing of those products other than to put them on the shelf. Those kinds of retailers and wholesalers who basically are pass-through entities, where the goods of a manufacturer are passed through that entity without any participation in the design, the manufacturing, the marketing, and distribution, that's what's contemplated under Iowa law.

And so we think under a couple of Iowa decisions that

relate to apparent manufacture, I think is the name of the theory, distinguish this factual situation in this case from what was intended by--what was expressed by the Iowa statute.

I think Your Honor's got the idea of the point that I'm trying to make so I'll move on. I guess it's called the apparent manufacturer doctrine.

I've got two more points I want to touch, Judge. I believe it was--point six was the next one Mr. Reynolds raised, about the intentional--the claim based on intentional or fraudulent misrepresentation.

THE COURT: If I could, there was one before that. They are asserting, since there is a manufacturing defect that is alleged, that the Court should not also submit negligence, the negligence being, as I understand your theory, in the forming of the threads, and the forming of the opening which allegedly left it bell-mouthed, and in the testing, and in the quality control procedures.

And I guess my question for you is, are you asking the Court to submit a negligence theory on those lines in addition to strict liability manufacturing defect, which requires only the finding of a defect--a different condition that was not planned?

MR. EATON: The plaintiff is not requesting an instruction on that, Judge. We've presented the evidence, and it's well within the theory of product liability, or product

defect, and that's really a simpler issue for the jury to address.

THE COURT: All right.

MR. EATON: Then we get to the intentional fraudulent misrepresentation, the proofmark issue. We think there's been ample--

THE COURT: There was even one more before that.

MR. EATON: Okay.

THE COURT: Are you asking the Court to submit failure to warn? And, specifically, what are the warnings you claim should have been given?

MR. EATON: Failure to warn, I think we are requesting that specific instruction based on the proofmark issue. It's almost--yes, it's failure to warn that this gun's not been proof-tested, but that includes an affirmative representation that it has been proofed.

THE COURT: Specifically what warning or instruction should they have given concerning proofmarks?

MR. EATON: Well, an instruction and admonition that this gun has not been proofed. I believe there was evidence that the failure to proof this gun was not rational or reasonable; a reasonably prudent manufacturer of a firearm like this would proof this gun. There was no economically feasible reasons not to proof this gun. I know that's a disputed issue, but I think there's evidence here to support that contention.

Instead of just--I guess--if there had not been a proofmark, we probably would have presented some evidence that there should be a warning, that it should have been proof-tested, or an admonition that it had not been proof-tested. But what we've actually got is a communication by way of a proofmark that it has been proof-tested. So I think the failure to warn is included in the affirmative representation that it was proof-tested.

Need us to make any more remarks on that, Judge?

THE COURT: No.

MR. EATON: If you're ready for me to move on, so am I. The next item is intentional or fraudulent misrepresentation of a proofmark. Again, not to beat that horse any more, Mr. Katzenmeier--I think the one and only element that might be somewhat--or might have been somewhat in question there would have been the element of reliance. And I think that element was presented through Mr. Katzenmeier's testimony to the effect that he knew what proofmarks were, he recognized these marks on this gun, as well as the other CVA products, and several other manufacturers' marks, that this gun had been proofed, and that he had relied on that at least in part. Part of his reason for assuming that gun was safe, or concluding that that gun was safe was the proofmark.

There wasn't a whole lot of testimony on that, but it could only come from Mr. J.D. Katzenmeier, the plaintiff, and we

believe that factual burden has been met.

That brings me to the proof-fire test that Mr. Singer mentioned, that--I'm not sure what his theory is, but we think evidence has been submitted that the failure to proof-test or proof-fire this gun was not reasonable, it was not rational. Yes, it's true that there is no government standard. Yes, it's true that there may not be an industry standard that is specific as to a particular pressure or a particular combination of load, that is propellant and projectile combination, because--one reason why industry standards sometimes don't get established in certain specialized fields is because there are too many variables to establish a standard. What would be a good proof-test may well vary between the designs of the guns.

If you design a gun--a muzzleloader for lower pressures, then what's required as an adequate proof-test for it would be a smaller projectile or a lesser propellant, or a combination of the two, as opposed to what we see in this case, a magnum muzzleloader that's promoted as being able to assume higher pressures, and you would have to have a proof load or a proof charge of a bigger projectile, or more propellant, or some combination of the two.

So I think it has to be viewed in an individual context as to whether the failure to proof-fire under an appropriate charge or load for a given firearm, whether or not that's appropriate.

There has been testimony by Mr. Roane, by Dr. Bruchey that proof-firing is well established and well known in the industry. Manufacturers, like Remmington--and the defendants, for instance, have listed Mr. Hutton as a witness in this case. I don't know if he's going to show up, but if he does, one of the things Mr. Hutton is surely going to be questioned about is his deposition testimony; that he knows, as a 25-year employee of Remmington, what proof-testing is, and that Remmington proof-tested 100 percent of their guns, and that Remmington put their own proofmark on all of their guns. And he's going to testify that they had different proof-tests for different guns, and he's going to recognize an exhibit that we have listed in our exhibit book, I believe it's Exhibit 60 or 90, it's an excerpt from a July 1960--or October 1960 article in the National Rifle Magazine about proofmarks that Mr. Hutton acknowledged that's reliable and authoritative.

So while that evidence is not before the Court, it's certainly going to be commented upon if Mr. Hutton comes and testifies. And if we want to put it before the Court, we offer that exhibit which we just haven't laid a foundation for at this time in further support of our assertion that there has been sufficient evidence to establish that the failure to proof-fire is a failure in the manufacture of the gun, and, in fact, it's the last step of the gun.

Your Honor may recall I asked Mr. Belategi, and he

acknowledged that that company does no proof--pardon me--no pressure testing of any kind with that gun during the manufacturing process. They don't use any kind of pneumatic or compressed air pressure test, they don't use any kind of hydraulic or fluid-type pressure test, and they surely don't proof-fire the production guns, except randomly as they trot them over to the proofhouse.

So the expert witnesses have commented on that particular failure as part of the manufacturing process, and we think the failure there goes right back up to--the failure to proof-test goes right back up to the manufacturing defect.

With that, unless Your Honor has some questions, I'm done.

THE COURT: Thank you.

Counsel, let me just go through these one at a time. First, the Rule 50 motions to dismiss the design defect claim and the loss of consortium claim of Mrs. Katzenmeier are granted for the reasons indicated on the record. I don't think those are really resisted; and, of course, with regard to the design, there is no evidence of a reasonable alternative design which would permit submission of that.

On the manufacturing defect claims, specifically BPI's motion, this isn't a case under Section 613.18(1)(a) which immunity from suit would apply because this suit is not based exclusively on strict liability and tort or breech of an implied

warranty. So I don't think that particular paragraph applies. Rather, it's the second paragraph, so paragraph (b), which has to do with no liability for damages, at least where the manufacturer is subject to jurisdiction in the course of this state--which Dikar is, they're here, and has not been declared insolvent, and there's no dispute they've not been declared judicially insolvent.

If BPI is a designer in any significant sense of the firearm, the statute does not apply, in my judgment. And, of course, there can be more than one designer. The evidence on that is not particularly strong, but there was evidence that the design was approved by BPI. Of course, it is true, also, that the product literature apparently was provided by BPI to Dikar. That's an issue which, if it goes forward, I'll probably, as you're going to see when you get the instructions, will be submitting to the jury, asking the jury questions whether or not BPI is a designer.

The apparent manufacturer issue is also, I think, unless there's some case law I have not seen, is one that the Court has some question about at this point. The Iowa Supreme Court in some earlier cases adopted Restatement Second of Torts, Section 400, which incorporates the apparent manufacturer rule, which basically is if you buy a product, and it looks like, in this case, CVA manufactured the rifle, and you wouldn't know that it was actually manufactured by somebody else, in other

words, CVA holds this product out as its own and implies and indicates that it's manufacturing this product in its literature, they would be held at that time liable as if manufacturing.

The apparent authority rule has been carried over into Section 14 of the New Restatement Third. I think Iowa would follow that rule, as far as it goes. But the real question is if BPI is not a designer, so that Section 613.18 would otherwise apply, does 613.18 adjust the responsibilities between a distributor, which BPI is, and a manufacturer in a way so that it essentially trumps the common law rule in the Restatement? I cannot see that the Iowa Supreme Court has dealt with that issue yet, and this situation is a different one because of the close connection between the distributor and the manufacturer.

For these reasons I am not going to exercise--I am going to exercise my discretion at this point not to grant the Rule 50 motion as it relates to BPI, but I told counsel the issues as I see them.

I do think it's the case, and counsel correct me if I'm wrong, as we've been sitting up here, I've looked through the CVA product literature to the extent I can find it in all these exhibits, and I don't see Dikar ever being mentioned. And any consumer going out to buy this rifle would think CVA is the manufacturer. So I do not see any dispute that the apparent manufacturer rule could apply if it is not trumped by the

statute 613.18.

Another problem with 613.18 is that strict liability and product liability law in Iowa has moved beyond that statute, so there isn't a neat fit anymore. I guess what I'm saying is it's boggy, there's legal issues here, and my inclination here is to submit it so we don't have to retry something again, but there are legitimate issues raised on both sides as it relates here. I'm not going to dismiss that one.

Failure to warn--and the warning would be an admonition that the gun had not been proof-fired. I'm not going to dismiss it now. If I submit it, it would really be sort of a fairness thing because it's gotten so much attention. But I have to say on the issue of reliance, which you do have to have in failure to warn cases, that it's not, it's not particularly strong, but I'm not going to grant that yet. But that would be the only warning that would be possibly present, as I see it.

On the claims of fraud, I'm also not going to grant the Rule 50 motion at this time, but, Mr. Eaton, I'm frank to say, in Iowa, fraud requires a higher standard of proof, it must be by clear, satisfactory, and convincing evidence. And basically what you're doing is you're taking that knight's head and three balls on the barrel of the gun and turning that into a representation, and trying to build knowledge and intent to deceive and all those things on top of it, and I don't see that it gets there.

This isn't an area where, frankly, the Court can go ahead and submit fraud and sort it out later, because fraud really reflects the entire submission. And if the Court erroneously submits fraud, for example, then comparative fault would not apply, but the instructions are changed. So if the Court erroneously submits it, and should the plaintiff receive a verdict, and the Court's inclination that the evidence is insufficient is correct, the result would have to be a retrial. So this is an area where the judge would have to make that judgment. I'm not making it yet, but this isn't fraud under Iowa law, and I just want to be frank with you.

Also, reliance particularly is weak on fraud because of the higher burden of proof. So you will not see that in the draft instructions that you'll be getting at the end of the day. I'm not going to rule, I don't like to foreclose things until I absolutely have to, so I'm not going to grant the Rule 50 motion at this time as it appears in the motion right now.

I understand all the points Mr. Singer made as it links to really there is no custom and practice other than, I suppose affirmatively for them, the custom and practice they would argue is not to proofmark muzzleloaders, there is no government standard in this country, there is no industry standard, and all those things.

Actually, most of those arguments go to negligence, were the Court going to submit negligence, because custom and

practice and industry standard go primarily to negligence. So I think negligence is not in the case, I think that essentially takes those issues out.

I do think they're appropriate and all right, I can't wall them off from the case, they're okay to argue because regardless of whether or not standards apply, the lack of proof-testing arguably from the plaintiffs' standpoint is some explanation as to, if their evidence is believed, the firearm got the plaintiff in the condition that he's in. So it's still fair game, I think, to argue to the jury under the manufacturing defect claim.

I want to let you know what I'm thinking. The long and the short of it is I am granting the Rule 50 motion for design defect, consortium claim. I have some issues about BPI and manufacturing defect, I'm not granting that motion at this time. I will probably submit it and have the jury determine whether or not BPI was a designer, which may resolve that issue one way or the other.

Failure to warn, got some issues, I may submit it. Probably will not submit misrepresentation, but at this time I am not formally entering any Rule 50 dismissal other than on the two claims I mentioned, design defect and loss of consortium.

That's my ruling on these issues at this time, and I'll see you in about 35 minutes or so.

(Recess at 12:25 p.m., until 1:05 p.m.)

AFTERNOON SESSION (1:05 p.m.)

(In open court, in the presence of the jury.)

THE COURT: Mr. Singer or Mr. Reynolds, you may call your first witness.

MR. SINGER: Your Honor, we would call Dudley McGarity.

THE COURT: Come forward, please, sir.

THE CLERK: Please raise your right hand.

DUDLEY McGARITY, DEFENDANTS' WITNESS, SWORN

THE CLERK: You may take the stand.

MR. SINGER: Your Honor, we do also move formally to have admitted XX, which was identified in Plaintiffs' case-in-chief. It's not on the pretrial. It's one of those photographs from Plaintiffs' book. I don't think there's objection.

MR. EATON: Plaintiff does not object.

THE COURT: Thank you. XX is received.

(Defendants' Exhibit XX was offered and received in evidence.)

DIRECT EXAMINATION

BY MR. SINGER:

Q. Dudley, how are you employed?

A. I'm currently the CEO of Blackpowder Products, Incorporated.

Q. Briefly, please, describe your company's business.

A. Well, we make several types of hunting products, the

largest--
Q. Do you make them?
A. Well, we don't make them, we sell them.
Q. Okay.
A. We actually don't make anything. We source these products from different places. Of course, as you heard, your muzzleloading guns come from Dikar. Those we sell under the CVA brand. We also sell a line of scope mounts by the name of DuraSight. We sell hunting accessories, such as rifle slings, and things of that nature, under the brand name of Quake. We sell muzzleloading projectiles under the brand name of PowerBelt.
Q. You used to have also Winchester?
A. Also at one time we marketed Winchester muzzleloaders, which was a licensed brand that we licensed from the Browning Corporation which owns the Winchester brand name.
Q. How long has BPI had the CVA brand that you just mentioned?
A. Well, since 1999.
Q. When was--was CVA--before that was CVA a company?
A. Yes. Before 1999 it was Connecticut Valley Arms, Incorporated.
Q. When was that formed?
A. 1971.
Q. And did BPI in 1999 buy the rights to the trade name and the little logo and that brand?

A. Yes, they did.
Q. Now, when did you get in the hunting and muzzleloading business?
A. I first started with BPI in 1995--I'm sorry--with CVA in 1995, which then became BPI in 1999.
Q. So in 19--you were with CVA as an employee in 1995?
A. That's correct, starting in 1995.
Q. Okay. And then in 1999 BPI bought that brand from CVA?
A. That is correct.
Q. Did that company still continue, but just not in that brand--in that name?
A. Did CVA still continue?
Q. CVA, Connecticut Valley Arms, under a different name?
A. No. No.
Q. That corporation no longer exists?
A. Correct.
Q. In any name?
A. Correct.
Q. Do you think perhaps it continued as DC 1980?
A. I believe there was sort of a transition period there where it did have that title, yes.
Q. Anyway, as far as you know, beginning in 1999 did BPI have the right to sell the CVA brand of product?
A. Yes, they did.
Q. And did you begin with BPI in 1999?

A. Officially, yes.
Q. Have you ever heard, either during your time at BPI or at CVA, Inc., before this case, of a Mr. Bruchey?
A. No.
Q. Now, are you familiar with the falling-block design?
A. Yes, I am.
Q. And how about--how did you first come to be familiar with that design?
A. Well, the design was introduced onto the market--well, it's been in existence for ages in cartridge guns, mostly black powder cartridge guns which were first introduced, I would say, back in the 1880s. Then the same type technology was sort of borrowed and applied to muzzleloaders I'd say in about 200--2000, 2001. So we saw that in the marketplace and we decided we needed to, perhaps, have a gun that had that type of action.
Q. Okay. Did you in fact sell that gun under different brands?
A. Yes, we did.
Q. What were the models and brands?
A. It would have been the Winchester Apex was the first gun we sold that had that action design, and then the CVA Kodiak and CVA Kodiak Pro.
Q. And for purposes of what we're here about today, they have the same breech plug?
A. Yes, they do.

Q. Same barrel/breech plug adjoining configuration?
A. Yes.
Q. The break-action design, are you familiar with that as well?
A. Yes, I am.
Q. Describe that, please.
A. A break-action gun works similar to what you may have seen in a double-barrel side-by-side or over/under shotgun, where you push a lever or a button and the breech of the gun actually folds open.
Q. And did--was that developed, a product like that from Dikar, developed about the same time as the falling block was developed?
A. At the same time, I believe, but not really by Dikar. There was another company that actually developed the design of the Winchester Apex.
Q. I'm talking about the falling block--
A. I'm sorry.
Q. --the break-action?
A. Only the break-action?
Q. Yes.
A. Yes, the break-action was developed by Dikar at about the same time as--about that same time, 2000--let's see--2002 I believe is when the project started.
Q. Okay. What models, if any, break-actions did BPI have?
A. We sold the Optima, was the first gun that we introduced in

break-action, and then the deluxe model of that was the Optima Pro. And then later we introduced the Wolf.
Q. They have interchangeable breech plugs with the falling block Apex and Kodiak?
A. Yes, they do.
Q. Are their barrels the same? They're the same barrel configuration, everything the same?
A. Yes, they are.
Q. It's just the action and what it looks like?
A. Correct.
Q. Now, we've heard talk about a magnum. Are each of those magnum?
A. They are all magnum-capable guns.
Q. What exactly is a magnum-capable gun?
A. A magnum-capable gun is a gun that is strong enough to shoot what is considered a magnum charge. And a magnum charge could be anything that's greater than what the standard charge would be, and the standard charge is generally accepted to be 100 grains. So a 110-grain load would be a magnum charge, just as a 150-grain load would, but the 150 grain would be the maximum magnum charge.
MR. SINGER: May I approach, Your Honor?
THE COURT: You may.
BY MR. SINGER:
Q. I'm going to hand you Exhibit 7, which is a CVA box

previously in evidence, Plaintiff's Exhibit 7, and Plaintiffs' Exhibit 72, previously in evidence, a 2004 Kodiak. Do you recognize those?
A. Yes, I do.
Q. And is that one of the model guns you have?
A. Yes, it is.
Q. Would you take it out of the box, please.
Now, let me ask you a question. Is that different from the Apollo and the Thompson Black Diamond that Mr. Katzenmeier was describing earlier that he had?
MR. EATON: Let me object to the form of the question as compound, Judge, comparing two guns.
THE COURT: Why don't you rephrase it.
BY MR. SINGER:
Q. Is that different from the Apollo?
A. Yes, it is.
Q. Is it different from the Black Diamond?
A. Yes, it is.
Q. Is the Black Diamond and Apollo similar?
A. Yes, they are.
Q. Describe the differences, if you would, between the Kodiak and Diamond?
A. The Kodiak is what's called a pivot-action or falling-block style action, which means the action opens like this, giving access to the breech plug area, which would be right in here.

So for either removal of the breech plug or capping the gun, you would access it at this point.

The gun is fired by a hammer mechanism right here, which is essentially spring-loaded, which will come down on the firing pin, and then the firing pin would strike the primer which would create the spark which would ignite the charge.

On the Apollo style gun and Black Diamond style gun, those are what we would call conventional in-lines, meaning they were the first in-line design that developed, which first started back in the early 1990s, at least the more modern in-line design.

Those had a receiver area, and there would be a plunger that was in there that was spring-loaded. You would essentially cock the gun back like this, and the breech plug was actually located up in an area closer to this position. The cap or primer would be put in at an angle into the breech plug.

When the safety was taken off and the trigger pulled, the plunger would go forward, and the plunger would actually hit the primer, which would create the spark that would ignite the charge inside the barrel. (Indicating throughout.)

Q. Could you shoot the same load, magnum load that you could shoot in a Kodiak, could you shoot that in an Apollo?

A. The Apollo was not a magnum-rated gun. So a maximum charge for a .50 caliber would be, generally speaking, 100 grains, though it's not required 100 grains be shot. Someone might

shoot a 70-, 80-, 90-grain charge. It's up to their discretion.
Q. You're familiar with Black Diamond?
A. Yes.
Q. Could you shoot a magnum charge in the Black Diamond?
A. My understanding is that it was magnum rated. I've heard Mr. Katzenmeier's testimony yesterday, and from what I know from reading Thompson Center literature, it is indeed magnum rated. However, I want to make sure I'm clear. Mr. Katzenmeier certainly made no mistake by only loading 100 grains. You do not have to load a magnum charge into a magnum-rated gun. And in fact, with the 22-inch barrel, that was probably the best load for him to load because it would most likely--from my experience would have been the most accurate charge to shoot out of that gun.
Q. So the Black Diamond had a 22, 22 1/2 inch barrel?
A. 22 1/2--yes, 22 1/2.
Q. What's the Kodiak?
A. Twenty-six.
Q. And what was the Apollo?
A. Twenty-four.
Q. Point that gun at me and pull the trigger.
A. Excuse me?
Q. Will you point the gun at me and pull the trigger?
A. No, I can't do that.
Q. And why not?

A. Because the gun could be loaded.
Q. It's been through security, it's been in the federal courthouse. That's not good enough assurance for you?
A. Not good enough.
Q. How do you determine that gun's not loaded?
A. The way I would determine it right now would be to remove the breech plug.
Q. Can you do that? Is it hard to do?
A. No, it's not difficult.
Q. Show us how you do that, please.
A. This is the tool that would come with the gun. And it will engage the back of the breech plug, and it screws out just like this.
Q. All right. Now you know it's unloaded?
A. The gun's unloaded.
Q. That's the breech plug?
A. Correct.
Q. Do you have a breech plug that's clean, that doesn't have any of the--
A. This one is fairly clean.
Q. That one doesn't have any anti-seize or--
A. There's just a little bit down in the threads, but that's all. It's not enough to get your hands dirty.

MR. SINGER: I'm going to mark that as an exhibit in a moment. It's previously been agreed to as an A exhibit. We

wanted to clean the stuff off of it.

BY MR. SINGER:

Q. If somebody hands you a shotgun--you heard me ask Mr. Katzenmeier that question--hands you a shotgun, double barrel or an over-and-under--you bear hunt?

A. Yes.

Q. Someone hands you that shotgun and it's closed, what's the first thing you do?

A. First thing always to be done is to make sure the gun is unloaded.

Q. How do you do that?

A. You would open the breech, look down the bore of the barrel, and if you can see all the way through the bore of the barrel, then it's unloaded.

Q. There's no obstruction; right?

A. Correct.

Q. How about a pump shotgun, how would you do that?

A. With a pump shotgun, a pump shotgun works with a slide mechanism that would be located in this area, and there would be a little release lever behind the trigger. You would press that. These are centerfire guns, these shotguns that shoot a cartridge. The cartridge--or in the case of a shotgun, it's a shotgun shell--it already has shot and everything in the cartridge along with the primer. That's put in the gun. It's nothing like a muzzleloader.

With that type of gun you press the release button, the slide would come down, it would open a chamber. You can look into that chamber and see if there was a shotgun shell in the bore of the barrel. (Indicating throughout.)

Q. How about a bolt-action rifle? These are centerfire?

A. Centerfire, yeah. With a centerfire bolt-action rifle, it would have what is called a bolt on the side of the gun. What that is, it's a mechanism where you grab onto a handle. That handle will rotate up to approximately a 90-degree angle, which allows the bolt of the gun, which contains the firing mechanism, to slide back. There's another release mechanism there that allows the bolt to be taken completely out of the gun, and then you can see right down into the chamber of the barrel and you could tell whether or not there was a cartridge in the chamber of the gun.

Q. Who does BPI sell to, and how do you sell your products?

A. We sell to most--I would say that really all major sporting good stores that deal in guns buy from us, that I'm aware of. That would be stores like Bass Pro, Cabela's, Dick's Sports, Scheel's Sporting Goods. Wal-Mart is one of--it is our biggest customer. And those accounts we sell directly to. And then we have quite a few very large distributors, which are sort of the middlemen that would sell to the smaller stores, like maybe your local sporting goods store that is not affiliated with any of these big chains.

Q. Does BPI keep records of serial numbers of muzzleloaders?
A. We don't keep any complete records. We have some records where a warranty card is returned, and it has a place on there to ask for the serial number, but that would be the only record we would have.
Q. Would BPI, when you sell it to a distributor or to a retailer, have any record of the serial number of that gun?
A. No, we do not.
Q. And why is that?
A. Well, black powder guns, or muzzleloaders, are not classified by the U.S. Bureau of Alcohol, Tobacco & Firearms as firearms. They're all considered to be what's called an antique design firearm. So, therefore, there are no record-keeping requirements like there are with a centerfire handgun or rifle, where the serial number is tracked to the purchaser, and records might be kept of who that gun might be sold to.
Q. Are there differences in how a person can sell one of those? Do you need a federal firearms license to sell a muzzleloader?
A. No. With a centerfire gun a dealer has to have a federal firearms licensed dealer, which means that they have met the requirements to keep all the records associated with the serial numbers on a firearm or centerfire firearm.
Muzzleloader guns, or black powder guns, because they're classified as antique weapons, if you will, they require none of that paperwork. So they can be sold by an archery store

that maybe sells no other guns, they can be sold by a hardware store, they could be sold, really, by any retailer that chose to sell them. The very unique thing is they could be sold through the mail. So that's why you see a lot of our guns, and our competitors' guns, in mail-order catalogs such as Bass Pro and Cabela's.

Q. You make the distinction of centerfire--just explain to the jury the centerfire as compared to muzzleloaders.

A. A centerfire, or a cartridge shell, as I explained before, is a gun where you would load a cartridge in the chamber. The powder is inside a brass cartridge, the bullet is mounted on top of that brass cartridge, and the primer is in back. So, in essence, the load is prepackaged for the consumer for ease of use. So this type gun there is no building the charge in the barrel as is required with a muzzleloader where you have to put the propellant down the barrel, push the projectile down the barrel, and place the primer back in this area (indicating).

The reason they're called "centerfire" goes back a ways. It's because the firing pin strikes the cartridge in the center of the cartridge where the primer's located.

Q. Is there any way for BPI to trace who it first sold the Katzenmeier gun, that we'll hear about, to?

A. No, there's not--no such records are present.

Q. Are there any records you're aware of that anybody keeps on whether that entity sold it to somebody else before it got to

the end place?
A. No, there's not.
Q. Is there any records you're aware of that reflect in any way when Ace got it, or who they got it from?
A. No.
Q. How about are you aware of any records that would reflect, since there aren't any record-keeping requirements, whether Ace sold it to somebody and took it back or took it in trade?
A. We would have no knowledge of that.
Q. What countries do you sell in?
A. Mostly--there may be the slight exception, I would say really all of our business is done in the United States and Canada.
Q. Can you sell elsewhere?
A. Yes, we could.
Q. And why don't you?
A. Well, the market is in the United States and Canada. Here in North America we have special seasons for using a muzzleloader gun. So there might be an archery season, then a muzzleloader season, and then a modern centerfire season. These muzzleloading seasons are also often called primitive weapon season. You can use a sidelock-style muzzleloader, what was earlier described as a Davy Crockett/Daniel Boone style, or in most states you could use one of these more modern looking in-line rifles.
MR. SINGER: May I approach, Your Honor?

THE COURT: You may.

BY MR. SINGER:

Q. Let me show you Exhibit E. This is a plaintiffs' exhibit, this is the defendants' copy. I think it's an A exhibit. Do you recognize that?

A. Yes, I do.

Q. Are there safety instructions contained--you sat here and heard Mr. Katzenmeier testify; correct?

A. Yes.

Q. Are there safety instructions contained in that manual for the use of this, use and safe use of this gun that were not followed by Mr. Katzenmeier?

A. Yes, there are.

Q. Let's talk about them. What was the first one?

A. The first one is verify that the gun is unloaded.

Q. Okay. And as you've heard, he never took the breech plug out; right?

A. That's right.

Q. Is there an instruction to take the breech plug out before shooting it?

A. Yes, there is.

Q. How about on the box, is there anything even on the box, Exhibit 7, right there (indicating)?

A. On the inside of the box right here it says, "Warning"--

Q. Excuse me. It says in bold black---what's it say? Read it

to us.
A. First it says, "Please read. Warning. Breech plug threads must be fully coated with breech plug grease or anti-seize compound prior to shooting. When reinstalling, do not overtighten or use excessive force. Failure to follow these instructions may result in the breech plug being difficult or impossible to remove."
Q. There's no way a person could follow that instruction if they didn't take the breech plug out.
MR. EATON: Objection, Your Honor. Offering a conclusion.
THE COURT: I'll sustain it as a conclusion.
BY MR. SINGER:
Q. Could a person follow that instruction if they did not take the breech plug out?
A. No.
Q. Were there other instructions that were not followed by Mr. Katzenmeier?
A. Yes.
Q. And what was that?
A. It states in the manual, No. 4 in the "Getting Started" section--
MR. EATON: Pardon me. Could the witness tell us what page in the manual? It's not displayed.
THE WITNESS: Page 2. Page 2, Section B, "Getting

Started."
BY MR. SINGER:
Q. What is 1?
A. No. 1 is "Safety first. Verify gun is unloaded."
Q. And what is 4?
A. Four is, "Remove breech plug using provided tools. Apply CVA breech plug nipple grease or high temperature anti-seize compound to breech plug threads."
Q. Are those kinds of instructions repeated throughout different parts of that manual?
A. Yes, they are.
Q. You heard Mr. Katzenmeier say he did not fire a cap through it.
A. Yes, I did.
Q. What is a cap?
A. What's referred to as the cap, it can be called the "cap," or it can be called the "primer." The word "cap" comes from percussion cap, which was used on more traditionally styled guns. Today what's called a 209 shotgun shell primer, which is the same type of primer used in a shotgun shell, is used in the gun. It's a more reliable ignition source than the older-style percussion cap.
Q. And this is the kind of cap that someone would have who is a reloader of shotgun shells?
A. That is correct, sure, or a muzzleloader shooter.

Q. Right. It's a proper thing to use--
A. Yes.
Q. --on this gun, and actually the preferred thing to use?
A. Yes, it's the preferred ignition source.
Q. Is firing a cap down it, in the gun, supposed to be done when the gun is empty?
A. Yes. Before loading the charge, it's recommended that a cap be fired through the gun.
Q. Just one?
A. Several.
Q. And that's not a dry fire, is it?
A. No, it's not a dry fire. A dry fire would be if the gun was cocked, and the trigger pulled, and the hammer--and the firing pin fell on an empty primer capper. That is not recommended, as stated, because it would cause the firing pin to go too far forward, which could damage the springs within the firing mechanism.
Q. If you put a cap on it--
A. If you put a cap on it, it stops the spring so there is no damage as there would be with a dry fire.
Q. And if you had put a percussion--if a person put a percussion cap on it, and it was loaded and they didn't know it and they pulled the trigger, what would happen?
A. The gun would fire.
Q. Now, Mr. Eaton said in opening statement that the Dikar

factory is not a modern muzzleloading factory. Have you been there?
A. Certainly.
Q. Have you been to other factories?
A. Yes, I have.
Q. Have you been to the Dikar facility when other people have been there with you?
A. Yes.
Q. Tell the jury some of the people that you've taken that have been to other factories, now, that you took and you were with when they went to the Dikar factory?
A. Well, executives from both Bass Pro Shop, Cabela's, and one of our major distributors have visited the factory.
Q. Has Browning been there?
A. Yes.
Q. Based upon what you know, and what you experienced, is this a modern facility?
A. It's the most modern muzzleloading manufacturing plant in the world.
Q. Do you have--has BPI prepared videotapes--television shows, actually?
A. Yes.
Q. With television personalities, an actual 30-minute television show shown on network channels that show the factory?
A. Well, we've done it in the form of television shows and

informational video, factory tour video.
Q. What channel does that run on?
A. Let's see. The Outdoor Channel and Versus Network are the ones I know for sure.
Q. Has any competitor of yours ever shown their manufacturing facilities on the television?
A. No competitor of ours that I know of, no muzzleloading company that I'm aware of.
Q. Do you advertise that, it's the most modern in the world?
A. We've said that in various writings, yes.
Q. Has any competitor ever challenged you on that?
A. No, they have not.
Q. Now, your company's name is on this gun, its brand; right?
A. Correct.
Q. The plaintiffs are suing your company contending that you somehow did not appropriately test before this gun was sold; do you understand that?
A. Yes.
Q. Describe to this jury what BPI does to satisfy itself that the guns BPI sells have integrity and are appropriate to sell?
A. Well, all of us at BPI are shooters and hunters, and we use the products that we make. In fact, we use them exclusively whenever we're hunting big game. So all of us shoot these guns on a regular basis. We have customer shoots where we take our buyers and executives from the retailers that sell our products

out to test-fire our guns. We take outdoor writers on hunts or to shooting sessions to let them fire the guns and experience the quality of the gun and the accuracy of the gun so that they will in turn write about it in the articles they publish.

Our families use them. We--I mean, this is more than just a business to us. It's our hobby. It's a sport that we love. We're in this business because we love the sport.

Q. Now, does BPI--you heard Mr. Belategi testify that they sent some preseries manufactured guns from the assembly line, but before the plant had started production, for BPI to test.

A. Yes.

Q. What about BPI do--I'm talking about the falling block, Kodiak Apex line--what did BPI do?

A. When we received the prototype, the first thing we do is take the gun out to shoot it because we want to see how it performs, we want to see how accurate it is, we want to see how easy or difficult to load it might be. We want to clean it. We want to do everything with it that an end-user would do just to make sure it's the kind of product we want to put on the market and sell.

Q. Do you shoot it a bunch of times, take it apart, put it back together, and see if it holds the target?

A. Yes.

Q. Different things like that?

A. Yes.

Q. Repetitive shooting?
A. Yes.
Q. Magnum loads?
A. Magnum load, many, many different types of loads. We might shoot magnum loads, we might shoot standard loads, we might shoot something in between, something like 130-, 120-grain charge. We'll experiment with many different types of loads to see what type of performance we get with each load.
Q. How many different times have you personally, you, Dudley McGarity, taken one of these guns we're talking about, Apex, Kodiak, Optima, a Wolf, out of the box new, as it's received in the United States, taken it out of the box, put a magnum charge in it, and as far as you know, you're the first person to ever shoot that gun?
A. I'm sure it would be thousands--over a thousand times. Perhaps thousands.
Q. And how about watching other people do it?
A. Yes, I've watched many other people do the same.
Q. Every time when you take those out of the box new, do you always take the breech plug out of it?
A. Yes.
Q. Before you load it?
A. Yes.
Q. Has the a Kodiak won any awards?
A. Yes, it has.

Q. What?
A. When the gun was introduced in 2004, it won several awards for new muzzleloader introductions. *Shooting Illustrated* gave it its Golden Bull's-Eye award. Outdoor Life gave it, I believe it's called, the Best of the Best award; and *Field & Stream* magazine gave it an award titled Editor's Choice. I think that's correct. I can't say for sure, I might have some of those mixed up. I think that's correct.
Q. Mr. McGarity, you describe it's your hobby, you describe you hunt with it, you go on shoots with it, you shoot it for business. Do you shoot it at picnics, company picnics?
A. Sure. When we have our company picnic, we always take that opportunity to let everybody in the company shoot the guns and experience the product that they deal with, everybody from the front office to the loading dock.
Q. Have you ever put a scope on a gun?
A. Yes.
Q. We've heard about bore sighting. What is bore sighting?
A. The term "bore sighting," as the name implies, comes from sighting down the bore. And so, as defined, bore sighting would be looking down the bore of the rifle and seeing where your eye met the target as you look down the bore, and then adjusting sights, be they open sights, or telescopic scope sights, to where they match the point that you see through the bore.
Q. With a Kodiak type of muzzleloader, or falling block, where

the action drops down below, can you bore sight a gun with a breech plug in it?
A. Yes, you can, because there's a hole that goes through the breech plug. You can actually see through that hole if you don't have 50-year-old eyes, perhaps. So, perhaps, a person with good eyes could see through that hole and see the target.
MR. SINGER: May I approach, Your Honor?
THE COURT: You may.
MR. SINGER: I just want to get the breech plug.
BY MR. SINGER:
Q. This breech plug you have, I'm sticking Exhibit I on it, is that the breech plug for these model guns that we're talking about?
A. Yes, it is.
Q. Now, you indicated that you can ship one of these in the mail, mail them, ship them, Fed Ex them?
A. Sure. They can be sold to the consumer through the mail.
Q. Do customers send guns back to BPI to be worked on, and so forth?
A. Yes, on occasion.
Q. Have you at BPI ever got a gun in the mail--well, first of all, let me ask you this: Is there any restriction for sending a gun in the mail?
A. Well, yes, there are restrictions with a centerfire gun. It can't be sold through the mail. If a consumer wanted to return

it to the factory to be repaired, they could indeed ship that gun through the mail, or UPS.

With a muzzleloader, the same would be true about returning it for repair, but also it could be sold through the mail. One thing that's consistent with both of them is that it be required that it be unloaded, which makes sense, before they be shipped.

Q. Is it a felony to ship a gun that is loaded?

A. That's my understanding, it's a felony to ship a loaded gun.

Q. Has BPI ever got guns in their warranty department that are loaded?

A. Many times.

Q. How often?

A. In the busy part of the season, as often as one or two a week.

Q. How--has BPI ever gotten them from customers that really ought to know better?

A. Well, every customer should know better.

Q. Let me ask you how--have you ever gotten them from retailers?

A. We've actually received them from retailers.

Q. Name some you received loaded guns from.

A. Wal-Mart, and I think Bass Pro Shops--

Q. Now--

A. --among others.

Q. --let me ask you about your own hunting and shooting experience. Tell the jury a little bit about your background in this area.
A. Well, I started hunting when I was very young with my father, similar to what Mr. Katzenmeier described, and going along on hunts at first, and then when I was old enough, actually being allowed to shoot. It's been a part of my life ever since.
So I would say the first time I ever fired a gun in a hunting situation would have been when I was seven or eight years old, and it's been a passion of mine ever since, and something that I've pursued with a passion.
Q. How many different kinds of guns do you own? Forget the ones in the warehouse at BPI.
A. Okay. I don't actually own those, but personally I own several handguns--gee, probably four or five centerfire--well, probably three or four centerfire rifles, and maybe eight to ten centerfire shotguns.
Q. Have you ever paid--
A. Plus muzzleloaders.
Q. Have you ever paid attention to what markings are on the outside of a gun before you loaded it and shot it?
A. I wouldn't say I ever paid attention to it before I got into the business. I mean, certainly I look at the brand name, or what the twist rate might be, or what the recommended--the

length of the chamber is, because that's very important when you're loading shotguns, in particular, that you don't load a shotgun shell that's too long for the chamber into a gun designed for a shorter shell.
Q. How about the other marks, manufacturing marks, the marks we've been talking about, we've talked about today?
A. Certainly I've seen marks before on various guns. I can't say that before I was in this business that I specifically noted what they were or what they meant, but I had seen them.
Q. What is your understanding, given your years of experience, and your years in this industry, and your working in the industry, of what a mark means on a gun as has been discussed in this case here?
A. What's called a proofmark?
Q. Yes.
A. I consider it an assurance of strength that the manufacturer is giving on that particular gun.
Q. Is it in your mind an assurance that that gun can fire?
A. No, it's not.
Q. Are you aware of muzzleloader manufacturers that do not proof-fire guns?
A. Yes.
Q. Can you name some?
A. Actually I don't know of any that do.
Q. Does Thompson Center proof-fire all their guns?

A. It's my understanding they do not.
Q. Does Knight?
A. It's my understanding they do not.
Q. Those are the biggest--big competitors?
A. Well, historically both Knight and TC have been big competitors. Thompson Center would be what I would classify as our number one competitor today.
Q. How about Traditions? Do they proof-fire their guns?
A. It's my understanding they do not.
Q. Where are they made?
A. They're made in Bilbao, Spain, which is essentially about--I guess it's probably 50 miles from where our factory is in Bergara.
Q. Do they have the same marks on them, knight's head and three balls that the Dikar guns have on them?
A. Yes, they do.
Q. Have you ever hesitated to put one of these guns to your shoulder to fire out of the box?
A. Well, not after I've checked it and gone through all the proper procedures I have not, no.
Q. In other words, opening the gun out of the box, doing what you need to do, verify it's unloaded, properly cared for, properly loaded, have you ever hesitated to put it to your shoulder and fire it?
A. No, I've never hesitated.

Q. Or hand to an employee to do it?
A. If I personally loaded it, yes, I have handed it to employees.
Q. And to your wife?
A. Yes.
Q. Your dad?
A. Yes.
Q. Sports writers?
A. Yes.
Q. TV personalities?
A. Yes.
Q. Have you ever hesitated to have a film crew film you as you're shooting with any of these guns that we're talking about today, these--
A. No, I have not.

MR. SINGER: At this time I'd ask to--tender to the jury Exhibit 1 so they can see--excuse me--I so they can see the breech plug we've been talking about.

MR. EATON: No objection.

THE COURT: Exhibit I is received.

(Defendants' Exhibit I was offered and received in evidence.)

MR. SINGER: I'll try and put this on the side and not cover up all the threads so they can kind of see it. My eyes are 50-year-old eyes.

Pass the witness.

THE COURT: Are you asking the jury to handle the breech plug?

MR. SINGER: If they'd like, yes, sir.

THE COURT: You can pass the breech plug among yourselves, if you care to.

Mr. Eaton, we'll wait until they're done looking at the breech plug.

Mr. Singer, why don't you retrieve the breech plug and put it with the other exhibits.

MR. SINGER: Thank you, Your Honor.

THE COURT: Mr. Eaton?

MR. EATON: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. EATON:

Q. Mr. McGarity, your company, BPI, employs a marketing firm of some kind to prepare various kinds of promotional materials; is that correct?

A. Yes, we do.

Q. What's the name of that company?

A. It's called the BullsEye Group. It's an advertising agency, essentially.

Q. BullsEye Group. Does BPI, Blackpowder, Inc., own any interest in BullsEye Group?

A. No, we do not.

Q. Do you know if Dikar owns any interest in BullsEye Group?
A. They do not.
Q. I think we've heard some testimony here about the business relationship between your company, Blackpowder Products, Inc., and Dikar?
A. Yes.
Q. And it's my understanding from that testimony that Dikar, the Spanish business or organization, owns 100 percent of the stock in your company, Blackpowder Products, Inc.; is that correct?
A. That's also my understanding.
Q. So you don't personally own any stock in Blackpowder Products, Inc.; is that correct?
A. No, I do not.
Q. The workers of Dikar own all the stock in your company?
A. Yeah--well, through Dikar. Since they own Dikar, I guess you could say that they, in essence, own BPI.
Q. Mr. Muniategui testified that Dikar is a co-op, a Spanish co-op?
A. Yes, sir.
Q. Owned by its employees?
A. That is correct.
Q. Is that consistent with your understanding?
A. Yes, sir.
Q. Now, is there anybody over there at Dikar that you report

to, since it's a parent company?
A. Yes.
Q. Who do you report to?
A. At present I report to Mr. Juan Garcia.
Q. Juan Garcia?
A. Yes.
Q. Is he the gentleman who's been in the courtroom with us a week or so?
A. Yes.
Q. Who was the predecessor of the position he now holds?
A. Jon Muniategui.
Q. That's the gentleman we saw by video the other day; correct?
A. Yes.
Q. Mr. Juan Garcia has succeeded Mr. Jon Muniategui as the boss at Dikar; is that correct?
A. That's right.
Q. Now, this BullsEye Group, what kind of promotional materials and activities does it undertake for Blackpowder Products, Inc.?
A. They will help us design product ads, catalogs, in some instances catalog pages for, say, a Bass Pro. So they'll essentially layout the art work for us and make it attractive for presentation.
Q. What role, if any, does this advertising group have in these television programs or productions that we've heard about?
A. None.

Q. None at all?
A. No.
Q. What about print media, like magazines? Does Blackpowder Products hold any interests in any magazines or journals?
A. No, we do not.
Q. Is there a muzzleloading or black powder magazine that BPI has paid a fee to over the years?
A. Yes.
Q. What's the name of that magazine?
A. *Blackpowder guns & Hunting*.
Q. Pardon me?
A. *Blackpowder Guns & Hunting*.
Q. Tell me how that works.
A. Actually that's the title of the magazine. The company that owns it is Grand View Media. That's who we would have paid the money for the advertising to.
Q. So Blackpowder Products pays some publisher of a magazine a fee to do what?
A. Well, we pay for, essentially, the advertising that we have in that magazine, we and other companies that are in the muzzleloading or hunting business.
Q. Well, doesn't Blackpowder Products do more than just pay for a specific ad or ads that were placed?
A. We pay for a group of ads.
Q. Pardon?

A. We pay for a group of ads, a number of ads.
Q. Doesn't it pay a fee on top of just a fee to place the ads?
A. No.
Q. I thought it had some sort of sponsorship in that magazine. Perhaps I'm wrong.
A. We advertise more in the magazine than anybody else. We're the major advertiser.
Q. Is that particular magazine, *Blackpowder Guns & Hunting*, let's say, the lead magazine for muzzleloading and black powder shooting in the United States?
A. I guess I could say that. I don't think there's a gun that's specific--I'm sorry--a magazine that's specific toward muzzleloading that has a tremendous readership, so--so in that field, it would be at least equal to any other publication.
Q. And does Blackpowder Products pay certain representatives to promote its products? I'm thinking of a guy named O'Neill Williams in particular.
A. We sponsor O'Neill Williams' show, television show, and that show, I believe, is called O'Neill Outside.
Q. So if someone sees O'Neill Williams' television show on TV, they're seeing a presentation that's paid for by Blackpowder Products, Inc.?
A. No, not necessarily.
Q. No?
A. We are one of his sponsors.

Q. All right. So when someone sees--when a viewer sees O'Neill Williams' show on TV, they're seeing a presentation wherein the main character, Mr. O'Neill Williams, is compensated at least in part by Blackpowder Products, Inc.; right?
A. That's correct.
Q. And does Blackpowder Products, Inc., have any other persons that it pays to promote its products in the muzzleloading world?
A. Yes, there's another personality by the name of Chad Shearer that we pay. He has a television show also.
Q. Now, are there any--pardon me. Go ahead.
A. And there are other television shows we sponsor as well, in addition to those. There are numerous. I didn't mean to imply there are just those two.
Q. Are there any television shows that are regularly produced that are not--pardon me.
Are there any television shows that are regularly produced which promote Blackpowder Products, Inc.'s, muzzleloader firearms that are not in some manner compensated by Blackpowder Products, Inc.?
A. Well, I would say most are compensated in some way, even though it may just be in product, like a gun to shoot on the television show, but I wouldn't--I don't know if I would call that compensation direct.
Q. Ad fees are paid, professional--what do they call these folks who are professional pitchman? There's a word for it.

They're compensated when they promote Blackpowder Products, Inc.?
A. Some are compensated, some are not, other than giving them product.
Q. What I'm really getting at is, can you name any particular television programs that have been presented that promote or recommend Blackpowder Products that have not been in some manner compensated by Blackpowder Products, Inc., some that are totally objective and unrelated to the company that's promoted its product?
A. A television show?
Q. Yes, sir.
A. I couldn't name one directly, I mean off the top of my head, no.
Q. Now, you mentioned a couple of awards that the Kodiak apparently has received. Are those awards presented by organizations that receive at least some manner of compensation from Blackpowder Products, Inc.?
A. In some cases they are, and in some cases they are not.
Q. What award has Black--pardon me--Blackpowder Products, Inc., received for the Kodiak that has not been compensated in some fashion by Blackpowder Products, Inc.?
A. I think that we--we've received awards from *Outdoor Life* and *Field & Stream* when there was no compensation--no advertising being purchased. Their editorial staff is completely

independent from their advertising staff.

And then there--I mean, we have bought advertising in *Outdoor Life* once, I think, one season, but that was it.

Q. The Kodiak, has it received awards from *Outdoor Life* or *Field & Stream*, or were those other models?

A. No. The Kodiak has received those awards, yes.

Q. All right. Has Blackpowder Products ever represented to the public that it is a manufacturer of any of its muzzleloader products?

A. I wouldn't say intentionally we have.

Q. I guess I don't know what that means. Somehow has it promoted itself as a manufacturer in an accidental manner?

A. Well, I would just say that we promote the brand. Many times when we talk about the brand CVA, we might say "we" because it's easier for the consumer to understand rather than explaining all the corporate entanglements.

Q. Would you turn to Plaintiffs' Exhibit No. 40. I believe that's in the smaller of the two black books, Mr. McGarity.

A. Okay.

Q. I believe it's the second or third page where it's a page that has a bull's-eye on it and picture of three muzzleloader rifles.

A. Yes.

Q. Do you see that one?

A. Yes, I do.

MR. EATON: Your Honor, we offer to move Exhibit No. 40 into evidence.

THE COURT: I believe it's category A.

MR. SINGER: Yes, it is. We have no objection.

THE COURT: 40 is received.

(Plaintiffs' Exhibit 40 was offered and received in evidence.)

MR. EATON: May we pose this to the jury, please?

THE COURT: You may.

BY MR. EATON:

Q. Now, Mr. McGarity, the text on that, if I'm reading it correctly, says, "CVA is No. 1 because we keep shooting holes in the notion that pricier is better."

A. Yes.

Q. "CVA rifles are loaded with features that deliver big game performance without the big time price. No wonder CVA outsells every other brand. Last season we could hardly make them fast enough."

Is that statement, "Last season we could hardly make them fast enough," something that was approved by Blackpowder Products, Inc., before it was placed in that particular ad?

A. Oh, I'm sure that I signed off on the ad.

Q. Is that an ad that was prepared by BullsEye Group?

A. Yes.

Q. And do you know what sort of publications, or print media,

or television media, that ad appeared in?
A. Well, this would be a print ad only.
Q. Blackpowder appeared in--in, what, *Blackpowder Guns & Hunting*?
A. Sure, it would appear there.
Q. Any other publication you know of?
A. I'm sure there were various others. I can't tell you exactly which ones.
Q. Was it ever disseminated as part of a television program, like O'Neill Williams' program?
A. I don't recall this exact wording being used in a television ad, but it could have been and I just may not remember it.
Q. I mean, is there anywhere in that particular ad that would suggest to a consumer or a user that these three guns, which I guess are the Optima Pro, the Kodiak Magnum, and the Buckhorn, are manufactured--are designed by anyone other than Blackpowder Products, Inc.? Is there anything to suggest that anybody other than Blackpowder Products, Inc.--pardon me--CVA designed that product?
MR. SINGER: Objection, Your Honor. There's nothing in the document about design.
THE COURT: Overruled. He can answer.
A. Well, the intention was that we were promoting the brand, CVA, because that is the brand by which our products are known.

BY MR. EATON:
Q. CVA is nothing more than a fictitious business name under which Blackpowder Products, Inc., conducts business; is that correct?
A. No. I classify it as a brand name, just like Cheerios or Nike.
Q. It's not an entity in and of itself, is it?
A. No.
Q. It's just a name, right?
A. It's a brand name.
Q. And it had some name recognition before Blackpowder Products acquired the right to use that name; is that correct?
A. Sure. Sure.
Q. And it, in fact, manufactured and produced different guns? In other words, guns other than the ones that are now promoted under the CVA name?
A. I'm not sure--maybe in the very early days CVA actually manufactured product, but CVA was the U.S. brand name. But for the most part, the product has always been sourced from somewhere else.
Q. Well, I guess, would you agree with me that an ordinary consumer reading that ad would believe that whatever company's behind CVA actually manufactures these guns?
A. Sure.
Q. Now, let's move along to another subject here,

magnum-capable gun. You told me certain guns--or you told the jury certain guns that CVA--pardon me--Blackpowder Products sells--let me go back.

Is it true what Mr. Muniategui told us, that all of CVA's muzzleloader rifles are manufactured by Dikar?

A. Today that is true, yes.

Q. And how long has that been true?

A. Oh, gee, I'm guessing probably ever since we were--ever since BPI was formed.

Q. When was that?

A. 1999.

Q. And before 1999--

A. I'm not 100 percent sure of that, though.

Q. Before 1999, Dikar was the sole supplier of muzzleloader firearms for Blackpowder Products's predecessor; is that right? True?

MR. SINGER: Object to the form to the extent "predecessor" denotes a legal connotation.

THE COURT: Overruled.

A. Could you repeat the question, please?

BY MR. EATON:

Q. Is it true that prior to Blackpowder Products being formed that its predecessor in interest, the company that preceded it, acquired all of its muzzleloader firearms from Dikar?

MR. SINGER: Same objection.

THE COURT: Actually as you've rephrased it, sustained.

BY MR. EATON:

Q. Let me ask it a different way. Let's just stick with the Kodiak instead of other models. Has Dikar been the sole and only producer of Kodiak firearms for Dikar--pardon me--for BPI, doing business as CVA?

A. Well, yes, for BPI selling guns under the brand name CVA.

Q. Right. So Dikar and BPI, Blackpowder Products, Inc., have this mutual relationship where all of Dikar's products are sold to BPI, and BPI's only supplier of muzzleloader rifles is Dikar; is that right?

A. That's correct.

Q. And it's been that way since--

A. 1999.

Q. --1999, which is well within the time which the Kodiak was nothing more than an idea between someone's ears and behind their eyeballs; is that right?

A. Yes.

Q. When it was nothing more than a concept?

A. Yes.

Q. Now, Mr. Muniategui testified that the final design, after prototypes had been built and tested in certain ways, that you and Mr. Mark Hendricks had to approve the final design before that gun went into production. Is that a correct statement?

A. I'd say that's a--well, we approved the final prototypes, so...
Q. Did you approve the final design before it went into production, before it went into--selling it to customers?
A. We didn't approve any design or mechanics.
Q. What did you approve?
A. We test-fired the gun, we made sure it was easy to load, that all the functional aspects, safety and everything, were easy to operate, that they functioned correctly, and that the gun was accurate.
Q. Well, BPI would not have approved the design or the manufacturing of this gun unless it had been satisfied with those things; is that a fair statement?
A. Well, we wouldn't have approved the final prototype unless we were satisfied with that prototype.
Q. You wouldn't have begun to accept and buy them from Dikar unless you were satisfied with that?
A. That's correct.
Q. So it's fair to say that you and Mr. Hendricks were essential to the process of approving those guns and getting them into production for delivery to consumers? If you hadn't approved them, they wouldn't have gotten into the U.S. market, would they?
A. Well, I think we were relied upon to approve the prototype and say, "Yes, this is the kind of product we want to sell, and

we feel it's good enough to sell and put our name on it."
Q. If you hadn't done that, you had not done that, you wouldn't be buying any guns from Dikar, would you?
A. If we hadn't approved it, probably some modifications would be made until we did approve it. So if--I'm sorry.
Q. Let's talk about this business of Blackpowder Products does not keep complete records of the serial numbers of the guns it receives from Dikar. Is that correct?
A. That's correct.
Q. So it really can't keep track of how its product is disseminated across the country through various wholesalers, retailers, and direct sales. Would that be a fair statement?
A. That's a fair statement.
A. And it really has--the only way it can get any information about who might own a gun, or where that gun might have been sold, is if a consumer fills out the little warranty card and sends it back in; correct?
A. That's correct.
Q. And I believe we took the deposition of a fellow named Carl Donaldson, who was your information manager or director. Is he the man who keeps track of that?
A. That's one of his duties, yes.
Q. So does Dikar--pardon me--Blackpowder Products--I keep getting them mixed up sometimes--without keeping track of all the serial numbers, does Dikar--Blackpowder Products have any

established practice or procedure for keeping track of any consumer complaints that might come in?

A. We have a customer service department.

Q. I understand that.

A. That handles any type of question or complaint that a consumer might have.

Q. Does that customer service department keep track, keep permanent records in an organized way about consumer complaints?

A. Not all complaints, no.

Q. So Blackpowder Products conceivably, theoretically, could be getting consumer complaints, and it doesn't necessarily keep track of them; correct?

A. That's certainly conceivable. Consumers can complain about a lot of things, though.

Q. Other bad things can happen other than a consumer being dissatisfied, and Blackpowder Products doesn't keep orderly, methodical records of that either?

A. Please clarify.

Q. Doesn't have a program or a practice or procedure to keep track of problems that users of its products might have?

A. Some complaints we do, some types of complaints.

Q. I understand that, that you might keep one. What I'm asking you is is there an organized, regular, established practice and procedure for keeping track of such things?

A. For certain types of things, yes.

Q. Certain types of things?
A. Yes.
Q. What types of things?
A. If a consumer had a particularly serious problem with a gun, say that a trigger didn't function properly, or a stock had the camouflage coming off, or a ramrod--I'm sorry--or a ramrod thimble was missing from one in the box. So, anything that we could identify as being some sort of problem that we needed to address would be officially recorded.
Q. And kept in some sort of a computer file or database by Mr. Donaldson?
A. No. Probably a paper file.
Q. So Blackpowder Products exercises discretion in what reports of complaints or problems it keeps track of. Would that be a fair statement?
A. I think so, yes.
Q. And some complaints or problems it simply does not keep track of, correct?
A. Correct. Simple things, sure.
Q. Now, you talked a little about that, I guess. The U.S. Government, the Department of Alcohol, Tobacco, and Firearms does not classify muzzleloader firearms as firearms; is that your belief?
A. They don't--yes, that is, by the technical definition of a firearm that the ATF uses.

Q. Would it be more accurate to say the regulations of Alcohol, Tobacco & Firearms has an exception to its regulations and grandfathered in muzzleloaders so it didn't have to meet all the same regulatory requirements as centerfires?
A. I think that would be fair, yes.
Q. When these muzzleloaders first really came to be used, they were what they called antique in their appearance, they had the sidelock and other features that are different from what we see in the modern muzzleloader. Is that fair?
A. Different in some minor aspects.
Q. As a result of that, the ATF, for whatever reasons, has made an exception for muzzleloaders, that that particular class of firearms does not have to meet all of this regulatory and record-keeping requirements; correct?
A. Correct.
Q. What some people might call a loophole for muzzleloader firearms, that's different from other firearms, like shotguns and rifles?
A. Some people might call it that.
Q. And I believe, to take your testimony down another step, the government of the United States really has no regulations whatsoever with regard to muzzleloader firearms; is that correct?
A. None that I'm aware of.
Q. Okay. And there are no government-issued standards of

performance for muzzleloader firearms in this country; is that right?
A. I don't think there are any for muzzleloaders or centerfires, actually.
Q. You've heard some testimony that even the firearms industry does not have any published standards for muzzleloader manufacturers. Do you agree with that?
A. None that I'm aware of.
Q. Mr. Roane I think testified to that, I think Mr. Bruchey did. Do you agree with that?
A. Yes, I do.
Q. In other words, there are no performance guidelines or standards that you're aware of for muzzleloader firearms in the United States; is that correct?
A. Nothing official, no.
Q. So really what that boils it down to is that the manufacturers, the individual manufacturers themselves, or a company that's owned by a manufacturer, like yours, must develop its own practices and procedures with regard to quality and safety and performance; correct?
A. Yes.
Q. To a certain extent it's kind of like beauty is in the eye of the beholder, each company develops its own standards/ practices for performance, for safety, et cetera. Would you agree with that?

A. I would say each company carries their responsibility.
Q. And carries out or discharges that responsibility in its own manner?
A. Yes.
Q. So consumers out here who buy these products that are promoted in various magazines and through industry awards and trade associations, and so forth, consumers are left to rely on an individual manufacturer, or wholly-owned subsidiary, such as BPI, doing business as CVA, to make a reasonably safe product; correct?
A. Yes, they are.
Q. And you'd agree that there's responsibility for the manufacturer, like Dikar, that you buy all your guns from, your company buys all its gun from, to exercise reasonable care to make reasonably safe products?
A. Absolutely.
Q. And wouldn't you agree that there are certain standards that are well-recognized for quality control in manufacturing firearms?
A. In manufacturing anything, yes.
Q. Fair enough. Now, have you still got the user's manual up there in front of you?
A. Yes, sir, I do.
Q. What exhibit number is that?
A. E.

Q. Exhibit E, okay. That's Defendant's Exhibit E. I think it's also Exhibit 5 or 6 for the plaintiff, but that's okay, it's the same exhibit.

Now, I want you to turn--

MR. EATON: Your Honor, could we publish parts of this as we go through?

THE COURT: I think it's an A. Yes.

BY MR. EATON:

Q. First of all, Mr. McGarity, look at the cover. Is this the cover of that user's manual or warranty manual? If we use those terms, are we talking about the same document, user's manual, warranty information?

A. Yes.

Q. Was this cover and the information on there created by this BullsEye Group and approved by your company before it was put into production to go in with these guns?

A. Yes, it was.

Q. Did you personally participate in--I don't mean do it all yourself, but I mean participate actively in the compilation of the content of this book, this booklet?

A. Yes.

Q. This user's manual?

A. Yes.

Q. Now, let's turn to the first full page, which has kind of like a table of content--it is a table of contents, that's what

it says. It's got two parts, correct?
A. Yes.
Q. Part one it says is for the Optima, and Optima Pro break-action models section; correct?
A. Correct.
Q. And break-action is a different model and style of muzzleloader than the Kodiak; is that right?
A. In terms of its action, yes.
Q. I mean, they're different guns, different models of guns, kind of put together differently, particularly with the way the firing mechanism is situated in the gun?
A. Yes.
Q. And, by the way, the Optima and the Optima Pro break-action, are those what you referred to as magnum-load guns, or magnum-capable guns?
A. Yes, they are magnum-capable.
Q. Now, part 2 is for Kodiak pivot-action models; correct?
A. That is correct.
Q. The questions Mr. Singer was asking you about, certain safety practices, and so forth, did you know when you were answering those questions which parts of the manual you were reading from and talking about?
A. Yes.
Q. Which part of the manual was it?
A. It was part 1.

Q. So that's--okay. So this business about taking the breech plug out and looking down the barrel, that was in part 1 for the Optima and Optima Pro break-action models; correct?
A. Yes.
Q. It doesn't say quite the same thing in part 2 for the Kodiaks, does it? Just turn to page 17. Let's start at page 17 where we're talking about the Kodiak.
Okay. You on page 17?
A. Yes, sir, I am.
Q. Okay. Now, the part A, introduction to safety, I'm going to try to zoom in on that a little bit. Doesn't say anything in items one through ten about removing the breech plug and be looking down the barrel to assure, to verify that the firearm is unloaded, does it?
A. Are you talking about section A?
Q. Section A, items one through ten.
A. No, I don't see anything there. That's the Ten Commandments of firearm safety.
Q. Let's go over here to part B--
A. Can I make one more comment?
Q. Sure. Go ahead.
A. Part A is general firearm safety rules. It's not specific to muzzleloaders. I just wanted to make that point, so...
Q. Doesn't say anything in there about how to verify a gun is unloaded?

A. It says the gun should be kept unloaded until ready to use, that's all it says.

Q. It doesn't tell you how to verify it, does it? In other words, Mr. Singer led you through this exercise that you're supposed to take the breech plug out and look down the barrel until you can see daylight to assure it's unloaded; correct.

A. That's one of the ways to assure it, yes.

Q. In part 1 about the Optima--and what was the other? But in part 2 for the Kodiak it doesn't say that, does it? In fact, in part 2, the Kodiak, it says, part B, No. 11, and I've highlighted it in my copy, it says, "Never load a muzzleloader until first verifying that it is unloaded."

A. Yes.

Q. Still doesn't tell us how to do it. It says "verified" in the book?

A. It says that in the first part of the book.

Q. Now we go to the next page, and let's look at section D, general cleaning and maintenance of the Kodiak. It says, "Note." Let's zoom in on that a little bit. See the part I've highlighted behind you there. It says, "Note: Verify that the gun is unloaded before beginning this procedure by placing the ramrod down the barrel until it touches the breech plug."

So would you agree that that's an acceptable method of verifying that the gun is unloaded?

A. Sure. That's another method.

Q. Just as effective, and, in fact, for the Kodiak, that's how it tells you to do it, isn't it?
A. It does mention that way, yes.
Q. There's nowhere in section 2, which pertains to the Kodiak, that directs or even recommends that someone screw the breech plug out and look down the barrel until they can see daylight; is that correct?
A. Not in section 2, no.
Q. That's right. And section 2 is for the Kodiak, isn't it?
A. That's true, but it also says that the book should be read in its entirety on it's cover, as you demonstrated when you showed the cover.
Q. Exactly. And the business about taking the breech plug out is over here in section 1 about the Optima. That's how you do it with the Optima?
A. Some of it here is.
Q. There's none of it in section 2 on the Kodiak that says anything about removing the breech plug and looking down the barrel until you can see daylight; is that correct?
A. I think it does say something about removing the breech plug somewhere in section 2.
Q. For what? Verify it's loaded or unloaded, or for other purposes?
A. Perhaps for other purposes. There are other purposes to remove a breech plug, obviously.

Q. So what you and Mr. Singer were talking about were the procedures that relate to verifying the loaded or unloaded condition of the Optima, but not the Kodiak; correct?
A. Not necessarily correct, no.
Q. Well, you don't see--you certainly see now up on the screen, which wasn't displayed to the jury during your direct examination, that an acceptable way of verifying the gun is unloaded is to run the ramrod down it until it touches the breech plug?
A. Yes.
Q. Do you agree that's an acceptable way and just as acceptable as looking down the bore of the barrel with the breech plug out? Correct?
A. It's not as sure a way of guaranteeing that it's unloaded, no.
Q. Then why would your company not put that information about taking the breech plug out and looking down the bore of the barrel for the Kodiak if that's what should be done? Why would it not be in the safety manual if that's what your company believes should be done? And why would an alternative method be stated?
A. You mean why did we not put it in section 2?
Q. I guess so, since that's for the Kodiak.
A. I would imagine that we probably had deleted some of the repetitive sections from the first part of the book.

Q. The important safety information, that would be the part you'd delete; is that right?
A. With the understanding that the people were expected to read the book in its entirety, we may have done that, yes.
Q. The people who have a Kodiak were supposed to do what's for the Optima, the different block--you get a Kodiak, you go to the part that says "Kodiak." You follow that. You get criticized because you didn't also follow the Optima section; is that right? Is that what you're saying?
A. I didn't criticize.
Q. Mr. Katzenmeier, as you heard his testimony, what he first did when he took it out of the box--one of the first things is run that ramrod down it. Did you hear that testimony?
A. I heard him say he put a patch on and ran it down the barrel, yes.
Q. He complied with that procedure verifying the gun was unloaded as described in section 2, which is specifically for the Kodiak; right?
A. Not necessarily. Running the ramrod down the barrel doesn't necessarily ensure it's not loaded.
Q. You said that one of the things he failed to do, it was very important, was verify that this Kodiak was unloaded. In other words, you wanted to make him look like he was a careless guy?
A. I don't think I said that, did I?
Q. You responded to Mr. Singer's question that he had violated

this requirement of assuring that it was unloaded before doing anything. Do you agree with that? That was your testimony, wasn't it?
A. I haven't heard it stated that he did everything to assure it was unloaded, no.
Q. You heard him testify he did what your manual said to do, that is verify that the gun is unloaded by placing the ramrod down the barrel until it touches the breech plug. You heard Mr. Katzenmeier say that he did that, didn't you?
A. Yes.
Q. So he verified that it was unloaded in an acceptable way, according to your own manual; right?
A. I wouldn't completely agree with that, no.
Q. And for the Kodiak, the other thing you said that Mr. Katzenmeier violated is that you said that he violated the provisions of the manual because he failed to take out the breech plug before shooting.
Now, your manual doesn't, under the Kodiak section, section 2, doesn't say anything about taking the breech plug out before shooting the gun. Would you agree with that?
A. I believe it said that on the box, if I'm not mistaken.
Q. I didn't ask you about the box, I asked you about the manual. Let me point you in the right direction.
A. Put me on the right page.
Q. How about page 21, "Loading Procedure." That sounds like

that's what you'd follow before you loaded and fired your gun, doesn't it?
A. Yes, sir.
Q. All right. Let's look at page 21, loading procedures. It says, No. 1, I've highlighted that, "Verify that the gun is unloaded." For the Kodiak we know how that's done now, correct?
A. Several different ways, yes.
Q. Mr. Katzenmeier said he verified it was unloaded by running his patch and ramrod down the barrel before he shot it that day, or attempted to shoot it?
A. He testified he ran a ramrod down the barrel, yes.
Q. And No. 2 says, "Swab a dry patch down the barrel to remove any gun oil." He testified that he did that; correct?
A. Yes, he did.
Q. And without going through all the other parts of that, it looks like he pretty much followed all the other instructions for loading procedures that I've not highlighted. Do you find anything in the loading procedures that you can point to that he did not do?
A. Yes, sir.
Q. What's that?
A. No. 3.
Q. No. 3, "With the gun pointed in a safe direction, place a 209 primer into the breech plug." My recollection of his testimony was that he didn't place that primer into the breech

plug until he was at his shooting station and squatting down and getting ready to fire, at which time he did remove the safety. Is that your recollection of the testimony?
A. No. 4 will expand No. 3. "Fire the primer to ensure bore and breech plug are dry. Repeat two or three times."
Q. You're critical he fired the gun--he never fired it with a cap or primer before the initial firing of the load?
A. I think it was a mistake. I wouldn't classify it as being--I wouldn't term it as being critical of him. I think it was a serious mistake.
Q. You what?
A. I think it was a serious mistake.
Q. To fail to fire a primer without a load?
A. Yes.
Q. Why is that?
A. It's another fall-back method to make sure the gun is unloaded prior to loading it.
Q. To make sure the gun is unloaded?
A. Yes.
Q. He knew it was loaded when he got ready to shoot it for the first time? He knew it was loaded; correct?
A. I would think so.
Q. He pointed it at his target, we've heard testimony about that, how it tore through that target?
A. What this says to do is fire the primer before it's loaded.

Q. What's the point of that? You just told me--just got done telling me it's to make sure it's not loaded.
A. That's not the only reason. It's also to make sure there's no oil in the breech area that could foul the charge, and also to make sure that the flash hole through the primer is clear of any debris, and to make sure that there's no obstruction in the muzzle or in the barrel.
Q. Firing a primer is not going to remove oil in the barrel?
A. Yes, it will.
Q. You're telling me that firing a primer through that will remove oil?
A. Yes.
Q. It might create some temperatures that remove some of the oil, but not all of the oil?
A. Depends how much is in there.
Q. We know Mr. Katzenmeier swabbed the barrel. That would have taken care of most of the oil, if not all of it. Any other criticism you have of Mr. Katzenmeier on these loading procedures?
A. I don't see anything else that I would say that he skipped, no.
Q. Now, we know that the so-called magnum load, three Pyrodex pellets, is an acceptable charge, according to Blackpowder Products, Inc., and Dikar's manual; correct?
A. Yes.

Q. Now, did your company--and one of the people, I guess, or companies that--well, strike that. Let me say that a different way.

In the CVA/BPI product manual, it recommends PowerBelt bullets as a projectile to use in these guns. Would you agree with that?
A. Yes.
Q. And, in fact, Blackpowder Products and Dikar recommend PowerBelt bullets be used in this gun to the extent that it puts some extra literature in the packaging for PowerBelt bullets; correct?
A. Yes.
Q. It also recommends, I believe, the use of Hogdon Pyrodex pellets; correct?
A. Hogdon is the correct pronunciation.
Q. Hogdon, okay. Hogdon Pyrodex pellets; correct?
A. Yes, sir. That's one of the propellants.
Q. Fifty-grain Pyrodex pellets are one of the several acceptable charges for the loads to be fired through this gun; correct?
A. That's one of the several acceptable propellants, yes.
Q. Okay. And did your company consult or collaborate in any way with Hogdon before putting in the manual that a charge of--propellant of 150 grains was appropriate and proper?
A. No, we did not.

Q. How did your company make the determination that the so-called magnum load of 150 grains of Hogdon Pyrodex pellets was a safe load, or safe charge of propellant to fire through this gun?
A. Dikar told us that it was.
Q. Dikar told you that?
A. Yes.
Q. Do you know what tests, if any, that--or what research, if any, that Dikar did to determine or conclude that it was safe to fire 150 grains of Pyrodex pellets, three 50-grain pellets, through that gun?
A. Just the ones that have been mentioned in other testimony.
Q. What's that? I forgot, I guess.
A. Testing the overpressure charges.
Q. Those overpressure tests did not use Hogdon Pyrodex pellets, did they?
A. I really don't know.
Q. You've not seen the protocol for those tests?
A. I can't remember enough about it to make a statement under oath about it.
Q. Would you be surprised to learn that those tests--you're talking about the five guns--five barrels per month that were overpressure tested?
A. Yes.
Q. Those were performed with a loose powder.

A. Okay. I remember it now that you mention it.
Q. Not Pyrodex pellets?
A. Correct. Yes. Okay.
Q. Have you ever seen any documentation from Dikar that it, to use the phrase, developed safe loads to be fired through the Kodiak Magnum muzzleloader rifle?
A. I don't recall seeing anything--I don't recall seeing anything in writing. It's been a long time. It doesn't mean that I didn't, but I don't recall it specifically.
Q. When I talk about developing a load for a muzzleloader, you know what I'm talking about, don't you, what "developing a load" means?
A. Of course I do.
Q. It means not only doing calculations on paper, but it means then going to the field and empirically testing those calculations, if any were made, by trying different combinations of loads to see that they're accurate?
A. Uh-huh.
Q. And to see if the gun is capable of withstanding those loads; correct?
A. Sure.
Q. Would you agree with me that most programs to develop acceptable loads are somewhat of a trial and error process?
A. I would agree with that, yes.
Q. In other words, you can do a certain amount of planning--

A. I would say to determine optimal loads, yes.
Q. You can do a certain amount of planning on paper, but the old cliche, proof is in the pudding, that comes out in the range somewhere, or in a proof-firing situation where the gun is loaded with a combination of different loads, that would be different propellants, different amounts of propellants, different projectiles, different sizes and weights of projectiles, to verify the criteria that were maybe on paper somewhere; correct?
A. I'd say that's true, yes.
Q. And it's important in developing proper loads not only for safety, but also for accuracy, to keep good close track what kind of propellant you're using, whether it's powder or pellet, black powder or pellet, and what size of projectile, whether it's 250-grain or 295-grain, or something else; correct?
A. You are correct.
Q. Now, BPI never performed that organized, methodical, empirical testing to develop appropriate loads for the Kodiak. Would you agree with that?
A. No, I wouldn't.
Q. You told us about various social occasions where you go out on the range with company employees and members of the family and fire these guns. And I believe you've testified in a deposition that you and Mr. Treadaway and Mr. Hendricks and Mr. Donaldson went out on the range and fired some of these

guns; is that correct?
A. That's correct.
Q. But in none of those exercises did you folks go through a methodical process with various amounts of powder, or varying types of powder, or varying types of projectiles or sizes of projectiles, and varying types of pelletized loads to develop a load chart? You never did that in a methodical way, did you?
A. I guess it depends on what you classify as methodical.
Q. Did you do any kind of testing?
A. At the time we did, we always have.
Q. Did you keep records? You didn't produce it at deposition.
A. We may not keep permanent records. If we're trying to determine what the best load is, if we find one load doesn't work that well, there's no reason to keep a record of it.
Q. Keep--
A. We do not keep methodical records.
Q. You tested some guns to failure, didn't you, some Kodiaks to failure?
A. Yes.
Q. You went out there and blew them up?
A. Yes.
Q. The way you blew them up was actually smokeless powder?
A. That's correct.
Q. You didn't test any of them to failure with black powder, did you?

A. We never could get one to fail with black powder.
Q. Never tested one to fail with smokeless powder, did you?
A. Yes.
Q. Pardon me. I meant pelletized powder. Never tested one to failure just using pelletized powder?
A. Not just pelletized powder, that's right.
Q. When you tested one to failure, you used smokeless powder; correct?
A. That was one of the components, yes, to the best of my recollection.
Q. I know you didn't keep permanent records. Once you tested to failure--you had some of them tested to failure where you had a combination of black powder and smokeless?
A. I think so.
Q. Okay. When it failed--but every failure, every one you tested to failure, failed with either all of the propellant being smokeless, or some of the propellant being smokeless; correct?
A. That's my understanding, yes.
Q. But you don't have any permanent records of that, do you?
A. I don't personally. No, I don't.
Q. When I say "you," I'm talking about Blackpowder Products.
A. If--I'm not sure if there are or there's not.
Q. Fair enough. At any rate, when that gun failed, or when those guns failed on the range, you were firing them remotely,

weren't you?
A. Yes.
Q. There might have been some other tests you did, where you might have fired them up on your arm, but most of those tests we're talking about now were done remotely, correct? From a firing bench?
A. Sure.
Q. And the smokeless tests were all done remotely; weren't they?
A. Oh, yes.
Q. Oh, yes. And when those guns failed with smokeless powder, what did they look like? How did they fail?
A. Well, some didn't fail, first of all. Some of them you couldn't see anything differently--different about the gun visibly.
Q. What failed?
A. We don't know they did fail. We know we shot smokeless powder through.
Q. I know some guns you fired smokeless powder they did not blowup; right?
A. Yes.
Q. I'm talking about when the guns failed with smokeless powder, what did they look like?
A. Well, let me see. To the best of my recollection, some of them would have--some of them blew out completely at the breech,

if they were very heavily charged.
Q. When you say "blew out completely at the breech," what are you talking about?
A. Meaning that this area would separate (indicating).
Q. The barrel in the area of the breech exploded--ruptured, that's what you're talking about?
A. Yes.
Q. In fact--hold that up again. Some of those--those failures you're now talking about involved a failure of the barrel in front of the breech plug and breech area; correct?
A. In some cases, yes.
Q. And what other characteristics or features did you see with smokeless powder failures?
A. Some barrel bulging.
Q. Swelling, bulging of the barrel?
A. Yes.
Q. What other features and characteristics did you see when they failed with smokeless powder--
A. I don't recall any others--
Q. --if any?
A. --specifically.
Q. You did not see any failure--
A. I do remember--I'm sorry.
Q. Go ahead.
A. I do remember that on some, this would not open

(indicating).
Q. What do you call "this"?
A. This is the action.
Q. In some of the smokeless powder failures, the action was impinged in some way that it did not open; correct?
A. Correct.
Q. And you've seen barrels that have failed due to--and not just in the test firing, I guess, that you did with the Kodiaks, but other models and other guns, you've seen them fail as a result of smokeless powder being fired through them, haven't you?
A. Very heavy charges of smokeless powder, yes.
Q. In other words, most all the failures you've seen with smokeless powder involved rupture of the barrel. Would that be a fair statement?
A. Yes. That was our intention, to try to rupture the barrel.
Q. I understand. When you've seen other guns, other than ones you've been testing, guns that failed at the hands of someone else as a result of smokeless powder, they had ruptures, or swelling of the barrel, didn't they?
A. If I ever saw them, then in most cases, yes--well, in every case I recall, yes, they had rupture.
Q. Every case you've seen?
A. That I've seen personally, yes.
Q. That you've seen smokeless powder failure, the barrel

ruptured or swelled; is that correct?
A. If I knew there to be a visible barrel failure, yes. I would say so, if a barrel failure was visible.
Q. You've not, however, seen a failure that you can confirm was a smokeless powder failure, where the breech plug blew out, can you?
A. Not that I could confirm, no.
Q. So in the failures you've seen because of this excessive pressure created by smokeless powder, the barrels have failed by rupture or swelling, but the breech plugs did not blow out; is that true?
A. I think in one case the breech plug was blown out, yes.
Q. One case?
A. That's my recollection.
Q. What--
A. One test. I'm sorry. It could be a legal term. It was in one of the tests of the guns.
Q. You've seen a Kodiak barrel that failed because smokeless powder was placed in it; is that correct?
A. I've seen one that I think failed--well, other than the ones I tested, yes, I have seen one.
Q. One that was out in the field?
A. Yes.
Q. And, in fact, in that gun the breech plug did not blow out, did it? It stayed in place, but it split through the area where

the breech plug screws in?
A. That's correct.
Q. It didn't blow the breech plug out the back, did it?
A. In that case, no it did not.
Q. That breech plug struck right there in the threads, and the barrel split around it?
A. In that instance, yes.
Q. And you believe that was a smokeless powder failure?
A. That's my belief, yes.
Q. What I'm really getting at, what I'm really getting at, you've not seen a breech plug failure, anything you can identify as a failure of the barrel to hold the breech plug when smokeless powder was the cause of the failure; is that right?
A. Well, not one that I could confirm with smokeless powder.
Q. And Mr. Katzenmeier's gun, you've looked at it on a number of occasions; correct?
A. A couple of occasions.
Q. Several occasions, several separate depositions, and here in court. Did you observe any defamation of the barrel in Mr. Katzenmeier's gun?
A. Not visibly I didn't.
Q. Did you observe any swelling in the barrel of Mr. Katzenmeier's gun?
A. Not visibly.
Q. And your company hired some experts to measure those guns

and inspect them; is that right?
A. I think our attorneys did.
Q. The Katzenmeier gun--okay, your attorney did.
A. Yes.
Q. That would be like Mr. Chapin and Mr. Schmidt and Mr. Hutton? Those names are familiar?
A. They're familiar, yes.
Q. You know some, not all of those people measured the barrel, inspected the barrel of Mr. Katzenmeier's gun; is that correct?
A. That's what I expect.
Q. You've seen the reports and seen what they reported?
A. Yes.
Q. Have you ever talked to them about it?
A. No.
Q. The work they produced indicated--or verified that Mr. Katzenmeier's gun did not swell in the barrel; correct?
A. That's my understanding, the barrel is not swollen.
Q. And their work will verify that Mr. Katzenmeier's gun did not split or rupture in the barrel; is that correct?
A. From my understanding, that's correct.
Q. And that's what you typically see when there's a smokeless powder failure; isn't it?
A. When it's a very heavy charge of smokeless.
Q. Now, Mr. Singer asked you some question. He asked do you know of any muzzleloader manufacturers who proof-fire all of

their guns, and you said, "I don't know of any"?
A. That's correct.
Q. Do you know any muzzleloader manufacturers who proof-test some of their guns?
A. Not firsthand I would not know, other than us, so...
Q. Your company proof-tests some of its guns?
A. We proof-fire some of the guns with excessive pressure or--
Q. You're talking about the five barrels that go to the proofhouse?
A. Yes.
Q. You understand that's not really a proof-test, don't you?
A. No.
Q. That's an overpressure test, that's not a proof-test. Let me ask you this anyway. You know none of those five guns that are overpressure tested at the proofhouse ever go back into production to be sold to consumers, don't you?
A. Sure, I know that.
Q. You know that because they are tested at a very high pressure which might well induce some weakness or defect in them; correct?
A. Yes, that might be invisible.
Q. In other words, they might not blow apart, but they're tested at such a pressure that they might be so swollen or deformed, or there's some metallurgical flaw created, it's just not safe to put them in the hands of consumers after they've

been fired at those excess test loads; correct?
A. Certainly; that some fatigue would occur would be a reasonable assumption.
Q. But proof-testing is testing to see if a particular gun, a particular gun will fail at a slightly more than service level pressure level. Do you understand that to be proof-testing as opposed to overpressure testing?
A. Proof-firing, that definition.
Q. Okay. Proof-firing instead of proof-testing. Okay. Same thing. Proof-firing, to use your words, is individual testing of an individual firearm primarily to see that it's been manufactured in accordance with design specifications and tolerances. Would you agree with that?
A. I would say that it would be to determine if that particular barrel could handle an excess charge, an overpressure charge.
Q. And you'd agree that there is no policy or procedure for proof-testing any of the Dikar guns that ultimately get into the hands of consumers?

In other words, some employee may go to the proofhouse to fire a gun a couple of times, as I guess we heard Mr. Belategi, or somebody say, then go clean it and put it back in the production line, but no records kept of that. What I'm getting at, there's no organized plan to proof-test all of the guns from Dikar, but there's no practice or procedure and record-keeping procedures to keep track of what guns, if any,

are proof-tested?

MR. SINGER: Objection.

THE COURT: Overruled.

BY MR. EATON:

Q. It was a long question. Let me see if I can ask you three questions and get to the same point.

A. Okay. Thank you.

Q. Would you agree that Dikar has no practice or policy or procedure to proof-test any particular percentage of the production guns coming out of its factory?

A. You mean proof-fire?

Q. Proof-fire to you.

A. That's my understanding, yes.

Q. You and I agree that the company from time to time sends employees over to the proofhouse with various models of guns to proof-test a specific gun--pardon me--proof-fire a gun; correct?

A. You mean to--

Q. Well, let me ask you, Mr. Belategi told us that its employees go over to the proofhouse from time to time and fire guns that come off the production line; correct?

A. Yes. Yes.

Q. And you heard him testify that there's no particular organization to that practice. In other words, they don't do it with one out of every 100 guns, or one out of every ten guns, or one out of every thousand guns, they just sort of do it in an

informal way; correct?
A. Yes.
Q. And that they then bring that gun back to the factory, they clean it up, and it goes back into the production line and out the door; correct?
A. Let me rephrase that. I don't know that it's done in any formal way, so--
Q. You don't know that it's what?
A. That it's done in any formal way. I really couldn't state that.
Q. Do you have any evidence it's done in a formal or organized way, where records are kept?
A. It's my understanding that records are kept when they do testing of any kind.
Q. The overpressure testing; correct?
A. Other kinds, also.
Q. Are you telling me you believe that Dikar keeps records of when these employees go over and fire a gun, clean it up, put it back in the production line?
A. I've seen records, yes.
Q. Pardon me?
A. I've seen records, targets, notations of what loads were used.
Q. I'm lost.
A. Targets--

Q. You've seen the targets those people shot at?
A. Uh-huh.
Q. Then on those targets somebody writes information like who shot them, what the loads were?
A. What the projectile was, yes.
Q. You've seen those actual targets?
A. Yes.
Q. Have you seen any other records other than those little targets?
A. I would imagine that I have at some time, yes.
Q. Now, proofmarks, or marks on guns, you've mentioned that you've come to be familiar with these marks that are on the Dikar-produced guns; correct?
A. Yes.
Q. The little three balls in a triangle?
A. I've become familiar with them, yes.
Q. And that represents to you what?
A. A black powder gun, muzzleloader; mainly black powder.
Q. There's another symbol or image on there that's a knight's shield, or a little head with a circle above it; correct?
A. Yes.
Q. What have you come to understand that mark to be?
A. That it's the mark of the Proofhouse of Eibar.
Q. But you know that those guns that bear those marks, at least for the most part, have not been proof-fired. Do you agree with

that?
A. Yes.
Q. In other words, Dikar puts proofmarks on guns that have not been proof-fired or proof-tested; do you agree with that?
A. They've been proof-tested. They have not been proof-fired.
Q. Pardon?
A. In my definition they've been proof-tested.
Q. The individual designs?
A. Not the individual guns.
Q. The five guns a month have been proof-tested, is that what you're saying?
A. No. They were overpressure fired.
Q. What are you saying have been proof-tested?
A. I interpret proof-testing to be assurance the design of the gun, the materials in the gun are of adequate strength to handle this load.
Q. That's what this five barrels a month is all about, to test the design; isn't that true?
A. Yes. So I guess my interpretation of that is that it would be a form of proof-test, even though other people may not go by that definition.
Q. Well, you'd agree with me that lots of guns get out of that factory that are never proof-fired or proof-tested or put under any type of pressure in that manufacturing process, whether pneumatic pressure or hydraulic pressure or pressure from proof

firing? They go out of there by the hundreds? By the thousands?
A. Yes.
Q. Right. They go out by the hundreds and the thousands that are never proof-tested or fired in any way?
A. Yes.
Q. But they have a proofmark on them?
A. The individual guns, that's right.
MR. EATON: I don't have any more questions for Mr. McGarity at this point, Your Honor. We pass the witness.
THE COURT: Redirect?
MR. SINGER: Very short, Your Honor.

REDIRECT EXAMINATION

BY MR. SINGER:
Q. Mr. McGarity, what's the front cover of the owner's manual say again, please?
A. "Warranty information for break-action and pivot action rifles. This book contains information critical to the safe use and maintenance of Connecticut Valley Arms muzzleloading firearms." In bold it says, "You must read this material entirely and fully to understand this information before you can safely use your muzzleloader. If firearm is loaned or sold by a dealer or individual, this book must accompany the firearm. Replacement books are available from our factory. Call CVA customer service at 700"--so on and so forth.

Q. I want to interrupt you. "Read the whole thing," bottom line, right? It says, "Read the whole thing"?
A. Yes.
Q. And in the first part of it that you were referring to when you answered questions from me, what is the title of that section called that you referred to earlier? Isn't it called "Getting Started"?
A. Yes, it is.
Q. And there's no getting started a second time, is there?
A. No.
Q. BPI does not actually d/b/a CVA, does it?
A. No.
Q. It's a brand, right?
A. Yes.
Q. Coke does not d/b/a Sprite, does it?
A. No.
Q. Do you know, are you an officer, employee, director of the company today that sold the CVA trademark and brands to BPI's use back in 1999?
A. You mean am I involved in that?
Q. No. Today, as we sit here today, are you employed by that company?
A. By BPI?
Q. No. The company that sold the name to BPI?
A. No.

Q. Because BPI has the CVA trade name now?
A. Correct.
Q. You can use that logo?
A. Yes, we have the rights to the logo.
Q. BPI owns the rights to that?
A. Yes, we do.
Q. The name and logo?
A. Correct.
Q. You don't work for the company that sold that?
A. No.
Q. Now, the magnum, it came out well before the Kodiak and the falling block and the break-action, didn't it?
A. Yes.
Q. And BPI not only asked Dikar to produce a gun that was magnum-capable, BPI actually would have shot those prototypes too; is that correct?
A. That's correct.
Q. Did BPI have magnum products that it sold, that it recommended magnum loads in it before these ever came?
A. Yes, we did.
Q. Now, I want to ask you something because we've talked to you about-- Now, you've gone out and actually, as far as Kodiaks go, blown up, or tried to blowup, three of them with smokeless powder; right?
A. That was our goal, yes.

Q. And in each of the three did you use what you would consider excessive amounts of smokeless powder?
A. Yes, we did, and we used the most volatile types of smokeless powder. We used several different types of smokeless powder.
Q. I want you to describe for us what would prevent the action from coming down, that you described earlier, if it was frozen and wouldn't push down?
A. My understanding is that breech plug is impinging the action.
MR. SINGER: Thank you.
THE COURT: Recross?

RECROSS EXAMINATION

BY MR. EATON:
Q. Would you turn to your little warranty manual again, Mr. McGarity, and turn to page--I guess it would be 1 and 2.
MR. EATON: May we publish this again to the jury, Judge?
THE COURT: You may.
BY MR. EATON:
Q. This "Getting Started" that Mr. Singer just now asked you about, that's item B that follows item A, which is "Introduction to Break-Action Muzzleloaders," and then B, "Getting Started"?
A. Yes.
Q. We're still talking about part one of the manual, and we're

talking about the--what was it now--we're in the Optima section of the guns; correct?

A. Yes.

Q. And it doesn't say anything about this section applies to--or this part applies, or this subparagraph applies to Kodiaks, does it?

A. No, sir, it doesn't.

Q. And that part's not repeated back in section 2 of the book, which is specifically directed to Kodiaks. Would you agree with that?

A. I agree with that.

MR. EATON: All right. Nothing else, Judge.

Thank you, Mr. McGarity.

THE COURT: Anything further?

MR. SINGER: Nothing of this witness.

THE COURT: You may step down, sir. Thank you.

(Witness excused.)

THE COURT: Why don't we take our mid-afternoon recess at this time. Members of the jury, we'll be in recess for approximately 15 minutes. During the break period, please bear in mind the admonition given previously. We'll see you in 15 minutes.

(In open court, out of the presence of the jury.)

THE COURT: Counsel, when we adjourn today, I'd kind of like to give the jury an idea where we are. Do you still

anticipate we'll be arguing tomorrow, or are you thinking more in terms of Friday now?

MR. SINGER: Well, I misjudged when I didn't anticipate the plaintiff being on the stand for six hours, but I definitely think we'll be arguing it tomorrow. I have here a short deposition video to play, very short; one expert is already here, and he's out here, and I don't know how long the cross would last. But I would appreciate the Court's indulgence. I believe that if we did have to get out a little earlier today, we could go quicker tomorrow and certainly be done before lunch or by lunch.

THE COURT: The times sometimes haven't been too on point to this point. I just want to give the jury an idea. I think what I'll tell them is probably the case will be argued tomorrow, perhaps at the outside Friday, but the case is moving along about as the parties anticipated. Would that be a fair statement?

MR. EATON: I guess so. We're done, so--except for cross-examination.

Judge, I do have one other topic I'd like to take up while the jury is out.

THE COURT: Sure.

MR. EATON: That is the scope of this next witness' testimony, or--I think the next witness will be Mr. Chapin.

MR. SINGER: Yes, after the video.

MR. EATON: After the video, that's fine. I want to be assured Mr. Chapin did no further testing after I deposed him. I asked him specifically about that, if there was any other testing that could be performed to possibly detect the presence of smokeless powder. He said there were a couple other things that could be done, but Mr. Singer did not direct him or ask him to do that.

He hit that point three or four times in his deposition, and I just want to be sure he has not done any additional testing.

MR. SINGER: He has not.

MR. EATON: He has not. That's good enough for me.

THE COURT: Okay. 15 minutes.

(Short recess.)

(In open court, out of the presence of the jury.)

THE COURT: We're proceeding outside the presence of the jury, and it's my understanding that selection from the deposition of Mr. Muniategui--was I close?

MR. EATON: Close enough for us.

THE COURT: --Mr. Muniategui is going to be played as a part of the defendants' case, and the plaintiffs have an objection they wish to make to it.

MR. EATON: Your Honor, the plaintiffs would like to renew the objection that we asserted yesterday, and just make

sure we have a record on it.

The defendants, as I understand it, intends to play portions of Mr. Muniategui's deposition. That would be the portions page 60, line 20, through page 63, line 12; pages 78, line 16, through 79, line 1; and page 98, lines 14 to 21. For reasons we stated the other day--first of all, those portions were not counter-designated in the pretrial order; and, secondly, and more importantly, they are--they contain statements that we believe are hearsay, wherein Mr. Muniategui says in several of those segments "The proofhouse told us to put proofmarks on firearms that had not been proof-tested." I think all of these portions basically relate to that. There's simply--they are, we believe, being offered for the truth of the matter being asserted therein, so we object. Thank you, Judge.

THE COURT: Mr. Singer, any further record you care to make in regard to this matter?

MR. SINGER: No, Your Honor.

THE COURT: You're not offering, as I understand it, page 94, lines 7 through 14; correct?

MR. REYNOLDS: Correct.

MR. SINGER: That's correct.

THE COURT: Thank you. The hearsay objection is overruled. As counsel notes, the sum and substance of the testimony, as I understand it, is that the witness is going to testify that the proofhouse instructed Dikar as it relates to

the marking of the muzzleloaders and also, somewhat, the testing that was involved. As I indicated in the--the other day, instructions to a witness from another--concerning their conduct is not hearsay. I referred to a Third Circuit case that indicates that, as well as the Federal Practice and Procedure section, and I would incorporate that prior record by reference.

Now, do you want me to give another limiting instruction?

MR. EATON: Yes, Your Honor. In fact, we would like you to give that before the testimony is given.

THE COURT: Well, what I wrote out previously is something like this: "You're going to hear some testimony concerning instructions allegedly given to Dikar from the Spanish proofhouse, the House of Eibar, concerning proof-firing the muzzleloading firearms, and placement of the House of Eibar marks on muzzleloaders manufactured by Dikar. You may consider this testimony only to explain Dikar's reasons and motives for its procedures concerning testing and marking of its muzzleloaders. You may not consider the testimony as proving the truth of anything representatives of the House of Eibar may have said to Dikar. As to any other evidence, the weight, if any, to be given to the testimony is for you to decide."

Does that sound all right?

MR. EATON: It's satisfactory to the plaintiff as an admonition, Judge.

THE COURT: That's what I'll do, then.

Let's call the jury back in.

(In open court, in the presence of the jury.)

THE COURT: Members of the jury, thank you for bearing with us for a few minutes while we took up another matter outside of your presence. At this time you are going to hear some deposition testimony concerning instructions allegedly given to Dikar by the Spanish proofhouse, the House of Eibar, concerning the proof-firing of muzzleloader firearms, and placement of the House of Eibar marks on muzzleloaders manufactured by Dikar. You may consider this testimony only as it may explain Dikar's reasons or motives for its procedures concerning testing and marking of its muzzleloaders. You may not consider the testimony as proving the truth of anything representatives of the House of Eibar may have said to Dikar. And as with any other evidence, it is solely up to you to determine what weight, if any, to be given to the testimony.

With that, you may present the additional deposition testimony.

MR. REYNOLDS: Your Honor, Defendants call Jon Muniategui by deposition. We just have three very short excerpts.

THE COURT: You may proceed.

JON MUNIATEGUI, DEFENDANTS' WITNESS BY DEPOSITION

(The designated deposition excerpts were shown in open

court.)

MR. REYNOLDS: That concludes those excerpts, Your Honor. Thank you.

THE COURT: Thank you.

MR. SINGER: And we call Mr. William Chapin.

THE CLERK: Please step forward and raise your right hand.

WILLIAM CHAPIN, DEFENDANTS' WITNESS, SWORN

THE CLERK: Please take the stand.

DIRECT EXAMINATION

BY MR. SINGER:

Q. Would you state your full name, please.

A. My name is William Lee Chapin.

Q. Were you retained by me, Mr. Chapin, to conduct an analysis of the inside of the barrel of the Katzenmeier gun that we're here about?

A. Yes, I was.

Q. And were you asked to look for things in the barrel that you felt should be there that may not be there?

A. Yes, sir, I was.

Q. And to look for things that should not be there, if anything, that was there?

A. That's correct.

Q. Did you do an analysis?

A. Yes, I did.

Q. Did you find things in the barrel that should not have been there, or you did not expect to find if you assumed that the gun was fired one time with three Pyrodex pellets and a bullet?
A. Yes.
Q. And did you find things when you examined the gun that--or did you fail to find things that you expected to be there?
A. Yes, that's correct.
Q. Now, let me show you--I've got Exhibit MM--
MR. SINGER: May I approach?
THE COURT: You may.
BY MR. SINGER:
Q. Do you recognize that document?
A. Yes, I do.
Q. What is that, please?
A. This is a copy of my curriculum vitae.
MR. SINGER: I think that may be an A exhibit. I move it be admitted at this time.
MR. EATON: Plaintiff does not object to Defendants' Exhibit MM, Judge.
THE COURT: It's MM?
MR. SINGER: MM.
THE COURT: MM is received.
(Defendants' Exhibit MM was offered and received in evidence.)

BY MR. SINGER:
Q. Mr. Chapin, they'll have the CV back in the jury room with them. Tell the jury, though, about what education, what training, what experience you have that allowed you to do what you did in this matter, and come to the opinions and conclusions that you did?
A. Okay. I have a bachelor's degree in biology and chemistry from a small college in Kansas, Sterling College. After graduation, I went to work for the Ohio Bureau of Criminal Identification and Investigation. That's a criminalistics laboratory. It's a state-run lab. I did basically drug analysis in the five years that I worked there, and we serviced approximately 22 counties, or so, in the northeastern corner of the State of Ohio.
In 1978, and after completion of five years with the BCI, I went to a small county laboratory in Kansas. It was the Johnson County Criminalistics Laboratory, and that's a suburb of the Kansas City metropolitan area. And there I started out doing drug analysis, and moved into doing trace evidence, and was there for 20 years, took an early retirement.
Q. Excuse me. Let me interrupt. Were you a deputy sheriff?
A. Yes, I was. I was a commissioned sheriff in Johnson County. Being commissioned meant I was issued a weapon, had a uniform, went out and did some uniformed extra hire work, and some things like that, in off-duty hours.

Again, fast forwarding then to 1998, I took an early retirement. We had a 20 and out program, so I took an early retirement after 20 years and went to work for a private concern called McCrone Associates.

Q. Describe the McCrone facilities.

A. McCrone Associates is one part of a group called the McCrone Group. We have one group that is a sales group that has microscopic specialized tools necessary to do microscopic analysis. We have those tools created, and we sell those, we sell microscopes, we sell cameras, things that are necessary for a microanalysis to be performed.

A second part of the group is the College of Microscopy, and we teach courses at the College of Microscopy for basically laymen, for school teachers to come in, to use the techniques in their classrooms at the junior high, elementary, and high school levels. We also have very specialized technical courses for post-doc students that come in and do work with us, and we train them there.

The group that I work for is the McCrone Associates group, and we are a microanalysis group. It simply means we do analyses on small particles. We focus on microscopic aspects of that, isolating and manipulating very small particles. When I say small particles, that would--a very, very large particle to me would be a piece of sand, a sand grain. Typically the particles I work on are the size of a piece of pepper, or even

much smaller than that.

And we use the microanalysis to analyze anything from trace evidence in a criminal case, to many of the civil cases there are trace evidence or small particle aspects. And there's also another aspect which is working in the industrial world, where we're trying to figure out what's going on with various processes.

To do what I'm doing, I had the basic training in college, basic biology and chemistry. And then in the course of my work within the criminalistics field, the forensics field, every year there was one or two courses that I took, courses that would be specific to either a technique or a specific material, such as paint, or hair, or blood, or fiber, or explosives, or some specific material that I would be working on to get more in-depth training on how to apply my skills to that particular type of material.

After having been in the field for a while, I got to the point where I was doing a lot of teaching. I teach at the College of Microscopy. I've also taught several school--or classes, workshops, seminars through an organization that I'm very active in, the Midwestern Association of Forensic Scientists. I've given numerous papers and presentations there, am very actively administratively, president, vice-president, on the training and education committee, board of directors, and that kind of thing. In 2002 I was privileged to be awarded the

distinguished scientist award for that particular organization.

So you put all of that stuff together, with the 35 years that I've been in business, and that provides the basis of the experience, as well as the training that went into the kinds of things that were necessary, the skills and the analysis and interpretational skills necessary to look at this weapon, this muzzleloader in particular, as well as other things that I do.

Q. Do you have any hobbies?

A. Yes, sir, I do.

Q. What are those?

A. The two things that take most of my time, I'm very active in our local church, and probably the thing that is most time consuming, I raise--my son and I have a large flock of show sheep. We're out in the morning and nights, all kinds of time, working with them.

Q. Is there any particular training that's mentioned on your CV that would be uniquely applicable to this work in this matter?

A. Actually there's--I can answer that on two different levels. There are several courses, general microscopy courses, training me generally to use a microscope, how to use that. One course in particular is Small Particle Handling, Manipulation, and Sample Preparation. I took that in 1998. Those are the basic skills necessary to actually--physically moving particles, and figuring out how to deal with them.

As far as explosives are concerned, there are at least

two, if not three, courses there that I took, one in 1987 with the FBI in Quantico, and that was An Instrumental Analysis of Explosives and Explosive Residues; a second course in the year after that, 1988, was a Microscopical Analysis of Explosives and Explosive Residues.

Q. Have you, based upon--in your experience, been involved in finding and harvesting and analyzing various powder residues and explosive residues in farm-related incidents, bombs, and so forth?

A. Yes, I have.

Q. About how many times?

A. With a direct request, in other words specifically to look for explosive residues, probably, maybe, 50 times. Aside from that, in all of my crime scene experience there's always clothing and various other articles where you're looking for anything that's there, and you often run across explosive residues, gunpowder expended and unexpended from weapons. When you're looking--trying to do distance determinations, you're looking for how much powder and any type of pattern you have on clothing, and that type of thing.

So in that aspect there's probably another 100 or 150 where it was an ancillary thing of what I was asked to do.

Q. Were you given any photographs of the gun before you did any work?

A. No, sir, I was not.

Q. Have any pleadings or anything about this matter?
A. Just a short verbal description of the events.
Q. And what did you understand happened?
A. All I knew was that it was a muzzleloader, and that there had been some kind of an incident where allegedly the breech plug had come out and done some damage, some injury to an individual, and that the breech plug had not been recovered or was not available. That's all I knew.
Q. Now, sight unseen, before you first saw this gun, describe to the jury what you expected, given your education, your training, your experience, that you could see when you looked in that breech end of the gun.
A. Well, the first thing, the obvious thing when there's an alleged malfunction, is that I expected to see some kind of very obvious damage to the barrel, and I really didn't see anything that was obvious to me.
When you looked inside the barrel, there should be a crust of residue fouling, if you will. There should be expended and unexpended material, a propellant, specifically. Expended is the material that burns up, and when it burns up it undergoes a chemical reaction, releases energy. Everything is not consumed, and so it reorganizes itself into reaction products. They're physically present, that's why you have to clean guns to make sure that they don't corrode and so you get all of that out so they don't mess up your barrel.

I would have expected, having not seen anything on the exterior of the barrel, I would have at least expected to have been able to see some shredding, if you will, ragged edges and pieces of metal in the threads, assuming that--rather than the barrel blowing up, as if it were stopped up. If the breech plug had blown out the back, I would have expected, when the threads ripped out, I would have expected to have seen some shards and shredding in those threads that were left in the barrel that I did not see.

Q. Again, before you even saw it, you expected to see crust, expended and unexpended propellant, metal shards. How about particles? Any charring?

A. Yeah, that's all part of what I call the crust. The crust is a combination of several things. After two years you would expect a lot of corrosion just simply because of the propellant and the metal. So that makes up part of the crust I would anticipate seeing.

I would anticipate seeing some shaped particles, particularly if smokeless had been used. Typically that's a very specific shaped particle. It would be unexpended, things that didn't get burned up or didn't react.

There should have been--I should see some specks of charcoal that are in that that are part of the black powder or the Pyrodex that makes up the propellant. There should have been a lot of--or should be a lot of melted particles that are

not identical with each other because they're reaction products, but just a lot of globular kinds of metal, melted particles from the heat, and there should be a lot of consistency, and you should be able to see a lot of those, and should be very easy to harvest those kinds of particles. That all makes up the crust, as well as the fouling from the smoke, and just the real fine hazy kind of residue on the exterior as well as on the interior.

MR. SINGER: May I approach, Your Honor?

THE COURT: You may.

MR. SINGER: I'll just stay over there in the interest of time.

BY MR. SINGER:

Q. Mr. Chapin, let me show you Exhibit 1--excuse me--FF, page 1. Can you identify that photograph, please?

A. Yes, that's a photograph of the harvesting procedure. I'm partially in the photograph, the microscope that was used, and the muzzle end of the barrel.

Q. You obviously didn't take it if you're in it?

A. No. That's correct.

Q. Does that truly and accurately depict you as you were looking at it under the microscope, or actually looking at it with the light shining down on it?

A. Yes.

Q. And it shows the part of the microscope you utilized in part of your work in this matter?

A. Yes, it does.
MR. SINGER: We move that FF-1 be admitted.
MR. EATON: No objection to FF-1.
THE COURT: FF-1 is received.
(Defendants' Exhibit FF-1 was offered and received in evidence.)
BY MR. SINGER:
Q. I'll show you FF-2. Will you identify that photograph for us, please?
A. Yes. That's a photograph--I'm not in this photograph, I'm backed away from it, but it shows the barrel--the breech end of the barrel. There's also a device that I rigged up just to hold the barrel in place and hold it steady so I could look at it under a stereoscope. You can see a little bit of the stereoscope and light showing down on the breech end.
MR. SINGER: Ask FF-2 be admitted.
MR. EATON: No objection.
THE COURT: It's admitted.
(Defendants' Exhibit FF-2 was offered and received in evidence.)
BY MR. SINGER:
Q. Showing you FF-3, can you identify that photograph, please?
A. Yes. FF-3 is a photomicrograph. In other words, that's a photograph taken through the microscope, so it's a photomicrograph, of the inside of the breech end of the barrel

as I first saw it.
MR. SINGER: Okay. I move that FF-3 be admitted.
MR. EATON: No objection.
THE COURT: FF-3 is received.
(Defendants' Exhibit FF-3 was offered received in evidence.)
BY MR. SINGER:
Q. Let me just ask you about these, and then we'll get to those in just a moment.
MR. SINGER: May I publish these, Your Honor?
THE COURT: You may.
BY MR. SINGER:
Q. So that would be FF-1, and that's you, and that shows the microscope; correct?
A. A portion of the microscope, yet.
Q. It actually sits up higher. You can look down in it and have a camera; right?
A. That's correct. This is the lens here, I'm over here, and the eyepieces would be up above where you can see (indicating).
Q. Okay.
A. I'm sorry. I'm going to have to ask how to take the markings away.
Q. You just did.
A. Thank you.
Q. I'll show you FF-2. Is that, as you described, the device

you rigged to hold it still under the microscope?
A. Right. And the reason we had to do something like this, the microscope is sitting on a bench, and it's hanging out over the edge so that I can get down--there's no way to get that kind of an angle on the barrel and actually look inside it if the barrel is lying on the table. So we had to get it at an angle, and I rigged up the stand just to hold it. And I could also rotate it 360 degrees and look down inside the barrel at least, oh, maybe an inch and a half, two inches, something like that.
Q. And let me show you FF-3. Does that show the end of the barrel as you saw it?
A. Yes, it does.
Q. And how did you first obtain the muzzleloader?
A. It was brought to our facility by Plaintiffs' counsel.
Q. Mr. Eaton came?
A. Yes.
Q. Mr. Sparks came?
A. Yes.
Q. Mr. Wise came?
A. Yes.
Q. They had it in their possession in a closed container?
A. Yes.
Q. And they opened it up, and you put it under, and that's what you saw?
A. That's correct.

Q. And did you see crust, as you expected to see?
A. No, sir, I did not, not in the main--there were small areas that were a little bit crusty, but not as massively crusty as I would have expected.
Q. Did you see any expended or unexpended propellant that you thought you would see?
A. No, sir, I did not.
Q. Shards of metal you expected to see?
A. No, sir, I did not.
Q. Charcoal you expected to see?
A. No, sir.
Q. The uniformly consistent particles you expected to see?
A. No, sir.
Q. Now, in your analysis did you see anything that you did not anticipate you would see?
A. Yes, I did.
MR. SINGER: Your Honor, may I approach again?
THE COURT: You may.
BY MR. SINGER:
Q. Let me show you FF-4 and ask you to identify that, please. Just what is it and then we'll talk about it in a moment.
A. This is a highly magnified section of the threads where the breech plug would have been screwed in.
Q. And it shows something that you did not expect to see?
A. Right. It shows actually two things. It shows a clump of

fibers that are wedged in there, and it also shows a metallic-like material that is not--that is not visually consistent with the barrel of the weapon--I'm saying with the threads. So it's something that was added, a foreign material.

Q. And that truly and accurately depicts what you saw in the microscope when you took that picture?

A. Yes, it does.

MR. SINGER: Move that it be admitted.

MR. EATON: Judge, may I just look at it?

THE COURT: Yes.

MR. EATON: Plaintiff has no objection to FF-4, Judge.

THE COURT: FF-4 is received.

(Defendants' Exhibit FF-4 was offered and received in evidence.)

MR. EATON: Plaintiff has no objection to the next several exhibits. That's FF-5 through FF-9, no objection.

MR. SINGER: Move they be admitted.

THE COURT: They'll be received as well.

(Defendants' Exhibits FF-5 through FF-9 were offered and received in evidence.)

BY MR. SINGER:

Q. All right. Well, let's talk about that first. Now, this shows what you were talking about, the metal and the cotton fibers or wads?

A. Yes, it does.

Q. And, again, if it had something ripped out of there, and it had not been altered or changed, you would not expect to find cotton fibers embedded in there, would you?
A. No, I would not.
Q. Given it was the firing of a propellant, and there was hot gases and ignition and fire associated with the heat, would you expect to find these white fibers embedded?
A. No, sir, I would not.
Q. Now, FF-5 has been admitted, and I'd ask that you--I'm going to put that up. Just describe what this shows.
A. Put your--
Q. You can mark it, if you want to.
A. What you're looking at, down in this area is where the threads are, the breech plug threads. This is a small shelf above those threads. This in this area is the--what you would see as a flat surface from the end of the breech end of the barrel to the top of those threads.

What you're seeing here as these white specks are just little particles of debris, very small, again, the size of a piece of pepper or smaller, just very small particles that are lying there.

What you can also see here are--and I don't want to do any more marking because I'm afraid I'll distort what you need to see, but there is--one, two, three, four, five--six, and then there's another--and there are other marks, and you can see that

they're lines, they're dark lines, they're mars on the surface. They're not parallel with each other, so it's not from twisting something out because they're not uniform, they don't follow any kind of a pattern. They're not from the--if the breech plug were blown out, you would expect more movement of the lines from--they would be straighter and more parallel from top to bottom as you're looking at their--from bottom to top as you're looking at the slide. These lines kind of wander around and kind of cross over each other and go in different directions.

What that indicates to me is something has been moved up and down on that surface, and not really scratched the surface because there's no deep etching of the surface, but at least left marks as if something has gone in and out, something like this, a few times. (Indicating throughout.)

Q. Were they just on the back behind the breech plug?

A. No, sir.

Q. Were you able to detect them other places?

A. Yes. You can actually see them go across the threads of the breached threads, and then when you were in the microscope, I could see them moving on past that down into the land and groove area of the rifle. Now, I couldn't see more than a half-inch or so below those threads down into the barrel, I just couldn't because I was looking at it through the end of the barrel not cut open. So I don't know how far they went, but they certainly extended below the threads.

Q. And those mars you say were made by something, it appeared to you did not actually scratch the surface, but marred it?
A. Right. Uh-huh.
Q. What is FF-6, please?
A. FF-6 is actually looking at the threads on the breech end. If you look up here in this corner, right here, that's that shelf, if you will, above the threads. So you've got the shelf here, and then up in here would be the flat area we just talked about, we saw on the last slide. So this is looking deeper into the barrel on the breech end and you're actually looking at the threads that would have held the breech plug. (Indicating throughout.)
Q. Do you see anything that you did not expect to see there?
A. What you can see in this picture are actually a couple, three different things. The material that you can look at and perceive as being slightly reddish in color, it's corrosion, it's rust, probably got there after the fact. So we're not concerned with the reddish material. What I'm concerned with is what you see here, is this grayish material in several places. This is that foreign metal--soft metal, like material that's pushed down in the grooves between the threads. In some areas it's actually smeared over the top of the threads.
The other thing that we see here is there's quite a bit--you can see right here there's kind of a half moon. It's a piece of lint. It's dirt that has gotten there after the fact.

So you never want to see extraneous material in something like this when you're trying to identify small particles and trying to figure out what's going on because it's an indication of contamination. (Indicating throughout.)
Q. Is FF-7 a close-up of an area of FF-6?
A. I'm confused on the numbering, I'm sorry. Which is which?
Q. I'm putting on here now--and the color is not quite right, and I apologize, but what is FF-7? Is what I have on the screen now a close-up of an area shown in the one we just discussed?
A. Yes, sir, it is.
Q. And describe to the jury the couple of things you see in there that you would not expect to find.
A. Well, again, here's another piece, another long piece of fiber, there's a particle. You know, there's just a lot of particles on there that are contamination.
This is kind of an unusual particle here that I wouldn't expect. It's a shaped bead. I don't know what it is, I couldn't remove it, I couldn't do anything with it. The interesting thing is that after a violent action like that, there should not be a shaped particle present. It should have been crushed, melted, blown. There should have been something there, you just should not have seen those kinds of particles here. It was another small indication to me there was contamination.
You can also see in here, again, you can see--where

you see gray, you can see the foreign metallic-like material that's pushed down into those threads. (Indicating throughout.)
Q. And you were not able to determine what that bead was made of or what it was? Something that was stuck in one of the threads?
A. That's correct.
Q. Let me show you FF-8 on the screen, see if you can tell the jury what you see--or is depicted in FF-8.
A. FF-8 is a lower magnification picture of the same area as FF-7. As you can see, it's got much better lighting to it so that you can see much better the gray material that's forced into those threads in those areas. There's your bead, kind of out of focus. Right there is the fiber-like particle, and you can see a lot of other just miscellaneous particles just all over the surface there. Again, the red material is probably corrosion, rust, and should not really interfere--it interferes, but it's to be expected. (Indicating throughout.)
Q. Let me show you FF-9. What is that, again?
A. That's another image, photomicrograph of the area. It's a higher magnification, highest magnification we've seen yet. This is the bead. You see some other melted material now. It's colorless, but you can see it in that area. This is your fiber here, and, again, you can see other kind of out-of-focus miscellaneous particles on the surface. (Indicating throughout.)

Q. After seeing all this soft metal, were you able to ascertain that it was Cerrosafe--
A. Yes, sir.
Q. --that had somehow gotten in there unbeknownst to us?
A. Yes, sir.
Q. Now, let me ask you, first of all as a scientist trying to find out what's in there, what does the presence, just by itself, the Cerrosafe in the grooves and on top of the things, what effect did that have on your ability to do what you do?
A. Cerrosafe, as well as some of these other things, indicated the presence of contaminants, something that I know should not be in a weapon that has been expended, been used, and brought directly for analysis.
The elements that are in the Cerrosafe are not consistent with anything that's known to be a part of either the weapon, muzzleloader construction, or the propellant, or the bullets, or anything like that that would go into it. It's a completely different set of elements, so it indicates simply to me that it was contaminated before I got it.
Q. Now I'll ask you to assume, and I'll represent to you that Mr. Roane, who put it down there, said he used some Cerrosafe that they had for years that they reuse. Given that it was reused Cerrosafe--
MR. EATON: Objection. I think. That misstates or mischaracterizes the evidence. When he said "reused," he meant

reused from the same original stuff, not recycled from the same container. Used it in several experiments.

THE COURT: Let's rephrase the question. Of course this is an area where the jury would be required to recall what the prior testimony was. Rephrase your question, please.

BY MR. SINGER:

Q. Is it your understanding Cerrosafe is reused?

A. It's designed to be reused.

Q. If the Cerrosafe that was put in here was reused, had been used before for anything, what effect, if any, does that have on your ability to make an assertion of what was in the barrel?

A. To use Cerrosafe, it's heated so that it's a liquid, it's molten. It's a thick viscous liquid, it's liquid and it's molten. It's about 100, 158, 160 Fahrenheit, 190 degrees Fahrenheit.

If you put that with--you put that in the threads, and it will loosen the particles that are on the surface, and those particles will float, if you will, into the solution, into that Cerrosafe. So it will physically pull those particles off so they're not available to you to look at.

Additionally, once it hardens, had there been some shredding of metal, and things like that, that would have been in the threads before, that was put in, there would be a likelihood it would pull those particles off physically because you put it in, let it cool and harden, and you screw it out.

When you do that, when it hardens, it's like putting a piece of gum, if you will, on--you drop it on the ground and you pick up the particles. Once that gum hardens, it's hard to get that dirt out of it, so it adheres to it, it's part of the cast.

The other thing that happens is that some of the particles will actually be solubilized, if you will, dissolved into--when we're talking on an element level, not--if you take a piece of salt, or something, it would have the potential of being melted and actually becoming part of that Cerrosafe.

So what happens when you do that, it pulls stuff off, it's in the Cerrosafe. Now, if someone chooses to use the same Cerrosafe, in other words take their cast, remelt it, and pour it, if they're going into a different weapon, or a different material, there's the possibility, it's not a high likelihood, but certainly the possibility of transferring material from the unassociated--the previous material that you're casting from into what you're trying to make the current cast of at the level of which I'm looking. So you're transferring, you're cross-contaminating, or have the potential of cross-contamination there.

Q. Let me ask you, Mr. Roane testified that he put a hard wad of cotton in the muzzle end and drove it down all the way to the breech to form a damn. What effect, if any, would that have, that action, unbeknownst to us, on your ability to look in the barrel and find what might have been used?

A. The purpose of that is to create, if you will, a floor for this hot molten metal so that it doesn't run out. For that to be efficient, it has to be very tight on the edges. That material is, to my understanding, is generally put in on the muzzle end and pushed all the way up, so you've got a tight-fitting plug pushing all the way up. So what is that going to do? It's going to act as a cleaner, a physical cleaner and push that debris up to the stopping point so that any of the particulate that I want to look at on that muzzle end has been physically removed. It's been pushed up into another area.

Then you add the Cerrosafe to that, even if you've got piles of it up there on the cotton wad, it's particles, and so therefore it's hot--it's going to get incorporated into the bottom portion of that Cerrosafe material, so it's gone for anything that I might want to be able to do.

Q. What does get incorporated gets thrown away with the cotton wad; right?

A. Yes.

Q. Now, you didn't know any of that when you did your analysis, did you, sir?

A. No, sir, I did not.

Q. I just asked you to look at it the way they brought it to us; right?

A. Yes.

Q. Did you do a rinse, an acetone rinse, a water rinse?

A. Yes, I did both.
Q. Did you find anything in the acetone rinse that would interfere with your ability to determine whether there was smokeless present?
A. Yes, I did.
Q. What was that?
A. Acetone is an organic solvent so it's designed to remove organic materials. It's used to look for the organic portions of smokeless powder, nitrocellulose, nitroglycerin, primarily. It will also dissolve anything else that's organic. In this case it removed a lot of oil, standard, I can assume, gun oil, but I can't say gun oil because I didn't actually do the testing. But it was an oil, similar to a gun oil, similar to a 3-in-1 oil, to those type of oils.
So when the acetone--it's rinsed out of the barrel, dissolves all this stuff, it's collected in a beaker, acetone is evaporated away, and what I was left with was an oily goop, if you will, at the bottom of my beaker. That oil would have contained mixed in it the organic materials that I would have wanted to evaluate.
Q. How does that presence of oil affect your ability to ascertain whether there was smokeless powder in the barrel?
A. If you had a very high proportion of unexpended smokeless powder, in other words you had a lot of nitroglycerin, you had a lot of nitrocellulose, you've got a high likelihood of being

able to separate it. It takes a lot of work, a lot of time, it takes some research, but you would have a high likelihood simply because you've got a lot of one in relationship to the other.

So it could be done on a theoretical basis. In this case where I had not found any indication of any nonexpended propellant of any kind, the probability of there being more than a minuscule amount, the ratio would be such that it would be virtually impossible, even if it were there, to pull it out because of the oil.

Q. Would it have been scientifically prudent to do any additional testing other than what you did in an effort to analyze what you had present?

A. It really wasn't. Given the fact that there was already obvious contamination to the inside of that barrel, the likelihood--the extremely low likelihood of finding anything, it simply would have--I would have had to charge a lot of people a lot of money for nothing, and the ability was not scientifically appropriate to do that.

Q. That is based upon what you knew at the time, right, just what you saw?

A. Yes, that's correct.

Q. Without knowing this cotton, hard wad, had cleaned, in effect, the barrel?

A. That's correct.

Q. Now, let me ask you--I'll just put it up again--at the time

you did your work, that's what you were presented with; correct? That was the condition of the barrel?
A. I think you need to hit another button, sir.
Q. Oh, I'm sorry. Is that correct, your Exhibit 3?
A. I'm only seeing it over there, but, yes, that is correct.
Q. And at the time of your report, had you seen Exhibit XX, which is in evidence, and was in a condition--photographs taken by Mr. Wise, investigator for the Plaintiffs' attorneys, of this gun sometime shortly after the incident, had you seen those when you prepared your report?
A. No, sir.
Q. Does that show the crusting that you would have expected to find?
A. Yes, it does.
Q. Does that show what appears to be expended propellant that you would anticipate finding?
A. It certainly shows a high likelihood it's present. It's hard to tell without a microscope.
Q. As a scientist you're not going to say that that's a propellant under oath?
A. That's correct.
Q. That's the kind of stuff you wanted to look for and thought you would see?
A. That's absolutely correct.
Q. Do you see any, what appears to be, the charcoal-type stuff?

A. Charcoal, it would be too small to see at this magnification.
Q. Do you see anything that appears to be of the consistency of the shapes that you thought you would find that were not there?
A. Yeah. If you look at a combination of photographs, this photograph here shows the crustiness very nicely in this flattened area along here. This photograph shows very nicely the particles, the large particles in this area that would have a high potential of being either expended or unexpended material, the kinds of things that would have a high likelihood of me having success of making the determination of the type of propellant that would be present. (Indicating throughout.)
Q. And as you look at these, do you also see, what appear to be extensively throughout this, pieces of metal shards?
A. Yes, you can see them. Again, primarily--if you can pull the fulcrum up on the machine? Slide it up on the machine, please.
Q. Slide it this way (indicating)?
A. Yes, please. Right there you can see several pieces of metal that are rolled over. There's also some more up to the right where I drew that second arrow, and there's other areas there. (Indicating throughout.)
Q. Can you see them here as well, and in here (indicating)?
A. There are objects there, but as I see them on the screen--perhaps if I had the photograph in front of me I could make a

better determination. It's possible they would be there.

MR. SINGER: May I approach?

THE COURT: You may.

BY MR. SINGER:

Q. I'll show you XX.

A. It certainly appears that they're there in those two photographs, also.

Q. Was this gun, for purposes of what you were asked to do, and asked to look at, was the condition of it spoiled before you got it?

A. Yes, it was.

Q. Things were removed that were there after the incident?

A. That's correct.

Q. And things were in there that should not have been there and wouldn't have been there after the accident?

A. That's correct.

MR. SINGER: Pass the witness.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. EATON:

Q. Mr. Chapin, let's talk about what you did find, and then we'll kind of go back and talk about what you didn't find, and what significance that might have.

Now, is it true that you did find residue, after washing the barrel first with distilled water, and then later

with the acetone, particles that were consistent with black powder?
A. I found particles that had elements that could be consistent, not that they are consistent.
Q. Did you find particles that were consistent with Pyrodex?
A. Again, same answer, particles that could have come from those materials. They also could have come from a lot of other kinds of materials.
Q. Well, they could not have come from smokeless powder. Would you agree with that?
A. Some of the particles could have come from smokeless in the same vein that they can't be eliminated as having originated from them.
Q. Do you remember when I took your deposition, Mr. Chapin?
A. Yes, sir.
MR. EATON: May I approach the witness with a copy of his deposition, Your Honor?
THE COURT: You may.
BY MR. EATON:
Q. Do you remember--let me see. Would you turn to page 33, Mr. Chapin. You got it there? Did I not give you the right deposition?
A. I'm sorry. I'm seeing a lot of materials, but I'm not seeing the deposition.
Q. That may be just the exhibit book. Here's another copy.

MR. EATON: May I approach?

BY MR. EATON:

Q. Is that just a book of exhibits?

A. Yes, exhibits only.

Q. Okay. Here's a smaller copy of your deposition.

A. And 33 of the deposition, or 33 of the packet?

Q. Is that a copy of your deposition?

A. Yes, but there's four numbers per page.

Q. Have you got a page there that says 33?

A. It says 33 here. Is that the page, or are you referring to the page number down here (indicating)?

Q. No. It's got four pages on it, 33, 34, 35, and 36.

A. Okay. Thank you.

Q. Before we get to that, let me ask you, what is nitrocellulose?

A. Nitrocellulose is a cellulosic material that is impregnated with nitrogen so that it creates an explosive material.

Q. Is that a marker for so-called smokeless powder?

A. It's one of the things, yes, sir.

Q. In other words, if you're doing an analysis and you see traces of nitrocellulose, you're thinking smokeless powder; is that correct?

A. That's correct. It depends on the context, but, yes, sir.

Q. It's contained in smokeless powder?

A. It is contained in smokeless powder, yes, sir.

Q. Now, calling your attention--starting at line 2, did I ask you the following question: "And then did you find any indications, in your analysis of the particles and residue from the Katzenmeier gun, did you find in the course of the FTIR analysis any evidence of nitrocellulose or nitroglycerin?" What's your answer?

A. "To the extent that those materials were analyzed, no, I did not."

Q. "Question: Now you said in that residue, I believe, of the acetone wash you found some trace of cellulose; is that correct?" Your answer was?

A. "Carbohydrate material."

Q. Next question, "Carbohydrate which was indicative of, perhaps, cellulose?" Your answer?

A. "Probably cellulose. It could be sugar."

Q. "Question: Okay. Do you know if sugar or cellulose are constituents of smokeless powder?" What's your answer?

A. "Not with smokeless powder. There are certain black powder substitutes that use sugars."

Q. "Question: And do you know what black powder substitutes those would be?"

A. "I'd have to go back and do some looking for specifics."

Q. "Question: Do you know if Pyrodex--are you familiar with Pyrodex?"

A. "Yes."

Q. "Do you understand Pyrodex to be a black powder substitute?"
A. "Yes."
Q. "Question: Do you know if Pyrodex contains the sugars and/or type of cellulose trace you found?"
A. "The Pyrodex brands that I know of do not, as far as I know."
Q. So you found some trace evidence that would be consistent with black powder; correct?
A. Black powder could not be eliminated as a source, that's correct.
Q. And neither could Pyrodex?
A. That's correct.
Q. But from the samples you were able to retrieve, you found no evidence of smokeless powder; is that correct?
A. Well, there are certain smokeless powders that contain some of the potassium and nitrates, and things, just like the Pyrodex, and just like the black powder. They also contain these other things, but they do contain the things that I found, the potassium, in some cases there's a little sodium, I believe, in some of them. So they can't be eliminated in the same way that Pyrodex or black powder can't be eliminated.
Q. What I'm trying to get to is you found trace elements that were consistent with Pyrodex and black powder; is that correct?
A. As well as being consistent with a lot of other things.
Q. Please, answer my question. Mr. Singer, he'll come up here.

Just answer my question.
Did you find trace elements that were consistent with black powder and Pyrodex?
A. Sure.
Q. All right. Now, I think you're trying to also say it's possible that those same elements could be found in smokeless powder. Is that what you were wanting to say?
A. And a lot of other things, too, that's correct.
Q. All right. All right. But what you did not find in your inspection of these materials that you retrieved from the residue was nitrocellulose; is that correct?
A. That's correct.
Q. And nitrocellulose is what you would expect to find in smokeless powder; is that correct?
A. It's the primary marker I'd be looking for, that's exactly right.
Q. It's the primary marker, it's the main thing you look for to confirm that you've had smokeless powder in there; correct?
A. That's correct.
Q. You did not find that? It wasn't there?
A. That's not a correct statement.
Q. Okay. It's a bad question. You did not find nitrocellulose in the residues that you were able to retrieve; is that correct?
A. That's correct.
Q. So the primary marker of smokeless powder was not there; is

that correct?
A. That is not correct. I cannot say that that's a correct statement.
Q. You did not find any evidence of the primary marker of smokeless powder in the residue you analyzed; is that correct?
A. That is correct.
Q. All right, sir. So when we boil all that--this and that possibility out, what we come to is there was evidence that is consistent with back powder or Pyrodex? Yes?
A. Yes.
Q. And there was an absence of the primary marker for smokeless powder; is that correct?
A. I cannot answer that yes according to scientific accuracy.
Q. All right. You're not going to say it wasn't there because you didn't perform these other tests that you said would be very expensive to do?
A. That's correct.
Q. What is true is, in the tests you did perform, you found no evidence of nitrocellulose, which is the primary marker for smokeless powder?
A. That is correct.
Q. And in your deposition at page--beginning on page 52, line 23, and following on to page 53, was the following question asked and answer given: Question, beginning at line 23, "Okay. I'm going to just kind of bypass a few things so we can get to

the end, and then if I need to go back. In your chemical analysis of the residues found in the barrel, including the breech area of the Katzenmeier gun, did you find any evidence which indicates to you that smokeless powder had probably been fired through that gun?" And what is your answer?
A. "Not within the confines of the testing that I was asked to perform."
Q. And the next question: "Okay. So based on all of the analyses, and all of the testing that you and your colleagues here at McCrone performed, is it your testimony that there was no evidence to establish that smokeless powder was probably fired through the gun?"
A. "I found nothing to indicate that smokeless powder was present in the confines of the testing I performed."
Q. And then going down to page 54, line 11, a question was asked, "Your analysis, I'm trying to get to the--your analysis of the residue and the particles found in the Katzenmeier gun was consistent with the residue that would be found if Pyrodex had been fired from the gun; is that correct?"
A. "That's correct."
Q. Then on page 62--
MR. SINGER: Your Honor, I'm going to object to this. He's just going through the deposition and reading excerpts. There's no question to the witness. I object.
THE COURT: Is this--

MR. EATON: This is continuing impeachment of the direct examination.

THE COURT: Is this something you're claiming is inconsistent with his testimony?

MR. EATON: Yes, sir.

THE COURT: Go ahead.

BY MR. EATON:

Q. Beginning at page 62, line 18, do you see that, sir?

A. Yes, sir.

Q. "Question: I understand that if you perform those analyses, it's possible that you would find some indication of smokeless powder. But what I'm really saying is, based on what you did find, that you positively affirmatively found, is there anything which would suggest that there is evidence of smokeless powder in the residue of the acetone wash, or is that a mere possibility?" And your answer was?

A. "It's a possibility. I found nothing to necessarily suggest it."

Q. Now, apparently you have some familiarity with these materials, what are called eutectic materials. You know what those are, don't you?

A. Sure.

Q. You know what Cerrosafe is; correct?

A. That's correct.

Q. It's one of those eutectic materials; is that correct?

A. That's correct.
Q. And one of the purposes of the eutectic materials is to make castings of various kinds of vessels or structures; is that correct?
A. Yes, sir.
Q. Have you ever used eutectic materials in your work?
A. No.
Q. Pardon?
A. Not of this type. I've used some of the plastic casting materials, but not of this type.
Q. Would you turn to--I believe it's Plaintiffs' Exhibit No. 17. That would be in that big black book to your left, the big one to your far left there. I believe on page 2 of five pages there's a list of HiTech alloy products. Do you see that?
A. Yes, sir.
Q. That's been received into evidence in this case previously. Can you look at that for a second? We've got a prettier picture of that in another copy of this exhibit that's in color, but for our purposes here I think that will be good enough.
Okay. All right. Cerrosafe is here. Would you just read the little thumbnail history of that Cerrosafe product and what it's used for.
A. "Cerrosafe alloy was originally made for toy soldier castings. One of its most popular uses today is casting to check gun chambers. Cerrosafe shrinks during the first 30

minutes, and at the end of one hour is exactly the same chamber size. Some other uses are casting cavities such as threads, dies, molds, blind holes, duplicate patterns in foundry match plate making, support work plates"--excuse work--"support work pieces while machining, spray coating wooden patterns, dental lab techniques, masking for electroplating. Cerrosafe is a noneutectic alloy with a yield temperature of 162.5 Fahrenheit."
Q. Now, you'd agree that Cerrosafe, at least by its manufacturer, is used to cast threaded cavities and threaded, I guess, connections. Would you agree with that?
A. That's correct.
Q. You criticized the use of it by Mr. Roane because you believe it affected, adversely affected the surface, particularly in the breech area of this Katzenmeier gun, for purpose of subsequent analysis; correct?
A. I don't believe I criticized anyone for anything. I simply stated fact.
Q. Are you saying you're not critical of Mr. Roane for using Cerrosafe to make a cast or a mold of the interior of this barrel?
A. I cannot sit here and tell you at whose direction, whether Mr. Roane did it under his own direction, or whether it was somebody else's direction. I have no idea why it was done, when it was done, other than it was done before I received it and I didn't have that information at the time.

Q. If Mr. Roane had done it of his own volition, would you be critical of that?
A. Then I would be critical. If I knew that Mr. Roane had done it at his own volition, I would have been critical of him. If it was done at the direction of someone else, I would be critical of them.
Q. Okay. So if Mr. Katzenmeier's lawyers directed Mr. Roane, or authorized Mr. Roane to do that, you would be critical of them?
A. For the purposes that I needed to do the examination, yes.
Q. However, you were able to retrieve sufficient residue to perform tests which disclosed the existence of trace elements consistent with black powder and smokeless powder; correct?
A. No, that is not correct.
Q. You don't think you retrieved--were able to retrieve enough material to perform proper testing?
A. That's closer to being accurate.
Q. Now, do you know under what conditions this barrel--this gun, including the barrel, were retrieved and maintained for several weeks after the incident occurred?
A. No, sir.
Q. Now, you worked--I think in your resume or CV you talked about working for a sheriff's office--
A. That's correct.
Q. --at some point in your career, a sheriff's office in

Kansas?
A. That's correct.
Q. Was that in a rural area or in an urban area?
A. No, it was an urban area, sir.
Q. Urban area?
A. Yes, sir.
Q. Are you familiar with Ogden, Iowa? Do you know what kind of an area Ogden, Iowa, is?
A. No, sir.
Q. Boone, Iowa?
A. No, sir.
Q. Have you been in evidence rooms in county sheriff's offices or departments in rural areas around the country during the course of your career?
A. No, sir. Evidence rooms are off-limits.
Q. Pardon?
A. Evidence rooms are off-limits, typically.
Q. So you've never been in the evidence room of a rural sheriff's office or department; correct?
A. No, sir.
Q. So you--I guess you have no knowledge as to what officers from the sheriff's office, Boone County Sheriff's Office, did with this gun when they retrieved it and took it to the evidence room and left it there for several weeks before turning it over to Mr. Katzenmeier; am I correct?

A. You're correct.
Q. Now, you found evidence of rust or corrosion in some of these photographs that you took; correct?
A. That's correct.
Q. And you would expect to find evidence of rust or corrosion in a gun barrel through which smokeless powder--pardon me. Pardon me. I said it wrong.
You would expect to find rust in the barrel of a gun through which black powder had been fired and left uncleaned for a time--
A. Yes, sir.
Q. --would you agree with that?
And you would--and if Pyrodex had been fired through a gun barrel, and the barrel was left uncleaned for several weeks, you would expect to find corrosion in that gun barrel, wouldn't you?
A. Given the same conditions, there should be less corrosion with Pyrodex.
Q. But with both you would expect some degree of corrosion from the propellant?
A. That's correct.
Q. Smokeless powder is not so corrosive, is it, as those two materials we just talked about?
A. I'm trying to recall specifics, and I really can't answer that.

Q. You're unaware as to whether smokeless powder is corrosive or noncorrosive?
A. I'd have to go back to some literature and look at that, so I can't--I'm not aware right now. I'm not on firm enough ground.
Q. As we're talking about that, does it--would it refresh your recollection if I were to suggest to you that one of the advantages of smokeless powder is that it is noncorrosive? Does that refresh your recollection any?
A. Well, part of the problem is that we're--in my mind, the application of using smokeless is not for muzzleloaders. And so, therefore, you've got some issues with having similar pressures, temperatures, all of that kind of thing going on if they're typically used for different applications. And so that's kind of where I would have to dig into the literature a little bit.
Q. Okay. So you really--well, let me ask it a different way.
Corrosion in the barrel of a gun through which smokeless--black powder or Pyrodex had been fired would be more likely than corrosion in a barrel where smokeless had been fired. Would you agree with that?
A. I'm just simply not prepared to answer that question.
Q. All right. Well, at least you acknowledge that black powder and Pyrodex cause corrosion?
A. Yes.

Q. All right. Now, you referred to Cerrosafe as a molten material; correct?

A. When it's applied, yes, sir.

Q. Okay. And so to change Cerrosafe from its solid form to its molten form requires a temperature of--what was it the exhibit said--162.5 degrees Fahrenheit? And you can refer to Exhibit 17 for your reference.

A. Yes, that's what it says.

Q. Now, that certainly won't melt steel, will it?

A. No, sir, it will not.

Q. What kind of a melting point do carbon steels typically have?

A. I'd have to guess at something over 2,000 degrees Centigrade, probably.

Q. So to make Cerrosafe, this material that's used for casting, casting threads, among other things, it only has to be elevated to 162.5 degrees Fahrenheit to become molten?

A. That's correct.

Q. But steel has to be heated to about 12 or 13 times that to become molten?

A. Something like that.

Q. So I take it from that that you don't contend that the use of Cerrosafe melted any of the--any portions of the threads, or residual threads, in the barrel of the Katzenmeier gun; is that correct?

A. That is correct.
Q. So it didn't change the metallic structure of whatever metal was left in that barrel; is that correct?
A. Unless there's something going on on a microscale that's beyond my expertise.
Q. Maybe it is. That's what I'm getting to. From a thermal standpoint--
A. From a thermal standpoint, no.
Q. From a thermal standpoint Cerrosafe would not change the metallurgy of what's left of the breech area of the Katzenmeier gun?
A. I wouldn't expect that, no, sir.
Q. No, that's not correct, or--
A. I would not expect that the thermal properties of Cerrosafe would have an effect on the metal of the gun barrel.
Q. Okay. I think we were on the same wavelength, but I asked you kind of a bad question in the negative form, and I'm pretty sensitive about that because sometimes when it's in black and white in the transcript, it's not very clear. So I apologize for my kind of improper formation of the question.
Now, let's turn to chemical--and you may have already answered it, or at least suggested it in your answers, is there anything that you know of in Cerrosafe, any compound or constituent of Cerrosafe, which would alter or change the chemical aspect of the carbon steel which comprised

Mr. Katzenmeier's barrel?
A. It's really outside the area of my expertise.
Q. Fair enough. Fair enough. We're done with that now.
You were talking about this--when you did the acetone wash, and then you evaporated it off to get down to this--what you referred to as oily goop--do you remember that?
A. Uh-huh. Yes, sir.
Q. What you were looking for was--if you'd have been looking for nitrocellulose, the primary marker for smokeless powder, which is an organic material--and you said as a practical matter it was very expensive or very difficult to do with this sample you were able to get. You mentioned something about oil, that oil came from somewhere.
A. That's correct.
Q. To make this-- Now, where did you believe that this oil came from to create this oily goop?
A. In the manufacturing process, weapons that have--any firearms will have at least a thin coat of oil on it, the exterior as well as the interior, to keep the surfaces from rusting, to help protect them a little bit. It's a normal practice when you clean a gun, you use oils to clean it, get rid of all the goop. You put a thin layer of oil on it to keep all the mechanisms working properly and, again, to help cut down on the corrosion aspects.
Q. Now, do you know if Mr. Katzenmeier's gun--obviously I guess

you're presuming that it had some patina of oil on it from the factory?
A. Yes, sir.
Q. Do you know whether or not he had ever used any oils to further clean or lubricate it prior to the incident?
A. No, sir.
Q. These oils that you're talking about, would these oils that are typically placed there by a manufacturer still be in the barrel of the gun through which a clean patch had been run?
A. Yes, sir, they would.
Q. Okay. So if someone has a brand new gun, and before they shoot it, they run a clean patch in and out of it, that would still leave some oily residue?
A. That's correct.
Q. Okay. So that didn't--that was not a surprise to you, that there was a little bit of oil there?
A. No, sir.
Q. In fact, you expected that?
A. That's correct.
Q. And so the residue that you got down to in this oily goo included the gun oil that was probably placed there by the manufacturer. And what other materials would have been in that oily goo, based on what analyses you'd already done? What elements would you expect to be in that oily goo?
A. Well, again, the double-based powders--any organic material

that would have been used, and the nitrocellulose, the nitroglycerin, and other components in the smokeless powders are organic, so I would expect those to be solubilized and be washed into that matrix.

The other thing that I did find, when you perform evaporation, you get rid of the acetone. A lot of times if you look very, very carefully at the residue that's left, what physically happens is that it evaporates in rings. So it partially separates materials so that you have something in the outer rings that evaporates and is deposited there first, and then it may not be in the core of the material, the residue that's left. That's what I saw in this case.

There was a difference between the core of the residue after the acetone evaporated, just a physical textural difference between that, and what was out here at the outer edges. So what I was able to do was just sample the outer edges, and that's why I picked up this carbohydrate material which could be a dissolved cellulose, it could be a sugar of some kind. A carbohydrate is a general term that takes in lots of different materials that you can't specifically identify using the instrumentation that we used on this.

THE COURT: Counsel, we'll take our evening recess at this time.

Members of the jury, during the evening hours please bear in mind the admonition given previously. We'll see you at

9 o'clock.

(In open court, out of the presence of the jury.)

THE COURT: We have the draft instructions for you that Kathy is going to give you. Why don't you come up to chambers, we'll have a brief discussion, and then I'll cut you loose.

MR. EATON: Thank you, Judge.

(Recess at 5:10 p.m., until 9 a.m., Thursday, December 11, 2008.)

C E R T I F I C A T E

I, the undersigned, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that I acted as the official court reporter at the hearing in the above-entitled matter at the time and place indicated;

That I took in shorthand all of the proceedings had at the said time and place and that said shorthand notes were reduced to typewriting under my direction and supervision, and that the foregoing typewritten pages are a full and complete transcript of the shorthand notes so taken.

Dated at Des Moines, Iowa, this 27th day of February, 2008.

/s/ Theresa Kenkel
CERTIFIED SHORTHAND REPORTER