IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - - - - X
JON D. KATZENMEIER and :
JULIE KATZENMEIER, :
Husband and Wife, :
:
Plaintiffs, :
:
vs. : Case No. 4:06-cv-00169
:
BLACKPOWDER PRODUCTS, INC., : TRIAL TRANSCRIPT
a Corporation, d/b/a :
CONNECTICUT VALLEY ARMS; : Volume VII
and DIKAR S. COOP, :
:
Defendants. :
- - - - - - - - - - - - - - - - X

Courtroom, Second Floor
U.S. Courthouse
123 East Walnut Street
Des Moines, Iowa
Thursday, December 11, 2008
9:15 a.m.

BEFORE: THE HONORABLE ROSS A. WALTERS, Magistrate Judge, and a Jury.

THERESA KENKEL - CERTIFIED SHORTHAND REPORTER

APPEARANCES:

For the Plaintiffs:

GARY A. EATON, ESQ.
WILLIAM E. SPARKS, ESQ.
Eaton & Sparks
1717 East 15th Street
Tulsa, Oklahoma 74104

For the Defendants:

JAMES E. SINGER, ESQ.
Bovis, Kyle & Burch, L.L.C.
200 Ashford Center North
Suite 500
Atlanta, Georgia 30338-2668

KEVIN M. REYNOLDS, ESQ.
NICHOLAS S.J. OLIVENCIA, ESQ.
Whitfield & Eddy, P.L.C.
317 Sixth Avenue
Suite 1200
Des Moines, Iowa 50309-4195

# I N D E X


| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Defendants: | | | | | |
| William Chapin (Resumed) | | 1070 (Eaton) | 1085 (Singer) | 1087 (Eaton) | |
| Frederick E. Schmidt | 1089 (Singer) | 1128 (Eaton) | 1158 (Singer) | | |


# E X H I B I T S


| PLAINTIFFS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 110 - Telephone conversation notes by Mr. Chapin | 1076 | 1076 |

| DEFENDANTS' EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| GG-1 - Micrograph | 1096 | 1096 |
| GG-2 - Micrograph | 1096 | 1096 |
| GG-3 - Photograph | 1103 | 1103 |
| GG-9 through GG-15 - Photographs | 1103 | 1103 |
| GG-16 through GG-43 - Photographs | 1118 | 1118 |
| GG-44 - Photograph | 1102 | 1102 |
| GG-45 through GG-52 - Photographs | 1121 | 1121 |
| GG-57 - Photograph | 1121 | 1121 |
| GG-59 through GG-74 - Photographs | 1118 | 1118 |
| II - Plug made by Dr. Schmidt | 1111 | 1111 |
| NN - Curriculum vitae of Dr. Schmidt | 1094 | 1094 |

P R O C E E D I N G S

(In open court, in the presence of the jury.)

THE COURT: Good morning. We'll continue with the witness who was on the stand yesterday.

Sir, if you'd go back on the stand. And, sir, please recall that you're still under oath.

THE WITNESS: Yes.

WILLIAM CHAPIN, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION (Resumed)

BY MR. EATON:

Q. Good morning, Mr. Chapin. How are you, sir?

A. Good morning.

Q. Mr. Chapin, I'm going to try to finish up here this morning in short order.

Prior to seeing this Katzenmeier gun--strike that.

Have you ever seen a firearm that has failed due to excessive pressures in the barrel?

A. If I have, it's not one that I've been actually performing testing on, it's been ancillary to other issues.

Q. I take it, then, you're not familiar with any particular characteristics or features of a barrel failure due to excess pressure within the barrel?

A. No, that's not my field of expertise.

Q. Now, when you saw the Katzenmeier gun for the first time, did a gross inspection, and observed that it had not ruptured,

the barrel had not ruptured--is that correct?
A. That's correct.
Q. --did you perform any measurements of the exterior or interior diameters of the barrel?
A. No, sir.
Q. You mentioned a phrase--or you used a phrase that you observed in--I'm not sure whether they were marks or scratches, but you said it was marred, not scratched?
A. That's correct.
Q. Do you remember that?
A. Yes.
Q. I guess I'm not familiar with the definition of "marred" in the context of the kind of work you do. To me, when you said "marred, not scratched," you meant that it didn't--whatever marks you observed did not gouge out the surface of the metal?
A. That is correct.
Q. Is marred something like a smudge that you might see on a piece of glass if you put your thumb on it, is that marred?
A. It could be that, it could be just wiping the dirt off. If you have a dirty window, you run your finger over it, that could be a mar. Oftentimes if you brush a shopping cart against your bumper, the side of the car, you see an impression, you see where it hit it, but it's not really a scratch because it doesn't gouge out the paint, or made a deep cutting motion into the material, but you can still see where that mark was. That

to me is a mar. There's not a lot of damage, but you can see where the contact took place.
Q. All right. It's really just an indication that there's been some sort of a contact, but it's really not changed the surface, I'm going to say, structure; would that be fair?
A. On a macro level, yes, that would be fair. On a micro level, like I deal in, there may be traces of materials there, very, very tiny traces. But on a macro level, no.
Q. I guess just to get down to laymen's terms, when you mentioned you observing some marring of the surface, but not scratching, you meant something lighter than scratching the metal?
A. That's correct.
Q. It wouldn't change the metallurgy in any way, would it?
A. Anytime you have any kind of contact between two materials, there will likely be a transfer of some material, one to the other. It can be very, very light and nominal, but there will always be some transfer. So if you interpret that as changing the surface chemistry a little bit, possibly, but it's fairly nominal.
Q. All right. A very minor change, very nominal change--
A. That's correct.
Q. --in the surface?
A. That's correct.
Q. Do you have a recollection or--and you may consult your file

on this, your case file--a recollection as to approximately when you were first contacted about this case?
A. To the best of my recollection, it was the last couple weeks of August of 2007.
Q. And what was the nature of that contact?
A. It was a--I've forgotten whether it was an e-mail or a phone contact from Mr. Singer's office just inquiring about what we could do, what our expertise was, and chatting about how we might be able to help him, and he explained very briefly what the situation was, and I explained to him the kinds of approaches we would take.
Q. Did you ask him any questions about where the incident muzzleloader was located?
A. No, I did not.
Q. Did you ask him any questions about who had possession of it?
A. No, I did not.
Q. Did you--he told you, generally, what kind of consultation he was seeking from you, didn't he?
A. Yes, he did.
Q. That he was interested in performing some sort of inspection of primarily the interior of the barrel, possibly the outside of the barrel, for chemical residue?
A. His request would be--was of me to look for the things that might be there that I would expect: Residue from black powder,

damage from the breech plug coming out, those kinds of things, as well as looking for anything that might be there that should not be there. And I took from that a propellant that was an inappropriate propellant that might be present, or something along that nature, something that would not be expected to be in that gun had it been used in a normal manner.

Q. In other words, he told you that the consultation involved examination and evaluation of a firearm that had allegedly been fired, and had had an injury accident. Did he say that?

A. That's correct.

Q. Did he tell you basically that the general idea was that a breech plug had been expelled from the rear of the gun?

A. Yes.

Q. And did he tell you anything else that was of significance?

A. He told me that the--at that point in time that the incident had occurred approximately two years prior.

Q. Did he--was there any information exchanged at all about what sort of conditions the gun had been maintained under during that two years or so?

A. No.

Q. Did you inquire of him about those things?

A. No, sir.

Q. Did you issue any instructions or directions or recommendations to him about how the gun should be handled, what should or should not be done with it and to it before you saw

it?
A. At the point after being stored for two years, first of all, it wouldn't have made a whole lot of difference on how the gun was maintained from that point on; and, secondly, it was my understanding that he did not have possession, didn't have any control whatsoever over that piece of evidence.
Q. That he what, now?
A. That he didn't have any control or possession of that evidence, so it was beyond his scope. So that was not discussed.
Q. Did you ask him to provide you with any photographs or other potential evidence?
A. No, sir.
Q. And thereafter did you have several conversations with him?
A. Yes, I did.
Q. Did he ever tell you what he believed, from inspections that may have been done before, what sort of material had been--or propellant had been fired through the gun?
A. No, sir.
Q. Do you take notes, what are called telephone notes at your company?
A. Yes, I do.
Q. Do you have your file with you?
A. Yes, I do.
MR. EATON: Rather than going through the time of

getting that out, may I approach the witness, Judge?

THE COURT: You may.

BY MR. EATON:

Q. Can you identify what I've marked for evidentiary purposes as Plaintiffs' Exhibit No. 110, Mr. Chapin?

A. Yes. It's a set of telephone notes that I had taken on a conversation with Mr. Singer.

Q. The handwritten part down toward the bottom, is that your handwriting?

A. Yes, it is.

MR. EATON: Your Honor, we'd move to offer 110 into evidence.

MR. SINGER: No objection.

THE COURT: 110 is received.

(Plaintiffs' Exhibit 110 was offered and received in evidence.)

MR. EATON: Permission to publish so all can see it? I don't have extra copies.

THE COURT: Yes.

BY MR. EATON:

Q. See that portion of the exhibit, Mr. Chapin (indicating)?

A. Yes, I do.

Q. Can you read that to the jury, please?

A. It says, and I quote, "Singer believes Pyrodex with possible smokeless single or double based."

Q. Did Mr. Singer tell you at all why he thought that the exam would produce Pyrodex and possibly smokeless?
A. I don't recall.
Q. I take it, based on your examination--your assignment, your examination, your testing, you have no opinion with regard to the efficacy or propriety of Dikar's manufacturing practices; is that correct?
A. No, I have no opinion.
Q. Same question with regard to its quality control practices?
A. I have no opinion.
Q. Its testing practices, product testing practices?
A. No opinion.
Q. I take it you have no opinion with regard to the pressure created in the barrel at the time of ignition?
A. No opinion.
Q. In this particular case, did you do any analysis of any control substances to compare with your findings from this barrel?
A. No, sir, I did not.
Q. What is a control substance when you perform a chemical analysis like you did?
A. A control is a known material with which you are making a comparison.
Q. And in this case you did no control analysis with the Pyrodex; is that correct?

A. Oh, that's correct.
Q. You did no control analysis with any smokeless powder; is that correct?
A. That's correct.
Q. You did no control analysis with any black powder; is that correct?
A. That's correct.
Q. For control purpose, did you have any tables or other, I'll say, scientifically valid sources that you utilized for control rather than performing control analysis?
A. There were numerous references that I had obtained in my training, classes that I referred to yesterday. There's also a particular reference book by Denn & McGiverin that describes the components that you would expect to find in Pyrodex, black powder, and the smokeless--various types of smokeless powders.

Aside from that--these are not necessarily direct references, but I did some internet searching looking for MSDSs--those are material safety data sheets--and looking for material that might be available from manufacturers to make sure that they were in line, since we have no idea what may have been used. You couldn't go to a specific site because you had no idea what the material may have been, didn't have any idea what was there. So it was kind of shooting in the dark with regard to what we were finding. I was looking more in a general fashion than a specific fashion.

Q. In any of your internet searches did you find any satisfactory data to use as a control for purposes of comparison of what you found to Pyrodex, what you found to black powder, what you found to smokeless?

A. The search was to look for current trend, if manufacturing information, if formulations had changed, if there were some new things on the market, those kinds of issues, so that I could then interpret what I found, recalling that what I found in the barrel was bits and pieces of information. I had no intact material to look at how, you know, it would have been before it was used to get a complete analysis on. So I'm just looking at bits and pieces of information.

So I was looking mainly for information to help me interpret the fragments of information that I found and identified from the barrel.

Q. So you really didn't have a control from it to make a comparison with?

A. In this context there really was no way to identify what a control should be since we had no idea what should--what was used.

Q. You could have performed an analysis of a Pyrodex pellet as a control, couldn't you?

A. I could have, but from the literature I knew exactly what I would find.

Q. That's pretty simple?

A. Yes.
Q. By the way, do you have a copy of your report with you?
A. Yes, I do.
Q. Can you get that easily?
A. Yes, I can.
Q. Would you do that, please?
Do you have it there in front of you?
A. Yes, I do.
Q. Would you turn to page 3 of 11 pages, please?
A. Yes.
MR. EATON: Your Honor, for purposes of ease, of communication, may I publish this page? I don't intend to offer it as an exhibit, I just want to ask the witness a question or two about a line.
THE COURT: Any objection if he shows the page?
MR. SINGER: I don't have a problem.
THE COURT: Okay.
BY MR. EATON:
Q. Now, what we're looking at is page 3 of your report to Mr. Singer after you did your work; is that correct?
A. Yes. I don't have it on my screen, so I'm looking over there.
Q. Is your screen not turned on?
A. You're there now.
Q. Okay. Okay. I've circled and highlighted portions of that.

Do you see it?
A. Yes, I do.
Q. It says, "The analytical portion of this report is only concerned with the items designated as being distributed to the defense. As discussed in the body of the report, there has been insufficient time allotted for complete testing," correct?
A. That's correct.
Q. And then at page 7 of your report, would you turn there, please?
We talked earlier about this oily material that you found in your acetone wash after you'd boiled it down; correct?
A. Yes.
Q. Now, you said, "Oil of this type would not be unexpected from the barrel of any weapon since it is of the type used to clean and protect the metal components from rusting. Once applied to metal surfaces aggressive measurements are necessary to remove completely all traces of the oil. Typically ordinary firing of the weapons does not remove all traces of the oil and it may still be found after repeated firings. In this instance the oil presents a direct determination of the possible presence of nitrocellulose and nitroglycerin that would be extracted in the acetone rinse but not in the water rinse."
Nitrocellulose, that's our smokeless powder marker, right?
A. That's correct.

Q. And we'd know that oil would always be present in one of these guns; correct?
A. To a greater or lesser extent.
Q. And even if you fire it, you're still going to have some of this oil?
A. Yes.
Q. And this oil tends to make it difficult to extract nitrocellulose; is that correct?
A. Yes.
Q. You expected that?
A. Yes.
Q. And it would be ordinary if anybody fired their gun?
A. Yes, sir.
Q. Then you go on and say, "It may be possible through certain extraction concentration techniques and further use of FTIR chromatograph implementation to isolate and identify one or both of these materials. These procedures are time consuming and would require approximately two weeks to complete. Insufficient time has been allowed to attempt these procedures." Correct?
A. That's correct.
Q. It could have been done, but whoever hired you to do this didn't allow you sufficient time to do it?
A. That's not entirely correct.
Q. "Insufficient time has been allowed." Who put the time constraint on you?

A. The court system, sir.
Q. The court system?
A. Yes, sir.
Q. You did this test way back in 2007.
A. Yes, sir, but if you go back to page one of this report it says it was a preliminary progress report. And I had a very limited amount of time to do the amount of testing that I could, create a document, and that's why it's called a preliminary progress because it's not a completed final report.
Q. Did you ever prepare a supplement to this report?
A. No, I did not.
Q. All right. You didn't get any orders from the Court or directives from the Court not to devote additional time to it, did you?
A. No, I did not.
Q. The only person who told you don't do any more is Mr. Singer or his associates; correct?
A. Our--we made that decision together.
Q. Okay. You and Mr. Singer made it?
A. Yes, sir.
Q. That's fine. One other thing I want to ask you about-- Now, Mr. Chapin, do you remember how much money your company has charged the defendant at least as of the time we took your deposition back in June of 2008?
A. Yes, I do.

Q. And how much was that?
A. It was something over $20,000.
Q. Had there been any additional charges since that time?
A. The fees for not only my deposition, but also some office rental for additional depositions that were taken at our facility.
Q. Do you have a figure on that?
A. It would be just a little over $4,000.
Q. So about 24,000 thus far?
A. Between 24 and 25, yes, sir.
Q. And one last thing. On your CV you list your formal education as being a bachelor of science degree in botany; is that correct?
A. That is not correct.
Q. Pardon me. Biology. I'm sorry.
A. And it's a bachelor of arts.
Q. Bachelor of arts degree?
A. That's correct.
Q. What would be the difference in a bachelor of arts and a bachelor of science degree in biology?
A. In the school that I went to, Sterling College, it was a small private liberal arts school. The bachelor of arts degree required a foreign language study, and the bachelor of science did not require a foreign language study, and that was the only difference.

Q. And so--you do not have a degree in chemistry; is that correct?
A. My minor was in chemistry, my major was in biology.
Q. Does that mean you did not have a degree in chemistry?
A. No, that does not mean I do not have a degree in chemistry. I have a minor in chemistry.
Q. But you don't list that on your CV, do you?
A. I don't recall if that's listed or not.
MR. EATON: I'll leave it at that. Thank you, Mr. Chapin.
THE COURT: Redirect?

REDIRECT EXAMINATION

BY MR. SINGER:
Q. He was referring, Mr. Chapin, to page 7 of your report where you say "It may be attempted to prove in the future if appropriate." Was it appropriate to attempt any further analysis given the condition that you found it in?
A. No, sir, it was not.
Q. Now, he was showing you 110.
MR. SINGER: May I approach, Your Honor?
THE COURT: Yes.
BY MR. SINGER:
Q. This is not dated in August when we had the first contact, is it?
A. No, sir, it is not.

Q. What is the date of that?
A. November 8th of 2007.
Q. How long did that phone call last?
A. I've got an indication here that it was approximately an hour.
Q. You've testified in court before, haven't you?
A. Yes, I have.
Q. You've been in the sheriff's department, haven't you?
A. Yes, I have.
Q. You know what it takes to do things the right way as a scientist, to come into court and raise your hand and tell the truth, don't you?
A. That's correct.
Q. We were discussing in that one-hour conversation, were we not, a protocol that would allow you to harvest stuff in the barrel and look because that's destructive testing, isn't it?
A. That's correct.
Q. You were not allowed to do anything without approval of the Court, were you?
A. That's correct.
Q. You're not going to go destroy evidence by pouring hot stuff in there, are you?
A. No, sir.
Q. You're not going to go ram stuff up there and scrub it out, are you?

A. Not without prior authority.

Q. Now, in an effort to kind of determine what you would do and how you would do it, did you ask what propellant was likely in there?

A. Yes. We were discussing the fact of whether we needed to use organic solvent as well as an inorganic, water being an inorganic solvent, acetone being organic solvent.

Q. Thank you. I'll show you Exhibit XX. I'm just going to hold it up here the way it was taken by Mr. Wise, and show you FF-3, the way it was when you got it.

A. Okay.

Q. Did the change in that gun, by whomever did it, impede and affect your ability to raise your hand and render an opinion to a reasonable scientific certainty as to what type of propellant was in there?

A. Yes, sir, it did.

Q. Did it in fact prohibit it?

A. Yes, sir.

Q. Was this evidence destroyed that you were going to look for?

A. Yes, it was.

MR. SINGER: Thank you. Nothing else.

MR. EATON: Very briefly, Judge.

RECROSS EXAMINATION

BY MR. EATON:

Q. Mr. Chapin, are you aware of when Defendants first had an

opportunity to inspect, personally inspect and photograph the Katzenmeier gun?
A. No, sir.
Q. Would it surprise you to know that the defendants saw this gun as early as January 2006 and photographed it?
MR. SINGER: Object to the form, Your Honor.
THE COURT: Sustained.
BY MR. EATON:
Q. If Defendants had had an opportunity to inspect and photograph this gun as early as January 2006, would you have expected them to provide you with copies of the photographs and information to assist you in setting up a protocol for your anticipated inspection of this gun?
A. I would expect that kind of information to be provided, but it's not always provided in a civil situation.
Q. You didn't get any information about what they knew early on, did you?
A. I was given information that I was--what my interpretation is of what they knew. I can't read their minds what they knew and didn't know.
Q. And you didn't ask them about earlier information, and they didn't provide it to you; correct?
A. No, sir.
Q. That's not correct?
A. No, sir, I did not inquire about anything other than the

basics of the situation.

MR. EATON: All right. Sir, thank you.

THE COURT: Anything further?

MR. SINGER: Nothing further.

THE COURT: You may step down, sir. Thank you.

(Witness excused.)

MR. SINGER: Your Honor, at this time we would call to the stand Dr. Frederick Schmidt.

THE COURT: Thank you.

THE CLERK: Please step forward and raise your right hand.

FREDERICK SCHMIDT, DEFENDANTS' WITNESS, SWORN

THE CLERK: You may take the stand.

DIRECT EXAMINATION

BY MR. SINGER:

Q. Dr. Schmidt, are you a little under the weather this morning?

A. Yes, I am, sir.

Q. What's going on?

A. Just have some allergy symptoms in my eyes. They're closing on me, but I think I'll be fine.

Q. What is your doctorate in?

A. Materials science and engineering.

Q. Where did you obtain it?

A. Drexel University in Philadelphia, Pennsylvania.

Q. Are you an academic guy or a real world guy?
A. I'm what everyone would call a heating and dealing metallurgist.
Q. Have you consulted the metallurgical--conducted a metallurgical analysis of the thread area of the Katzenmeier gun that we're here about?
A. Yes, sir, I have.
Q. Have you actually looked at the raw metal as opposed to making opinions based upon photographs?
A. Indeed I have.
Q. Can you explain to this jury how this gun came apart?
A. Yes, sir, I can.
Q. Can you tell this jury whether there was a tapering, which was measured after the fact, whether that existed before the incident, or as a result of the incident?
A. Yes, I can.
Q. Can you describe for the jury why and how, from a metallurgical and scientific standpoint, Professor Tipton and Mr. Bruchey had made errors that would prohibit their ability to properly and scientifically render opinions?
A. Yes.
MR. EATON: Your Honor, object. Lack of foundation.
THE COURT: Overruled.
BY MR. SINGER:
Q. Have you answered the question?

A. I did, sir.
Q. Have you conducted firing tests on guns before?
A. Yes, I have.
Q. Have you blown up guns and studied the metallurgy?
A. Yes.
Q. Have you conducted metallurgical analyses on guns which failed unintentionally out in the field?
A. Yes, I have.
Q. How many times have you examined failed guns intentionally or unintentionally?
A. Hundreds of times.
Q. Are you a licensed engineer?
A. I'm a registered professional engineer.
Q. Are you a metallurgist?
A. Yes, sir.
Q. What is metallography?
A. Metallography is like geology. Ology means the study of. In geology it means the earth. Metallography is the study of the metal and the structure of the metal.
Q. And what is--briefly tell the jury your experience in that area.
A. Well, as a graduate student I got very involved in metallography, a polishing and looking at structure, and it became a life-long hobby. Later in life I became involved in an organization called IMS, the International Metallography

Society, which is associated with the Metallurgical Society, ASM, and I served on their board of directors for three years. And then I've been the project program manager for the last two years of their annual conference.
Q. Have you taught in the field of metallography?
A. Yes, sir, I have
Q. Extensively?
A. Extensively.
Q. Have you written?
A. Yes, I've published a number of papers.
Q. What degrees do you have, other than your Ph.D.?
A. I have a bachelor of science in metallurgical engineering, a master of science in materials science and engineering, and I also have my Ph.D. in materials science and engineering.
Q. This is a case involving a muzzleloader, or a gun, and a manufacturing claim and a failure. Do you understand that?
A. Yes, sir, I do.
Q. Tell the jury a little bit about your employment background that would assist you in rendering the opinions and conclusions you have, and in doing the work that you did in this case.
A. The first three jobs I had were as a co-op student associated with my bachelor's degree, and I worked in a foundry on Air Force contracts with the General Telephone Electronics Company as it relates to that work. So the steel industry was in the foundry. And then after graduate school I started to

work at duPont Company in 1972. I'd say about 40 percent of my work throughout my entire career with duPont, from 1972 to 1989, involved steel and metallurgy and structure, which relates to this kind of work, and I did failure analysis on many things during that time period.

From the time period of 1979 to 1989 I was a consultant to various companies that were owned by duPont, one of which was the Remmington Arms Company. And I assisted on individual projects as they asked me to do so, one of which was from 1985 to 1987 at the U.S. Government's Lake City Army Munition Plant in Independence, Missouri. So I was there for two years while I was a consultant working for duPont.

After that, in 1989 up until 1996, I left duPont and transferred into the Remmington Arms Company as their full-time chief metallurgist. So I was the highest-ranking person in the company responsible for six plants and factories that made everything from the clay targets to the ammunition, the bullets, the propellants, and the firearms themselves.

Can I just get a cup of water?

Q. Sure.

A. Thanks.

Q. And what have you been doing since--was it 1996, right?

A. Yes. From 1996 until the present time I've worked for Engineering Systems and Packer Engineering as a corporate consultant.

Q. Are you a fellow--or do you hold any distinguished fellowship positions?
A. Yes. I'm a fellow of ASM International.
Q. How long have you been that?
A. Since 2002.
Q. Your CV is there in front of you. Can you identify Exhibit NN, please?
A. Yes, sir. I have it in my hand.
Q. Does that list your background, your employment, some of the articles you've written, and so forth?
A. Yes, since it was updated in June of 2008.
MR. SINGER: Move that it be admitted.
MR. EATON: No objection.
THE COURT: Received.
(Defendants' Exhibit NN was offered and received in evidence.)
BY MR. SINGER:
Q. I'm not going to go through that. The jury will have it back there with them. At my request did you travel to Tulsa to conduct a visual examination of the Katzenmeier gun?
A. Yes, sir, I did.
Q. At the time you got there and saw it, did you learn that Mr. Roane had already poured Cerrosafe down it and twisted it out?
A. At that time I didn't know who did it, but it turns out part

of the materials I examined involved this physical evidence, which I will call chamber cast.

Q. Was there anything metallurgically that you could determine just from looking in the gun and just observing what you saw that day?

A. No, sir. The purpose of my visit was to inventory all the evidence that was there.

Q. Was the breech plug there?

A. No, sir. The evidence that was presented did not have a breech plug.

Q. Has a breech plug ever been made available to you?

A. No, sir.

Q. Now, after establishing a protocol, approval of the Court, did you attend the cutting open of this barrel?

A. Yes, sir, I did.

Q. Where was it conducted?

A. I believe it's the Sherry Labs in Broken Arrow, Oklahoma.

Q. Next to Tulsa?

A. Yes, sir, near Tulsa.

Q. And who actually did that?

A. The staff of the Sherry Laboratory with, of course, Professor Tipton attending.

Q. What was your purpose of being there?

A. I was observing the proceedings.

Q. Did you look at the piece that got cut out under a SEM along

with Professor Tipton?

A. Yes, sir, I did.

Q. And could you tell anything metallurgically at all from that viewing?

A. No, sir.

Q. Let me show you GG-1 and GG-2.

MR. EATON: Plaintiffs have no objection.

MR. SINGER: Move GG-1 and GG-2 be admitted, Your Honor.

THE COURT: Any objection?

MR. EATON: No, sir.

THE COURT: GG-1 and GG-2 are received.

(Defendants' Exhibits GG-1 and GG-2 were offered and received in evidence.)

BY MR. SINGER:

Q. Let me just put it on the screen. Did you observe anything that would tell you that metallurgically you couldn't draw any conclusions from that viewing under an SEM?

MR. EATON: Object to the form as leading, Your Honor.

THE COURT: Overruled.

BY MR. SINGER:

Q. Go ahead.

A. The photograph that's on the screen here is a Scanning Electron Microscope photograph that was taken at 50 times magnification, and this is at my direction in my lab. And at

the lower left-hand corner--can I point at it?

MR. SINGER: Can this be oriented sideways?

MR. EATON: Your Honor, for purposes of foundation, Plaintiff would request that the witness identify what part of whatever he was looking at is this photograph.

THE COURT: Mr. Singer, did you hear that?

BY MR. SINGER:

Q. Was this in the breech area of--let's back up.

They cut--did they cut the sample in half?

A. Yeah, at Broken Arrow, at Sherry Labs.

Q. Did they cut the half in half?

A. We did at my lab.

Q. No. The half that you got at Sherry, was that cut in half?

A. Yes. I received a quarter of the sample, is what I received personally.

Q. And then you, then, brought your quarter back to your lab and your offices?

A. Yes, sir.

Q. And that's where you did your analysis on the piece that you got?

A. Yes.

Q. Is that a picture of the breech area under an SEM of what you got?

A. This is a portion of it; correct.

Q. And before you ever did anything with it?

A. Correct.
Q. Now--
MR. EATON: Pardon me, Your Honor. Again, the breech area as we've seen before is, like, 5/8, 3/4 of an inch long. It's got threads or remnants of threads, about 13 in number, and we've had topographical photos. Can he further define where he is within that area?
MR. SINGER: Your Honor, the evidence is in, first of all. Second, it's not offered for any particular thing other than representative of what he saw under the SEM.
THE COURT: If that's an objection, it's overruled. Let Mr. Singer ask his question.
A. Yes. This is a section of the overall piece, of what I received, which is one-quarter of the subject gun, and I took pictures of the whole thing using the Scanning Electron Microscope at 50 times magnification. This is just one of those pictures. In the lower right-hand side it says BSE. That means backscattered electron image. What's on this image is contamination and debris and rust.
Q. It's not the barrel still; right?
A. No, sir.
Q. And basically when you looked under the Scanning Electron Microscope at Sherry when Professor Tipton did the same thing, is this the kind of stuff you saw?
A. Yes, sir.

Q. Now, let me put up GG-2, and that's a different SEM photograph?
A. Yes, sir, it is.
Q. And does that show anything any different?
A. Yes. This is at a different magnification, 125 times, so it's larger than the one you just saw. In the lower left-hand side you see it says "SE detector." That means secondary electron image. What this shows, again, is the contamination and the covering. This shows--can I touch this?
Q. Sure.
A. This feature here is all grayish underneath because it's charging, it's part of the procedure. This groove here, or thread, it has all diffuse and out-of-focus things because it's still dirty (indicating).
Q. And, again, that's just a representative picture of many that you took; correct?
A. Yes.
Q. And basically what's the purpose for the jury of that?
A. We need--
Q. What does it say?
A. We need to establish and document the condition of the evidence before we clean it. And having looked at the evidence, I decided this absolutely has to be cleaned.
Q. From a metallurgical perspective, can you reach any opinions and conclusions as to the metal, or what may have happened to

the metal, looking at it in the contaminated state that you saw it before it was cleaned?
A. Absolutely not.
MR. SINGER: May I approach, Your Honor?
THE COURT: You may.
BY MR. SINGER:
Q. Let me show you Plaintiff's Exhibit No. 15. You see this photograph, at the bottom, is from an SEM that Professor Tipton was indicating he was basing his opinions from. Is that an uncleaned SEM photograph?
A. Yes, it is.
Q. Thank you. So after you determined it had to be cleaned, what did you do?
A. There's an established forensic technique to clean this kind of evidence, and at the same time save and harvest whatever debris and contaminants come off. It's called acetone replication, and it's an ASTM, it's the American Society for Testing of Materials Standard, way to do that. So, in general terms, you apply plastic film, such as Scotch tape without any glue on it that's been softened, you let it set up, and then you strip the contamination off the sample.
Q. Did you do that cleaning process?
A. I did that repeatedly to clean the sample.
Q. Is that how a metallurgist cleans the surface of the metal that you want to look at and analyze?

A. Yes, sir.
Q. Would it be appropriate to render opinions as to the metal without it being cleaned?
A. No, sir.
Q. How long did it take you to clean it so--
A. Three days.
Q. Let me show you--
MR. SINGER: May I approach, Your Honor?
THE COURT: You may.
MR. SINGER: For ease and time, can I just question the witness over there?
THE COURT: You may.
BY MR. SINGER:
Q. Let me show you GG-44. Can you describe what that photograph is?
A. Exhibit GG-44 is a photograph that I took, and it shows a ruler/scale, metal, a conventional ruler, and then it shows the full piece of material that I received at the Sherry Lab. And on top of it is a plastic--the acetate replica, which I'll outline. It's almost the full horizontal length, and this shows the acetate that's softened being applied to that material to engage the contamination and lift it off. So one of the terms is called lift.
MR. SINGER: Move that GG-44 be admitted.
MR. EATON: No objection.

THE COURT: Exhibit GG-44?

MR. SINGER: Yes, Your Honor.

THE COURT: GG-44 is admitted.

(Defendants' Exhibit GG-44 was offered and received in evidence.)

BY MR. SINGER:

Q. Let me show you GG-9 through 15. Look at those as a group, in the interest of time, and without describing each one and what you see in each one, tell the jury what that set of photographs is.

A. These are a series of photographs that document the procedure as we were cleaning the subject evidence.

MR. SINGER: Move they be admitted?

MR. EATON: May I look at them again?

MR. SINGER: Sure.

BY MR. SINGER:

Q. While counsel is looking at that, did it not only document it, but did those photographs show debris and stuff being pulled out of the grooves, and pulled out of the fractured surfaces of the metal?

A. Yes, sir.

MR. EATON: GG-9 through 15 is all part of that one process? These are consecutive ones; is that right?

THE WITNESS: Yeah, they go from one end of the sample to the other, and it's a representation of one of the stripping

phases. We did it each time, we took photographs like that each time when we applied it and stripped it off.

MR. EATON: Plaintiff has no objection.

THE COURT: GG-9 through 15 is received.

MR. SINGER: Thank you.

(Defendants' Exhibits GG-9 through GG-15 were offered and received in evidence.)

BY MR. SINGER:

Q. Let me show you GG-3. What is that?

A. I don't know if the jury can see this. For purposes of identification, it's GG--

Q. Don't show it to the jury. What is the photograph?

A. It's the tips of tweezers holding a piece of material that was pulled out of the threads as I was continuing with the cleaning.

MR. SINGER: Move GG-3 be admitted.

MR. EATON: No objection.

THE COURT: GG-3 is received.

(Defendants' Exhibit GG-3 was offered and received in evidence.)

BY MR. SINGER:

Q. Now, you have many, many photographs; right?

A. Hundreds, yeah.

Q. And they've all been provided on disk to the Plaintiffs' counsel?

A. To the best of my knowledge.
Q. Let's put up, first of all, what's in evidence as GG-9, and just real quickly, without spending a lot of time, you see something sticking up in there. What is that?
A. That is a segment of the thread that is being retained in the groove after the gun came apart and the breech plug left. And during the cleaning process the acetate replica that preceded this picture engaged it, and we've removed the replica prior to--it came loose and stuck up, and the rest is still engaged in the groove.
Q. Could you see that, that these grooves were filled that way and that that piece would be something that could be removed by looking at it initially, before cleaning?
A. No.
Q. Obviously-- Quickly, GG-10, does that show another part of the barrel?
A. Just for the jury's orientation, this would be a land of rifling, and then this area from here to here would be called the freebore, and then this is the initial part of the threading toward the muzzle and going back toward the back end of the gun (indicating).
Q. Does GG-11 show more debris being pulled out in that cleaning process?
A. Yes, sir, it does.
Q. And GG-13?

A. Yes, sir, it does.
Q. That's 12, I guess. And GG-13?
A. Yes, and now we're at the other end of the firearm.
Q. We just kind of walked back down, right?
A. Step by step the length of it under magnification.
Q. GG-14, does that also show some of the stuff being pulled out you were able to pull out and clean?
A. Yeah. Most of the photograph looks like it's out of focus, but right here and right here are two thread strands that were pulled up by the replica and standing proud. That's what we're actually trying to photograph (indicating).
Q. And what is 15?
A. Having used the tweezers, you can see the piece that was out, and--this part sticking up, and this part was in the groove, and we pulled it out of the evidence.
Q. And Exhibit GG-3?
A. This is at a thousand times magnification, and you see the two arms of the Tweezers, and this material here was a segment of the thread (indicating).
MR. SINGER: May I approach, Your Honor?
THE COURT: You may.
BY MR. SINGER:
Q. You've seen Dr. Tipton's deposition?
A. Yes, and I've read it.
Q. And you understand that his opinion is, looking at the

uncleaned contaminated surface through an SEM and a photograph, that he sees circumferential marks from the drilling process. Do you see those?
A. No, I do not.
Q. Let me ask you, if there had been no thread formed in the rear and circumferential drilling marks made on virgin metal, would they have been visible with the hot gases jetting out the back?
A. No, sir.
Q. Is that some kind of a mark that can be caused when somebody pours something in there that fills the grooves, that picks up debris, and screws it out?
A. Yes, sir.
Q. Once you look at these, okay, and cleaned it all out, what, if anything, did you see in the examination of the surface of the raw metal?
A. Well, as we went step-by-step, we were harvesting the evidence, for example the material that's in the roots of the thread, and as we progressed with the cleaning, we eventually got to the stage where we could actually make a fractographic, meaning fracture. When something breaks and tears and sheers, it leaves the broken surfaces. And what I've been doing in failure analysis for over 35 years is analyzing those fractured, broken surfaces. So yes, I can.
Q. That allows you to be able to do that?

A. Once it's cleaned.
Q. How did you--do you number your threads for your analysis, is that how you approached it?
A. Yes, I did.
Q. Where was No. 1 for you?
A. The No. 1 thread was at the back end of the gun, just opposite Professor Tipton's. So I started at the open back end, one, two, three, up to 14, which was closest to going to where the load would be, bullet and powder.
Q. In addition to finding a lot of thread material and metal, and so forth, as you described inside these grooves that you pulled out, picked out, did you only use acetate to pull this out, the tape?
A. And the tweezers; both.
Q. Any picks?
A. We used a dental pick. In certain cases the material was so tenaciously rooted in by the lead, that we had to, once we got a grip on it, we scooped it out.
Q. Besides Cerrosafe and that kind of debris, and barrel metal and that kind of debris, did you find any other kind of steel in any of the thread roots?
A. Yes, I did.
Q. What was that, please?
A. We found one segment towards position 4 from the back end, thread root 4, when we put it in a Scanning Electron Microscope

and tested it, it turned out it was consistent with the plug metal composition.

Q. Stainless steel?

A. Yes, sir.

Q. And that's all the way toward the back thread, No. 4?

A. Yeah. Thread one and two are partially formed, in general, and then as you go forward you get full threads, thread four.

Q. What did that indicate to you metallurgically? Is the breech plug still harder than the barrel?

A. Yes, it's about twice as hard.

Q. What did that indicate to you as far as thread engagement, thread forming that far back in the barrel?

A. That there was significant engagement.

Q. Now, at that time had you formed any opinions or conclusions?

A. No.

Q. You were still working, right?

A. Yes, sir.

Q. Are you familiar with the process of cold forming internal threads?

A. Yes, I am.

MR. SINGER: May I approach, Your Honor?

BY MR. SINGER:

Q. What did you do next, after being able to clean the surface and look at the fractures from the top?

A. Yeah, during that time we're using a feature of the Scanning Electron Microscope called EDS, Energy Disperses Spectroscopy. What it does is it tells you what the composition of the things are on the surface of the breech plug--not the plug but the breech segment of the barrel. And also, these threads we were removing, we could tell what their composition was, which ones were from the barrel, and the one that we mentioned that was from the breech plug.
Q. Did you take a section to do a microscopic metallurgical analysis of it?
A. Yes, sir, I did.
Q. Now I'm going to show you again Plaintiff's Exhibit 15 and ask you to look at the bottom, okay? Do you recognize that as a partial attempt of somebody to make a slide or a mounting, or photograph a slide or a mounting or montage of it?
A. That's my understanding from the deposition.
Q. Is this properly cleaned to perform a metallurgical analysis on it?
A. Can I examine it more closely?
Q. Sure.
A. No, sir, it is not.
Q. Tell the jury why.
A. There are numerous smaller scratches that you probably can not see from where you're sitting, but there's a big scratch--I'm kind of pointing it out with my finger (indicating).

THE WITNESS: Your Honor, I don't know if you can see that.

THE COURT: That's fine.

A. But there's a large arch scratch here, and in addition there's a space here you can see between the mount and the surface. That means to me that that piece, which did not have the Cerrosafe lead material removed, was capturing individual particles of the abrasive used to polish it, and so it continues to scratch and rescratch the surface, and this makes it impossible to interpret the microstructure of the mount.

Q. Did you make a mount?

A. Yes, sir, I did.

Q. Do you have that with you?

A. I do.

Q. Would you pull it out, please?

A. Yes, sir.

MR. SINGER: This would be II from the pretrial order that's been in Dr. Schmidt's possession the whole time.

May I approach?

THE COURT: You may.

BY MR. SINGER:

Q. I'm going to put II on the back of this, show you what Exhibit II is, and ask you just to identify that for the jury, please.

A. The lay term for this is called a plug. That's an epoxy

plastic that is made at high temperature. And in it is the segment--a piece of the segment that I received from Sherry Lab corresponding to the subject barrel threaded area.

MR. SINGER: Move II be admitted.

MR. EATON: I'd like to see II since he's had it.

THE COURT: Is it I or II?

MR. SINGER: II; double I.

THE COURT: Is there any objection to II?

MR. EATON: No objection.

THE COURT: II is received.

(Defendants' Exhibit II was offered and received in evidence.)

BY MR. SINGER:

Q. What was the next step in your work or analysis, Dr. Schmidt?

A. The next step was to examine this mount and measure the distance from the bottom of the roots of the thread to the outside diameter, which is this bottom of the plug on Exhibit II. So the distance from the bottom, this horizontal silvery surface, up to the position of each one of the threaded bottoms was measured (indicating). That was the next thing we did.

Q. Let me ask you, this photograph, Plaintiff's Exhibit 12--or 15, does it even have the outside of the barrel shell?

A. No, sir, it doesn't.

Q. Tell the jury what you discovered when you measured the

bottom of each root to the outside of the barrel?
A. It was essentially uniform, each about the same.
Q. What did that tell you with respect to whether or not the hole--the shape of the hole, when it was--the threads were formed?
A. One of the things it tells you is the barrel is being spun over the stationery mandrel, the mandrel is engaging in forming the root of each one uniformly, at the same distance from the outside of the barrel.
Q. How about the pilot hole itself, does that indicate to you anything? If the distance from the bottom of the thread to the outside of the barrel is the same all the way down, what does that tell you about that line?
A. It's straight.
Q. Thank you. Now, after measuring it under microscope, did you notice anything about the shape of the bottom of the roots?
A. Yes, sir, I did.
Q. And what, if anything, did you notice, and what did that tell you?
A. They looked remarkably similar and uniform, just looking at the shape.
Q. And then what did you do next?
A. The next thing to do is this particular plug at this time is in the unetched condition, it's shiny like a mirror, so we examined it. And then the next thing we did is we put a

solution on it which is kind of like vinegar. It's ethanol, like vodka, and a little bit of nitric acid. And what it does is it etches the microstructure of the steel and shows you the flow lines of the steel as it was formed.

Q. Did you measure the hardness?

A. Yes, sir, we did.

Q. And when you--where did you measure the hardness?

A. We measured it at a fixed distance just under the thread root.

Q. Of which thread?

A. All of the threads.

Q. And what did you find when you measured the hardness under the bottom of every single one of those thread roots?

A. They were very uniform.

Q. Was that significant to you metallurgically?

A. Indeed it was, yes.

MR. SINGER: May I approach, Your Honor?

THE COURT: You may.

BY MR. SINGER:

Q. Let me show you GG-16 to 43, and just ask you generally what that group of photographs is.

A. This group of photographs are ones that I had taken at my direction at both my lab, and also at MSI, an A2L, a certified lab, of the indentations and the metal as it was etched.

Q. Are the corresponding photographs--in other words, there's

one photograph at one magnification before it's cleaned, and another photograph next to it that's the same thing after it's cleaned?
A. One series is as received at my lab and then sent to a second lab under my direction. They did the same thing all again, ground it back and did the same thing again.
Q. What is the importance of, from a metallurgical standpoint, grinding it back and looking at the actual metal?
A. I was not satisfied with what I achieved the first time, so I wanted to redo it and get it perfect, so I had this done at an A2L certified laboratory.
Q. Did you look at the microstructure of the metal around these thread roots?
A. Oh, absolutely.
Q. And what did you see?
A. It showed me again that the hardnesses were very uniform and reproduced what was done at my lab, and also the microstructures.
Q. What did you see with respect to flow--
A. I'm sorry. Did you finish your question?
Q. Yes--if anything?
A. I saw that the flow was uniform in the thread root areas.
Q. Okay. Now, it's the same distance from the bottom of the root to the outside of the barrel in a straight line?
A. Yes, sir.

Q. The orientation and shape is straight to the barrel all the way down, each thread root; right?
A. Yes.
Q. The hardness is the same where it's been worked down, correct?
A. Yes.
Q. And that hardness--does that hardness measurement that you found reflect work hardening of the cold forming process as opposed to just the basic barrel of the steel?
A. Yes, it does.
Q. Then you look at the flow lines of the microstructure around those roots?
A. Exactly.
Q. And what did those four things tell you about whether or not the hole was straight when this barrel left--when this incident happened?
A. To a reasonable degree of engineering certainty, that these were made just as they were intended to be made in the manufacturing operation.
Q. So the threads were properly formed?
A. They were properly formed and were uniformly formed.
Q. Okay. Now, what was next in your analysis? Did that end it?
A. No.
Q. All right. What was done next in your analysis?

A. I wanted to understand the process, how this actually happened, this train of events. That's what we call the root cause failure analysis. And to do that, we do proctography, and what we just talked about, after everything has been cleaned.

Q. What is adiabatic shear?

A. Adiabatic shear is a high energy rate of shearing. Shearing is not an easy thing to explain. If you think of the plane of this paper--or the plane of the floor, and you have a solid block of something, and you take that plane--I'm going to use my hands to illustrate--and you shear it like this, and that's the thing that was happening in the breech plug in the breech of the barrel. When the powder charged, whatever was in that gun at the time it went off, it sheared the plug and sent it backward. (Indicating throughout.)

What adiabatic shear is--and it's unique, and if you see it and if it happens, it means beyond any shadow of a doubt it happened at an exceedingly high rate.

Q. Okay. We heard a term called the--I asked Professor Tipton about the Poisson effect.

A. Poisson, French term. That's used in mechanic's handbooks.

Q. As it relates to this case, does it have anything to do with stretching rubber bands?

A. No, sir.

Q. What is that effect as it has to do with this case?

A. There's two Poisson ratios. There's one used when you're

building bridges, which is called the elastic Poisson ratio. For steel it's .33. Then there's the plastic Poisson ratio which has to do when you're metal forming and changing the shapes of something, deforming it, and that's approximately .5 raw steels.

MR. SINGER: Can I approach?

THE COURT: You may.

BY MR. SINGER:

Q. Can an engineer see adiabatic shear in these magnification photographs?

A. Not a chance.

MR. SINGER: Your Honor, may I approach?

THE COURT: You may.

BY MR. SINGER:

Q. I want to show you Exhibits 59 to 74. They're different. They're color. Can you identify those, please?

MR. EATON: What exhibits are those?

MR. SINGER: 59 through 74.

MR. EATON: GG?

MR. SINGER: GG, I'm sorry. Have I moved in 16 to 43? If I haven't, I move them at this time.

MR. EATON: Let me get the GG first. That was GG--what's he got now?

MR. SINGER: 59 through 74.

MR. EATON: Okay. Those are--that's what?

MR. SINGER: This is 16 to 43.

MR. EATON: I don't have any objection to 16 through 43.

THE COURT: GG-16 through 43 are received.

(Defendants' Exhibits GG-16 through GG-43 were offered and received in evidence.)

THE COURT: 59 through 74 are offered?

MR. SINGER: Yes, Your Honor.

A. GG-59 through 74 are high magnification photographs taken at my instruction that illustrated the location of the interior fracture surface and the areas of adiabatic shearing.

MR. SINGER: Move they be admitted.

MR. EATON: No objection.

THE COURT: GG-59 through 74 are admitted.

(Defendants' Exhibits GG-59 through GG-74 were offered and received in evidence.)

BY MR. SINGER:

Q. Dr. Schmidt, you've got lots and lots of pictures, right? We just brought representative samples today?

A. That's correct, sir.

Q. Would you just pick out a couple of those that would help you describe to the jury the adiabatic shear that you saw, and then I'll put them up on the overhead?

A. Okay. I selected GG-59 and 60, they go together; GG-70 and GG-72.

Q. I'm putting up on the overhead 59 and 60 because they go together. I don't have them exactly overlapped, but would it essentially go something like this (indicating)?
A. Yes, that would be correct.
Q. Tell the jury what it is that you see there.
A. I'm going to put an X down here, and right to the left of that is a harvest indent, and I'm going to draw a little indication on where the thread bottom is. Here's the surface along here where the metal actually separated when the bolt was shot out--I'm sorry--the breech plug was shot out. And this that you're looking at is that interface surface, the fractured broken surface of the barrel that we were able to examine because the breech plug wasn't available. This material that shines very brightly here is an area that I recognize as adiabatic shearing. (Indicating throughout.)
Q. How are you familiar with adiabatic shear?
A. I've been studying it since graduate school on various materials, 70/30 brass, 70/75 aluminum, steels.
Q. Has it been addressed in various textbooks?
A. Yes, sir, it has.
Q. How long have you been aware of it, studying it?
A. Oh, since 1968.
Q. And have you seen it in very high pressure failures?
A. Many times.
Q. Let me show you what you pulled out as GG-70. Could you

just point out what you see there? That's another photograph in another place, right?
A. Yes. It's very high magnification using optical light. I'm going to draw a red line under the adiabatic shear area.
Q. And, again, what is--it's the same metal, right, that the barrel was, it's just gone through a change?
A. Yeah. We confirmed that with the Energy Disperses Spectroscopy, and then sheared, exceedingly high rate.
Q. Then let me show you Exhibit 72. Is that just another one of the same?
A. I'll underline it (indicating). Again, adiabatic shearing
Q. And, again, what does the presence of adiabatic shear tell you?
A. It tells you that an exceedingly high rate in inches, per inch per second, the two surfaces that were once a solid block were sheared and separated so fast that there was a face transformation. And so the metal changed from what it was before, same composition, to that area highlighted.
Q. Can adiabatic shear happen at 20, 25 thousand psi?
A. No, sir.
Q. Can adiabatic--does it take more than 40,000 psi?
A. Yes.

MR. SINGER: Showing counsel Exhibits GG-45 through 52, and then 57.

MR. EATON: No objection.

MR. SINGER: Move they be admitted, Your Honor, GG-45 through 52, and GG-57.

MR. EATON: No objection.

THE COURT: Those exhibits are received.

(Defendants' Exhibits GG-45 through GG-52, and GG-57 were offered and received in evidence.)

BY MR. SINGER:

Q. Dr. Schmidt, I'm just going to put up GG-45, and what is that?

A. This is an area, 45, that shows to me after cleaning--in the previous picture you saw there's like a lot of black--

Q. Excuse me. It's not on the screen.

A. It's on my screen.

Q. It's not on the big one yet. It's about to be.

A. Where I drew the red line is where before it was dirty and all fuzzy, and now it's clean. And the one side you can see shearing. I'll just kind of do this kind of thing, pointing at that surface. Over here we see what's called, in our business, microvoid coalescence, which means we had a tearing action. (Indicating throughout.)

Q. Let me put up Exhibit GG-46. Is that a higher magnification of tearing?

A. Yes, a much higher magnification.

Q. Metallurgists look at that, and what does it tell you?

A. Over here we see an area of intense shearing, which is a surface has been torn. And then here--almost all the rest of this picture shows microvoid coalescence, which means, basically, in lay terms, that the material stretched. It's very ductile and it's separating.
Q. Now, I'll show you--what does Exhibit 47 show, anything different? GG-47.
A. No. This, again, kind of helps locate the jury. Here's that same picture with the tearing. And then this little box here shows you that's the area which we enlarged to your right.
Q. And I'll show you GG-48. What is that?
A. This shows at a very high magnification the smearing, which is associated with this material flowing in that direction over and into a--shearing over one of the thread roots. So the red boundary shows that this material is smearing into the trough, a very dynamic, violent sort of thing.
Q. GG-49, what is that?
A. This is typical of toward the inside, where the--toward the muzzle end as opposed to the back end of the gun where we see the shearing happening predominantly. So there's the groove--I see I'm touching the top. I'm not sure what I'm doing wrong here. There we go.

So in this area here is--to your right--material is flowing to the left, and it's sheared. And then we have some more shearing in this zone that I just identified. (Indicating

throughout.)
Q. Let me just quickly put up, don't want to belabor it, what does GG-50 show?
A. That's another example of the shearing.
Q. What does GG-51 show?
A. High magnification, the details of the shearing called microvoid coalescence. Again, it's the stretching of the material and separating of a ductile material.
Q. Same thing with 52?
A. Yes, sir.
Q. What does GG-57 show?
A. This would be the rifling area. I wanted to have a comparison between the area which is gun blued in black, which was unaffected by the breech plug being shot out the back, and that's that area (indicating).
Q. You've described three words, and I wonder if they're different. Tearing, smearing, and shearing. Are they metallurgically--
A. Yes.
Q. Describe for the jury what they are and where in this breech area you would find those, and in fact did find those three different areas?
A. Okay. This is after the whole event of the breech plug exiting the barrel threaded portion. So initially you have threads on the top from the plug engaging threads on the bottom

from the barrel. And the instant that it moves one position over, all of those threads that are engaged shear.

But now, as it continues, because of the development of the high pressure inside between the bullet on one hand and the breech plug on the other, you have this high pressure developing. The Poisson effect says it's like taking a marshmallow and pushing on it from top to bottom. It goes fat. Take a marshmallow and push it this way between my hands, it would spread out that way. So the plastic Poisson effect is in the area toward the muzzle, and as these things first all break and shear off, that Poisson effect, the marshmallow, moves laterally. So the breech bolt actually expands laterally and starts to scoop out more material in the shearing.

The first--my thread numbers, we've basically gone from 13 to 11, we have the shearing and this Poisson effect that scoops out material, which I saw when I examined the sample.

Then we have all of that debris, meaning the threads that are cut off and sheared off, and the materials being scooped now being pushed back by the high pressure, and that's smearing on that surface. All the while at some length, as you can see from the plug, is this thing is going in that direction, it's getting fatter here, it's shearing, smearing, and now all of this is accumulating up. You know how a snow plow pushes the snow, and everything in front of it and it keeps accumulating, and it's in an annular, a circle. And as it pushes back, it

tears out, and with the hot gases from the explosion, the gases are jetting past and it clears out an area at the exit end which is a larger diameter than the inside diameter of the breech bolt after it's all done.

Q. Is that how the breech area of this gun wound up tapered after the fact?

A. That's my belief, after cleaning it.

Q. Based upon everything you saw, all your analysis, was the breech plug formed properly at the time they left the factory?

A. That's my opinion.

Q. Was the hole straight or tapered based on all your metallurgical analysis?

A. It was straight.

Q. Thank you. Did this gun fail at only 20 to 25 thousand psi?

A. No, sir.

Q. Had to be something more than 20, 25 thousand psi?

A. Correct.

Q. Had to be something in excess of 40,000 psi?

A. That's my opinion.

Q. Is it proper scientific or engineering practice to form opinions based upon the type of magnification, first of all, in Exhibit 15, of this magnification, trying to look at structure of metal?

A. No, sir, because it hasn't been cleaned.

Q. Now, do you notice anything else about Plaintiffs' Exhibit

15 that's odd from a scientific or engineering perspective?
A. The bottom series of pictures which are numbered, they kind of, like, have little steps in them. That would be called a montage. It's a group of pictures that are stuck together and matched. So it means it's very low magnification, and--there's the damage to the surface as I pointed out previously.
Q. The montage at the top is straight, and there's even a straight line imposed on the Plaintiffs' Exhibit 15, isn't there?
A. Yes.
Q. To make your eye think it's straight; is that correct?
A. That's correct.
Q. And the second one down is a straight line, and there's a straight line under it to make your eye think it's straight, right?
A. Yes, sir.
Q. And the third line down is straight and there's a straight line, too; correct?
A. Yes, sir.
Q. And then the subject one is stair-stepped, isn't it?
A. Yes, it is.
Q. To give the appearance that there's a taper, doesn't it, to the naked eye, just looking at it subconsciously?
A. That would be my observation.
Q. Can you think of any scientific purpose for photographing or

putting a montage together in that staggered fashion like that?
A. No.
Q. Will there always be swelling outside a barrel when the threads tear off inside the barrel?
A. No, sir.
Q. Will a barrel always rupture when there's overpressure in it?
A. I'm sorry? Your question again?
Q. Will a barrel always rupture or swell out plastically, bulge, when there's overpressure in it?
A. No, sir.
Q. Can you explain to the jury, if there's testimony here--and you've seen the barrel. It appears to be straight on the outside. Can you explain to the jury why it is that in your opinion there was pressure in excess of 40,000 psi there, but yet there's no swelling of the barrel?
A. The barrel is approximately--well, it's octagonally shaped. It's got a flat one inch, it's got a straight hole in it of approximately a half inch--
Q. This is a round barrel.
A. A round barrel?
Q. Yes.
A. So you have a barrel diameter of approximately an inch, a hole in it of about a half inch, there's a bullet, and then there's whatever the propellant is, and then there's the breech

plug. So when you detonate the charge, the pressure, according to science, radiates in all directions the same. And so what happens, as this pressure builds and builds and builds, it pushes the bullet. And if it's a high pressure, which is the question, exceedingly high pressure, it can also push the breech plug. And because I observed the adiabatic shearing, that tells me that that happened so fast that both of these went in that direction without causing sufficient pressure to build to cause the barrel itself to rupture, or both.

Q. I'll represent to you that the bullet in this instance actually went down range 30 or 40 yards and through a piece of board. Does that help in your explanation?

A. That's exactly what I'd expect.

Q. So the pressure goes both ways as opposed to out to rupture the barrel?

A. Yeah. The release of the pressure is why it didn't burst.

MR. SINGER: Thank you. Pass the witness.

THE COURT: Cross-examination?

CROSS-EXAMINATION

BY MR. EATON:

Q. Mr. Schmidt, you know Dr. Tipton, don't you?

A. You do know I'm a doctor, I believe.

Q. Oh, Dr. Schmidt.

A. Thank you so much.

Q. You know Dr. Tipton, don't you?

A. Yes. I have met him in this matter here.
Q. You met him, in fact, a few weeks ago, maybe a couple of months ago at an ASM meeting as well, didn't you?
A. Yeah. About October the 6th I congratulated him on becoming an ASM fellow.
Q. What's the significance of becoming an ASM fellow?
A. It's a very common thing for professors, because of the extent of their publications, for them to become a fellow of ASM. It's unusual for people from industry or government service labs or consulting practices to become fellows of ASM.
To fully answer your question, there's 38,000 members of ASM, and there can only be 600 living fellows at any given time.
Q. There's currently 38,000 members of ASM?
A. Between 36,500 and 38,000. It kind of fluctuates during the year.
Q. There's how many fellows?
A. Six hundred.
Q. So Dr. Tipton is--he's one of those 600 out of a total of 38,000?
A. It's a wonderful recognition program.
Q. You're a fellow in ASM?
A. Yes, sir.
Q. To become a fellow in ASM does one have to be invited or nominated by other fellows?

A. Typically in the university environment the peer group, the dean of engineering, or whatever, provost, would initiate the practice. If it's--there's five different ways. I don't know if you want the details of it.
Q. I guess what I want to know is, to become a fellow, do you have to show some special expertise in the field of materials?
A. Each individual fellow gets a citation that tells you exactly what he was recognized, or she was recognized, for.
Q. Did you vote on Dr. Tipton's admission as a fellow?
A. Yes. There's, at any given time, 150, 200 people, and I sat on the committee specifically in which Professor Tipton was a nominee, and I voted for him.
Q. So you'd agree he's a competent professional in the field of materials science?
A. Absolutely.
Q. Now, let's talk a little about adiabatic shearing. Adiabatic shearing occurs--when it occurs, at the moment that it occurs, that means the material simply gives way and comes apart quickly and smoothly; is that true?
A. That happens in a flash, in an instance, and it's a face transformation.
Q. That's why it shears quickly and smoothly across the material housing, crystals or grains; is that a fair description?
A. That's not technically accurate, but there's a face change,

and the key ingredient is it happens without any diffusion taking place.
Q. Diffusion?
A. Heat transfer. The word "adiabatic" relates to heat. It means there is no time for heat transfer.
Q. But is it true that adiabatic shearing, when that threshold pressure is met, that it shears smoothly and quickly? It's not ragged looking if you look at it microscopically?
A. It doesn't have anything to do with its shape. In fact, the term is it's called a shearing band.
Q. The main feature of it is it occurs fast and it creates this layer that you showed us in your photographs?
A. The main feature is it's a face change. It takes a lot of energy.
Q. You talked about the Poisson effect and adiabatic shearing. How do those two concepts relate to each other, if at all?
A. They don't.
Q. All right. You told me that the reason you believed that this bell-mouthing occurred was that as the breech plug exited the barrel quickly, it picked up and accumulated debris and just sort of wallowed out as it went out; is that correct?
A. I said it got fatter as it progressed through the exit. So it will scoop more, snowplow more stuff out.
Q. That occurred at the same time adiabatic shearing is occurring?

A. Absolutely.
Q. Adiabatic shearing is occurring, which means once that critical point is achieved, the shear occurs quickly; right?
A. Yes, sir.
Q. Now, we've also got this effect you've talked about, as the pressure is applied to the breech plug and it's moving backward, it gets fatter, the Poisson effect?
A. Yes, sir.
Q. Under pressure you're saying that that breech plug is compressed down from front to back and that causes it to get fatter in circumference?
A. Yes, sir.
Q. Fatter around?
A. Yes, sir.
Q. Is it a fact that as those gases expand, the exit--we're talking, I understand, very short times, but the truth of the matter is, as the breech plug begins to go out the back of the gun and the barrel goes toward the front, the pressure becomes less, doesn't it?
A. I think you meant the bullet.
Q. The bullet. What did I say?
A. Why don't you just rephrase the question.
Q. Projectile. As the breech plug goes one way and the projectile goes the other way, the pressure becomes less within that vessel that now exists. The barrel, the bullet on one end,

and the breech plug on the other, the pressure becomes less as the volume expands. Would you agree with that?
A. There's something called the ideal gas law that says under normal circumstances that's true. But when you have this adiabatic shearing and this explosion kind of a thing, there's not time for the pressure letdown.
Q. You've seen lots--you told us you've seen thousands of gun failures over your life?
A. Certainly hundreds.
Q. And you've seen failures of these guns where the barrels rupture and split; correct?
A. Sure.
Q. And typically that's an indication that that's where it was the weakest, where the portion of the vessel was the weakest. Fails first where it's weakest, would you agree with that?
A. There's many reasons for that to happen, but generally what we're talking about is the thinnest section of the barrel is where it's going to rupture, unless there's an internal defect.
Q. Have you ever--I realize you're a metallurgist or a materials person instead of a mechanical engineer, but are you familiar with the mechanical engineering concept that with pressure vessels they should be designed and manufactured so that they do not fail at--or risk closures or connections? Has that principle ever been part of your work?
A. This is not a pressure vessel. Guns are not pressure

vessels.
Q. You don't believe a gun is a special type of pressure vessel?
A. Absolutely not.
Q. Now, let me ask you this: You've just got a lot of photographs here that have gone into evidence. Did you ever take any photograph that showed the entire length of the sample of the breech area of the barrel that you obtained?
A. Oh, absolutely.
Q. I'll have a hard time, I think, finding it in this stack, but I'm going to look for it. I think there was one that had something--a guard stick or a ruler. There it is. Okay. That's Defendant's Exhibit GG-44.
MR. EATON: May I publish this to the jury, Your Honor, and ask Dr. Schmidt some questions?
THE COURT: You may.
BY MR. EATON:
Q. Okay. Now, this sample that's shown in your photograph--this is your photograph, right, you took it?
A. Yes.
Q. Which end of this sample do you submit is the breech end, and which is the muzzle end? If you would, just put a B at one end and an M at the other end to orient us, please.
A. The rifling is here, so that's the muzzle. And then the back end is this direction over here. What did you call it?

(Indicating throughout.)
Q. Breech; back.
A. Put a B?
Q. Yes.
A. (Witness complies.) Okay.
Q. Now, is this in what you called the precleaned state?
A. This is one of the applications of the scotch tape without the glue, replica. It's in place, draped over the evidence, and it was softened on one side with a solution of acetone and acetate so that it would infiltrate the sample, and then leave it. It takes about a half hour to dry it, and about an hour for it to cure.
Q. So in that particular photograph there's a piece of some sort of transparent, or nearly transparent, tape on top of the surface?
A. Yeah. It's sterilized. It comes in a kit.
Q. I was looking for a better photograph of the breech end here.
MR. EATON: May I approach the witness, Your Honor, ask him some questions about some other GG exhibits?
THE COURT: You certainly may.
BY MR. EATON:
Q. I'm handing you, Dr. Schmidt, what's marked as GG page 12. Do you see that?
A. Yes, sir.

Q. Can you just point to me, and then I'm going to put it on--can you just point which is toward the muzzle and which is toward the breech?
A. Sure. In this area, toward my right is what you call the breech (indicating).
Q. The back end?
A. The back end.
Q. That's what I thought. I think that shows up pretty good. Once again would you put an M toward one end, whichever end is the muzzle end, and a B which represents toward the breech end.
A. (Witness complies.)
Q. All right. Now, these horizontal lines here, do you see those that I'm pointing out?
A. Yeah, there's many lines.
Q. I'm talking about between these somewhat ballooned out areas. I'm talking about where it's kind of silvery-gray looking, and it looks like there's some light shining down here and you see some parallel striations there.
A. Yes, I see that.
Q. What do you believe that topography demonstrates?
A. The area here that you kind of talked about that has lines running this way, is gray, and is vaporized lead when the event happened. And then these jobs over here are a result of the twisting out of the lead. (Indicating throughout.)
Q. All right. That's what I'm talking about is those, what

appear to be little red marks as vertical lines.
A. Circumferential lines.
Q. Okay. Circumferential lines in--
A. Vertical in the picture.
Q. In this photograph they show it to be vertical. All right. Do you believe those lines have anything to do with the machining of the initial hole that was bored in that barrel?
A. No, I do not.
Q. You think those are some kind of scratches or indentations that were created when something was screwed out?
A. Called streaking.
Q. Streaking?
A. They're not continuous.
Q. So you think those lines identify something that was screwed out of the barrel as opposed to machine lines that were placed in the barrel during the drilling process; is that correct?
A. That's correct.
Q. That's what you interpret them?
A. I do.
Q. And your little--the block--
A. The plug?
Q. The plug, the profile, excuse me, gives us the profile of the connection with the breech; correct?
A. Yes, sir.
Q. I thought it would show up on here, but I guess it's not

going to. There's just a glare on it. At any rate, this section, this little block, that was taken of a profile of the section from the Katzenmeier gun; correct?
A. Yes, sir.
Q. And I'm looking at it with my naked eye, but would you agree with me that it shows deeper roots of the thread form toward the muzzle end than toward the breech end?
A. No, sir, I would not.
Q. In other words, it's smoother and flatter toward the breech end than it is the muzzle end? Do you agree or disagree?
A. What we're talking about, there's no question there's a taper in this before we cut it, okay? Everybody agrees on that. And I've testified here today that I've made measurements from the bottom of each thread groove along the length of it, and they're consistent with being a straight line with the outside.
So whatever you're seeing there in terms of some kind of a ramping or taper, which we've talked about as the bell-mouthing, is associated, in my opinion, with the breech plug being shot out the back end.
Q. Well, you were talking about--it's your opinion when this barrel was tapped and threaded, that the tap would have engaged the barrel, the breech area of the barrel, the same distance from breech to muzzle; correct?
A. Sure.
Q. Let me ask you this: If that pilot hole was indeed

bell-mouthed before it was threaded and tapped, is it possible that the tap, which is--it's inserted, the barrel turns around it, I understand that. But if it's bell-mouthed, smaller diameter toward the muzzle end than it is at the back end, or the breech end, that you may engage--if it's bell-mouthed, the tap may still engage all, but it simply won't engage as deeply at the back of the bell-mouth as towards the front? Do you follow what I'm trying to say?
A. I don't agree with that at all.
Q. Well, if you've got a bell-mouthed barrel, the tap is the same size from front to back, correct? It's a uniform tap.
A. First of all we keep calling it a tap. The tap is associated, and every mechanical engineer would know, with cutting threads. What's used in this process is called a mandrel. So the mandrel is stationary and you're rotating the barrel. As the barrel comes in, the mandrel engages the inside diameter, what you call that pre-drilled hole, and it begins to form. So the mandrel forms--these are actually called rolled threads.
Q. Exactly.
A. So as the barrel is turning on the mandrel, it is forming--engaging the metal and forming a wave form. It's actually deforming the metal. It's a shaping process, as opposed to a machine or cutting process. As the barrel spins and goes on, it fills, it's pushed in. The mandrel is bigger

than the hole, and it's pushing the metal in and forming it the whole length of the barrel. So when you get done and you extract the barrel by unscrewing it, you have filled threads.
Q. The tap is a stationary metal-forming tool; correct?
A. If you want me to assume a tap is the same as a mandrel, I'll do that.
Q. The mandrel is what holds the barrel; correct?
A. No. The mandrel is what's in a chuck. It is stationary. And the barrel is chucked to something out here to one end and it's spinning as it comes over--
Q. The barrel turns over the tool that forms the metal?
A. Exactly.
Q. That's what's called a rolling tap? What do you call it?
A. I call it the mandrel, the stationary part that forms the thread.
Q. The tool that forms the threads in the barrel you call the mandrel?
A. Yes, sir.
Q. And the barrel turns around the mandrel?
A. Yes, sir.
Q. And deforms the metal into the form of the threads; correct?
A. It's a forming operation.
Q. Right. Right. So what I'm asking you is if the barrel, the pilot hole in the barrel, is bell-mouthed before it engages with

what you refer to as the mandrel, as the barrel turns around the mandrel, it will deform metal, and that metal will deform more toward the front, or muzzle end of that barrel, but it won't engage as much metal or deform as much metal because it's simply not there if the barrel is bell-mouthed? Would you agree with that?
A. Hypothetically.
Q. Okay. So you'd agree that in the process of forming that barrel, it's possible, if the tools are out of adjustment, or if the tools are worn, or if the barrel--the instrument that's holding the barrel is out of alignment, that you can have a bell-mouthed situation occurring where full and complete threads will not be formed? Would you agree with that?
A. In that instance you wouldn't form the final threads at the breech end, and in this case they're fully formed.
Q. You'd be more likely to form full and complete threads at the narrower end of the barrel, and they would be less formed, or less fully formed, at the breech end? Wouldn't you agree with that?
A. In the instant, subject case, we have fully formed. That means that the mandrel came in contact with that.
Q. I'm not talking about your opinion in this case. I'm talking about the process of forming the threads in a bell-mouthed barrel.
A. If you had a big hole that's tapered and you put the same

mandrel in, you would form whatever made contact, I agree with that.
Q. And you could certainly have less contact and less thread being formed back toward the bigger diameter end of the bell-mouthed piece being worked; correct?
A. Assuming it's oversized.
Q. So we agree that can happen. And I guess what I'm curious about is--Dr. Tipton's photographs of the topography of his sample of the Katzenmeier barrel gives us a good view of the whole thing rather than just a lot of pictures that are taken of bits and pieces along there. Did you ever attempt to make a photograph that showed the front end to the back end of your sample, of the topography of the Katzenmeier barrel?
A. No.
Q. In other words, a view like this, where we could see what the breech end is like relative--the muzzle end is like relative to the breech end? Did you ever make a photograph that's of that kind of a scheme?
A. It's called a montage--
Q. Or a panorama.
A. --and it's for photographic purposes. I did not in this instance make such a--
Q. Did you take hundreds of photographs of a piece here, a piece there, and a piece here, and a piece there, hundreds of times?

A. Of every single one.
Q. All along the way?
A. At higher magnification.
Q. Right. But no photograph that would give us an overall picture of the surface of the breech end, the middle part, and the muzzle end of the Katzenmeier gun; correct?
A. You're absolutely right.
Q. Did you think that that would not be helpful to the jury in this case?
A. Exactly.
Q. Okay. You thought it would be more helpful to just take little pieces all along the way; correct?
A. It's just from an engineering standpoint. Other than being a graphics piece--which is fine, anyone can use any graphics piece--it doesn't show anything, engineering or scientific wise, that would be helpful to my opinion.
Q. For instance, we've got here Defendant's Exhibit GG-57, and, you know, to a layperson like me, that just looks like a lot of wavy lines. I can't really tell anything about what this barrel looked like from the inside from front to back. Would you agree that something like that is really pretty meaningless to a layperson? It takes an expert to explain the significance of that?
A. I'm sure I can explain it.
Q. You have. What I'm asking you is, do you think that would

tell anything, mean anything to anybody unless they had special knowledge as an expert, like you or Dr. Tipton?
A. If I were to tell a layperson that this was the rifling area, and it was just to show the representation of the roughness of that surface as finished, and I did an EDS on it and it's iron oxide, it means it was gun blue, and that's why that picture was taken.
Q. In GG-52, does that really tell a layperson anything, or does that need expert explanation to mean anything at all?
A. Yes, this would require expert explanation, no question.
Q. And GG-50, the same thing?
A. Yes, sir.
Q. GG--
A. It would take an expert.
Q. --46, an expert? All these, GG, I think it was, 45 through 55, something like that, they all require expert interpretation to mean anything to the layperson? Would you agree with that?
A. Well, I'd have to look at them to agree with you, because I think there were a couple in there I said you didn't have to.
Q. Well, they were introduced pretty much in that fashion.
Let me ask you something else. Did you take any exemplar Kodiak guns and section them for purposes of comparison to the Katzenmeier gun?
A. No, sir.
Q. Do you think it might have been helpful to you to section

the breech area of some other Kodiak rifles so you could see whether or not those lines, as you believed, were related to someone screwing something in and out of the breech area, or whether they were actually machining lines from the tools? Do you think you could have made a better determination if you had that at your disposal?
A. No, sir.
Q. Wouldn't have helped you at all?
A. No, sir.
Q. A comparison study of a nonfailed gun would have been of no benefit to you in your analysis; correct?
A. That's correct.
Q. As I went through your photographs, and they are many, I saw lots of photographs of the roots of the thread, and pretty much no photographs of what had been--or where there had been crowns of the threads. In other words, the photographs that you took--we're looking here now at Plaintiff's Exhibit 15--seemed to have a lot of photographs of this root and that root, roots all along the way, but really no photographs that focused in on the surfaces of what had been the crowns. Is that correct, or is that a misperception on my part?
A. I don't agree with your characterization. I photographed all the evidence that is physically present. And each one of those locations, going from your right to the left with the opposite numbers, and the whole thing is shown. There isn't any

physical evidence that was not examined.
Q. I guess I'm looking at the Exhibit GG-18, admitted as GG-18. Now, is this the root of what was a thread?
A. Yes.
Q. And GG-19, is that what was the root of a thread?
A. Yes.
Q. GG-20, is that a root of a thread?
A. Yes.
Q. And 21, root of a thread?
A. Yes.
Q. Twenty-two, root of a thread?
A. Yes.
Q. Twenty-three, root of a thread?
A. Yes.
Q. Root of a thread? 24, 25, 26, 27, all of those are roots of threads?
A. Yeah. And they show the whole thread profile as you showed in your Exhibit 15.
Q. Twenty-eight--
A. There's nothing missing.
Q. --that's the root of a thread, 28?
A. Yes, sir.
Q. And what's this little segment here, what does that represent?
A. Can you focus that a little better?

Q. I'll try.
A. Excellent. This shows the strength and toughness of the breech and the thread area. You can see a layer of compressions where it was roll threaded right at the inside edge. I think counsel was asking me to look at this area; is that correct, sir (indicating)?
Q. Yeah. What is this little ear?
A. Right here, that black line that I drew parallel to, that's where there was the trough of the thread root, and then the material that was bent down here was at one time up here. You can see that it flowed. These flow lines here show it metallurgically flowed over--as the breech plug is being shot out, this metal got snow plowed, just like that, like a snowplow, right into that trough. And, again, you have to remember this was not empty at the time this happened. There was a--I call it a slinky. There's an engagement surface between the threads and the plug, and the threads and the barrel that go in circles. You ever played a kid's toy like a Slinky? That's the contact area.

So when this breech bolt moved back, it's just not a linear thing of some threads on the top and some threads on the bottom shearing all at once. That whole contact area is moving out of there. And what we're seeing here is the metal flow, which I just drew for you, sir. (Indicating throughout.)
Q. Well, does this represent that the breech plug was going in

this direction (indicating)?
A. Yes, sir.
Q. So that's part of the crown of the thread being rolled over into the root of the thread?
A. If you can move the picture down and over a little bit to the left, make the diamond shape come to the bottom left.
Q. Like this?
A. Move it further to the left.
Q. That way?
A. Keep going. Let me just clear the sketch here. So the other part of the thread is all up in here. So when you're talking about the crown, it's way above this on the inside radius, and this is the diamond that I made my quantitative measurements, and this is the flow line around here that shows it was rolled, roll threaded uniformly. (Indicating throughout.)
Q. This is your mark for your hardness test?
A. Yeah.
Q. That's where you tested it for hardness, at the bottom of that root?
A. Yes, this distance here (indicating).
Q. It's just an instrument mark from your--
A. It's called an indentation. It's actually a diamond.
Q. It's from your tool?
A. It's a standard test tool.

Q. A tool you used?
A. Yes, sir.
Q. What I'm really getting at, I went through all your photographs and I didn't see any photographs that would go ahead and show us the whole length of what was a crown. I saw lots of roots, but I didn't see any crowns. Did you take any photographs that would have a whole crown on them?
A. No. I examined it as I was going from thread bottom to thread bottom to thread bottom.
Q. And I didn't see any photographs that showed us from a top down view this topography of what was along here, of what used to be a crown before it was stripped off (indicating). Did you take any of these?
A. Oh, yes.
Q. They're not exhibits here in this case?
A. They're all SEM pictures you received in my deposition.
Q. I understand. They're not exhibits in this case that the defendants are involved with; correct?
A. I would assume.

THE COURT: Mr. Eaton, I think we'll take our mid-morning recess at this time.

Members of the jury, be flexible with us today. We probably will be going into the noon hour before we recess again.

We'll be in recess for 15 minutes. Bear in mind the

admonition previously given.

(Short recess.)

(In open court, in the presence of the jury.)

THE COURT: Mr. Eaton?

MR. EATON: Are we ready?

THE COURT: Yes, please.

MR. EATON: Thank you.

BY MR. EATON:

Q. Dr. Schmidt, is it true that after you removed these materials that you've told us about from the surface of the Katzenmeier gun, it no longer interfered with or impeded your investigation?

A. That is correct.

Q. And it was your opinion that threads were stripped out of the breech of this gun because of some extreme excessive pressure; correct?

A. Well, some were, and some remained, as from the evidence.

Q. There were no full threads that remained, were there?

A. I only got to look at a quarter of the gun, so I couldn't tell you.

Q. Well, from breech to muzzle end, did you find in the quarter-round section out of the muzzle area that you had for yourself to analyze, did you find any remaining full and complete threads?

A. It seemed to me there were some.

Q. You thought there were some full, complete threads. Where were they located? Toward the muzzle end or the breech area?
A. I couldn't tell you.
Q. Did you photograph any of those, what you believed were full and complete threads?
A. Anything that was able to be retrievable, we took and we examined it. The rest is still in the mount.
Q. Let me ask it a different way. We saw lots of photographs here today that you took, Mr. Singer has proffered a lot of photographs to you that have been admitted into evidence. Do any of those photographs show what you believe to be some full and completely formed threads that still remain in the barrel?
A. No, sir.
Q. There's been none of those introduced into evidence in this trial so far?
A. Yes.
Q. Fair statement?
A. Yes, it is.
Q. At any rate, you opined that this--this barrel with the breech plug in it was subject to some excessive extreme pressure; correct?
A. Yes, sir.
Q. Did you attempt to determine how much pressure it would have taken to do that?
A. No, sir.

Q. Did you attempt to determine what caused or created that pressure?
A. No, sir.
Q. Were you asked to do any of those things?
A. No, sir.
Q. Did you read Mr. Katzenmeier's deposition?
A. Yes, sir.
Q. Do you contend that Mr. Katzenmeier did anything to cause or contribute to causing this failure that you observed?
A. Not to my knowledge.
Q. Place any fault or blame on him?
A. I don't.
Q. You do not?
A. Do not.
Q. Now, you worked for Remmington Arms for the last part of your--I shouldn't say the last part of your career. You're still an active, professional man. 1989 to 1996 you were the chief metallurgist for Remmington Arms Company, Inc.; is that right?
A. That's correct.
Q. And where did you work? What was your assignment during that seven-year period?
A. That's not an easy thing to answer. For the first two years I lived in Wilmington, Delaware/Chadds Ford, Pennsylvania. So I commuted to--there were six plants around the country. I had

four offices at the time. So from '89 to '91 I did a lot of travel. From '91 to '96 I lived in Newport, New York, close to the Ilion gun plant, which was their head operation. Does that answer your question?
Q. I guess close enough. Ilion, New York?
A. I-l-i-o-n. The guy surveying the area was reading Homer's *The Odyssey*. He took the city names from that.
Q. At any rate, that was one of several plants that you had responsibility for as chief metallurgist; is that correct?
A. That's where I was headquartered from '91 to '96.
Q. And before '91, had you ever worked in or around or at the Ilion, New York, plant?
A. Many times.
Q. You're very familiar with that plant?
A. Yes.
Q. Prior to 19--well, in 1989 to 1991, were you the highest ranking person with regard to metallurgy at the Ilion plant?
A. Yes.
Q. And prior to 1989 had you ever held a position which made you the highest ranking metallurgic person for the Ilion plant?
A. No.
Q. Had you had--prior to 1989 had you had responsibilities with regard to the metallurgic aspects of the products produced at the Ilion, New York, plant?
A. On many projects, yes. There were separate projects. I

didn't have the whole enchilada, but I had many separate projects where I was the leader of the metallurgical effort.
Q. Would it be fair to say from 1989 to 1996--pardon me. From '91 to '96 you were the person responsible for the metals that were selected to be used for the Remmington shotgun products?
A. Oh, yes.
Q. And prior to 1991, had you ever had ultimate responsibility for the metals selected to be used in Remmington shotgun products produced at the Ilion plant?
A. In certain product lines, yes.
Q. The classic 1100 model shotgun?
A. No. The 11-87.
Q. The 11-87 came after the 1100; right?
A. The 11-87 means it was the year 1987, and your question was about the year 1989 and back, so it was appropriate.
Q. Let's put it this way: Did you participate in the selection of materials to be used in Remmington's classic 1100 model shotguns at any time?
A. Not really.
Q. Did you participate in the selection of materials to be used in Remmington's model 11-87 shotguns?
A. The heat treatment of it.
Q. You were involved in the metal that actually went--the treatment of the metals that actually went into those guns, the 11-87 model; is that correct?

A. Yes.
Q. And when was that model introduced?
A. 1987.
Q. All right. Did Remmington cease to make the classic 1100 model in 1987 and replace it with the 11-87?
A. No, sir.
Q. The 1100 stayed in production?
A. Yes, it did.
Q. And from '89 to '91, what responsibility, if any, did you have with regard to selection of materials to be used in Remmington's shotgun products?
A. What was the time interval?
Q. '89 to '91.
A. Yeah, I had complete control over the steels purchased.
Q. And prior to '89, were you involved in the approval of the final metals that went into the shotgun products manufactured at the Ilion plant?
A. With the exception of the 87, no.
Q. Now, you're aware--and, by the way, you left Remmington in 1996; is that correct?
A. Actually the company was sold in 1993. The new management decided they didn't need my services anymore.
Q. New management of the company that took over Remmington Arms decided they didn't need you?
A. Clayton, Dubilier, Rice, lawyers from Manhattan.

Q. And you are aware that in that time frame, from 1991 to 1996, there was an action pending which involved the recall or replacement of all the barrels in all the 1100 model shotguns, and all the 11-87 model shotguns produced at the Ilion plant; is that correct?

MR. SINGER: Object, Your Honor. Relevancy.

THE COURT: Sustained.

MR. EATON: May we approach the bench Your Honor?

THE COURT: Not now.

BY MR. EATON:

Q. Do you know of any products in which you had responsibility for selection or approval that were ever taken out of the marketplace?

A. No.

Q. Or replaced?

A. None.

Q. Was the classic 1100 model shotgun ever subject to a replacement of barrels program?

A. I don't have any firsthand knowledge of the program.

Q. But you were the man who approved the metals that were used in the classic 1100 model shotgun and the 11-87 model shotgun from at least '91 to 1996 when the successor company no longer needed your services; is that correct?

A. No.

Q. Pardon?

A. That's not correct.
Q. What's incorrect there?
A. Well, the steel composition stayed the same for all of those models, and that was established, I'm going to say, back to 1948. The steel composition was no different. What happened is the steel mills changed their methods of making steel. It started out with an ingot cast method, huge 20-ton mold, you pour the molten steel into it and it freezes. And then from that you metal work it, it's milled down to the size you use for a shotgun barrel, or whatever. It's called lumber.
About 1985, steel mills throughout the United States converted from the ingot cast to a continuous strand cast, CSC material. I had nothing to do with that. The industry changed. Steel is different, same composition.
Q. Well, you were the person who continued to approve lots of steel, or you were responsible for the approval of lots of steel that came into that plant to be used in those two models of shotguns I mentioned; is that correct?
A. Oh, absolutely. It's quality control, is what you would call it.
Q. And ultimately those guns--the steel used in the barrels of those guns was changed sometime after you left the company; is that correct?
A. Again, I have no firsthand knowledge of that.
Q. And you've charged Mr. Singer's firm, or his clients, fees

for your services in this case; is that correct, Mr. Schmidt?
A. Not me personally. I'm a salaried employee at Engineering Systems, and they create invoices and itemize all the expenses and send them to Mr. Singer, and he takes care of it.
Q. Do you know how much your company has charged for the work it's done in this case?
A. I do not.
Q. What's your charge--or the charge for your services for appearing in court here today? Is there a standard hourly rate for that?
A. There's a standard hourly rate for all my services, and it's the same whether I'm working at my desk or whether I'm here at court.
Q. What is that standard hourly rate?
A. As I sit here it's $300 per professional hour.
MR. EATON: Thank you, Dr. Schmidt.
I pass the witness.
MR. SINGER: Very quickly, Your Honor.

REDIRECT EXAMINATION

BY MR. SINGER:
Q. Are you critical of Dr. Tipton as a person?
A. No, not at all.
Q. Did you welcome him as a fellow?
A. Well, indeed; yes.
Q. Of course, you voted for him since you were on the committee

to approve him?
A. Certainly did.
Q. Are you critical to his approach when the question to be answered in this case is whether the threads were bell-mouthed before or after?
A. I am.
Q. Are you critical of his opinions derived from that approach, as it was?
A. Yes, sir.
Q. Did it surprise you, or would it surprise you that Professor Tipton, as a mechanical engineer, would not be familiar with what adiabatic shear was?
A. Not surprise me at all.
Q. Would it surprise you that Dr. Bruchey, who looked at these, but did not do an analysis of the micrograph--and do a microscopic analysis of the breech section, but instead looked at another piece, that he did not see adiabatic shear?
A. I don't know what Dr. Bruchey did.
Q. If you look at that (indicating), you're not going to see adiabatic shear?
A. No. The magnification and quality is not appropriate.
Q. Why is a gun not a pressure vessel?
A. It has an open hole at the end.
Q. If this hole was bell-mouthed before, would you expect to be--the roots that you measured be the exact same distance to

the outside all the way down, the same shape all the way down, the same orientation, not cock-eyed all the way down, the same work hardening, the same microstructure, and the same hardness?
A. No.
Q. You took hundreds of photograph, didn't you?
A. Probably more than a thousand.
Q. You took--every time you would take a piece of that acetone off, you would carefully document each section, wouldn't you, with a photograph?
A. Both using a digital camera and using the SEM.
Q. You provided all the photographs, have you not, to Plaintiff's counsel?
A. To the best of my knowledge, yes.
Q. Turned over four boxes of your file at your deposition?
A. Yes.
Q. Said "Have at it," right?
A. Yes, sir.
Q. Now, when I met with you before this trial, you wanted to put in a whole lot more photographs, didn't you?
A. Sure did.
Q. Did I tell you we'll be here too long and we're going to get through this quick, and I want you to tell me which ones are directly important for what you're going to be testifying about with respect to this; correct?
A. That is correct.

Q. There are a lot more that are important, aren't there?
A. Yes.
MR. SINGER: Thank you.
MR. EATON: No recross, Judge.
THE COURT: Thank you. Counsel, why don't you approach the bench.
MR. SINGER: May the witness be excused?
THE COURT: Not quite yet.
(Side-bar conference.)
THE COURT: Sir, you may step down.
THE WITNESS: Thank you, sir.
(Witness excused.)
MR. SINGER: Your Honor, at this time we would formally move into evidence the documents that we have marked, to the extent we haven't admitted any. I don't know--I'd have to take a moment and look, but I think all we've marked and introduced have been admitted, but the defendants would rest.
THE COURT: I think, counsel, what you should do is both of you check your exhibit lists, and if there are things that inadvertently have not be offered, or something like that, we can make a record about that later, rather than making a nonspecific statement on my part it's all admitted. I think that's the better way to do it.
MR. SINGER: Yes, Your Honor.
THE COURT: Is there any rebuttal evidence--are you

resting?

MR. SINGER: Yes, Your Honor.

THE COURT: Any rebuttal?

MR. EATON: No rebuttal, Judge.

THE COURT: Thank you. All parties rest, then.

Members of the jury, this is a time when the Court has to visit with counsel concerning other matters preparatory to closing argument.

Now, there's some legal things I have to go through. It will take a little bit of time. I'm going to excuse you now to come back at 1:30, 1:30 this afternoon. We'll have closing argument at that time.

It is possible we won't be quite ready for you. This is a part of the trial that we have to do some things to get ready, and if we're not ready at 1:30, bear with us because we are getting ready. We're going to argue this case this afternoon. It will be submitted to you this afternoon.

So I'll let you go now. Come back at 1:30. During the noon hour please bear in mind the admonition given previously. Now, you have now heard all the evidence in the case, but you have not heard the Court's instructions, nor have you heard the arguments of counsel. You are to continue to keep an open mind and please continue to refrain from speaking about the case with yourselves or with anyone.

With that we'll see you back at 1:30 this afternoon.

(In open court, out of the presence of the jury.)

THE COURT: Counsel, please be seated. We'll do a couple things. Anybody wants to renew a motion, make a motion, we'll make those at this time. And, also, are you prepared to--I gave you a final set of instructions. They are all numbered. Are you prepared to make a record on instructions at this time?

MR. REYNOLDS: Your Honor, in terms of motions, the defendants, with the Court's permission, would reurge, and with the Court's permission we would ask that our prior record made on the Rule 50 motion at the close of the plaintiffs' evidence be incorporated into the record at this time. We would simply reurge that same Rule 50 motion, both my remarks and Mr. Singer's remarks made at that time.

THE COURT: Thank you.

Mr. Eaton?

MR. EATON: Your Honor, the plaintiff adopts the same responses to those Rule 50 arguments.

THE COURT: Thank you. And for the record, the Court recalls the motions, the arguments made in support of it, and the response and--arguments made in support of the response to it. It is not necessary for the parties to go over their motions again.

At this time the Court will make the same ruling it made previously with one exception. The Court at this time, to

the extent its pleaded, does grant the Rule 50 motion with respect to the--any claim of fraud concerning the marking of the barrel and proof-firing.

First of all, I think any such claim would have to be viewed as a fraudulent nondisclosure claim. The Wright case, at 652 Northwest 2d, the Iowa Supreme Court dealt with some of the requisites that have to be shown for that claim. But in the Court's judgment there's a higher standard of proof. It must be by clear and convincing and satisfactory evidence. I find that reasonable fact finders could not conclude, based on the record in these proceedings, could not conclude in favor of the plaintiff on the elements of knowledge, intent to deceive, or reliance.

For those reasons, and the other reasons stated previously when I expressed my concerns about that theory, the Rule 50 motion is granted with regard to fraud, and I'll call it a fraudulent nondisclosure.

Any other motions before we talk about instructions? Are you prepared to make your record on instructions at this time?

MR. EATON: Your Honor, I'd like two minutes, three minutes, four minutes just to finish reading.

THE COURT: That's fine. Why don't I give you about--10 minutes okay?

MR. EATON: That's perfect.

THE COURT: I just want to give you as much time before argument to sort yourselves out. All right. Ten minutes?

MR. EATON: That's fine.

THE COURT: I'll be back in ten. Also, look at them again, see if you see anything. I'm also going to ask everybody on the record if you've checked these firearms. Have we decided what firearms are going to go back? Do we need to talk about that?

MR. EATON: We have.

THE COURT: Okay. I want you to talk and agree what firearms are going to go back; and, of course, take some time either before the arguments or immediately after to check the exhibits, and make sure the list we have going back conforms with what you think has been offered. If you need to make further record on that, let me know.

I am going to ask you in open court, because we discussed it yesterday, if the firearms that are going back have been checked and have been determined to be unloaded, so you can expect that as well.

Ten minutes and I'll be back.

(Short recess.)

(In open court, out of the presence of the jury.)

THE COURT: Let the record reflect we're proceeding outside the presence of the jury.

Yesterday evening I gave counsel a copy of the--I guess it was yesterday afternoon--the Court's proposed statement and instructions. We had a conference--brief conference concerning the instructions yesterday evening and again this morning.

Counsel, I would ask you at this time, Mr. Eaton, have you had an adequate opportunity to review the Court's proposed statement and instructions?

MR. EATON: Your Honor, Mr. Sparks and I have reviewed those.

THE COURT: Thank you.

Mr. Singer or Mr. Reynolds, have you had an adequate opportunity to review the Court's statement and instructions?

MR. REYNOLDS: Yes, Your Honor.

THE COURT: Thank you.

Mr. Eaton, at this time I would hear the plaintiff with regard to any exceptions and objections you would care to take with regard to the Court's proposed statement and instructions.

MR. EATON: Plaintiffs have no objection or exception to the instructions as--in this final version.

THE COURT: Thank you.

Mr. Reynolds?

MR. REYNOLDS: Yes, Your Honor. On behalf of the defendants, first of all we'd object to the giving of the

instructions as a whole for the grounds previously stated in our Rule 50 motions made both at the end of the plaintiffs' case and at the end of all the evidence.

Our second objection, Your Honor, is the Court's failure to give Defendants' requested jury instruction on spoliation of evidence. Both Defendants previously requested Iowa Uniform Civil Jury Instruction 100.22, which is the stock instruction on spoliation of evidence. In this case we believe that the factual record here would support the giving of this instruction.

Exhibit XX is in evidence. It shows the condition of the breech area of Mr. Katzenmeier's barrel as that piece of evidence was in possession of the plaintiffs.

Significant amount of time yesterday afternoon was spent with Mr. Chapin, defense expert, discussing the types of evidence that he would expect to see in that area that was missing, and also things that were in that area that he found that he would not expect to find. He also testified about the fact that, you know, evidence was clearly lost and destroyed.

We believe that in this record there's circumstantial evidence upon which a reasonable jury could conclude that the loss or destruction of that evidence was intentional conduct on the part of the plaintiffs, and was done in bad faith. And for those reasons we believe that spoliation of evidence should be instructed on.

Our third ground addresses Instruction No. 13, paragraphs 3A and 3B. This would be the marshalling instruction, if you will, on the grounds of negligence that Defendants assert against Mr. Katzenmeier. The way it's currently phrased is it allows the jury--it says--it talks about two--or, strike that.

This is the grounds of defect--the manufacturing defect against Defendants, and it identifies two different defects. First of all, a bell-mouthing; secondly, incomplete forming of the threads. And the way it's currently worded under--under 3A it says, "alone or in combination with." The defendants believe that instead it should simply say at the tail end of sub A, "in combination with." The current state of the record from the plaintiffs' expert is that this was a combination defect. In other words, the manufacturing problem here was that the hole was bell-mouthed; and, secondly, that the tops of the threads were incompletely formed, and that those two alleged manufacturing defects combined to cause the problem here.

There's no record or evidence from Plaintiffs' expert that tapering alone caused this. By the same token there's no record or evidence from Plaintiffs that incomplete formation of the tops of the threads alone would cause this. But, rather, the record is it was both things that occurred at the same point in time in order to cause this accident.

Our fourth objection is to Instruction No. 14. And this is where you talk about BPI and CVA as a nonmanufacturing seller. I know we had a discussion about this yesterday, but it appears, and it appears also from the verdict forms, that the Court is going to submit a verdict interrogatory that's set forth in No. 14, "Was BPI/CVA a designer of the CVA Kodiak Magnum muzzleloader rifle that was involved in this case?" We object for this reason: There is no design claim in this case. So whether or not BPI/CVA was a designer is totally irrelevant.

Now, admittedly there's evidence in the record that BPI/CVA did design the warnings and instructions. So we would agree that to that extent BPI/CVA is a defendant on the failure to warn or instruct claim, but we do not believe that BPI/CVA should be a defendant on the manufacturing defect claim. And it's our understanding that the design defect is separate and distinct from manufacturing defect.

Our final record, Your Honor, on the verdict form, and it relates to the argument just made, there's a Question No. 2. We think that should be deleted. Again, Plaintiff has no design defect claim in this case. Whether or not BPI/CVA was a designer is completely irrelevant. BPI did draft warnings and instructions which were put in the box for the rifle. All that means is BPI/CVA would be a defendant on the failure to warn and instruct claim. It doesn't mean it's a defendant on the manufacturing defect claim.

That concludes our record on instructions.

THE COURT: Thank you both. I do have a question for you, Mr. Reynolds. On the spoliation, I assumed previously that the spoliation that is argued for is the pouring of the Cerro--what's it called?

MR. REYNOLDS: Cerrosafe.

THE COURT: --Cerrosafe by Mr. Roane and taking a cast of the inside of the threaded area of the barrel, and then pushing a plug in to hold that. Is there some other evidence, or some other way that you contend that the plaintiffs, or someone acting on their behalf, have intentionally spoliated the evidence?

MR. REYNOLDS: No, Your Honor.

THE COURT: I just wanted to make sure.

MR. REYNOLDS: Yes.

THE COURT: Mr. Eaton, I do have an Instruction No. 13, which is the manufacturing defect instruction. I did put in the words "alone or in combination with," so that it reads, basically, "Your claim is bell-mouthed either by itself or in combination with the threads," as we discussed.

You've heard the objection that they've made. I simply ask you if you want me to leave it this way, or if you want to address their objection in any way by my having to change the instruction?

MR. EATON: No, Your Honor. I believe the evidence

supports this instruction in the manner in which it's set forth in Instruction 13.

THE COURT: Thank you.

First, on the overall objection, the Court renews its Rule 50 ruling. With regard to the not giving the spoliation instruction, in the Eighth Circuit--of course we're talking here about--since we're talking about the casting made with the Cerrosafe, we're talking about alteration of the evidence which may have occurred in that process, and there is evidence of that.

In this circuit before the Court can submit a spoliation instruction there must be evidence of an intentional alteration of the evidence in circumstances which indicate a desire to suppress the truth; in other words, bad faith.

The problem, of course, with spoliation instructions is it's one of those rare, perhaps the only time when the jury is basically told that they don't have any evidence, they can draw conclusions from that. It invites them to speculate and draw conclusions in the absence of evidence, and that's why some indication of intentional or bad faith or tampering or alteration of the evidence is necessary.

Of course, the act of taking the cast was intentional. But I don't think--I find, to the extent it's a finding for me to make, that there's no evidence that Mr. Roane intended to alter the evidence remaining in the barrel by taking that

casting, and I find no basis to conclude that his actions, which may have been neglectful or improper as a matter of forensic science, but I find no indication of a desire to suppress the truth on his part.

And to the extent it might be for the jury, I do not believe reasonable jurors could find, essentially, the bad faith that would be required to draw the conclusion from the spoliation of the evidence. I believe it would be error for the Court to give that instruction, and that's the reason I'm not going to give it.

With respect to Instruction No. 13, I would agree that it appears that Plaintiffs' main theory is that bell-mouthing occurred; and, secondarily, that the threads in the breech area were improperly or incompletely formed. The way the instruction is written is basically that the jury must find that the breech area was improperly bell-mouthed or tapered, and then either alone or in combination with the thread-forming problem that has been talked about in the evidence.

I do not believe, though, however, that the evidence has been so precise in this case so as to cabin the plaintiffs to a theory of manufacturing defects which require that both of these things be proved. And, accordingly, I overrule that exception and objection.

With regard to the instruction on BPI/CVA as a designer, it's true that design is not submitted. Here's the

reason the Court believes it is appropriate to ask that question--this goes back to what we discussed I think it was yesterday about this issue in the Rule 50 motions.

Section 613.18 of the Iowa Code--and I'm talking about .18(b). If you compress those two together, the statute provides as follows: "A person who is not the assembler, designer, or manufacturer, and who wholesales, retails, distributes, or otherwise sells a product, is not liable for damages based upon strict liability in tort which manufacturing defect is, or breech of implied warranty," et cetera, et cetera.

So persons who are not manufacturers or designers have some--and are sellers have some protection under the statute. However, a party who is a designer, even though design is not submitted, if a party/seller has sufficient involvement as a designer, they have no protection under the statute. And, of course, the defendants have raised as a defense in connection with BPI/CVA that it is a nonmanufacturing seller, and not a designer. That's what they must have raised by raising that defense. And, therefore, they're not liable in damages because Dikar is subject to the jurisdiction of this Court and has not been judicially declared insolvent.

Accordingly, the fact whether or not BPI is a designer is significant to the application of the statute that is the basis for the defense, and that is why the Court is asking whether or not they were a designer, even though design is not

involved. Because if they're a designer in any material way, even though design is not involved, they are sufficiently connected to the product, in my view, that the statute, which is purely a statutory defense, would be inapplicable, and that's why I am not submitting that. So that objection/exception is overruled as well.

Let's see. I think that was it, right? Was there four or was there another one?

MR. REYNOLDS: The last one was the verdict form that just related to what you just addressed, so I think that's implicit in your ruling.

THE COURT: Thank you. My ruling, of course, would be the same with regard to that as well.

Now, counsel, when we get the jury back here, I'm going to read all the instructions first, except the last couple, and then we'll argue. Closing arguments, again, limited to an hour.

Mr. Eaton, you asked me to let you know when you have 15 minutes left, which I'll do.

MR. EATON: Yes, Your Honor. Mr. Sparks will present the last 15 minutes.

THE COURT: All right. That's fine.

Now, one thing I hope we don't get into in the argument, and I've had this happen before and it balls it all up, the last 15 minutes is rebuttal, so it's got to be rebuttal.

So don't save a whole chunk of your argument, i.e., on damages or something, and try and get that in on rebuttal because that will cause problems. Do you understand?

MR. EATON: Yes.

THE COURT: Rebuttal argument has to be rebuttal argument.

Local rules of the Court provide in a civil case ordinarily a verdict is taken by a sealed verdict, but the parties can be here if they want to. Let me explain that process to you. While the local rules specify a sealed verdict, I really don't take a pure sealed verdict. What I do is I get the jury in the courtroom, I review the verdict, I make sure they haven't messed it up somehow, make sure it's consistent, the math is right, and all that, and then I accept the verdict at that time, and I make sure that it is a--where I ask them generally if it's the verdict of each and all of them, and then I contact counsel.

I just ask counsel whatever you want to do is up to you, but that's the usual way we take a verdict, take a sealed verdict, and I'll call you. But if the parties want to be here, I need to know that, too. But if the parties want to be here, they have to be within shouting range of the Court to get then here right away because when the jury is ready, the jury is ready.

What would you all like to do?

MR. EATON: The attorneys for the plaintiffs will stay here.

THE COURT: All right. Mr. Singer?

MR. SINGER: They're here, we're here, if it's okay to be across the street.

THE COURT: It's okay to be across the street. We'll collect some phone numbers from you where we can get you, cell phones, I assume.

MR. SINGER: Yes, sir.

THE COURT: Mr. Reynolds, would you like us to contact you as well?

MR. REYNOLDS: Sure.

THE COURT: You'll be at your office?

MR. REYNOLDS: Yes.

THE COURT: When I make a call, I'll try and get ahold of you for about 15 or 20 minutes. But if somebody's on hold somewhere, and I can't get ahold of you, I'll have to go ahead. But I'll certainly make every effort to get you here for the verdict.

While we're here, you want to give some phone numbers--why don't we do it now.

THE LAW CLERK: Aren't they the same as you gave them before?

MR. SINGER: The same.

MR. SPARKS: Same one.

THE COURT: Also, if there's a question from the jury, I'll call you about the question, and we'll talk about it. But the same thing pertains, you have to be available. If I can't get ahold of you, after a reasonable period of time I'll go ahead and do my best.

Let's see. Anything else before you rest for a while before argument?

MR. EATON: One very minor housekeeping item. I am not sure the plaintiffs formally offered Plaintiff's Exhibit 110, which was used in cross-examination of Mr. Chapin. It had not appeared on our original exhibit list.

THE COURT: I believe you did.

Deb, do you have that?

THE CLERK: Yes, it's received.

THE COURT: It was offered and received.

MR. EATON: Thank you.

THE COURT: Counsel, make sure you checked the exhibits, you got in what you want to get in. Do we have an agreement on what firearms and barrels are going to go back?

MR. SPARKS: Right here, Your Honor, these three (indicating).

THE COURT: I ask everybody to check them to make sure they're not loaded. Have the plaintiffs checked the barrels and the firearms?

MR. EATON: Yes.

THE COURT: They're not loaded; is that correct?

MR. SPARKS: They're not.

THE COURT: Defendants, on your side, have you checked?

MR. SPARKS: Mr. Singer and I looked at them.

THE COURT: Looked at them together?

MR. SINGER: Yes, Your Honor.

THE COURT: So I have the parties' representation they're not loaded. Since I want to tell the jury that, I want to make sure that's in fact true. Sounds like it is.

We'll adjourn, then, until 1:30.

Counsel, one other thing. If the jury does not return a verdict today, you're still going to be in town tomorrow, and you'll want me to get you back over here tomorrow?

MR. EATON: I'll be here.

MR. SINGER: You let them go at 5?

THE COURT: Normally, but if they would like to continue past 5, we'll let them do so for a reasonable period of time. You call my office, somebody will be here, we'll let you know if they're still going.

See you at 1:30.

(Recess at 12:30 p.m., until 1:30 p.m.)

AFTERNOON SESSION (1:30 p.m.)

(In open court, out of the presence of the jury.)

THE COURT: A couple things before we call the jury in. You know there was a CD, sort of a little demonstration that was offered into evidence and it was received. You know what I'm talking about? I think it was the go/no-go.

MR. EATON: Yeah.

THE COURT: That was received in evidence, and a question has arisen what I should give to the jury to look at that with, or if both agree it should just be a demonstrative exhibit. We don't have to send it back. Whatever you want to do.

MR. EATON: Insofar as Plaintiffs are concerned, Judge, I don't think we necessarily need to send it back there. I don't know if those folks can manipulate the program, and so forth. It's certainly available if they ask for it, either your staff or Mr. Wise or somebody, the bailiff, can go show it to them if they requested, kind of like we do with the pellets. I don't know, I guess we have the same issue with the defendants' video.

THE COURT: Did the defense video also come in?

MR. SINGER: It did, but the way it was taped, when we put it on the DVD, it wouldn't play except kind of hesitant. You had to download it into the computer. So my suggestion would be they're both demonstrative. They're in, there was no

objections to either one of them, but--

MR. EATON: The plaintiff would like to have the right to let the jury see it in its animated form, at least if they request it. We're not going to insist that it go back. If they want to see it, I think they should be allowed to see it just like the propellant, just like the primers.

It may never be an issue, but I think if they ask for it, they should be allowed to see it, just like I think if they want to see Defendants' animation it should be shown to them. It's just inconvenient to try to turn those dynamic media into something more static like a piece of paper.

THE COURT: The defendants' was actually not an animation.

MR. EATON: Video.

THE COURT: What exhibits are we talking about, does anybody recall?

MR. EATON: Plaintiffs' Exhibits 100, 101, and 102.

THE COURT: Those are three CDs?

MR. SPARKS: They're on one CD. We can put them on three if you want, but we put them on one.

MR. EATON: Separate files.

MR. SPARKS: Separate files.

THE COURT: Mr. Singer?

MR. SINGER: I'm sorry, Your Honor. I can't find the one we had marked with the exhibit sticker on it that was a CD.

THE COURT: Could it be up here somewhere?

MR. SINGER: We had the CD here at the time it was played, but it was played from my computer. Now I can't see it. I went across to the hotel during lunch and couldn't find it. It's somewhere. We'll find it. Again, I tried to put it on the computer, it hesitated. If they insist on it, we'll find it. If the jury asks for it, they can come get it. I'm fine for our purposes that being demonstrative for the defense.

MR. EATON: If the defendants can't find their version, we have a version of it that they sent to us. We've got it on our computer system so if the jury requests, it can be shown to them, even without--

THE COURT: Mr. Singer, I guess they've got it. If the jury would like to see it, would you like them to see it?

MR. SINGER: Yes, if the jury wants to see it.

THE COURT: Where are these things? Right there? I think probably what I'd do--can we put their CDs on in here and show it?

MR. JAY LARSON: Yes.

THE COURT: I think what I'd do is have them come in the courtroom rather than send it back.

MR. EATON: I believe there's no video equipment in the jury room.

THE COURT: I don't think so.

MR. JAY LARSON: We can set up a laptop and put

speakers in there, we have that option.

THE COURT: Is it set up in there?

MR. JAY LARSON: It is set up in there.

MR. EATON: Either way. I don't care if they want to go in the courtroom or their room. There's a lot more technology in the courthouse. It's probably available in the jury room.

THE COURT: That's yours?

MR. SPARKS: This is ours, Your Honor. It's 100, 101, 102, on one disk, three files. I pulled it out of the exhibit book to go back to the jury. I don't know where we want to keep possession of it.

THE CLERK: All of those, the ones we've got in the book, are what we're giving to the jury?

MR. SPARKS: Right. We'll just set 100, 101, 102 up here. If they want them, they'll be here with us, and someone can take them back. Okay?

Is that all right with you, Your Honor?

THE COURT: That's fine.

Mr. Singer, apparently already set up in anticipation in the jury room is a laptop--with sound?

MR. JAY LARSON: Yes.

THE COURT: --if they can figure out how to play it. Should we just let them see what they can do with it?

MR. SINGER: Fine with me, Your Honor.

THE COURT: Is that all right with Plaintiff?

MR. EATON: That's fine, Your Honor.

MR. SINGER: So we're talking about it would be the go/no-go gauge and the other PowerPoint Mr. Tipton prepared, as well as the plant?

THE COURT: Yes. It's the Plaintiff's Exhibit 103-- is that correct?

MR. EATON: 100, 101, and 102.

THE COURT: On one CD?

MR. EATON: Right. There's three separate files, Exhibit 100, Exhibit 101, Exhibit 102 on one CD.

THE COURT: What's the Defendants' exhibit going to be marked?

MR. SINGER: According to the pretrial, EE.

THE COURT: Your CD is DD; is that right?

MR. SINGER: EE.

THE COURT: EE.

MR. SINGER: Edward Edward.

THE COURT: Edward Edward. So we're understood, we have two CDs that were played. The plaintiffs' is marked as Plaintiffs' Exhibit 101 through 103.

MR. EATON: 102.

THE COURT: I thought you said--

MR. EATON: 100, 101, and 102.

THE COURT: I'll get it straight--100, 101, 102; and

Defendants' is marked as Defendants' Exhibit EE; is that correct?

MR. SINGER: Yes, Your Honor.

THE COURT: And it's agreed, as I understand it, there is a--what is it back there?

MR. JAY LARSON: There's a laptop, a projector, and some speakers.

THE COURT: There's a laptop, a projector, and some speakers back in the jury room. It's agreed these CDs can go back and the jury may look at them, if they want, as any other evidence using that equipment; agreed?

MR. EATON: Yes.

MR. SINGER: Yes.

THE COURT: Do you want me to tell the jury--they'll see the equipment and maybe they can figure it out. Shall we just leave them up to their own devices?

I think that's it. It seems to me there was something else I wanted to talk about, but I can't remember what it is, so too late.

MR. EATON: Your Honor, there's also the audio CD, and it's in the exhibit book now. It's the same media, it can be played. It's a different kind of file. It can be played on a laptop computer. It's received in the evidence, it's in the evidence book. I forget what exhibit number it is.

THE COURT: Okay.

MR. EATON: Kind of the same kind of an issue.

THE COURT: It's an audio of what?

MR. REYNOLDS: The 911 call.

THE COURT: Oh, the 911 call? Correct. Anyway, they can have those things and play them if they want to; right?

Shall we call the jury in? Let's call the jury.

(In open court, in the presence of the jury.)

THE COURT: As I told you before we broke, we're going to be having closing argument now in the case. I'll read the closing instructions to you and then the case will be submitted to you.

First I'm going to read the instructions to you, except for the last two, which I'll read after the attorneys finish their arguments. I'll go over the verdict form with you, then the parties will argue the case. They'll take turns doing that, and it will be submitted to you, and you can retire to the jury room and you can start your deliberations.

I'll read the Court's instructions to you. Though you'll have copies in the jury room as well, please do pay attention to the instructions now as I read them because it will help you understand the arguments of the attorneys.

Jon D. Katzenmeier, Plaintiff, versus Blackpowder Products, Incorporated, along with Connecticut Valley Arms, Dikar S. Coop, LTDA, instructions to the jury.

Members of the jury, the Court now gives you the

following instructions:

(Jury instructions were read in open court.)

THE COURT: And then as I--I have two more instructions, as I told you, members of the jury. I'll save those until after the parties argue.

I'll go over the special verdict form with you--let me go over the verdict form with you. While you'll have numerous copies of the instructions with you in the jury room, you'll only have one verdict form with you. I'll go over the verdict form with you now.

The verdict form consists of a series of questions, and what questions you answer depend in part on the previous questions you've answered. And after each question there is an instruction on what you're to do based upon the answer to the question you just answered. I think you'll understand what I'm talking about as I go through the verdict form with you.

The verdict form reads as follows: "We, the jury, find the following verdict on the questions submitted to us. Question No. 1. Did Plaintiff Jon Katzenmeier prove his claim of fault because of a manufacturing defect as explained in Instruction No. 13?" And you're to answer yes or no.

Then you're told, "If you answered yes to Question No. 1, answer the next question. If you answered no to Question No. 1, do not answer Question No. 2, and proceed to Question No. 3."

Question 2 reads, "Was BPI/CVA a designer of the CVA

Kodiak Magnum muzzleloader rifle involved in this case?" And you are to answer yes or no. There's a space provided for the answer.

Then you're told to answer the next question, and the next question reads, "Question No. 3: Did Plaintiff Jon Katzenmeier prove that defendants were at fault because of inadequate instructions or warnings as explained in Instruction No. 15?" Again you're to answer yes or no.

Then you're told, "If you answered no to both questions numbered 1 and 3, answer no further questions. The foreperson should sign and date the verdict form. If you answered yes to either questions numbered 1 or 3, answer the next question."

Question No. 4 reads, "Did Defendants prove that Plaintiff Jon Katzenmeier was at fault because of his negligence as explained in Instruction No. 16?" Again, you're to answer yes or no.

And then you're told, "If your answer is no, do not answer Question No. 5 and proceed to Question No. 6. If your answer is yes, answer the next question."

Question No. 5 reads, "Using 100 percent of the total combined fault of Plaintiff Jon Katzenmeier and Defendants which was a proximate cause of Plaintiff's damage, what percentage of such combined fault do you assign to the Plaintiff, Jon Katzenmeier, and what percentage of such combined fault do you

assign to the defendants?"

Then there are two lines, one line for Plaintiff Jon Katzenmeier, and you're to fill in whatever percentage, if any, you find for him. Then there's a line for Defendants Dikar and BPI. Again, they are together and you're to put in a percentage, if any, you find against them, but your total must equal 100 percent.

Then you're told, "If you find Jon Katzenmeier to be more than 50 percent at fault, do not answer Question No. 6. The foreperson should sign and date the form. If you find the Plaintiff Jon Katzenmeier to 50 percent or less at fault, answer Question No. 6."

Question No. 6 reads, "State the amount of damages sustained by Jon Katzenmeier proximately caused by Defendants' fault as to each of the following items of damage. Do not take into consideration any reduction of damages due to Plaintiff Jon Katzenmeier's fault.

"If the plaintiff has failed to prove any item of damage, or has failed to prove that any item of damage was proximately caused by Defendants' fault, enter zero for that item."

Then there's a number of items of damage listed which correspond with the instructions that discuss the various items of damages. First, past medical expenses, and there's a line for your answer, whatever that would be. Continuing on, there

is a line for present value of future medical expenses, past lost wages, past loss function of the body, present value of future loss of function of the body, past physical and mental pain and suffering, and the present value of future physical and mental pain and suffering. And then there's a place for you to add up the total, and then the foreperson is to sign and date the verdict form.

And here's what I suggest: Once you've reached a verdict and you've gone through all of this and you've filled it out, I suggest that the foreperson carefully go over the verdict form with all the jurors to make sure that you've answered the questions you're supposed to have answered, based upon the Court's instructions, and not answer any questions you were not supposed to answer. Make sure you fill out the form completely. Before you come back into court and tell me you have a verdict, go over the form again very carefully and make sure you've filled it out as provided in the instructions on the verdict form. That concludes the Court's reading of the instructions and the verdict form at this time.

Just a minute, Mr. Eaton, before I recognize you.

Counsel, will you pull out Instruction No. 20. The last line, which I did read correctly to the jury, should read, "When deciding issues of future damages," and I'm going to make that correction. You see what I'm talking about?

MR. EATON: I do. You're making the correction?

THE COURT: I will make the correction on the instructions that go to the jury.

With that, Mr. Eaton, closing argument on behalf of the plaintiff.

MR. EATON: Thank you, Your Honor. May it please the Court.

Ladies and gentlemen of the jury, on behalf of Jon Katzenmeier, Mr. Sparks and I appreciate your time and attention. This has been a somewhat long trial. Parts of it were conducted under adverse weather conditions, so it was a burden for you to come down here under these conditions, and, believe me, Mr. Katzenmeier appreciates it. Everyone appears to have paid very close attention in this case. I think it was an interesting case. I know we all worked hard presenting it to you.

Now is the time that you do, in a way, the most important work in this case, however. The lawyers in a few minutes will be done. We're going to sit back and wait for you as you do your work in deliberations.

Now, this saga that has taken three years or so to come before you began, so far as Jon Katzenmeier is concerned, on October the 2nd, 2005. That was a bright, sunny, fall day here in Iowa. I think Mr. Katzenmeier referred to it as a perfect day, a perfect day. It was cool, it was sunny, it was dry, it was a perfect day for him to go out and sight in his new

CVA Kodiak muzzleloader rifle for the upcoming hunting season.

However, what began as a perfect day for Mr. Katzenmeier, ended as a tragic day for Mr. Katzenmeier, a day that changed his life in virtually every way forever, and it happened in the blink of an eye, it happened in the thunder of an explosion, when this gun exploded in his face and blew debris and the breech plug back into his face and crushed his skull and forehead, and crushed the bones of his sinuses, and split his head wide open, and severed nerves in his forehead and face. And then his day was confusion and pain and fear.

He was comforted only by the medical providers who rendered attention to him and the presence of his family for a few minutes when they first came to him in the hospital, and then when they followed him to Iowa University Medical Center and spent some time with him. Those were the few moments of comfort he had during that day.

Then you heard the medical testimony. He had a whole team of surgeons and other health care providers who got him through these first--his first week, or so, of really acute care for these catastrophic, or near catastrophic, injuries.

We've had evidence from Dr. Bauman, the otolaryngologist who put his face back together and made him look pretty normal, pretty normal insofar as his face is concerned; we've heard evidence from the ophthalmologist who attended and treated his eye injury, right eye injury. And that

ophthalmologist has a very good prognosis for Mr. Katzenmeier's future, but he told you it was a very serious injury at the time.

He had a burn that was 100 percent of the epithelia covering the globe of his eye. The eye heals fast if conditions are right, treatment is appropriate. That happened in Mr. Katzenmeier's case.

What could have been a tragic injury in so far as that right eye, was ameliorated by good medical care and probably the luck of the draw and maybe some help from above because he still has 100 percent use of that eye, functional use of that eye. He may have a few minor problems in the future that would require releasing scar tissue, but you heard Dr. Goins talk about how that's unlikely because of the surgery he performed with the amniotic transplant. But it took months for that to come back.

He had an orthopedic injury to his dominant right hand. You heard Dr. Adams testify about that. You heard Dr. Hastings talk about that. He still has problems with that right hand. He made a pretty good recovery, but he still has problems with that right hand. He can't make a fist, he lost a lot of strength, he's got stiffness, loss of range of motion. He has some significant permanent impairment to that right hand.

Dr. Bauman talked about, really, the most serious injury, at least as far as the long haul is concerned. She told you how the bones in the upper part--bones above his eye and

above his nose and his skull were fractured. The bones of his sinuses, around his eyes, were fractured, front and back, front and back. Not just the bones in the front, the ones in the back. His nose was crushed and deviated. Those injuries were treated by a very skilled surgeon, Dr. Bauman, and she was assisted by other surgeons.

She reconstructed Mr. Katzenmeier's face. In order to do that, she had to put some little titanium plates in there to kind of hold the bones together. That area is somewhat fragile. Dr. Hastings told you a little bit about that. In fact, what he's observed in some of the radiographs is that some of those bones are not completely fused or healed. That's why the plates are there, to make sure the structure of bones hangs together over time.

Dr. Bauman told you about the fat graft taken from Mr. Katzenmeier's belly to replace what had been in his face, in those sinuses. That fat graft obliterated those sinuses, and now instead of air, which affects the quality of your voice, ability to breathe, the comfort that you have, it's now filled with fat which will probably be there the rest of his life. Dr. Bauman told you about potential complications that will occur.

Maybe--I shouldn't say maybe. Probably the most notable, the most--the injury that affects Mr. Katzenmeier the most, every day of his life, every hour and moment of his life,

is his inability to smell and taste. Dr. Bauman told you how the cribriform bone with all these tiny nerves from the interior of your nose, the upper part of your nose, transmit odors and aromas up to the olfactory bulb, which is just below the brain. And then that bulb sends some more nerves around to other parts of the brain and we smell things.

And the olfactory system and the sense of taste are so inextricably intertwined that when your smell is compromised or gone, it adversely affects your ability to taste things. All you can smell or taste are very strong odors that you can smell, odors that typically make you jerk back, ammonia, gasoline, I suppose things like smelling salts. Other than that, Mr. Katzenmeier doesn't smell.

He doesn't smell new cut hay, wheat, or corn in these Iowa fields, he doesn't smell the fresh smells when he goes hunting. He doesn't smell the sweet aroma of flowers, trees, or grass. He doesn't smell breakfast cooking, coffee in the pot, he doesn't smell a good steak. He doesn't smell perfume, cologne, he doesn't smell those pleasant sensations of smell that we all have that add to the quality of our life and the safety of our life.

He has kind of a sense insofar as food because he remembers what food tasted like. He certainly feels textures, and he talks about how that is important to him, to know the texture of what food is because it sort of makes him recall, I

guess, almost instinctively what it tastes like. He gets no pleasure out of it.

The loss of the sense of smell has a potentially adverse effect on one's safety. We rely on our sense of smell as kind of a warning system for us if things are on fire. Other smells that are sort of alarms to us, he doesn't have those, so he has to find other ways to cope with that. He's done that.

Mr. Katzenmeier was a strong, independent, careful, methodical, responsible family man and worker. He's still a strong, in many ways, healthy man. And he's back to much of the normal things that we all experience and enjoy, take pride in in our daily life. He's back at his job, and he loves his job. He's worked for this company for over 20 years. He's worked his way up the ladder, and he's a supervisor of other men, and he takes pride in that. He takes pride in being a supervisor and emphasizing safety. You heard him talk about how that role of safety is responsible--is important to him, that responsibility is important to him every day as he looks over the welfare of his crew in supervising them.

That same sense of safety and responsibility, I submit to you folks, played a big part in the other aspects of his life. You heard this man on the witness stand a day or two ago go through meticulously what he did with his new muzzleloader. He described to you how he learned to shoot, and how he got interested in muzzleloaders, and how he had taken time to learn

how to engage in that sport correctly, responsibly, safely. I submit to you when you see Jon Katzenmeier, when you hear Jon Katzenmeier, there's no doubt in your mind that this man pays attention to what he's doing. His mind is not off on other things. He's a focused man. He's a careful man. He's a meticulous man.

And when--he described for you why he did each and every little thing that he did and instructing his young friend, Mr. Phipps, on the proper handling, loading, and shooting of a muzzleloader. That man did everything correctly, he did everything right. He told you how he laid out his materials that he had previously meticulously maintained in one place. He told you and explained to you how consistency is the order of the day if you want to be safe in using your gun.

Mr. Katzenmeier did everything right, and the defendants have not produced one scintilla, not one scintilla of evidence that he did anything wrong, that he inadvertently or intentionally did anything which caused or contributed to this terrible event.

I want to talk about the defendants' evidence for just a minute before I address some of the plaintiff's evidence. The defendants' whole defense in this case is that Mr. Katzenmeier somehow created some catastrophically great pressure in the barrel of this gun which blew the breech plug, and other components, off or out, broke things off and hit him in the

face. But it's all contrary to what Mr. Katzenmeier tells you, what he did. He used the proper propellant, Pyrodex, which they recommended in their book, they recommend in their promotional materials. He used PowerBelt bullets, which defendant, BPI/CVA actually sells. That's one of the product lines, accessory lines they sell.

He used the bullets that they recommend, he used the propellants they recommended. He used them in the amounts and sizes which the defendants recommend. And there's not been one scintilla of evidence presented by these defendants to the contrary.

They come in here with these two experts. I think about the last thing Mr.--pardon me. Not Mr.--Dr. Schmidt told you this morning was that he didn't place any blame on Mr. Katzenmeier. He didn't find fault with Mr. Katzenmeier.

He told you he didn't know how much pressure had been created. He had a tale here this morning that involved a lot of indecipherable photographs and a lot of big words which apparently he had some unique knowledge of. It didn't seem to translate too well to communicating to a layman. And you can look at those photographs when you go back there, you know. You need somebody like Mr.--Dr. Schmidt to tell you about them because I dare say they're not going to mean much to you. They kind of look like the surface of the moon, most of them.

But the point is, Dr. Schmidt did not blame

Mr. Katzenmeier, did not find one thing Mr. Katzenmeier did wrong. He just said there was an excess pressure in here. Dr. Tipton was wrong, Mr. Bruchey was wrong, Mr. Roane was wrong--pardon me, Dr. Bruchey was wrong, and Mr. Roane was wrong, and Mr. Roane did some bad things.

There's a man who worked for the Federal Government, been a civilian employee for several years, spent his whole career primarily working for the U.S. Government as an employee or as an outside contractor for the Federal Government in firearms and ballistics. Yet he's the brunt of Dr. Schmidt's criticism for contaminating this barrel. But Dr. Schmidt openly admitted that once, what he considered was contamination, was peeled away, picked away, cleaned away from the surface, it did not impede or interfere with his investigation.

What was his investigation? Well, just some place high pressure came and just blew this breech plug out, caused this adiabatic shearing. And I dare say when he got finished talking about adiabatic shearing, you still don't know what adiabatic shearing is, or what causes it, or what it really looks like from a metallurgical standpoint. He gave you not any kind of overview that you could really get a picture of.

Why did this man bring all these pictures? When you go back and look at them, why did this man bring all these pictures in here that show roots of these threads, that strip,

the roots? That's this part, that's this part, down here and down here. That's the roots. That's not what sheared away. What sheared away is up here. Dr. Schmidt didn't bring any pictures of that. He said he had them, but he didn't bring them. (Indicating throughout.)

Dr. Tipton showed you in a panoramic sort of way how this breech area failed, and I submit his explanation is the most compelling, his and Mr. Roane's and Dr. Bruchey's. Dr. Schmidt places no blame on Mr. Katzenmeier, and he gives no explanation for how this pressure was created.

Then we have Mr. Chapin, the biologist, who is now a forensic chemist who has a bachelor of arts degree in biology, but who is now the forensic chemist, the CSI man for firearms, I guess.

What did Mr. Chapin tell you? Well, he criticized Mr. Roane, too. Everybody wants to jump on Mr. Roane. What did he really tell you? There was enough residue left in that barrel, despite what he claims Mr. Roane did, there was enough residue in there to find elements and constituents of what? Pyrodex. And what? Black powder. He found no constituents of so-called smokeless powder.

That's the big, what I want to say, bugaboo in this case. Smokeless powder, we heard all about it. It causes tremendous explosions. But we see not one scintilla of evidence, not one piece of direct evidence that smokeless powder

was ever fired through this gun.

Now, they have excuses for why they didn't find smokeless powder. There's two of them. One is Mr. Roane. Poor Mr. Roane. He did everything backwards. This man who worked with firearms at HP White for virtually his whole adult career, who's tested and inspected hundreds, thousands of firearms, and who used the material as you've seen, probably ad nauseam, was an appropriate material for inspecting--making casts of and inspecting vessels and in particular threads.

Cerrosafe is used by gunsmiths and people who investigate and evaluate and develop firearms as a casting material. It's acceptable for that, it's used for that, it's intended for that. All these witnesses explained to you that it doesn't get hot enough to melt or change the characteristics of the metal being casted. It doesn't react chemically to change any of the granular and molecular structure of material--of steel. It's really an inert, innocuous material that's become the defendants' excuse for no evidence of smokeless powder, no evidence.

Mr. Chapin found enough residue, retrieved enough residue so that his chemical testing revealed elements, compounds consistent with Pyrodex and black powder. But miraculously, and conveniently, conveniently, no evidence of smokeless powder. And then the excuse, "Well, there could be some smokeless powder down in this oily residue that resulted

when I used acetone to wash the barrel, and then--we got whatever contents were left with that acetone, and we put it in a beaker and then we boiled the acetone off it. We got some oil in there, but that's normal, that's what you'd expect. Oil is in the barrel. You get this oily residue, and it might, it might have some evidence of smokeless powder, some trace evidence of smokeless powder if I do more tests." If I do more tests.

But, you saw in his report, and you heard his testimony, the defendants said, "Don't do any more tests. Don't do any more tests." Mr. Chapin says it might have been a little expensive, might have taken some more time. That was over a year ago, year-and-a-half ago. Had plenty of time to do any further tests. I assure you there's no evidence that the Court ever told him to stop doing his tests.

The defendant told him to stop doing his tests because it gives them an out. It gives them an out if they had no other evidence, "We might have found it if we had done that. I can't rule it out." The fact of the matter is they never ruled it in. They've never ruled it in.

They've come to you with no evidence at all of smokeless powder, yet that's what they say J.D. Katzenmeier did wrong, he somehow put smokeless powder in this gun. He must have been insane. He must have been insane. Why would a man who every day, every day he works at a natural gas compression

station where there's thousands of pounds of pressure inside of pipes and vessels and valves, why would that man do something insane, using a charge of smokeless powder?

You'll see the user's manual. It says, "Don't use smokeless powder." You'll see the container for the pellets. You know, there's admonitions in there, "Don't use smokeless powder." It's sort of, how do I say, just a basic fundamental of muzzleloader shooting, don't use smokeless powder. It's not a great mystery. This man whose whole life is basically being careful, being meticulous, being diligent, being responsible is not going to walk out there on a fine Iowa morning when he's got his wits about him and the sun is shining, and he's going to have a nice day in the country sighting his rifle, he's not going to do something stupid like putting smokeless powder in there.

Folks, if there was smokeless powder in there, there would have been residue of it because Dr. Chapin had every opportunity to find residue of it. They just stopped short of the last few tests because it was difficult, because it was expensive. He's supposed to be a scientist. Dr. Schmidt is supposed to be a scientist, but they really come to you with speculation and excuse for a defective gun.

Mr. Katzenmeier and his friend, Blake Phipps, told you what happened that morning. Those are credible people. There's been nobody here who's impeached their credibility, no one's

called their credibility into question. They were right there, right there together. Blake Phipps told you exactly what he observed and what he heard from Mr. Katzenmeier, and Mr. Katzenmeier took extra time that morning because he was instructing Blake. Yes, he was going to do some shooting, but he took extra time because he had a student, a pupil, a protegee in the black powder field. And Blake Phipps' testimony was boom, boom, boom, consistent with that of J.D. Katzenmeier. J.D. Katzenmeier's testimony is consistent with his ordinary custom and practice.

Do you remember how he talked about consistency, consistency in what you do, establish a good safe procedure and follow it each and every time? Keep that tackle box with all your stuff together, all the materials you're going to use.

I mean, this man didn't miss a beat. He didn't miss a beat, but he took a beating, he took a bad beating. He took a beating that he is going to live with the rest of his life. The beating that he took was because of this defective rifle, muzzleloader rifle.

Mr. Katzenmeier underwent numerous surgeries. He incurred $75,000, or so, of medical bills. He missed two or three months of work. Every time he takes a breath he only gets it on one side of his nose. You heard what Dr. Bauman told you about that. When you got one side of your nose stopped up, it just kind of makes you feel out of whack. You can't breathe

right.

Did you see him on the witness stand when he was testifying, especially when he got a little emotional, when he sort of draw up his face, throw his head up, open up his mouth? I think it was pretty obvious what he was doing. He was not breathing through his nose, he was breathing through his mouth, and he does that all the time.

Mr. Katzenmeier lives with the consequences of this defective gun every day. I want to talk about this defective gun. The defendants say, "You know, we put a proofmark on this gun." They know what proofmarks are, they admitted to you what proofmarks are. "We put a proofmark on this gun even though it had never been proofed. We put a proofmark on this gun even though it had never been subjected to any kind of pressure test." From the time it starts down the assembly line, manufacturing line, it's not subjected to any type of pressure testing by air, or pneumatic testing, by water or other fluids, hydraulic testing, never subjected to anything.

They just try to make it in accordance with their design specifications, but they're not always successful. I think Mr. Beletagi told you that, "During my tenure there we found 25 to 50 bell-mouthed barrels." And what kind of investigation did those folks make to figure out why that was happening? They still really didn't have any conclusion, or, certainly more importantly, a remedy. "We found 25 to 50

barrels."

The first time he told--I want you to remember this: The first thing he told you was, "When we identified a bell-mouthed barrel, what did we do? We identify it, we pull it off the line, and we put it in scrap." Then I started asking him some more questions and he kind of backtracked a little. "Well, no, we don't just throw it in scrap. We conduct some kind of inquiry, some kind of investigation. Depending on how serious it was we do a little bit of looking, and sometimes we make some notes. Sometimes we keep those, and sometimes we just throw them away. We don't have a record." They don't have a careful, methodically responsible, organized, reasonable, rational quality control program.

If and when they find something out of whack, they pull it out of the line, they scrap it, you know. I'll leave it to you to decide if they do any kind of investigation.

But I submit to you, whatever investigation they do, if any, it's pretty cursory. It's certainly not intense, it's certainly not organized, and it's certainly not designed to lead to a remedy of the problem.

He said, "Well, bell-mouthing, that can occur. Sometimes it's a loose tool, a worn tool, sometimes the equipment is out of adjustment, sometimes somebody will bump it, it's out of adjustment." But we really don't have any conclusions of how we minimize that, how we eliminate that.

They just accept that. They just accept that.

What kind of a quality control program is it, especially one where, as a gun is being produced, it's never subjected to any kind of pressure testing? What kind of quality control program only tests one in 25 threaded barrels before a breech plug goes in them, only one in 25? You saw them. They're little bitty. How long does it take to screw that threaded go/no-go in there to see if it works? Now, the threaded no-go is certainly not 100 percent accurate, but this is better than nothing. 25 out of 25 is better than one out of 25. 15 out of 25 would be better than one out of 25.

You heard the testimony about how these barrels are produced, they go to these bins. How do you figure out which is the previous 24? They said, "If we have a bell-mouthed one, our policy is to go back, check-out the previous 24, see if there's a problem, take it out." What he didn't say, I guess, is if he found that numbers 24, 23, and 22 were bell-mouthed, you go back even further, or if you just go back to 25. I'm not sure. That was never clear to me.

What was clear is their product control and product testing along the production line is lax, it's loose, it's inadequate, and defective units get through that system. They're not serious about safety, they're just not.

And what happens is every once in a while, in fact probably far too often, this happens, one of these barrels is

bell-mouthed, and one of these barrels gets threads that are either not formed completely, partially formed. Nobody really knows, nobody really knows because no investigation's been done.

Mr. Katzenmeier's sad incident, no real investigation was done there, at least with an eye toward improving the process. An investigation was certainly done to present this case. That's not the same thing as trying to figure out why something bad happens.

Mr. Belategi said this is a safety critical element of this gun. I dare say there's nothing more safety critical in this gun than the barrel and breech plug connection because it's exposed, according to them, to 15 to 25 thousand psi. That pales--they want to make it sound like that's somehow not so great because this gun is tested at 42,000. What is tested is guns not bell-mouthed. They only take five a month over there. That's kind of strange, five a month out of hundreds of thousands of guns. And then the best, the best, "We put a proofmark on the gun that's not proof-tested because the proofhouse told us to." No one from the proofhouse told Mr. Belategi directly. Mr. Muniategui said, "I think the Colonel told us we should put the proofmark on it. Even though we don't proof-test every one, he told us to put the proofmark on it."

How is that different than--they're supposed to proof-test every gun they sell in Europe. When it passes a

proof-test, it gets a proofmark on it. But for the United States, what we get are guns that have no proof-testing, but they all got proofmarks.

Now, I don't know. It makes no sense to me. "We don't sell any guns in Europe, but, again, if we have to, we'd have to proof-test them and put a proofmark on them. We only sell guns in the United States. We don't have to proof-test them so we don't, but we'll put a proofmark on them because the proofhouse told us to." That's like "The devil made me do that. The devil made me do that."

Folks, I submit to you if the Colonel had told them to put proofmarks on unproofed guns, they would have brought the Colonel over here. If the proofhouse had told them or ordered them to do that, there would be a document somewhere that issued that order, that said, "For every gun that you don't proof-test that you want to send to the United States, you still got to put a proofmark on it." There would be some documentation to back up that. Self-serving, that's what it is, that's self-serving, unsupported, uncorroborated assertions.

When you go back there, look at the exhibits from their policies and procedures manual. I think it's Nos. 48 through 55 that talk about it. "For guns we sell in Europe, we have to proofmark--test and proofmark 100 percent of them. For guns we sell in the United States, we don't have to proof-test any of them. We'll proofmark all of them." That's what they

did. That's what they did.

You heard these witnesses, familiar with guns, you heard Mr. Katzenmeier, he knows what a proofmark is, he knows what it means, he knows what information it conveys, he knows what kind of assurance it conveys, he knows that proofmark meant to him that this gun had been proofed. You heard him say "proofed." That means proof-tested.

Defendants have a loosey-goosey definition of what is proof-tested. They kind of blur it up with pressure testing and development testing. I submit to you, ladies and gentlemen, this testing they do of five guns a month is testing that really tests the design. That's what that kind of testing is designed to do. When you test at these extreme loads on any kind of product, when you test it at conditions that are greatly in excess of the service conditions, what you're really testing is the design, that that design will work if manufactured in accord with the design because you're only testing a sample and you're assuring that the design is efficacious.

Proof-testing is entirely a different purpose. Proof-testing is testing your manufacture. Proof-testing is "Did I actually manufacture this product in accordance with the design specification, and will it withstand normal service conditions that are designed for, intended for consumers who use the product?" That's what proof-testing is about. It is to test each and every unit to make sure that it's within

reasonable accord of the design specifications so it won't fail under normal working/operating conditions. The defendants tested none of their production, none of it. They didn't get subjected to air pressure, they didn't get subjected to hydraulic pressure, and they sure didn't get tested to the pressure from the blast of a load and a projectile.

So we have an explanation that is plausible, we have evidence of that defect, we have--we know that it occurred, that kind of defect occurred. It occurred at least 25 to 50 times, and let's say 26 to 50 times because we know Mr. Katzenmeier's gun got through there. It was bell-mouthed, it was not properly manufactured in accordance with the specifications, and it never got subjected to any kind of testing until October the 2nd, 2005, when it was tested in the flesh and blew half his face off.

Ladies and gentlemen of the jury, when you consider all this evidence, I submit to you the only direct evidence, the only credible evidence, the only compelling evidence is that this gun was defective. It got through the defendants' system, which was lax and loose, poorly documented. What kind of a quality control program has the lack of documentation those folks have? It got through there in a defective condition. It came over to this country in a box, and the first time it was used, it failed. If it had been subjected to proof-testing, it would have failed at the proofhouse by remote firing, and nobody

would have been hurt. But instead, it got its proof-test out here near Boone, Iowa, and its proof-test failed.

Now, let's talk a little about Dr. Tipton. Dr. Tipton is a fellow who is a scientist. He's a Ph.D. mechanical engineer, got his Ph.D. and his master's in mechanical engineering at Stanford. He's done all kinds of work on threaded metal fasteners and pressure vessels. In spite of what Dr. Schmidt says, this is a pressure vessel. This is a pressure vessel. A special kind of pressure vessel, but it's a pressure vessel. It's designed to expend its pressure in one direction, and one direction only, continue to do that right out the barrel, not out the back and the front. Out the front, not out the back. It's a special kind of pressure vessel.

Dr. Tipton explained to you how--his area of expertise in mechanical engineering, his knowledge of threaded metal fasteners, how they work and how they're designed, and what's required for the proper engagement, his knowledge of metallurgy. And he was just recently established as a fellow in the American Society of Materials, same thing Dr. Schmidt's in. Dr. Schmidt voted for him, but Dr. Schmidt disagreed with him on this test.

Dr. Schmidt, again, I think he just tried to dazzle you with whistles and bells and big words and a pile of pictures. Dr. Tipton gave you a more--how do I want to say it--understandable, simplified--not simplistic--simplified explanation of what happened here. Dr. Tipton presented you

with a panorama that compares the profile of Mr. Katzenmeier's gun with a topographical view. And it clearly shows, clearly shows where the threads were most engaged up toward the muzzle end, and were sheared and smeared away as that breech plug went backwards.

We get in the mid-range and there was less shearing because there was less thread there. There was simply less of these ears, less of these tips to shear off, and that's why you don't see as much metal in these views as you do to the left.

Finally, when you get to the back, you don't hardly see any shearing or any metal because there's little or no threads there, that's why. Dr. Schmidt sure didn't show you any kind of panoramic view like that.

Dr. Tipton tells you and explains to you--you can see it better when you get up close, but there are these, what appear to be, vertical lines. They're circumferential lines from the machine of that breech plug--or pardon me--that breech area of the barrel. And those machine lines are undisturbed when the breech plug went out. They were undisturbed because the breech plug was not contacting anything in the back. There was no thread to contact.

If that doesn't convince you, look at the typical thread form and how it makes up and engages with the breech plug. Look at this thread in the barrel, a typical gun. You saw the exemplars we've cut up. You're not going to see all of

them, but some of them will go back to the jury room with you. Look at this. How much engagement is that (indicating)? The engagement of the breech plug actually is about right at the line, where there is nothing but a gap or a void. Over here, not much more engagement. You can put a straight edge to it, or something, and see how much engagement there was, and that's Tipton.

So if you bell-mouth that connection, and you've got that kind of thread engagement, what's going to happen when you put some load on it? What's going to happen is what happened to Mr. Katzenmeier. You're going to get a load of black powder, a load of particles, maybe a breech plug and some components of the breech plug knocked off the firing assembly, you're going to get it in your head and face. That's what's going to happen.

Ladies and gentlemen, when you put all this evidence together, what makes sense and what's credible and what fits together, I submit to you there's no doubt, there's no doubt, that this incident was caused solely and only by a defective gun. Mr. Katzenmeier did not suddenly go crazy. Mr. Katzenmeier did not suddenly, on October 2nd, decide to become a reckless man or a careless man. There's no evidence of that. There's no reason for that. Everything about this man's makeup and history rejects that.

Mr. Katzenmeier did what he was supposed to do. He followed instructions, he followed in a consistent manner what

he had done hundreds of times before, and he suffered the consequences of flawed manufacturing processes that result in defective units. I'm not saying every one of those units come through defective, but I'm saying too many of them do. Some, a few of those, are going to cause injuries. Some of them are not going to fail so violently. Some of them will fail a little more safely. That breech plug may just get jammed up in there instead of coming out because it may not be bell-mouthed quite as much. The thread form defects might not be quite as bad. The failure might not be quite as catastrophic.

I heard they got a customer complaints department. They got some customer complaints in there. I submit to you some of those customer complaints are about failures like this that maybe didn't cause anybody injury, just jammed up the breech plug, or adversely affected it in some other way. What did you hear about that? What do they do about the customer complaints? They don't have any methodical, organized, custom and practice to deal with that. It's a matter of discretion, according to Mr. Dudley McGarity. They just do what they think is appropriate under the circumstances. To tell you the truth, it's to their advantage to do little or nothing.

If you don't look for the problem, you don't find the problem, you don't fix the problem, you keep on perpetuating the problem. That's what we got here. Lax manufacturing methods, lax quality control, poor record keeping, lack of investigation

and follow up when you've got a problem, and so this is what you're going to get. And this consumer who relied on this company and its proofmarked but unproofed product pays the consequences.

Ladies and gentlemen, I submit to you when you go back there and look at the exhibits, when you go back there and talk about the testimony, when you put your heads together and you think about and talk about what's credible, what's most likely, what's the most compelling evidence, you're going to reject the defendants' claim of smokeless powder, or some unknown propellant which created this big explosion. I almost thought it was a small nuclear device at times. It certainly wasn't smokeless powder. They would have had some evidence of smokeless powder.

All of this stuff about contamination of the sample, that's just an excuse because they have nowhere else to go. Mr. Roane is no dummy. Mr. Roane showed you the type of material he uses, the spec sheet on it. It's for these kinds of purposes that relate to firearms and other chambered areas, threaded connections, other kinds of connections.

Dr. Schmidt tells you after he cleaned it off he was able to do his exam, and then he produced all of his moonscaped pictures, none of which showed--not one, not one--a sheared crown of one of these threads, not one. You look at those pictures and he'll show you all about those roots. He's not

going to show you any photography of any crowns in the microscopic form.

I submit to you, ladies and gentlemen, the most credible evidence, the most truthful evidence supports Jon Katzenmeier's position in this case. I urge you at the conclusion of this case, after you've heard the arguments of counsel, you deliberate with the instructions of the law, that you return a verdict in favor of Jon Katzenmeier, that you award him substantial damages, substantial damages. That means damages for life-long.

I submit to you a seven-digit verdict is reasonable and appropriate here. This man has got a lifetime of disability and impairment ahead of him, he's got a lifetime of not being able to breathe good every day, not being able to sleep good at night, breathing through his mouth. He has a lifetime of headaches from time to time, he has a numb scalp. He has a lifetime of no smell, no taste. Think about that. No smell, no taste. Think about your last nice meal. Think about what you liked best, whether it was chocolate cake or beef steak or corn chowder or ice cream. This man doesn't taste that any more, he doesn't taste it.

Every day he looks in that mirror, he sees that big old jagged scar up there where that breech plug crushed the bones of his skull. When you look at his medical expenses, lost earnings, what he experiences every day, a big piece of his life

has been taken away, and he should be compensated for it.

We urge you to return a verdict that reflects the serious nature of those injuries. We urge you to return a verdict that is a million dollars, a million and a quarter, or more. Don't bring back a verdict of two or three hundred thousand dollars. That's not enough to compensate this man for what he's experienced in the past and what he's going to lose. It's not enough to compensate him for that day of the burning face, that day of the burning face, that day of not being in control of things, fighting to stay in control, fighting back to full life. Compensate this man for what he's suffered in the past, and what he's going to live with for the rest of his life. Thank you.

THE COURT: Closing argument on behalf of the defendants. Mr. Singer?

MR. SINGER: Thank you, Your Honor.

You don't have a choice to be here, but you do have a choice whether you paid attention, and you have, and you've been on time, and we thank you for that.

Ladies and gentlemen, this is a court of law. The judge gave you the charge, and the plaintiff has the burden. And I submit to you that what they have and what they've shown you this week is possibility, plausibility, and theory.

Listen to his argument that he just said, just think about that for just a minute, that because Mr. McGarity said

they don't keep records every time a customer calls to complain, that there must be complaints about breech plugs coming out. What is the proof about that? Come on, ladies and gentlemen, this is a court of law.

They've been to Spain, they've been to Norcross, we produced hundreds of pages of documents. Don't you think if there was one single shred that supports that, they would produce it to you? That's what you got, ladies and gentlemen, you've got theory and you've got speculation, and that is not proof.

There is a lot of things, red herrings here they've thrown out. Let's talk about this threaded go/no-go gauge for just a minute. You heard about it in the video deposition, you heard it from Aitor. When the machine makes the hole, one in 25 is checked with a size gauge. If there's a problem, they shut it down, they investigate it, they go back until it stops, they get rid of them, they fix it. Never healed themselves. Sure, they found it. Never healed itself.

After the threads are formed, one in 25 is checked with a threaded go/no-go gauge. What is the purpose that he said of the threaded go/no-go gauge? It's to check the dimensions of the threads themselves in the grooves, not the height of the opening. That's the 100 percent round go/no-go gauge that's checked 100 percent of the time. All these questions are just misrepresentations. The threading doesn't

have anything to do with that. Will it catch it? Sure. If you put it in starting at thread one, it doesn't even touch until thread four, because they're not there, I'm sure they'll know about it. It's another red herring, ladies and gentlemen.

You heard the video deposition when he's asked questions and he takes this document, and he talks about the time there were two barrels that had the threads malformed. But did you listen to the rest of the testimony? "We made them that way. We took them and made them with half the threads to have them tested to make sure that the barrel was safe." It's just one of the quality things they do. Lots of red herrings.

They talked a lot about design claims in opening, and asked questions, and so forth. There's no design claim being submitted to you, ladies and gentlemen. What's the experts they have tell you? That this metal is good metal. This metal is proper metal. This design is a good design. Every one of the exemplars with those threads are properly designed and will withstand a magnum load and well over a magnum load. That's the testimony, ladies and gentlemen, that's the proof.

Mr. Tipton, Professor Tipton, Dr. Tipton, the man upon--the lynchpin upon which the entire case hangs, what did he say? "A rogue one got out." Is that proof?

"How did it happen, Mr. Tipton."

"Somehow a rogue one got out."

"Well, you bear the burden of proof, Plaintiff. How

did it happen?"

"Somehow. Somehow."

What Mr. Eaton says is the most compelling witness in the case--that's just what he said a moment ago--is Professor Tipton. What does he say? "Somehow there was a rogue one."

But what's the proof, ladies and gentlemen? And, again, very important, we bear no burden. We don't have to come in and disprove anything. The Judge charged you at the beginning, he just charged you a moment ago. They have the burden of proving a defect case. We don't have the burden of proving one thing as far as defect goes. We didn't have to come in with a shred of evidence, or a single witness at all. It's their burden.

But what is that proof? Every time? Sure. Is it possible? Sure. Does this happen in manufacturing? Absolutely. What do you do? You have quality checks on it, you check a specific number, you look for it, you investigate it. If there's a problem, you fix it, and every single time you check 100 percent of the ones.

Is that good enough? Not for Dikar. They're going to have their quality people come around and check every day. It's a computerized routine that's set up. You've seen it on the tape. And still they have the quality people set it up. They have the quality people come back every day and check it. What is the evidence? The evidence from the witnesses, ladies and

gentlemen, is--and there's zero evidence and they bear the burden on it--that if there is a rogue one, how it happened, how could it happen. The testimony is every single time there was a bad one, there will be another bad one and another bad one until it's fixed. You can't have a rogue one just stuck in the middle of the 24. There's no evidence of that.

"Oh, but it's possible."

"Why, Dr. Tipton, why is it possible?"

"Well, let's see. I admit to you, ladies and gentlemen of the jury"--I'm Dr. Tipton--"that for there to be plastic deformation in the barrel, for this barrel to expand outward, there's got to be a pressure that exceeds its yield strength." He pulled them apart and the yield strength is 92,000 psi. So to have that breech plug come out the back and swell it out, you got to exceed 92,000 psi. That's his testimony. That's his proof. So that's point No. 1. Let's start there.

"I didn't see a swelling. Therefore, it's just impossible to me that this breech plug came out because it didn't swell." What kind of proof is that?

Here's a person who only looked at unclear surfaces. It took Dr. Schmidt three days to get the stuff off the top of the surface that Professor Tipton looked at, when Dr. Schmidt was over there when they cut it in half, and based his opinions on it--that's not true. I apologize. That's the only

microscopic examination he based his opinions on. He actually based his opinion on the Photoshop photographs in a different magnification.

The topo, as they say, why was that staggered? That's an interesting question. Point No. 2 is that Dr. Tipton, who is the lynchpin of everything, who has got to explain why this--why this rogue one got this way, says, "Well, I looked at unclean pictures under a microscope, and I looked at Photoshop pictures at a different magnification. It's a slam dunk to me."

Oh, what's his next point? "Dr. Tipton, what about the magnification? Don't you need to look at a different magnification? You're analyzing metal here. You're trying to go after the facts and figure out what happened."

"No, magnification doesn't make a difference."

"What's adiabatic shear, Dr. Tipton?" The most compelling witness they have, the one who is the lynchpin of their case, "I don't know what adiabatic shear is," he says. Never blown up a gun, never looked at a gun that's failed. Had thousands--hundreds of pages of deposition testimony from Dikar, all kinds of records from Dikar, all kinds of tests from Dikar. What did he do? He said, "Well, I didn't consider any of those, except I did see that the overpressure test was between 20 and 25 thousand psi." Really it's 42,000.

That's the guy who you're going to believe, who carries the burden of proof for these plaintiffs, ladies and

gentlemen, and that's what is the slam dunk?

Professor Tipton said one of the most important things in this trial, "Theory never matches reality one hundred percent of the time." He is absolutely right. He's a theorist. I can just see him sitting upstairs just like this in his classroom saying, "Well, what happens if it comes out? It must be bell-mouthed." That's theory. We are in a court of law, ladies and gentlemen. We're talking about proof. This case is to be decided on proof, not theory.

Now, what else does he do? He says, "Well, I believe"--and this is his final explanation--"that a worker took the gauges as I brought them here"--even though he had the film which showed that the gauge is round like this, a cylinder, and a size to not go or to go, he goes out and draws up a lollipop gauge that doesn't exist in any gauge catalog, and nobody-- Aitor has been to factories in the U.S. and Spain and Germany and Switzerland and China, and he's never even seen one of these in a catalog anywhere. He draws up a lollipop gauge and says, "Well, if you do that with this lollipop gauge, you might not get it. That's how it got out." That's their proof, ladies and gentlemen. That's the lynchpin of their case.

This is real world. You have to decide who to believe. The Judge will charge you can follow an expert if you want to, or disregard it, that's up to you.

They talk about the quality checks. Besides the

quality department, the other people. What about the breech plug lady? She's an owner of the company, it's her company. Her job for years is to take these breech plugs and put them in a gun. First she looks at it, she looks at the end of it down here, makes sure there's no burrs, it's the right size, she looks at the threaded part. Dr. Bruchey, he said, "I got the gun"--or was it Mr. Roane? I think it was Bruchey. He said, "I got the gun, I looked at it, I looked in the end of it. It was tapered."

So Dr. Bruchey can see it, but the breech plug expert, the lady who puts it in, can't. Is that plausible? Is that proof?

Not only does she not see it, but to have this get out, she has to take the breech plug and go in and miss four threads because, according to Tipton, the first four weren't formed. It goes in that far, and she misses that. Does it make sense to you, ladies and gentlemen? Is that proof. Have they carried the burden of proof on that, ladies and gentlemen? That's how this gun got out. That quality didn't catch it, that this gun left the factory when that's the quality.

One more thing I think is kind of important. Not only is she an owner of the company, ladies and gentlemen, but tomorrow morning she may be the one paid to take that gun off the final assembly line and go put 150 grains of powder to it in the proofhouse and put it to her shoulder and fire it because every employee does it, and they do it Monday, Tuesday, and

Wednesday for an hour-and-a-half every single week. If that isn't a pretty good quality check, I don't know what is. But, according to Professor Tipton, a rogue one got out. It's speculation, ladies and gentlemen, and it's theory.

Now, again, what did Dr. Bruchey do? He looked in the end of it and he says, "Well, it looks tapered to me." So then they cut open the end of it and sectioned it and Dr. Schmidt got a quarter, and Sherry Labs got a quarter, and prepared it for Tipton, they sent a slice of it to Dr. Bruchey, who is a metallurgist.

What did Dr. Bruchey do? What do we hear about? We here about threads. What did he do? He went to the area up in the muzzle, away from the threads. He didn't look at the threads. He didn't look at them. Cut a section of the metal, prepared a sample, and did a detailed and proper cleaning and metallurgical examination of that metal. And what did he find? Good metal. What's that prove? It's great metal, good materials. What does it say about the threads? Nothing. That's no proof, ladies and gentlemen.

Compare that to Dr. Schmidt. I'm not going to spend a lot of time on him. You heard him today. He's blown up hundreds of guns and seen guns that have failed. Why did we bring you the picture of the roots? Let me tell you, ladies and gentlemen, if I did something wrong in this trial, please don't hold it against my clients. I decided which ones of the

hundreds, or even thousands of pictures to bring in to you. But don't you know, ladies and gentlemen, if there was a single picture that helped the plaintiffs, they would have brought it to you. The importance of the root pictures is because they say this is a bell-mouthed hole, it looks like a cone. And when this rolling mandrel or tap without a guide on it hit in there, it didn't form these threads until it got up to the front.

But what did he say? Look at them. They're out there with you. He looked at the top and saw this tearing and shearing and smearing of the surface. Then he goes and looks at the size and says, "Oh, if I measure the bottom to the outside of the barrel, it's a straight line." How does that happen on a tapered line?

Now he looks a little closer. "Let me look at the shape of them, what's left in the bottom of the root. They're all shaped the same. None of them are cockeyed. Let's look metallurgically. Let's go in there and do hardness testing. Let's see if there was enough metal to work down and form and change the microstructure and make that root harder. It's the same. Thread No. 1 and thread No. 14 work the same way, the same amount of metal." Is that all? "Let's look at microstructure, the flow lines. They're all the same."

What's that tell you? This hole was straight when these rolled threads were formed, it was straight, and they were properly formed because it worked it all down, or you wouldn't

have them. That's what the importance of those photographs are, ladies and gentlemen.

Now, he's described the shearing and the tearing and the smearing and the plow effect, that when you take that breech plug--and, again, we're talking about something that happens in an incredibly quick instant. But if we were to try to go back to milliseconds and see it coming out, the very second that it moves one thread backward, they're all gone. Every one of them are sheared the exact same, that moment in time, boom, they're gone. And so the metal that was in the back one is now outside. The metal that was in the front one from the barrel is now over here (indicating).

And so by the time it gets two or three back, three back, these look--you have the color pictures. Look at the top of those things. They're scalloped. They come back and they tear and they shear out, and then they start tearing out and smearing out. And he described that's what you see, and it's a progression, and it changes from the front to the middle to the back because it's getting more and more stuff. The angle of the breech plug is like this, so it's plowing it up, and it's getting fatter as it goes out (indicating). But you have to decide who you believe.

If you look at a nonclean surface, there are marks that Professor Tipton interpolated are circumferential marks. "It has to be from the drill." First of all, it's not clean.

What do we know? Bored something down in there and they screwed it out, and they're not even uniform.

Now, there are two claims here the Judge charged you, and you have Instruction 15 out there with you. Instruction 15 deals with the manufacturing defect--I'm sorry. Instruction 13. I want to check that just a moment.

No. 1, "Defendants manufactured, sold, marketed." Sure, we agree with that. "Defendants were engaged in the business of manufacturing" this firearm. Of course we did that. Marketed it. BPI did that.

Here's the issue, here's the two--three critical points: "At the time it left Defendants' control, it contained manufacturing defects that departed from its design." And in four, "The defect was a proximate cause of Plaintiff's damages." That's the question, that's what they've got to prove. I submit to you, ladies and gentlemen, that the proof in this case is simply not there if we hadn't put on anything.

Now, they also have a charge or a claim on warning, and that's 15. And the gist of it, as I understand it, is that had there been--the charge is "The foreseeable risk of harm posed by Defendants' Kodiak Magnum muzzleloader rifles could have been reduced or avoided by the provision of a reasonable instruction or warning that the CVA Kodiak Magnum muzzleloader rifle had not been proof-tested or fired prior to sale to the consumer." So that's the first thing they have to prove.

Second, "The omission of the instruction or warning rendered the rifle not reasonably safe."

And then the next one is very critical. "The omission of the instruction or warnings was a proximate cause of Plaintiff's damages."

Let's talk about it in reverse order. This man had two other CVA guns. He had a Black Diamond that's not even proof-tested at all. Where is the proof that when his father gave him a gun, he looked at it and said, "Wow, that has been proof-tested. I'm not about to fire this gun unless it's been proof-tested. Because it's been individually proof-fired, I'm going to go out and fire it"? Where is that proof, ladies and gentlemen? And it certainly doesn't make sense. There is zero proof, and you know he's going to shoot that gun. That's the first thing in reverse order.

The second thing backwards, "The omission of the instruction rendered the rifle not reasonably safe." Putting a stamp on it required by the proofhouse, their theory is, rendered it not reasonably safe. Now, where is the cause in that? What do you know about that? Jon Muniategui, who's retired now, former the head of the company, says, "The proofhouse tells us to. The Colonel tells us to. We just can't do it." What has Aitor told you? "We have a license. It's not like the U.S. The Government tells us what we can make. They can come in there anytime they want to, and they do. They come

in and they stand there and watch and make sure that mark gets put on there the right way." And they're saying that there's some kind of a warning, some kind of defect because of that?

They want to talk about the proof certificate, another red herring. What was the testimony, ladies and gentlemen? That in Europe the muzzleloaders are at a lower standard; and, therefore, a proof load, whatever a proof load might possibly be, is not what a magnum would be.

Let's talk about the proof load for just a minute. Where is the proof? Where is the proof? Where is the procedure? What's the deal? I mean, let's have that procedure. Let's go out today and proof--let's go proof-fire one of those. Their expert can't tell us how to do it. "Well, it's just overpressure."

"You can't do it at 42,000 psi because that's more than 100 percent more pressure, so there might be a fatigue of that gun." What are you supposed to do?

"It's just overpressure."

"Well, how do you do it? How do you load it? What pressure do you make it?"

The CIV is here. Look in the book, they have specific procedures about how you do it over there, for those guns over there, and because it's low pressure. It doesn't apply, ladies and gentlemen. It's another red herring.

Now, I submit to you, ladies and gentlemen, that when

you get the verdict form, you answer Question No. 1 no, Question No. 3 no, and that's it, you're done. No need to consider the conduct of Mr. Katzenmeier at all.

I'm not going to stand up here and tell you he's a bad guy because I don't think he is. I'm not going to sit up here and tell you he's a bad father because that's certainly not our position. But we have raised that defense in this case, his conduct, because I think he made a mistake. You heard others say the same thing. Now, what do you know? You got to be safe. You got to be safe, ladies and gentlemen. You got to make sure the gun's unloaded. I asked him, "What would you do if I handed you a gun?"

"First thing I'd do is open it, make sure it's unloaded." He didn't do that, ladies and gentlemen, when he got it. He didn't do it the next day. He didn't do it for ten months. He didn't do it Saturday. He didn't do it Sunday. Wal-Mart, and others, have sent back loaded guns through the mail to BPI. People make mistakes, ladies and gentlemen, people make mistakes.

If you look at the owner's manual, it talks about the responsibility and how, particularly with a muzzleloader--you don't have some of the same features with a modern firearm--you have extra responsibility on the part of the user. It's amazing, but it's true, these aren't regulated by the ATF like firearms are, but yet these are the ones that the consumer has

to build the explosive in it, the ignition. They put the powder down in it. They have to build their own charge. Can't buy it off the shelf, they have to build it, and they have to have responsibility for it, ladies and gentlemen.

Now, I want to talk to you just a moment ago--a moment about what's undisputed with respect to that.

Now, when I had Dudley McGarity on the stand I asked him to point the gun at me and pull the trigger. I don't know if any of you were uncomfortable with that, or thought maybe if it goes off there will be one less lawyer and we'll be in a better place. I knew he wasn't going to pull the trigger, I knew he wasn't going to point it at me because he's safe. I'd squirm in my seat as I watched these barrels pointed at you all. You have to be safe. This is a firearm, and the first thing you got to do, it says in the owner's manual, is make sure it's unloaded. That's common sense. You shouldn't have to tell somebody about that. Lots of stuff about the breech plug. Running a dry patch down it is not making sure it's unloaded.

Now, let's look at why we know he didn't take the breech plug out. We know he never took it out. Something's kind of inconsistent with me, and I made a note of it. He talks about how excited he was. This is the first gun that's actually his. It's not a borrowed gun, it's not a loaned gun, it's his own. You heard him say, "I'm excited. I'm excited."

"How excited were you?"

"Well, I put it up, didn't look at it for ten months."

"What?"

"Yeah. I went and hunted in the spring, went and shot in the summer with these other guns, went and did all this other stuff. Oh, no, I never pulled that gun out for ten months."

Is that consistent?

How do we know something was in it? First, common sense. The bullet went that way, and the breech plug went that way (indicating). There's a tremendous amount of pressure in that, ladies and gentlemen, to make that happen. That's just common sense, and Dr. Schmidt described it for you. He said that the reason you don't have a bulge or swelling in the barrel is the pressure is leaving so fast, and it goes in both directions.

You heard Mr. McGarity. They tried to blow some up with smokeless. Yeah, it's true some of them the barrel comes open. What happened to one of them is they couldn't get the lever open. What causes that? The breech plug comes back and impinges it. You'll have a gun there.

What did Dr. Schmidt tell you? Adiabatic shear. And, again, look at the color photographs. It shows it. The adiabatic shear only happens above 40,000 psi. He's studied it, he's known it, he's known about it for years, and he gets his pictures, and this is it. And you can look at those and you can see it. There's a change in the metal. It's there. It's

there. Again, ladies and gentlemen, we don't have a burden of proof, not one, but we brought it to you anyway.

Now, absolutely, he read the account of Mr. Katzenmeier in his deposition of how he loaded the gun, put in three Pyrodex pellets, you put a bullet down it, and he fired it. "Do you have any criticism of that conduct?" Dr. Schmidt, he's looked at the metallurgy, but he got the deposition to find out when it was fired, what happened. He didn't have any criticism of that. That's not the point. The question is what happened over those ten months.

Now, I think this is--this is pretty important evidence. You heard from Mr. McGarity that a Black Diamond, which is what--and as Mr. Eaton just said, Mr. Katzenmeier shoots--has shot his guns hundreds of times before. Mr. Katzenmeier says you do the same thing every time. Remember that? That's the most important. The same thing, the same way every single time. How long is a Black Diamond, ladies and gentlemen? It's 22 1/2 inches long, the barrel. How long is a Kodiak? It's 26. Okay. Who do they say is a believable witness with no interest in the case? Blake. What does Blake tell you? He doesn't know anything about it. "He had a piece of tape on his range rod and it stopped at the top." Well, if it stopped at the top of the 22 1/2, how can it stop at the top of the 26 unless something's in it?

That's their proof, ladies and gentlemen, that's their

witnesses that they say are credible. That's true. Another thing about that, they've been displaying--look at all the stuff they bring in the place. Where is the range rod that Blake said had a piece of tape on it and Mr. Katzenmeier said did not? Where is the range rod?

Now, credibility, burden of proof. I'll talk to you just a minute about the evidence itself. And you heard Mr. Chapin. Mr. Chapin didn't find smokeless powder. Why would we want to bring a witness to say you don't find something? We brought him to say--because he's a scientist and he looked at it, and he looked carefully, and he says, "This evidence has been spoiled. This evidence has been changed."

Ladies and gentlemen, in these charges you will see that not only do they have to prove essential elements, but they have to prove proximate cause. They have to prove that their claims proximately caused what happened. We don't have to disprove anything, but they have to prove it, and they have evidence that has been tampered with, maybe not intentionally, but certainly altered and changed. How can they meet their burden of proof? I submit to you they can't.

Now I want to speak to you very quickly on the issue of damages just because it's been raised and addressed. They don't want two or three hundred thousand, and I certainly don't want you to award that either. I think the award ought to be zero. But you have to think about something. Mr. Katzenmeier

was hurt, and we don't disagree with that. Mr. Katzenmeier had pretty severe injuries. He's not perfect, he's not ever going to be 100 percent normal. But within a few months he's hunting and he's fishing and he's shooting, he's hitting home runs, playing outfield, back at work making $85,000 a year. He made a pretty good recovery. And I submit to you under any circumstances, seven figures? Huh?

I'm honored, ladies and gentlemen, to represent, along with Kevin, Jon Muniategui, who is now retired, Juan Garcia, who as you heard from Aitor is his boss but not a technical person, and the men and woman at Dikar, and Dudley McGarity and the men and women at BPI. At the beginning--and, of course, don't forget Aitor who looked at you and said, "Who's responsible for this? I am that man." I'm proud to stand up and represent him and his product, ladies and gentlemen, and I'll tell you something. At the beginning I asked you three things. First of all, if we had to get an interpreter, be patient. We didn't have to do that. Maybe it was hard to hear sometimes, but we didn't have to do that.

Second, keep an open mind, and I hope you have. Sometimes I can see you making notes as you hear a piece of something, and it will be explained later, like the threads, like the fact that they made half of them, and you find out later they intentionally made them that way.

And the third thing was to speak the truth, that your

verdict speak the truth. When you go back to your jury room, take the law that the Judge gave you, and all we ask is that your verdict speak the truth.

I have one more thing.

May I approach the evidence, Your Honor?

THE COURT: You may.

MR. SINGER: I just took out a breech plug. Took me that long. That never happened in ten months. And there's nothing in this barrel. Do you remember what Mr. Katzenmeier said, that he ran the--he took it out, and he ran the ramrod down it, just playing with it. Didn't alter it, didn't change it, didn't do anything with it, but he put it down the barrel when he got the gun. And because it only stuck up an inch and a half or two inches, an inch and a half or two inches, he used his range rod that Christmas Day to swab it with a patch. Ladies and gentlemen, the range rod is shorter than the end of the barrel.

I submit to you, ladies and gentlemen, that the verdict is for the defendants. Thank you.

THE COURT: Rebuttal argument on behalf of Plaintiff. Mr. Sparks?

MR. SPARKS: I will be the last lawyer you get to hear. Let me assure you of something. My client, J.D. Katzenmeier, never played with a gun as Mr. Singer just told you. This man has never played with a gun. He understands what

playing with a gun means, and for Mr. Singer to stand here and insult everyone's intelligence in this room that that man played with a gun just guts their defense.

Their defense is there is no proof in this courtroom. Do you think you would be there if there wasn't some scintilla of proof? Do you think we would have braved the weather, we all would have come here to listen to what happened if there was no proof whatsoever? This case wouldn't have been here.

Take a moment when you go into the jury room, a moment, and don't look at this weapon to start with. Look at this one. Pick this one up and start right here. Use your human tactile sensation and run your finger over the threads. And then take your finger and run it over the threads of that gun in that box, or that gun or that barrel, and, Lord, what you'll find different. They are no way near the same.

Those threads don't exist in that barrel where they exist in that one. And Lord help us how that massive explosion and pressure took place that Dr. Schmidt can't explain occurred, because he doesn't know how much pressure it was. Dr. Tipton told you it didn't require between 20 and 25 thousand psi to blow that breech plug out the back. Why? Because there were no threads. It's simple. You haven't had a chance to look at it. You've seen pictures of it. Take your finger and run it over it. It's that simple. Run your finger over that one, and you'll figure out where the problem was.

Mr. Singer wants you to believe that they can not make a defective product, that they're the only manufacturing company in the world that can't make a defective product. That's ridiculous. Things happen, those people are human. That same lady does the same job, according to Mr. Singer, day in and day out for God knows how many hours a day for how many years. she gets sick, she has children to worry about, she has bills to pay, she has things on her mind. It's not the computer that does that. It's the human that does that. It's the human that makes the mistake, it's not the machine. The human element is what he doesn't want to talk about. That's where the problem is.

The machine turns. The human puts it in. The human has to decide when the tap has to be changed, or the mandrel. I've never heard that phrase before today. Nobody over there used that phrase, they all called it the tap. But the human decides when a tap has to be changed. They don't have a policy or a procedure as to when to change the tap. I guess it's like a light bulb, when it gets bad, you take it out because it's dark.

That doesn't make much sense to me. I cannot keep records that way in my business. I submit to you most businesses that operate, that make products, that sell products, that transport products, don't do that, either. They keep records of when they change their parts out. You have a

warranty book in your car that tells you when to change your parts out. Why? Because we know what the life expectancy of those parts are over a period of time. What do they do? "We leave it up to a human to make a decision whether it's at the 650th gun or it's the 1500th gun." That's a great big gap.

That human that makes that mistake puts that gun in production. That gun isn't tested. That gun has a mark that says it's been proofed, but it's not tested. It doesn't get dropped on the floor, it doesn't get fired, except for the three or four that they might go shoot that they don't keep any records on that might get shipped to the United States, that when it gets here, they don't keep any records on. They can't tell you where they ship that gun.

Is that how you should run a business under quality control? If you ship a product and it has a serial number on it, don't you think you should be able to find it? Don't you think you should know where it went? Do you think you should know who you sold it to? Don't you think you should know where it ended up? Not whatsoever. They put a serial number on it and they ship it.

So here's the problem that I see: The problem I see is that we're not the ones playing with anything, we're not the ones making a weapon that can blowup in your face, we're not the ones playing with people's lives. What I see is a man who sat there for six hours and tried to tell you his life, how he was

safe in what he did. And what Mr. Singer wants to tell you is that he got that gun and didn't fire it for ten months, and he wants you to believe that couldn't be true. Why couldn't that be true?

Why couldn't he have left that gun and waited until he uses it in the season he wanted to use it in? Why does he make a big deal about the range rod? One, because we can't find the range rod, along with the other pieces that were at the explosion. We didn't take possession of it, the Boone County Sheriff took possession of the gun and pieces out there. We got back what they gave us. We can't help that.

He told you he had a long rod because they have different size barrels, and he didn't want to put a mark on it. Blake had only been with him one time, that day, to see it. What Blake might have seen and what he might have understood changed just like that when he starts wrapping a towel around J.D.'s face because he doesn't know what he sees from that explosion.

I submit to you, ladies and gentlemen, the evidence is fairly clear. I submit to you that there is no way on God's green earth that you could believe that that man created 97,000 psi in that barrel and is still together. Scientifically impossible. That barrel would swell, or rupture, or fall apart, blow up in pieces. I can't figure out how many black Pyrodex pellets I'd have to put in the barrel to create that kind of

pressure. I'm not sure you can put that many pieces of Pyrodex in there.

The point is it was premeasured, preloaded, and he did what they told him to do. The point is he told you he read their manual. The point is this manual, their manual, doesn't tell him to take the breech plug out. It says to take your range rod, run a dry patch through it, pull it out, and check it. Read their manual. That's what it says.

The problem is everybody thinks they knew what happened that day, and the person who does know what happened is sitting right in that chair. He's the one who can't smell, he's the one that can't taste, he's the one whose hand doesn't work, he's the one whose head is numb, he's the one whose nose doesn't work and he can't breathe.

I submit to you you've heard a lot in the last few days. You've heard Dr. Tipton, you've heard Mr. Roane, you've heard Dr. Bruchey, you've heard Dr. Schmidt who came in here and only noticed things that Dr. Schmidt does.

I've been accused of destroying evidence and my expert has been accused of destroying evidence and my client has been accused of playing with guns. My client has been accused of being unsafe, and my client has been accused of not bringing any evidence into this courtroom. Take the gun, run your finger over it, and you'll feel the threads that aren't there.

How do you put a value on the inability to smell? How

do you put a value on the inability to taste? How do you do that? There's almost 40 years of his life left, according to the Judge. I'm not very good with math. That's 50,000 meals he doesn't get to taste, 50,000 possible meals he doesn't get to taste, he doesn't get to smell, he doesn't get to do anything but try to remember what he should do with them.

I suggest if you have a cold for a week, you understand what happens when you lose the ability to smell or taste, and you miss that certain psychological craving, the ability to taste chocolate, or maybe have ice cream with apple pie, or whatever that craving may be. And he can't satisfy that craving because he can't taste it. Nobody in this room has ever gotten up not once in the middle of the night, maybe twice, and ripped through that cabinet looking for something to satisfy that craving? And he can't do it.

Ladies and gentlemen, we submit to you, we ask you to consider those damages in light of all the evidence and render a verdict in excess of seven figures. How do you say that and not turn you off? I don't know. I know 50,000 meals will have come and gone, if he lives his life expectancy, and he'll never get to taste again. I know if somebody would have checked that weapon properly we wouldn't be here today. That's the proof that's before you.

We appreciate your time, your attention, and please take a moment to look at those exhibits when you go back to the

jury room.

THE COURT: Members of the jury, as I told you, there are two more instructions I'll give you before you retire to begin your deliberations, and these will be those instructions. Instruction No. 22.

(Jury instructions were read in open court.)

THE COURT: Members of the jury, the case is now submitted to you. Copies of the instructions and the verdict form will be brought in to you shortly. It will take awhile to get the exhibits together, but those also will be brought in to you in a few moment's time.

Now you can take your notes with you at this time, and if you will go with the Court Security Officer, you can begin your deliberations. Thank you.

(The jury retires to deliberate at 3:40 p.m.)

(In open court, out of the presence of the jury.)

THE COURT: Where are the pellets and the bullets of the gun?

MR. SPARKS: They're right here, Judge (indicating).

THE COURT: They're right--

MR. SPARKS: In that box with the gun. We'll take them out.

THE COURT: If you'll take them out and give them to--why don't you give them to Deb here first.

MR. SPARKS: You want the bullets out, too, Judge?

THE COURT: Yes, bullets, pellets; projectiles and explosives.

Gentlemen, it's been a pleasure.

MR. SINGER: Thank you, Your Honor.

MR. SPARKS: Thank you, Your Honor.

THE COURT: Good luck to you all.

Thank you, Mr. Katzenmeier, our friends from Spain, and Mr. McGarity.

(Recess at 3:45 p.m., until 2 p.m., Friday, December 12, 2008.)

C E R T I F I C A T E

I, the undersigned, a Certified Shorthand Reporter of the State of Iowa, do hereby certify that I acted as the official court reporter at the hearing in the above-entitled matter at the time and place indicated;

That I took in shorthand all of the proceedings had at the said time and place and that said shorthand notes were reduced to typewriting under my direction and supervision, and that the foregoing typewritten pages are a full and complete transcript of the shorthand notes so taken.

Dated at Des Moines, Iowa, this 27th day of February, 2009.

/s/ Theresa Kenkel
CERTIFIED SHORTHAND REPORTER